1

DC9TJAC1

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   NOEL JACKSON-GUZMAN,
3
4                    Plaintiff,
4
5          v.                          10 CV 6353 (ALC)
5
6   P.O. BRIAN JAY,
6   Shield No. 29733, Individually
7   and in his Official Capacity,
7
8                    Defendant.
8
9   ------------------------------x
9                                      New York, N.Y.
10                                     December 9, 2013
10                                     9:15 a.m.
11
11  Before:
12
12                    HON. ANDREW L. CARTER, JR.,
13
13                                     District Judge
14
14                         APPEARANCES
15
15  JON NORINSBERG
16  JOHN MEEHAN
16  KATHERINE SMITH
17       Attorneys for Plaintiff
17
18  NEW YORK CITY LAW DEPARTMENT
18  OFFICE OF CORPORATION COUNSEL
19       Attorneys for Defendant
19  BY:  MORGAN KUNZ
20       MATTHEW MODAFFERI
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TJAC1

```
 1                (In open court, jury panel not present)
 2                (Case called)
 3                THE COURT:  Good morning.  Anything that we need to
 4   address?
 5                MR. KUNZ:  Yes, your Honor, we have several issues.
 6   On Friday afternoon the plaintiffs delivered a copy of an
 7   exhibit binder to our offices, and it has different exhibits
 8   that were not included in the joint pretrial order, and we have
 9   a couple of problems with two of them.
10                The first one is it has some patrol guide provisions,
11   use of force patrol guide provisions, pepper spray patrol guide
12   provisions.  It's our position to those documents are not
13   relevant, would be confusing and prejudicial, and because the
14   they were never disclosed on the joint PTO, they should be
15   excluded.
16                I will be happy to talk more about it, but that's our
17   position.
18                THE COURT:  Plaintiff?
19                MR. NORINSBERG:  These are not documents that we're
20   planning on introducing, they're only for impeachment.  They
21   may not be used at all, it just depends how the officer
22   testifies.
23                THE COURT:  OK.  Do the defendants still have an
24   objection?
25                MR. KUNZ:  As long as they're not used, we obviously
```

3

DC9TJAC1

1 have no objection, but the standard in this case is obviously
2 the 4th Amendment, as you're going to instruct the jury. And
3 if the jury learns about patrol guide provisions which set a
4 different standard than your Honor will instruct the jury on,
5 it would be very confusing for the jury to compare both your
6 instructions on the law with the patrol guide provisions. So
7 we just don't think there would be any possibility that they
8 could be used for impeachment since they could never be asked
9 about. The city is not a defendant, your Honor, so there's no
10 policy question here.
11         Then as the very last thing on a related issue, the
12 particular patrol guide provisions that the plaintiff has is
13 from 2000, and at least one of them I know for a fact has
14 changed since 2000, and this incident was in 2009, so I don't
15 think they could use old patrol guide provisions for any
16 probative value whatsoever.
17         THE COURT: Plaintiffs have indicated only plan to use
18 this for impeachment?
19         MR. NORINSBERG: That's correct, your Honor. And the
20 officers have given certain testimony relating to their
21 understanding of what rules were in play at the time, and they
22 were asked these questions at the deposition. And if they
23 testify consistent to what they said in their depositions, it
24 would never even come up. If it does come up, it's a very
25 minor part of our case, so I really don't think that this is an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

DC9TJAC1

1   issue at all.  Routinely in cases involving excessive force,
2   patrol guide regulations are a part of the examination.  This
3   is not a big issue in this case at all.
4               THE COURT:  What is this material to?
5               MR. NORINSBERG:  What's that?
6               THE COURT:  Where is the section of the deposition
7   that you're referring to?
8               MR. NORINSBERG:  I don't have it by page number.
9   Basically they testified about what circumstances you could
10  pepper spray and what circumstances you can use force, and it's
11  very general information.  The materials that we are using are
12  part of the CCRB file given to us by the defendant, so this is
13  not a great surprise.  These are actual sections of the patrol
14  guide were used by the CCRB in their evaluation.
15              THE COURT:  OK.  Putting aside the CCRB, what is
16  your -- what is essentially your argument to the jury about
17  this?  Assuming that they -- again, I don't want you to give
18  away your trial strategy, but I guess I'm trying to get a sense
19  of what the relevance of this would be.
20              Let's assume that the questions are going to center
21  around the officer not following the patrol guide in terms of
22  using pepper spray and the officer didn't follow the patrol
23  guide in terms of using force in this case, what is it that you
24  wish me to instruct the jury on regarding that?  What is it
25  that you wish to say to this jury?  Assuming that that's the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TJAC1

1  testimony that you have, that sort of testimony that the
2  officer didn't follow the patrol guide, you're going to say the
3  officer didn't follow the patrol guide and therefore that means
4  what?
5          MR. NORINSBERG:  The motive to fabricate, basically,
6  violating the rules and knowing that you violated the rules is
7  a motive to lie about what happened.
8          THE COURT:  Wait a minute.  But if the questions are
9  going to be concerned around the officer admitting that he --
10  well, hold on.  Is the officer here?
11          THE DEFENDANT:  Yes, your Honor.
12          THE COURT:  Let's have the officer excused when we
13  have this discussion.
14          MR. MEEHAN:  Your Honor, we also ask that Officer Diaz
15  be excused as well.
16          MR. KUNZ:  Officer Diaz is not here, your Honor.
17          MR. MEEHAN:  My apologies, your Honor.
18          THE COURT:  If the questions are going to be something
19  to the effect of, Officer, you didn't follow the patrol guide,
20  if the officer admits that he didn't follow the patrol guide,
21  how does that give him a motive to lie about something?
22          MR. NORINSBERG:  Basically he's on the hook if he does
23  something, he's violating a rule that he's supposed to follow.
24  He knows he's not supposed to do it, so he has a motive to
25  fabricate, to lie about what happened so he doesn't get in any

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

6

DC9TJAC1

1  type of trouble for violating the rule.  He knows what his
2  obligations are.
3            For example, if you're spraying somebody in the face
4  when they're already completely subdued, there's no reason to
5  spray them in the face.  You know you're not supposed to do
6  that because that's the way the rule makes it clear.  You're
7  not supposed to do it unless you absolutely need to use pepper
8  spray in that situation.  So the point being he knows it's a
9  violation, he has a reason to lie about it, and denies doing
10 what we're accusing him of doing.
11           THE COURT:  I guess I misunderstood your initial point
12 then.  It seems these questions are going to be designed to
13 bring out from the officer testimony where the officer
14 acknowledges or the officer testifies that he did follow the
15 patrol guide or he did certain actions.  And your questions are
16 going to be along the lines of saying well, you're basically
17 saying that because the patrol guide says you have to do that,
18 and that's why you're saying that?
19           Because I thought -- my understanding is I thought you
20 were going to say the officer was going to admit to not
21 following the patrol guide.
22           MR. NORINSBERG:  No, just the opposite.  What you just
23 said is what we're planning on doing.
24           THE COURT:  So what's the defendant's objection if the
25 basically the plaintiff wants to bring out from the officer

DC9TJAC1

1  that the officer followed the patrol guide, the defendants
2  objection is what?
3           MR. KUNZ:  Well, I guess, your Honor, our objection --
4  we have some case law that we brought with us that we could
5  pass up, but it's the 4th Amendment rules in this courtroom,
6  and your Honor is going to instruct the jury on constitutional
7  standards for use of force, which covers both the force and the
8  pepper spray.
9           So the city standards, as laid out in the patrol
10 guide, the minimal -- the officers should use the minimal
11 amount of force necessary is not the standard that the jury is
12 going to be looking at Officer Jay's actions for.  So the jury
13 is going to get very confused and they're going to think if
14 there's a slight technical violation of the patrol guide as
15 suggested by plaintiff, there is a violation of the 4th
16 Amendment.
17          So the case that we have is out of the Eastern
18 District, it's Harold Edwards v. The City of New York, 2011
19 U.S. District, Lexis 75300.  And in that case the judge
20 excluded the patrol guide provisions as unduly confusing and
21 unduly prejudicial.
22          So that's the heart of our argument, but as a related
23 issue, the fact that it was never disclosed in the original
24 JPTO puts us at a disadvantage.  We didn't discover the intent
25 to use these until Friday afternoon.  We certainly would have

DC9TJAC1

1   moved in limine had they been on the JPTO.
2           THE COURT:  Let me ask you this, if the plaintiffs --
3   the plaintiffs are indicating, as I understand from what
4   plaintiff's counsel are saying, plaintiffs are not going to be
5   eliciting any testimony from the officer in which the officer
6   is going to be acknowledging that he violated any provision in
7   the patrol guide.
8           Is that correct, plaintiff's counsel?
9           MR. NORINSBERG:  That's correct.
10          THE COURT:  So if the jury is instructed clearly that
11   the 4th Amendment is the floor, and perhaps the patrol guide is
12   the ceiling, and if the officer's allegiance to the law is up
13   to the ceiling, he certainly satisfied the floor, how are you
14   prejudiced by that?
15          MR. KUNZ:  Your Honor, I believe the question itself
16   that would lead to the impeachment would be properly excluded.
17   So if Officer Jay is on the stand and Mr. Norinsberg says to
18   him isn't it true that the New York City patrol guide requires
19   that an officer only use pepper spray under X circumstance,
20   that question itself should never be -- should not be asked and
21   answered.  It's our position that he can ask the witness what
22   he did, why he did it, and those sorts of questions, but we do
23   not think he should be allowed to bring up internal city
24   policies in regard to the use of force for the 403 issue.
25          And it's not just the prejudice, it's jury confusion.

DC9TJAC1

1  We're very concerned that the jury would think that when
2  Mr. Norinsberg implies that the officer did not follow the
3  patrol guide that they would get confused, and I think that
4  sets the standard.  So we would object to even a question
5  itself, and I'm not even sure how Mr. Norinsberg would craft a
6  question that wouldn't be objectionable.
7          THE COURT:  OK.  I'll reserve on that.  I will wait
8  and see.  Any other issues?
9          MR. KUNZ:  Yes, also included in the exhibits were
10  some demonstratives.  I can show it to your Honor.  Do you have
11  a copy of the plaintiff's exhibits?
12          THE COURT:  No.
13          MR. KUNZ:  It's Exhibit 28.  27 and 28, but 28 is the
14  one we're most concerned about it.
15          THE COURT:  OK.
16          MR. KUNZ:  So it's not really clear what relevance
17  these documents would have.  So for example, this appears to be
18  a step-by-step diagram of how the surgery that Mr. Guzman
19  received went, and we just don't see how this is possibly of
20  any relevance.  This isn't a medical malpractice case or a
21  products liability case.  We don't see how using these sorts of
22  photos with Dr. Dassa would add to any possible relevance to
23  the jury, and quite frankly, we think that there is the
24  possibility that it would inflame the jury.  If you look at the
25  second page, it's the knee is wide open, and I think these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TJAC1

 1  sorts of exhibits would only be used to inflame sympathy for
 2  Mr. Guzman, and we think they should be excluded for that
 3  reason.
 4          MR. NORINSBERG:  Your Honor, these are just classic
 5  demonstrative evidence.  They're here to help the jury
 6  understand what the procedures were that Mr. Guzman underwent.
 7  The doctor will testify that they are fair and accurate.  The
 8  doctor would also testify that it's going to assist him to
 9  explain to the jury the actual procedures that Mr. Guzman
10  underwent.  So I'm really somewhat at a loss to this objection.
11  This is something that any time you have an injury case you
12  have demonstrative evidence.  There's nothing unusual about
13  this at all.  This is a surgical storyboard to explain what
14  happened basically medically.
15          THE COURT:  And when was that turned over?
16          MR. KUNZ:  Friday at 4:45 p.m.
17          MR. NORINSBERG:  Just to be clear, we got the
18  defendant's exhibits on Friday also and got a new exhibit.  So
19  the suggestion we did something unusual is unfair.
20          But basically these documents are not -- these are not
21  documents that are evidence in the sense of what we normally
22  talk about police records and so forth, these are demonstrative
23  evidence.  They're there to assist the jury in understanding
24  the nature and extent of the injury.
25          THE COURT:  These documents don't seem to go directly

DC9TJAC1
1   and specifically to the jury as much as to the surgery,
2   correct?
3           MR. NORINSBERG:  Well, the second one, 28, is the
4   surgery, and 27 is explaining what exactly what foot drop
5   condition is and what ligaments and nerves are involved.
6           MR. KUNZ:  Your Honor, 27 we don't have a huge problem
7   with.  I think it make sense to use a demonstrative to show the
8   jury where these nerves are and where the ligaments are, that's
9   fine, it's really 28 that we have a problem with.
10          And just two other small issues here, Dr. Dassa did
11  not perform the surgery.  And secondly, we're not a hundred
12  percent convinced these are totally accurate, so we think there
13  are some problems in using them in that regard as well.
14          MR. NORINSBERG:  With regard to that, if their expert
15  feels they're in any way inaccurate, then their expert can say.
16  That goes to weight, not admissibility.
17          The other thing is it's extraordinarily rare where the
18  actual surgeon comes in.  It's always an orthopedic doctor
19  testifying about his review of surgical records and what
20  happened, and he certainly has an understanding of what
21  happened and he wants to explain it to the jury, but he wants
22  to explain it in a way that will help the jury understand
23  exactly what took place.  And that's all these records are.
24  I'm sure that we could have an instruction from the Court
25  explaining that these are there for demonstrative purposes to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DC9TJAC1

1  help the jury understand what the surgery is, and that's all
2  they're there for.
3          THE COURT:  OK.  We'll keep 28 out.  I think the
4  probative value is outweighed -- substantially outweighed by
5  the prejudicial nature of it, so 28 will be out.  We won't put
6  that in.
7          What other issues are there?
8          MR. KUNZ:  The last issue -- sorry, a couple of small
9  issues.  Also included in the binder were some transcripts of
10 CCRB interviews that the officers gave.  We have no problem
11 with the plaintiffs using those for impeachment, we just don't
12 want any mention of the CCRB, and I just ask that plaintiff
13 would agree to that, saying you previously testified in this
14 case as opposed to when you testified in the CCRB.
15         MR. NORINSBERG:  I don't feel that's going to be
16 possible.  The fact is he made statements to investigators who
17 were investigating a complaint.  It's part of our theory of the
18 case here.  I don't see any damage to it.  We're not talking
19 about what the results were of the investigation, we're not
20 talking about any findings, we're talking simply about the fact
21 that he was interviewed by investigators relating to this
22 incident and he gave statements.
23         THE COURT:  Why can't you just say investigators
24 related to this issue without mentioning CCRB?
25         MR. NORINSBERG:  I suppose that's it, he told

DC9TJAC1

1   investigators, but I mean I just -- it's going to be cumbersome
2   if we do have to impeach someone, you gave this interview and
3   gave your first interview to investigators, to keep saying that
4   as opposed to you told the CCRB.  I don't see -- why is it
5   prejudicial?  It's a fact.  It was an agency that did an
6   investigation.
7            THE COURT:  What is the relevance of this
8   investigation, the CCRB investigation, to this case?
9            MR. NORINSBERG:  It just helps the jury understand
10   that the statements were made prior to the lawsuit.  These were
11   made at a different time.
12            THE COURT:  OK, using the pure adverbial approach to
13   this, that's a "when" question, why does the "who" that you
14   raised matter?
15            MR. NORINSBERG:  It doesn't matter in terms of the
16   lawsuit, it matters in terms of being able to ask questions in
17   a fluid manner and quickly as opposed to having to reconstruct
18   the questions that I already worked on every time that I want
19   to use a reference to it.  It's cumbersome and there's no
20   reason for it.
21            THE COURT:  Why is it cumbersome to use less words,
22   not more?
23            MR. NORINSBERG:  The less words is you told CCRB, as
24   opposed to after this incident you were interviewed, and in the
25   interview you gave a statement, and you told investigators.

DC9TJAC1
```
 1   Why do I have to go through all that?
 2              THE COURT:  OK.  That defense motion in limine is
 3   granted.  Let's not mention the CCRB.  You can talk about prior
 4   investigations and things like that, but let's not mention the
 5   CCRB.
 6              What other issues do we have?
 7              MR. KUNZ:  Sorry, your Honor.  Also included in the
 8   trial binder are two sets of MRI film from May 2009 and
 9   April 2010.  We anticipate that the plaintiff is going to
10   cross-examine our expert and imply that our expert never
11   reviewed that film.  And there were questions to that extent at
12   his deposition.  We just received the film from the plaintiff
13   on Friday, and the certificates that came along with it about
14   authenticity state that the plaintiffs had it since
15   November 14.  So we don't believe they can withhold MRI film
16   from our doctor and then try to impeach him with evidence that
17   they had in their possession.
18              So we just want -- we're fine with allowing the MRI
19   film to come in because we think it will help the jury
20   understand what is going on here, but we don't want the
21   plaintiff to be able to impeach our expert by implying that he
22   never reviewed something which plaintiff withheld.
23              THE COURT:  Which exhibit is this?
24              MR. KUNZ:  This is going to be Exhibits 23 and 24.
25              MR. NORINSBERG:  Your Honor, these films were taken
```

DC9TJAC1

1    five years ago.  They absolutely had access.  We gave them
2    authorizations.  If they didn't feel like getting these films,
3    that's their business.
4            The doctor admitted that he basically wasn't even
5    aware of it.  And they were aware of it, they didn't tell their
6    own doctor.  He formed opinions in this case relating to what
7    was there and what wasn't there.
8            So it's our view they had five years to get this, we
9    gave them authorizations.  If they didn't do it on their own,
10   that's their problem, not our problem.  There are lots of
11   things it turned out he didn't look at, so it's really unfair
12   to put any limitation on that.  It's not our burden for us to
13   do that for their expert.
14           MR. KUNZ:  But it is their burden, they have Rule 26
15   obligations.
16           THE COURT:  Hold on, one at a time.
17           MR. NORINSBERG:  We gave them authorizations for the
18   films.  We gave them the actual reports.  They have had these
19   reports for five years.  I mean this is not new information.
20   Everything that is on the report is in the MRI and vice versa.
21   There's nothing new at all.  All it is is an actual film that
22   somebody could testify about in court.
23           THE COURT:  Let me hear from defense counsel again.
24   What is it that you're truly objecting to?  You're objecting to
25   plaintiff's counsel implying that your expert neglected to look

DC9TJAC1

```
1   at these MRIs?  Is that essentially what we're talking about?
2             MR. KUNZ:  That's essentially what we're talking
3   about.  And I point out not only does the plaintiff have
4   Rule 26 obligations to turn over documents that they're going
5   to use to support a claim, but we also have interrogatory
6   requests that were submitted in this case which we asked for
7   and require production of documents that are in their
8   possession.  So they had these documents as of November 14 and
9   then withheld them for two weeks until after Dr. Gidumal's
10  deposition.  They set up this impeachment and created this
11  impeachment and they shouldn't be able do that.
12            MR. NORINSBERG:  This is really -- honestly it's
13  offensive, the term "withholding."  We withheld nothing.  We
14  have given them an entire book of our exhibits.  We had no
15  idea -- I assumed they actually had films.  I can't even
16  believe I'm hearing this, that a lawyer representing a client
17  would not try to get the films at some point to his expert,
18  and/or more importantly that his expert wouldn't say:  Where
19  are the films?
20            These are references in my expert's report from three
21  years ago.  My expert said he reviewed the films in the 2010
22  MRI.  If they had any problem that they didn't have it, they
23  should have told us.
24            THE COURT:  This has a practical solution.  The
25  defendant's expert is an expert.  How long would it take the
```

17

DC9TJAC1
1    defendant to look at these MRIs?
2              MR. KUNZ:  We had him look at them over the weekend at
3    a cost to us.  That's why we're not going to object to them
4    being used generally, but we just don't want Mr. Norinsberg to
5    be able to imply that he should have looked at them sooner I
6    guess is the point here.
7              If he's had them since 2010 to show to his retained
8    expert, it boggles my mind why he didn't produce them to us
9    earlier.  I don't understand what is going on here.  And also
10   the certifications that go with these records state they came
11   in November 2013.
12             THE COURT:  OK.  Is plaintiff's counsel intending
13   on -- does the defense have an objection to the MRIs?  The
14   defense expert has seen the MRIs.  You can cross-examine the
15   defendant's expert about the opinions regarding the MRIs.
16             Plaintiff's counsel, are you planning on trying to
17   suggest that the defendant's expert was somehow delinquent by
18   not looking at the MRI's earlier?  Is that what you're planning
19   on doing?
20             MR. NORINSBERG:  There is a part of our complaint that
21   he formed certain opinions without looking at adequate
22   information.  He didn't look at certain films.  He didn't look
23   at records.  He locked himself into opinions, and now he's
24   going to tell the jury how it doesn't matter looking at these
25   films, everything is exactly what he thought it was.  But he
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TJAC1

1  did this not just with these MRIs but a whole bunch of other
2  things he did in this case like this.  And that is part of our
3  tack, and I don't understand why that's not fair
4  cross-examination.  If an expert reaches certain conclusions
5  and he doesn't have an adequate foundation on which to reach
6  those conclusions, that's fair game for cross-examination.
7            THE COURT:  I will reserve on that and see how the
8  examination of the expert goes.
9            What other issues are there?
10            MR. MODAFFERI:  Judge, we have no further substantive
11  issues, we just received from the deputy a copy of the juror
12  questionnaire, and we just wanted to make sure that this would
13  not be -- these would not be the only questions that are asked
14  of the jury, because we would have a few more that we would
15  request that your Honor would ask any potential jurors.
16            THE COURT:  OK.  Like what?
17            MR. MODAFFERI:  In our proposed voir dire we had
18  questions concerning have you ever brought a lawsuit or --
19            THE COURT:  OK.  All of those things -- what we'll do
20  is I will conduct the majority of the voir dire.  I have a lot
21  of other questions that will be asked of the jury before that
22  questionnaire.  That questionnaire is primarily for the juror's
23  personal information after I have given the jury some
24  preliminary instructions and asked them some general questions
25  about their ability to be fair and impartial.  And following

DC9TJAC1
```
 1    that, I will have a side bar with the lawyers to see if there
 2    are any additional challenge for cause, and after we have dealt
 3    with those challenges for cause, then the jurors will go
 4    through the questionnaire verbally.
 5              They will not read the question, they will just answer
 6    the questionnaire to help the lawyers in exercising their
 7    peremptory challenges.  So that he questionnaire comes at the
 8    end after I asked them some other general questions about
 9    whether or not they have been involved in similar incidents and
10    any dealings with the police or anything of that nature, any
11    law enforcement people in their family or close friends who are
12    in law enforcement, those issues, issues with any medical
13    things, those will be talked about.
14              MR. MODAFFERI:  Great, thank you.
15              MR. NORINSBERG:  One issue, the Court has already
16    ruled on the fact that plaintiff's statement in the Harlem
17    Hospital records will be coming in this trial for a limited
18    purpose.  I would like to be able to make a reference in my
19    opening statement when I'm talking about the statement that
20    they're claiming he made to EMT Smith to make it clear that
21    there was this subsequent statement.  I don't want to run afoul
22    of the Court's ruling, but because defendants will obviously be
23    opening on this in their opening, this statement to EMT Smith,
24    I would like to, in that same context in my opening, mention
25    the fact a few hours later the statement that he made to Harlem
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TJAC1

1  Hospital.  So I want to raise that while I'm opening and don't
2  want to run afoul of the Court's ruling in any way.
3              THE COURT:  OK.  Defense have an objection?
4              MR. MODAFFERI:  No objection.
5              THE COURT:  I looked at this a little more.  Again,
6  that statement should come in before this jury.  It's still
7  remains to be seen in my mind as to whether or not a limiting
8  instruction would be appropriate for this statement.  If this
9  is truly a traditional prior consistent statement being
10 introduced to rebut the charge of recent fabrication and
11 improper motive, than under 801(d) the statement can be
12 admitted for the truth of the matter asserted.  If it is being
13 introduced purely to rehabilitate a witness who has been
14 impeached, then a limiting instruction would be appropriate.
15             So I'm going to tell the parties what I'm thinking in
16 terms of this.  The statement can come in.  Plaintiff's counsel
17 can make the statement in the opening statement.  I'm going to
18 hold off giving any sort of limiting instruction until we get
19 to the end of the case, perhaps, and see whether or not it's
20 appropriate to give a limiting instruction depending on how
21 things go to see if this is really a traditional sort of prior
22 consistent statement, at which point, it could go in for the
23 truth of the matter stated, or whether or not a limiting
24 instruction should be given to the jury to the effect that the
25 statement is being offered essentially for the fact that it was

21

DC9TJAC1

1   said but can't be used as substantive evidence of what was
2   said.
3            Parties have any position on that?
4            MR. NORINSBERG:  Well, your Honor, our view is that it
5   does meet the criteria as a prior consistent statement, and
6   eventually the Court probably will rule that it can be admitted
7   for its truth without any restrictions, but we agree that the
8   evidence should first come in and then we can revisit the issue
9   on that.
10           THE COURT:  OK.  That's why I don't want to give a
11  limiting instruction first.  I want hold off on that and see
12  what happens.
13           Anything else that we need to do today?
14           MR. MODAFFERI:  Not from the defense.
15           THE COURT:  So from plaintiff's counsel?
16           MR. NORINSBERG:  Nothing from plaintiff.
17           THE COURT:  So we're going to pick nine jurors.  The
18  jury department tells us that we have should have our jurors
19  hopefully by or before 10:30.  Seems we're running a little
20  late with the weather and these other trials going on at the
21  same time.
22           So we'll put 15 jurors in the box.  Each side has
23  three challenges.  You can strike any order you want to, use
24  appropriate challenges on any of the qualified jurors one
25  through fifteen, and the nine that are remaining would be our

DC9TJAC1

1    jury.
2              Anything else we need to deal with?  And let me make
3    sure that we're still on the same page, how short is
4    plaintiff's counsel's opening?
5              MR. NORINSBERG:  It's a little longer than before,
6    it's probably going to be 25 minutes, maybe.
7              THE COURT:  All right.
8              MR. NORINSBERG:  It might be a little -- I'm trying to
9    time it out, but there is a lot to cover.
10             THE COURT:  Defense counsel?
11             MR. MODAFFERI:  Roughly 15 minutes.
12             THE COURT:  OK.  And then my introduction of the
13   parties and introduction of the case.  I know this was an issue
14   about how defense counsel is going to be referenced in this
15   case.  What I intend on saying to the jury regarding the
16   defendant is defendant is represented by attorneys from the
17   corporation counsel because he is a member of the New York City
18   Police Department, which is an agency of the City of New York,
19   then the attorneys are Morgan Kunz and Matthew Modafferi.
20             Any objection by the defense?
21             MR. KUNZ:  No, your Honor.
22             THE COURT:  Any objection by plaintiff?
23             MR. NORINSBERG:  No, your Honor.
24             THE COURT:  All right.  So then let me just get a
25   sense of how -- which witnesses are here today?

23

DC9TJAC1

```
 1              MR. KUNZ:  The defendant Brian Jay is here and Officer
 2     Johnny Diaz will be available this afternoon.
 3              THE COURT:  OK.  And let me ask Officer Jay to step
 4     outside again, please.  Is Officer Diaz here?
 5              MR. KUNZ:  He's not here now, no.  I believe the
 6     gentlemen that there was confusion over before is another
 7     attorney from our office, not Johnny Diaz.
 8              THE COURT:  That's fine.  Let me get a sense from
 9     plaintiff's counsel as to how short you believe your
10     examination of Officer Jay will be.
11              MR. NORINSBERG:  It's not that short, it's probably
12     going to be two hours and it might be less.  It might be a
13     little longer depending on whether the answers go the way I
14     expect them to.
15              THE COURT:  OK.  And defense counsel?
16              MR. KUNZ:  Depending on how much ground is covered, 45
17     minutes, an hour.
18              THE COURT:  All right.  So let do this, let's -- I
19     understand this is a main witness in this case from plaintiff's
20     perspective, and from the defendant's perspective, at least,
21     this is short witness.
22              I will go ahead and give plaintiff's counsel two hours
23     for this examination of Officer Jay.  Obviously if things are
24     moving along, I will give you some more leeway, and I will
25     be -- I won't be a miser about that, but I want to make sure
```

24

DC9TJAC1

1   that things get moving and stay moving.  And I'll give defense
2   counsel 45 minutes for their examination of Officer Jay.  And
3   again, I will be lenient with that as long as things are
4   moving, but I found in my experience if I don't put time
5   constraints on lawyers they tend to talk for a very long time.
6           So just sit tight, and my deputy will notify me as
7   soon as the jurors get here.
8           And anything else we need to deal with?  I got the
9   witness list.  I don't think there's anything else.  I will see
10  the parties soon.
11          (Jury selection conducted off the record)
12          (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

DCP3GUZ2

```
 1                (Ms. Spina present)
 2                THE COURT:  Have a seat.  Do you recognize anyone in
 3      the courtroom?
 4                MS. SPINA:  Can I go by face?  Yeah.
 5                THE COURT:  Who do you think you recognize?
 6                MS. SPINA:  The group of people in the back.
 7                THE COURT:  The three people in the back?
 8                MS. SPINA:  Yeah.  I know.
 9                THE COURT:  Where do you think you recognize them
10      from?
11                MS. SPINA:  From church, maybe, or my town, maybe.
12                THE COURT:  Your church or your town?
13                MS. SPINA:  Yeah, I think.  I just want to let you
14      know just in case.
15                THE COURT:  Do you have a belief as to who those
16      people are?
17                MS. SPINA:  No.
18                THE COURT:  Do you have any belief as to what their
19      relationship is to this case, if any?
20                MS. SPINA:  Maybe related to one of the people in the
21      front.
22                THE COURT:  What's that?
23                MS. SPINA:  I don't know anybody who is in front of --
24      I know you mentioned their names.
25                THE COURT:  You think maybe related to the people in
```

DCP3GUZ2

```
 1   the front?  Okay.  Is there anything about -- how often do you
 2   think you've seen these people before?
 3            MS. SPINA:  Pretty often.  If -- I go to church
 4   religiously, so I've seen them, I think.
 5            THE COURT:  Is there anything about your seeing them
 6   frequently that would make it difficult for you to be fair and
 7   impartial in this case?
 8            MS. SPINA:  No, not me personally, no.  But -- no.
 9            THE COURT:  Okay.  Thank you.  I'll ask my deputy to
10   escort you outside.
11            (Ms. Spina not present)
12            THE COURT:  Any follow-up questions counsel want to
13   ask?
14            MR. NORINSBERG:  Just she's in Westchester, and I
15   believe our clients are not anywhere near there.  I feel it is
16   very unlikely she actually knows these people.  So if she does
17   know them, she's only saying she recognizes them by face, not
18   that they know each other.  I don't have any follow-up
19   questions, but I don't really feel like anything we've just
20   discovered would in any way disqualify this juror.
21            MR. KUNZ:  A couple of issues.  First, that if she
22   feels she knows them, we're prejudiced the same.  It doesn't
23   matter if she actually does, because she might get in the jury
24   room and feel if she rules against the plaintiff, that it will
25   negatively affect her standing in the church.  So I feel like
```

27

DCP3GUZ2

1   there is going to be this overarching concern that she has.  So
2   even though she says she can be fair and impartial, that's
3   certainly on our mind.
4           And the other issue is that we obviously didn't know
5   this when we did our peremptory strikes.  So we weren't able to
6   consider whether or not we should remove her from the jury.
7   And based on all that, I think the simplest course here is to
8   proceed with eight.  That's what the federal rules typically --
9   it is the typical number in these juries.  And I just feel like
10  that's what needs to happen in this case.
11          THE COURT:  Let me ask this.  What is the parties'
12  position on either counsel or the Court conducting some sort of
13  brief investigation to see if these individuals know her.  It
14  may be that she's just mistaken.  Do you think it make sense to
15  find out the name of the church that she goes to and then
16  conduct an inquiry either of the three individuals in the
17  courtroom, they can be sworn and they can testify?  How does
18  that sound as an initial matter?
19          MR. KUNZ:  Assuming we do that and it turns out that
20  they go to different churches.  Do we then tell the juror, no,
21  you do not know them?
22          THE COURT:  I would think that might make sense, yes.
23  I think it would be appropriate to say -- I don't have to say
24  affirmatively you don't know them, but I could say these people
25  go to a different church or they don't go to your church, these

DCP3GUZ2

```
 1   people don't live in your neighborhood.
 2              MR. KUNZ:  That would work for us.
 3              THE COURT:  Let's ask Ms. Spina to come in again and
 4   let me just get the name of the church.  I guess in an
 5   abundance of caution we should ask the three potential
 6   witnesses to step out while we do this.  Okay.
 7              (Ms. Spina present; audience members leave)
 8              THE COURT:  Ms. Spina, I just had some questions.
 9   Because New York is a big place I want to make sure we're
10   talking about the right people.  What is the name of the church
11   that you attend?
12              MS. SPINA:  I go to both St. Francis and St. Mary's.
13   Mount Kisco and in Katonah.
14              THE COURT:  St. Francis is where?
15              MS. SPINA:  Mount Kisco.
16              THE COURT:  What street is it on?  Or what area?
17              MS. SPINA:  Main Street.  I really don't know.
18              THE COURT:  What about St. Mary's?
19              MS. SPINA:  St. Mary's is on Valley Road in Katonah.
20              THE COURT:  Katonah on Valley Road.  The neighborhood
21   you live in generally is where?
22              MS. SPINA:  Bedford Hills, Bedford, Town of Bedford.
23              THE COURT:  Again, you indicated you believe you know
24   them from church.
25              MS. SPINA:  I mean, know them in face.  I don't know
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2

```
 1    them personally.
 2               THE COURT:  Do you think you might have seen them
 3    anywhere else or only at church?
 4               MS. SPINA:  I honestly -- but I've seen them.
 5               THE COURT:  What?
 6               MS. SPINA:  I've seen the faces.
 7               THE COURT:  You think you've seen the faces.
 8               MS. SPINA:  I'm almost sure I've seen the faces.
 9    Where, I don't know.  I'll find out someday.
10               THE COURT:  Okay.  You live in Bedford Hills and where
11    do you work?
12               MS. SPINA:  I work at Dell Services.  But I'm based at
13    Phelps Memorial Hospital in Sleepy Hollow.
14               THE COURT:  Generally, what are your hours of work?
15               MS. SPINA:  9 to 5 or 8 to 4.
16               THE COURT:  When you go to the hospital, do you take
17    public transportation?
18               MS. SPINA:  No, I drive.  I drive.
19               THE COURT:  Thank you very much.
20               (Ms. Spina not present)
21               THE COURT:  Let's bring in one of those individuals at
22    a time.
23               THE DEPUTY CLERK:  Excuse me, Judge.  One of them does
24    not speak English.  The other one needs to come to interpret
25    for her.  The oldest one.
```

DCP3GUZ2

```
 1              THE COURT:  That's fine.  Let's get the English
 2   speaking person first.  You can have a seat there.  What is
 3   your name?
 4              MS. Y. GUZMAN:  Yvette.
 5              THE COURT:  What?
 6              MS. Y. GUZMAN:  Jackson Guzman.
 7              THE COURT:  Can you please swear the witness.
 8              (Witness sworn)
 9              THE COURT:  Ms. Jackson Guzman, did you see Ms. Spina
10   when she was in here a while ago?
11              MS. Y. GUZMAN:  Yes.
12              THE COURT:  Do you know her?  Have you seen her
13   before?
14              MS. Y. GUZMAN:  Not that I remember.
15              THE COURT:  Do you attend religious services anywhere?
16              MS. Y. GUZMAN:  Yes.
17              THE COURT:  Where do you attend religious services?
18              THE DEFENDANT:  In Dykeman.  Manhattan.  In Washington
19   Heights.
20              THE COURT:  What is the name of the temple, synagogue,
21   church, mosque that you attend?
22              MS. Y. GUZMAN:  It is a Spanish name.  Iglesia de
23   Dykeman, which is Dykeman Church.  It is an Adventist church.
24              THE COURT:  You attend religious services anywhere
25   else?
```

31

DCP3GUZ2

```
 1                MS. Y. GUZMAN:  Just that.
 2           THE COURT:  What area do you live in?
 3                MS. Y. GUZMAN:  In Washington Heights.  Manhattan.
 4           THE COURT:  Do you work, ma'am?
 5                MS. Y. GUZMAN:  Yes.
 6           THE COURT:  What area do you work in?
 7                MS. Y. GUZMAN:  In the Bronx, in the South Bronx.
 8           THE COURT:  What do you do in the South Bronx?
 9                MS. Y. GUZMAN:  I'm a social worker.
10           THE COURT:  As a social worker, what sort of social
11   worker are you?
12                MS. Y. GUZMAN:  I'm a case manager.  So I do home
13   visits, school visits basically.
14           THE COURT:  Does your work as a social worker ever
15   require you to work at any hospitals?
16                MS. Y. GUZMAN:  No.
17           THE COURT:  You said you work as a social worker where
18   again?
19                MS. Y. GUZMAN:  In the South Bronx.
20           THE COURT:  Thank you very much.
21                MS. Y. GUZMAN:  You're welcome.
22           THE COURT:  Just step outside for a second.
23           (Ms. Yvette Guzman not present)
24           THE COURT:  Any follow-up questions by either side?
25           MR. KUNZ:  No.
```

DCP3GUZ2

```
 1              THE COURT:  I know there are two other individuals.
 2      Do both of the other individuals speak Spanish?  Tara, is there
 3      another person who speaks English?
 4              THE DEPUTY CLERK:  There is only one that needs an
 5      interpreter.  The other one speaks English.
 6              THE COURT:  Let's have the other English speaking
 7      person come in.
 8              Please have a seat.  Please state your name.
 9              MS. E. GUZMAN:  Elizabeth Jackson Guzman.
10              THE COURT:  Could you please swear the witness.
11              (Witness sworn)
12              THE COURT:  Did you see Ms. Spina when she came here
13      and sat down?
14              MS. E. GUZMAN:  No, I don't even know her.
15              THE COURT:  But --
16              MS. E. GUZMAN:  I saw her, yes.
17              THE COURT:  Did you see her?
18              MS. E. GUZMAN:  Yes.
19              THE COURT:  Had you seen her before?
20              MS. E. GUZMAN:  No.
21              THE COURT:  You have to answer verbally.
22              MS. E. GUZMAN:  Excuse me?
23              THE COURT:  You have to answer verbally.  We're
24      putting this down.
25              MS. E. GUZMAN:  No, I haven't seen her.
```

33

DCP3GUZ2

```
 1                THE COURT:  Do you attend religious services?
 2                MS. E. GUZMAN:  Yes.
 3                THE COURT:  Where?
 4                MS. E. GUZMAN:  It is located in Dykeman.
 5                THE COURT:  What is the name of the --
 6                MS. E. GUZMAN:  It is Adventist.  It is in Spanish,
 7     it's Adventista.
 8                THE COURT:  Adventista, is it the name of a
 9     particular --
10                MS. E. GUZMAN:  It is the name of the religion.
11                THE COURT:  Right.  Is it called First Adventist
12     Church, Second Adventist Church, Adventist Church of -- is
13     there any other name to the church that you are aware of?  What
14     does it say even in Spanish.
15                MS. E. GUZMAN:  Adventistas del Sptimo Da.
16                THE COURT:  Where do you live generally; what
17     neighborhood do you live in?
18                MS. E. GUZMAN:  In Dykeman.  Nine Seamen.
19                THE COURT:  How long have you lived in that
20     neighborhood?
21                MS. E. GUZMAN:  Like 10 years, yes.  Since I came --
22     since I came to this country.  Yeah.
23                THE COURT:  Are you working?
24                MS. E. GUZMAN:  No.
25                THE COURT:  On a daily basis, do you travel outside of
```

DCP3GUZ2

```
 1   that area for any reason?  Like for school, to go shopping or
 2   do anything else.
 3              MS. E. GUZMAN:  I go to school.
 4              THE COURT:  Where do you go to school?
 5              MS. E. GUZMAN:  In City College, here in 137th Street.
 6              THE COURT:  What are you studying at college?
 7              MS. E. GUZMAN:  Psychology.
 8              THE COURT:  Thank you very much.
 9              (Ms. E. Guzman excused)
10              THE COURT:  Any follow-up questions by plaintiff?
11              MR. NORINSBERG:  No, your Honor.
12              THE COURT:  Any follow-up questions by defense
13   counsel?
14              MR. KUNZ:  No, your Honor.
15              THE COURT:  How do counsel propose we deal with the
16   third potential witness who doesn't speak English and needs a
17   Spanish translator?  I don't believe I can authorize using a
18   court certified Spanish interpreter for that for this civil
19   case to do that.  Let me hear if the parties have any
20   suggestions.
21              MR. NORINSBERG:  Given the very limited purpose for
22   which we are doing this, I think one of the first two witnesses
23   who spoke English should be brought back in and help out the
24   third witness, and just to give the Court some basic
25   translation of what the witness is saying.
```

DCP3GUZ2

```
 1              THE COURT:  Defense counsel?
 2              MR. KUNZ:  That's fine with us as long as they are
 3    both under oath.
 4              THE COURT:  You don't object to that?
 5              MR. KUNZ:  No.
 6              THE COURT:  Let's bring in the next witness and one of
 7    the other witnesses.  Please be seated.  Could the translating
 8    witness please just state your name.
 9              MS. Y. GUZMAN:  Yvette Jackson Guzman.
10              THE COURT:  Do you solemnly swear to faithfully and
11    honestly translate from Spanish into English the testimony of
12    the witness sitting next to you?
13              MS. Y. GUZMAN:  Yes.
14              THE COURT:  Please state your name.
15              Translate that for her.
16              MS. D. GUZMAN:  Doreen Jackson Guzman.
17              THE COURT:  Please swear the witness.
18              (Witness sworn)
19              THE COURT:  Do you know Maria Spina?
20              MS. D. GUZMAN:  No.
21              MS. Y. GUZMAN:  She doesn't know.
22              THE COURT:  Did you see the woman that was sitting
23    down in that chair about 10 minutes ago when you were sitting
24    in the audience?
25              Just translate, please.
```

DCP3GUZ2

```
 1              You were sitting in the back of the courtroom
 2    throughout the day today.  Is that correct?
 3              MS. Y. GUZMAN:  Yes, she was sitting over there.
 4              THE COURT:  About 10 minutes ago, there was a woman
 5    with glasses sitting in that seat.  At the time she was sitting
 6    there, there was no one else in the jury box.  Do you remember
 7    that?
 8              MS. Y. GUZMAN:  She said no, she doesn't remember her,
 9    like, seeing her.
10              THE COURT:  You can hold off on the translations for
11    now.
12              Let me find out how counsel feel about this.  We can
13    have Ms. Spina come in for a show-up identification unless the
14    parties have some objection to that.
15              What is plaintiff's position on that?
16              MR. NORINSBERG:  We have no objection.
17              MR. KUNZ:  No objection.
18              THE COURT:  Tara, have Ms. Spina come in and just
19    stand there by the door.
20              So, Ms. Guzman, I want you to look at the woman who is
21    going to come in that door to my right.  Okay?  Don't say
22    anything.  Just look at her.  Then I will ask you some
23    questions later, okay?
24              MS. D. GUZMAN:  Okay.
25              THE COURT:  All right.
```

DCP3GUZ2

```
 1                (Ms. Spina is present)
 2                THE COURT:  Ms. Spina, can you just stand there for
 3      just a second, okay.  All right.  Thank you very much.  You can
 4      just step back outside.
 5                (Ms. Spina not present)
 6                THE COURT:  Ms. Guzman, did you get a chance to see
 7      that woman?
 8                MS. D. GUZMAN:  Yes.
 9                THE COURT:  Do you recognize that woman?
10                MS. Y. GUZMAN:  She has never seen her before.
11                THE COURT:  Ms. Guzman, do you attend religious
12      services?
13                MS. D. GUZMAN:  Yes.
14                THE COURT:  Where do you go?
15                MS. D. GUZMAN:  In Dykeman.  Dykeman church.
16                THE COURT:  What is the name of the church?
17                MS. D. GUZMAN:  Adventist Church of the Seventh Day.
18                THE COURT:  Did you say Santa Maria?
19                MS. D. GUZMAN:  No.
20                THE COURT:  Could you repeat it again, the name of the
21      church?
22                MS. Y. GUZMAN:  Adventist church -- that's the Spanish
23      name that she's saying.
24                THE COURT:  What is the last part?  Can you say that
25      more slowly for me.
```

DCP3GUZ2
```
 1                MS. D. GUZMAN:  Adventist Church of the Seventh Day.
 2                THE COURT:  Ah, okay.  Are you working now?
 3                MS. Y. GUZMAN:  She's not working right now.
 4                THE COURT:  When is the last time -- well, have you
 5      worked in the last two or three years?
 6                MS. D. GUZMAN:  Yes.
 7                THE COURT:  Where do you work then?
 8                MS. Y. GUZMAN:  She has a day care in the house,
 9      taking care of kids.
10                THE COURT:  In the last two or three years, did you
11      travel outside of that Dykeman area -- where do you live?
12                MS. D. GUZMAN:  Nine Seamen.
13                THE COURT:  What neighborhood is that?
14                MS. D. GUZMAN:  Nine Seamen Avenue, apartment 2N.
15                THE COURT:  What neighborhood is that?
16                MS. D. GUZMAN:  Dykeman.
17                THE COURT:  Do you regularly travel outside that
18      Dykeman area?
19                MS. D. GUZMAN:  Once in a while.
20                THE COURT:  When you travel outside of there, where
21      are you usually going?
22                MS. Y. GUZMAN:  She goes to New Jersey.
23                THE COURT:  Have you been to any hospitals in the last
24      two or three years?
25                MS. D. GUZMAN:  For regular checks like getting a
```

39

DCP3GUZ2

1    physical, dental.
2            THE COURT:  I'm not trying to figure out your medical
3    condition.  When you go for regular checkups, where generally
4    are you going?  What area of town are you going?
5            MS. D. GUZMAN:  In Dykeman.
6            THE COURT:  Thank you very much.  Please step outside.
7            (Ms. Guzman not present)
8            THE COURT:  Any follow-up questions by counsel?
9            MR. KUNZ:  No, your Honor.
10           MR. NORINSBERG:  No, your Honor.
11           THE COURT:  What is counsel's pleasure?  How does
12   counsel want to proceed?  What I had proposed is that we bring
13   Ms. Spina in, and I tell Ms. Spina that these individuals
14   attend an Adventist church in the Dykeman area of New York.
15   And none of these individuals work or live in Bedford or
16   Bedford Hills or Sleepy Hollow.  Parties have any other
17   suggestions?
18           MR. KUNZ:  That's fine.  Just one thing that Ms. Spina
19   said as she was leaving which is that she knows she recognizes
20   them but she's not sure from where.  So if even after we tell
21   her those things, if she still says that, maybe it comes to her
22   during the trial she realizes where she recognizes them from,
23   and we would face the same difficulty that I was talking about
24   earlier.  This idea that if she knows them, it might prevent
25   her from judging this case fairly and impartially.

DCP3GUZ2

1           THE COURT:  What if I additionally tell her that these
2     other three individuals all testified under oath that they
3     don't know her and they have said they've never seen her
4     before.
5           MR. KUNZ:  That's fine.  I think that makes sense.  So
6     tell her that they don't live and work near her, they attend
7     the Adventist church in Dykeman, and that none of them
8     recognize her and none of them know her.  We would just like
9     that last follow-up question again and say, well, now that you
10    know this, do you believe you know these individuals.  Just to
11    see what she says.  If she still says yes, I think I recognize
12    their faces from somewhere, I just can't place it, I think we
13    have to have her struck from the panel.
14          THE COURT:  What is plaintiff's position?
15          MR. NORINSBERG:  We feel we should proceed to give her
16    the information that you proposed, they don't know each other,
17    they've sworn under oath they don't know each other, they are
18    never in Westchester where she is, and let's take it from
19    there.  Let's not speculate as to what the witness will say at
20    that point.  The juror.
21          THE COURT:  Let's bring Ms. Spina in.
22          (Ms. Spina present)
23          THE COURT:  Ms. Spina, just to explain something.
24    When I had you come in before, that was so another one of those
25    individuals could look at you to determine whether or not she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

DCP3GUZ2

1   recognized you.  Okay?
2          I had all three of those individuals testify under
3   oath here, and they've all indicated that they don't recognize
4   you, that they don't attend those churches, that they attend an
5   Adventist church in Dykeman.  And that they don't work or live
6   near Bedford or Bedford Hills or Sleepy Hollow.  They are all
7   in different sections of New York.
8          Having heard that, do you still feel that you know
9   these individuals?
10          MS. SPINA:  Well, what they say is what they say.  But
11   I just feel that.  I do feel it, earlier I was like maybe
12   60 percent sure or 70 percent sure.  I think I really have seen
13   them.  Or see them often enough.
14          THE COURT:  Okay.
15          MS. SPINA:  Just, I just wanted to -- I just felt
16   guilty not saying it.  That's why I opened it up to her when I
17   asked her.  I didn't notice it because I was facing my back
18   towards them earlier until I sat here.
19          THE COURT:  Okay.  Thank you.  Please just step back
20   outside.  Thank you.
21          Actually, before you do that, step back in here for
22   just a second.  Let me ask you something.  Let me ask you this.
23   You've indicated that you still feel that you have seen them
24   before.  Given what I've indicated they testified about, do you
25   still feel like you recognize them from church?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

DCP3GUZ2

```
 1              MS. SPINA:  Yes.
 2              THE COURT:  Okay.
 3              MS. SPINA:  Maybe they're not the same people.  I
 4    don't know.  But, yes.  All three of them together.
 5              THE COURT:  Before when you said that you think you
 6    recognize them from church, in what context in church do you
 7    think you recognize them in?
 8              MS. SPINA:  As parishioners.
 9              THE COURT:  Do you think you recognize them from
10    serving on any committees with them?
11              MS. SPINA:  No, I'm not a member of any organization
12    in my church.
13              THE COURT:  When you say you feel that you've seen
14    them as parishioners, what are you talking about?  Just at
15    service times?
16              MS. SPINA:  Yeah.
17              THE COURT:  How often do you think you've seen them?
18              MS. SPINA:  Yes, in service times, yeah.
19              THE COURT:  How often do you think that would be that
20    you've seen them?
21              MS. SPINA:  I've seen them more than once or twice.
22              THE COURT:  Do you feel you've seen them on a regular
23    basis?
24              MS. SPINA:  No.
25              THE COURT:  In your thought process that you've seen
```

43

DCP3GUZ2

```
 1    them maybe once or twice, is there anything about that that you
 2    feel would make it difficult for you to be fair and impartial
 3    in this case?
 4              MS. SPINA:  No.  No.
 5              THE COURT:  Do you recall ever having any conversation
 6    with them?
 7              MS. SPINA:  No.
 8              THE COURT:  Do you recall them ever speaking to you?
 9              MS. SPINA:  No.
10              THE COURT:  Do you recall ever sitting next to them at
11    a religious service?
12              MS. SPINA:  Not next to them, but maybe, you know, few
13    pews -- I mean, not next to me.
14              THE COURT:  Do you feel that when you say you
15    recognize them, recognize them being in close proximity to
16    other people who you know better or no?
17              MS. SPINA:  No.
18              THE COURT:  Thank you very much.  Please step outside.
19    I'm sorry.  Let me just ask you this before you step out.  When
20    you said that you feel that you've seen them once or twice,
21    that's over what period of time?
22              MS. SPINA:  I definitely saw them within the past few
23    months.  Within the past few months.
24              THE COURT:  You think that's the once or twice?
25              MS. SPINA:  Pretty recent.
```

44

DCP3GUZ2

```
 1              THE COURT:  Within the last few months?  Okay.  Thank
 2   you very much.
 3              (Ms. Spina not present)
 4              THE COURT:  Defense counsel, what's your position?
 5   Any follow-up questions with that for either side?
 6              MR. KUNZ:  No follow-up questions for us, no.  But I
 7   think she gave the answer that we were fearing, which is she's
 8   pretty sure she knows them from somewhere.  And whether or not
 9   she's wrong, I don't think is dispositive, because if it is in
10   her mind that she does know them, and that's going to infect
11   her deliberations in this case, we face the same difficulty as
12   if she does not actually know them.
13              THE COURT:  I asked her.  She said it would not affect
14   her deliberations.  She stated under oath that -- I guess she's
15   still under oath.  She stated that she's seen them once or
16   twice she thinks in the last several months.  She's indicated
17   she never had a conversation with them, is not close with them.
18   If she just recognized seeing someone, what makes that
19   something that would disqualify her as a juror if she has in
20   fact seen them once or twice in the pews at church?  Why would
21   that disqualify her from being a juror in this case?
22              MR. KUNZ:  If she thinks that next Sunday she is going
23   to go to church and see them and have to explain why she found
24   against their close relative, that could affect her
25   deliberations.  We had another juror with a similar problem
```

45

DCP3GUZ2

 1  with his family, with his daughter's married into a family and
 2  how that possibly affected his opinion.
 3          THE COURT:  That seems to me quite dissimilar in terms
 4  of a situation where that juror indicated that he saw those
 5  people frequently and because his daughter was marrying into
 6  that family was going to be required to see those people
 7  frequently.  She's indicated she's seen these people once or
 8  twice in the last several months.  I asked her if she thought
 9  it would have an impact on her.
10          Where is the connection that she is going to be
11  afraid?  It is not like she said she sees them every week and
12  she would have to face them every week.  She indicated to the
13  contrary.  She's seen them once or twice several months ago.
14  Where is that connection that by seeing someone once or twice
15  at church she is going to be afraid to go back to church
16  because these people who she's only seen once or twice are
17  going to confront her?
18          MR. KUNZ:  Well, I guess our point is that if let's
19  say everyone went to the same church, that they actually did go
20  to the same church, I feel there wouldn't be a debate here.
21  She would be excluded.  But I believe we are only sort of going
22  down this road because we are under the belief they go to
23  separate churches.
24          However, what matters from our perspective is what the
25  witness thinks.  What the juror thinks.  And the juror said

DCP3GUZ2

1   that she thinks she knows them.  And she believes it is from
2   church, but maybe it is not.  Maybe it's from something else.
3   And if that comes to her in the middle of the trial and she
4   realizes, oh, hey, I go to the area of Dykeman and I see them
5   at the same haircutting place or whatever it is, it is going to
6   affect her deliberations.
7            We're at nine.  This is the reason we have extra
8   jurors, so if we lose some we can still get a verdict.  And
9   I'll say it again, we didn't have this information when we were
10  making our peremptory strikes.  I am not saying it would have
11  affected our decisions, but it certainly might have.  So I
12  think the most prudent course here is to exclude her and
13  proceed with eight.
14           THE COURT:  Plaintiff's view?
15           MR. NORINSBERG:  Judge, I think your investigation has
16  conclusively proved that they don't know each other.  But even
17  if they did, the juror was asked point blank would that have
18  any affect whatsoever on her deliberations, and she clearly and
19  unequivocally said no, it wouldn't.  So this is all
20  speculation.  It is not based on any actual evidence that she
21  would have any bias towards anybody.  And that's the bottom
22  line.  You asked the question, she answered it clearly and
23  decisively, and they don't know each other, and it wouldn't
24  have any impact even if she recognized them.  So I think there
25  is not a sufficient record here for the Court to disqualify

47

DCP3GUZ2

1   this juror.
2           THE COURT:  Let me ask defense counsel in terms of
3   weighing the credibility just in terms of this proffer of
4   Ms. Spina and the other three witnesses.  What inference do you
5   draw, do you actually draw the inference that they know each
6   other or is it your position that whether they actually know
7   each other or not, she believe these know each other and that's
8   what matters.
9           MR. KUNZ:  That's what matters.  We acknowledge it
10  seems like, based on the statements made, that they go to
11  separate churches and live in and work in separate areas of New
12  York.  But, the juror was unequivocal.  She believes she said
13  stronger.  She said if she was 60 percent before, and now she's
14  looked at them longer she's even more sure that she has seen
15  them on a recent basis.
16          THE COURT:  Okay.  What is plaintiff's position on
17  that?  Because that does trouble me a little bit, that the
18  witness is now more certain that she's seen them after being
19  confronted with the fact that all three of these witnesses said
20  they don't know her and they've never seen her and they don't
21  go to the church and don't go to that neighborhood.
22          MR. NORINSBERG:  She may well have that belief.  You
23  asked the next question, would that belief have any ability for
24  her to serve on the panel.
25          THE COURT:  Why is it that the belief is getting
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

48

DCP3GUZ2

1   stronger after confronted with that evidence?
2            MR. NORINSBERG:  It might just be she's had more of a
3   chance to look at them.  Maybe she has honestly a good faith
4   belief she recognizes them from somewhere.  Everyone has that
5   from time to time.  The question is does that belief carry over
6   to make a juror who is otherwise qualified disqualified.  And
7   she could have articulated words that would have actually been
8   grounds for disqualification if she said yes, Judge, it might
9   influence me.  I might possibly be affected.  But she didn't
10  say that.  I would think the Court should just give her the
11  instruction that if at any time during the course of the trial
12  she believes that her apparent recognition of these people
13  would in any way influence her deliberations, to please notify
14  the Court.  So if there is any problem then she thinks it would
15  affect her, we give her an option to notify the Court.
16  Otherwise she's perfectly qualified to sit on this panel.
17            THE COURT:  If she does that, then what would you have
18  me do?
19            MR. NORINSBERG:  If she said it is going to influence
20  her in her deliberations, I would consent.  You saw in the
21  robing room there, Judge, I consented to a number of jurors
22  once they pass that threshold as an officer of the court, I
23  would consent.  We just have not met that threshold here.
24  We're not even close to it.
25            THE COURT:  My sense is again the parties had a

DCP3GUZ2

1    difficult time agreeing to eight or 10 jurors, so that's why I
2    compromised we went with nine.  And my sense is that the
3    plaintiff still does not wish to go with eight jurors.  Is that
4    correct?
5              MR. NORINSBERG:  That's correct.
6              THE COURT:  We've used up all our jurors?
7              THE DEPUTY CLERK:  We have.
8              THE COURT:  Can you call the jury and see how many
9    more jurors we have down there?
10             THE DEPUTY CLERK:  They have 20 people.
11             THE COURT:  I think I am inclined on this record in an
12   abundance of caution to excuse Ms. Spina.  I am concerned about
13   the nature of her testimony and I am concerned about the fact
14   she's gotten -- obviously my hope was that maybe it was just a
15   misidentification and she confused them with some other people
16   and once confronted with the fact that it seems that she
17   doesn't know these people, that she actually became more
18   certain of it, which gives me some concern that we are going to
19   run into some problems later on with her.  So I think I'll
20   excuse Ms. Spina.
21             My first question would be is there a juror that both
22   sides could agree on in terms of making juror number nine.
23   Because if not, I'll call some more jurors, we'll get three
24   more qualified jurors.  I understand counsel's position about
25   exercising peremptory challenges.  I could use my discretion,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

50

DCP3GUZ2

1  give each side an extra peremptory challenge, we qualify three
2  to pick one.  It seems like an inordinate amount of time to
3  spend on this extra juror.
4          Would the parties like to meet and confer to see if
5  there is a juror who has been excused that they can agree on?
6          MR. NORINSBERG:  If I could first just talk to my
7  colleagues and my client and we might be able to resolve this.
8          THE COURT:  Okay.
9          (Pause)
10         THE COURT:  What's counsel's pleasure?
11         MR. NORINSBERG:  We have a possible solution that the
12  women that were identified by this juror, they are not going to
13  be here anymore.  They don't need to be her.  His two sisters
14  do not need to be here.  That's what we propose to the Court.
15         THE COURT:  What is defendant's position on that?
16         MR. KUNZ:  Well, the harm's been done.  We spent an
17  hour doing this, and I am not sure if that can cure it.
18         THE COURT:  I don't think that cures the problem.  And
19  I'm sitting here now rethinking what I had stated before.  We
20  had selected nine jurors.  We selected nine jurors just so we'd
21  have extra jurors in case something happened.  It just so
22  happens something happened a little bit sooner than we thought
23  it would.  I'm inclined to just excuse her and we go forward
24  with the remaining eight.  But let me hear from plaintiff's
25  counsel as to why we shouldn't do that.

51

DCP3GUZ2

```
 1              MR. NORINSBERG:  That's acceptable, your Honor.
 2              THE COURT:  Okay.  So let's bring Ms. Spina in.
 3              Ms. Spina, thank you very much.  You are excused with
 4    the thanks of the Court.
 5              MS. SPINA:  Thank you.
 6              (Jury present)
 7              THE COURT:  Members of the jury, first of all, I want
 8    to apologize for the delay.  We take your time very seriously,
 9    and I am truly sorry that you were waiting for almost an hour.
10    But sometimes things come up and we can't help it.  We have to
11    deal with situations right away.
12              Is the jury acceptable to the plaintiffs?
13              MR. NORINSBERG:  Satisfactory to plaintiff.
14              THE COURT:  To defendants?
15              MR. KUNZ:  Yes, your Honor.
16              THE COURT:  Tara, please swear the jury.
17              (A jury of eight is impaneled and sworn)
18              THE COURT:  Congratulations.  You've been selected to
19    serve on this jury.
20              Members of the jury, now that you've been sworn, I
21    will give you some preliminary instructions to guide you in
22    your participation in the trial.  It will be your duty to find
23    from the evidence what the facts are.  You and you alone will
24    be the judges of the facts.  You will then have to apply to
25    those facts the law as I give it to you.  You must follow that
```

DCP3GUZ2

1   law whether you agree with it or not.  Nothing that I may say
2   or do during the course of the trial is intended to indicate or
3   should be taken by you as indicating what your verdict should
4   be.  The evidence from which you will find the facts will
5   consist of the testimony of witnesses, documents and other
6   things received into the record as exhibits, and any facts that
7   the lawyers agree to or stipulate to or that the Court may
8   instruct you to find.
9            Certain things are not evidence and must not be
10  considered by you.  I will list them for you now.  Statements,
11  arguments and questions by lawyers are not evidence.
12  Objections to questions are not evidence.  Lawyers have an
13  obligation to their clients to make objections when they
14  believe evidence being offered is improper under the rules of
15  evidence.  You should not be influenced by the objection or by
16  my ruling on it.  If the objection is sustained, ignore the
17  question.  If it is overruled, treat the answer like any other.
18  If you are instructed that some item of evidence is received
19  for a limited purpose only, you must follow that instruction.
20  Testimony that I have excluded or told you to disregard is not
21  evidence and must not be considered.  Anything you may have
22  seen or heard outside the courtroom is not evidence, and must
23  be disregarded.  You are to decide the facts only on the
24  evidence presented here in the courtroom.
25            There are two kinds of evidence, direct and

53

DCP3GUZ2

1 circumstantial.  Direct evidence is direct proof of a fact such
2 as testimony of an eyewitness.  Circumstantial evidence is
3 proof of facts from which you may infer or conclude that other
4 facts exist.  I will give you further instructions on these as
5 well as other matters at the end of the case.  But keep in mind
6 that you may consider both kinds of evidence.
7         It will be up to you to decide which witnesses to
8 believe, which witnesses not to believe, and how much of any
9 witness's testimony to accept or reject.  I will give you some
10 guidelines for determining the credibility of witnesses at the
11 end of the case.
12         This is a civil case.  A plaintiff has the burden of
13 proving his case by what is called a preponderance of the
14 evidence.  That means the plaintiff has to produce evidence,
15 which, considered in light of all facts, leads you to believe
16 that what the plaintiff claims is more likely true than not.
17 To put it differently, if you were to put the plaintiff's and
18 the defendant's evidence on opposites sides of the scales, the
19 plaintiff would have to make the scales tip somewhat on his or
20 her side.  If the plaintiff fails to meet this burden, the
21 verdict must be for the defendant.
22         Those of who you have served on criminal cases will
23 have heard of proof beyond a reasonable doubt.  That
24 requirement does not apply to a civil case.  Therefore you
25 should put it out of your mind.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

DCP3GUZ2

1          The trial will soon begin.  First each side may make
2     an opening statement.  An opening statement is neither evidence
3     nor argument.  It is an outline of what the party intends to
4     prove, offered to help you follow the evidence.  Next the
5     plaintiff will present his witnesses and the defendant may
6     cross-examine them.  Then the defendant may present his
7     witnesses, and the plaintiff may cross-examine them.
8          After all the evidence is in, the parties will present
9     their closing arguments to summarize and interpret the evidence
10    for you, and I will give instructions on the law.
11         I will allow you to take notes during the course of
12    this trial and let me give you some instructions on that.  You
13    are not required to take notes.  If you do not take notes, you
14    should not be influenced by another juror's notes, but should
15    rely on your own recollection of the evidence.  Your notes are
16    only a tool to aid your own individual memory, and you should
17    not compare your notes with other jurors in determining the
18    content of any testimony or in evaluating the importance of any
19    evidence.  Your notes are not evidence and are by no means a
20    complete outline of the proceedings or a list of the highlights
21    of the trial.  Your memory should be your greatest asset when
22    it comes time to deciding this case.  In addition, we have a
23    court reporter who is taking a transcript of everything that
24    happens in this case.  If at the end of this trial you need
25    something read back, you can ask us to do that.  The court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2

```
 1   reporter will find that testimony for you.
 2            We will now turn to the opening statements by counsel.
 3   We will start with plaintiff's opening statement, which he
 4   anticipates will last no longer than 25 minutes.  Counsel.
 5            MR. NORINSBERG:  Thank you, your Honor.  Good
 6   afternoon, folks.
 7            The case that you are about to hear is an important
 8   case and it is a disturbing case.  This case is about a police
 9   officer who injured a young man and then lied about what
10   happened to conceal his unlawful actions.  This case is about
11   the consequences of what that officer did.
12            You are going to learn that following this incident,
13   that young man wound up having surgery on his leg, and you'll
14   learn he has permanent nerve damage to this day and actually
15   has a condition called foot drop which even the defendant's
16   doctor confirms that he has.
17            How did this happen?  Let's turn back the clock, go
18   back in time to the date of this incident.  The incident took
19   place on February 14, 2009.  At that time, Mr. Guzman, who is
20   the plaintiff in this action, and the defendant is Brian Jay,
21   the police officer.  Mr. Guzman was 23 years old and he went
22   out to a nightclub with his friends.  He had a friend in town
23   named Jonathan.  The friend came in from Alaska.  So you'll
24   was they were going to go to this place call the Red Lounge.
25   This is a club that doesn't exist anymore, but it was in Upper
```

DCP3GUZ2                    Opening - Mr. Norinsberg

1    Manhattan on 207th Street and Sherman Avenue.  They were going
2    to meet some other friends there and have fun.  Do whatever
3    young men do at a club.  At the end of the night, that would be
4    that.
5              Basically, everything is uneventful.  Nothing in
6    particular happens of any importance in the club.  They get
7    there shortly after midnight.  It is a late night.  12:30.  The
8    club shuts down around 4 o'clock in the morning.  Everybody is
9    on their way out.  Still no problem, everything is fine.
10             At that time the group that he's with splits up in
11   two, and essentially Mr. Guzman takes it upon himself to go to
12   the corner of Sherman Avenue and 207th Street and get a cab.
13   So he's hailing a cab, and all of a sudden he hears loud noises
14   from behind him.  He turns around and he sees that one of his
15   friends, Henry, is getting into it with some other group over
16   there.  He is not sure what's going on here.  But the next
17   thing you know, Henry is actually getting into a fight with
18   some other guys over there.  And Mr. Guzman doesn't know this
19   group, doesn't know what this fight is about at all.  And he's
20   standing there.  And he kind of just freezes, not sure what he
21   should do.  It looks like there are eight guys he figures that
22   are part of this group, so he's kind of just frozen there.
23             At the same time this fight breaks out, the police
24   officers from the Anticrime Squad in the 34th Precinct, they
25   are coming up to this corner of 207th Street and Sherman

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

DCP3GUZ2                    Opening - Mr. Norinsberg

1   Avenue.  And it is important to know they're there almost from
2   the very, very start of this fight.  So they see the fight and
3   the defendant, Officer Jay, would later saw he saw two men
4   kicking and beating a third man down on the ground.  That third
5   man was Henry, Mr. Guzman's friend.  The two other people, I am
6   going to give you their names just so you know them when you
7   hear them.  One was Alberto Molina.  The other was Jorge
8   Henriquez.  Just to keep things simple I am going to call them
9   the Molina defendants.  As you'll learn, they were eventually
10  arrested for assault.
11          So anyway, Officer Jay sees the Molina defendants
12  there, sees the man on the ground.  And the police pull up as
13  close as they can pull up.  They get out of the car, and
14  Officer Jay would later testify that there was a large crowd
15  there.  There was over 50 to 75 people that were gathered.
16          As he's trying to get to the fight, he was being
17  blocked, he said.  People were there who were blocking him.
18  And he's telling the people -- he's not in uniform and they are
19  not in a regular police car.  It is an unmarked car.  He's
20  telling people "Police, get out of the way, get out of the
21  way."  Apparently one of those people is Mr. Guzman.
22  Mr. Guzman is not even aware the police are there.  He is
23  looking at the fight, still just kind of frozen, not sure what
24  to do.
25          This officer came up to him, and Officer Jay never
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

58

DCP3GUZ2                     Opening - Mr. Norinsberg

1    told him to get out of the way.  Mr. Guzman didn't hear it.
2    What he felt is the next thing that happened, Officer Jay came
3    up to him and he kicked him right in the leg.  He kicked him on
4    the side part of the knee, right here, a very vulnerable part.
5    There is no protective tissue, there is no fat, no muscle.
6    You'll see the actual photographs in this case to show where
7    this was kicked.  You'll be able to look at the bruises and
8    connect it up and you are also going to learn about that nerve
9    damage I was telling you about.  There is something call a
10   peroneal nerve.  That nerve is the nerve that was damaged when
11   Officer Jay kicked him.
12          What happened Officer Jay kicked him and Mr. Guzman's
13   knee buckles, he goes down to the ground.  He doesn't know
14   what's happening.  His first thought is are these guys like
15   part of the other group?  Are they now attacking me?  He
16   doesn't even know what's going on.
17          The next thing that happens, he's down on the ground.
18   The officer, Officer Jay, picks up his ponytail -- he has a
19   ponytail at the time -- picks it up, takes a can of mace,
20   sprays him, and he says "NYPD motherfucker."
21          Mr. Guzman is still kind of in shock.  One minute he
22   is out there trying to hail a cab.  The next minute this fight
23   is breaking out and then he is down on the ground.
24          And you'll learn after he was put down on the ground,
25   the officer kind of forcibly put his face into the ground where

DCP3GUZ2                    Opening - Mr. Norinsberg

1  you can actually see it, again, in terms of physical evidence
2  in this case, you'll see the point where it actually left an
3  abrasion on his forehead where he was put down on the ground.
4          So, he lifts Mr. Guzman back up, and you'll see there
5  is some visible signs, you'll see some evidence of the force he
6  used when he lifted him up, because Mr. Guzman was in no
7  position to get up on his own.
8          Mr. Guzman is arrested, charged with obstructing
9  governmental administration.  He wound up getting a ticket.
10 Not anything more than that.
11         But he takes him back to the precinct, and he's back
12 at the precinct, and Mr. Guzman immediately complains of pain
13 in his right leg.  Immediately complains, so it is documented.
14 It is not something that happened later on.  It is right there
15 at the precinct.
16         What you are going to learn at that moment, Officer
17 Jay had to make a decision back at the precinct.  The decision
18 was simply this:  He had a choice.  Does he tell the truth,
19 does he tell the truth and simply acknowledge what happened and
20 live with the consequences, let the chips fall where they may?
21 Or does he try to come up with a story, a story that will
22 justify what he did and will explain away Mr. Guzman's
23 injuries?
24         And at that moment, ladies and gentlemen, the reason
25 why we're here today, is Officer Jay chose the path of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2                    Opening - Mr. Norinsberg

1    dishonesty and deception.  And wait until you hear the story he
2    came up with.  You are going to learn this story has changed
3    over time and a lot of facts have been changed, but the basic
4    story is something like this.  Mr. Guzman is standing in the
5    crowd.  All of a sudden, out of nowhere, for no reason,
6    Mr. Guzman decides to attack two police officers.  Comes up and
7    grabs Officer Jay, grabs his partner Johnny Diaz, to grab both
8    of them, and then attempt to punch them.  And then -- mind you,
9    this is important, these officers are actually helping
10   Mr. Guzman's friend, they are stopping the fight.  Henry is
11   getting beaten up.  The officers are helping Mr. Guzman.  But
12   anyway, Officer Jay's story, he's running up to him, trying to
13   stop them from breaking up the fight.  He grabs the officers,
14   runs off, and the officers spray him as he tries to escape.
15   And then Officer Jay chases him down 10 feet and then he
16   tackles him to the ground.  That's the story that Officer Jay
17   came up with.
18            The proof in this case, ladies and gentlemen, will be
19   that story is an outright fabrication.  The proof in this case
20   will be that never happened.
21            Now how are we going to prove that?  A number of ways.
22   The first way we are going to prove it is through the testimony
23   of the other police officers who were on the scene.  You are
24   going to learn there are four officers all together.  Not one
25   of the other officers saw any of the things this Officer Jay

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2                    Opening - Mr. Norinsberg
1   claims happened.  None of them saw Mr. Guzman grab Officer Jay.
2   None of them saw him pull back Officer Jay.  None of them saw
3   him attempting to strike Officer Jay.  None of them saw him
4   grab the other officer, Officer Diaz.  None of them saw him try
5   to run away.  Not one officer on the scene saw that.
6          What is even more telling, you'll learn in this case,
7   not only didn't they see the things Officer Jay says happened,
8   they directly contradict him on critical points of his story.
9   For example, you are going to learn when Officer Jay says that
10  he saw with his own eyes he saw Mr. Guzman grab, he saw him
11  grab Officer Diaz, his partner.  Officer Diaz is going to say,
12  I don't remember him grabbing me.  I don't remember him
13  touching me at all.  Officer Jay says Mr. Guzman grabbed me,
14  Officer Jay, and pulled me backwards.  His partner's standing
15  right there and saying I don't remember him grabbing my
16  partner.  I don't remember him even touching my partner.
17  Officer Jay says another officer on the scene, Officer Walters,
18  he was right there with me, he actually helped tackle, he
19  helped handcuff Mr. Guzman on the ground.  Officer Walter says
20  I wasn't with him.  I had nothing to do with tackling.  I had
21  nothing to do with handcuffing him.  I wasn't even there, I
22  didn't see it.  Officer Jay says, hey, I'm the one, I got out
23  of the car, and I am the one that got the Molina defendants.  I
24  sprayed one, I handcuffed them, I am the one who did that.  I
25  was the one that subdued them before Mr. Guzman came.  Sergeant

62

DCP3GUZ2                     Opening - Mr. Norinsberg

1   McHugh says actually, no, I was the one with my partner P.O.
2   Walters that took care of the Molina defendants.  Officer Jay
3   was not there.
4            To put it together, you have all these officers on the
5   scene who didn't see any of the things he's claiming, and
6   officers that are directly contradicting what he's saying.
7            But there is definitely much more.  You are going to
8   learn that Officer Jay's story has changed over time.  From the
9   original version of what is in the arrest report, there is not
10  one word, not one word in that original report about any of the
11  things that he would later claim happened.  Not one word about
12  grabbing.  Not one word about Mr. Guzman attempting to punch
13  him.  Not one word about being pulled back.  Not one word about
14  seeing his partner grabbed.  Nothing in the original arrest
15  report.
16           You'll learn after Mr. Guzman was kicked by this
17  officer, he filed a complaint.  There was an investigation.
18  And you'll learn that Officer Jay a month later filled out a
19  criminal court complaint under oath.  And wouldn't you know it,
20  from that first police report when there was nothing there, all
21  of a sudden a month later a whole new story comes in.  For the
22  first time now, in the criminal complaint, all these
23  allegations of the wild and crazy Mr. Guzman, all the bad
24  things that he did.  And you'll see over time Officer Jay's
25  story has developed and embellished.  Each time he tells it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2                        Opening - Mr. Norinsberg

1   Mr. Guzman is doing more and more things.  He's running, he is
2   trying to grab people, he's punching one person, two people.
3   It keeps changing over time.
4           The problem is, Officer Jay can't seem to keep his
5   story straight.  Because you'll learn that on a number of
6   facts, he completely changes his story.  For example, you'll
7   learn in one version, Mr. Guzman is acting all by himself, no
8   one else is there.  Another version actually he's acting in the
9   aid of another person in custody.  One version, I never saw
10  Mr. Guzman, he just suddenly came up from behind.  The first
11  thing I knew of him was when he grabbed me.  Another version,
12  actually, I did see Mr. Guzman, I saw him run up to me full
13  speed.  When Mr. Guzman -- Mr. Guzman, he grabbed me by the
14  shirt in the front.  Actually, no, it was from behind, he
15  grabbed my jacket.  This man cannot keep his stories straight.
16  That's what I expect the proof here to be.
17          Now, what does Officer Jay have to say about all this?
18  Well, we are not going to have to wait very long to find out
19  because we are calling him as our first witness.  We are going
20  to get right down to business in this courtroom.  Now, we are
21  going to walk through it.  Imagine if we are walking there with
22  a video and watching this frame by frame.  We are going to go
23  through the frames of this incident with this officer from that
24  witness stand.
25          But for those of you who are expecting a dramatic

64

DCP3GUZ2                        Opening - Mr. Norinsberg

1  moment in court where the officer is going to break down and
2  say, "I admit it.  It's true, I kicked him."  That will never
3  happen.  I expect this man to take the witness stand, look you
4  directly in the eyes, and tell you the same lies that he's told
5  throughout this case, throughout the lawsuit, and two
6  investigations.  So your job is not going to be easy.  It's
7  going to be hard.  You'll have to put together a lot of
8  information.
9          But I promise you this much:  When I speak to you at
10  the end of this trial, I am going to tie up the loose ends.  I
11  am going to connect the dots.  There is going to be no doubt in
12  your mind this man has lied.  He absolutely kicked Mr. Guzman.
13          But you are not going to have to just rely on
14  testimony.  You are going to see photographic evidence.  You
15  are going to see the pictures and you will see there is one
16  part of the bruised area on Mr. Guzman's knee which is darker
17  than everything else.  And what you'll hear from the doctors is
18  that explains where the point of impact is.  Then you are going
19  to see there is a condition called ecchymosis.  There is
20  actually bleeding, internal bleeding that's going on after the
21  point of impact down Mr. Guzman's leg.  So the bruise is
22  larger, but the actual point of impact is right around the knee
23  on the side, both above and below.  That's where this officer
24  kicked him with his boot.
25          You are going to see not just the physical evidence

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCP3GUZ2                    Opening - Mr. Norinsberg

1   from the photographs.  The medical evidence is going to be
2   another clue for you to put this together.  Because you'll hear
3   from the doctors that this injury is consistent with blunt
4   force impact directly in this area.  Blunt force impact.
5   That's exactly what happened here with this kick.
6           The most telling thing of all perhaps of all the
7   evidence you are going to hear is what you don't hear.  You are
8   not going to hear a single officer who was there come into
9   court and tell you that Officer Jay didn't actually kick
10  Mr. Guzman.  You are not going to hear any officer say I was
11  there, I saw it happen.  No, he never kicked him.  None of
12  these other team members are going to say that.  In fact, you
13  are going to get something much different.  You are going to
14  get amnesia and excuses.
15          For example, you are going to hear Officer Diaz.
16  Officer Diaz who was right there.  He said Mr. Guzman was a
17  hand's distance away.  That's how close he was to where he and
18  Officer Jay was.  But, Officer Diaz says, yes, I saw that he
19  was that close to me, a hand distance away.  I saw my partner
20  grab him.  Okay, what happened next?  I don't remember.  How
21  did Mr. Guzman get down to the ground?  I don't remember.  What
22  happened on the ground?  I don't remember.  Do you remember any
23  part of this incident after that initial contact?  I don't
24  remember.  Nothing.
25          You'll learn the other officers, Officer Walters,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

66

1  basically saying, hey, don't ask me.  I was a half a block away
2  down the block, 75 to 100 feet away.  I didn't see anything.
3  Sergeant McHugh.  I didn't see anything.  I was busy
4  handcuffing somebody.
5          You'll learn, ladies and gentlemen, and defense
6  counsel will get up here and tell you, there were two different
7  fights going on.  So two officers are in one area; two in
8  another.  There is only one problem with that.  You are going
9  to hear from Officer Jay himself.  He puts all four officers in
10  the same place at the same time on that corner.  He actually
11  says there was a crowd of people around, they were inside a
12  circle, the crowd was surrounding them.  He said all four of us
13  were inside that circle with the Molina defendants, the two
14  people doing the assault on Henry on the ground.  Four people,
15  three men, were all inside the same circle.
16          So we'll come back to this in my closing argument when
17  we tie up the loose ends what's really going on here.  Why is
18  it one set of officers say there's two different things going
19  on and another officer, the defendant in this case, himself
20  puts everybody at the same place at the same time.
21          The bottom line in this case, ladies and gentlemen,
22  the truth will come out, you will hear exactly what happened.
23  You'll have all the clues.  You'll hear from Mr. Guzman
24  himself.  We've subpoenaed another witness who has a little bit
25  of knowledge about what went on.  We're hopeful, we don't know

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2                    Opening - Mr. Norinsberg
1   and I can't promise you the witness will be here, but we're
2   trying.  But basically you will have the information you need
3   from A to Z, all the facts you need to put together to figure
4   out what actually happened here.
5              Now, what happened medically to Mr. Guzman.  You'll
6   learn after he was brought back to the precinct, he immediately
7   complained, as I mentioned earlier, he immediately complained
8   about leg pain.  And they actually called an ambulance to the
9   precinct.  But at that point Mr. Guzman just wanted to go home.
10  He didn't want to be in police custody.  He wanted to go.  So
11  when they gave him his ticket, he wanted to leave and go home.
12             As soon as he stepped outside the precinct, the first
13  ambulance came and he said I'm all right.  I'll go there on my
14  own.  The problem is once the he actually got out of the
15  precinct around 5, 5:30 in the morning, somewhere around there,
16  he tried to walk and he couldn't walk.  So at that point he
17  actually called up an ambulance, and a second ambulance came
18  and it is documented.  There is no guesswork here.  They picked
19  him up right outside the precinct and they took him over to
20  Harlem Hospital.
21             When he went who Harlem Hospital, you'll learn the way
22  he described what his leg felt like.  He just said my leg feels
23  broken.  Now, it wasn't broken in the sense of broken bones.
24  But what you'll learn is it was broken in another sense.  He
25  had multiple torn ligaments from the weight, from the impact,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

DCP3GUZ2                          Opening - Mr. Norinsberg

```
 1    and the buckling and going down to the ground.  There are
 2    multiple torn ligaments, an ACL tear, a PCL tear, and a LCL
 3    tear.  You'll hear from the doctors.  I am not going to talk
 4    about medical terms in any great detail with doctors in here
 5    they'll explain it much better.  Basically, we actually are
 6    going to bring in the emergency room physician who was there
 7    that day, and he'll tell you about what Mr. Guzman's condition
 8    was and also the statement Mr. Guzman made at the hospital that
 9    night that he was kicked by the police in the leg.  You'll hear
10    about that from that witness.
11              After Harlem Hospital they gave him a set of crutches
12    and told him to stay off his leg, which he did.  But three days
13    later, he realized this was not getting any better.  In fact,
14    it was getting worse.  So, what happened is, he wound up going
15    to New York Presbyterian Hospital.  He went in there, it is a
16    very important finding they documented that he was feeling not
17    just that the leg wasn't right, but there was weakness in the
18    leg.  And as you'll see later on, that feeling, the weakness,
19    decreased strength in the leg was the first sign of the
20    detecting of nerve damage that was done.
21              You'll learn not long after that he went to Columbia
22    Presbyterian Medical Clinic.  And they finally made a diagnosis
23    for the first time that he had neuropathy in his peroneal
24    nerve.  Neuropathy is the nerve is not working properly.  And
25    they actually eventually would find out that this peroneal
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69

DCP3GUZ2                    Opening - Mr. Norinsberg

1    nerve, which runs down the leg, it is responsible for your
2    motion in a foot.  It allows you to bring up your foot.  It
3    allows you to bring up toes.  That nerve was damaged.  And this
4    was diagnosed just five weeks afterwards.  They suspected that
5    he might have this condition.  And what you'll learn is this
6    condition was eventually confirmed by a nerve conduction
7    velocity test, which they hook up the needles, they test the
8    nerve, and it showed there was a problem with his peroneal
9    nerve.
10           You'll learn this problem went from just experiencing
11   a little weaknesses, to a little bit of sensory deficits.  Over
12   a period of time it evolved into what they call a foot drop.  A
13   foot drop condition, which is just something we all take for
14   granted when we walk.  But what we are doing is we're just
15   moving the foot up every so slightly.  When we are doing that,
16   that's called a dorsal flexion.  With this foot drop, which
17   resulted in the damage to the peroneal nerve, he can't do that
18   Again, you are not going to have to take our word for it.
19   Their own doctor will confirm that he can't do that anymore.
20           He wears what's called an AFO, an ankle foot orthotic
21   device.  It actually locks the ankle and foot in position to at
22   least allow somebody to simulate somewhat more normal walking.
23   But he is going to have to have that for the rest of his life.
24           THE COURT:  You've got about three minutes left,
25   counsel.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2                    Opening - Mr. Norinsberg

1              MR. NORINSBERG:  Would it be possible to just have a
2    little longer than what I had predicted?  I really have some
3    other issues to cover.  I apologize to the Court.  When you do
4    it live, it sometimes take a little longer.
5              THE COURT:  Time is running.  Move it, counsel.  Let's
6    keep it moving.
7              MR. NORINSBERG:  In terms of his medical treatment,
8    you'll learn that he came under the care of an orthopedic
9    surgeon named Dr. Dassa.  Dr. Dassa treated him for the better
10   part of a year and a half.  He actually recommended him to get
11   surgery.  He got surgery for the torn ligaments.  And you'll
12   see it is kind of a complicated process.  They don't just tie
13   the ligament back.  They have to drill bones and connect things
14   again to try to simulate the best way they can what your
15   function is in mother nature, the way it is normally.  And the
16   surgery absolutely helped.  It helped in terms of the
17   stability.  But to this day, he still has problems.
18             And you'll learn, ladies and gentlemen, that the
19   defendant's own doctors confirmed that he has foot drop,
20   confirmed that it is permanent, confirmed that there is no
21   surgery that can be done to fix it.  Has confirmed that he
22   still has instability in his knee to this day.  And has said
23   that Mr. Guzman actually would benefit from a surgery to his
24   knee on the ligaments to help him.  That's the defendant's
25   expert.

71

DCP3GUZ2                    Opening - Mr. Norinsberg

1          Now, you'll see, ladies and gentlemen, there are a lot
2    of other things we are in disagreement with medically.  You'll
3    hear what their expert says in terms of the future for
4    Mr. Guzman.  But most recently you'll hear from Dr. Dassa that
5    Mr. Guzman they took an X-ray on film and it actually shows on
6    film that he has post-traumatic arthritis.  You can actually
7    compare it to the original film from Harlem Hospital on day one
8    and see it.  Now, five years later that joint space is narrowed
9    down significantly, and the doctor will explain to you what
10   that means.
11         Just going to address very briefly what I expect some
12   of these defenses will be, and then we'll move on with the
13   trial.  The defense from Officer Jay, I think there are two
14   defenses you are going to hear about, two primary defenses.
15   The first defense goes something like this.  Yes, it is true
16   that Mr. Guzman has a right leg injury.  Yes, it's true that he
17   complained about that injury right away.  And yes, it's true it
18   is permanent.  But hey, don't blame me, I had nothing to do
19   with causing that injury.  See, what happened was Mr. Guzman
20   had that injury before I arrested him.
21         We are going to prove, ladies and gentlemen, that that
22   is a completely phony defense.  We are going to prove it
23   through Officer Jay's own words.  He actually said to
24   investigators that he saw Mr. Guzman running full speed.  So on
25   one hand he is going to say that he had this injury before.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCP3GUZ2                    Opening - Mr. Norinsberg

1   And the other hand he is telling investigators how he saw
2   Mr. Guzman run at him full speed and run away from him and try
3   to escape.  The proof will be that it is medically impossible,
4   the condition that he had with his torn ligaments, there is no
5   way, no how, if he had those conditions before the arrest that
6   that ever could have happened.
7          The other main defense I expect you are going to hear
8   defendant say, oh, Mr. Guzman, he was involved in this fight.
9   Here is the proof that he wasn't involved with the fight and
10  that you'll hear about four officers were on the scene.  Not
11  one single officer will say they saw him in the fight.  None of
12  them will say that he was in the fight at all.  50 to 75 people
13  in that crowd that Officer Jay says was there, you are not
14  going to hear from any people in that crowd that are watching
15  to say Mr. Guzman is in the fight.  The only person of all
16  people that is going to claim Mr. Guzman was involved in the
17  fight is, of all people, Mr. Molina.  One of the two Molina
18  defendants.  The guy who the officers see pounding Mr. Guzman's
19  friend Henry, a two-on-one fight.  He is going to claim
20  Mr. Guzman was involved with this.
21         You are going to learn, ladies and gentlemen, that
22  right before Mr. Molina actually testified under oath, the
23  witness you are going to hear from, he admits he got high on
24  drugs and he's drinking the night he comes in to testify and he
25  comes in, he gives his deposition testimony.  And you'll learn

73

DCP3GUZ2                    Opening - Mr. Norinsberg
 1    he couldn't even describe the most basic things of who was
 2    involved in the fight.  He's describing it only as a
 3    light-skinned guy and a dark-skinned guy.
 4            You will learn in the middle of his deposition he
 5    actually switched his story.  Originally he was trying to say
 6    Molina was fighting with Mr. Guzman.  Then they actually show
 7    him a picture of Mr. Guzman, oh, okay, it wasn't me fighting
 8    with him.  It must have been my friend.  My friend Jorge must
 9    have been fighting with him.
10            (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TGUZ3                    Opening - Mr. Norinsberg
1              MR. NORINSBERG:  Absolutely impossible.  All officers
2     will tell you two-on-one fight, Mr. Guzman was not involved at
3     all.  So that's what the second defense is.
4              You'll also hear about some statement that was
5     supposedly made to the first EMT that came.  The only thing I
6     can tell you about this, this EMT will be the first to tell you
7     he gets a thousand calls a year, he does not remember this at
8     all, but he does acknowledge that there might have been a
9     police officer that night who told him that Mr. Guzman was
10    involved in a fight.  He acknowledges that.
11             And guess whose signature shows up on that document?
12    Officer Jay, who actually admits being there at the time
13    Mr. Guzman supposedly made this statement and signed off on the
14    document.  You'll learn the only other document, the document
15    Officer Jay wrote where he claimed Mr. Guzman had an injury
16    before this arrest, guess who signed that document?  Officer
17    Jay.  So the two big defense exhibits in this case, the defense
18    Exhibit A and B, we'll learn, have one thing in common, they
19    were both signed by Officer Jay.
20             Now when Mr. Guzman was not in the presence of Officer
21    Jay and a medical professional asked him what happened at
22    Harlem Hospital, he absolutely made this clear he was kicked in
23    the leg by the NYPD.  So you'll evaluate all this evidence and
24    make up your own mind as to what happened.  The bottom line is,
25    ladies and gentlemen, we brought this lawsuit because this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TGUZ3                    Opening - Mr. Norinsberg

 1    incident never should have happened.  The proof is going to be
 2    that this officer used excessive force, unnecessary force.
 3             And for those of you that think of this -- hear
 4    injuries and might think this is some type of case of personal
 5    injury case, I will tell you absolutely this is not, this is a
 6    case we're bringing under the United States Constitution.
 7    We're in federal court, not state court.  We are suing under
 8    special civil rights action, because we want this man to be
 9    held accountable for what he did.  And for five years he's
10    denied, denied, denied, shifted blame, pointed fingers, tried
11    to come up with one story after another, but the proof will be
12    that on February 14, 2009, Officer Jay kicked Noel Guzman and
13    kicked him hard enough to leave him with a permanent injury.
14             So listen carefully to the evidence, listen to what
15    the other side has to say, too, and you draw your own
16    conclusions.  The end of the day, I'm confident that if do you
17    that, you will get the right verdict in this case, and that's
18    TO hold this defendant responsible for what he did.
19             THE COURT:  OK, thank you.
20             We'll hear from defense counsel.  Defense counsel will
21    take approximately 15 minutes.
22             MR. MODAFFERI:  Your Honor, may I proceed?
23             THE COURT:  Yes.
24             MR. MODAFFERI:  Thank you.
25             Ladies and gentlemen, counsel just told you that he

DC9TGUZ3                    Opening - Mr. Modafferi

1  was going to get right down to business.  Well, I'm going to
2  cut to the chase, too.  This case is all about lying to get
3  money.  The plaintiff is lying in an attempt to get all eight
4  of you to give him money.
5          And where should I start?  First, his story is
6  incredible.  His story is that one night he's out with his
7  friends, they leave a club at four in the morning, his friends
8  get into a fight, but he's not fighting, he's innocent, he's
9  just trying to hail a cab, hailing a cab when Police Officer
10 Brian Jay just comes over and kicks him in the leg and pepper
11 sprays him for no good reason.
12         Ladies and gentlemen, that did not happen.
13         Let me tell you what really happened on February 14,
14 2009.  Plaintiff and his friends are partying out at the Red
15 Lounge in north Manhattan, it's on Sherman Avenue and 207th
16 Street.  It's around 3:30 a.m. or 4 o'clock in the morning when
17 all the bars and clubs in Manhattan close.  And plaintiff and
18 his friends, after partying and drinking that night at the Red
19 Lounge, they leave the club.  And they're out in the street on
20 Sherman Avenue and 207th Street, and plaintiff and two of his
21 friends, Henry Luzuriaga and Jocelin Roman, start a fight with
22 Alberto Molina and Jorge Henriavez.  Now you're going to learn
23 that plaintiff not only was in the fight, but started the
24 fight.  And you are going to learn that from Alberto Molina
25 because he was there.  Plaintiff got hurt in that fight.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77
DC9TGUZ3                    Opening - Mr. Modafferi
 1    was not hurt by Police Officer Jay.
 2              After the fight starts, that's when the police arrive.
 3    They're on patrol, they're driving by, and they see a large
 4    crowd with a fight going on.  What would any police officer do?
 5    You're going to learn they stopped their car, they jump out,
 6    and they try to break up the fight.  Officer Jay goes over to
 7    one of those fights and goes to place the individual that he
 8    observes assaulting another individual under arrest, like any
 9    officer would.
10              And while he's on the ground on his knees with Officer
11    Diaz attempting to place this individual in handcuffs, the
12    individual in handcuffs is on the ground and they're trying to
13    place handcuffs on him.  That's when plaintiff appears, and
14    plaintiff physically grabs Police Officer Jay and tries to pull
15    him off the individual they're handcuffing.  And Officer Jay is
16    going to tell you that when he's on the ground on his knees,
17    the plaintiff is hovering over him.  He's in a vulnerable
18    position.  He doesn't know who this individual is.  He's in
19    plain clothes.  For all he knows, he could be construed as an
20    ordinary person.  He turns around and sees the plaintiff, who
21    is grabbing him and pulling him.  He doesn't know who plaintiff
22    is.  So he turns around and pepper sprays him.  He's in a large
23    crowd, he's on the ground, he's on his knees, he pepper sprays
24    him to get the plaintiff off of him.
25              Plaintiff then tries to run away.  He realizes that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

78

DC9TGUZ3                    Opening - Mr. Modafferi

 1   Officer Jay is an officer.  I shouldn't have put my hands on
 2   him.  He gets only a few feet, Officer Jay is able to grab him,
 3   take him to the ground and place him in handcuffs.  Officer Jay
 4   never kicked or punched plaintiff at all.
 5           After the street, the officers take the individuals
 6   who were fighting and plaintiff back to the precinct.  And the
 7   precinct is where you're going to learn the truth.  The
 8   incident on the street happened at around 4 o'clock.  I believe
 9   the arrest time is around 4:09 or something, don't quote me on
10   the exact time.  But when we get back to the precinct, only
11   minutes later, that's when you find out what actually happened,
12   because plaintiff complains of pain to his leg.  So the
13   officers called him an ambulance.  The ambulance is there at
14   the precinct at 4:23 a.m., minutes later.  The plaintiff talks
15   to the EMTs and tells the EMTs:  I was injured in a fight.
16   Minutes later the truth comes out from the plaintiff.
17           Then, an hour later, after he has seen the EMTs and
18   denies medical treatment, he speaks to Officer Jay, tells
19   Officer Jay the same thing.  At around 5:45 in the morning he
20   says:  I was injured before my arrest.
21           Well, you're probably sitting here saying well, didn't
22   counsel -- the other attorney just say something completely
23   different?  Well, there's proof, and you're going to see this
24   proof during the course of the trial.  And the first piece of
25   proof is going to be called an ambulance call report.  You're

DC9TGUZ3                    Opening - Mr. Modafferi

1   going to learn that any time an EMT speaks to or treats a
2   patient, they fill out one of these.  So right after that
3   incident happened, they go back to the precinct, plaintiff
4   complains, they call him an ambulance, and an EMT arrives on
5   scene at 4:23 a.m.
6           And you're going to learn what that report says.  It
7   says that the plaintiff's chief complaint is:  I'm OK.  But
8   more importantly, you're going to learn this:  Patient states
9   that he was involved in a fight and someone kicked him in the
10  leg.  Someone.  Not a police officer.  We're minutes later at
11  the precinct when plaintiff is telling the truth at this point.
12          But that's not all.  Plaintiff signed this document in
13  two places.  Two.  Ladies and gentlemen, plaintiff told the
14  truth right after the incident, that he was injured in a fight
15  when someone kicked him in the leg, and he signed that
16  statement twice.
17          Just when you thought there probably couldn't be more
18  proof, there's more.  Remember when I said that plaintiff spoke
19  to Officer Jay at the precinct as well?  Well, you're going to
20  learn at 5:45 in the morning, Officer Jay had to fill out
21  what's called a medical treatment of prisoner form, and you
22  will learn that that's a form that officers have fill out any
23  time a prisoner complains of pain or complains of an injury.
24          So at 5:45 a.m., we're still only an hour and a half
25  removed from the incident when plaintiff is still telling the

DC9TGUZ3                    Opening - Mr. Modafferi
1    truth.  It says here:  Prisoner requests or requires medical
2    aid.  Yes.  Prisoner refuses medical aid.  Yes.
3              MR. NORINSBERG:  Objection, your Honor.
4              THE COURT:  Objection overruled.  Continue.
5              MR. MODAFFERI:  Going back to that medical treatment
6    of prisoner form, it says:  Prisoner refused medical aid.  Yes.
7    Nature of injury.  Right leg injury.
8              The next box you will see it says:  If injury -- and
9    there are two spaces, old or new.  Old is ticked off.
10             Then there's a remarks section.  It says:  Prisoner
11   had injury prior to arrest.
12             And you're going to learn that that was plaintiff's
13   statement to Officer Jay, he was injured prior to his arrest.
14             Ladies and gentlemen, that's not all.  Plaintiff
15   signed this document, too.  His signature is right on it, and
16   you'll get to see it when it's admitted into evidence.
17             After speaking to the EMTs -- we're still at the
18   precinct now.  After speaking to the EMTs and speaking to
19   Officer Jay, the plaintiff is placed in a holding cell.  And at
20   some point, about an hour or two after the holding cell, he's
21   given a ticket, as counsel referred to it, it's a desk
22   appearance ticket, and released.  He was given that ticket not
23   for assault but for physically interfering with a police
24   officer, and that crime you will find out is called obstructing
25   governmental administration.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DC9TGUZ3                    Opening - Mr. Modafferi
 1          So what you will learn is the other guys who were
 2    arrested and charged with assault, they were formally arrested,
 3    put through the system, meaning they went to central booking.
 4    Plaintiff, just because all the officers saw him doing that
 5    night was physically interfere, he got a ticket for obstructing
 6    governmental administration.
 7          But while plaintiff is in the cell, that's when his
 8    plan to lie begins.  He first told the truth to the EMTs and
 9    Officer Jay, but now he's thinking about this trial here today.
10    And let me go through some clues that will help you determine
11    that that is exactly what plaintiff is doing here in this case.
12          While he was in the cell at the precinct, he said he
13    was going to sue.  Once he's given his ticket and he walks out
14    of the precinct, you will learn plaintiff calls his own
15    ambulance.  The ambulance that the officers called for him,
16    that wasn't good.  That ambulance takes him to the hospital,
17    he's in the ER at around 9 in the morning, and he tells the ER
18    doctor:  The police hit me.
19          Ladies and gentlemen, you're going to learn this is
20    plaintiff putting his plan to lie for money in action.  So let
21    focus on the timeline, because that timeline is going to be
22    crucial.
23          You're going to learn that the incident out on the
24    street happened a little bit after 4:00 a.m.  Plaintiff is
25    bought back to the precinct and speaks to EMTs at around 4:23
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TGUZ3                    Opening - Mr. Modafferi

1    they were on the scene.  Then he speaks to Officer Jay and
2    Officer Jay fills out his report that plaintiff signed at
3    5:45 a.m.  Then he's in the cell, and his idea is ruminating.
4    He's given his desk appearance ticket at 8 o'clock, then he's
5    in the ER at 9:40.  Keep that timeline in your mind, because
6    the truth came out right after the incident, the lie ruminated
7    and was put into action.
8           After the hospital, plaintiff goes to a lawyer; and
9    not this lawyer, a different lawyer.  And that lawyer refers
10   plaintiff to this lawyer and a doctor, Dr. Dassa.  And
11   Dr. Dassa is going to come to court this week and testify, and
12   he's going to support plaintiff's incredible story.  But you
13   will learn Dr. Dassa is getting paid a lot of money to come in
14   here and support that story.  That's another clue.
15          Next, you're going to bring a lawsuit, you need a
16   witness.  So plaintiff gets a witness.  His best friend, his
17   best friend Jocelin Roman, may, according to counsel, may come
18   into court and testify.  And you are going to learn that his
19   testimony is incredible also.  Another clue.
20          But ladies and gentlemen, the biggest clues of them
21   all that we know that plaintiff is lying to get money are those
22   reports, the report of the EMT and report of Officer Jay that
23   happened immediately after at the precinct.  You're going to
24   learn that plaintiff has to overcome those documents.  They're
25   so strong, how is he going to overcome those documents?  Well,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

83

DC9TGUZ3                    Opening - Mr. Modafferi

1    he's going to lie about them.  The medical treatment for
2    prisoner form that Officer Jay filled out, he's going to come
3    on that stand and he's going to say this form was blank when I
4    signed it.  First lie.
5            How is he going to get around the second document?
6    He's going to say:  I don't remember ever speaking to EMTs at
7    the precinct.  He has to say that.  If he doesn't say that,
8    that's going to harm him from getting money from you guys.
9            Think about that.  That's a big clue.
10           THE COURT:  Let's wrap up, counsel.
11           MR. MODAFFERI:  Another clue is we're going to bring
12   in a doctor also, Dr. Gidumal.  And Dr.Gidumal will testify
13   that defendant had a pre-existing injury, and that plaintiff
14   hurt himself further after February 14, 2009.  Clues that
15   plaintiff is not telling the truth.
16           Last, you're going to learn that plaintiff applied for
17   unemployment benefits, and he filed an unemployment application
18   saying:  I'm ready, willing, and able to work, I just can't
19   find work.  That's what you have to say when you get
20   unemployment benefits.
21           But at the same time, he filed for Social Security
22   disability, and in that application he said:  I'm injured and
23   disabled and cannot work.
24           Well, we know those can't be true.  On the one hand, I
25   am ready, willing, and able to work but can't find work, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                        Opening - Mr. Modafferi

1   hey, Social Security administration, I'm disabled, I can't
2   work.  We know that those two things can't be true.  That's an
3   example, prime example of when plaintiff lied to get money.
4           Now counsel mentioned that you are going to see
5   photographs, you're going to hear a lot about injuries during
6   the course of this week, but they're a distraction, because
7   plaintiff got hurt from fighting with Alberto Molina and Jorge
8   Henriavez, just like he told the EMTs that night at the
9   precinct, minutes after, minutes after he was not hurt by
10  Police Officer Jay.
11          And finally you're going to learn that plaintiff
12  brought two claims here, false arrest and excessive force.
13  Well, you're going to learn that Officer Jay is merely doing
14  his job breaking up a fight and arresting those responsible for
15  assault.  Plaintiff physically interfered with an arrest, and
16  that's a crime, obstructing governmental administration.
17          Because he committed a crime, he, too, was arrested
18  and given that ticket.  Officer Jay used only reasonable force
19  to place plaintiff under arrest.  Police Officer Jay never
20  kicked plaintiff.  Remember, plaintiff himself said to the EMT:
21  I was involved in a fight, and someone kicked me in the leg.
22  Officer Jay never used excessive force.
23          Ladies and gentlemen, do not reward plaintiff for his
24  lies.  And after hearing all the evidence, myself and my
25  co-counsel, Mr. Kunz, are confident that you will render a

DC9TGUZ3                    Jay - direct

 1   verdict in favor of defendant Police Officer Jay.  Thank you.
 2               THE COURT:  Thank you, counsel.
 3               Members of the jury, are we OK?  Do we need a bathroom
 4   break or are we OK?
 5               JUROR:  OK.
 6               THE COURT:  All right.  Let's go ahead, plaintiff call
 7   your first witness.
 8               MR. NORINSBERG:  At this time the plaintiff calls
 9   defendant Brian Jay to the stand.
10    BRIAN JAY,
11        called as a witness by the Plaintiff,
12        having been duly sworn, testified as follows:
13   DIRECT EXAMINATION
14   BY MR. NORINSBERG:
15   Q.  Good afternoon, Officer Jay.
16   A.  Good afternoon, sir.
17   Q.  Sir, you're here pursuant to a subpoena, is that correct?
18   A.  Yes, sir.
19   Q.  And you are the officer arrested Mr. Guzman, correct?
20   A.  Yes, sir.
21   Q.  And you are the defendant in this lawsuit, right?
22   A.  Yes, sir.
23   Q.  Now you have previously given testimony in this case,
24   correct?
25   A.  Yes, sir.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DC9TGUZ3                    Jay - direct

1   Q.  Gave testimony in a deposition on October 16, 2011,
2   correct?
3   A.  Yes, sir.
4   Q.  And you also gave testimony to investigators who were
5   conducting an investigation related to this incident, correct?
6   A.  Yes, sir.
7   Q.  And you also filled out a sworn affidavit setting forth
8   your version of the incident of what happened, correct?
9   A.  Yes, sir.
10  Q.  And you considered that affidavit to be a form of
11  testimony, too, right?
12  A.  Yes, sir.
13  Q.  So all together you testified three times, right, Officer?
14  A.  Yes, sir.
15  Q.  Now Officer, you're currently employed at the 34th
16  Precinct, is that correct?
17  A.  Yes, sir.
18  Q.  And you're currently in anticrime, correct?
19  A.  No, sir.
20  Q.  At the time of this incident were you in anticrime?
21  A.  Yes, sir.
22  Q.  And anticrime is where you patrol in plain clothes,
23  unmarked unit, and go to scenes where crimes are occurring in
24  progress, right?
25  A.  Yes, sir.

DC9TGUZ3                    Jay - direct

```
 1   Q.  You started anticrime back in 2008, is that correct?
 2   A.  Yes, sir.
 3   Q.  And at the time of your deposition you were still working
 4   in anticrime, right?
 5   A.  Yes, sir.
 6   Q.  Now you were working with a team on that tour, correct?
 7   A.  Yes, sir.
 8   Q.  You had two other police officers and a supervisor with
 9   you, right?
10   A.  Yes, sir.
11   Q.  One of those officers was Police Officer Johnny Diaz, true?
12   A.  Yes, sir.
13   Q.  And another officer was Police Office Walters, true?
14   A.  Yes, sir.
15   Q.  And then your boss, your sergeant, Sergeant McHugh was with
16   you that night, correct?
17   A.  Yes, sir.
18   Q.  Now you were working the 8:30 to 5:00 a.m. shift on that
19   night, is that correct?
20   A.  Yes, sir.
21   Q.  So technically your shift started on February 13 and it
22   went to the morning of February 14, is that right?
23   A.   Yes, sir.
24   Q.  And until this incident happened with Mr. Guzman, nothing
25   of any importance or anything that was documented happened, is
```

DC9TGUZ3                    Jay - direct

1  that correct?
2  A.  Yes, sir.
3  Q.  So this is the first notable activity you had that night,
4  correct?
5  A.  Yes, sir.
6  Q.  You arrived on the scene at 207th Street and Sherman Avenue
7  at approximately 4:00 a.m., right?
8  A.  Yes, sir.
9  Q.  When you first arrived at the corner of 207th and Sherman,
10 you almost immediately noticed something was happening on that
11 corner, correct?
12 A.  Yes, sir.
13 Q.  You saw a crowd there, correct?
14 A.  Yes, sir.
15 Q.  And then you saw two men fighting a third man, true?
16 A.  Yes, sir.
17 Q.  You could actually see these men fighting before you exited
18 the vehicle, correct?
19 A.  Yes, sir.
20 Q.  Even though they were surrounded by the crowd, you could
21 see them, right?
22 A.  Yes, sir.
23 Q.  So we have three men all together and there is a crowd
24 surrounding the three men, right?
25 A.  Yes, sir.

DC9TGUZ3                    Jay - direct

1   Q.  When you got a little closer to the scene, you saw there
2   was a victim on the ground and two men were punching and
3   kicking that victim, correct?
4   A.  Yes, sir.
5   Q.  They were kicking him in around a way that made you think
6   they were kicking around a rag doll, correct?
7   A.  That's correct, sir.
8   Q.  Those two men, you later learned their names, correct?
9   A.  Yes, sir.
10  Q.  One of them was Alberto Molina, true?
11  A.  Yes, sir.
12  Q.  And the other one was Jorge Henriavez, true?
13  A.  Yes, sir.
14  Q.  So if I refer to them as Molina defendants, you will
15  understand who I'm talking about, right?
16  A.  Yes, sir.
17  Q.  The third person who was on the ground, the victim, was
18  Henry Luzuriaga, is that correct?
19  A.  I think so, sir.
20  Q.  If we refer to him as Henry, will that be clear to you who
21  we're talking about?
22  A.  Yes, sir.
23  Q.  So just so we're clear, up to this point in your testimony
24  you see a fight, three people were involved, we have the two
25  Molina defendants then the victim Henry on the ground, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   A.  Yes, sir.
2   Q.  Can you please tell this jury, sir, Mr. Guzman was not
3   involved in that fight, was he?  Yes or no.
4   A.  Not that I know of, sir.
5   Q.  You never saw him fighting with Mr. Molina, did you, sir?
6   A.  No, sir.
7   Q.  Never saw him fighting with Mr. Henriavez, did you?
8   A.  No, sir.
9   Q.  Never saw Mr. Guzman fighting with anybody that night,
10  isn't that true?
11  A.  That's true, sir.
12  Q.  And to be perfectly clear, we're talking about a two-on-one
13  fight, right?
14  A.  Yes, sir.
15  Q.  We're not talking about a two-on-two fight, are we, sir?
16  A.  No, sir.
17  Q.  You were here when you just heard Mr. Modafferi give an
18  opening statement to this jury, right?
19  A.  Yes, sir.
20  Q.  You heard your attorney tell this jury that Mr. Molina saw
21  Mr. Guzman fighting with his friend Jorge, right?
22          You heard that, right?
23  A.  Yes, sir.
24  Q.  But that's not what you saw, is it, sir?
25  A.  No, sir, it's not.

DC9TGUZ3                    Jay - direct

1   Q.  Would it be fair to say that you never saw Mr. Guzman
2   fighting with any other person that night?  Yes or no.
3   A.  That would be fair, sir.
4   Q.  So the vehicle you're in comes to a stop, correct?
5   A.  Yes, sir.
6   Q.  And you came to a stop south of the intersection of Sherman
7   Avenue and 207th Street?
8   A.  Yes, sir.
9   Q.  Just south of where the men were fighting, is that correct?
10  A.  Yes, sir.
11  Q.  I would like to show you some photographs, Officer Jay.
12          MR. NORINSBERG:  If I could approach the witness?
13          THE COURT:  Yes.
14  Q.  Showing you what has been marked as Plaintiff's 2A, 2B, 2C
15  and 2D.
16  A.  OK.
17  Q.  Do you recognize these photos, sir?
18  A.  Yes, sir.
19  Q.  Do these photographs depict the intersection of 207th
20  Street and Sherman Avenue?
21  A.  Yes, at various angles.
22          MR. NORINSBERG:  I offer these photographs into
23  evidence.
24          THE COURT:  Any objection?
25          MR. KUNZ:  No, your Honor.

DC9TGUZ3                     Jay - direct

```
 1              THE COURT:  OK, they're in.
 2              (Plaintiffs' Exhibits 2A, 2B, 2C and 2D received in
 3      evidence)
 4              MR. NORINSBERG:  First put up Plaintiff's 2A.
 5              (Pause)
 6              MR. NORINSBERG:  Your Honor, rather than spend time
 7      now, we'll revisit the photos later on in the exam and I will
 8      proceed through my examination.
 9      Q.  Can you describe the direction you were traveling on
10      Sherman Avenue?
11      A.  I don't recall, sir.
12      Q.  Sherman Avenue goes north and south, correct?
13      A.  Yes.
14      Q.  So you don't remember if you were going north or south on
15      Sherman Avenue?
16      A.  I don't recall which direction we came to the intersection,
17      sir.
18      Q.  And wherever your car ended up, when it stopped it was
19      right near the fight, correct?
20      A.  Yes, sir.
21      Q.  What corner was the fight on?
22      A.  The fight was more on the northeast side of the street.
23              THE COURT:  Hold on just a second.  Can the members of
24      the jury hear the witness?
25              OK, make sure you speak up.
```

DC9TGUZ3                    Jay - direct

1   Q.  So let's see, your testimony then, if you were heading
2   north on Sherman Avenue, it would be on the far right-hand
3   side, not on the far left-hand side?
4   A.  Yes, sir.
5   Q.  And you got out of your car very close where the crowd was?
6   A.  Yes, sir.
7   Q.  And you estimate this crowd was around 50 to 75 people,
8   correct?
9   A.  Yes, sir.
10  Q.  And you went through the crowd in order to try to approach
11  the two men fighting the third man, right?
12  A.  Yes, sir.
13  Q.  And this crowd was noisy, correct?
14  A.  Yes, sir.
15  Q.  This crowd was screaming and people were jostling, right?
16  A.  Yes, sir.
17  Q.  There was yelling and screaming at a high volume, right,
18  Officer?
19  A.  Yes, sir.
20  Q.  And as you were making your way through this crowd, you
21  yelled:  Police, get out of the way.  True or not true?
22  A.  True, sir.
23  Q.  And you yelled that repeatedly, didn't you, sir?
24  A.  Yes, sir.
25  Q.  And the reason you yelled that was because you were having

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

DC9TGUZ3                    Jay - direct

1   a hard time getting through, isn't that true?
2   A.  Yes, sir.
3   Q.  In fact, you there were people blocking you and preventing
4   you from getting through to the fight, right?
5   A.  Yes, sir.
6   Q.  Now eventually you got to the fight, is that correct?
7   A.  Yes, sir.
8   Q.  And when you reached the fight you got to a point where you
9   were actually inside the center of the crowd, isn't that
10  correct?
11  A.  Yes, sir.
12  Q.  And all of your fellow officers were with you inside of the
13  center of that the circle, is that correct?
14  A.  I'm not sure exactly where they all were.  I know Officer
15  Diaz was probably off to my left-hand side.
16  Q.  Referring to your deposition, page 62, line 19, do you
17  recall being asked the following question and giving the
18  following answer:
19  "Q.  At the point that you yelled, 'Police, don't move,' were
20  any of the other police officers in that area in the center of
21  the crowd?
22  "A.  I believe by then they all were."
23          Do you recall being asked that question and giving at
24  that answer, sir?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95

DC9TGUZ3                    Jay - direct

1   Q.  So we're clear, there's a 15-foot square in the center
2   where this fight is taking place, correct?
3   A.  Yes, sir.
4   Q.  All four officers and the three men were in this -- inside
5   this square at the same area, isn't that true?
6   A.  Yes, sir.
7   Q.  Just so we're clear, at that moment in time there's one
8   fight going on, all officers are at the same place at the same
9   time, true?
10  A.  Yes, sir.
11  Q.  Now you claim, Officer Jay, that you were the first one to
12  reach the Molina defendants, right?
13  A.  Yes, sir.
14  Q.  So it was not Officer Walters who reached them first,
15  right?
16  A.  Yes, sir.
17  Q.  It wasn't Sergeant McHugh, right?
18  A.  That's correct, sir.
19  Q.  It was -- you were the first one, right?
20  A.  Yes, sir.
21  Q.  And first you pepper sprayed these two men, right?
22  A.  Yes, sir.
23  Q.  And Mr. Molina surrendered immediately, correct?
24  A.  Yes, sir.
25  Q.  But then Mr. Henriavez tried to get away, right?

```
     DC9TGUZ3                    Jay - direct
 1   A.  Yes, sir.
 2   Q.  And then you claim you chased after him and you brought him
 3   down to the ground, right?
 4   A.  Yes, sir.
 5   Q.  And then you and Officer Diaz started to cuff
 6   Mr. Henriavez?
 7   A.  Yes, sir.
 8   Q.  That's your version of what happened, right?
 9   A.  That's what happened, sir.
10   Q.  Up to this point, you haven't seen Mr. Guzman, correct?
11   A.  That's correct, sir.
12   Q.  You haven't heard Mr. Guzman, correct?
13   A.  I have never known about Mr. Guzman at all, sir.
14   Q.  You had no dealings with him up to that point, correct?
15   A.  That's correct, sir.
16   Q.  Then you claim while you were on the ground cuffing
17   Mr. Henriavez, Mr. Guzman came running up to you full speed,
18   right, Officer?
19   A.  From behind, yes, sir.
20   Q.  And you actually saw that with your own eyes, him running
21   up to you full speed?  Yes or no.
22   A.  I more heard it than saw it, sir.
23   Q.  Please play the audio.
24              (Audio according played)
25              THE COURT:  Hold on a second.  Just identify what it
```

DC9TGUZ3                    Jay - direct

1  is that is being played for the jury.
2  Q.  You were interviewed by investigators approximately six
3  months after this incident, correct?
4  A.  Yes, sir.
5  Q.  You were asked certain questions about what happened,
6  correct?
7  A.  Yes, sir.
8  Q.  And you then answered those questions, correct?
9  A.  Yes, sir.
10 Q.  Do you recall telling the investigators the following?
11         MR. NORINSBERG:  Please play the --
12         (Audio recording played)
13 Q.  That's your voice on that audio recording, correct?
14 A.  Yes, sir.
15 Q.  So you told the investigators that Mr. Guzman ran up to you
16 full speed?  True or not true.
17 A.  Yes, sir.
18 Q.  Now when you testified before these investigators, you
19 understood that you were obligated to tell the truth, the whole
20 truth and nothing but the truth, correct?
21 A.  Yes, sir.
22 Q.  There was no room for any dishonesty, correct?
23 A.  That's correct, sir.
24 Q.  There was no room for any deception, true?
25 A.  Yes, sir.

DC9TGUZ3                    Jay - direct

1    Q.  Yet when you told the investigators that Mr. Guzman, quote,
2    ran up to us full speed, end quote, you were not telling the
3    truth, were you, sir?
4    A.  Yes, sir, I was.
5    Q.  You were making that up, weren't you, sir?
6    A.  No, sir.
7    Q.  So is it your sworn testimony now before this jury that
8    when you said Mr. Guzman, quote, ran up to us full speed, end
9    quote, that that in fact was the truth?
10              MR. KUNZ:  Objection.
11   A.  Yes, sir.
12              THE COURT:  Overruled.
13   Q.  And saw that with your own eyes, right, sir?  Yes or no.
14   A.  Yes, sir.
15   Q.  Sir, your back was to Mr. Guzman when you first -- when he
16   first approached, isn't that true?
17   A.  Yes, sir.
18   Q.  And until you actually felt someone pull you off
19   Mr. Henriavez, you had never seen Mr. Guzman, isn't that what
20   you previously testified to?
21   A.  I was kind of aware someone was coming up behind me.  I
22   have decent peripheral vision.
23   Q.  My question is, sir, when you first noticed Mr. Guzman it
24   was after he physically touched you, isn't that true?
25   A.  That's when I first became aware Mr. Guzman was there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

99

DC9TGUZ3                    Jay - direct

1   Q.  If your back was to Mr. Guzman, you couldn't have seen him
2   running at you at full speed, could you, sir?
3   A.  With my peripheral vision I could see something coming
4   towards me.
5   Q.  Your peripheral vision, is that your explanation for how
6   you saw that happen?
7   A.  Yes, sir.
8   Q.  Now, sir, you actually claim that Mr. Guzman grabbed you,
9   right?
10  A.  He did, sir.
11  Q.  And he grabbed Officer Jay, correct?
12  A.  I am Officer Jay, sir.
13  Q.  He grabbed Officer Diaz.  My apologies.
14  A.  I believe so, sir.
15  Q.  So first he grabbed you and pulled you back, right?
16  A.  Yes.
17  Q.  And you saw him grab your partner, too, right?
18  A.  I believe so, sir, yes.
19  Q.  And you saw Mr. Guzman attempt to strike you, too, correct?
20  Yes or no.
21  A.  Yes, sir, I believe that's what he was going to do next.
22  Q.  You actually saw him attempt to strike you, didn't you?
23  A.  He grabbed me by my shoulder, pulled me backwards.  I don't
24  know exactly what was on his mind, but his hands were up.
25  Q.  Sir, after this incident, you wrote an arrest report,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DC9TGUZ3                    Jay - direct

```
 1   correct?
 2   A.  Excuse me?
 3   Q.  After this incident you filled out an arrest report,
 4   correct?
 5   A.  Yes, sir.
 6   Q.  In that arrest report you were asked to put forward the
 7   details of this incident, correct?
 8   A.  Yes, sir.
 9   Q.  And there's a section on there that actually is called the
10   details section, correct?
11   A.  Yes, sir.
12            MR. NORINSBERG:  I would like to approach.
13            THE COURT:  Yes.
14   Q.  I show you Plaintiff's 3 for identification.  Do you
15   recognize this document?
16   A.  Yes, sir.
17   Q.  Is this the arrest report that you prepared?
18   A.  Yes, sir.
19   Q.  Did you sign this report?
20   A.  No, sir, it was computer-generated report.
21   Q.  But this is the one that you entered into the computer,
22   right?
23   A.  Yes, sir.
24   Q.  And there's a details section in that report, correct?
25   A.  Yes, sir.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct
```
 1              MR. NORINSBERG:  I offer Plaintiff's 3 into evidence.
 2              MR. KUNZ:  No objection.
 3              THE COURT:  Admitted.
 4              (Plaintiff's Exhibit 3 received in evidence)
 5   Q.  You have the report in front of you now, correct?
 6   A.  Yes, sir.
 7   Q.  I direct your attention to details section of this report.
 8   You didn't mention anything about Mr. Guzman grabbing you in
 9   that report.  Yes or no.
10   A.  The report is listed --
11   Q.  My question is:  Did you mention anything about Mr. Guzman
12   grabbing you?  Yes or no.
13   A.  No, sir.
14   Q.  Did you mention anything about Mr. Guzman pulling you back?
15   Yes or no.
16   A.  No, sir.
17   Q.  Did you mention anything about Mr. Guzman attempting to
18   strike you?  Yes or no.
19   A.  No, sir.
20   Q.  Did you mention anything in that report about Mr. Guzman
21   grabbing your partner?  Yes or no.
22   A.  No, sir.
23   Q.  There's not one word about any of those allegations in
24   there, is there?  Yes or no.
25   A.  No, sir.
```

DC9TGUZ3                    Jay - direct

1              THE COURT:  Let me just speak to lead counsel just a
2     second about scheduling issues.
3              We don't need the court reporter.
4              (Pause)
5              THE COURT:  So the jury understands what is happening,
6     the individual who just came in here is a very talented person
7     who works in the courthouse to help out with some of the
8     technical difficulties that we had before.  I think counsel is
9     going to ask some other questions right now.  We're going to go
10    for a little longer.  As I told you, we're not going to go past
11    five, we'll stop before that.
12             Go ahead, counsel.
13    BY MR. NORINSBERG:
14    Q.  Officer, apart from your arrest report, you also filled out
15    a memo book entry, is that correct?
16    A.  Yes, sir.
17    Q.  And in that memo book entry, there's a reference to the
18    incident that took place here, is that correct?
19    A.  Yes, sir.
20    Q.  And you spent approximately five lines, give or take,
21    writing out the description of some of the events, is that
22    correct?
23    A.  Approximately.
24    Q.  I would like to show the witness -- I would like to show
25    you what has been marked Plaintiff's Exhibit A and B.  Do you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TGUZ3                         Jay - direct
1  recognize this document?
2  A.  Yes, sir.
3  Q.  Is this your memo book entry from the night of this
4  incident, correct?
5  A.  Yes, sir.
6          MR. NORINSBERG:  I offer Plaintiff's AB into evidence.
7          MR. KUNZ:  No objection.
8          THE COURT:  So admitted.
9          (Plaintiff's Exhibit AB received in evidence).
10  Q.  Have you had a chance to look it through, Officer Jay?
11  A.  Yes, sir.
12  Q.  There's nothing in your memo book entry about Mr. Guzman
13  grabbing you, is there?  Yes or no.
14  A.  No, sir.
15  Q.  There's nothing about Mr. Guzman pulling you back, is
16  there?  Yes or no.
17  A.  No, sir.
18  Q.  There's nothing about Mr. Guzman attempting to strike you,
19  is there?  Yes or no.
20  A.  No, sir.
21  Q.  There's nothing in there about Mr. Guzman grabbing your
22  partner, is there?
23  A.  No, sir.
24  Q.  In fact, Officer Jay, the first time you ever mentioned
25  anything about Mr. Guzman grabbing you was one month later when
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TGUZ3                    Jay - direct

1   you filled out a criminal court affidavit, isn't that true?
2   A.  Yes, sir.
3              MR. NORINSBERG:  May I approach, your Honor?
4              THE COURT:  Yes.
5   Q.  I would like to show you what has been marked as
6   Plaintiff's 5 for identification.
7   A.  Yes, sir.
8   Q.  Did you sign this document, sir?
9   A.  Yes, I did.
10  Q.  You signed this document under penalty of perjury, correct?
11  A.  Yes, sir.
12  Q.  And tell the jury what date did you sign this document?
13  A.  On April 11 -- March 11, rather, 2009.
14  Q.  That's approximately one month after this incident, right?
15  A.  Yes, sir.
16             MR. NORINSBERG:  I offer that document into evidence.
17             MR. KUNZ:  No objection.
18             THE COURT:  For the record, what exhibit is that?
19             MR. NORINSBERG:  Plaintiff's 5.
20             THE COURT:  It's admitted.
21             (Plaintiff's Exhibit 5 received in evidence)
22  Q.  Now according to this document, Mr. Guzman came up to you,
23  grabbed your shirt, right?
24  A.  Doesn't say where he grabbed on my shirt.
25  Q.  Your shirt.

105

DC9TGUZ3                    Jay - direct

1    A.  It was my jacket.
2    Q.  Does it say grabbed your shirt?
3    A.  Yes, sir.
4    Q.  And then attempted to strike you, correct?
5    A.  Yes, sir.
6    Q.  Now you just told us a moment ago before you said you were
7    grabbed from behind when Mr. Guzman came up to you?
8    A.  Right.
9    Q.  You were wearing a winter jacket at that time, sir?
10   A.  Yes, sir.
11   Q.  You were wearing a winter jacket that went mid length to
12   down right above your knee, correct?
13   A.  A little higher than that, sir, yes.
14   Q.  And it was a winter night, right?
15   A.  February, yes, sir.
16   Q.  So Mr. Guzman grabbed you by your jacket over your coat and
17   pulled you backwards, is that correct?
18   A.  Yes, sir.
19   Q.  And in your criminal complaint it says Mr. Guzman grabbed
20   you by your shirt, right?
21   A.  Yes, sir.
22   Q.  But in order to grab you by your shirt, Mr. Guzman would
23   have to be facing you, wouldn't he?  Yes or no.
24   A.  I believe the ADA might have a made a mistake what she
25   wrote -- when she wrote this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   Q.  Sir, you reviewed this document before you signed it,
2   didn't you?
3   A.  Yes, sir.
4   Q.  And you read it carefully before you signed it, right?
5   A.  I guess not as carefully as I should have, but yes.
6   Q.  But when you signed it, you were swearing to the
7   truthfulness of what's in that document, correct?
8   A.  Yes, sir.
9   Q.  Would you agree, sir, if you were wearing a winter coat you
10  were wearing it as an overcoat and someone came up to you from
11  behind and grabbed you on the shoulder, there's no way they're
12  grabbing you by the shirt, is there?
13  A.  No, sir.
14  Q.  That would be impossible, wouldn't it, sir?
15  A.  I don't know about impossible, sir.
16  Q.  Would you agree, Officer Jay, that in order to grab you by
17  the shirt, Mr. Guzman would have had to have been facing you,
18  wouldn't he?  Yes or no.
19  A.  I don't know, sir.
20  Q.  Mr. Guzman would have had to approach you from the front,
21  not from behind, in order to grab you by your shirt?
22  A.  If he grabbed my shirt, sir.
23  Q.  Now in your criminal complaint you talk about Mr. Guzman
24  grabbing you, but you don't mention anything about him grabbing
25  your partner, do you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   A.  Police Officer Diaz is mentioned in the complaint, yes,
2   sir.
3   Q.  It says that Mr. Guzman grabbed your shirt and attempted to
4   strike you, the deponent, correct?  Do you see that, sir?
5   A.  Says and Police Officer Johnny Diaz, sir.
6   Q.  Sir, I'm directing your attention to the part of the
7   document where you said the defendant, Mr. Guzman, approached
8   you, grabbed your shirt, and attempted to strike you.  Do you
9   see that?
10  A.  Yes, sir.
11  Q.  Did you mention anything about Mr. Guzman approaching
12  Officer Diaz and grabbing him also in this document?  Yes or
13  no.
14  A.  No, sir.
15  Q.  Now when Mr. Guzman supposedly attempted to strike you,
16  which hand was he using, his right hand or left hand?
17  A.  His left hand, I guess, sir.
18  Q.  Are you guessing?
19  A.  From what I'm seeing in my mind's eye, yes, sir.
20  Q.  Was his hand open or closed?
21  A.  I can't tell you.
22  Q.  Did he pull his arm back like he was going to hit you?  Yes
23  or no.
24  A.  His arm was cocked back, yes, sir.
25  Q.  Was he wearing a glove on this hand that he supposedly was

DC9TGUZ3                           Jay - direct
```
 1    trying to hit you with?
 2    A.  Sorry, sir?
 3    Q.  Was he wearing a glove?
 4    A.  I don't think so, sir.
 5    Q.  Now if I understand your testimony so far, Mr. Guzman
 6    grabbed two police officers and Mr. Guzman attempted to strike
 7    two police officers, right?
 8    A.  Yes, sir.
 9    Q.  Now somebody grabs a police officer and attempts to strike
10    him, that would be a crime, wouldn't it, sir?
11    A.  Yes, sir.
12    Q.  That would be a serious offense, wouldn't it?
13    A.  Yes, sir.
14    Q.  That would be attempted assault on a police officer, right?
15    A.  Actually there's no such charge as attempted assault on a
16    police officer.
17    Q.  Would there be an assault charge filed on that?  Yes or no,
18    sir.
19    A.  No, sir.
20    Q.  You never charged Mr. Guzman with any assault-related
21    charges?  Yes or no.
22    A.  No, sir.
23    Q.  You charged Mr. Guzman with one crime, OGA, right?
24    A.  Yes, sir.
25    Q.  That's obstructing governmental administration?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1    A.  Yes, sir.
2    Q.  And you actually released him with a desk appearance
3    ticket, right?
4    A.  Yes, sir.
5    Q.  So here you have this man who is running up to you,
6    grabbing you, grabbing your partner attempting to punch you,
7    and you send him out of the precinct with a ticket, right?
8    A.  Yes, sir.
9    Q.  I would like to show you Defendant's Exhibit G, please.  Do
10   you recognize that document?
11   A.  Yes, sir.
12   Q.  Is that the desk appearance ticket that you gave
13   Mr. Guzman?
14   A.  Yes, sir.
15   Q.  So this is the ticket you gave him after he ran up to you,
16   grabbed your partner, and attempted to punch both of you,
17   right?
18   A.  Yes, sir.
19   Q.  You gave him that ticket and said he could go on his merry
20   way, right?
21   A.  I never used those words, no.
22   Q.  But you let him out of the precinct after that?
23   A.  Yes, sir.
24          MR. NORINSBERG:  I offer Defendant's G into evidence.
25          MR. KUNZ:  No objection.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

110

DC9TGUZ3                        Jay - direct
1                THE COURT:  It's admitted.
2             (Defendant's Exhibit G received in evidence)
3    Q.  Now just to be clear, when Mr. Guzman was grabbing you and
4    Officer Diaz, he's doing this by himself, right?
5    A.  Yes, sir.
6    Q.  And when Mr. Guzman was attempting to strike you and
7    Officer Diaz, he was acting by himself, right?
8    A.  Yes, sir.
9    Q.  There was no one else aiding Mr. Guzman at that time, was
10   there?
11   A.  No, sir.
12   Q.  And yet, according to your arrest report, Mr. Guzman did
13   these things, quote, with aid of other in custody, end quote,
14   isn't that true?
15   A.  Yes, sir.
16   Q.  So according to your arrest report, Mr. Guzman and another
17   person in custody were attempting to stop you from performing
18   your duties.  True or not true?
19   A.  I can see what happened here, sir, but it's not exactly
20   clear the way you're saying, sir.
21   Q.  Did you write the words, quote, aid of other in custody,
22   end quote?
23   A.  Yes, sir, but what I thought --
24   Q.  I'm asking that question, sir.
25   A.  Yes, sir.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DC9TGUZ3                    Jay - direct

1  Q.  So according to your police report, Mr. Guzman acted,
2  quote, with the aid of other in custody, end quote.  Correct or
3  not?
4  A.  No, sir, what I meant to say was I thought he was aiding
5  the person in custody.
6  Q.  So when you wrote he actually acted with another person in
7  custody, that's not what you meant, right?
8  A.  That's correct, sir.
9  Q.  Who exactly was Mr. Guzman trying to aid at that time?
10  A.  It's kind of unclear, but it would be Mr. Henriavez, the
11  second gentleman who was arrested.
12  Q.  Mr. Henriavez, the second man -- Mr. Jorge?
13  A.  One of the Molina defendants, yes, sir.
14  Q.  Let me see if I understand this.  You have the Molina
15  defendants, they're -- both of them are assaulting Mr. Guzman's
16  friend on the ground, right?
17  A.  Yes, sir, but I don't know who was friends with whom at the
18  time.
19  Q.  So you made that up, didn't you?
20  A.  No, sir, it's what I actually thought occurred until
21  further evidence came to light after the arrest report
22  generally.
23  Q.  Well, did you ever correct the error in your police report
24  that you wrote?
25  A.  By then it couldn't be corrected, sir.  It was it was sent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

112

DC9TGUZ3                    Jay - direct

1   down the line, and it was corrected when the accusatory
2   instrument was drawn up by the DA's Office, which is much more
3   detailed than the arrest report.
4   Q.  So the answer to my question is no, you never corrected the
5   report at any time, right?
6   A.  There's no way to correct it once it's already gone.  The
7   correction would be made with the accusatory instrument at the
8   DA's office, which is what occurred.  The DA's office's
9   accusatory instrument is a much more detailed document which
10  tells exactly what occurred as to why someone is arrested.
11  Q.  And no point in time did you ever see Mr. Guzman acting
12  with the aid of another person, true or not true?
13  A.  With the aid of another person, no, sir.
14  Q.  So your report as written is inaccurate, would you agree
15  with that?
16  A.  It's a typo, sir.
17  Q.  It's a typo?
18  A.  Yes, sir.
19  Q.  Now you claim also that after Mr. Guzman supposedly grabbed
20  you, then at that point you turned around and you sprayed him,
21  right, sir?
22  A.  Yes, sir.
23  Q.  And you sprayed him behind you and above you, so basically
24  you're bent down and you went up like this, right?
25  A.  No, it was more across me like this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   Q.  Was Mr. Guzman behind you and above you when you maced him?
2   A.  Yes, sir.
3   Q.  And the reason you sprayed Mr. Guzman was to get him to
4   back off, supposedly, right?
5   A.  Yes, and get off me, too.
6   Q.  So you wanted to prevent Mr. Guzman from getting any closer
7   to you at that point, right?
8   A.  I wanted him to relinquish hold of my shoulder, yes, sir.
9   Q.  You could agree that point Mr. Guzman wasn't trying to run
10  away from you, was he?
11  A.  Sorry?
12  Q.  Was Mr. Guzman trying to run away from you at that point?
13  A.  What point, sir?
14  Q.  He grabs you, you are turning around and spraying him,
15  right?
16  A.  Yes, sir.
17  Q.  Can we agree if freeze the frame at that moment when you're
18  turning around spraying him, at that moment he's not trying to
19  escape from you, is he?
20  A.  No, sir, he just he got ahold of me.
21  Q.  Yet in your arrest report you were asked to give an
22  explanation why you maced him, correct?
23  A.  Yes.
24  Q.  And you said you maced him in order to prevent him from
25  escaping from you, isn't that true?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   A.  Yes, sir.
2   Q.  Was that another mistake in your report, sir?
3   A.  No, there's a of series of answers that are drop in boxes,
4   and there's not one that properly fit.  I had to put something
5   in there, so I put the first one in.
6   Q.  So the first one that came up was you had to mace him
7   because he was trying to escape from you, and you checked that
8   off, right?
9   A.  It was the only one that -- it was the closest thing.
10  Q.  Tell the jury what some of the other choices are that you
11  could have chosen.
12  A.  Overcome resistance, overcome weapons, things of that
13  nature.
14  Q.  If someone is grabbing you, wouldn't that be overcoming
15  resistance?  You would have to turn around and fight him,
16  right?
17  A.  That would be better if it had to stop someone from
18  assaulting you, but it doesn't have that in there.
19  Q.  So just to we're clear, when you said on your report that
20  you used force, and the force you used was to pepper spray
21  Mr. Guzman to prevent his escape, that statement was not
22  accurate, correct?
23  A.  Correct.
24  Q.  Now as a police officer, when you spray someone with mace,
25  you're trying to temporarily disable that person, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                        Jay - direct

1   A.  Yes, sir.
2   Q.  Someone who is sprayed with mace will feel an extreme
3   burning sensation in their eyes, correct?
4   A.  Yes, sir.
5   Q.  They will have a hard time keeping their eyes open in fact,
6   won't they?
7   A.  Some cases, yes, sir.
8   Q.  But it's your claim after you sprayed Mr. Guzman in the
9   face that somehow at that point he then ran away from you for
10  ten feet, true or not true?
11  A.  That is true, sir.
12  Q.  That's your claim, right?
13  A.  That's what happened, sir.
14  Q.  Before that happened, did you try to grab Mr. Guzman?
15  A.  No, sir.
16  Q.  So you never tried to first grab him before you sprayed
17  him, is that your testimony?
18  A.  Yes, sir.
19  Q.  And after you sprayed him, did you try to grab him?
20  A.  Yes, sir.
21  Q.  And how many hands did you grab him with?
22  A.  Both hands.
23  Q.  So you fully touched him with both hands, right?
24  A.  Yes, sir.
25  Q.  What part of his body were you touching?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   A.  I wrapped my arms around his body, so my hands were on his
2   chest and my back was -- my chest was pressed against his back.
3   Q.  And he was still able to escape and run away from you for
4   ten feet?
5   A.  No, that was after I caught up with him.
6   Q.  I'm asking about the moment when you sprayed him, did you
7   try to grab him at that moment?
8   A.  I was on my knees.  I had to stand up first, and that gave
9   him a little bit of a head start.
10  Q.  Did you try to grab him at that moment?
11  A.  Yes, sir.
12  Q.  Did you in fact succeed in grabbing Mr. Guzman in that
13  moment after you sprayed him?
14  A.  No, sir.
15  Q.  So your hands made no contact with him at all at that
16  point, is that correct?
17  A.  At that point, no, sir.
18  Q.  And you claim you didn't grab him because he started to
19  run, right?
20  A.  Sorry, sir?
21  Q.  You claim that you didn't grab him because he started to
22  run away from you, right?
23  A.  I didn't grab him because he started to run away from me?
24  Q.  You tried to grab him and he ran away from you.
25  A.  No, I was on my knees, sir.  By the time I got to my feet,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9TGUZ3                    Jay - direct

1   he already had a head start running away from me, sir.
2   Q.  I understand that.  Did you try to grab him before he got
3   that head start and ran away?
4   A.  I had to stand up first, so he was already more than arm's
5   distance away.
6   Q.  So the answer to my question would be no, you didn't try to
7   grab him.
8   A.  I had my arms reaching out, but he was not in arm's reach.
9   So yes, I tried to grab him, but no, I didn't succeed.
10  Q.  You caught up with Mr. Guzman?
11  A.  Yes.
12  Q.  And you claim at that point you dragged him to the ground,
13  right?
14  A.  Yes, sir.
15  Q.  So when you first broke up this fight, you ran after
16  Mr. Henriavez a little bit, right?
17  A.  Yes.
18  Q.  And you chased him and you tackled him to ground?
19  A.  Yes.
20  Q.  And then Mr. Guzman is trying to run away and you took him
21  down to the ground, too?
22  A.  Yes, sir.
23  Q.  So you, Officer Jay, did all of this, right?
24  A.  Yes, sir.
25  Q.  None of the other police officers were helping with you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

118

DC9TGUZ3                        Jay - direct
1   this, right?
2   A.  Officer Diaz was trying to help me handcuff Mr. Henriavez,
3   and he was still handcuffing Mr. Henriavez when I had to run
4   after Mr. Guzman.
5   Q.  If you were the police officer who cuffed Mr. Henriavez,
6   could you please tell the jury where was Officer Walters at
7   this time?
8   A.  I believe Officer Walters and Sergeant McHugh were
9   handcuffing Mr. Alberto Molina.
10  Q.  Referring to your deposition, page 71, line 5.
11  "Q.  At the point when you were attempting to handcuff,
12  Mr. Henriavez, do you know where Officer Walters was?
13  "A.  No, sir."
14          Do you recall being asked that question and giving
15  that answer?
16  A.  Yes, sir.
17  Q.  So according to your deposition testimony, at that time you
18  didn't know where Officer Walters was, right?
19  A.  Yes, sir.
20  Q.  Tell the jury, at the point you were attempting to handcuff
21  Mr. Henriavez, where was Sergeant McHugh?
22  A.  I'm not sure, sir.  I think he was with Officer Walters.
23  Q.  You don't know that either, right, sir?
24  A.  No, sir.
25  Q.  You told us before that all four police officers were in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

119

DC9TGUZ3                    Jay - direct

1  the same area, correct?
2  A.  Yes, sir.
3  Q.  Four officers and three men were fighting in the area in
4  the center of the crowd, correct?
5  A.  Yes, sir.
6  Q.  Yet you have no idea where either Officer Walters or
7  Sergeant McHugh was at that time, true or not true?
8  A.  True, sir.  The scene was a chaotic.  We did get separated.
9  Q.  Now you told us that you originally were the person who
10  secured Mr. Molina, is that correct?
11  A.  No, sir.
12  Q.  Tell the jury who was the one who secured Officer Molina if
13  it wasn't you.
14  A.  Sorry, I don't know anyone by the name of Officer Molina.
15  Q.  Tell us who secured Mr. Molina.
16  A.  I believe Mr. Molina was secured by Officer Walters and
17  Sergeant McHugh.
18  Q.  Referring in your deposition page 66, line 24.
19  "Q.  But you don't know who it was?
20  "A.  No."
21          Do you recall being asked that question and giving
22  that answer?
23  A.  Yes, I'm extrapolating based on who was there and what I
24  know happened now.
25  Q.  According to your personal knowledge, sir, it's your claim

DC9TGUZ3                  Jay - direct
1   that you and Officer Diaz were the ones handling Mr. Molina and
2   Mr. Henriavez, and you don't know where Sergeant McHugh or
3   Officer Walters was at that time.  Yes or no?
4   A.  The scene was chaotic and we got separated, so I'm not
5   exactly sure where everybody was at the same time with the
6   exception of Officer Diaz, who was sort of off to my left.
7   Q.  So the answer to my question, you don't know where Officer
8   Walters and Sergeant McHugh were at that time, true or not
9   true?
10  A.  True.
11          MR. NORINSBERG:  Nothing further for today, your
12  Honor.
13          THE COURT:  We're going to stop for today.  So again
14  don't discuss this case with anyone.  As I told you, 5 o'clock
15  is the latest.  We'll try break a little earlier than 5 each
16  day.  I apologize for the delays earlier this afternoon.  We do
17  expect you to not be waiting not doing anything, so get here
18  bright and early tomorrow at 9:30 and we'll continue with the
19  testimony.  Thank you very much.
20          (Jury not present)
21          THE COURT:  OK.  So we're done for the day.  Let's
22  have the lawyers get here -- I like to conference with you at
23  9:15 to make sure nothing has come up.  I don't think anything
24  will come up between today and tomorrow, but just in case,
25  maybe have counsel get here at 9 o'clock and speak to my deputy

121

DC9TGUZ3

1 and try to make sure that we have the technician here so the
2 counsel can work out any technical problems early in the
3 morning.
4            Let's have counsel get here at 9 o'clock and we'll try
5 to coordinate with the technician, and if there are any other
6 issues, let's have counsel work out the technical difficulties
7 and we'll continue with this witness at 9:30 tomorrow.
8            Anything from plaintiff?
9            MR. NORINSBERG:  No.
10           THE COURT:  Anything from defendant?
11           MR. KUNZ:  Mr. Norinsberg ended saying no further
12 questions for today.  Does that mean you're done with the
13 officer?
14           MR. NORINSBERG:  No.
15           THE COURT:  That's just for today.  Because I
16 mentioned to counsel before off the record we had a scheduling
17 conference, I told counsel that we had a technician here for
18 the ELMO.  I didn't want to say anything in front of the jury,
19 I didn't want to interrupt counsel's flow of examination.  In
20 case counsel wanted to go back to putting up the pictures, I
21 wanted counsel to know that the technician was here.  I also
22 told counsel that we would be wrapping up at 4:45 this
23 afternoon.
24           Anything else from defense counsel?
25           MR. KUNZ:  No.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

122

DC9TGUZ3

```
 1              THE COURT:  Thank you very much, have a good day.
 2              MR. KUNZ:  We have quite a bit of stuff, and I wanted
 3      to know if we could leave some in the courtroom overnight.
 4              THE COURT:  I believe you can.  Make sure it's
 5      compartmentalized neatly because I think there will be a
 6      meeting in here later, so you can leave things but definitely
 7      try to keep track of the exhibits.
 8              MR. KUNZ:  Yeah, we have got a system for that.
 9              THE COURT:  All right.  Thank you very much.
10              (Adjourned to December 10, 2013 at 9:15 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                      123
 1                     INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   BRIAN JAY
 4   Direct By Mr. Norinsberg . . . . . . . . . . .85
 5                   PLAINTIFF EXHIBITS
 6   Exhibit No.                              Received
 7    2A, 2B, 2C and 2D  . . . . . . . . . . . . .92
 8    3   . . . . . . . . . . . . . . . . . . . 101
 9    AB  . . . . . . . . . . . . . . . . . . . 103
10    5   . . . . . . . . . . . . . . . . . . . 104
11                   DEFENDANT EXHIBITS
12   Exhibit No.                              Received
13    G   . . . . . . . . . . . . . . . . . . . 110
14
15
16
17
18
19
20
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
        DBATGUZ1
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------x
  2
  3     NOEL JACKSON-GUZMAN,
  3
  4                     Plaintiff,
  4
  5           v.                          10 CV 6353 (ALC)
  5
  6     P.O. BRIAN JAY,
  6     Shield No. 29733, Individually
  7     and in his Official Capacity,
  7
  8                     Defendant.
  8
  9     ------------------------------x
  9                                       New York, N.Y.
 10                                       December 10, 2013
 10                                       9:15 a.m.
 11
 11     Before:
 12
 12                     HON. ANDREW L. CARTER, JR.,
 13
 13                                       District Judge
 14
 14                           APPEARANCES
 15
 15     JON NORINSBERG
 16     JOHN MEEHAN
 16     KATHERINE SMITH
 17          Attorneys for Plaintiff
 17
 18     NEW YORK CITY LAW DEPARTMENT
 18     OFFICE OF CORPORATION COUNSEL
 19          Attorneys for Defendant
 19     BY:  MORGAN KUNZ
 20          MATTHEW MODAFFERI
 20
 21
 22
 23
 24
 25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

125

DBATGUZ1

```
 1                (In open court, jury not present)
 2                THE COURT:  Are there any issues we need to address
 3      this morning?
 4                MR. NORINSBERG:  Just one, and this came up at one of
 5      the pretrial conferences, you were going to ask plaintiffs for
 6      an offer of proof with regard to several of police officer
 7      witnesses they were going call.  The officer we were thinking
 8      of is Officer McHugh, and we would like to have the offer of
 9      proof of why he is being called.
10                THE COURT:  We'll do that later.  We can do that after
11      Officer Jay testifies.
12                Anything else this morning?
13                MR. KUNZ:  No, your Honor.
14                THE COURT:  Is the ELMO working?
15                MR. NORINSBERG:  Yes, your Honor.
16                THE COURT:  We're just waiting for some of the jurors
17      to arrive and then we'll start.
18                Who is the next witness?
19                MR. NORINSBERG:  Officer Diaz.
20                (Pause)
21                (Jury present)
22                THE COURT:  I hope you all had a pleasant evening.
23      Good morning, and we will continue with the case on trial.
24                Officer, you're still under oath.
25                Go ahead, counsel.
```

DBATGUZ1                    Jay - direct
```
 1            MR. NORINSBERG:  Thank you, your Honor.
 2    BRIAN JAY,   (Continued)
 3         called as a witness by the Plaintiff,
 4         having been previously sworn, testified as follows:
 5   DIRECT EXAMINATION
 6   BY MR. NORINSBERG:
 7   Q.  Good morning, Officer Jay.
 8   A.  Good morning, sir.
 9   Q.  Sir, where we left off, you told us that you chased down
10   Mr. Guzman, is that correct?
11   A.  Yes, sir.
12   Q.  And then you tackled him down to the ground, correct?
13   A.  I subdued him to the ground, yes, sir.
14   Q.  And then you handcuffed him, correct?
15   A.  Yes, sir.
16   Q.  And while you were handcuffing Mr. Guzman, you claim that
17   Officer Walters came and assisted you, correct?
18   A.  No, sir.
19            MR. NORINSBERG:  Play the audio.
20            (Audio recording played)
21   Q.  You told investigators that, "Officer Walters came and
22   approached us," didn't you?
23   A.  Yes, sir.
24   Q.  And you had told investigators that Officer Walters then
25   helped you actually place the handcuffs on Mr. Guzman, didn't
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

127

DBATGUZ1                    Jay - direct

1   you?
2   A.  Yes, sir.
3   Q.  So when I asked you a few moments ago in front of this jury
4   about Officer Walters helping assist you, why did you tell them
5   that he wasn't there?
6   A.  Just slipped my mind, sir.
7   Q.  You understood, sir, that when you were in front of the
8   CCR -- when you were in front of the investigative body, you
9   had to tell the truth, right, sir?
10  A.  Yes, sir.
11  Q.  In fact, Officer Walters was nowhere near you when you
12  actually handcuffed Mr. Guzman, isn't that true?
13  A.  No, sir, I believe he came up behind me when I was
14  handcuffing him, sir.
15  Q.  You were actually by yourself when you handcuffed him,
16  isn't that true?
17  A.  I was by myself when I subdued him, sir.
18  Q.  If Officer Walters were to come into this courtroom and
19  tell this jury that he was not only not there with you but
20  actually halfway down the street --
21          MR. KUNZ:  Objection, your Honor.
22          THE COURT:  Sustained.
23  Q.  -- would that be consistent?
24          When you were interviewed by investigators, you were
25  asked specifically how Officer Walters helped you, correct?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DBATGUZ1                    Jay - direct

1    A.  Yes, sir.
2    Q.  And you told them that you grabbed one hand of Mr. Guzman
3    and Officer Walters grabbed another hand, and together you two
4    handcuffed him, right?
5              MR. KUNZ:  Objection, your Honor.
6              THE COURT:  Sustained, as to form.  Rephrase.
7    Q.  Do you recall being asked the following question and giving
8    the following answer?
9              MR. KUNZ:  Objection.
10              THE COURT:  Sustained, let's approach.
11              (In robing room)
12              THE COURT:  It seems to me that you're trying to
13    impeach him but you haven't confronted him with the
14    inconsistent statement yet.  Tell me exactly what it is you're
15    doing.  You're asking him about what he said, but he hasn't
16    said anything inconsistent with that portion of that yet.  So
17    you can ask him a question, if he says something inconsistent
18    you can impeach him with that, but you can't bring in -- that's
19    hearsay to bring that.
20              MR. KUNZ:  Your Honor, another issue is he already
21    played the audio from that exact portion to the jury, so the
22    question is asked and answered.
23              THE COURT:  No, I'll overrule that objection, but ask
24    him the question.  If he says something inconsistent, then you
25    can impeach him with that, but you can't bring out some prior

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

129

DBATGUZ1                    Jay - direct

1   testimony.
2              (In open court)
3   BY MR. NORINSBERG:
4   Q.  Officer Jay, can you tell the members of the jury how
5   Officer Walters actually assisted you in handcuffing
6   Mr. Guzman?
7   A.  If my memory serves me correctly, as I was pulling one arm
8   out from underneath Mr. Guzman, another officer, Officer
9   Walters or another officer, came and pulled his arm behind him
10  and put them behind his back so we could handcuff him.
11  Q.  When you were being interviewed by investigators, you
12  understood that you could potentially be facing serious
13  consequences if it was found that you kicked Mr. Guzman, true?
14             MR. KUNZ:  Objection, your Honor.
15             THE COURT:  Sustained.  Please rephrase the question.
16  Q.  You understood that you could potentially be suspended from
17  your job, correct?
18             MR. KUNZ:  Objection.
19             THE COURT:  Sustained.
20  Q.  Did you understand there were any consequences to your
21  testimony, sir?
22             MR. KUNZ:  Objection.
23             THE COURT:  Sustained.
24             Did you understand that it was important for you to
25  tell the truth to those investigators?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DBATGUZ1                    Jay - direct

 1            THE WITNESS:  Yes, sir, I did.
 2   Q.  Now you put Mr. Guzman in the car, you took him back to the
 3   precinct, correct?
 4   A.  He was put into a car and taken back to the precinct, yes.
 5   Q.  And at the precinct you heard Mr. Guzman complain about an
 6   injury, correct?
 7   A.  Yes, sir.
 8   Q.  And specifically, he told you that he had an injury to his
 9   right leg, correct?
10   A.  Yes, he said he was injured prior to the police
11   interaction.
12   Q.  We'll get to that in a minute, sir, I'm asking right now
13   about the injury.  He told you specifically that he had an
14   injury to his right leg, correct?
15   A.  Yes, sir.
16   Q.  And he told you that right there while he's still in police
17   custody at the precinct, correct?
18   A.  Yes, sir.
19   Q.  And you asked Mr. Guzman at that time if he needed an
20   ambulance, correct?
21   A.  Yes, sir.
22   Q.  And Mr. Guzman told you yes, he wanted an ambulance, right?
23   A.  Yes, sir.
24   Q.  After Mr. Guzman requested medical attention, you had to
25   fill out what is known as a medical treatment for prisoner

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

131

DBATGUZ1                    Jay - direct

1  form, correct?
2  A.  Yes, sir.
3  Q.  This is a form that's filled out whenever a prisoner either
4  requests medical attention or has an obvious physical injury,
5  right?
6  A.  Yes, sir.
7  Q.  And under such circumstances, you were required to fill out
8  a medical treatment for prisoner form, correct?
9  A.  Yes, sir.
10          MR. NORINSBERG:  May I approach the witness?
11          THE COURT:  Yes.
12  Q.  I would like you to take a look at that document that's
13  Defendant's Exhibit A.  Do you recognize that document, sir?
14  A.  Yes, sir.
15  Q.  Is that the medical treatment of prisoner form that you
16  filled out for Mr. Guzman?
17  A.  Yes, sir.
18  Q.  And you signed that document, correct?
19  A.  My signature is not on this document, sir.
20  Q.  But you filled it out and you put all the information on
21  this, is that correct?
22  A.  Everything from the third line down, yes, sir, it was my
23  handwriting.
24  Q.  So when it talks about the detailed section in there, that
25  came from you, correct?

```
     DBATGUZ1                    Jay - direct
 1   A.  Yes, sir.
 2              MR. NORINSBERG:  I offer Defendant's Exhibit A into
 3   evidence.
 4              MR. KUNZ:  No objection.
 5              THE COURT:  So admitted.
 6              (Defendant's Exhibit A received in evidence)
 7              THE COURT:  Counsel, we can dim the lights if you
 8   would like.
 9              MR. NORINSBERG:  That would be helpful.
10              THE COURT:  Can everyone on the jury see that?
11   BY MR. NORINSBERG:
12   Q.  So let's start there, this is a medical treatment of
13   prisoner form, right?
14   A.  Yes, sir.
15   Q.  Relates to Mr. Guzman, correct?
16   A.  Yes, sir.
17              THE COURT:  Hold on a second, counsel.  Can everyone
18   see?  We have extra seats.  If you want to move, you can.
19              You're OK?
20              Go ahead, counsel.
21   Q.  And you said first the three lines were put in by someone
22   else?
23   A.  Yes, sir.
24   Q.  But everything down here is from what you, Police Officer
25   Jay, put in, right?
```

DBATGUZ1                    Jay - direct

1  A.  Yes, sir, that is my handwriting.
2  Q.  Now directing your attention to this line right here, it
3  says nature of illness or injury, is that correct?
4  A.  Yes, sir.
5  Q.  And you document he has a right leg injury, right?
6  A.  Yes, sir.
7  Q.  And then it says old or new, correct?
8  A.  Yes, sir.
9  Q.  And you checked off old injury, right?
10  A.  Yes, sir.
11  Q.  So by that you meant something before this arrest, correct?
12  A.  Yes, sir.
13  Q.  And then you put here prisoner had injury prior to arrest,
14  is that correct?
15  A.  Yes, sir.
16  Q.  Yet, Officer Jay, you told us yesterday that Mr. Guzman ran
17  up to you full speed, didn't you?
18  A.  Yes, sir.
19  Q.  And you told us yesterday that Mr. Guzman ran away from you
20  also, correct?
21  A.  Yes, sir.
22  Q.  So on the one hand you claim Mr. Guzman had an injury to
23  his right leg prior to the arrest, but on the other hand you
24  claim Mr. Guzman was able to run up to you full speed, correct?
25  A.  Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

134

DBATGUZ1                         Jay - direct

1    Q.  And he was able to run away from you as well, correct?
2    A.  Yes, sir.
3    Q.  Are you aware that Mr. Guzman had multiple torn ligaments
4    diagnosed in his knee?
5    A.  No, sir.
6    Q.  Now according to you, Officer Jay, Mr. Guzman gave you in
7    information that he had the injury prior to the arrest, is that
8    correct?
9    A.  Yes, sir, he stated that to me at the station house.
10   Q.  So he told you this conversation at the station house,
11   right?
12   A.  Yes, sir.
13   Q.  In fact, sir, you never had any conversation with
14   Mr. Guzman at the precinct, did you?
15   A.  No, sir, we had a conversation about his injury, sir.
16   Q.  Referring to your deposition, page 87, line 15.
17              MR. KUNZ:  Hold on a second, please.
18              OK.  Go ahead.
19   "Q.  Did you have any conversation at all with Mr. Guzman while
20   he was at the precinct?
21   "A.  No, sir."
22              Do you recall being asked that question and giving
23   that answer under oath at your deposition, sir?
24   A.  No, sir, I don't.
25   Q.  So according to to your deposition, you never had a
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DBATGUZ1                      Jay - direct
1   conversation with Mr. Guzman at the precinct, true or not true?
2   A.  According to the deposition, but we did have a conversation
3   as to his pedigree as well as what was mentioned on this form.
4   Q.  You told us you didn't do the pedigree part, you told us
5   that was already there that somebody else put.
6   A.  On this form, yes.
7   Q.  Sir, isn't it true, according to your own prior deposition
8   testimony that you gave under oath, you had no conversation
9   with Mr. Guzman at the precinct?
10              Is that what you said in your deposition?  Yes or no.
11  A.  Yes, I did, but in reference to the crime that was being
12  charged.
13  Q.  I believe the question and answer was as follows, without
14  any qualification, page 8, line 15:
15  "Q.  Did you have any conversation at all with Mr. Guzman while
16  he was at the precinct?
17  "A.  No, sir."
18              Do you recall that?
19  A.  Yes, sir.
20              THE COURT:  Hold on.
21  Q.  You didn't --
22              THE COURT:  Just have a seat, counsel.
23              Go ahead, counsel, just please rephrase the question.
24  Q.  Do you recall being asked that question and giving that
25  answer, sir?

136

DBATGUZ1                    Jay - direct

1    A.  Yes, sir, I understood that to mean --
2    Q.  I'm not asking what you understood that to mean, did you
3    give that testimony, sir?
4    A.  Yes, sir.
5    Q.  Now I would like to direct your attention to the middle
6    line here.  It's very hard to read, but let's see if we can
7    read it together.
8              This box here says prisoner requests/requires medical
9    aid, correct?
10   A.  Yes.
11   Q.  And you checked yes?
12   A.  Yes, sir.
13   Q.  And you checked yes for what reason, sir?
14   A.  Because the prisoner asked for an ambulance.
15   Q.  And then you said prisoner refused medical aid and you
16   checked yes, is that correct?
17   A.  Yet.
18   Q.  And then to document that he refused the medical aid he
19   signed it.  That's Mr. Guzman's signature, correct?
20   A.  Yes.
21   Q.  And at the point where Mr. Guzman signed this document
22   right here, everything else was blank, wasn't it, sir?
23   A.  No, sir.
24   Q.  You filled that in after he signed it, didn't you?
25   A.  No, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - direct

1  Q.  So tell us how this conversation happened.  Did Mr. Guzman
2  come up and tell you I had an old injury, don't worry about it,
3  Officer?  How did it happen?
4  A.  All he stated was, both to me and to EMS, was that he was
5  injured prior to being arrested.
6  Q.  Did I just hear you say that he told EMS that?
7  A.  Yes, sir.
8  Q.  Didn't you testify in your deposition that you couldn't
9  remember what he told to EMS?
10  A.  I testified that I was with them in the room when they made
11  a statement, sir.
12  Q.  Referring to your deposition, page 86, line 9:
13  "Q.  What did the paramedics say to Mr. Guzman and what did
14  Mr. Guzman say to the paramedics?
15  "A.  I'm not sure of the exact conversation."
16         Do you recall being asked that question?
17         MR. KUNZ:  There's several lines preceding in the
18  deposition that gives the full context here.
19         THE COURT:  Hold on.  Let's have a side bar.
20         (In robing room)
21         THE COURT:  Can you just read back the question that
22  preceded turning to the deposition?
23         (Record read)
24         THE COURT:  All right.  Go ahead, what's the relevant
25  portion of the deposition?

138

DBATGUZ1                    Jay - direct
1              MR. NORINSBERG:  Page 86, line 9:
2    "Q.  What did the paramedics say to Mr. Guzman and what did
3    Mr. Guzman say to the paramedics?
4    "A.  I'm not sure of the exact conversation."
5              MR. KUNZ:  So the lines directly preceding that quote,
6    it says:
7    "Q.  At any time --"
8              THE COURT:  What line?
9              MR. KUNZ:  Page 58, line 18:
10   "Q.  At any time that morning did Mr. Guzman say that he did
11   not want medical treatment?
12   "A.  Yes, sir.
13   "Q.  When was that?
14   "A.  When the paramedics arrived.
15   "Q.  Was that after the paramedics had spoken to him?
16   "A.  Yes, sir.
17   Q.  Were you present when the paramedics were speaking to
18   Mr. Guzman?
19   "A.  Yes, sir.
20   "Q.  Did you hear what the paramedics send to Mr. Guzman?
21   "A.  Yes, sir."
22             So he very clearly is saying that he's present, and
23   then directly after that --
24             THE COURT:  Read what happened.
25             MR. KUNZ:  So then you have Mr. Norinsberg's quote,
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
        DBATGUZ1                   Jay - direct
 1   then:
 2   "Q.  What did the paramedics say to Mr. Guzman and what did
 3   Mr. Guzman say to paramedics.
 4   "A.  I'm not sure of the exact conversation, sir.
 5   "Q.  In sum and substance what was said?
 6   "A.  The sum and substance that was Mr. Guzman had told EMS
 7   that he really didn't need to be checked out by EMS so he
 8   refused medical attention."
 9             MR. NORINSBERG:  So nothing at all to do with him
10   claiming that he had an old injury.  There's nothing.
11             THE COURT:  That wasn't the question that you asked
12   him right before the impeachment, the question that you asked
13   was didn't you say in your deposition you didn't remember what
14   he told the EMS.
15             MR. NORINSBERG:  But Judge, the fact that he
16   contradicted himself later in his deposition doesn't nullify
17   the fact that he said he's not sure of the exact conversation,
18   and yet, he's telling this jury --
19             THE COURT:  But the question that you asked him wasn't
20   were you sure of the exact conversation, the question that you
21   asked was more general than that.  The question you asked was
22   didn't you say in your deposition that you didn't remember what
23   was said.  That wasn't the exact words, so I think that next
24   portion is certainly something that can be read.  If you want
25   to strike all this and go and ask the questions again more
```

DBATGUZ1                    Jay - direct

1    precisely, I'll let do you that, but that is -- that does seem
2    an unfair impeachment because the question that you asked
3    preceding that wasn't that precise, you asked him a more
4    general question.
5            MR. NORINSBERG:  I could do it like this, I could
6    break it into two questions:  You remember part of your
7    conversation with EMS, you remember the part that he refused
8    medical aid, but you have no recollection of anything else that
9    he said, correct?
10           That's directly impeaching what he told this jury that
11   he remembers -- he remembers Mr. Guzman telling --
12           THE COURT:  That's fine, but that isn't what you
13   asked.  You can't -- the question that you asked when you're
14   confronting someone with the statement for them to make the
15   inconsistent statement, you have to fairly confront them with
16   something that is very close to what the inconsistency is.  The
17   way you did this before was a little generic.  So we can strike
18   those questions preceding that and then --
19           MR. MODAFFERI:  Judge, the jury already heard that, so
20   we request first reading the subsequent question and answer,
21   and counsel can do whatever he wants, because the jury already
22   heard --
23           MR. NORINSBERG:  They can do that on their redirect.
24           THE COURT:  I think the next portion of that should be
25   read.

141

DBATGUZ1                        Jay - direct
 1               MR. NORINSBERG:  Which lines?
 2               MR. KUNZ:  I want you to read 85, 18, to 86, 21.
 3               THE COURT:  Go back to the stuff that's after that.
 4     What comes right after what Mr. Norinsberg wants?
 5               MR. KUNZ:  In sum and substance, what was said you?
 6               The sum and substance was Mr. Guzman had told EMS that
 7     he really didn't need to be checked out by EMS, so he refused
 8     medical attention.
 9               THE COURT:  The first portion of that doesn't need to
10     be read, there's nothing inconsistent about that.  I don't
11     think he was impeaching on that.  There's no doubt that the
12     witness on the stand indicated that he was there and that he
13     heard this conversation.  That's not inconsistent, right?  The
14     first part of that is not inconsistent with him hearing the
15     conversation, but the following lines should be read.  In so
16     sum and substance --
17               MR. NORINSBERG:  I will read the following lines and
18     follow it up.
19               MR. KUNZ:  But I also have a problem with the follow
20     up as well, because the question and answer here does not
21     suggest that he never heard this from the EMT.
22               THE COURT:  What's that?
23               MR. KUNZ:  He wants to argue that Officer Jay did not
24     testify in his deposition that plaintiff said that he had been
25     injured prior to arrest to the EMT, but he doesn't have

                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

DBATGUZ1                    Jay - direct

1    impeachment, he hasn't shown us any impeachment for that yet.
2            THE COURT:  But he didn't ask that question yet.  He
3    asked the general question that is saying that you didn't
4    remember what was said.
5            MR. KUNZ:  Right, but Mr. Norinsberg is going to go
6    out there and read this section, and then he's going to say OK,
7    I want to be really clear, you didn't hear Mr. Guzman tell the
8    EMT that the injury happened prior to the arrest.
9            THE COURT:  That section -- where is that section
10   about the prior to the arrest there?
11           MR. KUNZ:  That's what I'm saying, it's not here, so
12   he doesn't have impeachment and he's going to imply --
13           THE COURT:  What is not here?
14           MR. KUNZ:  It wasn't asked.  There's no impeachment
15   for it.  He's trying to use something else, a different
16   statement to impeach him on this.
17           THE COURT:  That sounds like something you can do on
18   redirect.  That's something that you can clear up on redirect.
19           What are the exact lines?
20           MR. KUNZ:  We'll start with Mr. Norinsberg read, 86
21   line 9, through 86 line 21.
22           THE COURT:  Let me see this.
23           MR. NORINSBERG:  I thought it was the next question
24   and answer.
25           MR. KUNZ:  There's one objection, so it jumps.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

143

DBATGUZ1                        Jay - direct

```
 1              THE COURT:  Then we don't need the other part with the
 2     read back, that's fine.
 3              MR. NORINSBERG:  Can I see it so we're all clear.
 4              (Pause)
 5              MR. NORINSBERG:  OK.
 6              THE COURT:  All right.
 7              (In open court)
 8              THE COURT:  Let's have the court reporter read back
 9     the last question and answer that was asked in open court.
10              (Record read)
11              THE COURT:  Counsel, turn to the deposition.
12     BY MR. NORINSBERG:
13     Q.  Referring to page 86, line 9:
14     "Q.  What did the paramedics say to Mr. Guzman and what did
15     Mr. Guzman say to the paramedics?
16     "A.  I'm not sure of the exact conversation, sir.
17     "Q.  In sum and substance, what was said?
18     "A.  The sum and substance was Mr. Guzman had told EMS that he
19     really didn't need to be checked out by EMS, so he refused
20     medical attention."
21              Do you recall being asked those questions and giving
22     those answers, sir?
23     A.  Yes, sir.
24     Q.  So according to your deposition, you remembered that
25     Mr. Guzman had refused medical attention, right?
```

144
DBATGUZ1                    Jay - direct

1    A.  Yes, sir.
2    Q.  And you remember that he told that to the EMT, correct?
3    A.  Yes, sir.
4    Q.  But you didn't mention anything about Mr. Guzman saying he
5    had an old injury, did you?
6              MR. KUNZ:  Objection.
7              THE COURT:  Overruled.
8    A.  I mentioned it on the form that we're looking at, sir.
9    Q.  I'm talking about your deposition, sir, when you were asked
10   the questions at your deposition.
11   A.  No, sir.
12   Q.  First, you said you weren't sure of the exact conversation,
13   then you said you remembered just that he refused medical
14   attention, right?
15   A.  The exact words are four years old, and the substance was
16   remembered though.
17   Q.  And the only substance you remembered is that Mr. Guzman
18   refused medical care, correct?
19   A.  Yes, sir.
20   Q.  You didn't remember any other part of the conversation, did
21   you?
22   A.  Except for what I put on these forms, sir.
23   Q.  Once again, I'm talking about at your deposition.
24   A.  No, sir.
25   Q.  So you didn't remember anything else in the conversation

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DBATGUZ1                    Jay - direct

1  except that Mr. Guzman didn't want medical care, right?
2  A.  Yes, sir.
3  Q.  Now going back to this conversation that you claim you had
4  with Mr. Guzman, the only thing Mr. Guzman supposedly told you
5  was that his injury occurred prior to police contact, correct?
6  A.  In substance, yes.
7  Q.  That's the only thing he told you, correct?
8  A.  In substance, yes.
9  Q.  He didn't give any other details, right?
10  A.  No, sir.
11  Q.  He didn't say how it happened, correct?
12  A.  No, sir.
13  Q.  He didn't say when it happened, right?
14  A.  No, sir.
15  Q.  He just told you that it happened sometime before the
16  arrest, right?
17  A.  Yes, sir.
18  Q.  And when Mr. Guzman told you all this, did you then turn
19  around and ask him how did you injure your leg?  Did you ask
20  that question?
21  A.  No, sir.
22  Q.  The reason you didn't ask it is because you knew how he
23  injured his leg, didn't you, sir?
24  A.  No, sir.
25  Q.  You knew it because you're the one that injured his leg,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

146

DBATGUZ1                    Jay - direct
1    isn't that true?
2    A.  No, sir.
3    Q.  Now at some point you do remember being present when the
4    EMT came to the precinct, correct?
5    A.  Yes, sir.
6    Q.  And you actually saw the paramedics speaking to Mr. Guzman,
7    correct?
8    A.  Yes, sir.
9    Q.  And you yourself were actually present at the time the very
10   moment when Mr. Guzman was talking to the EMTs, isn't that
11   true?
12   A.  Yes, sir, I have to safeguard my prisoners.
13   Q.  So the answer to my question is yes, you were present at
14   the time that Mr. Guzman was speaking to the EMT, is that
15   correct?
16   A.  Yes, sir.
17   Q.  Not only were you present but you actually signed the
18   ambulance call report, isn't that true?
19   A.  That's standard operating procedure, sir, yes.
20   Q.  So the answer is you signed it, right?
21   A.  Yes.
22   Q.  I would like to show you Defendant's Exhibit B.
23            Have you had a chance to review the document, sir?
24   A.  Yes, sir.
25   Q.  Do you see your signature on the second page?

147

DBATGUZ1                    Jay - direct

1   A.  Yes, sir.
2            MR. NORINSBERG:  I offer Defendant's Exhibit B into
3   evidence subject to connection with EMT Smith's testimony.
4            MR. KUNZ:  No objection.
5            THE COURT:  OK.
6            (Defendant's Exhibit B received in evidence)
7   Q.  Officer Jay, you actually told the EMT that Mr. Guzman
8   injured himself in a fight, didn't you?
9   A.  No, sir.
10  Q.  Isn't it true, sir, that what really happened that night
11  you is kicked Mr. Guzman, and you knew he had an injury, and
12  you the wanted to document an explanation for how it happened,
13  and that's why you created this form, isn't that true?
14  A.  No, sir.
15  Q.  Would you agree that this form, the medical treatment of
16  prisoner form and the ambulance call report, both have
17  something to do with you?  Would you agree with that?
18  A.  My signature is on one and my name is on the other, so yes,
19  sir.
20  Q.  So you prepared one and you signed the other, correct?
21  A.  Yes, sir.
22  Q.  Now have you ever seen the pictures of Mr. Guzman's leg?
23  A.  No, sir.
24  Q.  So to this day, you've never actually seen the injuries on
25  his leg?

148

DBATGUZ1                    Jay - direct

1   A.  No, sir, I have not.
2   Q.  You told us earlier or yesterday when you got out of the
3   car, people were blocking you, correct?
4   A.  Yes, sir.
5   Q.  And you told us that you were yelling several times police,
6   get out of the way, right?
7   A.  Yes, sir.
8   Q.  And one of those people in your way was Mr. Guzman, isn't
9   that true?
10  A.  I never saw Mr. Guzman in the crowd, sir.
11  Q.  And you would never kick a suspect, right?
12  A.  No, sir, I would not.
13  Q.  And in fact, you have never done that in your career,
14  correct, sir?
15          MR. KUNZ:  Objection, your Honor.
16          THE COURT:  Objection sustained.
17  Q.  No one else has ever made a complaint against you --
18          MR. KUNZ:  Objection, your Honor.
19          THE COURT:  Sustained.
20          MR. NORINSBERG:  May we approach?
21          THE COURT:  No, keep going.
22  Q.  Was this the first time in your career that anyone had ever
23  made a complaint that you kicked them?
24          MR. KUNZ:  Objection, your Honor.
25          THE COURT:  Sustained.  Let's approach.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

149
DBATGUZ1                    Jay - direct
```
 1              (In robing room)
 2              THE COURT:  What are you doing?
 3              MR. NORINSBERG:  You indicated, Judge, when we last
 4     argued this issues on the Hidalgo incident in January you said
 5     you're reserving decision.  You precluded us, but you would
 6     allow for the possibility during the examination, if he says
 7     something which would open the door and allow us to get this
 8     in.  And I'm not saying it in the affirmative, I'm not saying
 9     isn't it true someone made a complaint.  I said it the exact
10     opposite, no one ever made a complaint against you, isn't it
11     true?
12              THE COURT:  But you can't open the door for him.
13     You're clearly trying to open the door.  Your question about
14     you've never done this, you're trying to open the door.
15              MR. NORINSBERG:  I am trying to open the door.
16              MR. KUNZ:  In direct violation of your Honor's in
17     limine ruling.  He suggested to the jury that there's something
18     they're not being told about.  This is incredibly
19     inappropriate.
20              MR. NORINSBERG:  Absolutely not.
21              THE COURT:  All the objections are sustained, we'll
22     strike all that.
23              MR. KUNZ:  We need an instruction to tell the jury.
24     This is unbelievable.
25              THE COURT:  Do you want a curative instruction?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DBATGUZ1                    Jay - direct
1              MR. KUNZ:  Can we think about that?
2              THE COURT:  You don't want to draw attention to it.  I
3    will sustain the objections and strike all those questions.
4              MR. KUNZ:  And future conduct like this.
5              THE COURT:  You can't do this.  You can't try to open
6    the door like that.
7              How much further do you have to go with this witness?
8              MR. NORINSBERG:  Probably half hour or less.
9              THE COURT:  OK.
10             (In open court)
11             THE COURT:  OK, those objections are all sustained.
12   Those questions by counsel should be disregarded by the jury,
13   and they will be struck from the record.
14             Go ahead, counsel.
15             MR. NORINSBERG:  May I approach the witness?
16             THE COURT:  Yes.
17   BY MR. NORINSBERG:
18   Q.  Have you had a chance to look at the documents 1C, 1E and
19   1F?
20   A.  Yes, sir.
21   Q.  Those are photographs, is that correct?
22   A.  Yes, sir.
23   Q.  One is a picture of bruising --
24             MR. KUNZ:  Objection, your Honor.  He needs to ask a
25   question.

151

DBATGUZ1                    Jay - direct
1              THE COURT:  Objection sustained.
2              MR. NORINSBERG:  I offer the photographs in subject to
3    connection.
4              MR. KUNZ:  Objection, your Honor.
5              THE COURT:  Objection sustained as to form.
6    Q.  So is it your testimony, sir, that you didn't cause any
7    injuries to Mr. Guzman in this incident?
8    A.  Yes, sir.
9    Q.  And you had nothing do with any types of bruising that
10   might show up on photographs that are admitted into evidence
11   later in the trial, right?
12             MR. KUNZ:  Objection, your Honor.
13             THE COURT:  Objection sustained as to form.
14   Q.  You were wearing boots that night, sir?
15   A.  I might have been wearing boots, sir.
16   Q.  You were wearing a pair of Timberland boots?
17   A.  I might have been wearing a pair of Timberland boots.
18   Q.  And you admit being with Mr. Guzman at the moment that he
19   went down to the ground, correct?
20   A.  Yes, sir.
21   Q.  So the only thing that you would really disagree on is how
22   he went down to the ground, correct?
23             THE COURT:  Objection sustained as to form.
24   Q.  You claim you dragged Mr. Guzman down to the ground, right?
25   A.  Yes, sir.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

152

DBATGUZ1                    Jay - direct

1   Q.  You tackled him from behind?
2   A.  I grabbed him from behind and dragged him to the ground.
3   Q.  Once you got him to the ground, you then took his ponytail
4   and put pepper spray in his face, didn't you are?
5   A.  No, sir.
6   Q.  You never did that?
7   A.  No, sir.
8   Q.  And you never told Mr. Guzman:  NYPD, mother fucker.  You
9   never said that either, right?
10  A.  No, sir, I did not.
11  Q.  You would never curse at a civilian, right, sir?
12  A.  Not purposefully, no, sir.
13  Q.  Now you would agree, Officer Jay, that once you had
14  Mr. Guzman on the ground, there was no reason at that point to
15  pepper spray him, right?
16  A.  I don't understand the question, sir.
17  Q.  Once he's down on the ground, you would have no reason to
18  pepper spray him at that point, right?
19  A.  When we went down on the ground, I had no ability to pepper
20  spray him.  My hands were full.
21  Q.  You told us before that you had an Officer Walters there
22  assisting you, right?
23  A.  After my hands were still on his arms.
24  Q.  How did you land?  Did you land on him?
25  A.  Actually when I -- my arms were around him, so the first

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - direct

1    thing we landed on was my right arm.
2    Q.  So your right arm came in contact with the concrete ground,
3    is that correct?
4    A.  Yes, sir.
5    Q.  So you told us now you've tackled two people in this
6    incident, Mr. Henriavez, you brought him down to the ground and
7    then tackled Mr. Guzman and landed on your right arm?
8    A.  Yes, sir.
9    Q.  And yet you didn't sustain any injuries in this incident,
10   did you?
11   A.  No, sir, I did not.
12   Q.  You had no cuts, correct?
13   A.  Not that I recall, sir.
14   Q.  No bruises, no lacerations, no bleeding from any part of
15   your body, correct?
16   A.  Not that I remember, sir, no.
17   Q.  Even after tackling two men on a winter night on a concrete
18   sidewalk, right?
19   A.  Yes, sir.
20   Q.  And you're familiar with what is known as the patrol guide,
21   correct?
22           MR. KUNZ:  Objection, your Honor.
23           THE COURT:  Sustained.
24   Q.  I would like to clear up a few points and then we'll
25   conclude the examination.  When you went after the first of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - direct

1   Molina defendants, Mr. Henriavez and you had a struggle with
2   him on the ground, right?
3   A.  Yes, sir.
4   Q.  But your testimony is that struggle lasted just a few
5   seconds, is that correct?
6   A.  Yes, sir.
7   Q.  And to be clear, when Mr. Guzman supposedly came up from
8   you from behind, the first time you were aware of him is when
9   he grabbed you, is that correct?
10  A.  The first time I was aware it was Mr. Guzman, yes.
11  Q.  And you didn't have any conversation with him at that time,
12  correct?
13  A.  No, sir.
14  Q.  So it wasn't a situation where you were saying Mr. Guzman
15  stepped back and he kept coming at you and you kept telling him
16  to step back, right?
17  A.  Yes.
18  Q.  That never happened, right?
19  A.  That's correct, sir.
20  Q.  Now we tried to put up some pictures yesterday, I would
21  like to show you some today that we tried to get up of the
22  location.
23            THE COURT:  State for the record which exhibit this
24  is.
25            MR. MEEHAN:  Plaintiff's 2A, your Honor.

DBATGUZ1                    Jay - direct

```
 1                THE COURT:  Members the jury all see that?
 2                Go ahead, counsel.
 3      Q.  Do you recognize what is shown in that picture, sir?
 4      A.  Yes, sir.
 5      Q.  Is that Sherman Avenue?
 6      A.  It is Sherman Avenue northbound.
 7      Q.  Is that the intersection of 207th Street?
 8      A.  Yes, sir.
 9      Q.  Now which side of the street was the fight on?  Was it this
10  side or this side?
11      A.  It would be this side, sir.
12      Q.  So you're indicating the right side?
13      A.  Yes, sir.
14      Q.  That's the northeast corner?
15      A.  Yes, sir.
16      Q.  And that's where the police car pulled into?
17      A.  Somewhere in that area, yes, sir.
18      Q.  It was definitely not this side, right?
19      A.  Not that I think so.
20      Q.  And the side you're identifying is the northeast corner not
21  the northwest corner, correct?
22      A.  Yes.
23                MR. NORINSBERG:  Put up the next picture.
24                Identify it for the record.
25                MR. MEEHAN:  Plaintiff's Exhibit 2B.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

156

DBATGUZ1                          Jay - direct

1   Q.  And again, looking at Sherman Avenue and 207th Street,
2   correct?
3   A.  Yes, sir.
4   Q.  A little bit closer, that's the northwest corner on the
5   left side, northeast is on the right side, correct?
6   A.  Yes, sir.
7   Q.  And the Red Lounge would be on the northeast side?
8   A.  No, sir, it was on the left side.
9   Q.  So the Red Lounge is over here, but the fight is breaking
10  out over here?
11  A.  Yes, sir.
12  Q.  So the fight is across the street from where the club is,
13  is that your testimony?
14  A.  Yes, sir.
15  Q.  Since the date of the incident, have you ever had any
16  discussions at all about what happened on this night with
17  Sergeant McHugh?
18  A.  Yes, sir.
19  Q.  Can you tell the members of this jury how many times you
20  talked to Sergeant McHugh about what happened?
21  A.  I don't know the exact number, sir, but it wasn't that
22  often.
23  Q.  Would it be more than five times?
24  A.  I don't know, sir.
25  Q.  Would it be more than ten times?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

157

DBATGUZ1                    Jay - direct

1   A.  I don't know, sir.
2   Q.  Have you had -- but you definitely had discussions, more
3   than one discussion, with Sergeant McHugh about the incident,
4   right?
5   A.  Yes, sir.
6   Q.  And after there was a lawsuit filed, you certainly spoke to
7   him after that point, right?
8   A.  Yes, sir.
9   Q.  And how many discussions have you had with Officer Walters
10  after this the incident?
11  A.  A few, sir.
12  Q.  And can you tell us approximately how many conversations
13  you talked to Officer Walters about this incident?
14  A.  I don't know, sir.
15  Q.  Would it be more than five?
16  A.  I don't know, sir.
17  Q.  What's that?
18  A.  I don't know.
19  Q.  Would it be more than ten times you have spoken with him?
20  A.  I don't know.
21  Q.  How about Officer Diaz, can you tell the jury how many
22  times have you discussed the events of that morning with
23  Officer Diaz?
24  A.  No, sir.
25  Q.  What's that?

158

DBATGUZ1                         Jay - direct

1   A.  I don't know, sir.
2   Q.  That could be five or ten times also, you don't know?
3   A.  Don't know, sir.
4   Q.  Now you actually spoke with Officer Diaz the date before
5   you testified at your deposition, isn't that true?
6   A.  I might have, sir.
7   Q.  Referring to your deposition, page 11, line 11.
8            MR. KUNZ:  Hold on one second.
9            OK, go ahead.
10  "Q.  When did you last speak to Johnny Diaz?
11  "A.  Yesterday morning, sir."
12           Do you recall being asked that question and giving
13  that answer?
14  A.  Yes, sir.
15  Q.  So according to your deposition, you spoke to Officer Diaz
16  the day before you testified, is that true?
17           MR. KUNZ:  Objection, your Honor, this is another
18  example.
19           THE COURT:  Sustained as to form.
20           MR. KUNZ:  I think we need to read the next two or
21  three questions.
22           THE COURT:  Hold on.  Let's have a sidebar.
23           (In robing room)
24           THE COURT:  So what's next?
25           MR. KUNZ:  Page 11, the quote Mr. Norinsberg read
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

159

DBATGUZ1                    Jay - direct

1   started at 11:
2   "Q.  When did you last speak to John Diaz?
3   "A.  Yesterday morning, sir.
4   "Q.  Did you mention to John Diaz that you were coming to a
5   deposition today?
6   "A.  Yes, sir, I did.
7   "Q.  Yesterday did you discuss with John Diaz what happened on
8   February 14, 2009?
9   "A.  No, sir, I have not."
10          MR. NORINSBERG:  If you look at my cross-examination,
11  that's the very next point I'm making.  I'm challenging his
12  credibility on that.  They can make whatever argument they
13  want.  I'm establishing, first of all, that he did speak to
14  him, which he wasn't a hundred percent sure on, and the next
15  thing I'm going to challenge his claim that he never talked
16  about the incident.  You can look at it right here, it's my
17  next question.
18          THE COURT:  The question that -- you're seeking to
19  impeach him, and the question that you asked prior to the
20  impeachment, it's an unfair question.  You didn't ask him
21  whether or not -- you implied to this jury -- more than
22  implied, you basically said to this jury that he's been
23  speaking to these other officers about this case.  He doesn't
24  remember how many times he has spoken to these officers about
25  this case.  And then you asked him if you don't know how many

DBATGUZ1                    Jay - direct

 1    times you had spoken to Officer Diaz, but you spoke to him
 2    right before your deposition.
 3                MR. NORINSBERG:  That's right, and the next question
 4    I'm going to ask, but -- I'm reading from my outline.  But you
 5    didn't talk about the details of the case at all, right,
 6    Officer?
 7                THE COURT:  That's fine, but you --
 8                MR. NORINSBERG:  That's cross-examination.
 9                THE COURT:  No, here's the problem, if you ask this
10    question -- I don't need to look at your cross-examination, but
11    your question in the order, the sequence of your
12    cross-examination is under this chapter, if you will, of him
13    talking to these officers about this situation so they can all
14    get their stories straight or whatever argument you're going to
15    make to the jury, that he has spoken to all of them about this,
16    and they're tailoring this testimony so it fits in nicely
17    together.
18                So when you asked this question, "And you spoke to
19    Officer Diaz the day before the deposition," that's still
20    within that chapter, that's still within the framework of him
21    tailoring testimony with other people.  So when you asked that
22    question -- if you ask that question and his answer on the
23    stand was:  I think I spoke to him but we didn't talk to about
24    the case; then fine, but his answer was:  I don't remember.
25    And then you try to impeach him with deposition transcripts

DBATGUZ1                    Jay - direct

1  that indicate that he did speak to him, which is still under
2  this chapter of you have been talking to people about the case.
3  So you can't leave that there, you have to read the extra part
4  of that.
5            MR. NORINSBERG:  But Judge, the first part of this
6  point was that he was unsure, he was -- I asked him, and the
7  question was:  And you spoke to him the morning before your
8  deposition.  And he was like:  I'm not sure, I don't remember.
9            MR. KUNZ:  Then you show him.
10           MR. NORINSBERG:  No, you don't show --
11           MR. KUNZ:  Refresh.
12           MR. NORINSBERG:  I can refresh --
13           THE COURT:  Hold on.
14           MR. NORINSBERG:  I can --
15           THE COURT:  You don't have to refresh, you can
16  impeach, but if you're asking him about talking to people,
17  talking to the officers generally, then this would be
18  absolutely fine, but you didn't ask him about talking to the
19  officers generally.  If you were doing some examination saying
20  you hang out with Diaz, you hang out with these people, you
21  talk all the time, you're always hanging out, then that would
22  be fine.  But you did it under this section of talking about
23  the case, so you need to read the next lines of that.
24           MR. NORINSBERG:  But the next line is simply:  Did you
25  mention that you were coming to the deposition?  That supports
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

162

DBATGUZ1                    Jay - direct

1    my theory.
2            THE COURT:  I understand what you have there, but you
3    can't impeach him with that.
4            MR. NORINSBERG:  But the next line is:
5    "Q.  Did you mention to John Diaz you were coming to a
6    deposition today?
7    "A.  Yes, sir, I did."
8            Which I'm happy to read.  And my next point was:  You
9    didn't talk about the details of the case, right?
10           THE COURT:  But if you're saying it's the same thing,
11   what is your prejudice of reading the rest of the deposition
12   transcript?
13           MR. NORINSBERG:  I don't understand.
14           THE COURT:  Let me explain it to you, and we're going
15   to have to do this because I have to move on.  When you impeach
16   someone, if you're going to say the car is red and that person
17   says the car is blue, you can go and impeach them and you can
18   say you testified in this deposition you were asked this
19   question and gave this answer:  What color was the car?  The
20   car was red.  That's fine.
21           But you can't do these general kind of things and say
22   you don't remember whether or not the car was red and then ask
23   him these -- then start trying to impeach with:  What color was
24   the car?  The car was red.  You can't do that.  What I'm saying
25   is your questions aren't quite tight enough for the impeachment

DBATGUZ1                    Jay - direct

1    that you're trying to do.  It's an unfair comment to take this
2    out of context, because what you're presenting to the jury is
3    again, under this chapter of your cross-examination that you
4    have spoken to Diaz, you have spoken to all these other
5    officers about this case, about what happened on February 14,
6    correct?
7          MR. NORINSBERG:  Which he admitted, yes.
8          THE COURT:  OK.  So then when you asked him in front
9    of this jury, in a very animated voice you spoke to Diaz the
10   day before your deposition, and he says I don't remember, that
11   is still in this framework about what happened on February 14th
12   2009.
13         MR. NORINSBERG:  I agree, but let's say --
14         THE COURT:  But if you agree with that, then you can't
15   just impeach him with something that doesn't contain all of the
16   rest of that.
17         MR. NORINSBERG:  Judge, if we took out the deposition
18   completely, if he simply said:  Yes, I spoke to him the day
19   before the deposition.  And then I said:  But you did not talk
20   at all about this case, right?  That's same point, the only
21   difference is we got there because he hedged on whether he
22   could remember.
23         THE COURT:  But it's in the wrong chapter of your
24   cross-examination, because the question was an unfair question
25   in that context.  So you need to read the rest of that.  If you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

164

DBATGUZ1                    Jay - direct

1  were simply going to ask him --
2          MR. NORINSBERG:  I'm showing it to you.  This is what
3  I was going to ask him.  You mentioned you had a deposition but
4  didn't talk about the case.
5          THE COURT:  But your whole theory is he's lying.
6          MR. NORINSBERG:  Yes.
7          THE COURT:  So when you say to a jury -- when you cut
8  out the rest of that, you make him look like a liar unfairly
9  when you're saying you spoke to Diaz the day before your
10  deposition, and implied in that about what happened on
11  February 14, 2009, then when you simply ask him -- you simply
12  read back testimony that says didn't you speak to Officer Diaz,
13  when is the last time you spoke to Officer Diaz, the day before
14  that's unfair.
15          I ruled you need to read the rest of that.  Let's get
16  the pages.
17          MR. KUNZ:  Page 11, line 11 through 23.
18          THE COURT:  Let me see the page.
19          MR. KUNZ:  Sorry, through line 20.
20          THE COURT:  Page 11, line 11 through 20.
21          OK, yeah, 11 through 20.
22          (Continued on next page)
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - direct
```
 1              (In open court)
 2   BY MR. NORINSBERG:
 3   Q.  Referring to your deposition, page 11, line 11.
 4   "Q.  When did you last speak to John Diaz?
 5   "A.  Yesterday morning, sir.
 6   "Q.  Did you mention to John Diaz that you were coming to a
 7   deposition today?
 8   "A.  Yes, sir, I did.
 9   "Q.  Yesterday did you discuss with John Diaz what happened on
10   February 14, 2009?
11   "A.  No, sir, I did not."
12           Do you recall being asked those questions and giving
13   those answers?
14   A.  Yes, sir.
15   Q.  So you acknowledge speaking to Officer Diaz, you
16   acknowledge telling him that you're going to the deposition but
17   you didn't talk at all about this incident.  Is that your
18   testimony?
19   A.  Yes, sir.
20   Q.  Now you mentioned earlier about giving statements to the
21   investigators, is that correct?
22   A.  Yes, sir.
23   Q.  Before giving those statements to the investigators, did
24   you discuss what happened on February 14, 2009 with either
25   Sergeant McHugh, John Walters or John Diaz?
```

DBATGUZ1                   Jay - direct

1    A.  As per instructions, no, sir.
2    Q.  You did not.  Referring to your deposition, page 12, line
3    19:
4    "Q.  Before going to the investigators, did you discuss what
5    happened on February 14, 2009 with either Sergeant McHugh, John
6    Walters or John Diaz?
7    "A.  Yes, sir."
8            Do you recall giving that testimony under oath, sir?
9    A.  No, sir, I don't.
10   Q.  So according to your deposition, you did in fact discuss
11   this incident with your partners before you testified to the
12   investigators, correct?
13   A.  I might have, sir.
14   Q.  But you just told us a minute ago that according to
15   regulations you're not allowed to speak to your fellow officers
16   about the incident.  Isn't that what you told us?
17   A.  Yes, sir.  There are certain circumstances, though, that
18   one of things about this case we brought up all the time was
19   because of the humor in it, and that's the whole NYPD mother
20   fucker thing.  It's humorous because nobody in real life talks
21   like that.  We talk about that all the time kind of as kind of
22   an ongoing joke.
23   Q.  I see.  So basically, you talk to the other officers just
24   about the joke of NYPD mother fucker, that's your testimony?
25   A.  Yes, sir.

167

DBATGUZ1                    Jay - direct

1    Q.  But you didn't talk at all about the incident or any
2    details, is that correct?
3    A.  Yes, sir.
4    Q.  Would you agree you spoke with all three of your partners
5    before you gave your testimony to the investigators?
6    A.  We're friends, we speak almost every day.
7    Q.  You spoke about the incident before you gave your testimony
8    to the investigators with all of them, true?
9              MR. KUNZ:  Objection, your Honor.
10             THE COURT:  I'll allow it.
11   A.  As I said before, we spoke about portions of it.
12   Q.  Now before this incident, this team had worked together, is
13   that correct?
14   A.  I don't understand the question.
15   Q.  Before February 14, 2009, you worked together as a team, is
16   that right?
17   A.  Yes, sir.
18   Q.  You worked since October 2008, right?
19   A.  Yes, sir.
20   Q.  And you worked steadily with the same team members,
21   correct?
22   A.  Yes, sir.
23   Q.  And up until the time of your deposition, you were still
24   working with those same team members, correct?
25   A.  Yes, sir.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

168

DBATGUZ1                        Jay - direct
 1   Q.  Now Officer Jay, this is not the first time you testified
 2   in court, is it?
 3   A.  No, sir, it's not.
 4   Q.  As a police officer, you're called upon from time to time
 5   to testify in court, right?
 6   A.  Yes, sir.
 7   Q.  So for example, you've testified in grand jury proceedings,
 8   correct?
 9   A.  Yes, sir.
10   Q.  You've testified in criminal court hearings, correct?
11   A.  Yes, sir.
12   Q.  You've testified in criminal trials, correct?
13   A.  Yes, sir.
14   Q.  You've also testified in civil proceedings, correct?
15   A.  Yes, sir.
16   Q.  Would you agree, Officer Jay, that you testified over 100
17   times as a police officer?
18   A.  I don't know the exact number, sir.
19            MR. NORINSBERG:  Nothing further.
20            THE COURT:  OK.  This seems like a good time to take
21   our morning break, so let's take a 15-minute break and let's
22   come back at five after eleven.
23            (Jury not present)
24            THE COURT:  OK.  See everyone at five after eleven.
25            (Recess taken)
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

169

DBATGUZ1

```
 1                 (Jury not present)
 2                 MR. MODAFFERI:  Judge, we have one brief application
 3       before the jury gets brought into the courtroom.
 4                 THE COURT:  Does the application have to do with the
 5       officer's testimony?
 6                 MR. MODAFFERI:  I think it has to do with the case in
 7       its entirety and the officer's testimony.
 8                 THE COURT:  Maybe we should have the officer excused
 9       while you make this application.
10                 MR. MODAFFERI:  Sure.
11                 THE COURT:  Please step outside.
12                 (Witness not present)
13                 MR. MODAFFERI:  Judge, we're only on the first witness
14       in this case and we already feel that we have been immensely
15       prejudiced by some of the questioning by counsel, including the
16       fact that he had asked the witness about prior complaints, in
17       contravention of your Honor's in limine ruling.  The plaintiff
18       did mention the word "CCRB" at one point.  He said the word
19       "investigators" maybe 10 to 20 times, and even at the end he
20       snuck in a question regarding the fact that Officer Jay, have
21       you ever testified in a civil proceeding before, planting the
22       seeds in the jury's mind that he may have been sued in the
23       past.
24                 So in light of the "investigators" being mentioned
25       over and over again, the word "CCRB," the questions about prior
```

170

DBATGUZ1

```
 1   complaints, and the fact that he's participated in civil
 2   proceedings before, we feel that we have been immensely
 3   prejudiced just on the first witness in this case, and we would
 4   just make an application to your Honor that the only way really
 5   to cure that prejudice would be to ask about that
 6   investigation, and if there was a disposition and what, if
 7   anything, it was.
 8            Because at this point it's in the jury's mind there
 9   were investigators, these people -- the officers were
10   conspiring somehow because they knew that they would get fired
11   or terminated, the Officer Jay kicked someone before, all of
12   these seeds have been planted and we are now prejudiced because
13   we cannot in any way attack all of those lines of questioning.
14            THE COURT:  So what is it that you want to do?
15            MR. MODAFFERI:  I wish I had an easier way to cure the
16   prejudice, but the only thing that I can think of after
17   speaking to my co-counsel is to get the finding of the
18   investigators.  Investigators have been mentioned numerous
19   times, CCRB was mentioned, prior complaints were mentioned, I
20   don't see any other way to cure the prejudice.
21            THE COURT:  OK, I guess counsel did start saying "CC,"
22   he didn't say "RB."  In terms of complaints, the objection to
23   those questions was sustained, and those questions have been
24   stricken from the record.
25            In terms of mentioning investigators, I'm not sure
```

171

DBATGUZ1

1    what the problem is there.  In terms of the investigators, it
2    was in the context typically speaking of him impeaching the
3    witness.  I don't see a problem with that.  It sounds as if
4    you're asking again, and it seems to me that the conclusion of
5    the investigators seems to be highly irrelevant and
6    prejudicial, what the investigators' conclusion -- why is that
7    relevant what the investigators concluded?
8              MR. MODAFFERI:  Because it creates an image, there's
9    the seed that has been planted in the jurors' minds that
10   something really wrong happened here because investigators were
11   investigating, there were prior complaints.  And looking at
12   this as a whole, we have been prejudiced.  And we would take
13   your Honor's lead in suggesting how to cure this prejudice
14   absent the finding of the investigators.  It's just we have
15   already prejudiced on the first witness and we're sitting here
16   and our client has been prejudiced.
17             THE COURT:  How have you been prejudiced?  I'm trying
18   to figure out how.  Those other questions have been stricken
19   from the record.  Where is the prejudice?
20             MR. MODAFFERI:  In an ideal word if they were stricken
21   and deleted from the jurors' minds there is no prejudice.
22   However, they heard the questions, they -- the seed has been
23   planted that this guy has been the subject of complaints for
24   kicking people in the past.  He is being investigated by
25   investigators.  He's participated in civil proceedings in the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

172

DBATGUZ1

1  past.  All of these things are mounting and they amount to
2  prejudice.
3          THE COURT:  My understanding of the questions and my
4  recollection of the questions about investigators is those
5  questions were all related to impeaching his testimony with
6  statements by the investigators in this case.  I don't recall
7  any general mention of any kind of general investigations or
8  investigations related to something else.  Let me know if I'm
9  wrong.
10         MR. KUNZ:  Judge, the problem, your Honor, is that
11 when he goes to impeach one of our witnesses with their
12 testimony to the Civilian Complaint Review Board he could say
13 when you previously testified you said this, play the tape,
14 read the transcript, but he didn't do that, he intentionally
15 and repeatedly used the word investigator, investigator.
16         THE COURT:  I think I ruled that he could use that
17 word.
18         MR. MODAFFERI:  But Judge, to go back to the opening,
19 counsel mentioned in the opening his client made a complaint
20 and then investigators took up an investigation.  If he just
21 used it in impeachment and said OK, let's go to your testimony,
22 when you were questioned by investigators, but now he's already
23 told the jury that his client made a complaint.
24         THE COURT:  I'm trying to figure out what is it
25 specifically that you're asking to do.  Do you want to ask this

173

DBATGUZ1

1  witness about the CCRB investigation for this case?  Is that
2  what you're asking me?  Because that's what you tried to
3  preclude before, but is that what you want to do?
4          MR. MODAFFERI:  For this case we never made a motion
5  about it, it was all for prior instances.  In this case we're
6  suggesting that now that investigators have brought to the
7  forefront that plaintiff made a complaint, investigators were
8  involved, the final piece to the puzzle is what that
9  determination was by the investigators.  So that's what we're
10 asking for to cure the prejudice.
11         THE COURT:  Plaintiff?
12         MR. NORINSBERG:  Every single argument that I have
13 just heard really just boggles my mind.  They objected to me
14 using "CCRB," so they were the ones that said use the word
15 "investigator."  I used the word investigator, now they're
16 unhappy with it.  How else am I supposed to distinguish between
17 prior testimony to an investigator and prior testimony at the
18 deposition?
19         THE COURT:  That's fine.  I will reserve on that.
20 Let's not do that now.  Officer Jay is a defendant in this case
21 and will be around.  If there is some issue and I'm persuaded
22 later, you can recall him at some other point, but let's stay
23 away from that for now and get him on the stand and not waste
24 the jury's time.
25         Let's bring them in.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DBATGUZ1                     Jay - cross
1                (Jury present)
2                THE COURT:  Good morning, Officer.
3    CROSS-EXAMINATION
4    BY MR. KUNZ:
5    Q.  Good morning, Officer Jay.  I got a little confused during
6    your cross-examination with all the yeses or nos about
7    paperwork.
8                MR. NORINSBERG:  Objection.
9                THE COURT:  Objection sustained as to form.
10   Q.  So I want to ask you about the paperwork, and let's start
11   there.  First is Defendant's Exhibit A, which is the medical
12   treatment prisoner form.
13               THE COURT:  Counsel, do you want us to dim the lights?
14               MR. KUNZ:  Sure.  Thank you, your Honor.
15   Q.  Now does this form indicate when it was finally completed?
16               THE COURT:  Hold on.  Can all the jurors -- if you're
17   going to stand there, that's fine, but can all the jurors see?
18               JUROR:  Yes.
19               THE COURT:  Go ahead.
20   Q.  Does this form indicate when it was finally completed, when
21   it was written?
22   A.  Yes, sir.
23   Q.  And is that right here?
24   A.  Yes, 5:45.
25   Q.  5:45 a.m.?

DBATGUZ1                    Jay - cross
1    A.  Yes, sir.
2    Q.  And is it fair to say that your memory of what happened
3    that night was stronger than it is now?
4            MR. NORINSBERG:  Objection, leading.
5            THE COURT:  I'll allow it.
6    A.  Yes, sir.
7    Q.  And how about at your deposition when you testified, was
8    your memory stronger then?
9    A.  I don't know, sir.
10   Q.  Now the information on the form here, where did this
11   information come from, the name and the other information about
12   Mr. Guzman, where did you get that information?
13   A.  From his pedigree card, sir.
14   Q.  And how about the statement "right leg injury," where did
15   you get that information?
16   A.  Mr. Guzman told me that, sir.
17   Q.  So you had a conversation with Mr. Guzman?
18   A.  About his injury, yes, sir.
19   Q.  And how about this information here, the remarks section,
20   where it says "prisoner had injury prior to arrest," where did
21   you get that information?
22   A.  From Mr. Guzman, sir.
23   Q.  So I think you also testified during your cross-examination
24   for Mr. Norinsberg, Mr. Guzman told you he wanted medical
25   attention?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross

```
 1    A.  Yes, sir, he did.
 2    Q.  So then is it fair to say that you had conversations with
 3    plaintiff at the precinct?
 4    A.  Yes, sir.
 5    Q.  Now plaintiff's signature is that on this form here?
 6    A.  Yes, sir, it is.
 7    Q.  Can you describe for the jury where plaintiff's signature
 8    is?
 9    A.  It's in the middle of the form four or five lines under the
10    date.
11    Q.  So is that right next to the time that says 5:45?
12    A.  Yes, sir.
13    Q.  And now were you there when the plaintiff signed this form?
14    A.  Yes, sir, I was.
15    Q.  And what time did he sign this form?
16    A.  Approximately 5:45 a.m., sir.
17    Q.  So during your direct examination by Mr. Norinsberg when he
18    suggested that you didn't have any conversations with
19    Mr. Guzman at the precinct, was that accurate?
20            MR. NORINSBERG:  Objection.
21            THE COURT:  Objection sustained as to form.
22    Q.  Now I want to look at the arrest report, this is
23    Plaintiff's Exhibit 3, did you create this the document?
24    A.  Yes, sir, I did.
25    Q.  And when did you create this document?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross
1    A.  Directly after the arrest.
2         MR. KUNZ:  Now I don't want to stand in front of the
3    jury, so Mr. Norinsberg, do you have another copy of this?
4    Q.  You created -- to bring us back, you created this document
5    on the night of the incident, is that correct?
6    A.  Yes, sir.
7    Q.  Now on this document, if you look in the section that says
8    "charges," I'll zoom in there so we can see it.  Do you see the
9    section here that I'm zooming in on that says "charges?"
10   A.  Yes, sir.
11   Q.  What is the top charge here?
12   A.  The only charge is obstructing governmental administration
13   in the second degree.
14   Q.  What were you indicating when you put obstruction of
15   governmental administration in the second degree?
16   A.  Indicating interference by physical means to an arrest.
17   Q.  So you were saying that the plaintiff interfered in your --
18   physically interfered in your effort to place him under arrest?
19   A.  Yes, sir.
20   Q.  Now this information here on Mr. Guzman, his sex, his race,
21   his age, his date of birth, where did you get that information?
22   A.  Just on observation, sir.
23   Q.  And how about his date of birth and his height and weight,
24   where did you get that?
25   A.  Mr. Guzman provided the pedigree information, sir.

178

DBATGUZ1                    Jay - cross

1   Q.  Mr. Guzman's address is on this arrest report.  Where did
2   you get that the information?
3   A.  Mr. Guzman provided that as pedigree information, sir.
4   Q.  On the second page of this document at the top, do you
5   remember yesterday when you were asked some questions about
6   whether or not the arrest report indicated that Mr. Guzman had
7   attempted to punch you?
8   A.  Yes, sir.
9   Q.  This section in the arrest report here that says "physical
10  force," it says "threatened" after that?
11  A.  Yes, sir.
12  Q.  What is that in reference to?
13  A.  Reference to the physical force used against me at the time
14  of arrest.
15  Q.  By who?
16  A.  By Mr. Guzman.
17  Q.  And then it says "weapons used, none?"
18  A.  Yes, sir.
19  Q.  So that means that Mr. Guzman didn't have a weapon?
20  A.  He did not have a weapon, sir.
21  Q.  Now finally, in the section here that says "force used,"
22  you indicated "yes," right?
23  A.  Yes, sir.
24  Q.  Can you just explain to the jury, are these like text boxes
25  that you can type into?

          DBATGUZ1                    Jay - cross
 1    A.  No, sir, they're actually drop boxes you have to click on
 2    to.
 3    Q.  So there's a drop box here, I guess, "yes" or "no?"
 4    A.  Yes.
 5    Q.  And you indicated "yes" because you used force?
 6    A.  Yes.
 7    Q.  And type of force used, chemical agent?
 8    A.  Yes.
 9    Q.  Why did you select "chemical agent" there?
10    A.  Because I used pepper spray.
11    Q.  In addition to the pepper spray, did you use any other
12    force to subdue the plaintiff?
13    A.  Yes, sir.
14    Q.  And what was that?
15    A.  I used physical force to restrain him with my hands.
16    Q.  Why did you use that physical force to restrain him with
17    your hands?
18    A.  Because he was fleeing.
19    Q.  Is that why you indicated "prevent escape" as reason here?
20    A.  Yes, sir.
21          THE COURT:  Hold on just a second, counsel.  If some
22    of the jurors in the middle would like to move over or move to
23    the other row.
24          MR. KUNZ:  Am I blocking?
25          JUROR:  I'm looking around.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DBATGUZ1                     Jay - cross
```
 1              THE COURT:  But if you need to, feel free, you can
 2    move behind if you like or move over there if you like.
 3              Can everyone see?
 4              JUROR:  Yes.
 5              THE COURT:  Go ahead.
 6    BY MR. KUNZ:
 7    Q.  So where it says officer injured, you indicated no?
 8    A.  I was not injured, sir.
 9    Q.  Now I also want to look at Plaintiff's Exhibit 5.  This is
10    the criminal court complaint that was drawn up in regard to
11    Mr. Guzman, is that correct, sir?
12    A.  Yes.
13    Q.  Now did you draft this document?  Did you write these
14    words?
15    A.  No, I did not.
16    Q.  Do you know who?
17    A.  A member of the district attorney's office.
18    Q.  Did you speak with this member of the district attorney's
19    office before that?
20    A.  Yes.
21    Q.  And what, if anything, did you tell her?
22    A.  I explained to them the facts of the case, and they wrote
23    them down as best they could on this document.
24    Q.  Do you know when that conversation with the ADA took place?
25    A.  Yes, sir, it took place on March 11.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DBATGUZ1                    Jay - cross

1    Q.  Of what year?
2    A.  2009.
3    Q.  Looking at the facts section here, it says deponent states
4    that deponent observed two separately charged defendants
5    repeatedly striking an individual known to the district
6    attorney's office.  What is that in reference to?
7    A.  That's a reference to the Molina defendants, sir.
8    Q.  And just remind the jury what you saw the Molina defendants
9    doing.
10   A.  When we arrived at the location, we observed two men
11   beating a third man who was already on the ground and unable to
12   defend himself.  They were striking him repeatedly in his head
13   and body with closed fists and their feet.
14   Q.  Next sentence says:  Deponent further states that as
15   deponent and Police Officer Johnny Diaz, shield number 31661 of
16   the 34th Precinct, were attempting to physically restrain
17   separately charged defendants from striking said individual,
18   the defendant approached deponent, grabbed deponent's shirt,
19   and attempted to strike deponent and one separately charged
20   defendant.
21          What were you telling -- is that accurate?
22   A.  Yes.
23   Q.  And what were you explaining to the ADA when that was
24   written?
25   A.  That at the time of the occurrence, when Mr. Guzman had

DBATGUZ1                    Jay - cross
1    come up from behind me, he grabbed on to me and pulled me back
2    violently, he had his arm cocked back to either strike myself,
3    my partner, or even the person we were attempting to handcuff I
4    wasn't sure who he intended to hit.
5    Q.  And finally ends with:  Thereby preventing deponent from
6    subduing said separately charged defendant and placing said
7    separately charged defendant under arrest.
8              What does that mean?
9    A.  That means that his actions could have led to the escape of
10   the person whom we were trying to handcuff.
11   Q.  Did his actions also prevent you from completing your
12   arrest of the individual you had on the ground?
13   A.  Yes, sir.
14   Q.  I also want to take a look at your memo book, I believe
15   this is Plaintiff's 2B, this is you on the front here, Brian
16   Jay?
17   A.  Yes, sir.
18   Q.  Sorry, it's 8B.  So we're going to zoom in on the back
19   here.
20             So first, can you explain to the jury what a memo book
21   is?
22   A.  A memo book is an item-by-item event of what days go by in
23   chronological order.
24   Q.  And do you carry this book when you when you're patrol?
25   A.  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

183

DBATGUZ1                     Jay - cross
1    Q.  What does it look like?
2    A.  The cover is blue with my name and identification number on
3    it, and also the date on which the book was first initiated and
4    started, and the name of the supervisor who issued the book to
5    you.
6    Q.  So on the top says Saturday 2/14/09, 34th Precinct, assign
7    AC.  What does "assign AC" mean?
8    A.  It's abbreviation for assignment, anticrime.
9    Q.  And says color of the day, yellow.  What does that mean?
10   A.  Color of the day is a randomly generated color of four
11   colors that come directly from headquarters.  All members of
12   the plain clothes units, not undercovers, plain clothes units
13   are to wear the color of the day to identify themselves to
14   police officers so there's no friendly fire incident.
15   Q.  And indicates your tour was 2030 to 0505?
16   A.  Yes.
17   Q.  What is that in civilian time?
18   A.  8:30 p.m. to 5:05 a.m.
19   Q.  Let's look at 0400, that's 4:00 a.m.?
20   A.  Yes, sir.
21   Q.  And you have an indication 207 Sherman.  What is that an
22   indication for?
23   A.  The letters PU right after 0400 means pick up, the number
24   34 is police code for assault in progress.
25   Q.  So what does it mean that, it was a pick up?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DBATGUZ1                    Jay - cross

1   A.  That means that it was not generated by the radio, it means
2   that we rolled into it as it was occurring prior to any 911
3   calls.
4   Q.  So this means that you drove up to the scene and saw it in
5   progress, you weren't called there by 911 call?
6   A.  Yes, sir.
7   Q.  Next it says two under, assault third.  What does that
8   mean?
9   A.  The two men, the Molina suspects, were arrested and charged
10  with assault in the third degree.
11  Q.  Now right below that two under OGA?
12  A.  Yes, sir.
13  Q.  In this context, what does OGA mean?
14  A.  Obstructing governmental administration.
15  Q.  So what did you mean when you wrote that you had two under
16  for OGA?
17  A.  Mr. Guzman had been arrested for OGA, another person on the
18  scene had been arrested for OGA, but not by myself.
19  Q.  So let's focus on plaintiff, Mr. Guzman.  So when you wrote
20  he was under arrest for OGA, what behavior of his were you
21  referring to when you wrote OGA?
22  A.  When he grabbed me and pulled me off of one of the Molina
23  suspects I was trying to handcuff, he committed obstructing
24  governmental administration by stopping me from completing my
25  lawfully assigned duties.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                     Jay - cross

1    Q.  What time did that happen?
2    A.  Approximately 4:09 a.m.
3    Q.  And then what time were you arriving at the precinct?
4    A.  4:20 a.m.
5    Q.  And this next line here, can you read what that says to the
6    jury?
7    A.  EMS to station house for injured complainant/victim.
8    Q.  Do you know what time that is?
9    A.  Approximately 4:25.
10   Q.  And then, I'm sorry, just the bottom line here, at 0805
11   that's 8:05 in the morning?
12   A.  Yes, sir.
13   Q.  What is DAT Guzman?
14   A.  Mr. Guzman was issued a DAT, desk appearance ticket, a
15   modified form of arrest, and released from the station house.
16   Q.  OK.  We'll come back to some of these things in a moment.
17   I want to look at the paperwork.
18            I want to be crystal clear about this issue because
19   it's important, this is the medical treatment to prisoner form
20   that you prepared in regard to the plaintiff?
21   A.  Yes, sir.
22   Q.  Was this form blank when the plaintiff signed it?
23   A.  No, sir, it was not.
24   Q.  And would you ever have someone sign a blank form?
25   A.  No, sir, I would not.

DBATGUZ1                    Jay - cross

```
1    Q.  Why not?
2    A.  Well, it's grossly improper and I don't think anybody would
3    sign a blank form.  You don't know what you're signing.
4    Q.  Thank you.  So I do want to talk about the incident, but
5    before we do, let's just get a little background on yourself.
6    How long have you been a police officer with the NYPD?
7    A.  I have been a police officer now for 17 years.
8    Q.  And before you joined the NYPD, what did you do?
9    A.  I was in the United States Army.
10   Q.  How long were you in the Army?
11   A.  Seven years.
12   Q.  What did you do in the Army?
13   A.  I was a medic.
14   Q.  And did you serve overseas?
15   A.  Yes, sir, I did.
16   Q.  Where did you serve overseas?
17   A.  I served in first Gulf War in '91, and Somalia in '93,
18   Bosnia in '95, and served in Honduras in '96.
19   Q.  And you were a medic in all those deployments?
20   A.  Yes, sir.
21   Q.  How tall are you?
22   A.  I'm six feet tall, sir.
23   Q.  What is your approximate weight?
24   A.  170 pounds.
25   Q.  Was that true also in February of 2009?
```

DBATGUZ1                      Jay - cross

1   A.  Back then I was approximately 180 pounds.
2   Q.  Were you the same height?
3   A.  Yes.
4   Q.  You're wearing glasses today.  Do you always wear glasses?
5   A.  I always gases yes, sir.
6   Q.  Do you ever wear contacts?
7   A.  I don't own them.  I don't have them.  I don't want them.
8   Q.  In February 2009 did you wear contacts?
9   A.  No, sir.
10  Q.  On the night in question were you wearing glasses?
11  A.  Yes, sir.
12  Q.  Have you ever worn your hair slicked back?
13  A.  This is as long as my hair has been since I was 17.  I
14  never had hair too slicked back.
15  Q.  Now could you just briefly walk the jury through your
16  various assignments in your 17 years as a police officer?
17          MR. NORINSBERG:  Objection.
18          THE COURT:  Sustained.  I don't think that we need to
19  go back that far.
20  Q.  Well, so you were currently at the 34th Precinct?
21  A.  Yes, sir.
22  Q.  How long have you been there?
23  A.  I've been there almost the entire time.
24  Q.  Almost the entirety of your career as a police officer?
25  A.  Yes.

DBATGUZ1                    Jay - cross

1   Q.  Have you worked in the same role at the 34th Precinct
2   throughout that time?
3   A.  No, sir.
4   Q.  How many different roles have you served in at the
5   precinct?
6   A.  Three, sir.
7   Q.  At the time of this incident, what was your assignment?
8   A.  I had was assigned to the special operations unit in the
9   anticrime.
10  Q.  Can you briefly explain to the jury what an anticrime unit
11  is?
12  A.  An anticrime unit is a small team that goes out in plain
13  clothes in unmarked or nondescript cars in order to get as
14  close to any street level violent crime as possible without
15  being tipped off.  It's not an undercover unit, but it is kind
16  of less marked, less in your face police so that you can get as
17  close to the crime as it's occurring as possible.
18  Q.  What types of crime and criminality are you focusing on in
19  the anticrime unit?
20  A.  Anticrime unit is usually focused on the street level
21  violent crimes, assaults, weapons possessions, street level
22  robberies, things of that nature.
23  Q.  And you mentioned to the jury that you're in an unmarked
24  police car and not in uniform when you're doing this?
25  A.  Yes.

DBATGUZ1                    Jay - cross

1  Q.  Do you have anything on you that indicates you're a police
2  officer?
3  A.  Yes.
4  Q.  What do you have on you?
5  A.  You wear your shield around your neck on either a beaded
6  chain or lanyard, you wear the color of the day on your
7  non-shooting arm, you wear your bullet resistent vest
8  underneath your shirt, you wear a belt that includes certain
9  equipment such as your firearm, your police radio, and pepper
10  spray.
11  Q.  So do you remember what exactly you were wearing on the
12  night of February 14, 2009?
13  A.  No, sir.
14  Q.  Now on February 14, 2009, you said your tour started at
15  8:30 p.m.?
16  A.  Yes, sir.
17  Q.  So this is actually February 13 at 8:30 p.m.?
18  A.  Yes, sir.
19  Q.  What's the first thing you did when your tour started that
20  day?
21  A.  We met in the station house, and we meet up in the
22  anticrime office and discuss any activity from the prior tour,
23  any reports of anything happening on the street, we discuss
24  what the color of the day is for that day and what car we're
25  talking on patrol that night.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross

1   Q.  And did you in fact take a car on patrol that night?
2   A.  Yes, sir, we did.
3   Q.  And who all went on patrol?
4   A.  Officer Diaz, myself, Sergeant McHugh and Officer Walters.
5   Q.  Were you all traveling in the same vehicle?
6   A.  Yes, sir.
7   Q.  And did there come a time on February 14 when you ended up
8   at the Red Lounge?
9   A.  Yes, sir.
10  Q.  Explain to the jury what it is that you saw as you pulled
11  up to the Red Lounge.
12  A.  We first saw the crowd gathering around, but then we could
13  distinctly see there was a fight involving three people, a
14  violent fight involving three people.
15  Q.  Describe the crowd.
16  A.  The crowd was standing both in the street on both sides of
17  the sidewalk, the crowd in the street was about 50 or 75
18  people.  There was a loud, boisterous crowd kind of witnessing
19  the fight.
20  Q.  Where was the fight taking place?
21  A.  It was kind of in the street on the northeast corner of
22  207th Street and Sherman Avenue.
23  Q.  So let's look at Plaintiff's 2B again.  So where I'm
24  pointing, this is the northeast corner?
25  A.  Yes, sir.

191

DBATGUZ1                    Jay - cross

1  Q.  This is the corner on the right-hand side of the photograph
2  at 2B, right?
3  A.  Yes.
4  Q.  So was the fight taking place on the sidewalk or in the
5  street?
6  A.  It was in the street in front of a parked car.
7  Q.  So you the four of you were in this vehicle, you pull up,
8  you see this fight taking place with the big crowd, what do you
9  do?
10 A.  We exit the vehicle, I start moving through the crowd to
11 get to the fight.
12 Q.  And what was your goal?  What were you aiming to do when
13 you got out of that vehicle?
14 A.  First and foremost was to stop the assault, because this
15 guy needed help, the second was to arrest both perpetrators,
16 and third was to stop the fight completely.
17 Q.  And did the other officers also get out of the vehicle?
18 A.  Yes.
19 Q.  Do you know exactly what the other officers did when they
20 got out of the vehicle?
21 A.  No, sir.
22 Q.  Why not?
23 A.  Because I was focused on the fight.
24 Q.  To the best of your recollection, what did Officer Diaz do
25 when he got out of the vehicle?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

192

DBATGUZ1                    Jay - cross

1   A.  He stayed close to me on my left-hand side.
2   Q.  And to the best of your recollection, how about Sergeant
3   McHugh and Officer Walters, what did they do?
4   A.  They were following shortly behind us.
5   Q.  Now as you went towards the center of the fight, did you
6   get a better view of what was happening in the fight?
7   A.  Yes, sir, I did.
8   Q.  What did you see?
9   A.  I observed Mr. Molina and Mr. Henriavez punching and
10  kicking a third man who was already on the ground.
11  Q.  Now yesterday plaintiff's attorney asked you a number of
12  questions about whether or not you saw the plaintiff fighting.
13  Do you remember being asked questions about that?
14  A.  Yes, sir.
15  Q.  Now I want to be really clear about this.  When you first
16  arrive and get out of the car and were going to the fight, did
17  you notice the plaintiff?
18  A.  No, sir.
19  Q.  Did you see him anywhere?
20  A.  No, sir.
21  Q.  So do you know one way or the other if the plaintiff was
22  fighting?
23  A.  No, sir, I don't.
24  Q.  Was the fight already in progress when you first arrived?
25  A.  When we first saw it, yes.  At that time it wasn't even a

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DBATGUZ1                    Jay - cross

```
 1  fight anymore because the person who was the recipient of this
 2  fight was no longer even defending himself.  It was a full-on
 3  assault.
 4  Q.  Now you were asked some questions by Mr. Norinsberg also
 5  about how you were able to get through the crowd and get to the
 6  fight.  Do you remember being asked those questions?
 7  A.  Yes, sir.
 8  Q.  Can you explain to the jury how it was you moved through
 9  the crowd and went to the fight?
10  A.  I walked through the crowd saying, "Police, get out of the
11  way, Police, get out way," and shouldered my way getting
12  through the crowd.
13  Q.  Did you have difficulty getting past people in the crowd?
14  A.  No, not really.
15  Q.  So at some point did you get up to the men that were
16  fighting that you were going towards?
17  A.  Yes, sir, I did.
18  Q.  Now if you could estimate approximately how much time
19  passed between when you exited the vehicle and when you arrived
20  at the fight.
21  A.  Few seconds.
22  Q.  And what did you do when you arrived at the fight?
23  A.  I announced myself by saying, "Police, don't move."
24  Q.  Is that exactly what you said?
25  A.  That is exactly what I said.
```

194

DBATGUZ1                    Jay - cross

1   Q.  How do you know you used that exact phrase?
2   A.  From the first day of the police academy they teach to you
3   say, "Police, don't move," because when you say "Police," you
4   identify yourself as the police, and "Don't move" is a command
5   that you want them to follow right off the bat.  It's clear and
6   it's precise.
7   Q.  Did you say, "NYPD, mother fucker?"
8   A.  No, sir, I did not.
9   Q.  Would you ever say that?
10  A.  No, sir, I would not.
11  Q.  Why not?
12  A.  Well, it's a little childish and it's a little
13  unprofessional, and it doesn't give distinct instructions of
14  what you want them to do.  It's not what -- it wouldn't help.
15  Q.  OK.  So you get to the fight, you tell them "Police, don't
16  move," and at that point are you paying attention to what
17  Sergeant McHugh and Officer Walters are doing?
18  A.  No, sir, I'm not.
19  Q.  What are you paying attention to?
20  A.  I'm paying attention to the Molina defendants.
21  Q.  OK.  So do the Molina defendants stop assaulting the man
22  that they're assaulting when you gave them this direction of
23  "Police, don't move?"
24  A.  No, sir, they do not.
25  Q.  What to they do?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross

1   A.  They continue punching and kicking the man on the ground.
2   Q.  What happened next?
3   A.  I took immediate action by pepper spraying both of these
4   individuals.
5   Q.  Now when you say "pepper spray," can you explain to the
6   jury what you mean by that?
7   A.  Pepper spray is an aerosol propelled irritant made out of
8   cayenne pepper, and it projects up to 15 feet.  And when it's
9   deployed properly into the face area of your suspect, it can
10  have the effect of incapacitating them almost immediately.
11  Q.  Does it have the same effect on everyone?
12  A.  No, sir, it doesn't.
13  Q.  Can you explain a little bit what you mean by that to the
14  jury?
15  A.  I have been pepper sprayed multiple times in my career as a
16  police officer, and it has less and less effect on me the more
17  times I get pepper sprayed.
18  Q.  How did these men react when you applied the pepper spray?
19  A.  Mr. Molina surrendered right away, and his co-defendant
20  took off running.
21  Q.  And what did you do?
22  A.  I chased the co-defendant.
23  Q.  By yourself?
24  A.  I was by myself at first, but Officer Diaz was right to my
25  left-hand side.

DBATGUZ1                        Jay - cross

1   Q.  Did you catch up with the man you were chasing?
2   A.  Yes, sir, I did ask.
3   Q.  How far did you get?
4   A.  Approximately to the middle of the street on the double
5   yellow lines.
6   Q.  So when you first arrived, the fight was taking place in
7   the street but towards the northeast corner of the
8   intersection, right?
9   A.  Yes.
10   Q.  When you actually got to the man that ran, you were more in
11   the middle of the street here?
12   A.  Yes, sir.
13   Q.  Let the record reflect, is this the intersection of 207th
14   and Sherman Avenue?
15   A.  Yes, sir, facing northbound on Sherman Avenue.
16   Q.  Now how were you able to apprehend the man?  How did you
17   stop him?
18   A.  I ran up behind him, I kind of grabbed onto him with my --
19   both arms wrapped around his chest with both arms, and with my
20   body weight I pulled him onto the ground.
21   Q.  Did that work?  Did you get him on the ground?
22   A.  Yes, sir, I did.
23   Q.  Describe to the jury what happened while you were on the
24   ground.
25   A.  Once I got him on the ground, I tried to keep him on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                  Jay - cross
1    ground until my partner caught up to me.  I grabbed his right
2    arm, my partner grabbed his left arm, and we pulled his arms
3    behind his back and started cuffing him.
4    Q.  And how much -- let's talk about the timing.  How much
5    time, do you think, passed between when you got out of the
6    vehicle and now you have this guy on the ground are you're
7    trying to handcuff him?
8    A.  It seemed like a long time, but probably under a minute.
9    Q.  So now you're in this position, you're on the ground trying
10   to handcuff this guy, and can you explain to the jury what your
11   physical position is?
12   A.  I'm trying to handcuff him.  I was actually on my knees on
13   the ground with both my hands on his arm trying to pull it
14   behind his back.
15   Q.  Where was Johnny Diaz at this point?
16   A.  On the opposite side on a similar position.
17   Q.  You were struggling with one of his arms and Johnny Diaz
18   was with the other arm?
19   A.  Yes.
20   Q.  What happened next?
21   A.  Next thing I know, I kind of catch something out of the
22   corner of my eye coming towards us fast, and before I had a
23   chance to react at all, I felt something grab my left shoulder,
24   and start pulling me back violently.
25   Q.  And what happened next?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DBATGUZ1                    Jay - cross

1   A.  I turned around to see who it was or what it was.  It was
2   nobody I recognized, so he had ahold of me, I pepper sprayed
3   him to get him off of me.
4   Q.  So let me stop you there.  Do you now know who that person
5   was that tried to pull you off the man you were arresting?
6   A.  Yes, sir.
7   Q.  Who was that?
8   A.  That was Mr. Guzman.
9   Q.  And do you know -- so Johnny Diaz was right next to you,
10  right?
11  A.  Yes.
12  Q.  Do you know if the plaintiff actually touched Johnny Diaz?
13  A.  No, sir, but it looked as if he did.
14  Q.  Was the plaintiff successful in pulling you off of the
15  person on the ground?
16  A.  No, sir.
17  Q.  So what happened after he approached you and tried to pull
18  you off the person on the ground?
19  A.  I was able to maintain control of the person on the ground.
20  I was able to pepper spray Mr. Guzman to get him off me.  Once
21  I realized that the person on the ground was secured, I saw
22  Mr. Guzman taking off and I followed him to take him down.
23  Q.  So you just mentioned that you pepper sprayed Mr. Guzman
24  when he was over your shoulder?
25  A.  Yes.

DBATGUZ1                    Jay - cross

1   Q.  Can you complain to the jury why you did that?
2   A.  I was in a vulnerable position on the ground, and he had
3   the upper -- he was above me, and I felt like I was in danger,
4   so I wanted to incapacitate him so he was not able to do
5   anything further than grab me.
6   Q.  Now so plaintiff comes over, tries to grab you off the man
7   you're arresting, you pepper spray him, and then what happens?
8   A.  He takes off running on towards westbound on 207th Street.
9   Q.  Did he get very far?
10  A.  No, sir.
11  Q.  How far did you get?
12  A.  Approximately ten feet.
13  Q.  What did you do after you applied the pepper spray?
14  A.  I got up and ran after him.
15  Q.  And you said you caught up with him after about ten feet?
16  A.  Yes, sir.
17  Q.  What happened when you reached him?
18  A.  I used the same technique that I taken down the first
19  person with to take him down as well.
20  Q.  This is the locking your arms?
21  A.  Around his body, putting my chest against his back, and
22  then using my body weight to drag him to the ground.
23  Q.  Did this work again?  Did this work at this time on the
24  plaintiff?
25  A.  Yes, sir, it did.

200

DBATGUZ1                    Jay - cross

1  Q.  So you were able to get him to the ground?
2  A.  Yes, sir, I was.
3  Q.  What happened on the ground?
4  A.  On the ground I then tried to grab his hands and -- his
5  arms and pull his hands behind his back.  He at first locked up
6  his hands underneath him so I couldn't get them, but after a
7  few seconds of struggling I was able to pull his arms behind
8  his back and handcuff him.
9  Q.  So the plaintiff struggled with you?
10 A.  A little, yes.
11 Q.  Were you saying anything to the plaintiff while you were
12 trying to place him in handcuffs?
13 A.  I don't recall.
14 Q.  Did he eventually stop struggling?
15 A.  Yes.
16 Q.  So at this point, what happened, what did you do?
17 A.  He's in handcuffs, so I roll him over onto his butt, and
18 then I stand him up and walk him to the nearest police car for
19 transport.
20 Q.  At this point is the plaintiff under arrest?
21 A.  Yes, sir, he is.
22 Q.  What is he under arrest for?
23 A.  Objecting governmental administration.
24 Q.  And why did you decide to arrest him for obstruction of
25 governmental administration?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DBATGUZ1                    Jay - cross

1   A.  Because that was the first act of criminality he committed
2   that I knew of.
3   Q.  OK.  So I know you said the man you were chasing who you
4   originally apprehended and then you were trying to handcuff and
5   the plaintiff came over, you said that he was in the middle of
6   the street, right?
7   A.  Yes.
8   Q.  And then when the plaintiff came up to you, he ran a little
9   bit, right?
10  A.  Yes.
11  Q.  So where did you end up apprehending the plaintiff?
12  A.  Closer to the front of the other parked car on the west
13  side of the street.
14  Q.  So the original arrest of one of the Molina defendants is
15  here in the middle of the street, and you got caught up with
16  the plaintiff towards the curb area on the right-hand side?
17  A.  Yes, sir.
18  Q.  Now while this was all going on, while you were arresting
19  first guy, chasing the plaintiff and arresting him, were cars
20  able to pass through the area?
21  A.  No, sir.
22  Q.  So after you had the plaintiff in handcuffs, you said you
23  got him up, and what's the next thing that you do?
24  A.  I moved him to the closest police car and transported him
25  back to the station house.

DBATGUZ1                    Jay - cross
1    Q.  And had other police cars arrived?
2    A.  By then, yes, sir.
3    Q.  Tell the jury what that -- what other police cars came.
4    A.  Excuse me?
5    Q.  Tell the jury about what other police cars came.
6    A.  Both marked cars and vans all had arrived.  I assume that
7    someone from my team called for additional units.
8    Q.  And the vehicle that you escorted the plaintiff to, how far
9    was that from where you arrested him?
10   A.  Maybe two or three car lengths.
11   Q.  And you walked with the plaintiff from the scene of his
12   arrest to the vehicle?
13   A.  Yes, sir.
14   Q.  Did you notice anything about plaintiff's condition at that
15   point?
16   A.  No, sir.
17   Q.  Did it appear that he was injured in any way?
18   A.  No, sir.
19   Q.  So after you had the plaintiff under arrest, did you speak
20   with Sergeant McHugh?
21   A.  Yes, sir.
22   Q.  And what did you say to Sergeant McHugh?
23           MR. NORINSBERG:  Objection.
24           THE COURT:  I'll allow it.
25   Q.  What did you say to Sergeant McHugh?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

203

DBATGUZ1                    Jay - cross
1   A.  I explained that the Molina defendants were under arrest
2   for assault, Mr. Guzman was under arrest for obstructing
3   governmental administration.
4   Q.  Did you tell Sergeant McHugh what the plaintiff did to you?
5   A.  Yes, sir.
6   Q.  And why did you explain that to Sergeant McHugh?
7   A.  Because he's my supervisor.
8   Q.  And very, very briefly in sum and substance, what did you
9   tell Sergeant McHugh?
10              MR. NORINSBERG:  Could we have a side bar?
11              THE COURT:  Sure.
12              (In robing room)
13              THE COURT:  OK, where are you going with this?
14              MR. KUNZ:  This is my last question to refute the
15  allegation of a recent fabrication that he clearly made during
16  his direct.
17              MR. NORINSBERG:  This is a self-serving hearsay
18  statement.  Our position is the motive to fabricate exists
19  immediately.  It's not something that arises later on.  Of
20  course he's going to lie to his boss.  So being able for this
21  witness to repeat his own prior statement to bolster his
22  in-court testimony is improper.
23              It's different than when we're talking about hospital
24  records where there is a contemporaneous record when the
25  statement was actually made.  There it's documented.  In this
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DBATGUZ1                    Jay - cross

1   situation we're having a witness come in and essentially
2   bolster his own in-court testimony by saying not only did this
3   happen but I told my boss this happened.  And that's improper
4   bolstering, that's absolutely not permissible.
5           THE COURT:  But aren't you alleging recently all of
6   your cross-examination, all of your examination yesterday and
7   today is all about him recently fabricating the story?
8           MR. NORINSBERG:  But the question is when did the
9   motive to fabricate arise?  In this situation, it's his boss.
10  The motive is there from the beginning, so it doesn't meet the
11  fundamental criteria of a prior consistent statement.
12          THE COURT:  Similarly, whether or not it comes in for
13  the truth or the fact that it was said, I will let it in.  We
14  can talk about limiting instructions later, but I will allow
15  it.
16          (In open court)
17  BY MR. KUNZ:
18  Q.  Officer, what did you tell Sergeant McHugh at the scene
19  that night?
20  A.  I told him that Mr. Guzman grabbed me while I was trying to
21  apprehend one of the Molina suspects.
22  Q.  What happened next?  What happened after you had this
23  conversation?
24  A.  We took all of the subjects back to the station house for
25  processing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

205

DBATGUZ1                    Jay - cross

```
 1   Q.  Did you personally take the plaintiff back to the station
 2   house?
 3   A.  No, sir.
 4   Q.  Do you know who did?
 5   A.  No, sir.
 6   Q.  So what happened at the police precinct?
 7   A.  The prisoners are brought in before the desk, which is
 8   where a supervisor sits at the station house, and their
 9   pedigree cards are filled out.  A pedigree card is the name and
10   address and phone number and what they're charged with so they
11   could be lodged inside the cell.
12   Q.  How many prisoners came back to the precinct?
13   A.  Three.
14   Q.  Three that you had, correct?
15   A.  Yes, sir.
16   Q.  Do you know whether there was another prisoner?
17   A.  At the scene I saw somebody, but I don't know what happened
18   to him.
19   Q.  Now the victim, the man you saw being attacked when you
20   first arrived, what happened to him?
21   A.  He was also brought to the station house.
22   Q.  What happened at the station house?
23   A.  After getting the pedigree information and a telephone
24   number to reach him for prosecution, he was removed from the
25   station house by ambulance to the hospital.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross

1   Q.  Did you speak with him at all?
2   A.  Yes, sir, I did.
3   Q.  What did he tell you?
4   A.  In substance, that he had taken a rather bad beating from
5   Mr. Molina and his cohort.
6   Q.  So let's go back to the arrest processing that you just
7   mentioned.  You said first thing that happens is they go before
8   a desk?
9   A.  Yes, sir.
10  Q.  Just explain to the jury what that means.
11  A.  The desk is basically when you go into the precinct house,
12  the first thing you see is a large desk kind of like where the
13  judge is sitting.  Behind that desk is a police supervisor who
14  will basically book the suspects into the command log at the
15  desk.
16  Q.  And do each one of the prisoners go through this process?
17  A.  Yes, sir.
18  Q.  And are you there with them as they go through the process?
19  A.  Yes, sir, I am.
20  Q.  So then what happens after they go from the desk?
21  A.  Pedigree cards are filled out and they're lodged in our
22  holding cells.
23  Q.  So then they're actually in a holding cell at the police
24  precinct where you put the prisoners?
25  A.  Yes, sir.

DBATGUZ1                    Jay - cross

1   Q.  What is going on while they are there in the holding cell?
2   A.  They're waiting and I'm doing paperwork.
3   Q.  The paperwork is the arrest report that we looked at?
4   A.  Yes, sir.
5   Q.  Other reports like that?
6   A.  Yes, sir.
7   Q.  Besides the plaintiff, you said you had two other people
8   who you were the arresting officer for?
9   A.  Yes, sir.
10  Q.  Did you do paperwork for those people as well?
11  A.  Yes, sir, I did.
12  Q.  Now what happens after you are done with your paperwork?
13  A.  After I'm done with my paperwork in a regular arrest
14  situation when the arresting -- the booking sheet is filled out
15  and entered into the computer, it's generated an arrest number.
16  With that number you can do the photographs for the moving
17  slips from the station house to central booking and
18  fingerprints.
19  Q.  So you said that once the paperwork is complete a person is
20  brought from the station house to central booking?
21  A.  Yes, sir.
22  Q.  And can you explain what central booking is?
23  A.  Central booking is a larger holding facility that is
24  directly attached to arraignment court so they can be brought
25  up from a holding area to see an arraignment judge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross

1   Q.  Every prisoner who is arrested, do all of them go to
2   central booking?
3   A.  No, sir.
4   Q.  So this came up during direct examination from
5   Mr. Norinsberg, but can you explain to the jury what a desk
6   appearance ticket is?
7   A.  A desk appearance ticket is a modified form of arrest.  It
8   has all the elements of an arrest, including an online booking
9   sheet, a complaint report, fingerprints and photographs.
10  However, the defendant is issued a ticket which gives them a
11  court date at a later time.
12  Q.  And then what happened when they're given this ticket?
13  A.  They're released onto their own recognizances from the
14  station house and they go about their business.
15  Q.  With the expectation they will show up in court on a later
16  date?
17  A.  Yes.
18  Q.  How is it decided whether a person goes through the full
19  process of central booking or receives a desk appearance
20  ticket?
21  A.  There's two ways that's decided, one is by charge and other
22  is by supervisor's authorization.
23  Q.  What do you mean by a charge?  How does that determine if a
24  person is released on a DAT?
25  A.  Certain charges don't warrant a DAT, such as failure to

DBATGUZ1                     Jay - cross

1    answer summonses in the past, driving while intoxicated,
2    violent felonies and violent crimes.
3    Q.  So if a person is being accused of committing a violent
4    felony or violent crime, they're not eligible to be released on
5    a DAT?
6    A.  That's correct.
7    Q.  Who makes the final decision whether to release someone on
8    a desk appearance ticket?
9    A.  Your supervisor does.
10   Q.  Do you recall who the supervisor was at the precinct that
11   night?
12   A.  Yes, sir.
13   Q.  Who was that the supervisor?
14   A.  My supervisor was Sergeant McHugh.  The desk officer at the
15   time was Sergeant Eiler.
16   Q.  And do you know what tour Sergeant Eiler works?
17   A.  The midnight to 8:00 a.m. tour.
18   Q.  And then who is the sergeant that takes over after Sergeant
19   Eiler?
20   A.  Sergeant Long was working on the day tour shift.
21   Q.  So Sergeant Eiler and Sergeant Long are the desk sergeants?
22   A.  Yes, sir.
23   Q.  And this is the same desk that the prisoners go before when
24   they first arrive at the precinct?
25   A.  Yes, sir.

DBATGUZ1                    Jay - cross

1    Q.  I want to very briefly show you the desk appearance ticket.
2    This is in evidence as Defendant's Exhibit G.  So at the bottom
3    here, is that your signature?
4    A.  Yes, sir, it is.
5    Q.  And under the section here that says desk officer
6    signature, can you read what signature that is?
7    A.  That would be Sergeant G. Long, L-O-N-G.
8    Q.  And so that means that Sergeant Long signed this desk
9    appearance ticket?
10   A.  Yes, sir.
11   Q.  And at the top here it says Guzman, Noel?
12   A.  Yes, sir.
13   Q.  And then his address?
14   A.  Yes, sir.
15   Q.  And then the offense charged says obstructing governmental
16   admin.?
17   A.  Yes, sir.
18   Q.  And then it gives his court date, correct?
19   A.  Yes, sir, it does.
20   Q.  What is his court date?
21   A.  Court date is March 16, 2009.
22   Q.  So let's focus on what happened at the precinct with the
23   plaintiff.  Did the plaintiff say anything to you when you
24   first arrived at the precinct?
25   A.  Yes, he did.

211

DBATGUZ1                    Jay - cross

1  Q.  What did he say to you?
2  A.  He said that he had an injury to his right leg.
3  Q.  What did you do after he said that to you?
4  A.  I notified the front desk and called EMS to respond.
5  Q.  Did EMS respond?
6  A.  Yes, sir.
7  Q.  How long did it take for them to get there?
8  A.  Few minutes.
9  Q.  And did you actually see the EMTs when they came into the
10 precinct?
11 A.  Yes, sir, I did.
12 Q.  So what happened when the EMTs came into the precinct?
13 A.  The EMTs were brought into the holding area where
14 Mr. Guzman was being held.  He was brought out of his cell and
15 sat in a chair where they examined him and took pedigree
16 information, vital signs, blood pressure, heart rate, things
17 like that, examined the injury and asked if he needed to go to
18 the hospital.
19 Q.  Did he tell them at all what had happened, how he sustained
20 the injury?
21 A.  He stated to them that he was in a fight prior to the
22 arrest and that he was kicked in his leg by somebody.
23 Q.  And did he go with them to the hospital?
24 A.  No, he refused medical attention.
25 Q.  And how long do you think they were there until?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBATGUZ1                    Jay - cross

```
 1   A.  20 minutes or so.
 2   Q.  So what happened after he said:  No, I don't want to go to
 3   hospital?
 4   A.  The EMTs finished preparing their reports, Mr. Guzman
 5   signed these reports and the EMTs went back to answering their
 6   calls.
 7   Q.  There's Defendant's Exhibit B, the ambulance call report.
 8   Your signature is on the second page of this document, right?
 9   A.  Yes, sir.
10   Q.  Was this document blank when you signed it?
11   A.  No, sir.
12   Q.  Did you see -- were you there when the plaintiff signed it?
13   A.  Yes, sir.
14   Q.  Was it blank when he signed it?
15   A.  No, sir.
16   Q.  So what happened after the EMTs left?
17   A.  I continued processing my arrests.
18   Q.  That's doing the paperwork that we have been talking?
19   A.  Yes, sir.
20   Q.  Is that when you did the medical treatment to prisoner
21   form?
22   A.  I did it a little later on.
23   Q.  So the EMTs leave about what time?
24   A.  5 o'clock or so.
25   Q.  They arrived about 4:20, 4:25?
```

DBATGUZ1                    Jay - cross

1   A.  Yes.
2   Q.  And this is Defendant's Exhibit A, I believe, are the
3   medical treatment to prisoner form.  Does this indicate what
4   time the plaintiff signed this document?
5   A.  Yes, sir, it does.
6   Q.  What time is that?
7   A.  5:45 a.m.
8   Q.  So first the ambulance arrives close to 5:00, then you do
9   the medical treatment to prisoner at 5:45 in the morning, and
10  then what time is the desk appearance ticket given to the
11  plaintiff?
12  A.  8:05 a.m.
13  Q.  Is that indicated on here?
14  A.  Yes, sir, by Mr. Noel Guzman's signature.
15  Q.  Actually let's talk a little more about the medical
16  treatment to prisoner.  We went through this a little bit with
17  plaintiff's counsel and a little bit when I started, but the
18  box here that says prisoner requires or requires medical
19  assistance.  Why did you check yes in that box?
20  A.  Because Mr. Guzman had indicated that he had an injury.
21  Q.  And then the box next to it that says prisoner refused
22  medical aid?
23  A.  Yes, refused medical aid both to myself and the EMTs.
24  Q.  Then right leg injury and prisoner had injury.  The right
25  leg injury you indicated was old, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

214

DBATGUZ1                    Jay - cross

1    A.  Yes, sir.
2    Q.  And prisoner had injury prior to arrest, right?
3    A.  Yes, sir.
4    Q.  Where did you get that information again?
5    A.  From Mr. Guzman.
6    Q.  Now you were asked some questions by Mr. Norinsberg about
7    your conversations with Sergeant McHugh, Johnny Diaz, and
8    Officer Walters after this incident.  Do you remember being
9    asked questions like that?
10   A.  Yes, sir.
11   Q.  Now did you continue to work with these men after the
12   incident?
13   A.  Yes, sir.
14   Q.  For how long?
15   A.  Another two years, sir.
16   Q.  And you said that you think you spoken to them about what
17   happened that night after the incident, correct?
18   A.  Yes, sir.
19   Q.  Do you remember how many times you spoke to them after the
20   incident?
21   A.  No, sir.
22   Q.  If I showed you a section of your deposition, would that
23   refresh your recollection about how many times you spoke could
24   them?
25              MR. NORINSBERG:  Objection.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

215

DBATGUZ1                    Jay - cross

1              THE COURT:  I'll allow it.
2    Q.  So I'm going to point out a section here and I want you to
3    read it to yourself.  So we're looking at page 10, lines 13 to
4    page 11 -- sorry, page 10, line 13, through line 22, just read
5    that to yourself.
6              Does that refresh your recollection about how many
7    times you had conversations about this incident with Sergeant
8    McHugh?
9    A.  No, sir, unfortunately not.
10   Q.  Did you discuss this incident with Sergeant McHugh more
11   than five times?
12   A.  I don't know, sir.
13   Q.  So just so we're crystal clear about this incident, did
14   you -- when you first arrived at the scene, did you go up to
15   the plaintiff who was watching the fight and kick him in the
16   leg?
17   A.  No, sir.
18   Q.  Did you kick anyone that night?
19   A.  No, sir, I did not.
20   Q.  Did you grab the plaintiff's hair and spray him with mace?
21   A.  No, sir.
22   Q.  Did you tell him, "NYPD, mother fucker?"
23   A.  No, sir, I did not.
24             MR. KUNZ:  I have no further questions but reserve the
25   right to call him in our case if needed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

216

DBATGUZ1                     Jay - redirect
1                 THE COURT:  Any brief redirect?
2                 MR. NORINSBERG:  Yes.
3                 THE COURT:  OK.
4     REDIRECT EXAMINATION
5     BY MR. NORINSBERG:
6     Q.  Good afternoon, Mr. Jay.
7     A.  Good afternoon, sir.
8     Q.  You told us earlier that you didn't write the words on the
9     criminal court affidavit, is that correct?
10    A.  That's correct.
11    Q.  But you read what was put there, correct?
12    A.  Yes, sir.
13    Q.  And you have seen complaints like this a lot in your
14    career, haven't you?
15    A.  Yes, sir.
16    Q.  Your responsibility as a police officer is to read it
17    carefully and make sure everything is accurate, correct?
18    A.  Yes, sir.
19    Q.  And you did that in this case, correct?
20    A.  For the most part, yes, sir.
21    Q.  And what you have written there, your testimony is that
22    it's accurate, correct?
23    A.  With the exception of shirt instead of jacket, yes, sir.
24    Q.  So everything else is accurate in there, the attempting to
25    strike and grabbing, that's accurate?

DBATGUZ1                    Jay - redirect

1   A.  Yes, sir.
2   Q.  Now when you had that conversation with the district
3   attorney's office, did you mention at that time that Mr. Guzman
4   also grabbed your partner Johnny Diaz?
5   A.  I said that I thought it might have happened, yes, sir.
6   Q.  But then when you spoke to investigators, six months later,
7   you told him it did happen, that you actually saw Mr. Guzman
8   grab your partner, right?
9   A.  I believe that's what I saw, sir.
10  Q.  Now you were asked questions about the two Molina
11  defendants, right?
12          You were asked some questions about what you observed
13  them doing?
14  A.  In what context?
15  Q.  You saw them kicking and beating a man on the ground,
16  correct?
17  A.  Yes, sir.
18  Q.  So one of the people doing that was Alberto Molina,
19  correct?
20  A.  Yes, sir.
21  Q.  Yet Alberto Molina is a witness that you're going to call
22  in your case, isn't that correct?
23          MR. KUNZ:  Objection.
24          THE COURT:  Objection sustained.
25  Q.  You testified earlier that you weren't sure if plaintiff

DBATGUZ1                    Jay - redirect
1   was in a fight, is that correct?
2   A.  Yes, sir.
3   Q.  But yesterday you told us he wasn't in a fight, isn't that
4   true?
5   A.  I'm sorry, sir?
6   Q.  Yesterday when you testified you told this jury you didn't
7   see him in a fight.
8   A.  I never said that I saw him in a fight, sir.
9   Q.  So to be perfectly clear on the record, if somebody were to
10  say to you right now did you actually see Mr. Guzman in a
11  fight, what would be your answer to this jury?
12  A.  A definitive no, I never saw Mr. Guzman in a fight.
13              MR. NORINSBERG:  I have nothing further.
14              MR. KUNZ:  Nothing further.
15              THE COURT:  Thank you, you're excused.
16              Plaintiff, call your next witness.
17              MR. NORINSBERG:  At this time, the plaintiff calls
18  Police Officer Diaz.
19              THE COURT:  Just one moment before the officer takes a
20  stand.  There are some documents here, does someone want to
21  retrieve those documents?
22              (Continued on next page)
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

219

```
      DBATGUZ1                    Diaz - direct
 1      JOHNNY DIAZ,
 2          called as a witness by the Plaintiff,
 3          having been duly sworn, testified as follows:
 4   DIRECT EXAMINATION
 5   BY MR. NORINSBERG:
 6   Q.  Good afternoon, Officer Diaz.
 7   A.  Good afternoon.
 8   Q.  Now you're here pursuant to a subpoena, correct?
 9   A.  Yes.
10   Q.  But you're not actually a defendant in this case, right?
11   A.  Yes.
12   Q.  And you have previously given testimony in this action,
13   right?
14   A.  Yes.
15   Q.  And you also gave testimony as part of an investigation,
16   correct?
17   A.  Yes.
18   Q.  And that testimony you gave was approximately six months
19   after the incident, right?
20   A.  Yes.
21   Q.  Would it be fair to say, Officer Diaz, that six months
22   after the incident you told investigators that you couldn't
23   remember anything about what happened?
24              MR. KUNZ:  Objection.
25              THE COURT:  Objection sustained.
```

DBATGUZ1                    Diaz - direct

1   Q.  Do you recall being interviewed by the investigators?
2   A.  At CCRB?
3   Q.  Do you recall speaking to investigators at some point early
4   on after this incident, six months after?
5   A.  Yes.
6   Q.  Do you recall being asked questions about what happened
7   that led up to the incident between Mr. Guzman and Officer Jay?
8   Do you recall that?
9              MR. KUNZ:  Objection.
10             THE COURT:  Objection sustained.
11  Q.  Now directing your attention to the night of the incident,
12  February 14, 2009, you were working as a police officer that
13  night, correct?
14  A.  Yes.
15  Q.  And you were in an unmarked police vehicle, right?
16  A.  Yes.
17  Q.  You were driving a four door sedan, is that correct?
18  A.  Yes.
19  Q.  And you were actually the driver of that vehicle, right?
20  A.  Yes.
21  Q.  Officer Jay was the passenger, correct?
22  A.  Front passenger, yes.
23  Q.  He was in the front passenger seat, correct?
24  A.  Yes.
25  Q.  And you respond to the location of 207th Street and Sherman

DBATGUZ1                    Diaz - direct
1   Avenue, right?
2   A.  Yes.
3   Q.  Now Sherman Avenue is a two-way street, right?
4   A.  Yes.
5   Q.  And it runs north/south, correct?
6   A.  Yes.
7   Q.  And you were actually driving northbound on Sherman Avenue,
8   right?
9   A.  Yes.
10  Q.  And as you were driving northbound going up Sherman Avenue,
11  the Red Lounge was on your left, is that correct?
12  A.  Repeat that?
13  Q.  As you're driving north on Sherman Avenue, the Red Lounge
14  was to your left, is that correct?
15  A.  To the left, it was on the left side, yes.
16  Q.  So you went past the intersection of 207th Street and
17  Sherman Avenue, and then you brought your police vehicle to a
18  stop, is that correct?
19  A.  No.
20  Q.  You stopped your police vehicle at the northwest corner of
21  207th and Sherman, is that correct?
22  A.  Yes.
23  Q.  Could we have the photograph, please.
24          So we're clear, this is the northwest corner, this is
25  the northeast, is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

222

DBATGUZ1                        Diaz - direct

1    A.  Yes.
2    Q.  So you're heading northbound on this Sherman Avenue, is
3    that correct?
4    A.  Yes.
5    Q.  You're heading in the same direction as this vehicle is
6    shown, is that right?
7    A.  Yes.
8    Q.  And you see a fight on this corner break out, is that
9    correct?
10   A.  Yes.
11   Q.  So the fight is on this corner and you pulled your car on
12   to this corner, the northwest corner, right?
13   A.  Yes.
14   Q.  You didn't pull in over here, correct?
15   A.  Correct.
16   Q.  You didn't see any fight on this northeast corner, correct?
17   A.  Correct.
18   Q.  And can you show us -- just to give you the laser for a
19   minute -- where exactly you pulled your police vehicle?
20   A.  Right around here.
21          MR. NORINSBERG:  Let the record reflect the witness is
22   using a laser pointer to indicate the actual northwest corner
23   right at the edge of the crosswalk.
24   Q.  Is that correct, sir?
25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

223

DBATGUZ1                        Diaz - direct

1   Q.  So would it be fair to say that all the events that took
2   place took place on this area, not on the other side of the
3   street, is that correct?
4   A.  Correct.
5   Q.  Now when you stopped the police car, you saw a crowd of
6   people there, right?
7   A.  Yes.
8   Q.  And the crowd was right on the edge of the sidewalk here on
9   the northwest corner, correct?
10  A.  No.
11  Q.  Referring to your deposition page 46, line 2:
12  "Q.  Where was this large crowd located?
13  "A.  On the sidewalk on Sherman on 207th Street in the
14  northwest corner."
15  A.  Yeah, they were spread out on both sides.
16  Q.  On both sides but still in this same corner, right?
17  A.  Yes.
18  Q.  And you stopped the vehicle within approximately eight feet
19  of that crowd, correct?
20  A.  Yes.
21  Q.  Stopped the vehicle and you exited the car, right?
22  A.  Yes.
23  Q.  And you saw two men assaulting a third man on the ground,
24  correct?
25  A.  A couple guys assaulting a man on the ground, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

224
DBATGUZ1                         Diaz - direct
1   Q.  So you saw two men assaulting a third man on the ground,
2   right?
3   A.  It was more than two.
4   Q.  So you saw more than two men assaulting a third man?
5   A.  The guy on the ground, yes.
6   Q.  So the guy on the ground had three people assaulting him?
7   A.  Three or four.
8   Q.  Four people, five people?  How many people were assaulting
9   him?
10  A.  Three or more.
11  Q.  Whatever you saw there, you wanted to stop this fight as
12  soon as possible, right?
13  A.  Yes.
14  Q.  So you wanted to get to where this fight was and intervene
15  and break it up as soon as you could, right?
16  A.  Yes.
17  Q.  So all four police officers left the vehicle at the same
18  time and tried to go and break up that fight, isn't that true?
19          MR. MODAFFERI:  Objection.
20          THE COURT:  I'll allow it.
21  A.  No.
22  Q.  Are you telling us that all four officers didn't get out of
23  the car at the same time?
24  A.  Yes.
25  Q.  Did there ever come a time, sir, where there was a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DBATGUZ1                          Diaz - direct

1   circle --
2            THE COURT:  Wait, repeat that question, I'm not sure,
3   just --
4   Q.  Are you telling us that all four officers did not get out
5   of the car at the same time?
6   A.  Yes.
7   Q.  What sequence -- what do you remember of the sequence of
8   people getting out of the car?
9   A.  Everyone got out before me.
10  Q.  So everyone is out before you.  You're the driver, you're
11  the last person out, is that right?
12  A.  Correct.
13  Q.  Then all four of you go to where the fight is, correct?
14  A.  No.
15  Q.  You didn't see your fellow officers with you as you went to
16  the fight?
17  A.  I saw officer Brian, Officer Jay.
18  Q.  You saw Officer Jay.  What about sergeant McHugh and
19  Officer Walters, where were they when you got out of the car?
20  A.  On the right side.
21  Q.  The right side of the vehicle?
22  A.  Yes.
23  Q.  But then everybody get out within a few seconds, would you
24  agree with that?
25  A.  Yes.

226

DBATGUZ1                          Diaz - direct

1   Q.  And then everybody starts moving towards the fight, isn't
2   that what happened?
3           Isn't that what happened, sir?
4   A.  Yes.
5   Q.  Now when you got out of the car, you were able to see
6   clearly what Officer Jay did, right?
7   A.  I don't understand.
8   Q.  When you got out of the car, did you see what Officer Jay
9   was doing?
10  A.  He ran towards the guy that was on the ground.
11  Q.  Did you ever see Officer Jay actually go and pepper spray
12  those first two men?  Did you see that with your eyes?
13  A.  No.
14  Q.  And you were like right there, sir?
15  A.  What do you mean by right there?
16  Q.  This is within a matter of a few feet from where you're
17  located, correct?
18  A.  The assault?
19  Q.  Yes.
20  A.  Yes.
21  Q.  It's within eight feet of the car, right?
22  A.  About, yes.
23  Q.  Now you claim you saw Officer Jay grab one of the men, is
24  that right?
25  A.  Yes.

227

DBATGUZ1                     Diaz - direct

1   Q.  And you saw him put him to the ground, correct?
2   A.  Yes.
3   Q.  And just to be clear, the man Officer Jay is putting to the
4   ground at the point, it's not Mr. Guzman, right?
5   A.  No.
6   Q.  It's a different man, right, it's one of the men assaulting
7   the guy on the ground, right?
8   A.  Yes.
9   Q.  Now where were you when Officer Jay put this assaulter down
10  to the ground?  Where were you located?
11  A.  I was with Officer Jay.
12  Q.  When you say "with him," how close were you to him?
13  A.  A foot.
14  Q.  OK.  So you're a foot away from Officer Jay when he took
15  one of these two assaulters down to the ground, correct?
16  A.  Yes.
17  Q.  Please tell the jury, how did Mr. -- how did Officer Jay
18  take this first man down to the ground?
19  A.  I don't remember.
20  Q.  So you can't tell this jury any details about something
21  that you supposedly saw and you were one foot away from, is
22  that correct?
23          MR. MODAFFERI:  Objection.
24          THE COURT:  I'll allow it.
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

228

DBATGUZ1                      Diaz - direct

1   Q.  You claim you actually helped Officer Jay bring the man to
2   the ground, right?
3   A.  Handcuff him, yes.
4   Q.  But you can't give us any details about how that happened,
5   right?  Is that correct, sir?
6   A.  How what happened?
7   Q.  How this man actually got down to the ground.
8   A.  No.
9   Q.  Now while you were cuffing one -- while one of these
10  assaulters was being cuffed by Officer Jay, did you assist him
11  in that?
12  A.  Yes.
13  Q.  Just so we're clear, you're involved with cuffing one of
14  these assaulters.  Up to this point, you haven't seen
15  Mr. Guzman, right?
16  A.  No.
17  Q.  You haven't heard of him, you're not aware of his presence
18  anywhere, is that correct?
19  A.  Correct.
20  Q.  Then you say Mr. Guzman came on the scene, is that right?
21  A.  Yes.
22  Q.  And you saw it with your own eyes Mr. Guzman coming on to
23  the scene, right?
24  A.  I saw him on the scene, yes.
25  Q.  Can you tell the members of the jury, did Mr. Guzman
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DBATGUZ1                       Diaz - direct

1   approach from the front towards you or from behind?
2   A.  He came from the side and then behind me.
3   Q.  Referring to your testimony before the investigators, do
4   you recall giving the following testimony, page 3:
5   "Q.  And how did this, the second individual, intervene?
6   "A.  He walked up on me.
7   "Q.  From the front, from behind?
8   "A.  I don't know exactly how."
9            Do you recall giving that testimony to investigators?
10           MR. KUNZ:  Objection.
11           THE COURT:  Overruled.
12  A.  No.
13           (Audio recording played).
14           MR. KUNZ:  Objection, Judge.
15  Q.  Listening to that tape, does it refresh your memory of what
16  you told investigators just six months after this incident?
17  A.  No.
18  Q.  But that is your voice on the audiotape, correct?
19  A.  Yes.
20  Q.  So when you were asked six months after this incident to
21  describe how Mr. Guzman approached the scene, your answer was,
22  "I don't know exactly how," correct?
23  A.  Yes.
24  Q.  Now was Officer Jay facing towards Mr. Guzman or away from
25  Mr. Guzman when Mr. Guzman first approached?

230

DBATGUZ1                    Diaz - direct

1   A.  He was facing away.
2   Q.  Referring to deposition page 59, line 11:
3   "Q.  Now as Mr. Guzman was approaching, was Officer Jay facing
4   the direction from which Mr. Guzman was coming?
5   "A.  I don't remember which way he was facing, but we were
6   still trying to handcuff the individual that we had on the
7   ground.  We only had one hand."
8           Do you recall being asked that question and giving
9   that answer?
10  A.  No.
11  Q.  Do you recall page 57, line 8:
12  "Q.  In which direction was Officer Jay facing?
13  "A.  I don't remember."
14          Do you recall being asked that question and giving
15  that answer at your deposition?
16          MR. MODAFFERI:  Judge, Judge I would like to have the
17  next question.
18          THE COURT:  Let's have a side bar.
19          (In robing room)
20          THE COURT:  OK.
21          MR. MODAFFERI:  Judge, we just heard a whole line of
22  impeachment regarding which direction Mr. Guzman was coming
23  from, and the witness told investigators that he didn't know.
24  And then here in his deposition he says, the very next question
25  after the question that Mr. Norinsberg read, was:
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

231

DBATGUZ1                    Diaz - direct
1   "Q.  Was Mr. Guzman coming from your right?
2   "A.  Yes."
3            That's on page --
4            MR. NORINSBERG:  That has nothing to do with the
5   point.
6            THE COURT:  Hold on.  Mr. Guzman coming from your
7   right, that objection is overruled.  The questions were before
8   about the direction that the officer was facing in terms of
9   Mr. Guzman.
10           MR. MODAFFERI:  But the previous line of questioning
11  was in regard to where Mr. Guzman came from.
12           MR. MEEHAN:  You didn't object to that.
13           THE COURT:  Those objections are overruled.  I would
14  like to -- I don't usually -- I don't want to interrupt
15  anyone's flow, I don't want to give anyone advice how to try
16  the case, but to move things along, it seems to me that what
17  you're doing with this witness is when the witness gives an
18  answer and you have a prior inconsistent answer to a similar
19  question, that you're impeaching this witness with that prior
20  inconsistency.  You're impeaching the witness, am I wrong?
21           MR. NORINSBERG:  That's correct.
22           THE COURT:  If you're trying to impeach the witness,
23  it may not be helpful, particularly with this witness, to keep
24  asking the witness if they recall -- if he recalls giving this
25  testimony before the deposition.  Ask him didn't you say that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

232

DBATGUZ1                    Diaz - direct
1              MR. NORINSBERG:  OK.
2              THE COURT:  Because every time you ask someone if they
3    recall, sometimes you invite them to say no, I don't recall.
4    And that's happened several times and it's kind of -- it is
5    kind of taking more time here.
6              But if you're trying to refresh, that's fine, refresh,
7    but if you're trying to impeach, you don't have to ask the
8    witness in terms of deposition transcript, you could ask:  You
9    were asked this question and gave the following answer,
10   correct?  You don't have to ask him if he recalls.  You can
11   refresh or leave it alone or do what you want to do, but it may
12   speed things up.
13             MR. NORINSBERG:  OK.
14             (In open court)
15             THE COURT:  That objection is overruled.
16             Would you like the question read back?
17             MR. NORINSBERG:  Sure.
18             (Record read)
19             THE WITNESS:  No, I don't recall.
20   BY MR. NORINSBERG:
21   Q.  Now you saw Mr. Guzman approach Officer Jay.  That part you
22   do remember, right?
23   A.  Yes, he approached both of us.
24   Q.  Well, in terms of Officer Jay and his position, was he
25   standing or was he kneeling or in some other position when
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

233

DBATGUZ1                      Diaz - direct
1    Mr. Guzman approached him?
2    A.  I believe we were both on our knees.
3    Q.  In what position was Officer Jay when you first saw
4    Mr. Guzman?
5    A.  I believe he was on his knees.
6    Q.  Deposition, page 57, line 5:
7    "Q.  In what position was Officer Jay when you first saw
8    Mr. Guzman?
9    "A.  I wouldn't remember exactly."
10            That was your testimony at the time deposition,
11   correct?
12   A.  I don't recall.
13   Q.  Well, you reviewed your deposition before coming here
14   today, didn't you, sir?
15   A.  Yes.
16   Q.  You wanted to make sure that you familiarized yourself with
17   your prior testimony before you came to court, correct?
18   A.  Correct.
19   Q.  So if I understand your testimony so far, you don't
20   remember whether Mr. Guzman approached Officer Jay from the
21   front or back, you don't remember if Officer Jay was facing
22   Mr. Guzman or away, and you don't remember what position
23   Officer Jay was when Mr. Guzman first approached, is that
24   correct?
25            MR. MODAFFERI:  Objection.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DBATGUZ1                    Diaz - direct
1            THE COURT:  I'll allow it.
2   A.  As far as I remember, we were both on our knees trying to
3   handcuff the individual.
4   Q.  My question is we went through various details that you had
5   no memory of, would it be fair to say that the reason that you
6   don't remember those details is because they never happened?
7            THE COURT:  Objection, let's have a side bar.
8            (In robing room)
9            THE COURT:  Not to be hyper technical, but my
10  recollection is that the witness testified today that he did
11  remember where all of these individuals were.  That was his
12  testimony on the stand.  Isn't that correct?
13           MR. NORINSBERG:  Yes, and I should have clarified
14  that.  The question should have been in reference to his
15  deposition why he couldn't remember.
16           THE COURT:  OK.  That's fine as long as you reference
17  the deposition, because that his testimony today was that he
18  remembered.
19           MR. NORINSBERG:  You're right, sorry.
20           MR. MODAFFERI:  Judge, we also have another issue with
21  the deposition.  Mr. Norinsberg asked at the first point that
22  you saw Mr. Guzman where was he -- what position was Officer
23  Jay in the first time that you saw Mr. Guzman.  And he read a
24  question and answer from the deposition, but the answer was:  I
25  don't remember exactly.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

235

DBATGUZ1                    Diaz - direct
1              But on the page before, the question was:  At the
2   point you first saw Mr. Guzman, were you engaged in assisting
3   Officer Jay to handcuff the person, the individual that the two
4   of you encountered?
5              Answer:  Yes, I was down on my knees.
6              THE COURT:  OK.  You can do that on redirect.
7              MR. NORINSBERG:  What time are we going to?
8              THE COURT:  About 1:00.
9              (In open court)
10             THE COURT:  OK, please rephrase the question.
11  BY MR. NORINSBERG:
12  Q.  Officer Diaz, the reason why you couldn't remember any of
13  those details at your deposition was because those details in
14  fact never happened, isn't that true?
15  A.  Which details and facts?
16  Q.  About mr. Guzman approaching, whether the front or the
17  back, whether Officer Jay is standing or kneeling, about what
18  direction he was facing, you can't remember those things at
19  your deposition because none of those things happened, isn't
20  that true?
21  A.  No.
22  Q.  Can you tell us, sir, as you sit here today in court, would
23  you agree that you don't remember ever seeing Mr. Guzman touch
24  Officer Jay?  Would you agree with that?
25  A.  Repeat that?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

236

DBATGUZ1                        Diaz - direct

1   Q.  As you sit here today, do you have any recollection
2   whatsoever of seeing Mr. Guzman touch Officer Jay?
3   A.  No.
4   Q.  And you were just one foot away, right, sir?
5   A.  Mr. Guzman was actually right behind me.
6   Q.  Would it be fair to say, sir, you never saw Mr. Guzman grab
7   Officer Jay, Officer Jay's jacket, did you, sir?
8   A.  No.
9   Q.  You never saw Mr. Guzman actually pull Officer Jay back
10  violently, did you?
11  A.  No.
12  Q.  You never saw him pull him back at all, did you, sir?
13  A.  No, I was handcuffing the individual.
14  Q.  So the answer to my question would be no, you never saw
15  those things happen, right?
16  A.  No.
17  Q.  And you never saw Mr. Guzman cock back his arm as if he was
18  attempting to strike Officer Jay, did you?
19  A.  No.
20  Q.  Now we focused on Mr. Guzman touching Officer Jay.  I would
21  like to ask about him touching you now.  You don't have any
22  memory whatsoever of Mr. Guzman touching you, do you, sir?
23  A.  No.  I know he was right behind me.
24  Q.  My question is:  Do you have any recollection of Mr. Guzman
25  actually touching you?

237

DBATGUZ1                    Diaz - direct

1    A.  No.
2    Q.  You never felt him grab you, did you, sir?
3    A.  Not that I recall.
4    Q.  Now when Mr. Guzman first approached you and Officer Jay,
5    he was walking in the street, according to your prior
6    testimony, is that correct?
7    A.  Yes.
8    Q.  And when you first see him, he's approximately three feet
9    away from you, right?
10   A.  About, yes.
11   Q.  And your claim is that Mr. Guzman kept walking towards you
12   and Officer Jay, correct?
13   A.  Yes.
14   Q.  And you didn't see him like run up full speed, right?
15        You didn't see that, did you?
16   A.  From what I recall, he was walking to our direction.
17   Q.  So he was walking, and then your claim is that Officer Jay
18   told Mr. Guzman to step back, is that right?
19   A.  Multiple times, yes.
20   Q.  So this was actually a conversation going on, Mr. Guzman
21   keeps approaching, Officer Jay keeps telling him move back,
22   move back, is that correct, sir?
23   A.  Yes.
24   Q.  So you didn't just see Mr. Guzman come up grab Officer Jay,
25   Officer Jay pepper spray him, and then Mr. Guzman try to run

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

238

DBATGUZ1                          Diaz - direct

1    away, you didn't see that, right?
2    A.  Repeat that?
3    Q.  You didn't see Mr. Guzman just run up, grab Officer Jay,
4    Officer Jay turn around, spray him, and Mr. Guzman try to
5    escape, you didn't see that, right?
6    A.  No.
7    Q.  What you saw is Mr. Guzman keep coming and walking towards
8    Officer Jay and Officer Jay telling him repeatedly to step
9    back, right?  That's what you saw, is that correct?
10   A.  And heard, yes.
11   Q.  But you specifically remember Officer Jay asking Mr. Guzman
12   to move away, right?
13              MR. MODAFFERI:  Objection.
14              THE COURT:  I'll allow it.
15   A.  I don't recall exactly what he was saying, but he was
16   telling him not to come closer, not to come towards us, to stay
17   away from us as we were handcuffing the individual on the
18   ground.
19   Q.  You recall being asked the following question and giving
20   the following answer to investigators, page 4:
21   "Q.  OK.  And what did Officer Jay do when this individual
22   approached?  Did he have any physical contact with him or did
23   he instruct him to move away?
24   "A.  I don't remember exactly what happened."
25              Do you recall giving that testimony to investigators,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

239

DBATGUZ1                    Diaz - direct

1   sir?
2   A.  No.
3   Q.  That was your sworn testimony just six months after this
4   incident, wasn't it?
5   A.  I don't recall.
6   Q.  Six months after this incident you had no recollection of
7   Officer Jay instructing Mr. Guzman to move away, right?
8   A.  I don't recall.
9   Q.  And yet three years later at your deposition for the first
10  time you said that Mr. Guzman kept coming and Officer Jay kept
11  telling him to move away, right?
12              MR. KUNZ:  Objection.
13              THE COURT:  I'll allow it.
14              MR. MODAFFERI:  Objection.
15  A.  Yes.
16  Q.  So at the interview with investigators, you said you don't
17  remember if Officer Jay instructed him to move away, but at
18  your deposition you said Officer Jay repeatedly told him to get
19  away, right?
20  A.  If that's what I said, yes.
21  Q.  Well, can you tell the members of this jury which version
22  of your testimony is the truth, what you originally told
23  investigators or what you said at your deposition?
24              MR. MODAFFERI:  Objection.
25              THE COURT:  Objection sustained.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

240

DBATGUZ1                    Diaz - direct

1   Q.  You never actually saw Mr. Guzman repeatedly approaching
2   Officer Jay, did you?
3   A.  Yes.
4   Q.  You made that up, didn't you, sir?
5   A.  No.
6   Q.  You never actually heard Officer Jay instructing him to
7   move back, did you?
8   A.  Yes.
9   Q.  You made that up because you wanted to help your partner
10  out, isn't that true?
11  A.  No.
12  Q.  In fact, you told the investigators you actually didn't
13  even remember how the interaction between Officer Jay and
14  Mr. Guzman even started, isn't that true?
15          MR. MODAFFERI:  Objection.
16          THE COURT:  Overruled.
17  Q.  Isn't that true, sir?
18  A.  Repeat the question?
19  Q.  You told investigators that you don't even remember how
20  this interaction between Mr. Guzman and Officer Jay started,
21  isn't that true?
22  A.  I don't recall.
23  Q.  Referring to your testimony before the investigators, page
24  4:
25  "Q.  OK.  And you said that you don't really remember how the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

241

DBATGUZ1                    Diaz - direct

1   interaction between Mr. Jackson and Officer Jay started, is
2   that correct?
3   "A.  Correct."
4           Do you recall -- that was your testimony, sir, in
5   front of the investigators, wasn't it?
6   A.  I don't recall.
7   Q.  Would you agree just six months after this incident you
8   would have had a good memory of what happened, wouldn't you?
9           MR. MODAFFERI:  Objection.
10          THE COURT:  I'll allow it.
11  A.  Perhaps.
12  Q.  Now going back to the point where Mr. Guzman is approaching
13  Officer Jay and Officer Jay keeps telling him to move back,
14  according to your testimony, you then see Officer Jay actually
15  stand up, is that correct?
16  A.  He stands up at some point, yes.
17  Q.  OK.  And you see Officer Jay stand up, but you don't see
18  him pepper spray Mr. Guzman at that time, right?
19  A.  No.
20  Q.  You see Officer Jay stand up and you see him actually
21  grabbing Mr. Guzman physically, right?
22  A.  I know he cuffs him.
23  Q.  Sir, I'm not quite up to the cuffing, I want to focus on
24  the moment Mr. Guzman has approached, according to your
25  testimony, and Officer Jay keeps telling him to go away and

242

DBATGUZ1                    Diaz - direct
1   he's not going away.  Officer Jay stands up, and at the moment
2   that he stands up, he then physically grabs Mr. Guzman, right?
3   A.  If I saw him physically grab Mr. Guzman?
4   Q.  Yes.
5   A.  I know he handcuffed him.
6   Q.  Referring to your deposition, page 58, line 6:
7   "Q.  Then what happened?
8   "A.  Officer Jay got up and grabbed him."
9           That was your sworn testimony at a deposition,
10  correct?
11  A.  I don't recall.
12  Q.  You knew you were under oath when you gave that testimony,
13  correct, sir?
14  A.  Yes.
15  Q.  You swore to tell the truth, the whole truth, and nothing
16  but the truth when you gave that testimony, correct?
17  A.  Yes.
18  Q.  And you testified under oath that you saw Mr. Guzman being
19  grabbed by Officer Jay at that time, didn't you?
20  A.  That I saw what?
21  Q.  Excuse me?
22  A.  Repeat that?
23  Q.  You testified at your deposition that you, with your own
24  eyes, saw Mr. -- you saw your partner Officer Jay grabbing
25  Mr. Guzman, right?  That was your testimony?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

243

DBATGUZ1                         Diaz - direct

1   A.  I know he handcuffed him.
2   Q.  As you sit here today in front of this jury, did you see
3   Officer Jay get up and grab Mr. Guzman?  Yes, you did, or no,
4   you didn't?
5   A.  I don't recall.
6   Q.  Now Officer Jay brought Mr. Guzman down to the ground,
7   right?
8   A.  He's the only one that had contact with Mr. Guzman, yes.
9   Q.  Can you please tell the members of the jury how did Officer
10  Jay get Mr. Guzman down to the ground?
11  A.  I cannot.
12  Q.  Sir, you were right there with your partner, right?  You
13  really can't tell this jury how Mr. Guzman was taken to the
14  ground by your partner?
15  A.  I wasn't there when he grabbed Guzman.  I was still trying
16  to handcuff the other individual.  The cuffs kept getting stuck
17  on his clothing, so I couldn't get one arm cuffed.  We only had
18  one hand cuffed, we couldn't get the other hand cuffed.
19  Q.  Let me try to understand, sir.  Your testimony is the
20  reason why you can't tell us how Officer Jay got Mr. Guzman to
21  the ground was because the cuff kept getting stuck?  Is that
22  what your testimony is?
23  A.  It's because of my focus was handcuffing the individual I
24  had on the ground.
25  Q.  And you claim that you didn't see anything that happened

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

244

DBATGUZ1                    Diaz - direct

1   between Officer Jay and Mr. Guzman, correct?
2   A.  Correct.
3   Q.  But you can see Mr. Guzman only a hand's distance away from
4   where Officer Jay was, right?  That part you saw, correct?
5   A.  Yes.
6   Q.  So Mr. Guzman walked to you and he got so close, just a
7   hand's distance away, you see Officer Jay grab him, according
8   to your deposition testimony, but you can't tell us anything
9   else that happened after that point, is that correct?
10              THE COURT:  Objection sustained.  Please rephrase the
11  question.
12  Q.  After Mr. Guzman comes up, walks up to you, do you see
13  anything else happen before Mr. Guzman is placed in handcuffs?
14  A.  Not that I recall, no.
15              MR. NORINSBERG:  I think this would be an appropriate
16  time, your Honor.
17              THE COURT:  All right.  Members of the jury, we'll
18  take our lunch break now, so let's come back at ten minutes
19  after 2:00.
20              Don't discuss the case with anyone.  Don't discuss the
21  case amongst yourselves.  And I will instruct you that the
22  lawyers and parties have been instructed not to talk to you, so
23  remember they're not being rude.  Don't do any independent
24  research regarding any of the parties or anything in this case
25  as well.  Have a good lunch.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

245

DBATGUZ1

```
 1                  (Jury not present).
 2             THE COURT:  Let me discuss some scheduling matters
 3    with the attorneys.  Officer -- let me ask Officer Diaz to step
 4    outside for a second.
 5             Defense counsel, how short do you believe your
 6    examination of Officer Diaz will be?
 7             MR. MODAFFERI:  Half hour, less.
 8             THE COURT:  And then let's get an offer of proof, who
 9    is the next witness for plaintiff?
10             MR. NORINSBERG:  To be clear, I still have more
11    questions for him, I'm not done with him.
12             THE COURT:  I thought you were done.
13             MR. NORINSBERG:  I don't have much longer, but I was
14    trying to break at a time without getting into a new section.
15             THE COURT:  Who is your next witness going to be?
16             MR. NORINSBERG:  Sergeant McHugh.
17             THE COURT:  Who is after him?
18             MR. NORINSBERG:  John Walters.
19             THE COURT:  Let's ask Officer Jay to step outside for
20    a second.
21             Let me get an offer of proof on McHugh.
22             MR. NORINSBERG:  He's a fact witness.  He was there at
23    the scene.  He made important observations.  His observations
24    are directly contrary to what Officer Jay says happened.  So
25    that's why we're calling him.
```

DBATGUZ1

```
 1              THE COURT:  OK.  But give me a sense of -- there's not
 2    going to be much of a surprise here.  I assume McHugh was
 3    deposed?
 4              MR. NORINSBERG:  Yes.
 5              THE COURT:  And generally give me a sense of -- my
 6    sense was that Diaz was closer to Officer Jay when whatever
 7    happened happened here.  Where is McHugh while the relevant
 8    facts are taking place?
 9              MR. NORINSBERG:  Our view is McHugh and Walters are
10    the ones subduing the Molina defendants, and actually the other
11    two officers are not involved with that at all, contrary to
12    what they have testified to.  So that's basically our theory of
13    the case, which I will spell out on summation in much greater
14    detail, but that's where we're going with this.
15              THE COURT:  But again, my question is where are they
16    in relation to Officer Jay and Mr. Guzman, how far away, you're
17    theory or any other theory?
18              MR. NORINSBERG:  I think within a matter of a few feet
19    of each other.
20              THE COURT:  Again, I want to get a sense -- I want to
21    move things along because I anticipate this may be another
22    witness who is going to be asked a lot of questions about not
23    seeing a lot of things primarily.
24              MR. NORINSBERG:  Well, yes and no.
25              THE COURT:  Which is fine, I want to -- I'm not going
```

247

DBATGUZ1

1  to keep from you doing that, but I want to move things along.
2  I don't want a lot of cumulative testimony on this.
3          How short do you think your examination of McHugh
4  would be?
5          MR. NORINSBERG:  I guess 30 minutes or less.
6          THE COURT:  Sounds good.  I will see you at ten
7  minutes after 2:00.
8          (Luncheon recess taken)
9          (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

248

DCATGUZ2                        Diaz - direct
1                        AFTERNOON SESSION
2                          (2:15 p.m.)
3              (Jury present)
4              THE COURT:  Welcome back.
5              Go ahead, counsel, you may continue.
6              Officer, you're still under oath.
7    BY MR. NORINSBERG:
8    Q.  Good afternoon, Officer Diaz.
9    A.  Good afternoon.
10   Q.  Sir, at any point before Mr. Guzman was placed under
11   arrest, did you ever see him on the ground?
12   A.  Yes.
13   Q.  Referring to your testimony before the investigators, page
14   6:
15   "Q.  OK.  Do you remember whether Mr. Jackson was standing up
16   or if he was on the ground at any point?
17   "A.  I don't remember if he was."
18          You gave that testimony to the investigators, correct?
19   A.  I don't recall.
20   Q.  Just six months after this incident you told them that you
21   couldn't even remember if Mr. Guzman was ever on the ground,
22   isn't that what you told them?
23   A.  I don't recall.
24   Q.  You also don't recall seeing Officer Jay handcuff
25   Mr. Guzman, right?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

249

DCATGUZ2                        Diaz - direct
1   A.  Correct.
2   Q.  So we're clear here, the last thing you remember, you
3   remember Mr. Guzman walking over to Officer Jay, you remember
4   Officer Jay standing up, correct?
5          Is that correct?
6   A.  He got up, yes.
7   Q.  He got up.  From the point he got up until you see
8   Mr. Guzman in handcuffs, do you remember anything else during
9   that time period?
10  A.  I finally got to place the second cuff on the individual I
11  had down on the ground.
12  Q.  How long does it take for you to do that, sir?
13  A.  At all depends on the situation.
14  Q.  In this situation, how long did it take you to cuff the
15  other individual?
16  A.  Longer than unusual.
17  Q.  A minute, two minutes?
18  A.  I don't recall how long.
19  Q.  Going back to my previous question, from the time you saw
20  Officer Jay stand up until the time you saw Mr. Guzman in
21  cuffs, can you tell the jury anything else that happened
22  between Officer Jay and Mr. Guzman during that time period?
23  A.  No.
24  Q.  So if you didn't see how Officer Jay brought Mr. Guzman to
25  the ground, then you don't know if Officer Jay kicked
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

250

DCATGUZ2                    Diaz - direct

1   Mr. Guzman, do you?
2   A.  I didn't see it.
3   Q.  Referring to your deposition, page 61, line 6:
4   "Q.  Do you know if Officer Jay kicked Mr. Guzman in any part
5   of his body?
6   "A.  No.
7   "Q.  No meaning you don't know, correct?
8   "A.  Correct."
9           MR. MODAFFERI:  Objection, improper impeachment.
10          THE COURT:  Objection sustained.
11  Q.  As you sit here today, can you tell this jury whether or
12  not Officer Jay kicked Mr. Guzman in the knee?  Yes or no.
13  A.  No, he didn't kick him.
14  Q.  I don't understand, sir, you told us a minute ago that you
15  completely lost sight of what happened between Officer Jay and
16  Mr. Guzman, you were busy cuffing someone, isn't that what you
17  just told us?
18  A.  Yes.
19  Q.  So if you didn't see anything that was going on during that
20  time period, how could you tell the jury that Officer Jay
21  didn't kick Mr. Guzman?  How could you tell them that if you
22  didn't see anything?
23  A.  I didn't see him kick him.
24  Q.  Can we agree, sir, that at no point in time during this
25  incident did you ever see Mr. Guzman involved in a fight?  Can
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

251

DCATGUZ2                          Diaz - direct

1   we agree with that?
2   A.  Yes.
3   Q.  Now you did become aware Mr. Guzman asked for medical
4   attention, correct?
5   A.  Yes.
6   Q.  And he said his leg was hurting, right?
7   A.  Yes.
8   Q.  You were aware of that, correct?
9   A.  Yes.
10  Q.  But you never asked Mr. Guzman how he hurt his leg, did
11  you?
12  A.  No.
13  Q.  And the reason you never asked him is because you already
14  knew how he hurt his leg, didn't you?  Yes or no.
15  A.  No.
16  Q.  Now you are friends with Officer Jay, is that correct?
17  A.  Yes.
18  Q.  You socialize from time to time?
19  A.  What do you mean by "socialize?"
20  Q.  Well, you have been to his home a couple of times, haven't
21  you?
22  A.  Work related.
23  Q.  Did you ever talk to Officer Jay about the incident that
24  took place on February 14, 2009 at any time after that night?
25  A.  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCATGUZ2                    Diaz - direct
1    Q.  How many times did you talk to him about the incident?
2    A.  I don't recall.
3    Q.  Would it be more than five times?
4    A.  I don't recall.
5    Q.  Would it be more than ten times?
6    A.  I don't recall.
7    Q.  And you also specifically talked about this lawsuit with
8    him, didn't you, sir?
9    A.  Yes.
10   Q.  How many times did you talk to Officer Jay about this
11   specific lawsuit?
12   A.  I don't recall.
13   Q.  Could it have been more than ten times that you spoke to
14   him about this lawsuit?
15   A.  Doubt it.
16   Q.  But you don't remember, do you?
17   A.  No.
18             MR. NORINSBERG:  Thank you, Officer Diaz, I have
19   nothing further.
20             THE COURT:  Thank you.
21             Defense counsel.
22   CROSS-EXAMINATION
23   BY MR. MODAFFERI:
24   Q.  Good afternoon, Officer Diaz.
25   A.  Good afternoon.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCATGUZ2                    Diaz - cross

1    Q.  How long have you been with the NYPD?
2    A.  18 and a half years.
3    Q.  And approximately how many arrests have you made?
4    A.  Me personally?
5    Q.  Yes.
6    A.  500, about.
7    Q.  500?
8    A.  Yes.
9    Q.  About?
10   A.  Yes.
11   Q.  And how many arrests were you involved in like this one
12   where you aren't the arresting officer you were just involved?
13   A.  Over 500.
14   Q.  More than 500?
15   A.  Yes.
16   Q.  And when counsel was questioning you, you testified that
17   you did not see the plaintiff grab Officer Jay, is that right?
18   A.  Yes.
19   Q.  Why didn't you see that?
20   A.  Because my head was down, I was on my knees trying to
21   handcuff the individual on the ground.
22   Q.  So does that mean that plaintiff never grabbed Officer Jay?
23        MR. NORINSBERG:  Objection.
24        THE COURT:  Sustained, rephrase the question.
25   Q.  Just because you didn't see it, does that mean it didn't

DCATGUZ2                    Diaz - cross

1   happen?
2   A.  No.
3   Q.  You also testified that you did not see the plaintiff cock
4   his hand back, is that right?
5   A.  Yes.
6   Q.  And why didn't you see that?
7   A.  Because I was down on my knees and my head -- I was looking
8   down at the individual on the ground trying to handcuff him.
9   Q.  So because you were looking down, you didn't see what was
10  going on, is that correct?
11          MR. NORINSBERG:  Objection.
12          THE COURT:  Sustained as to form.
13  Q.  Which way were you facing, Officer Diaz, at the moment that
14  you were trying to place the individual in handcuffs?
15  A.  I was facing down.
16  Q.  Where was the plaintiff at that time?
17  A.  Behind me.
18  Q.  Can you see behind you?
19  A.  No.
20  Q.  You also testified that you did not see Officer Jay use
21  pepper spray on the plaintiff, is that right?
22  A.  Yes.
23  Q.  And why didn't you see that?
24  A.  I was looking down.
25  Q.  So what were you doing when you were looking down?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DCATGUZ2                    Diaz - cross

1  A.  I was trying to cuff the individual on the ground.
2  Q.  Now you also testified that you didn't see how plaintiff
3  was taken down to the ground by Officer Jay, is that right?
4  A.  Yes.
5  Q.  And why didn't you see that?
6  A.  I was still trying to handcuff the individual on the
7  ground, so I was looking down.
8  Q.  Were you watching Officer Jay the whole time?
9  A.  No.
10  Q.  Why not?
11  A.  Because my goal was to handcuff the individual on the
12  ground to prevent escape.
13  Q.  Now Officer Diaz, I want to switch gears a little bit and
14  talk a little bit about your employment with the NYPD.  Where
15  are you currently assigned?
16  A.  The 34th Precinct.
17  Q.  How long have you been with the 34th Precinct?
18  A.  18 years.
19  Q.  So for your entire career?
20  A.  Yes.
21  Q.  And what assignments have you held while you have been an
22  officer with the 34th Precinct?
23  A.  Patrol, conditions, anticrime.
24  Q.  And can you briefly tell the jury what your duties and
25  responsibilities are as an officer in anticrime?

DCATGUZ2                   Diaz - cross
1    A.  Anticrimes, we generally drive around looking for crimes in
2    progress, violent crimes in progress.
3    Q.  Sorry?
4    A.  Violent crimes in progress.
5    Q.  And can you briefly tell the jury what your duties and
6    responsibilities are as an officer, say, in conditions?
7    A.  That would be more quality of life conditions, like people
8    drinking in public, urinating in public.
9    Q.  Now getting back to anticrime, is that something that you
10   patrol in uniform or plain clothes?
11   A.  Plain clothes.
12   Q.  And why is that?
13   A.  This way we could roll up and surprise the individuals
14   committing the crimes.
15   Q.  What assignment are you currently in?
16   A.  Anticrime.
17   Q.  And on the early morning of February 14, 2009, what was
18   your assignment?
19   A.  Anticrime.
20   Q.  And do you remember your tour?
21   A.  Yes, it was 8:30 p.m. to 5:05 a.m.
22   Q.  Who were you working with that night?
23   A.  That night I was working with Officer Jay, Sergeant McHugh,
24   and Officer Walters.
25   Q.  And earlier you told us that as an officer in the anticrime
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCATGUZ2                        Diaz - cross

1   unit, you wear plain clothes.  So how do you identify yourself
2   as a police officer?
3   A.  With our shield, the color of the day, we wear headbands
4   around the left arm, non-shooting hand.
5   Q.  And you made a motion toward your chest when you said
6   shield.  Can you explain that?
7   A.  Yeah, we usually wear a chain around the neck and then the
8   shield is hanging.
9   Q.  So on that night or the early morning of February 14, 2009,
10  were you out patrolling?
11  A.  Yes, as anticrime.
12  Q.  Who were you with?
13  A.  Officer Jay, Sergeant McHugh, and Officer Walters.
14  Q.  Now did there come a time on February 14, 2009 that you
15  ended up in the vicinity near the Red Lounge?
16  A.  Yes.
17  Q.  And what did you observe once you were in that vicinity?
18  A.  I observed a large crowd at the northwest corner of 207th
19  Street and Sherman Avenue, and I observed an individual on the
20  ground getting kicked and punched by some other males.
21  Q.  So I want to talk about that first observation.  Where are
22  you when you first made that observation?
23  A.  I was driving northbound on Sherman.
24  Q.  So is it fair to say you were in the car?
25  A.  I was in the car, yes.

DCATGUZ2                        Diaz - cross
```
 1   Q.  So did the fight already occur?
 2            I'll rephrase that.  What were you witnessing?  Were
 3   you witnessing a fight?
 4   A.  Yes.
 5   Q.  So the fight had already begun before you got there?
 6   A.  Yes.
 7   Q.  In fact, if the fight didn't break out before you got
 8   there, you wouldn't have had any reason to stop?
 9   A.  Correct.
10   Q.  Now getting back to the crowd, about how many people were
11   in the crowd?
12   A.  20 or more.
13   Q.  And where was the crowd?
14   A.  They were scattered on the northwest corner of Sherman and
15   207, along the side of it.
16   Q.  Can you describe for us in a little more detail what was
17   going on regarding the fight?
18   A.  There was one individual, a male Hispanic, who was on the
19   ground, and there were like three or four guys over him.  Some
20   were kicking, some were punching him.
21   Q.  Three or four guys?
22   A.  Three or four, maybe five.
23   Q.  So what did you do after you observed this crowd and these
24   three or four people fighting someone who was on the ground?
25   What do you do next?
```

DCATGUZ2                        Diaz - cross

1   A.  I went right to the west north corner of Sherman and 207,
2   parked the car there, and we all got out.
3   Q.  Why did you park the car?  Why did you stop?
4   A.  To stop the assault, help the individual who was getting
5   assaulted.
6   Q.  And what did the other officers do?
7   A.  They also got out.
8   Q.  Who got out first?
9   A.  I think Officer Jay.
10  Q.  And I believe you testified before that you got out last?
11  A.  Yes.
12  Q.  Why is that?
13  A.  I was driving the vehicle.  I made sure I parked the
14  vehicle.
15  Q.  And explain for us what you did after you parked the
16  vehicle.
17  A.  After I parked the vehicle, I opened my door, ran out, was
18  going to run towards the individual getting assaulted.  At that
19  point Brian -- Officer Jay had grabbed one of the individuals
20  who was doing the assaulting.
21  Q.  I want to get back to the moment where you step out of your
22  vehicle.  When you step out of your vehicle, did you see any of
23  the other officers?
24  A.  Officer Walters and Sergeant McHugh were on the right side
25  of the vehicle.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                    Diaz - cross

```
 1   Q.  Where was Officer Jay?
 2   A.  He was in front of the vehicle.
 3   Q.  In front of the vehicle?
 4   A.  He ran towards the front of the vehicle, yes.
 5   Q.  Where exactly did you go?
 6   A.  Towards the front of the vehicle.
 7   Q.  So you went in the direction Officer Jay was going?
 8   A.  Yes.
 9   Q.  And where is that in relation to where Sergeant McHugh and
10   Officer Walters were going?
11   A.  It was west of the intersection of 207th Street and
12   Sherman.
13   Q.  So is it fair to say that you and Officer Jay were going
14   west or they were going west?
15   A.  We were going west.
16   Q.  And they were going in what direction?
17   A.  They were going east.
18   Q.  OK.  Now was it difficult to move through the crowd?
19   A.  No.
20   Q.  Why not?
21   A.  Pretty much people started running when they saw us.
22   Q.  And what happened after you get out of the car and after
23   you head in the direction that Officer Jay is going?
24   A.  What happened?  I helped -- Jay stopped one of the
25   individuals who was the committing the assault, and I helped
```

261

DCATGUZ2                    Diaz - cross
1   him handcuff him.
2   Q.  And I see you paused.  When did this incident take place?
3   A.  When?
4   Q.  Yes.  That night that we're talking about, what was the
5   date?
6   A.  The 14th of February.
7   Q.  What year?
8   A.  2009.
9   Q.  So that was more than four and a half years ago?
10  A.  Yes.
11  Q.  So who gets to where the fight is going on first, which
12  officer?
13  A.  Officer Jay.
14  Q.  And what is it that you see him do?
15  A.  Grab a male Hispanic.
16  Q.  And what did you do?
17  A.  I assisted in handcuffing him.
18  Q.  Was that person under arrest?
19  A.  Yes.
20  Q.  Why?
21  A.  For assault, assaulting an individual.
22  Q.  You saw that, right?
23  A.  Yes.
24  Q.  What happens after you start helping Officer Jay to place
25  that individual in handcuffs?

DCATGUZ2                    Diaz - cross

1   A.  We're trying to handcuff him, and we get one handcuffed,
2   the other cuff gets stuck on his jacket, sweater, so it was
3   giving us a hard time because he was moving his hands around,
4   so we had to hold him still while trying to handcuff him.
5   Q.  Let me stop you there.  You're looking down when you're
6   speaking.  Why are you doing that?
7           MR. NORINSBERG:  Objection.
8           THE COURT:  I'll allow it.
9   A.  Because that's where I was looking when I was trying to
10  handcuff the individual and trying to look to see where the
11  cuff was stuck.
12  Q.  What position were you in at that time?
13  A.  I was on my knees on the ground.
14  Q.  And what position was Officer Jay in at that time?
15  A.  I believe he was the same way.
16  Q.  Where was he in relation to where you were?
17  A.  He was to the left of me.
18  Q.  So you're trying to handcuff this individual, and you get
19  one cuff on and you're having difficulty with the other one.
20  What happens?
21  A.  That's when we hear someone shouting at us, yelling,
22  screaming.
23  Q.  Could you tell what they were yelling and screaming?
24  A.  I don't recall.
25  Q.  Do you know who that person was that was yelling and

263

DCATGUZ2                    Diaz - cross

1   screaming?
2   A.  Yes.
3   Q.  Who was it?
4   A.  Mr. Guzman.
5   Q.  And what did he do, if anything?
6   A.  He kept walking closer to where we were.
7   Q.  And what happened after that?
8   A.  Officer Jay was shouting at him, telling him to stay back.
9   Q.  And did you do anything?
10  A.  I kept trying to cuff the individual on the ground.
11  Q.  And where was the plaintiff at that point in time
12  physically?  Where was he when he's yelling and Officer Jay is
13  telling him to stay back?
14  A.  He was about three to five feet away from us.
15  Q.  Did he ever get closer than three to five feet?
16  A.  Yes.
17  Q.  Tell me about that.
18  A.  He was right behind me.
19  Q.  Did he ever make physical contact with you?
20  A.  Not that I recall.
21  Q.  Do you know if he made physical contact with Officer Jay?
22  A.  No.
23  Q.  Why not?  Why don't you know that?
24  A.  I don't know because I was still trying to handcuff the
25  individual on the ground and I was looking down on the ground.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                    Diaz - cross

1   Q.  So when the plaintiff was right behind you, was the guy
2   that you're trying to place in handcuffs actually fully cuffed
3   at that time?
4   A.  No, only one hand was cuffed.
5   Q.  So what happens when the plaintiff is right behind you,
6   what happens after that?
7   A.  Officer Jay shouted to him, and at some point he gets up.
8   Q.  Who is "he?"
9   A.  Officer Jay gets up.
10  Q.  He stands up?
11  A.  He stands up.
12  Q.  And what does he do?
13  A.  He goes to grab him, I guess.
14  Q.  You say you guess.  Why?  What are you looking at?
15  A.  I'm looking down on the ground, trying to handcuff the
16  individual on the ground.
17  Q.  What's the next thing that you see with respect to the
18  plaintiff and Officer Jay?
19  A.  That Officer Jay has him down on the ground and he's pretty
20  much kneeling the way I was.
21  Q.  Did you see Officer Jay place the plaintiff in handcuffs?
22  A.  No, but I know he was cuffed.
23  Q.  About how far was Officer Jay and the plaintiff from you
24  and the other individual when you saw him?
25  A.  About five to eight feet.

DCATGUZ2                          Diaz - cross

1   Q.  Five to eight feet?
2   A.  Yes.
3   Q.  And during all this time, you have been talking a little
4   bit about you and Officer Jay, where was Sergeant McHugh and
5   Officer Walters?
6   A.  They were on the other side --
7   Q.  Did you see?
8   A.  -- of the vehicle.
9   Q.  Could you see them?
10  A.  I couldn't see them from where I was positioned.
11  Q.  So you don't know what they were doing?
12  A.  No.
13  Q.  So what happens next?
14  A.  Finally got the initial -- the second cuff -- the second
15  hand cuffed.  Mr. Guzman was cuffed.  Other officers came to
16  the scene, and Mr. Guzman and the other individual -- three
17  other individuals were transported to the station house.
18  Q.  And how were the individuals transported back to the
19  station house?
20  A.  In the police vehicles.
21  Q.  When you say station house, just so we're all clear, you
22  mean the 34th Precinct?
23  A.  The 34th Precinct, yes.
24  Q.  Who called for the additional cars?
25  A.  I don't know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

266

DCATGUZ2                    Diaz - cross

1    Q.  Did you?
2    A.  No.
3    Q.  But additional cars came?
4    A.  Yes.
5    Q.  And did you see the plaintiff get placed in one of those
6    vehicles?
7    A.  Yes.
8    Q.  And did he look visibly injured to you?
9    A.  No.
10   Q.  Now did you go back to the precinct as well?
11   A.  Yes.
12   Q.  Did you go in the same car as the plaintiff?
13   A.  No.
14   Q.  But at some point in time you do go back to the precinct?
15   A.  Yes.
16   Q.  And what happened at the precinct?
17   A.  At the precinct we were doing the pedigree cards, all four
18   individuals that were arrested were in front of the desk, and
19   then they were placed inside the holding cell.
20   Q.  Did you hear plaintiff ever complain of an injury at the
21   precinct?
22   A.  Yes.
23   Q.  And what did he say?
24   A.  He complained about his knee.
25   Q.  And what, if anything, did you do?

```
        DCATGUZ2                    Diaz - cross
1       A.  Nothing.
2       Q.  What, if anything, did the officers do in response to that
3       complaint?
4       A.  Officer Jay had an ambulance respond to the precinct.
5       Q.  And did you actually see EMS arrive?
6       A.  Yes.
7       Q.  Did you see the plaintiff talking with the EMTs?
8       A.  Yes.
9       Q.  Where was that taking place?
10      A.  Inside the holding cell.
11      Q.  Could you hear anything that was being said?
12      A.  No.
13      Q.  Why not?
14      A.  I wasn't in the room.
15      Q.  Did you see the plaintiff leave with those EMTs?
16      A.  No.
17      Q.  Now did you have any involvement with the plaintiff at all
18      at the precinct aside from the pedigree information?
19      A.  No.
20      Q.  Just getting back to out on the street, did you observe
21      Officer Jay ever slam the defendant's head into the ground?
22      A.  No.
23      Q.  Or grab his hair?
24      A.  No.
25      Q.  Or kick him?
```

268

DCATGUZ2                         Diaz - cross

1   A.  No.
2   Q.  Did you observe Officer Jay kick anyone that night?
3   A.  No.
4   Q.  Is it fair to say that you didn't see what we mentioned
5   earlier, you didn't see plaintiff grab Officer Jay because you
6   were looking down trying to handcuff the individual?
7   A.  Yes.
8   Q.  And you didn't see Officer Jay pepper spray the plaintiff
9   because you were looking down trying to handcuff that
10  individual?
11  A.  Yes.
12          MR. MODAFFERI:  Your Honor, one moment, please.
13          Nothing further.
14          THE COURT:  Anything else from plaintiff?
15          MR. NORINSBERG:  Yes, your Honor.
16  REDIRECT EXAMINATION
17  BY MR. NORINSBERG:
18  Q.  Good afternoon again, Officer Diaz.
19  A.  Good afternoon.
20  Q.  Sir, you told us a few moments ago you heard Officer Jay
21  shouting at Mr. Guzman, is that correct?
22  A.  Yes.
23  Q.  What did you hear him shouting?
24  A.  Why?
25  Q.  What did you hear him shout?

DCATGUZ2                         Diaz - redirect

1   A.  Get back.
2   Q.  Apart from "Get back," did you hear him shout anything
3   else?
4   A.  I remember "Get back."
5   Q.  Then you saw Officer Jay stand up, right?
6   A.  I know he got up.
7   Q.  That's the next thing, he got up, right?
8   A.  Yes.
9   Q.  So you have your partner shouting at somebody and then
10  standing up, and then your testimony is you just started
11  looking down to the ground to continue handcuffing this person.
12  Is that your testimony?
13  A.  Not to the ground, to the actual ground.
14  Q.  Well, you were asked a number of questions by counsel to
15  what you saw and your answer to every single question was I was
16  looking down to the ground, isn't that true?
17  A.  Looking down to see where the handcuff was getting caught
18  on.
19  Q.  Now you said it took a long time to get that cuff, right?
20  A.  Yes.
21  Q.  In fact, it took just a few seconds, isn't that true?
22  A.  Repeat that?
23  Q.  It took just a few seconds to get that cuff on, isn't that
24  true?
25  A.  No.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

270

DCATGUZ2                     Diaz - redirect

1   Q.  So if Officer Jay testified in this courtroom earlier that
2   it took just a few seconds to get that hand cuffed, would he be
3   mistaken about that?
4             THE COURT:  That's sustained.
5   Q.  Weren't you a little concerned you had someone coming up to
6   your partner, your partner was shouting at him, your partner
7   stands up, weren't you concerned about what was going on with
8   your partner, too?
9   A.  Yes, but I'm mostly concerned about not finishing cuffing
10  the individual on the ground and him escaping from me.
11  Q.  So you have him down on the ground, he was actually face
12  down on the ground, correct?
13  A.  Yes.
14  Q.  What side of him were you on?
15  A.  On the left side of his body.
16  Q.  So you're on the left side of his body and Officer Jay is
17  on the right side of his body or somewhere else?
18  A.  Officer Jay was next to me on my left side of me.
19  Q.  So both of you on the left side, is that correct?
20  A.  Yes.
21  Q.  Now Mr. Guzman walked over to you.  How close did he get to
22  you right before Officer Jay stood up?
23  A.  Right behind me.
24  Q.  So behind you, you mean behind your back?
25  A.  Behind my back.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

271

DCATGUZ2                        Diaz - redirect

1    Q.  And you he was so close he was a hand's distance away,
2    right?
3    A.  Less than that.
4    Q.  He was so close that if he got any closer, you thought he
5    would jump on you, right?
6    A.  He could have.
7    Q.  And yet you can't tell us anything that happened after that
8    moment, right?
9    A.  Correct.
10   Q.  Now you told us that you were in a lot of arrests in your
11   career, is that correct?
12   A.  Yes.
13   Q.  But not all of those arrests involve situations where
14   you're called upon to testify with investigators, right?
15        MR. MODAFFERI:  Objection.
16        THE COURT:  Sustained.
17   Q.  Would you agree a situation where you have an arrest and
18   then you have to speak to investigators, that's something that
19   would stand out in your memory, wouldn't it, sir?
20        MR. MODAFFERI:  Objection.
21        THE COURT:  I'll allow it.
22   A.  What do you mean by "investigators?"
23   Q.  Well, you told us earlier you spoke to investigators six
24   months after this incident, right?
25   A.  Yes.

272
DCATGUZ2                        Diaz - redirect
1   Q.  And that investigation had nothing to do with this federal
2   lawsuit, right?
3                   MR. MODAFFERI:  Objection.
4                   THE COURT:  Let's have a side bar.
5                   (In robing room)
6                   THE COURT:  OK.  So where are you going with this
7   line?
8                   MR. NORINSBERG:  I'm trying to rebut the suggestion
9   made by defense counsel that the reason why Officer Diaz can't
10  remember details of this case is there's so many arrests he's
11  been involved with in his career.  My point being of all the
12  universe of the arrests, there's a very small number of them
13  that would be ones where they result in investigations, and
14  those would stand out, so he should remember this one.
15                  THE COURT:  You already asked that question.  Didn't
16  he answer that?
17                  What was the question and answer?  Let's have the last
18  two questions ago read back.
19                  (Record read)
20                  THE COURT:  What's the purpose of that last question?
21                  MR. NORINSBERG:  Because he never answered the earlier
22  question, which is to simply say this investigation would stand
23  out in his mind.  It's not that oh, I have a thousand arrests
24  in my career so how am I supposed to remember this.  This was
25  an investigation that had nothing to do with our federal
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

273

DCATGUZ2                        Diaz - redirect
1    lawsuit.  Our lawsuit wasn't filed until much after.  So the
2    fact is this was six months after this incident, and it would
3    stand out in his memory.  I'm rebutting the inference created
4    by counsel.
5              THE COURT:  That first part of the question is fine,
6    that's why I let you ask that.  I overruled that objection, in
7    terms of you spoke to an investigator and therefore this should
8    stand out in your mind.  I'm not sure what the link in terms of
9    this investigation has nothing to do with this federal lawsuit.
10   What is the relevance of that part of it?
11             MR. NORINSBERG:  I can rephrase the question.  I just
12   want to get a clear answer to the question because I didn't get
13   an answer.  He said what do you mean what type of
14   investigation, and I didn't want to open a discussion about
15   CCRB and explain to him what I meant.
16             THE COURT:  I understand.
17             MR. NORINSBERG:  Then I was trying to distinguish
18   between our lawsuit and the CCRB investigation.
19             THE COURT:  I understand.  What's defense's position
20   on this?
21             MR. MEEHAN:  We have a few concerns.  One, the
22   investigation was to Officer Jay so he was merely testifying to
23   investigators as a witness.  And again, now this case is
24   becoming more about the investigation and investigators, just
25   getting back to our other point what is going on here and what
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

274

DCATGUZ2                    Diaz - redirect

1   happened that night.  But to the extent that counsel is drawing
2   a parallel to the investigators and this lawsuit, that was our
3   my objection.  To the extent he wants to ask, say, you should
4   remember this because you spoke to people six months later,
5   yes, it was asked and answered.  I don't think we need to go
6   into this any further.
7           THE COURT:  I think he -- why not simply ask him
8   something to the effect of not every arrest leads to you
9   testifying, and then you can ask him some other questions and
10  you testified in a deposition here and that's unusual, and you
11  also testified for the investigators, something to that effect,
12  and therefore this should stick out in your mind.  But I'm
13  concerned about the -- especially since this witness -- I guess
14  getting back to defense counsel's earlier objection about the
15  CCRB, I will state for the record I guess it's obvious to
16  everyone that plaintiff's counsel asked this witness questions
17  before the lunch break about the investigators and this witness
18  volunteered:  And you are you asking about the CCRB?  And
19  plaintiff's counsel, even though this witness volunteered that,
20  kept the questions focused on investigator.
21          So a lot of the prejudice that the defendants are
22  complaining about at this point has been caused by their own
23  witness, who actually got me to limit the way that that
24  investigation was going to be referred to.  But obviously I
25  don't know if the witness wasn't prepped or the witness just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

275
DCATGUZ2                    Diaz - redirect
1    decided to do that, but it's your witness is the one who threw
2    out CCRB.  And the reason I wanted to stop this, I was
3    concerned this witness would blurt that out again, which
4    investigation are you talking about, he will blurt out CCRB
5    again.  So why not ask him questions about -- questions about
6    testifying and that's unusual, that's perfectly fine.  We don't
7    need more descriptions of the investigation.
8                MR. NORINSBERG:  OK.  That's what I'll do.
9                THE COURT:  OK.
10               (In open court)
11               THE COURT:  Please rephrase the question.
12   BY MR. NORINSBERG:
13   Q.  Would you agree, Officer Diaz, not every arrest that you're
14   involved with leads to an investigation?  Would you agree with
15   that?
16   A.  Yes.
17   Q.  Would you also agree that not every arrest that you're
18   involved with leads to you giving testimony at a deposition?
19   Will you agree with that?
20   A.  Yes.
21   Q.  Would you agree that not every arrest you're involved with
22   leads to a federal lawsuit?  Would you agree with that?
23               MR. MODAFFERI:  Objection.
24               THE COURT:  Overruled.
25   A.  Yes.

276

DCATGUZ2                    Diaz - redirect

1   Q.  These are all things that would make this particular
2   incident stand out in your memory.  True or not true?
3   A.  What things?
4   Q.  The fact there was an investigation, the fact that you
5   testified in a deposition, the fact there's actually a lawsuit,
6   you're testifying in now in court, wouldn't those things make
7   this particular incident stand out in your memory over all the
8   other arrests you were involved with?
9   A.  Not necessarily.
10  Q.  When you gave the first statement that you gave to
11  investigators, the incident at that moment in time was fresh in
12  your memory, wasn't it, sir?  True or not true?
13  A.  Perhaps.
14  Q.  At that time, when it was fresh in your memory, you
15  repeatedly said you couldn't remember anything, isn't that
16  true?
17              MR. MODAFFERI:  Objection.
18              THE COURT:  Overruled.
19  A.  I don't recall what I said.
20              MR. NORINSBERG:  Nothing further, thank you.
21              THE COURT:  OK.  Anything else from defendant?
22              MR. MODAFFERI:  No, Judge.
23              THE COURT:  Thank you, you're excused.
24              Plaintiff, call your next witness.
25              MR. MEEHAN:  Your Honor, at this time the plaintiff
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

277

```
    DCATGUZ2                    McHugh - direct
 1  calls Sergeant Michael McHugh.
 2   MICHAEL McHUGH,
 3        called as a witness by the Plaintiff,
 4        having been duly sworn, testified as follows:
 5  DIRECT EXAMINATION
 6  BY MR. MEEHAN:
 7  Q.  Good afternoon, Sergeant McHugh.
 8  A.  Good afternoon.
 9  Q.  You are here pursuant to a subpoena, is that correct?
10  A.  That's correct.
11  Q.  And you are not a defendant in this lawsuit, is that
12  correct?
13  A.  Yes, that is correct.
14  Q.  And you and I have never met before, is that correct?
15  A.  That's correct.
16          THE COURT:  Hold on just a second.
17          Can the jury all hear the witness?  Maybe bring the
18  mic a little closer.
19          Go ahead.
20  Q.  But you have previously given testimony in this case,
21  correct?
22  A.  That's correct.
23  Q.  And that was in the form of a deposition taken on
24  February 24th, 2012, correct?
25  A.  Correct.
```

278

DCATGUZ2                    McHugh - direct

1   Q.  You also gave a statement to investigators prior to the
2   filing of this federal lawsuit, correct?
3   A.  Correct.
4   Q.  And you read a summary of that statement, correct?
5   A.  Yes, that's correct.
6   Q.  And you read that summary to prepare for your deposition in
7   February of 2012, correct?
8   A.  Yes, that is correct.
9   Q.  And that summary accurately reflects the testimony you gave
10  to that investigator, correct?
11  A.  Yes, that is correct.
12  Q.  There were no errors in that summary, were there?
13  A.  Not that I recall.
14            MR. MODAFFERI:  Objection.
15            THE COURT:  I'll allow it.
16  Q.  You're currently employed, are you not?
17  A.  Yes, I am.
18  Q.  And you are employed with the New York Police Department,
19  are you not?
20  A.  Yes.
21  Q.  And you been at the 34th Precinct since July of 2007,
22  correct?
23  A.  Yes, that is correct.
24  Q.  And you joined the force in March of 2000, correct?
25  A.  Yes.

279

DCATGUZ2                    McHugh - direct

1   Q.  And you were an officer on February 14th, 2009, correct?
2   A.  No, that is not correct.
3   Q.  You were a sergeant on February 14, 2009?
4   A.  Yes, that is correct.
5   Q.  On February 14, 2009 your assignment was the anticrime
6   unit, correct?
7   A.  Yes, anticrime supervisor.
8   Q.  And anticrime was formed in November of 2008, right?
9   A.  Yes.
10  Q.  And the duties of anticrime is to patrol the 34th Precinct,
11  try and prevent violent crimes, burglaries, assaults, correct?
12  A.  Yes, that is correct.
13  Q.  With you on the night of February 14, 2009, were Officers
14  Jay, Diaz and Walters, correct?
15  A.  Yes, that is correct.
16  Q.  And you had previously worked with them on your team,
17  right?
18  A.  Yes.
19  Q.  You were their supervisor?
20  A.  From when the anticrime team was established in 2008,
21  November of 2008, they were -- started there from the
22  beginning, and I worked with them.  They were in my squad when
23  I was a patrol sergeant from July of '07 until -- basically
24  until November of '08.
25  Q.  And so you have been a team since November of '08?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

280

DCATGUZ2                      McHugh - direct

1    A.  Yes.
2    Q.  And every tour that you worked between November of 2008 and
3    February the 14th of 2009, you all worked together, correct?
4    A.  That's not correct, there's times where we have had court
5    that we worked different tours.  If one of the guys who made an
6    arrest had court, he would do a different tour.
7    Q.  But the vast majority of them was you four as a team,
8    correct?
9    A.  Yes.
10   Q.  Directing your attention to the night of February 13, going
11   into the morning of February 14, 2009, you worked from
12   8:30 p.m. on February 13 to about 5:14 a.m. on February 14,
13   correct?
14   A.  That was the scheduled tour, yes.
15   Q.  And you were working with the other officers on your team,
16   correct?
17   A.  Yes.
18   Q.  And you were all in plain clothes?
19   A.  Yes, that is correct.
20   Q.  I would like to direct your attention to about 4:00 a.m. on
21   the morning of February 14, 2009.  You arrived at the
22   intersection of West 207th Street and Sherman Avenue, correct?
23   A.  Correct.
24   Q.  And the car came to a stop in the middle of that
25   intersection, did it not?

281
DCATGUZ2                    McHugh - direct
1   A.  Yes.
2   Q.  And you immediately exited the car when it came to a stop,
3   correct?
4   A.  Yes, I observed a large fight going on in the middle of the
5   street.
6   Q.  And all the officers immediately exited the car, correct?
7   A.  Correct.
8   Q.  When you got out of the car, you observed multiple people
9   assaulting a gentleman on the ground, correct?
10  A.  Yes.
11  Q.  So there was one individual on the ground getting assaulted
12  by multiple people, correct?
13  A.  Correct.
14  Q.  So after you got out of the car, you went to go break up
15  that fight, did you not, Sergeant McHugh?
16  A.  Yes.
17  Q.  And you grabbed one of the guys in the fight and brought
18  him to the ground, is that correct?
19  A.  Yes.
20  Q.  And you put him on the ground by grabbing his shoulders and
21  placing him on the ground, correct?
22  A.  Correct.
23  Q.  And you handcuffed that individual, correct?
24  A.  Correct.
25  Q.  So you grabbed one of the guys who was assaulting the man
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCATGUZ2                    McHugh - direct

1    on the ground, and it was Police Office Walters who apprehended
2    the second individual assaulting the man on the ground, was it
3    not?
4    A.  I believe so.
5    Q.  It was not Officer Jay, was it?
6    A.  No, it was not.
7    Q.  Officer Jay had nothing to do with breaking up that fight,
8    did he?
9    A.  That's not correct.  There was multiple fights going on.
10   When Officer Walters and myself went to one fight, we had the
11   individuals, multiple individuals assaulting the guy on the
12   ground, there was other fights, and Officer Diaz and Officer
13   Jay went to break up those fights.
14   Q.  Sergeant McHugh, you do not recall seeing any other fights
15   going on that night, do you?
16   A.  There was a large fight, there was multiple groups
17   fighting.
18   Q.  Referring to your deposition, page 54, line 12:
19   "Q.  So we are accurate here, is it accurate to say that you do
20   not recall seeing any other fights going on besides this one
21   that you went to break up?
22   "A.  That's correct.  I don't recall if there were any others."
23             Do you recall being asked that question and giving
24   that answer at your deposition?
25   A.  Yes, I do.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

283

DCATGUZ2                       McHugh - direct

1   Q.  And do you recall being under oath when you gave that
2   answer at your deposition?
3   A.  Yes.
4   Q.  And do you recall the oath you just took with the court
5   deputy right now?
6   A.  Yes.
7   Q.  And some point that night, Sergeant McHugh, you saw a
8   person you now know as the plaintiff in this case, Noel
9   Jackson-Guzman, correct?
10  A.  That's correct.
11  Q.  Could you please tell this jury, was Noel Jackson-Guzman
12  one of the people you saw punching and kicking a man on the
13  ground?
14  A.  No, he was not.
15  Q.  So Mr. Guzman was not involved in this fight, correct?
16  A.  Not the one that I broke up, no.
17  Q.  You saw Mr. Guzman standing in the crowd, correct?
18  A.  That's what I gave to investigators.  At this time I don't
19  recall exactly, but that's -- I remember giving that statement
20  to investigators that I saw him in the crowd.
21  Q.  And you gave that statement about six months after this?
22  A.  Yes, that's correct.
23  Q.  So that accurately reflects what do you remember as what
24  happened, correct?
25  A.  Yes.

284

DCATGUZ2                    McHugh - direct

1   Q.   Sergeant McHugh, can you please tell this jury, did you
2   ever see Mr. Guzman grab Officer Jay?
3   A.   No, I did not.
4   Q.   Did you ever see Mr. Guzman attempt to strike Officer Jay?
5   A.   No, I did not.
6   Q.   Did you ever see Mr. Guzman pull Officer Jay backwards?
7   A.   No, I did not, I was involved in apprehending.
8   Q.   Did you ever see Mr. Guzman have any contact with Officer
9   Jay whatsoever?
10  A.   No, I did not.
11  Q.   Did you see Mr. Guzman attempt to run away from Officer
12  Jay?
13  A.   No, I did not.
14  Q.   Did you see Officer Jay tackle Mr. Guzman and bring him to
15  the ground?
16  A.   No, I did not.
17  Q.   Did you ever see Mr. Guzman run full speed towards Officer
18  Jay?
19  A.   No, I did not.
20  Q.   And just going back to the fight that you broke up, back to
21  the man you saw assaulting the man on the ground, did you ever
22  see Police Officer Jay attempt to handcuff either of these
23  people?
24  A.   No.
25  Q.   Did you ever see either of these men try to run away from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

285
DCATGUZ2                        McHugh - direct
1   Officer Jay?
2   A.  Not that I recall.
3   Q.  Did you ever see Police Officer Jay tackle either of these
4   men in the fight that you had broken up?
5   A.  No.
6   Q.  In fact, you didn't even see Police Officer Jay anywhere
7   near this fight, correct?
8   A.  It was in the vicinity, but not with regards to the
9   individuals that were fighting with the man on the ground, no.
10  Q.  So I would like you to assume that we've heard testimony
11  that all four officers -- all three members of your team,
12  Sergeant, were in the middle of a crowd with the three men in
13  the middle of the fight.  Would that be an accurate portrayal
14  of what happened that night?
15          MR. MODAFFERI:  Objection.
16          THE COURT:  Sustained.
17  Q.  Now after you brought one of the men to ground and
18  handcuffed him, you stayed with that individual, correct?
19  A.  Yes, until other units arrived.
20  Q.  In fact, the entire time you had that gentleman in your
21  custody you had a hand on him, correct?
22  A.  Yes.
23  Q.  And that man was one of the assaulters, either
24  Mr. Henriavez or Mr. Molina, correct?
25  A.  I don't recall their names, but sounds about right.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

286

DCATGUZ2                    McHugh - direct

1  Q.  Sounds about right.  OK.  You told us before that all four
2  officers exited the vehicle at the exact same time, correct?
3  A.  Correct.
4  Q.  And as you were approaching the people that were fighting,
5  could you please tell the jury where exactly was Officer Jay
6  the last time you saw him?
7  A.  Exiting the vehicle to my left.
8  Q.  To your left?
9  A.  Yes.
10 Q.  Page 57, line 6 of your deposition:
11 "Q.  Where was Officer Jay the last time that you saw him as
12 you approached the three or four people that were fighting?
13 "A.  I don't remember."
14        Do you recall being asked that question and giving
15 that answer at your deposition?
16        MR. MODAFFERI:  Objection, Judge, I request the next
17 question and answer be read.
18        THE COURT:  Let's have a side bar.
19        (In robing room)
20        THE COURT:  What's the next question and answer?
21        MR. MODAFFERI:  "What is the last recollection you
22 have of Officer Jay as you approached the three or four
23 individuals that were fighting?
24 "A.  Last recollection, just getting out of the car and
25 approaching the crowd."

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

287

DCATGUZ2                    McHugh - direct
1            THE COURT:  OK.  That seems to be fair.
2            MR. MEEHAN:  I have no problem reading that at all.
3            THE COURT:  OK.  How much longer do you have with this
4    witness?  This is a lot of I just didn't see anything.
5            MR. MEEHAN:  I understand.  Probably got another 15,
6    ten minutes, your Honor.
7            THE COURT:  OK.
8            (In open court)
9            THE COURT:  Please read the next portion of that
10   transcript as well.
11           MR. MEEHAN:  Page 57, line 10.
12   "Q.  What is the last recollection you have of Officer Jay as
13   you approached three or four individuals who were fighting?
14   "A.  Last recollection, just getting out of the car and
15   approaching the crowd."
16           So you did not recall --
17           THE COURT:  Hold on.  Were you asked those questions
18   and did you give those answers?
19           THE WITNESS:  Yes.
20           THE COURT:  Go ahead.
21   Q.  So you did not recall getting out on your left in your
22   deposition, did you, Sergeant McHugh?
23   A.  I just remembered him getting out of the car when I got out
24   of the car and went around the front of the vehicle and the
25   officers exited, which would be to my left.

DCATGUZ2                         McHugh - direct

1   Q.  So the last thing you remember about Officer Jay was him
2   getting out of car and approaching the crowd, correct?
3   A.  Correct.
4   Q.  Well, Sergeant McHugh, can you at least tell us, was
5   Officer Jay in front of you?
6   A.  I don't recall.
7   Q.  You don't recall.  Was Officer Jay behind you?
8   A.  I don't recall.
9   Q.  Was Officer Jay to your right or to your left?
10  A.  I recall he was to my left.
11  Q.  And can you please tell us, Sergeant McHugh, where Officer
12  Jay's location was when you did lose sight of him?
13  A.  Approaching the crowd.
14  Q.  And the last time you recall seeing Officer Jay when he was
15  getting out of the vehicle and approaching the crowd, did he
16  have a can of mace in his hand?
17  A.  Not that I recall.
18  Q.  Well, did you ever see Officer Jay walk up to men that were
19  assaulting on the guy on the ground and mace them?
20  A.  No.
21  Q.  You didn't see that?
22  A.  No.
23  Q.  And Sergeant McHugh, up to this point we have focused
24  primarily on Officer Jay.  I would like to ask you a couple of
25  questions regarding Officer Diaz.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

289

DCATGUZ2                    McHugh - direct

1          Sergeant McHugh, at any time during this incident, did
2    you ever see Mr. Guzman grab Officer Diaz?
3    A.  No, I did not.
4    Q.  Did you ever see Mr. Guzman attempt to grab Officer Diaz?
5    A.  No, I did not.
6    Q.  Did you ever see Mr. Guzman attempt to strike Officer Diaz?
7    A.  No, I did not.
8    Q.  Did you ever see Mr. Guzman have any contact with Officer
9    Diaz whatsoever?
10   A.  No, I did.
11   Q.  Did you see Mr. Guzman attempt to run away from Officer
12   Diaz?
13   A.  No, I did not.
14   Q.  Sergeant McHugh, you claim that you lost sight of Officer
15   Diaz, correct?
16   A.  That is correct.
17   Q.  So in other words, you lost sight of both Officer Jay and
18   Officer Diaz, correct?
19   A.  Yeah, that is correct.
20   Q.  Even though all four of you police officers got out of the
21   same police vehicle at the exact same time, approached the
22   exact same fight, you lost sight of half of your team?
23   A.  There was a large fight going into the crowd.  I focused on
24   helping the victim of the assault that was laying on the
25   ground.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

290

DCATGUZ2                    McHugh - direct

1   Q.  Before you lost sight of both Diaz and Jay, they were close
2   to each other, were they not?
3   A.  I don't recall, but I believe so.
4   Q.  According to you, they were only a couple of feet apart,
5   right?
6   A.  That could be accurate, yes.
7   Q.  Now at that time, Sergeant, when you lost sight of them and
8   they were together, Officer Jay and Officer Diaz, were they in
9   front of you?
10  A.  I believe they were to my left.
11  Q.  They were to your left.  At some point you called for back
12  up, did you not?
13  A.  Yes.
14  Q.  And this was after you had taken one of the individuals
15  from the fight and taken him to the ground, correct?
16  A.  That's correct.
17  Q.  And you handcuffed that individual you took down, right?
18  A.  Yes.
19  Q.  And you called for back up after you had taken that
20  individual to the ground and handcuffed him, did you not?
21  A.  Yes.
22  Q.  And back up arrived about one minute after you called them,
23  correct?
24  A.  That's an accurate statement about that, yes.
25  Q.  Sergeant McHugh, your team spent a total of only three

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                    McHugh - direct

1   minutes on the scene, is that correct?
2   A.  I don't recall how long we were on the scene.
3   Q.  Well, you arrived on the scene at 4:06 in the morning,
4   correct?
5   A.  I don't remember the exact time.
6   Q.  Are you familiar with what is called a Sprint report?
7   A.  Yes.
8   Q.  Can you tell the jury what a Sprint report is?
9   A.  It's a documentation of our radio transmissions between us
10  and central along with the 911 calls information.
11  Q.  I would like to show you what has been previously marked as
12  Plaintiff's 9.
13           MR. MEEHAN:  May I approach, your Honor?
14           THE COURT:  Yes.
15  Q.  Do you recognize this document, Sergeant McHugh?
16  A.  Yes.
17  Q.  What do you recognize that document to be?
18  A.  It's a copy of the Sprint report.
19  Q.  And directing your attention to the highlighted portion on
20  the fourth line, does that refresh your recollection that you
21  arrived on the scene at 4:06 in the morning?
22  A.  Yes.
23  Q.  Does it refresh your recollection that you by 4:09 you had
24  six collars?  That does refresh your recollection?
25  A.  At that time, yes.  Reading further, it's -- correction,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCATGUZ2                          McHugh - direct

1    it's four.
2    Q.  So four?
3    A.  Yes.
4    Q.  Not six?
5    A.  No, two others were victims.  Two were going to transport
6    to the station house, so four other arrests and then two were
7    victims.
8    Q.  But the timeline is accurate?
9    A.  Roughly, yes, because that's me going over the air for
10   central, so that's the time that they have.
11            MR. MEEHAN:  At this time I offer Plaintiff's Exhibit
12   9 marked into evidence.
13            MR. MODAFFERI:  No objection.
14            THE COURT:  OK, it's in.
15            (Plaintiff's Exhibit 9 received in evidence)
16   Q.  You told us earlier you lost sight of Officer Jay, correct?
17   A.  Yes.
18   Q.  At some point later you saw Officer Jay again, correct?
19   A.  That is correct.
20   Q.  And at that time was Officer Jay holding on to a prisoner?
21   A.  Yes, he was.
22   Q.  He was?
23   A.  Yes.
24   Q.  Referring to deposition, page 65, line 25:
25   "Q.  When Officer Jay approached you, was he holding on to a
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

293

DCATGUZ2                    McHugh - direct
1  prisoner?
2  "A.  I don't remember."
3          Do you recall being asked that question and giving
4  that answer?
5  A.  Yes.
6  Q.  In fact, you don't remember what happened when Officer Jay
7  approached you, do you?
8  A.  That is not correct.  I remember Officer Jay and Officer
9  Diaz approaching me both a holding a prisoner.
10  Q.  Referring to your deposition, page 66, line 10:
11  "Q.  What do you remember about what happened when Officer Jay
12  approached you?
13  "A.  Not much."
14          Do you recall being asked that question and giving
15  that answer.
16          THE COURT:  Objection sustained.
17  Q.  Can you please tell this jury, Sergeant McHugh, was
18  Mr. Guzman on the ground or standing with Police Officer Jay
19  when you first saw him?
20  A.  He was standing.
21  Q.  Referring to your deposition page 66, line 24:
22  "Q.  When you first saw Mr. Jackson-Guzman, was he standing,
23  was he on the ground, or something else?
24  "A.  I don't remember."
25          Do you recall being asked that question and giving

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

294

DCATGUZ2                        McHugh - direct

1    that answer, Sergeant McHugh?
2    A.  Yes, I do.
3    Q.  Can you tell the jury what was Mr. Guzman's condition when
4    you first saw him?
5    A.  Standing up, in handcuffs.
6    Q.  Referring to your deposition page 67, line 9:
7    "Q.  What was Mr. Jackson-Guzman's condition when you first saw
8    him?
9    "A.  I don't remember."
10           Do you recall being asked that question and giving
11   that answer at your deposition?
12   A.  Yes.
13   Q.  But you remember now?
14   A.  Yes, in reviewing the summary of the testimony I gave to
15   the interviewers, yes.
16   Q.  Sergeant McHugh, you claim that you did not see what
17   happened between the Officer Jay and the plaintiff that night,
18   correct?
19   A.  That is correct.
20   Q.  You did not see any part of that interaction, correct?
21   A.  That is correct.
22   Q.  So you don't know if Officer Jay kicked Mr. Guzman in the
23   leg, do you?
24   A.  No, I do not.
25   Q.  You don't know anything about what Police Officer Jay did

295

DCATGUZ2                    McHugh - direct

1    to Mr. Guzman, do you?
2    A.  Only what Officer Jay told me when he approached with
3    Mr. Guzman.
4    Q.  So your only knowledge of what happened what is what
5    Officer Jay told you?
6    A.  That is correct.
7    Q.  And after you left the scene, you went back to the
8    precinct, correct?
9    A.  Correct.
10   Q.  And while you were back at the precinct, Police Officer Jay
11   told you that Mr. Guzman complained that his leg hurt, correct?
12   A.  That is correct.
13   Q.  So you then directed Officer Jay, as his supervisor, to
14   call an ambulance, correct?
15   A.  I believe so, yes.
16   Q.  And it was Officer Jay who called the ambulance, correct?
17   A.  I don't recall who called the ambulance.
18   Q.  And Officer Jay himself spoke to the EMT when he arrived at
19   the precinct, did he not?
20   A.  I don't recall who spoke to him.
21   Q.  And Officer Jay was right next to the EMT when the EMT
22   interviewed Mr. Guzman, correct?
23   A.  I don't recall where Officer Jay was.
24   Q.  Now at any point that evening, from the time that
25   Mr. Guzman was first arrested until the time he was released,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

296

DCATGUZ2                    McHugh - direct

1   did you hear Mr. Guzman say that he injured his leg before his
2   arrest?
3   A.  No, the only thing I heard him say is that his leg hurt.
4   Q.  OK.  Sergeant McHugh, you have known Officer Jay since you
5   were assigned to the precinct, correct?
6   A.  Correct.
7   Q.  In July 2007?
8   A.  That's correct.
9   Q.  And you worked together many, many times, correct?
10  A.  Correct.
11  Q.  As many as a hundred times prior to your deposition,
12  correct?
13  A.  I don't know the exact number, but that could be accurate.
14  Q.  And you're also pretty good friends with Officer Jay
15  outside of work, correct?
16  A.  No, that is not correct, we're work colleagues.
17  Q.  You have seen Officer Jay outside of work at certain social
18  functions, have you not?
19  A.  I invited him to my wedding along with the other members of
20  the anticrime team because we're work colleagues.
21  Q.  Did you invite everybody from the 34th Precinct to your
22  wedding?
23  A.  No, I did not.
24  Q.  I would like you to assume that we have heard testimony
25  this morning --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                        McHugh - direct

1           THE COURT:  Sustained.  Objection sustained.
2    Q.  Now Sergeant McHugh, you claim that since the night of this
3    incident you have never once discussed the events of
4    February 14, 2009 with Officer Jay, don't you?
5    A.  Discussed it for -- after going to -- for the making
6    testimony for the other interviewers, the other interviewers
7    after the giving testimony to the other interviewers I have
8    talked to him.
9    Q.  So you have discussed it with him?
10   A.  Yes.
11   Q.  Referring to your deposition page 13, line 15:
12   "Q.  Since February the 14th, 2009, have you either discussed
13   the events of that night or early morning with Brian Jay?
14   "A.  No, I have not."
15           Do you recall being asked that question and giving
16   that answer?
17   A.  Yes, I do recall that.
18   Q.  Do you recall being asked that question on February 24th of
19   2012?
20   A.  Yes.
21   Q.  And you recall that your first time giving testimony about
22   the incident was six months after the dissident?
23   A.  Yes.
24   Q.  So even though you two have worked together a hundred times
25   and he went to your wedding, you have never spoken about the

DCATGUZ2                         McHugh - direct

1   incident, right?
2   A.  No, just after the one about with the other interviewers,
3   testimony about the other interviewers about an alleged comment
4   that was made.
5   Q.  At some point you learned that a lawsuit had been filed in
6   this case, correct?
7   A.  Yeah, that's correct.
8   Q.  And you learned that Officer Jay was being sued by
9   Mr. Guzman for causing his right leg injury, correct?
10  A.  Correct.
11  Q.  And you were Officer Jay's supervisor, were you not, that
12  night?
13  A.  Yes, I was.
14  Q.  But you never once spoke to him about the claims in this
15  lawsuit, right?
16  A.  No, I looked up the case and saw that it was an arrest made
17  on that day.
18          MR. MEEHAN:  No further questions, your Honor.
19          THE COURT:  Let's go ahead and start with defendant.
20  Anything from defense counsel?
21          MR. MODAFFERI:  Yes, Judge.
22  CROSS-EXAMINATION
23  BY MR. MODAFFERI:
24  Q.  Good afternoon, Sergeant McHugh.
25  A.  Good afternoon.

299

DCATGUZ2                    McHugh - cross

1   Q.  You had just mentioned something about an alleged comment
2   that you had discussed with officer Brian Jay.  What was that?
3   A.  The alleged comment was NYPD mother fucker.
4   Q.  And why did you talk about that?
5   A.  Because I thought it was ridiculous that that was used,
6   that someone made the allegation that Officer Jay used that to
7   identify himself.
8   Q.  Why is that ridiculous?
9   A.  Because we don't use "NYPD," we say, "Police," or "Police,
10  don't move."
11  Q.  Is that something that you're trained to say?
12  A.  Yes.
13  Q.  And you were shown earlier a copy of what's called a Sprint
14  report.  Do you remember that?
15  A.  Yes.
16  Q.  And referring you back to that Sprint report, how many
17  victims were there?
18  A.  Two.
19  Q.  And how many people were under arrest?
20  A.  Four.
21  Q.  So the fight that you observed and you and Officer Walters
22  went to, how many victims were there?
23  A.  There was one on the ground.
24  Q.  So there was another victim?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                    McHugh - cross

1   Q.  Was there more than one fight?
2   A.  There was a large fight, multiple people were fighting.
3   Q.  Sergeant, how long have you been with the NYPD?
4   A.  13 years, nine months.
5   Q.  Where were you first assigned?
6   A.  47th Precinct in the Bronx.
7   Q.  How long were you working at the 47th Precinct?
8   A.  From October of 2000 to May of 2007.
9   Q.  So roughly seven years?
10  A.  Roughly, yes.
11  Q.  And where did you go after that?
12  A.  A month of training in the police academy for basic
13  leadership training for training to become a sergeant.
14  Q.  How did you become a sergeant?
15  A.  Written test that I took for it.  And I took a test because
16  I wanted to advance my career.  I like what I'm doing.
17  Q.  What do they teach you at this training course?
18  A.  To transition from being a police officer to supervising
19  other police officers.
20  Q.  And when specifically did you become a sergeant?
21  A.  June 28 of 2007.
22  Q.  And after being promoted to sergeant, where did you begin
23  to work?
24  A.  34th Precinct in Manhattan.
25  Q.  And why did you change precincts?

DCATGUZ2                    McHugh - cross

1    A.  It's department policy when you get promoted from police
2    officer to sergeant they move you out of the borough that you
3    worked in.
4    Q.  Where do you currently work?
5    A.  34th Precinct.
6    Q.  Doing what?
7    A.  I'm street narcotics enforcement supervisor.
8    Q.  What does that mean?
9    A.  We deal with all street level drug sales, all street level
10   drug narcotics enforcement.
11   Q.  Is that a different assignment than the assignment that you
12   were working in on February 14, 2009?
13   A.  Yes, it is.
14   Q.  What assignment were you working on that date?
15   A.  Anticrime.
16   Q.  And what are your duties and responsibilities as a
17   supervisor in anticrime?
18   A.  Supervise the officers that are with me in the enforcement
19   and preventing of violent street crimes.
20   Q.  Were you working on February 14, 2009?
21   A.  Yes, I was.
22   Q.  And who were you working with?
23   A.  Police Officer Jay, Police Officer Diaz, and Police Office
24   Walters.
25   Q.  How would you normally start your tour while working as an

302

DCATGUZ2                        McHugh - cross

1   anticrime supervisor?
2   A.  The first part of my tour I put on the computer system for
3   recent complaint reports to see where some of the violent
4   crimes are happening, robberies, grand larcenies and see if
5   there's any emerging patterns and the areas where I target for
6   patrol for that night.
7   Q.  And did there come a time that you did go on patrol that
8   night?
9   A.  Yes.
10  Q.  What were you wearing?
11  A.  Not my uniform, plain clothes.  I don't recall.  Probably
12  jeans, boots, sweatshirt and a jacket, it's February.
13  Q.  Is there any way when you are wearing plain clothes that
14  you identify yourself as a police officer?
15  A.  Yes, I wear my shield around my neck and the color of the
16  day on my left arm.
17  Q.  Take us to the moment in time that you're out on patrol and
18  you become -- you get to the vicinity of the Red Lounge.  What
19  is the first thing you observe?
20  A.  It's a large group, a large fight in middle of the street.
21  Q.  You say a large fight, about how large?
22  A.  Pretty large fight.  I focused in on the individual that
23  was on the ground with the two -- multiple individuals punching
24  and kicking him, but there was a large fight.  At least
25  throughout the entire area, probably about ten people.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                         McHugh - cross

1   Q.  And where was the fight taking place?
2   A.  In the street.
3   Q.  In the middle of the street?
4   A.  Yes.
5   Q.  Now were there separate -- did you come to learn there were
6   separate groups that were fighting?
7   A.  Yes.
8   Q.  Could you explain that for us?
9   A.  Large group.  I went to one.  Afterwards I found that there
10  was another victim of an assault that was in close proximity to
11  the other fight that I broke up.
12  Q.  So tell the jury what you did after you and the other
13  officers observed the fight.
14  A.  I get out of the car, I focused on whether the individuals
15  on the ground were multiple individuals punching and kicking
16  him.  I went to that, grabbed one of the individuals, took him
17  to the ground, placed him in handcuffs, and requested
18  additional units on my radio once I had control of him.
19  Q.  Who, if anyone else, went with you to that fight?
20  A.  Police Office Walters.
21  Q.  Where were Officers Jay and Diaz?
22  A.  They went off to -- from what I recall, I remember them
23  getting out of the car and on my left.
24  Q.  Did they go to the fight that you went to?
25  A.  No, they did not.

304

DCATGUZ2                    McHugh - cross

1    Q.  Did you see them when you were dealing with the individuals
2    in your fight?
3    A.  No, I did not.
4    Q.  Could you see what was going on with Officer Jay and
5    Officer Diaz?
6    A.  No, I could not.
7    Q.  Why not?
8    A.  Because I was engaged with the individual I was trying to
9    and apprehend and put in handcuffs and preventing the assault
10   of the individual that was laying on the ground.
11   Q.  So you testified earlier that you did not see the plaintiff
12   fighting, is that right?
13   A.  Yes, that is correct.
14   Q.  Why didn't you see that?
15   A.   Because I was engaged with the individuals that were
16   fighting that were assaulting a third individual on the ground.
17   Q.  You also testified that you did not see the plaintiff grab
18   Officer Jay.  Why didn't you see that?
19   A.  Again, because I was apprehending another individual.
20   Q.  And you testified that you did not see Officer Jay use
21   pepper spray.  Why didn't you see that?
22   A.  Again, I was apprehending another individual.
23   Q.  How many people did you place in handcuffs?
24   A.  One.
25   Q.  And was that person -- what was that person arrested for?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

305

DCATGUZ2                        McHugh - cross

1    A.  Assault.
2    Q.  And what did you do after your individual was handcuffed?
3    A.  Requested additional units, maintained control of him.
4    Q.  Let me stop you right there.  How did you request
5    additional units?
6    A.  From my radio.
7    Q.  Continue.
8    A.  When other units arrived, I placed that individual in the
9    back of our patrol car.
10   Q.  How much time had elapsed from the moment that you exited
11   the vehicle to the moment that you called for back up?
12   A.  I don't recall, maybe a couple of minutes.
13   Q.  Did there come a point in time when you saw Officer Jay and
14   Officer Diaz?
15   A.  Afterwards, yes.
16   Q.  When did you see them?
17   A.  After the back-up units arrived they walked up to me each
18   with an individual in handcuffs.
19            THE COURT:  Let's take our afternoon break.  Let's
20   take a ten-minute break, come back at 3:45.
21            (Recess taken)
22   BY MR. MODAFFERI:
23   Q.  I believe you were at the point in your testimony where you
24   say you observed Officer Jay and Officer Diaz each with an
25   individual in handcuffs, is that correct?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCATGUZ2                    McHugh - cross

```
 1    A.  Yes, that is correct.
 2    Q.  So what happened after that?
 3    A.  After that I had a conversation with Officer Jay about why
 4    the individuals were in handcuffs.
 5    Q.  And who was the individual that he had in handcuffs?
 6    A.  In Mr. Noel Guzman.
 7    Q.  And do you know why he was in handcuffs?
 8    A.  After the conversation, yes.
 9    Q.  What did you learn?
10    A.  Learned that while Officer Jay and Officer Diaz were
11    attempting to place an individual under arrest, Mr. Guzman
12    grabbed Officer Diaz and attempted to pull him off, at which
13    time Officer Jay used his pepper spray on Mr. Guzman, which
14    time he ran off, Officer Jay chased him, and then apprehended
15    him, took him to the ground and apprehended him.
16    Q.  So after you learned that, what happened next?
17    A.  Mr. Guzman and the other individuals that were arrested
18    were transported back to the precinct.
19    Q.  And did you go back to the precinct as well?
20    A.  Yes, I did.
21    Q.  Do you know if an ambulance came for the plaintiff?
22    A.  Yes, there was one called, yes.
23    Q.  And did you see the plaintiff talking with the EMTs?
24    A.  Yes, before I left, yes.
25    Q.  Did plaintiff complain of an injury at the precinct?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2                    McHugh - cross

1    A.  He just said his leg hurt.
2    Q.  And who called an ambulance for him?
3    A.  I don't recall who called, but an ambulance was called.
4    Q.  By one of the officers?
5    A.  Yes.
6    Q.  Now aside from -- well, let's put it this way, did you have
7    any involvement with plaintiff at the precinct?
8    A.  No.
9    Q.  As a supervisor, what are you required to do when someone
10   in police custody complains of an injury sustained from a
11   police officer or during the course of an arrest?
12   A.  Inform the police officer.  I make two notifications, one
13   to the duty captain and the other to internal affairs.
14   Q.  Why do you make those notifications?
15   A.  It's more of protection.
16   Q.  What do you mean protection?
17   A.  Protection of the officers.  If there's an allegation that
18   the officers -- that the person was injured in police custody,
19   that they can come out and interview them right on the scene.
20   Q.  Did that happen in this case?
21   A.  No.
22   Q.  Why not?
23   A.  Because Mr. Guzman never alleged that the injuries came
24   from a police officer.
25   Q.  So in the absence of an injury sustained from a police

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

308

DCATGUZ2                    McHugh - cross
1    officer or during the course of an arrest, what would you do in
2    that scenario?
3    A.  If the injury was sustained prior to police contact, a
4    medical treatment of prisoner form would be filled out.
5    Q.  Do you know if a medical treatment of prisoner form was
6    filled out for Mr. Guzman?
7    A.  Yes, there was.
8            MR. MODAFFERI:  Thank you, Sergeant, I have no further
9    questions at this time, and I reserve the right to call him on
10   defendant's case.
11           THE COURT:  OK.  Any redirect by plaintiff?
12           MR. MEEHAN:  Briefly, your Honor.
13   REDIRECT EXAMINATION
14   BY MR. MEEHAN:
15   Q.  Sergeant McHugh, you just testified on direct when you
16   approached the scene you observed multiple fights, is that
17   correct?
18   A.  Yes.
19   Q.  Referring to your deposition again, page 54, line 12:
20   "Q.  So we're accurate here, is it accurate to say that you do
21   not recall seeing any other fights going on besides this one
22   that you went to break up?
23   "A.  That's correct, I don't recall if there were any others."
24           Do you recall being asked that question at your
25   deposition and giving that answer at your deposition?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

309

DCATGUZ2                          McHugh - redirect

 1   A.  Yes, it was a large fight.
 2   Q.  I also like to talk about the Sprint report, plaintiff's
 3   Exhibit 9.  There were four under it, is that correct?
 4   A.  Yes.
 5   Q.  Four.  So two assaults and two OGAs, correct?
 6   A.  I don't recall the exact charges.
 7   Q.  So of all these ten people fighting, only two were arrested
 8   for assault, correct?
 9   A.  I don't recall.
10           THE COURT:  Objection sustained.  Please rephrase the
11   question.
12   Q.  You testified on direct that you saw about ten people
13   fighting?
14   A.  Yes.
15   Q.  You testified on direct that there were multiple fights?
16   A.  Yes.
17   Q.  And you testified that you broke up a fight, you and
18   Officer Walters broke up one fight, and that Officer Diaz and
19   Officer Jay broke up the other fight, correct?
20   A.  Correct.
21   Q.  So Police Office Walters was with you, correct, Sergeant
22   McHugh?
23   A.  Yes.
24   Q.  If he was with you, Officer Walters, breaking up that one
25   fight, then he could have not possibly assisted Officer Jay in

310

DCATGUZ2                        McHugh - redirect
```
 1   cuffing Mr. Guzman, could he?
 2   A.  Yeah, that's correct.
 3              MR. MEEHAN:  No further questions.
 4              THE COURT:  OK.  Anything else from defense?
 5              MR. MODAFFERI:  No, Judge.
 6              THE COURT:  OK, you're excused.
 7              Plaintiff, call your next witness.
 8              MR. NORINSBERG:  Police Office Walters to the stand.
 9    JOHN WALTERS,
10         called as a witness by the Plaintiff,
11        having been duly sworn, testified as follows:
12   DIRECT EXAMINATION
13   BY MR. NORINSBERG:
14   Q.  Good afternoon, Officer Walters.
15   A.  Good afternoon.
16   Q.  You're here pursuant to a subpoena, is that correct?
17   A.  Correct.
18   Q.  You're not a defendant in this case, are you, sir?
19   A.  No, I am not.
20   Q.  And you and I have never met before, have we?
21   A.  No.
22              THE COURT:  Hold on a second.
23              Can the members of the jury hear the witness?
24              Try to speak into the microphone.
25   Q.  But you did previously give testimony in this case,
```

311

DCATGUZ2                    Walters - direct

1   correct?
2   A.  Yes, I did.
3   Q.  Was that approximately March 2012, does that sound right?
4   A.  I don't know the exact date.
5   Q.  But you do recall testifying about this incident, correct?
6   A.  Yes.
7   Q.  And you also gave testimony to investigators approximately
8   six months after this incident, correct?
9   A.  Yes.
10  Q.  And you have reviewed your deposition testimony before
11  coming here, correct?
12  A.  Yes.
13  Q.  Now directing your attention to February 14, 2009, you were
14  on duty that day, correct?
15  A.  Yes, I was.
16  Q.  You were part of an anticrime team, correct?
17  A.  Yes.
18  Q.  With Sergeant McHugh, Officer Jay, and Officer Diaz,
19  correct?
20  A.  Yes.
21  Q.  At approximately 4:00 a.m. you observed a fight taking
22  place, correct?
23  A.  Yes.
24  Q.  And you actually saw this fight on the corner, the
25  northwest corner of that intersection, true?

DCATGUZ2                    Walters - direct

1   A.  Yes.
2   Q.  You saw a crowd of people around the fight, correct?
3   A.  There was a large number of people exiting the location as
4   well as a couple of people standing around the actual fight
5   taking place.
6   Q.  More than a couple, there's a crowd of people watching the
7   fight take place on the corner of that intersection, true?
8   A.  What's considered a crowd?
9   Q.  Refer to varying numbers, but would you agree there was at
10  least 20 to 30 people in that area?
11  A.  When you say in the area, do you mean actually watching the
12  fight or in the area of the fight?
13  Q.  Actually watching the fight, there was actually a crowd
14  centered around the fight, isn't that correct?
15  A.  No.
16  Q.  That's not true?
17  A.  No.
18  Q.  Now can we agree that once the police vehicle stopped, all
19  four officers left that vehicle at approximately the same time?
20  A.  Yes.
21  Q.  Everybody was trying to go to the fight on the northwest
22  corner to break up that fight, right?
23  A.  No.
24  Q.  Your answer is no?
25  A.  Yes.

DCATGUZ2                    Walters - direct

```
 1   Q.  And is it your testimony, sir, that the group split up to
 2   different directions?
 3   A.  I went in the opposite direction than other members of my
 4   team, yes.
 5   Q.  Isn't it true that all four officers went to the fight on
 6   the corner, got in the center of the crowd, and all four
 7   officers and the three men fighting were in the same area at
 8   the same time, isn't that true?
 9   A.  That's incorrect.
10   Q.  So if Officer Jay testified to that under oath in this
11   trial --
12            THE COURT:  Objection sustained.
13   Q.  Now you did break up a fight, correct?
14   A.  Yes, I did.
15   Q.  You broke up a fight involving Alberto Molina and Jorge
16   Henriavez, correct?
17   A.  I don't know the name -- either of those names.
18   Q.  But at some point you learned their names later on, didn't
19   you?
20   A.  Yes.
21   Q.  And their names were Alberto Molina and Jorge Henriavez,
22   isn't that true?
23   A.  I don't know that to be true.
24   Q.  There were only two people arrested for assault that night,
25   the Molina defendants, those two names, isn't that true?
```

314

DCATGUZ2                          Walters - direct
1    A.  I can't say that to be true.
2    Q.  Well, whoever were the people that you went to separate,
3    you were there with Sergeant McHugh, right?
4    A.  Yes, I was.
5    Q.  You placed these two men in handcuffs, correct?
6    A.  I assisted Sergeant McHugh in placing two people in
7    handcuffs, yes.
8    Q.  Can we agree, Officer Walters, that it took only five
9    seconds from the time you got out of the police vehicle to the
10   time that you actually got to the fight, five seconds?
11   A.  Yes.
12   Q.  And then in as little as 15 seconds to 30 seconds that
13   fight was already ended, isn't that true?
14   A.  By end ended, what do you mean?
15   Q.  Within 15 to 30 seconds, you had separated the men and you
16   had handcuffed both men, is that true or not true?
17   A.  That's correct.
18   Q.  And it was you and Sergeant McHugh who stopped this
19   particular fight, isn't that true?
20   A.  Yes.
21   Q.  So if I understand your testimony correctly, you and
22   Sergeant McHugh go to this fight, you reach it within five
23   seconds of getting out of the vehicle, you break up the fight,
24   and within 30 seconds both men are handcuffed, right?
25   A.  Correct.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCATGUZ2                         Walters - direct

1   Q.  Officer Jay didn't help separate these two defendants that
2   were assaulting somebody on the corner, did he?
3   A.  Where I was?
4   Q.  Where you were.
5   A.  No, he was not there.
6   Q.  Officer Jay didn't pepper spray these two men, did he?
7   A.  No.
8   Q.  Officer Jay didn't handcuff these two men, did he?
9   A.  No.
10  Q.  Now these men that you arrested for assault, you actually
11  turned that arrest over to Officer Jay, didn't you?
12  A.  Yes, I did.
13  Q.  So Officer Jay was the arresting officer for those two men
14  on the corner, correct?
15  A.  Yes.
16  Q.  And in total, Officer Jay arrested three people that night,
17  Alberto Molina, Jorge Henriavez and Noel Jackson-Guzman, isn't
18  that true?
19  A.  I believe four individuals.
20  Q.  He didn't arrest that the fourth person himself, did he?
21  A.  I don't know that to be true.
22  Q.  Now is it your testimony -- just so we're clear about this,
23  is it your testimony that you're in one area and Officer Jay is
24  in some other area?
25  A.  That's correct.

316

DCATGUZ2                          Walters - direct
1  Q.  So if you're in one area, you couldn't have been with
2  Officer Jay assisting him handcuffing Mr. Guzman, right?
3  A.  No.
4  Q.  You can't be in two places at the same time, correct?
5  A.  Right.
6  Q.  And you actually lost sight of Officer Jay, is that
7  correct?
8  A.  Yes.
9  Q.  So you don't know where Officer Jay was when you and
10  Sergeant McHugh broke up the assault on the corner, do you?
11  A.  No.
12  Q.  His location at that time is completely unaccounted for for
13  two or three minutes, isn't that true?
14         MR. MODAFFERI:  Objection.
15         THE COURT:  I'll allow it.
16         Is that correct?
17  A.  Can you restate the question?
18  Q.  For two to three minutes you lost sight of Officer Jay,
19  correct?
20  A.  I lost sight of Officer Jay upon exiting the vehicle.
21  Q.  And then for two or three minutes you have no idea what
22  he's doing, right?
23  A.  Yes.
24  Q.  So you're not in any way, shape or form involved with him
25  helping handcuff Mr. Guzman, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

317
DCATGUZ2                    Walters - direct
1   A.  No, I'm not.
2   Q.  And during that two- to three-minute period, you have no
3   idea what Officer Jay was doing, correct?
4   A.  That's correct.
5   Q.  You don't know if he kicked Mr. Guzman in the leg during
6   that time period, do you?
7   A.  No.
8   Q.  You didn't see Officer Jay even apprehend Mr. Guzman,
9   right?
10  A.  No, I did not.
11  Q.  In fact, Officer Walters, you never saw anything that
12  happened between Officer Jay and Mr. Guzman, correct?
13  A.  Correct.
14  Q.  According to what you previously testified to, you are half
15  a block away from what was going on with Officer Jay, right?
16  A.  Yes.
17  Q.  So even though everybody got out of the car at the same
18  time and there's a fight on the corner, somehow you wound up a
19  half a block away from Officer Jay, right?
20  A.  Yes.
21  Q.  Now would you agree from the moment that you actually
22  arrested and handcuffed the two men you saw engaged in the
23  assault that you were watching these two prisoners continuously
24  until you next saw Officer Jay?
25          THE COURT:  Restate the question.  Rephrase the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

318

DCATGUZ2                         Walters - direct
1   question.
2   Q.  You told us a moment ago you got out of the car, within 15
3   to 30 seconds you separated the two men who were doing the
4   assault and they were handcuffed, correct?
5   A.  Correct.
6   Q.  You stayed with those prisoners from that moment until the
7   time when you saw Officer Jay two to three minutes later,
8   correct?
9   A.  That's correct.
10  Q.  And when you next saw Officer Jay, your recollection is he
11  was 75 to 100 feet away from you with Mr. Guzman, right?
12  A.  Correct, approximately half a block.
13  Q.  And half a block, 75 to 100 feet, you're using
14  approximately the same approximation, right?
15  A.  Yes.
16  Q.  From the very minute you got there on the scene to the end
17  of the incident, did you ever see Mr. Guzman grab Officer Jay
18  in any way?
19  A.  I wouldn't be able to see that given I was watching two
20  prisoners.
21  Q.  But if you were actually with Officer Jay helping him cuff
22  Mr. Guzman, then you might have seen it, right?
23          MR. MODAFFERI:  Objection.
24          THE COURT:  I'll allow it.
25  A.  I wouldn't be able to see what was going on because I was
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCATGUZ2                         Walters - direct
1  with my two individuals.
2  Q.  So the answer to my question would be you never saw
3  Mr. Guzman grab Officer Jay at any time, correct?
4  A.  Again, I can't answer that question because I was with my
5  two individuals.
6  Q.  Let's go from the minute you left the car to the minute
7  when Mr. Guzman is coming back to the car in handcuffs.  From
8  the start to the finish, did you ever see Mr. Guzman have any
9  physical contact with Officer Jay?
10  A.  Again, the same answer, I can't see what is going on
11  because I'm dealing with my own situation.
12  Q.  I just want to clarify my last question.  I'm talking about
13  the start where you are just getting out of the car until the
14  end, at any time during that window did you see any contact
15  between Mr. Guzman and Officer Jay?  Yes, you did, or no, you
16  didn't.
17  A.  No, I did not.
18  Q.  Did you ever see Mr. Guzman attempt to punch or strike
19  Officer Jay?
20  A.  I feel you keep asking me the same question, and again, I'm
21  sorry, but my answer would be I'm dealing with --
22          THE COURT:  Hold on, don't comment on the question,
23  just answer the question.
24          Go ahead and restate the question, counsel.
25  Q.  Would it be fair to say that from the beginning to the end

320

DCATGUZ2                      Walters - direct

1   of the incident, you never saw, at any time, Mr. Guzman grab
2   Officer Jay, attempt to strike Officer Jay, or attempt to run
3   away from Officer Jay, at any time from start to finish?  Yes
4   or no.
5   A.  No.
6   Q.  Now you yourself never actually saw any other fights
7   besides this one fight on the northwest corner, isn't that
8   correct?
9   A.  That's correct.
10  Q.  So you saw only one fight taking place that night, true or
11  not true?
12  A.  True.
13          MR. NORINSBERG:  Thank you, I have nothing further.
14          THE COURT:  Defense counsel?
15          MR. MODAFFERI:  Judge, could we have a moment?
16          THE COURT:  Yes.
17          (Pause)
18          MR. MODAFFERI:  Judge, we have no questions.
19          THE COURT:  Thank you, you're excused.
20          MR. NORINSBERG:  Could we have a side bar?
21          THE COURT:  Yes, let me see counsel at side bar.
22          (In robing room)
23          THE COURT:  Who is your next witness?
24          MR. NORINSBERG:  Dr. Carbajal.  He's scheduled to be
25  here tomorrow morning.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

321

DCATGUZ2

```
 1                MR. KUNZ:  He'll be here tomorrow, but the plaintiff
 2    is here now, so I think we should go ahead.
 3                MR. NORINSBERG:  With all due respect, in terms of our
 4    ability to put on the evidence in the manner we want, with the
 5    Court's discretion, we're very close to where we would normally
 6    break at 4:30, and we prefer not to start his testimony and
 7    stop and break it up like that.
 8                MR. KUNZ:  We did this with Jay.
 9                THE COURT:  Give me an offer of proof on -- you're
10    calling Carbajal?
11                MR. NORINSBERG:  Mm-hmm.
12                THE COURT:  Give me a sense of how short Carbajal is
13    going to be.
14                MR. NORINSBERG:  Probably a half hour.
15                THE COURT:  How long would your cross be?
16                MR. KUNZ:  Five minutes.
17                THE COURT:  Next witness would be who?
18                MR. NORINSBERG:  After that is the plaintiff.
19                THE COURT:  All right.  And then who?
20                MR. NORINSBERG:  Then Dr. Dassa Thursday morning we
21    have him scheduled.
22                THE COURT:  How short is Dassa going to be?
23                MR. NORINSBERG:  That could be an hour and a half.
24                THE COURT:  And how long is your cross of Dassa going
25    to be?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

322

DCATGUZ2

```
 1              MR. KUNZ:  Hour.  My only concern is the only person
 2      we have tomorrow is plaintiff.
 3              THE COURT:  We have got Carbajal, the plaintiff, and
 4      who else?
 5              MR. NORINSBERG:  That's all we have.
 6              THE COURT:  We got to move this thing.  We can take
 7      witnesses out of order, that's fine.
 8              MR. NORINSBERG:  Judge, the one thing -- I understand,
 9      but the concern I have is Dr. Dassa, the earliest I could get
10      him is Thursday morning, so I feel like --
11              THE COURT:  That's fine, I'm saying defendant's
12      witnesses?
13              MR. KUNZ:  Our doctor can't get here until Thursday,
14      and then Alberto Molina, I can call him and see if he can come
15      in tomorrow afternoon.  And EMT Smith, he works two jobs, and
16      I'll try with him as well, but he already rearranged him
17      schedule to be here Thursday, which is what we were -- I was
18      told by plaintiff that his case would end Thursday morning.
19      That's when I had my witnesses here.
20              THE COURT:  All right.  So tomorrow you've got
21      Carbajal, the plaintiff, and see if you can get Molina, and
22      then who else?  Can you check with Dassa to see if Dassa --
23              MR. NORINSBERG:  I can't get him Wednesday, Judge.  We
24      have made efforts to get Mr. Roman here, I can't -- we don't
25      have control of this witness.
```

323

DCATGUZ2
```
 1                THE COURT:  OK.  And your other witnesses are who?
 2                MR. KUNZ:  Just those three, EMT, Molina, and our
 3    expert.
 4                THE COURT:  Expert is available on Thursday?
 5                MR. KUNZ:  Yes, but I'm a little concerned about the
 6    comment you made about Roman.  You subpoenaed him, right?
 7                MR. NORINSBERG:  I'll run my case, with all due
 8    respect --
 9                THE COURT:  Wait.
10                MR. KUNZ:  What I'm saying is if someone is under
11    subpoena --
12                MR. NORINSBERG:  I'm not going to drag somebody in
13    with the federal marshals.  We had the exact situation with
14    Michelle Hernandez.
15                THE COURT:  Hold on.  Who do you have again?  Who is
16    on your witness list?
17                MR. KUNZ:  EMT Smith, Alberto Molina, Ramesh Gidumal.
18                THE COURT:  When is the EMT scheduled to be here?
19                MR. KUNZ:  Thursday morning.  And I will call and ask
20    him.  And he has two jobs, and he rearranged his work schedule
21    with both jobs to be here on Thursday.  I will call him and see
22    if he can do it Wednesday instead of Thursday, but --
23                THE COURT:  How long is the plaintiff's direct going
24    to be?
25                MS. SMITH:  I would say about an hour, maybe a little
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

324

DCATGUZ2

```
 1   less.
 2              THE COURT:  How long is your cross of the plaintiff
 3   going to be?
 4              MR. MODAFFERI:  Half hour, 45 minutes, maybe a little
 5   more depending on the answers.
 6              THE COURT:  I will let the jury go for today since we
 7   certainly wouldn't finish the plaintiff, even if we started it.
 8   And I don't want the jury totally twiddling their thumbs
 9   tomorrow, but try again with Dr. Dassa, see if this Jocelin
10   person can come here Wednesday, see what you can do with the
11   EMT and any other witnesses, and try to use this jury's time
12   Wednesday.  I'll let them go for today.
13              So all right.  That's it.  Carbajal you said would be
14   about 30 minutes?
15              MR. NORINSBERG:  Yes.
16              THE COURT:  How long is your expert going to be?
17              MR. KUNZ:  The only thing is we need to look at some
18   film with him, and so hour and a half, maybe.
19              MR. NORINSBERG:  Carbajal will be here first thing in
20   the morning?
21              MR. KUNZ:  Carbajal will be here.
22              THE COURT:  We'll go to Carbajal and plaintiff and
23   hopefully get someone else on here.
24              (In open court)
25              THE COURT:  Members of the jury, we are done for the
```

325

DCATGUZ2

1  day.  So come here tomorrow we'll have more testimony for you
2  tomorrow morning.  Get here at 9:30.  Have a good night.
3              (Jury not present)
4              THE COURT:  Do counsel need any audiovisual equipment
5  for the witnesses tomorrow besides the ELMO?
6              MR. NORINSBERG:  Just the ELMO.
7              THE COURT:  So let's have counsel get here at
8  9 o'clock again to be on the safe side.  I don't think anything
9  will come up between now, and then make sure the audiovisual
10  equipment is working, and we'll start bright and early at 9:30.
11              MR. KUNZ:  Your Honor, there's another issue that we
12  have.  This came up on the side bar where we feel we need to
13  supplement the record where Mr. Norinsberg asked Brian Jay
14  several questions that suggested there were other complaints
15  made against him.  He was in direct violation of an in limine
16  ruling that your Honor made.
17              Mr. Norinsberg put forward that he was attempting to
18  see if the door would be opened, but if he wanted to do that,
19  he should have asked for a side bar, made his argument, and
20  renewed the motion in limine.  He can't blurt it out on the
21  stand and put it in the jurors' ears.
22              Normally a violation of your Honor's ruling like that
23  is a very serious matter, but in this case it's even worse
24  because one of the jurors, number three, juror three, during
25  jury selection specifically said in a previous trial he had

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCATGUZ2

```
 1   done he learned after the fact that the defendant had had a rap
 2   sheet a mile long and he was very surprised by that.  So given
 3   that that comment was made in jury selection, we feel that
 4   Mr. Norinsberg intentionally asked those questions to put it in
 5   this juror's mind that there is in fact a long record.
 6           So we feel this is incredibly sanctionable conduct,
 7   and we're going to -- we want to think more about the
 8   particular sanction that we want, but it's possible that -- we
 9   obviously want to this discuss with our client first, but it's
10   possible that this would lead to a mistrial, your Honor.  So we
11   obviously need to discuss that with our client, but we needed
12   to preserve the record here and put on the record what one of
13   the jurors said during jury selection because that was not on
14   the record.
15           THE COURT:  To be clear, so the record is nice and
16   clear in terms of the questions that you're talking about that
17   plaintiff's counsel asked, let me know exactly which questions
18   are you talking about.
19           MR. KUNZ:  It was of the questions:  Isn't is it true
20   that you have been accused of kicking someone in the past,
21   isn't it?
22           THE COURT:  I don't think that was the question.
23           MR. KUNZ:  We're going to order the transcript, your
24   Honor, so we can get the exact questions asked, and I don't
25   have them memorized.  Maybe Jon could open up his binder and
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2

1    tell you what exactly he said, but he specifically asked
2    questions about prior discipline against Officer Jay.
3           THE COURT:  My recollection is -- and maybe counsel
4    should get the transcript and we can have more argument about
5    this, we may have some time tomorrow, but my question is
6    counsel asked one question, you never kicked a plaintiff and
7    you never would kick the plaintiff, or something like that.  I
8    don't believe the officer answered that second question because
9    the objection was made, but you never kicked plaintiff.  He
10   said no.  And I think there was another question, you never
11   would kick anybody, there was an objection which I sustained.
12          I don't I know that counsel mistakenly -- I will take
13   it as a good faith mistake, at one point said investigator said
14   CC, but then stopped, but as I indicated before, to the extent
15   that the defendants are really concerned about this issue of
16   the CCRB being in front of the jury, the defendant's own
17   witness is the one who blurted that out and wasn't asked that
18   question.
19          MR. KUNZ:  I think that's a concern of ours, your
20   Honor, but I think that's a separate concern from what I'm
21   talking about now.  What I'm talking about now is the
22   implication that plaintiff's counsel, we believe, intentionally
23   put in the jurors' minds that Officer Jay has a long history of
24   complaints against him, and we believe that -- I believe it was
25   three questions that were asked.  I believe you sustained the

328

DCATGUZ2

1  first two, you sustained one, he asked basically the same
2  question, you sustained it again, he asked another question,
3  and that's when finally we went back and did the side bar where
4  you admonished him for doing that and warned him not do it
5  again.
6          And so we just think in light of the comments that
7  juror number three made during jury selection that this was an
8  intentional decision on their part to try to put this in the
9  mind of the juror.  So we'll obviously consider what we want to
10  do here, but we want to preserve the record today and make sure
11  that everyone was clear about what that juror said during jury
12  selection.
13          THE COURT:  What's plaintiff's counsel's position on
14  this?
15          MR. NORINSBERG:  Your Honor, the question actually was
16  stated in the opposite manner.  The question was:  And you
17  never had a complaint against you?  And then there's an
18  objection, and we went there.  It wasn't there were complaints
19  against you, it wasn't there have been disciplinary actions, it
20  was exactly the opposite.  All he had to do was say yes, then
21  we would have an issue to whether or not there was a side bar
22  at that point.
23          THE COURT:  All he had to do is say yes to what?
24          MR. NORINSBERG:  If he said there were complaints
25  against me or not, that would be the next question where I
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

DCATGUZ2

```
 1    believe the door would be opened if he lied about complaints
 2    against him.  But all I said was:  There were never complaints
 3    against you, isn't that true?
 4             Now Judge, that is much different than what they're
 5    suggesting.
 6             THE COURT:  Well, but it's clearly an attempt by you
 7    to open the door.  It's not the defendant opening the door,
 8    it's clearly -- if your intention was to have him answer that
 9    affirmatively, I am not sure how -- that is extremely
10    problematic in terms of the ruling that I made before.  If
11    you're asking that question deliberately trying to get him to
12    acknowledge there were prior complaints made against him --
13             MR. NORINSBERG:  Just the opposite, Judge.
14             Judge, I'm sorry to interrupt you, I expected him to
15    say no.  That's what I expected him to say at that moment.  The
16    issue would -- then we would have to have a discussion to
17    whether -- I think if he said no to that, that would open the
18    door to the Hidalgo complaint.
19             THE COURT:  But you're asking the question, and your
20    good faith basis -- well, not good faith basis, but you're
21    asking the question believing that the truthful answer to the
22    question is yes, correct?
23             MR. NORINSBERG:  Correct.
24             THE COURT:  So that how is that not extremely
25    problematic if you're saying basically -- what you said on one
```

330

DCATGUZ2

1  hand, you're asking this question so that either he says yes,
2  which would be true, which then has effectively violated my
3  prior ruling and put in the jury's minds all this information
4  the prior complaints, or he says no, at which point you say now
5  he's lying and opens the door so you could still put in front
6  of the jury.  That seems extremely problematic.
7        MR. NORINSBERG:  I want to put on the record that the
8  Court specifically said, when I raised the Hidalgo incident,
9  which was three weeks before this incident, the Court
10  specifically said you are reserving decision, and if this
11  witness opens the door in any way, you will reconsider.  If he
12  says anything that -- if he denied this, which is what I
13  expected, then at that moment in time I would have had a side
14  bar with the Court and say at this point, your Honor, I believe
15  we should be able to ask that question.
16        However, what information actually got before this
17  jury is nothing, nothing, because the question itself said
18  there were no other allegations.  That's the way I worded the
19  question.  So there was no implications.  I said there were no
20  other allegations.  That would be confirmed by the record when
21  they look at the transcript, and that's what I ask the Court to
22  do before we spend more time on this because that was the
23  question.  In black and white it would be clear that was
24  absolutely the limit of what my question was.
25        THE COURT:  My question is why isn't that question --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

331
DCATGUZ2
```
 1  in and of itself that question, that question -- this is not a
 2  situation in which the defendant said something during his
 3  testimony and that opened the door, you kicked the door open
 4  for him and tried to shove him through it.  How is that
 5  question not extremely problematic if in fact that was the
 6  question that was asked?
 7          MR. NORINSBERG:  Judge, the only thing I could tell
 8  you, in my view, based on the Court's ruling -- the Court made
 9  a clear cut ruling on the Michelle Hernandez incident that was
10  per se prohibited we can't get into it.  I believe Court took
11  into consideration the Hidalgo incident.  It was three weeks
12  before, it involved kicking, it was very close in time, the
13  exact same location.
14          My impression -- and this is my impression of the
15  Court's ruling -- is that issue was a live issue to be
16  revisited if the witness said something.  And I believe, Judge,
17  in good faith that the Court made that ruling and I had an
18  opportunity to do something without putting before the jury the
19  Hidalgo incident to at least ask a question which would allow
20  me to then possibly probe into it.
21          THE COURT:  Let's do this.  Do we have a time how
22  long --
23          (Discussion held off the record and record read)
24          THE COURT:  OK.  Thank you very much.  Let me hear
25  from plaintiff's counsel.
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

332

DCATGUZ2

```
 1            MR. NORINSBERG:  Judge, I think if you listen, the
 2   first two questions clearly -- there's not even an issue with
 3   them.  The third question I think there was a request to
 4   approach at that point, I think in terms of trying to figure
 5   out what the proper wording would be for me to make a point.
 6            I believe, based on Court's ruling, in good faith I
 7   had an ability to probe that line of questioning.  If it was so
 8   improper, I imagine defense counsel would call for a side bar
 9   and immediately head it off.  It was:  Objection sustained,
10   objection sustained.  It wasn't, "Counsel, come up, don't get
11   into this area," which would have been a clear demarcation I
12   can't ask this.  But I have had multiple questions that have
13   been sustained in this case where I have been able to rephrase
14   the question without an objection.
15            So I really -- I mean, Judge, I am doing the best I
16   can.  I'm fighting as hard as I can for my client.  These
17   people got up and told the jury at the beginning my client was
18   a liar and defrauding people and it's about money.  I'm doing
19   my job the best I can.  And I am an aggressive trial lawyer,
20   but I would never consciously violate a Court's decision.  I
21   would never do that.  If that was the impression by those
22   questions, I'm telling you now that is absolutely not my
23   intention, Judge.  I can't say anything more than that.  I
24   really believe we had a little latitude by the way you left it
25   open on the ruling on the Hidalgo incident.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

333

DCATGUZ2

1            THE COURT:  Tell me what you thought the latitude was.
2            MR. NORINSBERG:  The latitude was to probe a little.
3    If I could get him to say something that could possibly open
4    the door on it, I could explore it.  I mean --
5            THE COURT:  Why did you think that was the latitude?
6            MR. NORINSBERG:  Because, Judge, unlike the Hernandez
7    incident where you said you point blank I cannot talk about it,
8    I can't talk about it, I didn't talk starting with other
9    possible incidents where he used pepper spray because you made
10   a black line, black and white ruling.
11           I thought -- maybe my impression was wrong, I thought
12   you struggled with this a little more because it really fits
13   the 404(b) pattern of evidence.  I really think it was within
14   your discretion to rule either way.  You could have allowed it,
15   you could have not allowed it, but we were very close to
16   getting it in, and I believed, based on the Court's ruling,
17   that I had an opportunity to probe during cross-examination and
18   explore this.
19           And I just want to say if I was wrong, then why didn't
20   defense counsel immediately say let's have a side bar, no
21   further questions on this?  They shared my understanding.  It
22   was basically a -- it was an objection to a question.  OK, I
23   rephrased the question, and tried to state it in a proper way.
24   And that's all that was going on, Judge.
25           I feel it's very unfair to single my questioning out.

334

DCATGUZ2

```
 1    And this is a way of -- this is the way this trial has been
 2    going.  We have things that are going on with counsel getting
 3    up in opening statement and showing things not in evidence and
 4    waving in front of the jury, or an officer walking in here and
 5    keeping his badge on the whole time to create an impression, or
 6    improper bolstering with military history.  There's a lot of
 7    stuff that goes both ways.  Both parties are trying to
 8    aggressively represent their clients.  And honestly, that, to
 9    me, is all I was trying to do, Judge.
10             THE COURT:  All right.  What does defense counsel
11    want?
12             MR. KUNZ:  I need to consult with my client about if
13    we actually want the sanction of a mistrial, but we just want
14    to today preserve the record.  And because the jury selection
15    was not on the record, there was no record of what that juror
16    had said, and so I wanted to get that down, alert the Court to
17    what we consider to be a serious issue, and we need some time
18    to talk to our client.
19             MR. NORINSBERG:  I want to make one point on that
20    issue on the juror.  I mean if anything, my team -- I had this
21    juror saying that he found out that the defendant had multiple
22    other convictions was a cause of great concern when we were
23    deciding whether to keep him or not.  So I think defense
24    counsel is completely misguided in that notion that we're
25    making an argument for one particular juror.  If anything, that
```

335

DCATGUZ2

1    juror's statement about prior convictions gave us pause because
2    it made us concerned they're going to think the same thing
3    about Mr. Guzman.  So that's really, to me, a red herring, that
4    argument about that juror.  It has no relevance to this
5    discussion.
6            THE COURT:  Let me hear more from plaintiff's counsel
7    as to your understanding of my prior ruling about the prior
8    CCRB complaints.  Let me hear more from you on that as to what
9    you thought that meant as to in your mind.  It sounds like
10   you're trying to make a distinction between when I say you
11   can't ask about those things that you can still ask about that,
12   and what is the distinction?
13           MR. NORINSBERG:  The exact context we only moved for
14   reconsideration on one particular incident, the Hidalgo
15   incident, and that one incident happened three weeks before in
16   the same location and involved a kicking allegation.  Our view
17   is under 404(b) the inclusionary approach of the Second
18   Circuit, that absolutely would be admissible.  The Court ruled
19   otherwise.
20           However, the Court, in making that limited ruling,
21   indicated that if the door was opened, we could revisit this
22   during trial.  That's different in my mind than the other CCRB
23   rulings and all the prior lawsuits and disciplinary history,
24   which I believe the Court clearly said we can't get into and I
25   wasn't getting into at all.  This related strictly to this

DCATGUZ2

1  Hidalgo incident three weeks before where I believe if we check
2  the record we will see in the transcript the Court indicated if
3  the door was opened that was something we could revisit.
4          THE COURT:  What is your understanding of a door being
5  opened?
6          MR. NORINSBERG:  A door being opened is in process of
7  probing a witness.  If a witness says something that touches on
8  an issue that allows for an opening to come in, if a witness
9  says something that is not true, then we have a possibility
10  basis to go and ask the Court.
11          THE COURT:  And is it your understanding that the
12  opening of a door includes asking a witness directly the
13  question that has been excluded by the Court, that that still
14  opens the door by indirectly -- here's what I'm saying, if
15  opening the door generally, in most jurisdictions, means if you
16  were to ask this witness -- let's do this before I get into
17  this, let's ask Officer Jay to please leave.
18          (Officer Jay left courtroom)
19          THE COURT:  If you were to ask Jay did you kick the
20  plaintiff, and Officer Jay says no, sir, I would never kick a
21  plaintiff, I never kicked anybody in my life, if you look at my
22  record you will see that nobody ever said that I never kicked
23  him, the door is opened.  If you asked him has someone made a
24  complaint before about kicking them, how is he not going to
25  open the door because you opened the door?  What is his answer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCATGUZ2

 1  to supposed to to be?
 2              MR. NORINSBERG:  There's different ways -- like Johnny
 3  Diaz opened the door on the CCRB.  You made ruling not to get
 4  into it.  I didn't get into it even though he opened the door.
 5  Sometimes it happens like that, but I think there's a gray area
 6  where questioning can be done in a way that is within the
 7  limits of a court's ruling and that can push and prod a witness
 8  and see whether or not you can get an answer that might open
 9  the door.
10              THE COURT:  And this particular question that was read
11  back about complaints about you kicking --
12              MR. NORINSBERG:  I said no one ever made a complaint,
13  right?
14              THE COURT:  That's fine, how is that a gray area?
15  What is the answer to that supposed to be?  That seems to be a
16  yes or no answer that is required by that response.
17              MR. NORINSBERG:  If he said no, no one ever made a
18  complaint against me for kicking, which is absolutely what I
19  expected him to say, then at that moment I absolutely would say
20  Judge, he just opened the door and I should be able to ask
21  about the questioning.
22              THE COURT:  And if he says yes, then what?
23              MR. NORINSBERG:  Then we're confined with the answer.
24              THE COURT:  But the answer -- the question and the
25  answer is in direct violation of my ruling.  You put in front
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

338

DCATGUZ2

1   of the jury that there was a prior complaint about his kicking
2   someone.
3           MR. NORINSBERG:  Judge, I am not at all suggesting
4   that the way you're analyzing this is incorrect, but I'm
5   suggesting that as a person asking the question, I absolutely
6   did not intend to violate the Court's order.  I intended to
7   come up to a proper line of what I could ask, get an answer
8   which I expected, and then go back and talk with the Court as
9   to whether or not I could probe further.
10           I did not ask anything about Hidalgo.  I didn't ask
11   anything about three weeks earlier, any details like that,
12   Judge.  I mean that is the -- if you look at the actual black
13   and white transcript, Judge, there's nothing in there that
14   tells the jury that anything actually happened.  There's no
15   details, there's no facts, there's nothing around that
16   question.
17           THE COURT:  OK.  Let me find out from the defense
18   counsel as to what potential remedies there are.  I know you
19   move for mistrial.  If you want to do that, that's fine.
20           MR. KUNZ:  Other possible remedies would be, for
21   example, the Hidalgo incident itself was unsubstantiated, this
22   incident was exonerated, so we could have Officer Jay take the
23   stand and he could say there's never been a complaint against
24   me that was substantiated, and in this complaint the
25   allegations against me were exonerated.  That would be a

339

DCATGUZ2

```
 1   possible sanction.
 2           I can confer with my office and think about -- we have
 3   got attorneys that have done lots of the cases, so perhaps
 4   there's other limiting instructions or solutions to this
 5   problem that have come up before.
 6           THE COURT:  But the issue in terms of this case, that
 7   doesn't seem to be where you're prejudiced.  If you're claiming
 8   that the prejudice results from the jury inferring from those
 9   questions, even though the answers to those questions were
10   struck and the questions were struck, and the objections were
11   sustained, if your concern is that this jury is going to infer
12   that there were other complaints regarding Officer Jay kicking
13   someone, this issue about this complaint being substantiated or
14   unsubstantiated doesn't seem to address that.
15           MR. KUNZ:  You're right, your Honor, I think that's
16   right, and that's why we're in a very difficult situation here
17   based on the questions that were asked.
18           THE COURT:  But it seems to me that perhaps -- I'm
19   certainly not blaming defense counsel on this, because
20   plaintiff's counsel asked this question, the prejudice may stem
21   from the fact these questions were asked and the objections
22   were raised and the objections were sustained.  So what you're
23   really saying is that the simple asking of those questions you
24   think, coupled with my sustaining the objections to those
25   questions and having the side bar, is making the jury think
```

340

DCATGUZ2

 1  that there really is something to hide there in terms of other
 2  complaints about him kicking people.  Is that what you're
 3  saying?
 4          MR. KUNZ:  That's absolutely part of the prejudice.
 5  And we think -- and I think plaintiff's counsel basically
 6  acknowledges this -- that's why he asked the question.  He
 7  wanted to see if he could bait Officer Jay into making a
 8  comment in front of the jury.  And that's hugely improper.
 9          And just your Honor's ruling excluding this was on 403
10  grounds, its prejudicial value outweighs any probative value.
11  So by then putting that same prejudice before the jury in the
12  question, it's incredibly inappropriate.
13          THE COURT:  Let me ask you this, what about,
14  hypothetically speaking, if Officer Jay were to be asked
15  questions about whether or not he's ever kicked anyone before,
16  he can answer that however he answers that question, and his
17  answer to that question, whatever the answer to that question
18  may be, would not then open the door to any prior complaints or
19  anything else like that, it would be his answer to those
20  questions.
21          If Officer Jay was asked:  Have you ever kicked anyone
22  while you've been in the line of duty and have you kicked
23  anyone before this or kicked anyone after this, and the answer
24  is however he answers that, does that at least limit the
25  prejudice or eliminate the prejudice?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

341

DCATGUZ2

```
 1              MR. KUNZ:  It might, your Honor, but on the flip side
 2   of that coin is drawing more attention to it might make the
 3   situation worse.  So I don't know, I'm not sure -- I can't,
 4   sitting here now, come up with a way to cure this prejudice.
 5   Like I said, I want the opportunity to discuss it with
 6   supervisors in my office and my client to think about our
 7   course of action here, but I feel this is a very serious issue.
 8              THE COURT:  OK.  Anything else from plaintiff on this?
 9              MR. NORINSBERG:  Did the Court give a curative
10   instruction on that point?  Did you instruct them to disregard
11   it?
12              THE COURT:  I did.  I struck the answers, I believe.
13              Let's find it in the transcript.
14              (Record read)
15              MR. NORINSBERG:  I don't know what could be more
16   clear, Judge.  The Second Circuit repeatedly said that the jury
17   is presumed to follow the instructions of the Court.  You told
18   them the objections were sustained, you told them to disregard
19   it, and they're struck from the record.  What else needs to be
20   done?  Right now it's just speculation that anyone would be
21   thinking about these questions.
22              THE COURT:  Defense counsel?
23              MR. KUNZ:  We just ask until tomorrow morning to have
24   a proposal.
25              THE COURT:  One other thought that I have, and I don't
```

DCATGUZ2

1   know how counsel feel about this, I know there was a big deal
2   of it made by counsel for the defendant earlier about having no
3   mention of CCRB, as I mentioned before, and the defendant's own
4   witness blurted out something about CCRB.  I'm not sure whether
5   or not you feel any prejudice you may have suffered as being
6   compounded by this still referring to investigators and
7   investigation, and it's already been blurted out this has
8   something to do with CCRB.  I don't know defendants want to
9   refer to these investigators as CCRB investigators at this
10  point, I don't know what the defendant's position is on that.
11          MR. KUNZ:  Well, I feel that is a separate issue, your
12  Honor, and no, we don't want to refer to these investigators as
13  CCRB, but I do feel that in some respects the Johnny Diaz was
14  prompted into giving that information by the confusing manner
15  in which the question was asked and so he didn't realize that
16  the referral was to CCRB.
17          But he did say it, we acknowledge that, and that is
18  not sort of what the point that we're bringing up here.  But
19  yeah, we do feel like the way in which the plaintiffs have used
20  this previous investigators from six months ago, six months
21  after the incident, previous investigators, they have clearly
22  been aiming to put in the mind that there was an investigation
23  into this incident six months after the fact, which we feel
24  like was the whole purpose of excluding the CCRB was so that
25  didn't get in the mind jurors.  And now that it is in their

343

DCATGUZ2

```
 1   mind, we do feel like they should be told the result of this
 2   CCRB investigation, which is that the kick was exonerated and
 3   the pepper spray was exonerated.
 4           THE COURT:  Why is that, though?  Do you have any
 5   cases for that?  Why is it the jury should be told what
 6   relevance is there to the CCRB investigators' or anybody else's
 7   determination about that?  It's like the fact that the
 8   complaint was dismissed the fact that some judge approves
 9   somebody's SSI, somebody else's conclusion, determination about
10   the credibility of witnesses, what is the relevance of that?
11           MR. KUNZ:  We agree, your Honor, and that's why it
12   should have never come before the jury there was this
13   investigation six months after the fact, because we agree it
14   doesn't have relevance.  But the plaintiffs have made a very
15   big deal of this and stressed it with each of the four
16   witnesses that testified today.  And now we are prejudiced
17   because the jury has in their mind that there was this
18   investigation, and they're going to possibly presume that it
19   was negative for Officer Jay, which is why we're at a lawsuit
20   today when it wasn't negative for Officer Jay.  We want to cure
21   the prejudice created by how hard plaintiffs hit on the
22   investigation that happened six months after the incident.
23           But again, I feel like these are separate issues.  I
24   feel like they're both serious issues, but obviously the
25   questions that we were discussing before we feel like is the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

344

DCATGUZ2
```
 1   more serious of the two issues.
 2            THE COURT:  OK.  Anything else on any of this?  If you
 3   could respond to this last bit -- I don't think that you need
 4   to respond to that, I don't think plaintiff's counsel question
 5   to Officer Diaz was at all confusing.  My recollection of
 6   Officer Diaz's testimony is that I think from the very first
 7   question that plaintiff's counsel asked him I think was
 8   something about the location of the corner where the fight took
 9   place and there seems to be some confusion about the point, and
10   I thought the question was a pretty simple question about the
11   investigation and he blurted it out.  That is more of an
12   opening the door type situation there.  So if that's what
13   plaintiff's counsel wants to address -- you don't need to
14   address that, but go ahead, counsel.
15            MR. NORINSBERG:  There is one other line of
16   questioning I was trying to develop, that Officer Jay had
17   motive to fabricate early on.  I'm routinely able to develop
18   this type of record at trial where there are consequences if he
19   was found responsible for what happened, and I feel like I was
20   unfairly foreclosed from that line of inquiry.  I want to be
21   able to argue before the jury not only that he lied but why he
22   lied.  I feel like those questions being stopped.  I have not
23   been able to develop a factual record as to why he had a reason
24   to tell a story that wasn't true.
25            THE COURT:  And your allegation in terms of the motive
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

345

DCATGUZ2

1   to lie was you could get in trouble because of what?  Not
2   following the patrol guide?
3           MR. NORINSBERG:  No, if you go up to someone and kick
4   them and you're found responsible for that, there are
5   consequences, serious consequences, and that's all I was trying
6   to developed.
7           THE COURT:  What do you mean found responsible for
8   that?
9           MR. NORINSBERG:  If it's a substantiated complaint,
10  there's an internal trial, I'm not getting into any of that.
11          THE COURT:  When you start talking about a finding
12  from somebody, that's inevitably getting in something that's
13  extremely prejudicial and not relevant.  If you want to ask him
14  you can get in trouble for kicking someone in the leg, you can
15  feel free to ask him that, I won't stop from you that, but when
16  you start talking about particular procedures or particular
17  processes, that's when the probative value is substantially
18  outweighed by the prejudicial nature of it.
19          I think I have been pretty lenient with plaintiff's
20  counsel and given you quite a bit of scope, especially these
21  last couple of witnesses a lot of this was pretty cumulative,
22  but I have given plaintiff's counsel quite a bit of scope and
23  defense counsel quite a bit of scope.  But again, yes, I think
24  there is -- I think that the probative value is outweighed by
25  the prejudicial -- substantially outweighed by the prejudicial

346

DCATGUZ2

1  nature about getting into the internal procedures and someone
2  else's finding about these things.
3           Anything else?
4           MR. NORINSBERG:  No, your Honor.
5           THE COURT:  So let's do this, we have the jury coming
6  here at 9:30, let me hear preliminarily from of the parties --
7  I guess let's try to get here at 9:00.  Let me hear
8  preliminarily from the parties to whether or not defense
9  counsel wishes to move for a mistrial.  If you do, it would be
10 very helpful to send me some cases tonight if that's what you
11 wish to do.  Whatever it is that you wish to do, whatever you
12 wish to ask for, it would be helpful if could you obviously
13 send that to plaintiff's counsel, email that to them tonight.
14          Anything else that we need to talk about?
15          Thank you very much.
16          (Adjourned to December 11, 2013 at 9:00 a.m.)
17
18
19
20
21
22
23
24
25

347

```
 1                      INDEX OF EXAMINATION
 2     Examination of:                            Page
 3     BRIAN JAY
 4     Direct By Mr. Norinsberg . . . . . . . . . . 126
 5     Cross By Mr. Kunz  . . . . . . . . . . . . . 174
 6     Redirect By Mr. Norinsberg . . . . . . . . . 216
 7     JOHNNY DIAZ
 8     Direct By Mr. Norinsberg . . . . . . . . . . 219
 9     Cross By Mr. Modafferi . . . . . . . . . . . 252
10     Redirect By Mr. Norinsberg . . . . . . . . . 268
11     MICHAEL McHUGH
12     Direct By Mr. Meehan . . . . . . . . . . . . 277
13     Cross By Mr. Modafferi . . . . . . . . . . . 298
14     Redirect By Mr. Meehan . . . . . . . . . . . 308
15     JOHN WALTERS
16     Direct By Mr. Norinsberg . . . . . . . . . . 310
17                      PLAINTIFF EXHIBITS
18     Exhibit No.                             Received
19       9  . . . . . . . . . . . . . . . . . . . . 292
20                      DEFENDANT EXHIBITS
21     Exhibit No.                             Received
22       A  . . . . . . . . . . . . . . . . . . . . 132
23       B  . . . . . . . . . . . . . . . . . . . . 147
24
25
```