348

DCCTGUZ1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  NOEL JACKSON-GUZMAN,
3
4                    Plaintiff,
4
5          v.                        10 CV 6353 (ALC)
5
6  P.O. BRIAN JAY,
6  Shield No. 29733, Individually
7  and in his Official Capacity,
7
8                    Defendant.
8
9  ------------------------------x
9                                   New York, N.Y.
10                                  December 11, 2013
10                                  9:00 a.m.
11
11  Before:
12
12               HON. ANDREW L. CARTER, JR.,
13
13                                  District Judge
14
14                        APPEARANCES
15
15  JON NORINSBERG
16  JOHN MEEHAN
16  KATHERINE SMITH
17       Attorneys for Plaintiff
17
18  NEW YORK CITY LAW DEPARTMENT
18  OFFICE OF CORPORATION COUNSEL
19       Attorneys for Defendant
19  BY:  MORGAN KUNZ
20       MATTHEW MODAFFERI
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

349

DCCTGUZ1

1              (In open court, jury not present)
2              THE COURT:  OK.  Has counsel for the defense decided
3    what they wish to do?
4              MR. KUNZ:  Yes, your Honor, after careful deliberation
5    and consultation with our office we are going to move for the
6    sanction of a mistrial.  We feel that the questions that were
7    asked yesterday did cause a severe prejudice to us.  Your Honor
8    specifically ruled in limine that that matter could not be
9    inquired into, and then counsel did in fact inquire into that
10   matter.  So we feel that sanctions are appropriate.
11             We also feel that because this was an intentional
12   breach of your Honor's motion in limine rulings that there
13   needs to be some sort of monetary sanction here, so we propose
14   that the plaintiff's attorney be required to pay the cost of
15   impaneling this jury and also our time in preparing and being
16   here these past two days.  And finally, because we feel the
17   questions have tainted these entire proceedings, we want a
18   ruling that the transcript of the testimony given so far cannot
19   be used in the new trial.
20             So that's the motion that we're making.  At the very
21   least we believe if your Honor is going to deny the mistrial
22   application, at the very least we believe there should be
23   monetary sanctions here to send the message that it is entirely
24   improper to violate motion in limine rulings in the manner in
25   which they were violated.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

350

DCCTGUZ1

1                    THE COURT:  OK.  Plaintiff's counsel?
2                    MR. NORINSBERG:  Your Honor, whatever possible
3       prejudice came from the line of questions was absolutely
4       addressed immediately by the Court.  The Court not only
5       instructed -- not only sustained the objections, not only
6       instructed the jury to disregard what was just said, but also
7       struck it from the record.  So I'm at a loss to see how one
8       question, really the third question, how that possibly could
9       have affected the substantial rights of a party, which is the
10      standard really for a new trial.
11                   I feel like this is basically a pretext because I
12      think that certain things have not gone very well for
13      defendants in this case and they are seizing this opportunity
14      to try to get a new trial and get out of what happened up to
15      this point.  And I feel I felt like yesterday I really stated
16      on the record, and I will reiterate, I did not at all
17      intentionally violate the Court's order.  I tried to word the
18      questions in a way in which I could possibly have this
19      opportunity with the Court to redress bringing Hidalgo without
20      actually mentioning it.  I tried to be an aggressive advocate
21      but not cross the line.
22                   And I will point out again, because I think it needs
23      to be stated, there's no reference to CCRB, and even when there
24      was an opportunity for me to do that, I adhered to the Court's
25      ruling.  And my conduct in the case is to adhere to the Court's

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

351

DCCTGUZ1

1  ruling.  I did not intentionally do -- I did not try to violate
2  the Court's order.
3          And I feel like a mistrial would be a gross injustice
4  really to everybody here.  We're all here trying to accomplish
5  the objective of getting this case to the jury.  We're done
6  with the officers, we only have one more day of testimony.  It
7  would be a terrible waste of time and resources.
8          As for a monetary sanction, I want to again point out,
9  your Honor, if you want to talk about Court orders and
10 violations of Court orders, the Court gave a specific directive
11 and order that counsel are not to do anything in opening
12 statements without talking to co-counsel and getting
13 permission.  That order was directly violated.  I was very
14 upset when Mr. Modafferi was showing things not in the evidence
15 in front of this jury after the Court ordered counsel not to do
16 that.  And I couldn't object at that point, your Honor, because
17 it would highlight the prejudice of that document.
18         So I think what's good for the goose is good for the
19 gander.  If the rule of thumb is going to be violating Court's
20 orders results in sanctions, I believe both sides would have to
21 be sanctioned, in fairness, your Honor.
22         MR. MODAFFERI:  Judge, let me make clear that --
23 because I believe that's a gross account of what actually
24 happened in the opening, I think if we have a transcript of my
25 opening statement you will hear that I actually said that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

352

DCCTGUZ1
```
 1   will not --
 2              THE COURT:  The opening is not really the subject of
 3   the mistrial motion.
 4              MR. MODAFFERI:  I wanted to clear up for the record
 5   that I did not do that, and that was wrong.  I actually held
 6   the document to myself and stated that you won't see it now,
 7   you will see it when it's in evidence to the jury.  So I never
 8   showed anything that was not in evidence to the jury.  I wanted
 9   to clear that up for the record.
10              THE COURT:  Let me hear from the defendants again in
11   terms of the prejudice that you're suffering.  Again let me
12   hear a little more about that and why my curative instruction
13   is insufficient.
14              MR. KUNZ:  Thank you, your Honor.  The prejudice is
15   the impression that's left in the jury's mind that there is a
16   significant history against Officer Jay of complaints of
17   kicking, of complaints filed against him, and that those
18   matters are not being inquired into for some reason.  That
19   distinct impression was absolutely left in the jurors' minds
20   based on those three questions, and then we went back into your
21   Honor's robing room and had a 10, 15-minute discussion on the
22   matter that further highlighted the significant -- possible
23   significance of that evidence.
24              And so when your Honor came out and we did ask for the
25   curative instruction -- that it be struck and your Honor gave
```

353

DCCTGUZ1

1    that curative instruction, but we don't feel that cures the
2    prejudice, and we don't feel that a further curative
3    instruction would cure the prejudice.  In fact, we think it
4    would just make the prejudice worse if we highlighted this
5    more.  So the problem with this situation is that we don't see
6    any way to remedy the prejudice short of a new trial.  And
7    that's why we really feel our hands are tied in this matter and
8    feel we don't have a choice.
9            THE COURT:  Let me hear from you more as to why this
10   impression that you allege that there are other complaints of
11   Officer Jay kicking people, why that is severely prejudicial in
12   this case.
13           MR. KUNZ:  Well, so there's two related -- I guess two
14   reasons.  One is, as I mentioned yesterday, the juror, juror
15   number three, who mentioned during voir dire that in a previous
16   case he had done he learned later that the defendant had a rap
17   sheet a mile long.  So we know already it was on the mind of at
18   least one juror that there's a possibility that there was a
19   significant history behind the defendant.
20           And so when Mr. Norinsberg asked those questions, we
21   feel that he was playing to that idea that was raised during
22   voir dire by that juror.  And the prejudice is the exact reason
23   why this information was excluded, your Honor, the jury should
24   not consider propensity evidence.  Just because Officer Jay has
25   been accused of something in the past does not mean that he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

354

DCCTGUZ1
1    acted in conformity with that allegation during this incident.
2    And he's entitled to have the jury fairly look at all the
3    evidence and rule on the evidence as is.
4            When you bring in propensity evidence or the
5    suggestion that there's propensity evidence there, it causes a
6    severe prejudice because it puts in the minds of the jurors
7    that Officer Jay has done this before, which is not the case,
8    and it's an unfair suggestion to make.
9            THE COURT:  And again, just to be clear, the
10   impression that you're talking about from the question was the
11   impression that there have been complaints about Officer Jay
12   doing this, correct?
13           MR. KUNZ:  Correct.
14           THE COURT:  And you're saying from that that the jury
15   is automatically going to leap to the conclusion that if there
16   were complaints that he actually did it?
17           MR. KUNZ:  Absolutely, your Honor.  That's why we
18   moved in limine to preclude this information, to prevent that
19   improper inference from being made.  But that's the exact --
20   that is the inference that we're concerned about, your Honor,
21   we're concerned that the jury is going to think that because
22   other people may have made complaints against Officer Jay in
23   the past that it's more likely that he did what the plaintiff
24   is accusing him of.  And that's precisely the improper purpose
25   of using prior bad acts.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

355

DCCTGUZ1

```
 1           So we just really feel like our hands are tied in this
 2   situation.  We quite frankly do not want a mistrial.  We've
 3   spent a lot of time preparing for this case, and we feel the
 4   evidence has been going well, but we feel our hands are tied,
 5   your Honor, and with this prejudice that's been put upon us we
 6   don't have a choice but to move for a mistrial.
 7           MR. NORINSBERG:  Your Honor, I want to say --
 8           THE COURT:  Hold on a minute.
 9           Yesterday defense counsel indicated something about
10   letting the jury hear something about whether or not this
11   complaint or any other complaints regarding Officer Jay had
12   been substantiated, and the defense, I take it -- what's your
13   position on that?
14           MR. KUNZ:  Well, the concern about that is I guess
15   twofold, one is that we feel that would highlight the issue,
16   your Honor, and again, putting an underline on the prejudice.
17   And the second concern is that there is a subsequent CCRB
18   complaint that was substantiated, and your Honor ruled that
19   that could not come in.  So we can't have -- we can't obviously
20   have him take the stand and say something that's not accurate.
21           THE COURT:  OK.  Plaintiff's counsel?
22           MR. NORINSBERG:  Judge, I think the actual questions
23   that were asked in no way, shape, or form give any type of
24   details of any actual accusation that in fact he was accused of
25   kicking.  I feel there's been a great distortion and
```

356

DCCTGUZ1

1  exaggeration of the potential impact.  There's a leap in logic
2  from the questions that draw the inference that there are
3  multiple complaints of kicking against this officer and that
4  he's been accused many times.
5          If you look at the actual questions, the first two
6  questions are the negative, it's never happened, it's never
7  happened, and the third question I believe there's an objection
8  sustained and we got up, it was never even answered.  So I'm
9  really failing to see the prejudice when the Second Circuit
10  repeatedly said that the Court's instruction to the jury is
11  presumed to be an instruction that is followed by the jury.
12  And the Court unequivocally struck the testimony and told them
13  to disregard it.
14          To suggest that the jury can't follow the Court's
15  instruction is really to go against the weight of Second
16  Circuit authority on this.  There's multiple, multiple cases
17  that stand for that proposition.  The Court handled the
18  situation immediately and dealt with it.  Any other further
19  remedy that the Court is offering counsel, counsel doesn't want
20  to take it.  They say the trial is going well and they don't
21  want a mistrial.  Where is the prejudice here?
22          THE COURT:  Thank you.  Let me go back and think about
23  it a little bit.  Thanks.
24          (Recess taken)
25          THE COURT:  I do find that plaintiff's counsel did
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

357

DCCTGUZ1

1  deliberately violate my order.  However, I do not find that
2  there's prejudice here sufficient to grant a mistrial.  I did
3  sustain the objection.  So there is no testimony, and I told
4  the jury to disregard it, and it's stricken from the record.
5        So I will deny the motion for a mistrial at this
6  point.  Obviously, it can be renewed later as things develop.
7  I would like to caution plaintiff's counsel that you are
8  getting pretty, pretty close to the line here.  And the
9  plaintiff's motion for reconsideration is denied.
10        Plaintiff's next witness ready?  Let's get the jury.
11        (Jury present)
12        THE COURT:  I hope you had a pleasant evening.
13        We're ready to continue.  Plaintiff please call your
14  next witness.
15        MR. NORINSBERG:  Yes, your Honor, at this time
16  plaintiff calls Dr. Carbajal to the stand.
17   JOSE CARBAJAL,
18        called as a witness by the Plaintiff,
19        having been duly sworn, testified as follows:
20  DIRECT EXAMINATION
21  BY MR. NORINSBERG:
22  Q.  Good morning, Dr. Carbajal.
23  A.  Good morning.
24  Q.  Are you a physician duly licensed to practice medicine in
25  the State of New York?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCCTGUZ1                    Carbajal - direct

1   A.  Yes.
2   Q.  Can you tell us briefly about your background and
3   qualifications?
4   A.  I'm a board certified emergency physician.  I'm employed at
5   Harlem Hospital Center.
6   Q.  And are you here today pursuant to a subpoena?
7   A.  Yes.
8   Q.  How long have you worked at Harlem Hospital?
9   A.  Approximately eight years.
10              THE COURT:  Hold on a second.
11              Can the members of the jury hear the witness?
12              Try to move closer to the microphone.
13              Did the jury hear the answers?
14              JUROR:  Yes.
15              THE COURT:  Go ahead, counsel.
16   Q.  Dr. Carbajal, can you tell the members of the jury, what is
17   your position at Harlem Hospital?
18   A.  I'm an attending physician in the emergency department.
19   Q.  And what are your duties and responsibilities as an
20   attending physician?
21   A.  I am responsible for direct patient care in the emergency
22   department.  I also supervise physician assistants and
23   residents who are caring for patients in the emergency
24   department.
25   Q.  Directing your attention to the morning of February 14,

DCCTGUZ1                      Carbajal - direct

1   2009, were you involved in the care and treatment of Noel
2   Jackson-Guzman?
3   A.  Yes.
4   Q.  Was that at Harlem Hospital?
5   A.  Yes.
6   Q.  You were the attending physician at that time?
7   A.  Yes.
8           MR. NORINSBERG:  Your Honor, at this time I would like
9   to offer in certified hospital records from Harlem Hospital,
10  Plaintiff's 12 and 13.
11          MR. KUNZ:  No objection, your Honor.
12          THE COURT:  OK, they're in.
13          (Plaintiff's Exhibit 12 and 13 received in evidence)
14          THE COURT:  Counsel, would you like us to dim the
15  lights?
16          MR. NORINSBERG:  Yes, please, your Honor.
17  Q.  Doctor, before we get into specific details, can you just
18  take a look at what we have up here.  Is that part of the chart
19  for Noel Jackson-Guzman?
20  A.  Yes.
21  Q.  And can you tell us, Doctor, what is an emergency
22  department provider initial note?  What is that?
23  A.  The initial note is a document of the initial encounter
24  with the patient which includes the history that was taken from
25  the patient as well as the physical examination.

DCCTGUZ1                    Carbajal - direct

1   Q.  Doctor, can you tell us what do you mean when you say
2   history?
3   A.  It's the history of the present illness, what the patient
4   told you happened to them.
5   Q.  Is it your custom and practice to take a patient history
6   for every patient?
7   A.  Yes.
8   Q.  And do you rely in part on the history that you obtained
9   from a patient for treatment and diagnosis?
10  A.  Yes.
11  Q.  I would like to direct your attention to where it says
12  chief complaints and then it says HPI.  What does HPI mean?
13  A.  HPI is an acronym for history and present illness.
14  Q.  Starting with chief complaints, right leg pain, correct?
15  A.  Yes.
16  Q.  And just reading, I just want to start with the first half
17  sentence here and go through the whole thing, but it says
18  23-year-old man with no -- that's SIG, stands for significant,
19  correct?
20  A.  Correct.
21  Q.  And then what does that say, Doctor?
22  A.  It's abbreviation for past medical history.
23  Q.  And then says BIBEMS.  What is that?
24  A.  Brought in by emergency medical services.
25  Q.  So if we put that all together, 23-year-old man with no

DCCTGUZ1                     Carbajal - direct

1   significant prior medical history brought in by EMS, is that
2   right?
3   A.   Yes.
4   Q.   And then it says CO.  What does that mean?
5   A.   Complaint of.
6   Q.   So it says complaint of pain to right leg, then it says
7   after he says he was kicked in the leg by police while being
8   arrested last night, is that correct?
9   A.   Correct.
10  Q.   Now you got that information when you interviewed
11  Mr. Guzman, is that correct?
12  A.   Yes.
13  Q.   So according to the history of present illness, a few hours
14  after this incident it says he was kicked in the leg by police.
15  That's what is documented there, right?
16  A.   Yes.
17  Q.   Now what time was this complaint made to you?  Do you see
18  it anywhere?
19  A.   This was -- I saw him at 9:40 a.m.
20  Q.   And you actually prepared this note yourself, is that
21  correct?
22  A.   Yes.
23  Q.   You prepared it shortly after you evaluated Mr. Guzman?
24  A.   Yes.
25  Q.   Now directing your attention to the part of the record that

362

DCCTGUZ1                    Carbajal - direct
1   says communication method, then it says direct communication,
2   patient's primary language.  Do you see that?
3   A.  Yes.
4   Q.  Dr. Carbajal, you speak Spanish, is that correct?
5   A.  Yes.
6   Q.  You are fluent in Spanish?
7   A.  Yes.
8   Q.  As far as you remember, you might have spoken with
9   Mr. Guzman in Spanish, is that correct?
10  A.  That's correct.
11  Q.  Moving a little bit further down, we'll get back to this
12  other stuff in a minute, but it says patient states his leg
13  feels broken.  Did that come from Mr. Guzman?
14  A.  Yes, generally I put words in quotations if that's what the
15  patient told me.
16  Q.  And that's the general medical practice when a patient says
17  something and you use the exact words, correct?
18  A.  Yes.
19  Q.  And you indicate that with quotation marks?
20  A.  Yes.
21  Q.  It says most of the pain is localized to lateral aspect of
22  the knee, distal thigh and proximal fibula.
23          Doctor, we actually have an anatomical model, maybe
24  could you use this model just to show us where those areas are.
25          THE COURT:  Can the members of the jury all see this?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCCTGUZ1                          Carbajal - direct

1   If you're on the far side, if you like, you could move over
2   here.
3              Counsel, do you want the lights still dimmed?
4              MR. NORINSBERG:  I think so.
5              THE COURT:  That's fine.
6   Q.  Most of pain is localized to lateral aspect of knee.  Where
7   is the lateral aspect of the knee?
8   A.  Well, this is a model of the right knee, so the lateral
9   aspect is the side, the same side that your right hand would be
10  on.
11  Q.  And then it says most of pain is localized in lateral
12  aspect of knee, then it says distal thigh.  Where is that?
13  A.  The distal thigh would be the end of the thigh farthest
14  from your head.  So the thigh is overlying all these bones.  It
15  would be the part of the thigh closest to the knee.
16  Q.  So the bottom part of the thigh right above the knee?
17  A.  Correct.
18  Q.  And then the last part where it describes the proximal
19  fibula, can you tell us first, what is the fibula?
20  A.  The fibula is one of the bones just below the knee in the
21  lower leg.  It's the smaller of the two located on the lateral
22  aspect of the leg.  In this model, this is the fibula.
23  Q.  So when it says proximal fibula, what part of the knee
24  model -- what is that referring to?
25  A.  It's referring to the part of the end of the fibula that's

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCCTGUZ1                    Carbajal - direct
1    closest to the knee, so up in this area.
2    Q.  So it's basically right -- the right side of the knee and
3    just above the knee, just below the knee, is that fair
4    description?
5    A.  Yes.
6    Q.  Now all of these complaints were in reference to
7    Mr. Guzman's right leg only, correct?
8    A.  Correct.
9    Q.  Now Doctor, just directing your attention to the bottom
10   here where it says EXT, what does that stand for?
11   A.  Extraneous.
12   Q.  What does it mean, "extraneous?"
13   A.  It's examination of the limbs.
14   Q.  So it says next to extremities there's tenderness to
15   lateral aspect of the right knee.  Again you told us that's the
16   right side of the knee, right?
17   A.  Correct.
18   Q.  Then says states he cannot walk due to pain, is that
19   correct?
20   A.  Correct.
21   Q.  And the hospital actually prescribed him with crutches at
22   that point, is that right?
23   A.  Yes.
24   Q.  Now you also noted on here that there were abrasions to
25   left forehead, is that correct?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCCTGUZ1                     Carbajal - direct

1   A.  Yes.
2   Q.  And what were you describing there?
3   A.  He had -- I noticed some scrapes on the left side of his
4   forehead.
5   Q.  Now going back up here, it says the leg was splinted by
6   EMS.  What does that tell you, if anything?
7   A.  When he arrived he had a splint that was put on by the
8   EMTs.
9   Q.  What was your preliminary diagnosis for Mr. Guzman?
10  A.  Right knee pain.
11  Q.  Did you recommend that he go to an orthopedic specialist to
12  follow up?
13  A.  Yes.
14  Q.  Did you also indicate that he was to not put weight on his
15  knee or leg?
16  A.  Yes.
17  Q.  Now I would like to take a look at the one part where we
18  skipped over before, it says per EMS the patient called 911
19  upon release from precinct and he was found standing outside of
20  precinct.  Do you see that?
21  A.  Yes.
22  Q.  So you actually got that from the ambulance attendant that
23  delivered him?
24  A.  I don't believe I did.  I don't recall speaking to the EMS.
25  Q.  Then you're familiar with what is known as an ambulance

DCCTGUZ1                          Carbajal - direct

```
 1   call report, correct?
 2   A.  Correct.
 3   Q.  Can you tell the members of the jury what is an ambulance
 4   call report?
 5   A.  An ambulance call report is a note that is written by the
 6   ambulance personnel which gives their assessment of the patient
 7   that they're bringing to the hospital.
 8   Q.  And the ambulance call report would typically document the
 9   complaints that a patient presented with?
10   A.  Yes.
11   Q.  And it would document whatever treatment had been given to
12   the patient, right?
13   A.  Yes, if the ambulance personnel provided any.
14   Q.  The normal practice would be to include the ambulance call
15   report in the hospital chart, right?
16   A.  Correct.
17   Q.  But you've noted previously there is no copy of the
18   ambulance call report in Mr. Guzman's hospital chart, is that
19   correct?
20   A.  Correct.
21   Q.  As you sit here today, Dr. Carbajal, do you have any idea
22   where that ambulance call report is?
23   A.  No.
24   Q.  Do you have any explanation where it could be?
25   A.  I do not.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCCTGUZ1                        Carbajal - direct

1    Q.  Now just for the record, we have been reading from page 4
2    of 26 of Plaintiff's Exhibit 12.  Doctor, I want to also ask
3    you about a notation on page 5 where it says the assessment
4    plan and it says first awake, alert, oriented times three.
5    What does that mean?
6    A.  It means the patient is mentating normally.  When you say
7    someone is oriented times three, it means they're aware who
8    they are, where they are, and basically when they are, so the
9    date.
10   Q.  And are you familiar with the abbreviation AOB?
11   A.  Correct.
12   Q.  What does AOB stand for?
13   A.  Alcohol on breath.
14   Q.  There's no notation of AOB anywhere in the hospital record,
15   is there?
16   A.  I don't recall.
17   Q.  You're familiar with the document -- the abbreviation ETOH,
18   correct?
19   A.  Correct.
20   Q.  What does ETOH stand for?
21   A.  Ethanol.
22   Q.  Is that another way of saying alcohol?
23   A.  Yes.
24   Q.  There's no notation of ETOH anywhere in the hospital
25   record, is there?

368

DCCTGUZ1                        Carbajal - direct

1   A.  I don't recall.
2   Q.  Now you are currently employed by the State of New York, is
3   that correct?
4   A.  Yes.
5   Q.  You you work for the Health and Hospitals Corporation?
6   A.  Yes.
7   Q.  And when you appeared for a deposition, Mr. Kunz was acting
8   as your attorney in that deposition, is that correct?
9   A.  Correct.
10  Q.  Apart from our contact at your deposition, we have never
11  spoken at all, is that correct?
12  A.  No.
13          MR. NORINSBERG:  Thank you, Dr. Carbajal, I appreciate
14  it.
15  CROSS-EXAMINATION
16  BY MR. KUNZ:
17  Q.  So I want to start with the same page 4 we have been
18  looking at.  So it says per EMS, the patient called 911 upon
19  release from precinct and was found standing outside precinct,
20  right?
21  A.  Yes.
22          (Continued on next page)
23
24
25

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

369

DCB3GUZ2                         Carbajal - cross
 1   Q.  You wrote that in the history of present illness section
 2   because it was relevant to your examination of the plaintiff?
 3   A.  Yes.
 4   Q.  In fact, the fact that he was standing when he was picked
 5   up by EMS was something that you would note about his
 6   condition, yes?
 7   A.  Yes.
 8   Q.  I also noted how you indicated the source of this
 9   information.  You said per EMS.  Right?
10   A.  Correct.
11   Q.  Then the next line here it says patient states.  So, again,
12   you're indicating the source of the information.  Correct?
13   A.  Correct.
14   Q.  That's a standard practice for medical professionals when
15   filling out reports, they state the source of the information,
16   right?
17   A.  Yes.
18   Q.  So, if the information comes from an EMT, comes from a
19   patient, you'll note that, right?
20   A.  Correct.
21   Q.  Likewise, if the information had come from a police
22   officer, you would have noted that as well, correct?
23   A.  Yes.
24   Q.  Let's focus on the second to last line here.  It says he
25   denies focal numbness or weakness.  The "he" here is the

370

DCB3GUZ2                    Carbajal - cross

1  patient, correct?
2  A.  Yes.
3  Q.  That's the plaintiff?
4  A.  Yes.
5  Q.  That means that you asked him if he was feeling numbness or
6  weakness anywhere and he said no, correct?
7  A.  Yes.
8  Q.  You were asked a brief question about this section here.
9  So, in addition to taking history of the present illness, you
10  also conducted an exam of the plaintiff?
11  A.  Correct.
12  Q.  During that exam you noted a superficial abrasion to the
13  left forehead?
14  A.  Correct.
15  Q.  "Superficial" means it is minor, correct?
16  A.  Correct.
17          THE COURT:  Hold on.  Can the jury hear the witness?
18          A JUROR:  Yes.
19          THE COURT:  Make sure you speak into the microphone.
20  Q.  You also looked at his neck, correct?
21  A.  Correct.
22  Q.  The neck was supple and non-tender?
23  A.  Correct.
24  Q.  That means that when you did this exam of him, you didn't
25  see anything wrong with his neck?

DCB3GUZ2                      Carbajal - cross

```
 1   A.  Correct.
 2   Q.  You were asked a brief question about page five of the
 3   medical documents.  About awake, alert, oriented times three.
 4   A.  Yes.
 5   Q.  You also noted that he was ambulatory, correct?
 6   A.  Actually, this wasn't my note.
 7   Q.  This is a note from Susan Torres?
 8   A.  Correct.
 9   Q.  Susan Torres is a registered nurse?
10   A.  Yes.
11   Q.  So she noted he was ambulatory, awake, alert and oriented?
12   A.  Correct.
13   Q.  I'm sorry.  Just going back to page four for a second here.
14   In your exam of him, GEN here, that means "generally"?
15   A.  Yes.
16   Q.  No acute distress?
17   A.  Correct.
18   Q.  You ordered some X-rays of the plaintiff, correct?
19   A.  Correct.
20   Q.  You ordered that he have X-rays of his knee, his tibia,
21   fibula, and his femur, correct?
22   A.  Yes.
23   Q.  So this is basically the whole right leg was X-rayed?
24   A.  Correct.
25   Q.  So the femur would be above the knee.  The knee is the
```

DCB3GUZ2                     Carbajal - cross

1   knee.  And the tibia and fibula is the bone below the knee.
2   A.  Yes.
3   Q.  Those X-rays came back negative, didn't they?
4   A.  Correct.
5   Q.  Nothing broken?
6   A.  Correct.
7   Q.  You said this before, but you saw the plaintiff at 9:40
8   that morning?
9   A.  Yes.
10  Q.  Before 9:40 when you saw the plaintiff, you didn't have any
11  interaction with him, did you?
12  A.  Correct.
13  Q.  Obviously you weren't there when the incident happened.
14  A.  I was not.
15  Q.  We went over the history of the present illness section.
16  Other than that one sentence in history of the present
17  illness -- I'll put it up.  Other than the one sentence that
18  says per EMS, all the information that you received came from
19  the patient, correct?
20  A.  Correct.
21  Q.  You didn't review any of the plaintiff's past medical
22  history, did you?
23  A.  Only what he told me.
24  Q.  But you didn't see any medical documents related to his
25  past medical history?

DCB3GUZ2                    Carbajal - cross
```
 1   A.  No.
 2   Q.  You were asked some questions about the ambulance call
 3   report from the ambulance that brought him to the hospital and
 4   you said you think you saw that that night or that morning,
 5   rather?
 6   A.  Yes.
 7   Q.  Did you see an ambulance call report from earlier that
 8   night, from about 4:30 in the morning when an ambulance went
 9   and saw the plaintiff at a police station?
10   A.  No.
11   Q.  This document is in evidence as Defendant's Exhibit B.
12            MR. NORINSBERG:  Objection with this witness.
13            MR. KUNZ:  I just want to show it to him --
14            THE COURT:  Overruled.
15   Q.  I can hand you a copy of this if you'd like to look at it
16   more carefully.  Why don't we do that to make sure.
17            Take a moment to review Defendant's Exhibit B and then
18   I am going to ask you some questions about it.  Looking at the
19   top of page one of the document, do you see the arrival time on
20   the scene at 4:23 in the morning?
21   A.  Yes.
22   Q.  That's about five hours and 20 minutes before you saw the
23   plaintiff?
24   A.  Yes.
25   Q.  In this section here it says pain, zero through 10.  It
```

374

DCB3GUZ2                    Carbajal - cross

1   indicates a two.
2   A.  Yes.
3   Q.  Can you just explain to the jury what that means.
4   A.  Generally, when a medical provider says his pain, do it on
5   a pain scale of zero to 10.  Zero being no pain, and 10 being
6   the worst pain you've ever had in your life.
7   Q.  That means the EMTs asked him what his pain was on this
8   scale and he said a two.
9   A.  Yes.
10  Q.  Then, this section here which is in the narrative report
11  with narrative history and comments section.  It says that he
12  was found conscious in NYPD custody.  And upon arrival, patient
13  stated that he was involved in a fight and someone kicked him
14  in his leg.  Correct?
15  A.  Correct.
16  Q.  Again, just so we're all clear, the night of the incident
17  when you saw the plaintiff, you did not have this document, did
18  you?
19  A.  No.
20  Q.  The information that you received that night, other than
21  this one sentence from the EMT, came from the plaintiff, and
22  other than speaking to the plaintiff, you didn't speak to any
23  police officers involved in the incident, did you?
24  A.  No.
25  Q.  You didn't speak to any persons who might have witnessed

DCB3GUZ2                    Carbajal - cross
1   what happened?
2   A.  No.
3   Q.  So then, if what the plaintiff told you at the hospital at
4   9:40 in the morning, if that was not accurate, then your report
5   would not be accurate as well, correct?
6             MR. NORINSBERG:  Objection.
7             THE COURT:  Please rephrase the question.
8   Q.  If when the plaintiff said to you he was kicked in the leg
9   by police while being arrested last night, if that was not an
10  accurate statement, then your recording of it would also not be
11  accurate, correct?
12            MR. NORINSBERG:  Objection.
13            THE COURT:  Please rephrase the question.
14            Let me ask you this.  Doctor, when you wrote that
15  down, you wrote that down based on what the plaintiff told you?
16            THE WITNESS:  Yes.
17            THE COURT:  Okay.
18            MR. KUNZ:  No further questions, your Honor.
19  REDIRECT EXAMINATION
20  BY MR. NORINSBERG:
21  Q.  Doctor, you were asked some question about the X-rays which
22  we've admitted into evidence as Plaintiff's 13.  Is there a
23  difference between taking an X-ray and taking an MRI?
24  A.  Yes.
25  Q.  First of all, was any MRI taken at Harlem Hospital that

376

DCB3GUZ2                          Carbajal - redirect
1   night?
2   A.  No.
3   Q.  Tell the members of the jury, what is the difference
4   between taking an X-ray and taking an MRI?
5   A.  An X-ray generally allows us to visualize the bones with a
6   fair amount of detail.  An MRI is a test which gives you a
7   cross section of all the soft tissue, and you can see some bony
8   detail, but it's generally done to diagnose soft tissue injury,
9   ligament injuries, muscle injuries.  Whereas an X-ray is used
10  to diagnose bony injuries.
11  Q.  So, an X-ray would be good to show a broken bone, but an
12  MRI would be better to show a torn ligament, right?
13  A.  Correct.
14  Q.  Doctor, you actually didn't rule out a torn ligament in
15  your exam, did you?
16          MR. KUNZ:  I am going to object here as beyond the
17  scope of cross.
18          THE COURT:  Overruled.
19  A.  No.
20  Q.  Doctor, you're actually the first one to point out that
21  your specialty is in emergency medicine not as an orthopedist,
22  correct?
23  A.  Correct.
24  Q.  You previously told us that at your deposition, right?
25  A.  Yes.

DCB3GUZ2                        Carbajal - redirect

1   Q.  Outside doing a two-week rotation during your residency,
2   you have had no training in orthopedics, correct?
3   A.  Correct.
4   Q.  Counsel asked you about this question of this statement he
5   denies focal numbness or weakness.  Doctor, you didn't make any
6   conclusions whether Mr. Guzman had suffered any type of nerve
7   damage in his leg, did you?
8   A.  No.
9   Q.  There was nothing in your evaluation of Mr. Guzman that
10  would rule out the possibility of nerve damage, was there?
11  A.  No.
12  Q.  In fact, you didn't even rule out the possibility of
13  Mr. Guzman developing a foot drop injury, right?
14  A.  If -- well, if he told me he didn't notice any weakness, I
15  wouldn't have noticed any either.
16  Q.  You allowed for the possibility that another doctor would
17  make that type of diagnosis later on, right?
18  A.  Certainly.
19  Q.  That's actually why you referred him to another doctor
20  afterwards, correct?
21  A.  Yes.
22  Q.  You noted before that Mr. Guzman had arrived and his leg
23  had been splinted by EMS.  In your hospital note, did you
24  indicate whether this leg splint was removed during your exam?
25  A.  No, I did not.

378
DCB3GUZ2                    Carbajal - redirect
1   Q.  As you sit here today, do you remember whether you actually
2   took off the leg splint and examined his leg?
3   A.  I do not.
4   Q.  So this entire exam might have been conducted with his leg
5   splint on, is that correct?
6   A.  It is possible.
7           MR. NORINSBERG:  Nothing further.
8           THE COURT:  Anything else?
9           MR. KUNZ:  Just one quick clarification.
10  RECROSS EXAMINATION
11  BY MR. KUNZ:
12  Q.  Your recommendation that he follow up with an orthopedist,
13  you made that on February 14?
14  A.  Yes.
15  Q.  Do you know if he followed up with an orthopedist?
16  A.  I do not.
17          MR. KUNZ:  No further questions.
18          THE COURT:  Thank you.  You are excused.
19          (Witness excused)
20          THE COURT:  Let's turn the lights back up.  Let's have
21  plaintiff call your next witness.
22          MS. SMITH:  We call plaintiff Mr. Guzman.
23          MR. KUNZ:  Could we get a side bar briefly to discuss
24  an issue before we start with the plaintiff?
25          THE COURT:  Yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

379

DCB3GUZ2

```
 1                  (At the side bar)
 2            MR. KUNZ:  I just wanted to note that even after what
 3     happened this morning, Mr. Norinsberg indicated I'm a city
 4     attorney, again in violation of an in limine order.  I didn't
 5     raise an objection at the time because again I didn't want to
 6     underline and highlight it.  But I did want to put on the
 7     record now that by asking Dr. Carbajal are you a city employee
 8     and were you represented by Mr. Kunz at the deposition, he was
 9     in fact violating another in limine ruling of your Honor.
10            MR. NORINSBERG:  That is absolutely unfair, untrue,
11     your Honor.  The bottom line is I had no access to this
12     witness.  He was completely under the control of Mr. Kunz and I
13     wanted to point out that before he was questioned by Mr. Kunz,
14     that he is not exactly a neutral witness.  He is not coming
15     from a private hospital.  He was represented by counsel at the
16     deposition, he's represented here.  And that goes very much to
17     any potential bias that he might have.  I think that's
18     perfectly fair game.
19            THE COURT:  What do you ask me to do with this?
20            MR. KUNZ:  I wanted to put on the record and I feel
21     I've done that.
22                  (In open court)
23                  (Witness sworn)
24            THE WITNESS:  My name is Noel Jackson Guzman.
25       NOEL JACKSON GUZMAN,
```

380

DCB3GUZ2

```
 1         called as a witness by the Plaintiff,
 2         having been duly sworn, testified as follows:
 3  DIRECT EXAMINATION
 4  BY MS. SMITH:
 5  Q.  Good morning, Noel.  What is your date of birth?
 6  A.  01/16/86.
 7  Q.  How old are you today?
 8  A.  27.
 9         MR. MODAFFERI:  Objection.  Relevance.
10         THE COURT:  Overruled.
11  A.  27.
12         THE COURT:  Hold on.  Can the members of the jury hear
13  the witness?  Is counsel going to be using the Elmo with this
14  witness?
15         MS. SMITH:  I will.
16  Q.  So on the date of the incident on February 14 of 2009, how
17  old were you?
18  A.  23.
19  Q.  How tall are you now?
20  A.  Like 5'11.
21  Q.  I am going to ask you to speak up a little bit more.  How
22  much do you weigh today?
23  A.  200.
24  Q.  On the date of the incident, what was your approximate
25  height and weight?
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCB3GUZ2                    Guzman - direct

1   A.  Like 160.
2   Q.  How tall were you on the date of the incident?
3   A.  Like 5'11.
4   Q.  So you're heavier now than you were on the date of the
5   incident?
6   A.  Correct.
7   Q.  Where do you live?
8   A.  Nine Seamen.
9   Q.  Where is that?
10  A.  In Manhattan.  Inwood.  Dykeman.
11  Q.  Where is Inwood in Manhattan?
12  A.  Seamen Avenue.
13  Q.  Who do you live with?
14          THE COURT:  Just again please pull it closer to the
15  microphone and tilt it up just a little bit.
16  Q.  Who do you live with?
17  A.  With my mom and father.
18  Q.  How long have you lived there?
19  A.  For more than 10 years.
20  Q.  On the date of the incident, were you living in the same
21  apartment in Inwood?
22  A.  Yes.
23  Q.  Who were you living with then?
24  A.  My father, mother, and sisters.
25  Q.  What is your citizenship status?

382

DCB3GUZ2                        Guzman - direct
1   A.  I have a green card.
2   Q.  How old were you when you got your green card?
3   A.  I'm not sure.
4   Q.  Where were you born?
5   A.  Dominican Republic.
6   Q.  Approximately when did you get your green card?
7   A.  1995.
8   Q.  Noel, what is your highest level of education?
9   A.  High school.
10  Q.  Where did you go to high school?
11  A.  I went to Humanities High School in Manhattan.
12  Q.  Did you go to any other high school?
13  A.  Yes, I went to Independence High School.  That's located on
14  55th Street and Tenth Avenue.  And I finished high school in
15  J.F.K. in the Bronx.
16  Q.  So all told, how long did you attend high school?
17           MR. MODAFFERI:  Objection, Judge.
18           THE COURT:  Overruled.
19  A.  Can you repeat the question for me?
20  Q.  How long did you attend high school?
21  A.  For five, six years.
22  Q.  Did you graduate with a diploma?
23  A.  Yes.
24  Q.  Did you go to school after high school?
25  A.  Yes.

DCB3GUZ2                    Guzman - direct

1   Q.  Where did you go?
2   A.  I went to Apex school to study mechanics.
3   Q.  How long did you go to Apex?
4   A.  For like eight months.
5   Q.  Did you get a degree or diploma from Apex?
6   A.  No, I didn't.
7   Q.  Bringing you back in time to the date of the incident on
8   February 14 of 2009, what were you doing that day?
9   A.  I was in my house waiting for Jonathan to come in.
10  Q.  Who is Jonathan?
11  A.  Jonathan is a friend that I know from high school that he
12  moves to Alaska and he came to visit New York in the same week,
13  I don't remember.  And we was planning to, like, to get
14  together from people from high school.
15  Q.  Who was at your home that day?
16  A.  My parents and my sisters.
17  Q.  What were your plans that night?
18  A.  I was -- plan was to meet with each other and go to -- to
19  Red Lounge to have fun.
20  Q.  What time did Jonathan come over to your house?
21  A.  At like 11:30.
22  Q.  What did you do when Jonathan came over?
23  A.  I was preparing myself to leave.  And I was waiting for my
24  friend to call me so we can meet in front of the Red Lounge.
25  Q.  Had you been drinking yet that night?

384

DCB3GUZ2                    Guzman - direct

1   A.  No.
2   Q.  What time did you leave your house to go to the Red Lounge?
3   A.  Around 12:15 or 12:20.  I'm not sure.  Around that time,
4   yeah.
5   Q.  Approximately what time did you arrive at the Red Lounge?
6   A.  Around 12:15, 12:20.
7   Q.  Why did you decide to go to the Red Lounge at that time,
8   why so late at night?
9   A.  I was waiting for my friend Henry to call me so I can bring
10  Jonathan in front of the Red Lounge.
11  Q.  How did you get from your home to the Red Lounge?
12  A.  In a cab.
13  Q.  Where was the Red Lounge located?
14  A.  Red Lounge in 207th street and Sherman Avenue.
15  Q.  In what area of New York?
16  A.  Inwood, Dykeman.
17  Q.  Describe the Red Lounge.
18  A.  Red Lounge is like a mostly Spanish people go in there,
19  dance, drink, and have fun in there.
20  Q.  Describe the clientele.
21  A.  Can you please repeat the question?
22  Q.  Describe what type of people are there.
23  A.  Spanish people.
24  Q.  Is it mostly men or are there men and women?
25  A.  There are both.  Men and women.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

385

DCB3GUZ2                          Guzman - direct

```
 1   Q.  Prior to February 14 of 2009, had you ever been to the Red
 2   Lounge before?
 3   A.  Yes.
 4   Q.  How many times?
 5   A.  Like two times.
 6   Q.  You testified earlier you got to the Red Lounge around
 7   12:30.  Did you meet anyone else there?
 8   A.  I meet Pinto, Henry, Jose, Pinto, Henry and Jose and me and
 9   Jonathan went over there, and Pinto bring his friend, I didn't
10   know him.
11   Q.  Why were you meeting your friends at the Red Lounge that
12   night?
13   A.  That was the plan, to go to Red Lounge, and he told me when
14   he called me, we was going to meet in front of the Red Lounge.
15   Q.  What did you do after you all met in front of the Red
16   Lounge?
17   A.  We said hi to each other and then we went in.  And we went
18   to get our coat checks.
19   Q.  What did you do after that?
20   A.  We went to get some drinks.
21   Q.  Were you drinking that night?
22   A.  Yes.
23   Q.  Did you drink at all prior to getting to the Red Lounge?
24   A.  No.
25   Q.  What did you drink at the Red Lounge?
```

DCB3GUZ2                        Guzman - direct

1   A.  I drink like four -- like three or four beers and I may
2   have two gin and tonic.  Mixed drinks.
3   Q.  How long did you stay at the Red Lounge?
4   A.  Like three hours.
5   Q.  So what time did you leave the Red Lounge, approximately?
6   A.  Around 3:30 in the morning.
7   Q.  So for the three hours that you were at the Red Lounge,
8   what were you doing?
9   A.  Dancing, I was talking to girls, having fun.
10  Q.  Was there any entertainment at the Red Lounge?
11  A.  Yeah, there was professional dancers in the Red Lounge.
12  Q.  Did they play music?
13  A.  Yes.
14  Q.  Why did you leave when you decided to leave?
15  A.  Well, my friend told me to leave.  I don't know why.
16  Q.  Did you all leave together?
17  A.  Yes.
18  Q.  Who did you leave the club with?
19  A.  I leave with Pinto, Jose, Henry, Jonathan, the friend of
20  Pinto that I don't know him, and me.
21  Q.  What did you do when you left the club?
22  A.  We went to the front of the Red Lounge.  We said hi to each
23  other.  Bye.
24  Q.  What happened after that?
25  A.  Pinto and Jonathan and the friend of Pinto went to one

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DCB3GUZ2                         Guzman - direct

```
 1   direction.  And me and Jose and Henry went to another direction
 2   to the corner of 207 to grab a cab.
 3   Q.  Can you say again what direction did you and the people
 4   that you were with go?
 5   A.  In the same direction of Red Lounge.
 6   Q.  What did you do as you were leaving with your friends?
 7   A.  Say it again, please?
 8   Q.  What did you do as you left with your friends?
 9   A.  I went -- we went to the corner to grab a cab.
10   Q.  Did you personally try to hail the cab?
11   A.  Yes.
12   Q.  What were Henry and Jose doing when you were trying to hail
13   the cab?
14   A.  They was in the sidewalk and I was trying to hail a cab.
15   Across -- like in the sidewalk like to -- between in the
16   sidewalk and the street.
17   Q.  How far were you from Henry and Jose?
18   A.  Like three or four feets.
19   Q.  What happened next?
20   A.  They -- a group of people came walking and I heard arguing.
21   Q.  Describe for the jury the group of people.
22   A.  It was a big group, group of people and boys and girls.
23   Q.  Did they have any interaction with Henry and Jose?
24   A.  Yes.
25   Q.  Describe that.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

388

DCB3GUZ2                          Guzman - direct

```
 1   A.  Henry started argument with them.
 2   Q.  Did you know anybody in this group of people?
 3   A.  No.
 4   Q.  Could you hear what they were arguing about?
 5   A.  I heard but I don't remember what it was about.
 6   Q.  At that point how far were you from Henry and Jose?
 7   A.  Three or four feets.
 8   Q.  Did you get any closer to them --
 9   A.  No.
10   Q.  -- than that?
11   A.  No, I was trying to hail a cab.
12   Q.  At any point did the argument between Henry and the group,
13   did that turn physical?
14   A.  Yes.
15   Q.  How soon after the arguing did the fight turn physical?
16   A.  Seconds.
17   Q.  Describe the fight.
18   A.  Henry and the other guy, he was punching each other.
19   Q.  At that point how far were you from the fighting?
20   A.  Like three or four feets.
21   Q.  Did you get any closer than that?
22   A.  No.
23   Q.  Did you try to help out your friend Henry?
24   A.  I didn't have time.
25   Q.  Did you want to?
```

DCB3GUZ2                        Guzman - direct

```
 1    A.  Yes.
 2    Q.  Why didn't you?
 3    A.  Mr. Jay came right away and kicked me.
 4    Q.  Since the incident, have you had any contact with Henry?
 5    A.  Can you repeat the question?
 6    Q.  Since the incident, have you had any contact with Henry?
 7    A.  Like when they was fighting?
 8    Q.  Since the incident, have you spoken with or seen Henry?
 9    A.  Oh.  After that day, after that day, he told me that was
10    not --
11              MR. MODAFFERI:  Objection.
12              THE COURT:  Sustained.
13    Q.  Just tell me, without saying what Henry told you, can you
14    tell me if you've had any type of interaction with Henry.
15    A.  No.
16    Q.  Is he mad that you didn't help him that night?
17    A.  Yes.
18              MR. MODAFFERI:  Objection.
19              THE COURT:  Sustained.
20    A.  Yes.
21    Q.  How long were you watching the fight?
22    A.  Seconds.
23    Q.  How many seconds, generally?
24    A.  I don't remember.  Several seconds.
25    Q.  What prevented you from getting involved?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
      DCB3GUZ2                    Guzman - direct
 1    A.  When I was first -- I was -- when they started fighting I
 2    wasn't sure what to do.  When they started fighting, I wanted
 3    to help because they my friends.  But, Mr. Jay came from the
 4    back and kicked me.
 5    Q.  Where did Officer Jay kick you?
 6    A.  In my right leg.
 7    Q.  What side of your right leg?
 8    A.  In the side.
 9    Q.  Is that the right or the left side of the right leg?
10    A.  Right side.
11    Q.  Where did the kick land specifically?
12    A.  In my knee.
13    Q.  Describe the pain that you felt to your right leg.
14    A.  It was a strong pain I never felt before.
15    Q.  How long after the fighting between Henry and Jose started
16    did you feel the kick in your right leg?
17    A.  Seconds.
18    Q.  How many seconds?
19    A.  Several seconds.
20    Q.  Was it under a minute?
21    A.  No, I don't think so.
22    Q.  Was it under a minute?
23    A.  No.  Seconds.
24    Q.  Okay.  What happened right after you were kicked?
25    A.  I went to the ground.  Mr. Jay went on top of me.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

391

DCB3GUZ2                         Guzman - direct
1   Q.  Could you see him?
2   A.  No.  When I went to the ground, I -- I was not able to see
3   him.
4   Q.  Could you see anything identifying about the person who
5   kicked you and then took you down to the ground?
6   A.  He has a yellow boots, that's the only thing that I saw.
7   Q.  Mr. Guzman, I am going to show you what's been previously
8   marked as Defendant's A.  1A through D.
9              MS. SMITH:  Your Honor, may I approach?
10             THE COURT:  Yes.
11             MS. SMITH:  I'm sorry, it's plaintiff's.
12  Q.  Mr. Guzman, do you recognize these photographs?  I am going
13  to hand them to you.
14  A.  Yes.
15  Q.  Do you recognize these photographs?
16  A.  Yes.
17  Q.  What do you recognize them to be?
18  A.  That I have a kick.
19  Q.  Are these photographs that were taken by you or someone
20  that you know?
21  A.  Yes.
22  Q.  When were they taken?
23  A.  The same day or the next day.
24             MS. SMITH:  I'd like to offer these into evidence.
25  Plaintiff's 1A through D.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

392

DCB3GUZ2                         Guzman - direct
1                 THE COURT:  Any objection?
2                 MR. MODAFFERI:  No objection.
3                 THE COURT:  They're in.
4                 (Plaintiff's Exhibit 1A through 1D received in
5      evidence)
6      Q.  Noel, I am going to direct your attention to Plaintiff's
7      1A.
8                 THE COURT:  Would you like us to dim the lights,
9      counsel?
10                 MS. SMITH:  I would, your Honor.  Thank you.
11                 THE COURT:  Thank you, Tara.
12     Q.  Can you describe for the jury what this photograph depicts.
13     A.  Can you repeat the question?
14     Q.  Yes.  Can you describe for the jury what this photograph
15     shows.
16     A.  It shows --
17                 THE COURT:  Hold on just a second.  Do the jurors need
18     to move?
19                 MS. SMITH:  I'm trying to move out of the way.
20                 THE COURT:  Pick one stationary spot.  If the jurors
21     need to move.  Can everyone see?
22                 MS. SMITH:  I'll stay here.
23                 THE COURT:  Go ahead, counsel.  Do you want that
24     question read back?
25     Q.  I'll ask it again.  Describe for the jury what this
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCB3GUZ2                        Guzman - direct

1   photograph shows.
2   A.  It shows the kick that Mr. Jay did the same day that I was
3   kicked.
4   Q.  Is this your leg?
5   A.  Correct.
6   Q.  Describe what side of your leg this is.
7   A.  That's my right side.
8   Q.  I'm going to show you Plaintiff's Exhibit 1B.  Explain for
9   the jury what this photograph shows.
10  A.  It shows the kick that Mr. Jay did to me.
11  Q.  This is just from a different angle, correct?
12  A.  The same one.
13  Q.  I'm showing you now Plaintiff's 1C.  Please describe for
14  the jury what caused these markings on your leg.
15  A.  The kick.
16  Q.  Finally I'm showing you Plaintiff's 1D.  Please describe
17  for me what this photograph shows.
18  A.  It shows my leg was swollen, like big.
19  Q.  Is this the front of your leg?
20  A.  That's the front.
21  Q.  Can you describe is there any markings here to the front of
22  your leg?
23  A.  No.
24  Q.  Thank you.  Noel, after you were on the ground, what did
25  you do?

394

DCB3GUZ2                        Guzman - direct

1   A.  I started moving myself.
2   Q.  Did you say you started moving?
3   A.  Yes.
4   Q.  Why were you moving?
5   A.  I didn't know who was that kicked me.
6   Q.  To be clear, when you moved around, were you standing or
7   were you on the ground?
8   A.  No, I was on the ground.
9   Q.  Are you sure?
10  A.  I'm 100 percent sure.
11  Q.  Did you move at all while you were standing?
12  A.  No.
13  Q.  Why again were you moving?
14  A.  Mr. Jay came and kicked me right away.  I was on the
15  ground.
16  Q.  Did you know that he was an officer at that point?
17  A.  No.
18  Q.  What happened next?
19  A.  When I was on the ground, he went on top of me.  I didn't
20  know who was on top of me.  And I started to move myself.
21  Then, he grabbed pepper spray, he sprayed with pepper spray on
22  my eyes.
23  Q.  Describe how he did that.
24  A.  He put the pepper spray right here and the pepper spray was
25  touching my face.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCB3GUZ2                          Guzman - direct
1              THE COURT:  Counsel, do you want the lights back on?
2              MS. SMITH:  Please, your Honor.
3    Q.  Noel, how many times did he pepper spray you in the face?
4    A.  One.
5    Q.  How long did that spray last?
6    A.  Seconds.
7    Q.  How far was the actual mace can from your eyes?
8    A.  It was touching my face.
9    Q.  Describe for the jury how your eyes felt after you were
10   sprayed in the face with pepper spray.
11   A.  It felt burning.  Burning.  Too much burning.
12   Q.  Could you open your eyes at all?
13   A.  Yeah, I could, but with trouble.
14   Q.  Could you see anything?
15   A.  When I opened my eyes, yes.
16   Q.  Just to be clear, were you on the ground when you were
17   sprayed?
18   A.  Correct.
19   Q.  You were not standing?
20   A.  I was not standing.
21   Q.  What happened after he pepper sprayed you?
22   A.  He grabbed my ponytail.  At that time I had a ponytail.
23   And he pushed my head into the ground with the ponytail.
24   Q.  How many times did he push your head into the ground?
25   A.  Twice.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCB3GUZ2                     Guzman - direct

1   Q.  Did that leave any marks?
2   A.  Yes.
3   Q.  I'm going to show you what's been marked as Plaintiff's 1E
4   for identification.
5            Your Honor, may I approach?
6            THE COURT:  Yes.
7   Q.  Noel, do you recognize this photograph?
8   A.  Yes.
9   Q.  What do you recognize this to be?
10  A.  When Mr. Jay pushed my head in the ground.
11  Q.  Is that a fair and accurate representation of how your head
12  looked at that time?
13  A.  Correct.
14           MS. SMITH:  I'd like to offer Plaintiff's 1E into
15  evidence.
16           MR. MODAFFERI:  No objection.
17           THE COURT:  It's in.
18           (Plaintiff's Exhibit 1E received in evidence)
19  Q.  Noel, I'd like to direct your attention to this photograph.
20  It's Plaintiff's 1E.  Describe for the jury what this
21  photograph shows.
22  A.  When Mr. Jay grabbed my ponytail and pushed my head into
23  the ground.
24  Q.  So how did you sustain the markings that we can see on the
25  photograph?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

397

DCB3GUZ2                         Guzman - direct

1   A.  Can you say that again?
2   Q.  How did you get those marks to your head?
3   A.  Mr. Jay did it to me.
4   Q.  At what point in time did that happen during the incident?
5   A.  After he pepper sprayed me and then he pushed me in my head
6   in the ground.
7   Q.  Thank you.  How did it feel when your head was pushed into
8   the ground?
9   A.  Pain.
10  Q.  What happened immediately after that?
11  A.  He was trying to -- I mean, he was trying to put -- to he
12  was trying --
13  Q.  Did he say anything to you?
14  A.  Yes, he did.
15  Q.  What did he say?
16  A.  He says "NYPD motherfucker."  And then he was trying -- at
17  the same time, at the same time that he was trying to pull --
18  pull the handcuffs on me, he said "NYPD motherfucker."  That's
19  when I know that he was a cop and then I --
20  Q.  How long after he kicked you did he put the handcuffs on
21  you?
22  A.  Seconds.
23  Q.  Approximately how many seconds?
24  A.  Several seconds.
25  Q.  Did any other officer help Officer Jay arrest you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCB3GUZ2                          Guzman - direct
1    A.  No, he was him alone.
2    Q.  Are you sure?
3    A.  100 percent sure.
4    Q.  At any point in time did he tell you to get up?
5    A.  Yes, he told me -- he was trying to -- he was trying to
6    pull me up.  I told him I can't.  Can you -- can you help me.
7    Q.  What did he say?
8    A.  No, he just helped me.
9    Q.  How did he help you to get off of the ground?
10   A.  He -- I have a scarf that night and he grabbed my scarf
11   together with my jacket and he pulled me up, helped me to pull
12   me up.
13   Q.  Describe the scarf that you were wearing that night.
14   A.  At that time, there was a style that people used or maybe
15   young guys use it, like a scarf, skinny scarf.
16   Q.  It was a skinny scarf?
17   A.  Yeah.
18   Q.  I'd like to show you what's been marked as Plaintiff's 1F
19   for identification.
20              Your Honor, may I approach?
21              THE COURT:  Yes.
22   Q.  Noel, do you recognize this photograph?
23   A.  Yes.
24   Q.  What do you recognize it to be?
25   A.  When I have a scarf and he was pulling my jacket, it was

399

```
DCB3GUZ2                       Guzman - direct
 1  carried together.
 2  Q.  When was that taken?
 3  A.  The same day of the incident.
 4  Q.  Is that a fair and accurate representation of how your neck
 5  looked at that time?
 6  A.  Yes.
 7  Q.  Noel, I am going to show you --
 8            MS. SMITH:  I'd like to offer it into evidence.
 9            THE COURT:  Identify the document again.
10            MS. SMITH:  1F.
11            MR. MODAFFERI:  No objection.
12            THE COURT:  It's in.
13            (Plaintiff's Exhibit 1F received in evidence)
14  Q.  I'd like to show you what's been marked as Plaintiff's 1F.
15  Describe for the jury what we see here.
16  A.  That's when I was on the ground that I asked Mr. Jay to
17  help me, to pull me up.
18  Q.  How did you sustain this marking to your neck?
19  A.  I don't understand the question.
20  Q.  How did you get that mark?
21  A.  When I have the scarf, he grabbed my jacket and the scarf
22  together and pulled me up.
23  Q.  Who made that mark on your neck?
24  A.  The scarf when Mr. Jay was trying to pull me up.
25  Q.  Thank you.  When Officer Jay helped you off the ground, was
```

DCB3GUZ2                        Guzman - direct

1    that the first time you saw his face?
2    A.  When he pulled me up, yes.
3    Q.  What did he look like?
4    A.  He was a tall man, glasses, and he was a light skinned man.
5    Q.  Do you see the officer who kicked and maced you here in the
6    courtroom today?
7    A.  Yes.
8    Q.  Please identify him for the record.
9    A.  He's there, right there in front of me.
10           MS. SMITH:  Indicating that the witness has pointed
11   out defendant Jay.
12   Q.  When he said "NYPD motherfucker," who did you think he was?
13   A.  A police officer.
14   Q.  Up until that point, did you have any idea who that person
15   was?
16   A.  No.
17   Q.  Who did you think it was?
18   A.  I thought it was one of the people who was fighting that
19   kicked me.
20   Q.  How many times again were you kicked in the leg?
21   A.  One.
22   Q.  Prior to Jay kicking you, had you been involved in a fight
23   that night at all?
24   A.  No.
25   Q.  Did you ever grab Jay's jacket on the night of the

401

DCB3GUZ2                    Guzman - direct

1   incident?
2   A.  No.
3   Q.  Did you ever grab Jay's shoulder?
4   A.  No.
5   Q.  Did you ever grab Officer Diaz?
6   A.  No.  He was not there when Jay kicked me.
7   Q.  Did you grab any other officer at all on the night of the
8   incident?
9   A.  No.
10  Q.  Did you pull Jay backwards?
11  A.  No.
12  Q.  Noel, did you attempt to run away at all that night?
13  A.  No.
14  Q.  Did you attempt to strike or threaten to strike Officer
15  Jay?
16  A.  I don't understand the question, can you explain to me in
17  simple words.
18  Q.  Yes.  Did you make a fist in an attempt to hit Officer Jay?
19  A.  No.
20  Q.  Did you attempt to make a fist or attempt to hit any other
21  officer?
22  A.  No.
23  Q.  You're sure?
24  A.  100 percent sure.
25  Q.  What happened after Officer Jay helped you up?

DCB3GUZ2                          Guzman - direct

1   A.  He put me in a car.
2   Q.  What type of car did he put you in?
3   A.  It was a black car.  And I think it was an Impala car.
4   Q.  I'm sorry.  You thought it was?
5   A.  He put me in a black car.
6   Q.  Was anyone else in the car with you?
7   A.  When I first get in the car, no.  But, when I was in the
8   car, my friend Jose came into the car.
9   Q.  Where did the car take you?
10  A.  To the precinct.
11  Q.  Describe how you arrived at the precinct.
12  A.  They take me to the back of the precinct.
13  Q.  Describe how you got from the car into the precinct.
14  A.  I was like jumping with my -- my leg, my one on my left.  I
15  was jumping because I couldn't --
16  Q.  Why were you jumping?
17  A.  Because my right leg, it was hurting too much so I had to
18  jump.
19  Q.  How many feet was it from the police car to the precinct?
20  A.  I don't remember.  Several feets.
21  Q.  Describe what happened when you got to the precinct.
22  A.  They put me in the cell.
23  Q.  Did they do anything else?
24  A.  They put me in the cell and I was asking for water.
25  Q.  What happened to you?  How did it feel to be arrested?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCB3GUZ2                      Guzman - direct
1    A.  Can you repeat the question?  I don't understand.
2    Q.  I said after this had happened, how did it feel to be
3    arrested?
4    A.  It feel bad.
5    Q.  Were you scared?
6    A.  Yes.
7    Q.  Why?
8    A.  Because these men right here did it to me.
9    Q.  When you were taken to the cell, was there anyone else in
10   the cell?
11   A.  Yeah, there was one guy in the cell.
12   Q.  Who was that?
13   A.  That was, well, me and my friend went to the same cell, and
14   there was another guy there that I didn't know him.  We was in
15   the same cell.
16   Q.  Who was in the cell that you knew?
17   A.  Jose.
18   Q.  Describe physically how you felt when you were in the cell.
19   A.  I was in pain.  My eyes, it was burning too much.  Like I
20   was -- it was burning like.
21   Q.  Why were your eyes burning?
22   A.  Officer Jay, when I was on the ground, he pepper sprayed my
23   eyes.
24   Q.  What other area of your body was experiencing pain?
25   A.  My knee.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

404

DCB3GUZ2                         Guzman - direct

```
 1    Q.  Describe the pain to your knee.
 2    A.  It was pain like -- it was strong pain.  Very strong pain.
 3    Q.  Could you bend your knee?
 4    A.  No.
 5    Q.  Why?
 6    A.  Because my leg was like swollen.
 7    Q.  Swollen?
 8    A.  Yes.  It was big.
 9    Q.  Describe now the pain to your eyes.  Were you able to open
10    your eyes?
11    A.  Yes, I was -- I was able to open my eyes.  But when -- when
12    I ask him for water, it was for throwing water in my eyes.
13    Q.  Who gave you water?
14    A.  Officers.  I don't remember.
15    Q.  Who put the water in your eye?
16    A.  Myself.
17    Q.  Describe what you were doing when you were in the cell.
18    A.  I was sitting and screaming.
19    Q.  Why were you screaming?
20    A.  My eyes it was burning, like, too much and I had in my leg,
21    was hurting too much.
22    Q.  Did you say anything to any of the officers?
23    A.  Yes.
24    Q.  What did you say?
25    A.  I told them to give me water several times.
```

405

DCB3GUZ2                         Guzman - direct

1   Q.  Did they give you any water?
2   A.  Yes.
3   Q.  How many times did they give you water?
4   A.  Like three times.
5   Q.  You said earlier that you put the water in your eyes,
6   right?
7   A.  Yes.
8   Q.  Did that help when you put the water in your eyes?
9   A.  Yes.
10  Q.  But why did you do it three times if it helped?
11  A.  Because when the water is finished, the burning came back
12  right away.
13  Q.  Did you tell any of the officers about the pain that you
14  had to your knee?
15  A.  I was screaming I had pain.  I told one officer that I had
16  pain.
17  Q.  Did they let you go to the bathroom at all?
18  A.  No, they didn't.
19  Q.  Were you allowed to make a phone call?
20  A.  No.
21  Q.  While you were in the cell, did paramedics come to examine
22  you?
23  A.  Yes.
24  Q.  What did they say?
25  A.  "What happened."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

406

DCB3GUZ2                         Guzman - direct

1    Q.  What did you tell the paramedics?
2    A.  I tell the paramedic I was watching a fight and somebody
3    kicked me.
4    Q.  So where was Officer Jay when you told this to the
5    paramedics?
6    A.  Next to the paramedic.
7    Q.  Why did you tell the paramedics that someone kicked you in
8    the leg?  Why didn't you just tell them that Officer Jay kicked
9    you in the leg?
10   A.  Because he was next to the paramedic and he was looking at
11   me and I was scared.
12   Q.  Just to be clear, did you ever actually say that you were
13   involved in a fight to the paramedics?
14   A.  No.
15   Q.  At some point in time that night, did you get to leave the
16   cell?
17   A.  Yes.
18   Q.  Approximately when?
19   A.  Around 8 o'clock.
20   Q.  Did you have to leave the cell any earlier to sign any
21   forms?
22   A.  Yes.
23   Q.  Who had you leave the cell to sign the form?
24   A.  Mr. Jay.
25   Q.  Did he show you the form?

407

DCB3GUZ2                    Guzman - direct

1   A.  Yes.
2   Q.  Did you read the form?
3   A.  Yes.
4   Q.  I am going to show you what's already been admitted into
5   evidence as Exhibit 6.  Do you recognize this form?
6   A.  Yes.
7   Q.  Was this the form that Officer Jay told you you had to sign
8   before you could leave?
9   A.  Yes.
10  Q.  Can you describe where your signature is located in the
11  form.
12  A.  In the right side of the paper, in the middle of the paper.
13  Q.  What area of the form was completed when you signed the
14  form?
15  A.  Up to my signature.
16          (Continued on next page)
17
18
19
20
21
22
23
24
25

408

DCBTGUZ3                    Guzman - direct
1   BY MS. SMITH:
2   Q.  So you're saying all this stuff from below your signature
3   was not on the form when you signed it?
4   A.  It was not there, 100 percent it was not there.
5   Q.  And can you read for us what it says in the lined portion
6   of the middle of the form?
7   A.  It says prisoner had injury prior to arrest.
8   Q.  And are you sure, are you positive that wasn't on the form
9   when you signed it?
10           MR. MODAFFERI:  Objection.
11           THE COURT:  I'll allow it.
12  A.  I'm 100 percent that that was not in that form when I
13  signed it.
14  Q.  Were you in a fight with anyone prior to your arrest on
15  February 14, 2009?
16  A.  No, I was not fighting.
17  Q.  Were you involved in any fight before the police got there?
18  A.  No.
19  Q.  Or any fight after they got there?
20  A.  No.
21  Q.  After you signed the form that we just looked at, what
22  happened next?
23  A.  He put me back in the cell.
24  Q.  And how long were you in the cell?
25  A.  For like an hour, hour and a half.

409

DCBTGUZ3                        Guzman - direct

1    Q.  And did they finally let you out of the cell and tell you
2    you could go home?
3    A.  Yes.
4    Q.  What happened when they did that?
5    A.  He gave me my stuff back and he told me to go home.  I told
6    him that can he please take me home.
7    Q.  Who did you ask to take you home?
8    A.  Mr. Jay.
9    Q.  Why did you ask him to take you home?
10   A.  I was in pain and I didn't have money for a cab.
11   Q.  Well, why couldn't you walk home?
12   A.  My leg, it was hurting.  I couldn't bend my leg.  I
13   couldn't walk right.
14   Q.  How far was your home from the precinct?
15   A.  20 blocks.
16   Q.  Why did you, instead -- strike that.
17          What happened when they said they couldn't take you
18   home?
19   A.  I remember I first I asked Mr. Jay and then I told police
20   that was there can you please tell him to take me home.
21   Q.  So you asked other officers whether they could take you
22   home?
23   A.  No, I didn't, I didn't ask -- I asked the officers can you
24   please -- can you tell Mr. Jay to take me home.
25   Q.  And what happened when they told you they couldn't take you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCBTGUZ3                          Guzman - direct
1    home, what did you do?
2    A.  I got to jump to the front of the --
3    Q.  When you say "jump," what do you mean?
4    A.  Jump on like one leg, jump, jump, jump, and then I get to
5    the front of the precinct.
6    Q.  What happened when you got to the front of the precinct?
7    What did you do?
8    A.  I had to call 911 for an ambulance.
9    Q.  Why did you call 911?
10   A.  I couldn't walk, my leg was -- it was like I feel pain, I
11   mean --
12   Q.  Did an ambulance arrive?
13   A.  Say again?
14   Q.  Did an ambulance arrive?
15   A.  The ambulance came, yeah.
16   Q.  How long did it take for the ambulance to come after you
17   called 911?
18   A.  Minutes, I don't remember.
19   Q.  And where were you when that second ambulance arrived?
20   A.  In front of the precinct.
21   Q.  What were you doing?
22   A.  I was standing on one leg.
23   Q.  Why were you standing?  Why didn't you sit down?
24   A.  I couldn't bend my knee, it hurt.
25   Q.  Why couldn't you bend it?

411

DCBTGUZ3                          Guzman - direct

1    A.  Because Mr. Jay kicked me.
2    Q.  Was there anyone outside with you when that ambulance came?
3    A.  No, just myself, but I seen people like walk by, I don't
4    know if they was going to work or nothing.
5    Q.  When the ambulance arrived, what did they do?
6    A.  They put me in the ambulance.
7    Q.  Did they ask you what happened?
8    A.  Yes.
9    Q.  And what did you tell them?
10   A.  I told them that a police kick me.
11   Q.  What did the EMTs do for treatment when you were in the
12   ambulance?
13   A.  They cut my pants, they tried to put my leg straight, they
14   put ice, and they put me in a brace.
15   Q.  At this point describe the pain that you were feeling.
16   A.  I was feeling pain, yeah.
17   Q.  Describe for the jury the pain that you were feeling then.
18   A.  I was in pain, some pain.
19   Q.  Where did the ambulance take you?
20   A.  To the Harlem Hospital.
21   Q.  Did the cops -- did any cops accompany you in the
22   ambulance?
23   A.  Two cops came and talked to me, but there was not --
24   Q.  Were they in the ambulance?
25   A.  No.

DCBTGUZ3                    Guzman - direct

1   Q.  Were any of those officers Officer Jay?
2   A.  No.
3   Q.  How long did it take to get you to Harlem Hospital?
4   A.  Minutes.
5   Q.  And what happened once you got to Harlem Hospital?
6   A.  I got I saw medic.
7   Q.  Did you see any medical personnel?
8   A.  Yes.
9   Q.  Did they ask you what happened?
10  A.  Yes.
11  Q.  Did you tell them how you got hurt?
12  A.  Yes.
13  Q.  What did you tell them?
14  A.  I told them that I got -- police kick me.
15  Q.  Did they give you any treatment at Harlem Hospital?
16  A.  Yes.
17  Q.  What did they give you?
18  A.  They give me X-ray.
19  Q.  Did you do know the findings of the X-ray?
20  A.  Yes.
21  Q.  What is that?
22  A.  There was no broken bone.
23  Q.  And what were your complaints when you went into Harlem
24  Hospital?
25  A.  I told the nurses, whoever seen me, that I feel that my

413

DCBTGUZ3                    Guzman - direct

1   leg, it feels broken.
2           THE COURT:  OK, I think this would be a good time for
3   our morning break.  Let's take our morning break and come back
4   at 11:15.  Don't discuss the case, again, and don't take it
5   personally if the parties don't speak to you in the hallway.
6           (Jury not present)
7           THE COURT:  Just so I know in terms of scheduling,
8   were the parties able to get any other witnesses here for
9   today?
10          MR. KUNZ:  Alberto Molina should be here.  I haven't
11  been able to check, but he should be here very soon.  EMT Smith
12  was not able to make it.
13          THE COURT:  Any of the other medical personnel?
14          MR. KUNZ:  The only other witnesses that we have is
15  our expert, and he can't come either.
16          THE COURT:  But those experts will be here tomorrow
17  morning.
18          MR. KUNZ:  Yes.
19          THE COURT:  All right.  Good.  See you after the
20  break.
21          (Recess taken)
22          THE COURT:  While we're waiting for the jury,
23  Mr. Guzman, you can come back on the seat.
24          (Continued on next page)
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

414

DCBTGUZ3                    Guzman - direct

```
 1              (Jury present)
 2    BY MS. SMITH:
 3    Q.  Hello, Mr. Guzman.  At Harlem Hospital right before you
 4    were released, did they give you any instructions?
 5    A.  Yeah.
 6    Q.  What were those?
 7    A.  They gave me brace and crutches.
 8    Q.  Did they tell you to get any other tests?
 9    A.  They gave me another appointment, but I don't remember.  I
10    didn't go because I didn't have insurance at that time.
11    Q.  I would like to show you what has been marked as
12    Plaintiff's 1J for identification.
13              MS. SMITH:  Your Honor, may I approach?
14              THE COURT:  Yes.
15    Q.  Do you recognize this picture?
16    A.  Yes.
17    Q.  And what does this picture show?
18    A.  When I get out from the Harlem Hospital.
19    Q.  When was that photograph taken?
20    A.  The same day, the same day in the morning.
21    Q.  And is that a fair and accurate representation of your
22    injuries on the date of the incident?
23    A.  Yes.
24    Q.  Thank you.
25              MS. SMITH:  I would like to offer Plaintiff's 1J into
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

415

DCBTGUZ3                    Guzman - direct
1   evidence.
2              MR. MODAFFERI:  No objection.
3              THE COURT:  It's in.
4              (Plaintiff's Exhibit 1J received in evidence)
5   Q.  Noel, I'm going to show you Plaintiff's 1J.  Describe to me
6   what this picture shows.
7   A.  It shows my right leg.  I seen the doctor for my right leg.
8   Q.  Describe what this rip on your pants is from.
9   A.  It was from the paramedic when they first see me in front
10  of the prison, they cut my pants and put ice on me.
11  Q.  And what is this area behind you?
12  A.  That's the hospital.
13  Q.  Thank you.  Noel, what did you do when you were released
14  from Harlem Hospital?
15  A.  I went to my house.
16  Q.  And after you left the hospital, how did your knee feel?
17  A.  It feel pain.
18  Q.  And what did you do to try to help with the pain?
19  A.  I was putting ice and something my mom gives me to put,
20  feel like cold and hot.
21  Q.  After Harlem Hospital did you get treatment again?
22  A.  Yes.
23  Q.  Where did you go for treatment?
24  A.  I went to New York Presbyterian.
25  Q.  When did you go to New York Presbyterian?

416

DCBTGUZ3                    Guzman - direct

1   A.  It was February 17, 2009.
2   Q.  So it was a couple of days after the incident?
3   A.  Yes.
4   Q.  What did they do for you at New York Presbyterian?
5   A.  They take my X-ray and they send me to do an MRI.
6   Q.  Did you actually get the MRI?
7   A.  No, I didn't have insurance at that time.
8   Q.  What did the X-rays show?
9   A.  No broken bone.
10  Q.  Did they give you any medicine or any other type of
11  treatment?
12  A.  I think they give me something for the pain.
13  Q.  Now after New York Presbyterian, did you go for treatment
14  any other time?
15  A.  Yes.
16  Q.  When?
17  A.  I went -- it was March 29, 2009.
18  Q.  And where did you go for treatment?
19  A.  Colombia Presbyterian.
20  Q.  What were your complaints when you went to Colombia
21  Presbyterian?
22  A.  I was complaining that my knee hurt and I was not feeling
23  something in my right knee, I was not feeling like -- I don't
24  have like no sensitive in one part of my leg.
25  Q.  Did you have a loss of sensitivity below your knee?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCBTGUZ3                          Guzman - direct

1   A.  Yes.
2   Q.  And what did they do for you at Colombia Presbyterian?
3   A.  They sent me to do a nerve test.
4   Q.  Did you go and get the nerve test?
5   A.  No, I didn't have no insurance.
6   Q.  Why didn't you get the test?
7   A.  I didn't have no insurance to pay.
8   Q.  How long after the accident did it take for you to get
9   insurance?
10  A.  Three months.
11  Q.  And after you got insurance, how long did it take for you
12  to get an MRI?
13  A.  Right away.
14  Q.  Before you got insurance, how did you deal with the pain to
15  your knee?
16  A.  Can you repeat the question?
17  Q.  Yeah, before you got insurance and you were able to get an
18  MRI, how were you dealing with the pain that you were
19  experiencing to your knee?
20  A.  Yeah, I got pain at that time.
21  Q.  How did you deal with it on your own?  Did you have any
22  treatments that you use?
23  A.  No, just in my house put ice and take some pills for --
24  Q.  Did you have crutches?
25  A.  Yes.

DCBTGUZ3                          Guzman - direct

```
 1    Q.  Did you use the crutches?
 2    A.  Yes.
 3    Q.  Were you able to walk?
 4    A.  With the crutches.
 5    Q.  And were you able to go out?
 6    A.  Yes.
 7    Q.  But did you go out less than before?
 8    A.  Can you repeat the question?
 9    Q.  Were you going out less than before?
10    A.  Less than before, but I like to go out.
11    Q.  After you got insurance, who was the first doctor that you
12    saw?
13    A.  Dr. Dassa.
14    Q.  And why did you go to Dassa?
15    A.  My friend -- my friend, his mom friend used to go there,
16    and he told me -- he told me you should go to this doctor.
17    Q.  When did you first go to Dassa?
18    A.  Right after I got my insurance.
19    Q.  And when you went to Dassa, what were your complaints?
20    A.  I was complaining that my knee and my nerve -- like not the
21    nerve because I didn't know what it was, but I didn't have no
22    sensation, I can't pick up my foot and it don't work right.
23    Q.  Did Dr. Dassa do an MRI?
24    A.  Yes.
25    Q.  What were his findings?
```

419

DCBTGUZ3                           Guzman - direct

1    A.  He find on the MRI that I need surgery because my knee, it
2    was dislocated.
3    Q.  And you said something about nerve damage, did he make any
4    diagnosis at all to your leg?
5    A.  Can you repeat the question?
6    Q.  What was his diagnosis about nerve damage?
7    A.  Oh, that I have a foot drop.
8    Q.  Describe to me what your understanding of a foot drop is.
9            MR. MODAFFERI:  Objection.
10           THE COURT:  I'll allow it.
11   A.  A foot drop is when you walk you are able to flip your
12   ankle up and down, but when you have foot drop, you can't -- if
13   the nerve -- the nerve don't helps you to flip it up and down.
14   Q.  So can you flip your right foot up and down at all?
15   A.  No.
16   Q.  No matter how hard you try, you cannot lift your foot up?
17   A.  No matter how hard I try.
18   Q.  And can this condition, to your understanding, be fixed?
19   A.  The doctor told me it was a permanent nerve damage.
20   Q.  So you're telling me that you will never be able to lift or
21   flip your foot up again?
22           MR. MODAFFERI:  Objection.
23           THE COURT:  Sustained.
24   Q.  To the best of your knowledge.
25           THE COURT:  Sustained.

420

DCBTGUZ3                        Guzman - direct

1    A.  Never.
2              THE COURT:  That's sustained.
3    Q.  Did you go to Dassa again after that initial appointment?
4    A.  Yes.
5    Q.  About how many times?
6    A.  I don't remember the times, but he send me to therapy.
7    Q.  And did he refer you for any other type of treatment or
8    surgery?
9    A.  Yes.
10   Q.  Tell me about therapy.  How many times did you go to
11   therapy?
12   A.  I don't remember, but I used to go.
13   Q.  How often did you go to therapy?
14   A.  I went to therapy for like a year and a half.
15   Q.  And did it help?
16   A.  Yeah, it stretching my legs, it helps, yeah, it helps.
17   Q.  Now Dassa recommended you for surgery.  Did there come a
18   time that you actually had the surgery performed?
19   A.  Can you repeat the question?  I don't understand.
20   Q.  Did you get surgery to your knee?
21   A.  Yes.
22   Q.  When?
23   A.  October 7, 2010.
24   Q.  To the best of your understanding, what did they do in the
25   surgery?

421

DCBTGUZ3                    Guzman - direct
1               MR. MODAFFERI:  Objection.
2               THE COURT:  Rephrase the question.
3   Q.  To your understanding, what was the surgery for?
4   A.  It was for -- to fix my -- to put the ligaments, that's all
5   you hear about, I don't know about medical things, all I heard
6   was ligaments, ligaments.
7   Q.  Did the surgery fix or try to fix your nerve damage, to the
8   best of your knowledge?
9   A.  No, it didn't fix my nerve damage.
10  Q.  After surgery, were you given any type of brace?
11  A.  Yes, he gave me a brace.
12  Q.  Describe what that brace -- where that brace affixes to
13  your body?
14  A.  It helps me to walk better with a brace than without a
15  brace.
16  Q.  And where is the brace?  Where do you put it on your body?
17  A.  On my right foot.
18  Q.  And what does that brace help you to do?
19  A.  It helps me walk without dragging my foot.
20  Q.  And were you given crutches after surgery?
21  A.  Yes, they did.
22  Q.  And how long did you use the crutches?
23  A.  Like two months.
24  Q.  Did you use a cane at all after surgery?
25  A.  Yes.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

422

DCBTGUZ3                        Guzman - direct

1    Q.  How long did you use a cane?
2    A.  After the crutches.
3    Q.  For how long after the crutches did you use the cane?
4    A.  I don't remember.
5    Q.  Did you feel better after the surgery?
6    A.  Yes.
7    Q.  Did it help your knee?
8    A.  It helps my knee, the nerve still the same, and --
9    Q.  Is your knee the same as it was before the incident?
10   A.  No.
11   Q.  Describe how it's different.
12   A.  It's different when I go up the stairs, I got like a little
13   pain, it bothers me sometime.  My knee bothers me when it's too
14   cold, it hurts me.  Not that much, but it hurts me.
15   Q.  And is your knee stable now as it was before the incident?
16   A.  It's not that much.
17   Q.  Were you ever examined by a doctor for the defendants?
18   A.  Yes.
19   Q.  When was that?
20   A.  I'm not sure.
21   Q.  Describe what that doctor did.
22   A.  He was examining my leg.
23   Q.  And did he give you any treatment?
24   A.  No.
25   Q.  What were his findings?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCBTGUZ3                        Guzman - direct
```
 1              MR. MODAFFERI:  Objection.
 2              THE COURT:  Please rephrase the question.
 3   Q.  What's your understanding of his findings?
 4              MR. MODAFFERI:  Objection.
 5              THE COURT:  Sustained.
 6   Q.  Are you still under medical treatment now?
 7   A.  Yes.
 8   Q.  And where do you go?
 9   A.  I go to Dr. Dassa.
10   Q.  And when was the last time you went to Dassa?
11   A.  One month ago.
12   Q.  And describe the treatment.
13   A.  He sent me to take an X-ray.
14   Q.  Noel, what damages are you claiming?
15   A.  I'm claiming my nerve damage and my knee damage.
16   Q.  And your neck, your shoulders, and your eyes from the
17   incident, are they healed?
18   A.  They healed.
19   Q.  Describe the injury to your knee that you're now claiming.
20   A.  Can you explain that some more?  I don't --
21   Q.  Describe the injury to your knee that you are claiming.
22   A.  My knee was dislocated and I had to have surgery on my
23   knee.
24   Q.  And describe the other damages that you're claiming.
25   A.  I have a foot drop.
```

424

DCBTGUZ3                          Guzman - direct

1  Q.  Noel, what can't you do now that you could do before the
2  incident?
3  A.  Well, before the incident it's different, it's completely
4  different.
5  Q.  Well, describe how your injuries affect your walking.
6  A.  Before I used to walk normally, and now I have to wear a
7  brace for the rest of my life.
8  Q.  Do you always every day wear the brace?
9  A.  No, when I go to take a shower I have to take it off, my
10 brace, and if I go to swimming I take it off.
11 Q.  And what happens when you walk without the brace?
12 A.  I walk slowly and I walk -- I have to drag my foot no
13 matter what.
14 Q.  Describe now after the incident how it feels to go up and
15 down the stairs.
16 A.  When I go up and down the stairs it bothers me, like I got
17 pain.
18 Q.  And describe now after the incident how standing is
19 different than it was before.
20 A.  Before I used to stand more than eight hours a day, now I
21 can only stand two or three hours a day.
22 Q.  What happens if you stand for longer than that?
23 A.  It hurts and I get like cramps.
24 Q.  What part of your leg hurts when you stand?
25 A.  My knee.

425

DCBTGUZ3                        Guzman - direct

1    Q.  Noel, were you involved in a fight at any time before you
2    were arrested on February 14, 2009?
3    A.  No.
4    Q.  And Noel, did you injure your leg at any time prior to your
5    arrest on February 14 of 2009?
6    A.  No.
7              MS. SMITH:  Thank you.
8              THE COURT:  Defense counsel.
9              MR. MODAFFERI:  Judge, could we have a side bar before
10   I begin my examination.
11             THE COURT:  Yes.
12             (In robing room)
13             MR. MODAFFERI:  Judge, on the direct examination of
14   the plaintiff the plaintiff was asked how it felt to be
15   arrested, and he said that he felt scared.  And that directly
16   opens the door to any of his prior arrests because it goes to
17   his emotional damages.
18             THE COURT:  I think there was a follow-up question
19   after that.  I think the question after that was why were you
20   scared, and the answer was because the people who did this to
21   me were there.
22             MR. MODAFFERI:  Judge, we feel that they're trying to
23   use their -- the fact that they are not claiming emotional
24   damages on false arrest as a sword and a shield.  On the one
25   hand they're asking him how he felt to be arrested --

426

DCBTGUZ3

1               THE COURT:  Hold on just a second.
2               (Discussion held off the record)
3               THE COURT:  That's my recollection of how that went,
4     they asked how did you feel to be arrested, but his answer was
5     scared.  And they asked why were you scared, and his answer was
6     because the people who did this to me were right there.
7               MR. MODAFFERI:  But I think that question alone, how
8     did it feel to be arrested, that's opening the door, regardless
9     of the follow-up question.
10              THE COURT:  It's the question and the answer, it's not
11    just --
12              MR. MODAFFERI:  Scared, right, but by asking that,
13    you're inferring to the jury he's never been arrested before.
14    How did it feel to be arrested?
15              MS. SMITH:  We disagree.  We have a deprivation of
16    liberty claim.  We should be allowed to get into that without
17    dovetailing into the area that we're prohibited.  I was in that
18    moment how he felt to be arrested with the people who had
19    assaulted him, essentially.  We don't think it opens the door.
20              MR. MODAFFERI:  Judge, we're prevented from rebutting
21    how it was how he felt to be arrested?
22              THE COURT:  What do you mean?
23              MR. MODAFFERI:  As it stands now, the jury thinks this
24    guy has never been arrested before.
25              THE COURT:  Right.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

427

DCBTGUZ3

```
 1              MR. MODAFFERI:  So then we should be able to rebut
 2    that by saying:  You testified that you were scared because you
 3    were arrested, but isn't it true that you were arrested before?
 4    That's all.
 5              THE COURT:  That's overruled.
 6              Anything else?
 7              MR. KUNZ:  There was one other thing.  We feel that
 8    when he was talking about why he went to the Red Lounge to have
 9    fun, or it was just dancing and drinking, the clientele there,
10    there was a lot of detail about that, and we feel that will
11    opens the door to the history of the Red Lounge and how there's
12    a history of fighting there.  And these officers knew that when
13    they went there.  We don't want to ask Noel about that, the
14    plaintiff about that, but we want to be able to call Officer
15    Jay in our case because the plaintiff opened the door to the
16    history of the Red Lounge --
17              MR. MEEHAN:  We're saying --
18              THE COURT:  Hold on.
19              MR. KUNZ:  -- giving the jury the impression it's a
20    place where people go to have fun and saying this is just
21    innocent having fun and drinking and dancing, when in fact this
22    place was closed down because of a nuisance abatement
23    proceeding.  These officers had personally been at fights
24    outside this club on numerous occasions.  We feel he opened the
25    door to establishing what was in the officer's mind.  These are
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

428

DCBTGUZ3

1  objective determinations, and the jury needs to know what the
2  officers knew when they made the decision to arrest and then
3  made the decision to use force.
4         THE COURT:  Let me get it straight.  You don't plan to
5  cross-examine the plaintiff about this?
6         MR. KUNZ:  No, we don't plan to cross-examine the
7  plaintiff about this.  We're going to touch on it because he
8  changed his story from his deposition to his testimony here
9  today, but really what we want to do is have Officer Jay take
10 the stand in our case and for the limited purpose of just
11 explaining the history of the Red Lounge and what Officer Jay
12 knew when he was going there that night.
13        THE COURT:  OK, that is denied as well.  The plaintiff
14 certainly in his testimony touched about his experience at the
15 Red Lounge, his experience that night and his experience on the
16 other two or three occasions.  I don't remember exactly the
17 number that he said he had been there.  If you want to ask him
18 about his experience at the Red Lounge, you're certainly
19 welcome to do that, but that doesn't open the door to the other
20 officers testifying about their experience with the Red Lounge.
21        Anything else?
22        MR. MODAFFERI:  That was all.
23        THE COURT:  OK.
24        (Continued on next page)
25

429

DCBTGUZ3                          Guzman - cross
 1              (In open court)
 2   CROSS-EXAMINATION
 3   BY MR. MODAFFERI:
 4   Q.  Mr. Guzman, you just testified that you were fighting that
 5   night, didn't you?
 6   A.  No, I wasn't.
 7   Q.  As I recall, it slipped out when you were testifying, you
 8   said --
 9              MS. SMITH:  Objection.
10              THE COURT:  Please rephrase the question.
11              MR. MODAFFERI:  Sure.
12   Q.  You testified when your attorney was questioning you that
13   you thought the person who kicked you was one of the people you
14   were fighting, is that not true?
15              MS. SMITH:  Objection, it's a complete
16   mischaracterization.
17              THE COURT:  Overruled.
18              Is that what you said?
19              THE WITNESS:  No, I was not fighting that day.
20   Q.  But you did testify that you thought the person who kicked
21   you was one of the people that was fighting, is that right?
22   A.  I testified when I was in prison that I was watching the
23   fighting and somebody kicked me, because Mr. Jay was with the
24   paramedic and I was scared.
25   Q.  I'm asking you if you just testified when counsel was
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

430

DCBTGUZ3                         Guzman - cross
1    questioning you that you thought the person who kicked you was
2    one of the people that were fighting.
3    A.  Correct.
4    Q.  So my question to you is why would you think that someone
5    from the fight was the person who kicked you if you weren't
6    fighting?
7    A.  Well, my friend, he was fighting, and I was with him, and I
8    thought it was one of those guys that kicked me.
9    Q.  So you thought it was one of those guys but you weren't
10   fighting?
11   A.  I was not fighting.
12   Q.  OK.  Now you also testified that you had been to the Red
13   Lounge two times?
14   A.  Yeah.
15   Q.  So two times.
16   A.  I think so, yeah.
17   Q.  You remember testifying in your deposition, Mr. Guzman?
18   A.  Yes, I remember.
19   Q.  And you were under oath when you were asked questions at
20   that deposition?
21   A.  Yes.
22   Q.  In fact, Mr. Kunz is was the person who asked you those
23   questions at that deposition?
24   A.  Yes.
25   Q.  And before you answered any of those questions, you swore

431

DCBTGUZ3                        Guzman - cross

1   to tell the truth, didn't you?
2   A.  Yes.
3   Q.  The same oath you took before you took the stand here
4   today, right?
5   A.  Yes.
6   Q.  Mr. Guzman, I'm going to read from that deposition, and I'm
7   reading from page 76, and I'm starting at the bottom at line
8   24.  Were you asked the following questions and did you give
9   the following answers:
10  "Q.  Had you been to the Red Lounge before the incident?
11  "A.  No.
12  "Q.  So this was the first time at the Red Lounge?
13  "A.  First time.
14  "Q.  Have you been there since the incident?
15  "A.  No."
16          Mr. Guzman, you were asked those questions and you
17  gave those answers, didn't you?
18  A.  Yes.
19  Q.  So now you're coming to court and saying you were there two
20  times when at your deposition you only testified that you were
21  there once?
22  A.  Well, that happened five years ago, and now in those five
23  years I always think about what happened and about what
24  happened in general, and now I think -- no, not I think, I know
25  that I went like two times before.

432

DCBTGUZ3                    Guzman - cross

1   Q.  So let me get it straight, you went back there after the
2   night of the incident?
3   A.  No.
4   Q.  You never went back there.  But at your deposition you were
5   incorrect when you said you were only there one time?
6   A.  Yes, you're right.
7   Q.  OK.  Now you also testified when your attorney was
8   questioning you that you had beer and mixed drinks, is that
9   correct?
10  A.  Yes.
11  Q.  In fact, I think you said the mixed drink that you drank
12  that night was gin and tonic?
13  A.  I might have two gin and tonic.
14  Q.  You may have?
15  A.  Yes.
16  Q.  Well, I want to refer you back to that deposition.  That
17  deposition occurred before today?
18          MS. SMITH:  Objection, there's no question.
19          THE COURT:  Hold on.  Overruled.
20  Q.  You recall being deposed in 2012?
21  A.  Can you repeat the question more clear?
22  Q.  Sure, your deposition occurred in 2012?
23  A.  Yes.
24  Q.  That's before today?
25  A.  Yes.

433

DCBTGUZ3                    Guzman - cross
1    Q.  Closer in time to the day of the incident?
2    A.  Yes.
3    Q.  And I want to read from that deposition on page 96 starting
4    at line 5.  Mr. Guzman, were you asked these questions and gave
5    these answers:
6    "Q.  Did your friends take any shots that night?
7    "A.  No.
8    "Q.  Were your friends drinking?
9    "A.  Alcohol.
10   "Q.  Beer, wine, liquor?
11   "A.  Liquor.
12   "Q.  Were you the only one that was drinking beer?
13   "A.  Yeah."
14              MS. SMITH:  Objection.
15              THE COURT:  Let's have a side bar.
16              (In robing room)
17              THE COURT:  What was the purpose of all those earlier
18   questions?
19              MR. MODAFFERI:  He basically said at his deposition
20   the only thing he had to drink -- well, what he did say in his
21   deposition was beer, and now today after the deposition --
22              THE COURT:  That's fine, but all those earlier
23   questions seemed totally irrelevant to that impeachment, the
24   question about what his friends were drinking and everything
25   else.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

434

DCBTGUZ3                       Guzman - cross
1          MR. MODAFFERI:  I apologize, I started a few questions
2  too early.
3          THE COURT:  What is it that you wish to ask from the
4  deposition?
5          MR. MODAFFERI:  I want to get out the fact --
6          THE COURT:  Read from the deposition.
7          MR. KUNZ:  Question:  How much would you drink when
8  you were --
9          MR. MODAFFERI:  That's not it.
10          MR. KUNZ:  "Were you the only one that was drinking
11  beer."
12          THE COURT:  What line?
13          MR. KUNZ:  96, page 96, line 9.
14          MR. MODAFFERI:  Could we go from 9 to 13?  So:
15  "Q.  Were you the only one drinking beer?
16  "A.  Yes.
17  "Q.  Why were you drinking beer?
18  "A.  I don't know, I just wanted beer that night."
19          MS. SMITH:  That's not impeachment.
20          THE COURT:  That doesn't seem inconsistent.  That
21  doesn't say that he was only drinking beer that night.
22          MR. MODAFFERI:  It's in here somewhere that he only
23  said he had two to three beers, but we have to find the right
24  portion.
25          Page 72:
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
     DCBTGUZ3                   Guzman - cross
1    "Q.  Did you drink any alcohol?
2              THE COURT:  What line?
3              MR. MODAFFERI:  19:
4    "Q.  Did you drink any alcohol?
5    "A.  Yes.
6    "Q.  What alcohol did you drink?
7    "A.  Beer.
8    "Q.  Any alcohol besides beer?
9    "A.  No."
10             THE COURT:  That's fine.
11             MR. MEEHAN:  Your Honor, for the false impeachment --
12             THE COURT:  I will sustain all that.
13             MR. MEEHAN:  Fine.
14             (In open court)
15             THE COURT:  That objection is sustained.  We'll strike
16   that last question, and the jury is instructed to disregard
17   that.
18             Go ahead and rephrase the question.
19             MR. MODAFFERI:  Yes, Judge.
20   BY MR. MODAFFERI:
21   Q.  So Mr. Guzman, your testimony here today is that you had
22   beer and mixed drinks, correct?
23   A.  Correct.
24   Q.  And you think that the mixed drinks that you had that night
25   were gin and tonic?
```

436

DCBTGUZ3                      Guzman - cross

1   A.  Mixed drink, I don't remember.
2   Q.  You don't remember which one it was?
3   A.  Mixed drink.
4   Q.  Now I refer you to your deposition, and I'm reading from
5   page 72, starting at line 19, do you remember being asked these
6   questions and giving these answers:
7   "Q.  Did you drink any alcohol?
8   "A.  Yes.
9   "Q.  What alcohol did you drink?
10  "A.  Beer.
11  "Q.  Any alcohol besides beer?
12  "A.  No."
13          Mr. Guzman, you were asked those questions and gave
14  those answers at your deposition, didn't you?
15  A.  Yes.  I said --
16          THE COURT:  Hold on, there's not another question
17  before you.  Were you asked those questions and did you give
18  those answers?
19          THE WITNESS:  Yes.
20  Q.  Mr. Guzman, I also now want to refer you to your prior
21  testimony when counsel was questioning you regarding the red
22  mark that you had on your neck.  Do you remember being asked
23  about that?
24          MS. SMITH:  Objection.  What's the question?
25          THE COURT:  Overruled.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCBTGUZ3                    Guzman - cross

1    Q.  You testified earlier about the red mark that you had on
2    your neck, do you remember that?
3    A.  Yes.
4    Q.  And you were actually shown a picture of that mark,
5    correct?
6    A.  Correct.
7    Q.  And I believe you said that the mark on your neck was from
8    your scarf?
9    A.  From my scarf.
10   Q.  Now I want to refer you to your deposition at page 180,
11   starting at line 11.
12             THE COURT:  Hold on a second.  Does counsel have that?
13             Go ahead.
14   "Q.  No, I'm asking about the mark on your neck, it looks like
15   a red line going around your neck.  I'm asking how you got
16   that.
17   "A.  I don't remember.  I don't remember, but --
18   "Q.  You don't remember?
19   "A.  It was -- it was him.
20   "Q.  But what did he do to cause that?
21   "A.  I don't know.  I don't remember."
22             Do you recall being asked those questions and giving
23   those answers?
24   A.  Yes, I remember, I recall that.
25   Q.  You recall that -- those questions and those answers at
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

438

DCBTGUZ3                         Guzman - cross

1   your deposition?
2   A.  Yes.
3   Q.  So you didn't remember how you got that line at your
4   deposition, but now here in the courtroom you do remember?
5   A.  I do remember now that he grabbed me, and I have a scarf,
6   and when I feel like burning, and that's why he when he pulled
7   me up, that mark, it was from him when he pulled me up.
8   Q.  So you figured it out four and a half years later when
9   you're in front of this jury, right?
10              MS. SMITH:  Objection.
11              THE COURT:  Sustained.
12  A.  Yes.
13              THE COURT:  No, that question -- that objection has
14  been sustained.  You don't have to answer that question.
15  Q.  And you also testified that I believe you said your friend
16  referred you to Dr. Dassa?
17  A.  Yes.
18  Q.  And that was after you got your insurance, correct?
19  A.  I'm not sure.
20  Q.  You're not sure?
21  A.  No.
22  Q.  Well, I want to refer you again to your deposition at page
23  196, starting at the bottom at line 23, Mr. Guzman, were you
24  asked these questions and did you give these answers:
25  "Q.  So what happened?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCBTGUZ3                              Guzman - cross

```
 1   "A.   Then when the insurance got home, my lawyer refer me to
 2   the doctor.
 3   "Q.   Jon Norinsberg?
 4   "A.   No.
 5   "Q.   A different lawyer?
 6   "A.   A different lawyer."
 7   A.   That's correct.
 8   Q.   That's correct?
 9   A.   That's correct.
10   Q.   So when you said that your friend had referred you --
11           THE COURT:   Hold on, were you asked those questions
12   and did you give those answers?
13           THE WITNESS:   Yes.
14   Q.   I didn't ask a question.   When you said your friend had
15   referred you to Dr. Dassa, that wasn't true, was it?
16   A.   It is true.
17   Q.   So your friend is a lawyer?
18   A.   No, he's not a lawyer, my friend is a friend of mine that
19   his mom friend used to go there.   He told me that before I was
20   going to a lawyer.   Then I went to the lawyer and the lawyer
21   told me to go to Dr. Dassa, so I did go to Dr. Dassa, he said
22   go to the doctor, that's why I went there.
23   Q.   So both your friend and the lawyer both referred you to
24   Dr. Dassa?
25   A.   Yes, correct.
```

440

DCBTGUZ3                         Guzman - cross

1   Q.  Mr. Guzman, I want to take you now to that night,
2   February 14, 2009.  It's your testimony that the fight breaks
3   out and you are just standing in the street trying to hail a
4   cab, correct?
5   A.  Correct.
6   Q.  And your friend Henry was fighting?
7   A.  My friend Henry was fighting.
8   Q.  I'm sorry?
9   A.  My friend Henry was fighting.
10  Q.  According to you, Officer Jay comes over to you and not to
11  the people fighting, is that right?
12  A.  Correct.
13  Q.  He doesn't go first to stop the fight?
14  A.  I don't even know, I just -- what I remember, I was
15  stopping a cab and I feel a kick.
16  Q.  Let me ask you this, you didn't see Officer Jay go to the
17  people fighting?
18  A.  No.
19  Q.  You didn't see him first go to arrest the people that were
20  fighting?
21  A.  No.
22  Q.  He just kicks you for no reason?
23          MS. SMITH:  Objection.
24          THE COURT:  I'll allow it.
25  A.  I don't know, you are going to have to ask that question to

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

441

DCBTGUZ3                    Guzman - cross

1   him.
2   Q.  Well, you didn't give him a reason?
3   A.  I didn't give him a reason to.
4   Q.  You didn't do anything to provoke him, did you?
5   A.  No.
6   Q.  In fact, no one else that was standing there that night got
7   attacked by the police, did they?
8            MS. SMITH:  Objection.
9            THE COURT:  Did you see anyone else there get attacked
10  by the police?
11           THE WITNESS:  No.
12           THE COURT:  Go ahead, counsel.
13  Q.  So you're the only one who was supposedly attacked by the
14  police, right?
15           MS. SMITH:  Objection.
16           THE COURT:  Sustained.
17  A.  I was the only one.
18           THE COURT:  You don't have to answer that.
19  Q.  In fact, you didn't see the person who kicked you?
20  A.  No.
21  Q.  You didn't see that person approach you?
22  A.  No.
23  Q.  You didn't actually see the kick?
24  A.  I didn't actually see the kick.  When he went on top of me,
25  that's when I know that he was --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

442

DCBTGUZ3                    Guzman - cross

1   Q.  We'll get there.  And you still didn't see the person when
2   you were pepper sprayed, right?
3   A.  No.
4   Q.  And you mentioned that you were pepper sprayed when that
5   person was on top of you?
6   A.  When that person was on top of me.
7   Q.  So someone is on top of you and they pepper spray you like
8   that?
9   A.  No, he pulled my ponytail to the back and pepper sprayed
10  me.
11  Q.  But are you and the person who is on top of you facing --
12  A.  I was facing to the ground.
13  Q.  But your head is going in the same direction as the person
14  on top of you?
15  A.  Can you repeat that question?
16  Q.  Sure.  You're on the ground like this, and the person who
17  is on top of you like this?
18  A.  Yes, with his knee.
19  Q.  With his knee?
20  A.  Yes.
21  Q.  So you are facing the same direction?
22  A.  Yes.
23  Q.  So you want the jury to believe that that person then
24  pepper sprayed you --
25            THE COURT:  Sustained to form.  Please rephrase the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

443

DCBTGUZ3                    Guzman - cross
1   question.
2   Q.  That person that was on top of you?
3   A.  Yes.
4   Q.  He pepper sprayed you and came around and pepper sprayed
5   you in the face?
6   A.  No, he grabbed my hair and pepper sprayed, put the spray in
7   front of my head and pepper sprayed me.
8   Q.  Back in his direction?
9   A.  Yes.
10  Q.  Essentially sprayed himself?
11  A.  No, sprayed my eyes, the barrel of the pepper spray was
12  touching my face, he was touching my face like this.
13  Q.  Mr. Guzman, we'll move on.  After that point, you hear,
14  according to you, "NYPD, mother fucker," is that right?
15  A.  Correct.
16  Q.  And according to you, that's when you first realized that
17  the person that was on top of you was a police officer?
18  A.  Correct.
19  Q.  And the person that you say kicked you was not wearing
20  glasses, is that right?
21          MS. SMITH:  Objection.
22  A.  I remember --
23          THE COURT:  Hold on.  Please rephrase the question.
24  Q.  The person that you say kicked you was not wearing glasses?
25          MS. SMITH:  Objection.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

444

DCBTGUZ3                        Guzman - cross
 1              THE COURT:  Overruled.
 2    A.  He was wearing glasses.
 3    Q.  Mr. Guzman, I want to refer you to your deposition.  And
 4    I'm referring the Court and counsel to page 139.  I'm reading
 5    lines 14 and 15.  Mr. Guzman, were you asked these questions --
 6    this question at your deposition and did you give this answer:
 7    A.  Yes.
 8    "Q.  Did he wear glasses?
 9    "A.  No, I don't remember it."
10              Do you recall being asked that question and giving
11    that answer?
12    A.  Yes, I remember, I recall.
13    Q.  You recall that.  Do you know that the officer you're suing
14    wears glasses?
15    A.  Yes.
16    Q.  You know that now?
17    A.  No.
18    Q.  And you said you were a hundred percent sure that it was
19    Officer Jay who kicked you?
20    A.  100 percent sure.  I swear to myself, to my mother, that he
21    kicked me.
22    Q.  A hundred percent sure, but you weren't sure that he was
23    wearing glasses?
24    A.  I saw him when I was in the cell, and he got glasses, I
25    don't know, but he got glasses.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

445

DCBTGUZ3                    Guzman - cross

1   Q.  So when you testified at your deposition that he wasn't
2   wearing glasses, that wasn't true?
3           THE COURT:  Please rephrase the question.
4           MR. MODAFFERI:  Sure.
5   Q.  You said at your deposition, we just read that, that the
6   person who kicked you did not wear glasses, is that right?
7   A.  Correct.
8   Q.  Mr. Guzman, you said that your leg was kicked and that's
9   how it was injured, right?
10  A.  Yes.
11  Q.  You were never struck with a hard object while you were on
12  the ground, correct?
13  A.  Can you explain that in simple words, please?
14  Q.  Sure.  While you were on the ground, no one struck you with
15  a hard object, correct?
16  A.  I don't remember.
17  Q.  You don't remember that?
18  A.  Can you repeat the question?
19  Q.  It's simple, I'm just asking while you were on the
20  ground --
21          THE COURT:  Please rephrase that without the comment.
22  Q.  While you were on the ground, did someone strike you with a
23  hard object?
24  A.  What do you mean, like did he punch me?
25  Q.  No, was a hard object used on you that night?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

446

DCBTGUZ3                          Guzman - cross

1   A.  I don't understand those words.
2   Q.  It was in the complaint that you filed to start this the
3   lawsuit, do you know that?
4   A.  Yes.
5   Q.  You do know that.  You know that it was in your complaint,
6   the lawsuit?
7   A.  Can you read it?
8   Q.  Sure, I will read it for you.  In your complaint --
9              MS. SMITH:  Objection.
10             THE COURT:  Sustained.  Please rephrase the question.
11  Q.  Sure.  Are you aware that in your complaint it says that
12  you were stomped on and struck with a hard object on your knee?
13             THE COURT:  Let's have a -- sustained, let's have a
14  side bar.
15             (In robing room)
16             THE COURT:  Let me make sure I understand where is it
17  you're going with this.
18             MR. MODAFFERI:  Plaintiff is testifying he was only
19  kicked that night.  However, in his lawsuit he says after he
20  was kicked, defendant then struck plaintiff with a hard object
21  on his knee, and he's saying that never happened.
22             THE COURT:  OK.  But you're doing -- you're reading
23  from the complaint in order to do what, to impeach his
24  testimony here?
25             MR. MODAFFERI:  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

447

DCBTGUZ3                    Guzman - cross

1           THE COURT:  But I don't think that he answered that
2      first question yet in terms -- I don't know if you have
3      established the distinction in his mind between the hard object
4      and whatever it is he's talking about.
5           MR. MODAFFERI:  Right, because he said he doesn't know
6      what the hard object was, but yet it's in his complaint.
7           THE COURT:  What are you going to do with his
8      complaint?
9           MR. MODAFFERI:  This is his lawsuit.  I'm going to ask
10     if he saw it, if he read it, is it accurate?  Hard object is
11     not accurate, is it?
12          THE COURT:  If you're going to ask him, you need to
13     clarify that if that's what you're going to do.
14          MR. KUNZ:  We could ask some clarifications.  Other
15     than the knee, was he hit with anything else?  Does he know
16     what a hard object is?
17          MS. SMITH:  For the record, in the beginning of the
18     case and your instructions to the jury it was clarified that
19     the hard object was a kick.  I want to note that for the
20     record.
21          MR. KUNZ:  Well, the complaint --
22          MS. SMITH:  Is it possible to take a brief break to
23     use the restrooms for me?  I could run out quickly.
24          THE COURT:  Let's use that one right here.
25          MS. SMITH:  Thank you.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

448

DCBTGUZ3                    Guzman - cross
1              MR. MODAFFERI:  I will try to get it out in a more --
2              THE COURT:  Wait for counsel.
3              (Pause)
4              THE COURT:  While we're here, counsel that is using
5    the restroom, is she going to be conducting the examination of
6    Molina?
7              MR. NORINSBERG:  No, I will.
8              THE COURT:  How short is Molina going to be?
9              MR. KUNZ:  Half hour.
10             THE COURT:  And your cross?
11             MR. NORINSBERG:  Probably half an hour.
12             MR. KUNZ:  He's not here yet, but I spoke to him and I
13   you believe he's on the way.
14             MR. NORINSBERG:  At the appropriate time I do have an
15   application relating to Mr. Molina.
16             THE COURT:  OK.
17             MR. KUNZ:  Can we get notice on what that application
18   is?
19             MR. NORINSBERG:  The accident that he had in May.
20   Maybe you're not planning on getting it into it, but he had a
21   remarkably poor memory on his deposition about the accident, so
22   I don't want --
23             THE COURT:  Let's deal with that later.
24             Yes, you can ask some clarification questions, but you
25   need to clarify that.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

449

DCBTGUZ3                          Guzman - cross
1            (In open court)
2  BY MR. MODAFFERI:
3  Q.  Mr. Guzman, you say that you were kicked, right?
4  A.  Yes.
5  Q.  Aside from the kick, were you ever hit with any other
6  object?
7  A.  I don't remember.
8  Q.  Not that you remember.  You filed a lawsuit in this case,
9  right?
10  A.  Yes.
11  Q.  And in your complaint it says you were stomped on and hit
12  with a hard object on your knee, is that right?
13  A.  He went on top of me and like he put the boots on top of
14  me, like --
15  Q.  Mr. Guzman, I'm only asking you if you know that that was
16  written in your lawsuit.
17  A.  Yes.
18  Q.  So you do know it was written there?
19  A.  Yes.
20  Q.  But that's not true, is it?
21  A.  Can you read it?
22  Q.  Yeah.  Defendant struck plaintiff with a hard object on his
23  right knee.  That's not true, is it?
24  A.  He went on top of me, like I told you, he put his boots on
25  top of me or I feel something like he was pressing on me when
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

450

DCBTGUZ3                    Guzman - cross

1  he was on top of me.
2  Q.  So as you sit here today, the hard object is the boots?
3  A.  Boots, because I was kicked.
4  Q.  But you never said "boots" in your lawsuit, did you?
5          MS. SMITH:  Objection.
6          THE COURT:  I'll allow it.
7  Q.  You never said "boots" in your lawsuit.
8  A.  No.
9  Q.  I'm sorry?
10  A.  No.  Actually I said boots, I said yellow Tims, and yellow
11  Tims, I said probably not in that paper, if you look in the
12  paper I said yellow Tims, that's -- it was the boots that he
13  was wearing that night, yellow boots, Tims.
14  Q.  Yellow Tims?
15          MR. MODAFFERI:  Your Honor, I ask that be stricken.
16  That's not responsive to my question.
17          THE COURT:  That's denied.
18  Q.  Mr. Guzman, I want to talk to you some more about lying.
19          MS. SMITH:  Objection.
20          THE COURT:  Sustained.  Please rephrase the question.
21  Q.  You testified previously that you lost your job at Fairway
22  because you were laid off, correct?
23  A.  Correct.
24  Q.  And you gave testimony that you were laid off because
25  things were slow?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

451

DCBTGUZ3                        Guzman - cross
 1                THE COURT:  Let's stop.  Let's have a brief side bar.
 2           (In robing room)
 3                THE COURT:  OK, just as a technical matter, the line
 4      of cross-examination is fine, but you keep asking him about him
 5      giving testimony earlier.  You don't need to put that in there.
 6      He didn't testify to that today.  The jury doesn't know
 7      anything about that, and you can't refer to the deposition at
 8      the beginning of your questioning.
 9                MR. MODAFFERI:  Sure.  I only want -- then I want to
10      state on the record that counsel repeatedly in his examination
11      of the officers referred to the investigators and spoke to
12      investigators and spoke to investigators.  Even when it wasn't
13      impeachment, I believe he started the examinations with you are
14      not a defendant, you're here by subpoena, in fact you spoke to
15      investigators.  I don't think that --
16                THE COURT:  But if you want to -- early on in your
17      examination if you want to set up that he gave a deposition,
18      that he spoke whoever else at the beginning before you start
19      bringing out your impeachment, you're welcome to do that.  You
20      brought out in front of the jury that he testified in a
21      deposition, but I'm saying it's the combination of you
22      testified earlier and the question that you're asking that's
23      the problem.
24                MR. MODAFFERI:  Understood.
25                THE COURT:  Ask the question.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

452
DCBTGUZ3                    Guzman - cross
1              MR. MODAFFERI:  Understand.
2              MS. SMITH:  Your Honor, I would like to bring up we
3    don't have a lost earnings claim in the case, so all the
4    questions surrounding employment we believe are irrelevant.
5              THE COURT:  That's overruled.
6              (In open court)
7              THE COURT:  Counsel, please rephrase the question.
8              MR. MODAFFERI:  Yes, Judge.
9    BY MR. MODAFFERI:
10   Q.  You were laid off from your job at Fairway because things
11   were slow, is that right?
12             MS. SMITH:  Objection.
13             THE COURT:  Overruled.
14   A.  No.
15   Q.  You were really fired, correct?
16   A.  I thought they gave me two options.
17             THE COURT:  Hold on a second, let's have a side bar.
18             Actually, keep going.  Do you want that question read
19   back?
20             MR. MODAFFERI:  Yes, please.
21             (Record read)
22   A.  They gave me two options, they gave me to pick up some
23   poops, dog poops --
24   Q.  Mr. Guzman, all I want to know is:  Were you fired?
25   A.  I thought I was fired.  I thought I was fired.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

453

DCBTGUZ3                         Guzman - cross

1   Q.  You thought you were fired.
2   A.  Later on I find out I quit, but I thought -- I quit, but
3   later on I found out I was fired.  They didn't send me home
4   that day.
5   Q.  So when you testified at your deposition that you were
6   never fired from any job, that's not true, is it?
7               MS. SMITH:  Objection.
8               THE COURT:  Please rephrase the question.
9               MR. MODAFFERI:  Judge, I'm just going to refer the
10  Court to page 43 of the deposition?
11              MS. SMITH:  Objection.
12              THE COURT:  Basis?
13              MS. SMITH:  Pardon?
14              THE COURT:  What's the basis of your objection?
15              MS. SMITH:  I'm not sure where he's referring the
16  Court.
17              THE COURT:  Overruled.
18              MR. MODAFFERI:  I'm referring everyone to lines 4
19  through 9, actually lines 8 and 9.
20  Q.  Mr. Guzman, do you recall being asked this question or did
21  you -- were you asked this question and did you give this
22  answer at your deposition:
23  "Q.  Have you ever been fired at all?
24  "A.  No."
25  A.  Like I told --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCBTGUZ3                    Guzman - cross

1   Q.  Do you recall being asked that question and giving that
2   answer?
3   A.  Yes.  Like I told you right now, I was -- like they send me
4   home, I thought I was quitting, but later on I found out that
5   they fired me for not going back to the job.
6   Q.  Mr. Guzman, when you were asked that question at your
7   deposition, why didn't you explain further?
8   A.  I don't know.  Probably I didn't have the chance to explain
9   it to you guys, it was asking me too much questions.
10  Q.  So it was Mr. Kunz's fault, is that what you're saying?
11           MS. SMITH:  Objection.
12           THE COURT:  I'll allow it.  You can answer that.
13  A.  No.
14  Q.  It was your fault?
15  A.  My fault.  My fault.
16  Q.  And Mr. Guzman, you also applied for unemployment benefits,
17  didn't you?
18  A.  Yes.
19  Q.  And also filled out an application for disability benefits,
20  is that right?
21  A.  Yes.
22  Q.  And you filled out your application for disability benefits
23  on May 19, 2009?
24  A.  Yes.
25  Q.  And in that application, you were claiming that you were

455

DCBTGUZ3                         Guzman - cross

1   disabled and unable to work, is that right?
2   A.  Yes.
3   Q.  And at that same time you were receiving unemployment
4   benefits?
5   A.  Correct.
6   Q.  And in order to get unemployment benefits, you had to
7   certify you were not disabled or ready to start work
8   immediately, isn't that true?
9   A.  Correct.
10  Q.  And on October 7, 2009, after you filed your application
11  for disability benefits, you filed an application for
12  unemployment and stated that you were not disabled but ready to
13  start work immediately, isn't that right?
14  A.  Correct.
15  Q.  And again, on November 17, 2009, you reapplied for
16  unemployment and stated that you were not disabled and ready to
17  start work immediately, isn't that true?
18  A.  Correct.
19  Q.  Just to be clear, in May of 2009 you said you were not able
20  to work, then in October and November of 2009 you said you were
21  ready and able to work, is that right?
22  A.  Correct, I am ready to work, the only thing is --
23          THE COURT:  There's not a question before you.  Go
24  ahead, counsel.
25  Q.  Well, I want to ask one more question.  Did you ever give

456
DCBTGUZ3                      Guzman - cross
1   that money that you received from unemployment back?
2              MR. NORINSBERG:  Could we have a side bar?
3              THE COURT:  That objection is sustained.
4   A.  Can you repeat the question?
5              THE COURT:  You don't have to answer that question.
6              MR. MODAFFERI:  I'll move on.
7   Q.  Mr. Guzman, you went to the Red Lounge on February 14,
8   2009?
9   A.  Yes.
10  Q.  And you didn't have anything to drink before you got to the
11  Red Lounge, is that right?
12  A.  No.
13  Q.  When you got there --
14             THE COURT:  Hold on.  The question is:  Did you have
15  anything to drink before you went to the Red Lounge?
16             THE WITNESS:  No.
17             THE COURT:  OK.
18  Q.  When you got to the Red Lounge, you went straight to the
19  bar?
20  A.  Straight to the bar.
21  Q.  And then you had a few beers and some mixed drinks?
22  A.  Yes.
23  Q.  And then you left the bar at around 3:30?
24  A.  That's correct.
25  Q.  Isn't it the truth that outside of the Red Lounge you and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

457

DCBTGUZ3                          Guzman - cross
1   your friends got into an argument with other people?
2   A.  Can you explain it again?
3   Q.  Sure.  Isn't it the truth that outside of the Red Lounge
4   both you and your friends got into an argument with other
5   people?
6   A.  Not me, my friends.
7   Q.  Isn't the truth that at that you and your friends actually
8   started a fight with other people?
9   A.  Well, I just -- the only thing I heard was Henry arguing.
10  I was stopping a cab and I heard an argument and then just
11  started fighting right away.
12  Q.  Mr. Guzman, yes or no.
13  A.  No.
14  Q.  Isn't it true that you and your friends started fighting
15  with two other people?
16  A.  Like I told you, I can't respond to that question because I
17  was trying to hail a cab, and then I hear Henry screaming like
18  arguing with one guy, and they just started punching each
19  other.
20  Q.  Mr. Guzman, you can't answer yes or no as to whether or not
21  that you --
22         THE COURT:  Sustained.  Please rephrase the question.
23  Q.  Well, your friend Henry was fighting with one of those
24  other people, right?
25  A.  Yes.

DCBTGUZ3                    Guzman - cross

```
 1   Q.  And isn't it true that you were fighting with the other
 2   person?
 3   A.  No.
 4   Q.  You got knocked to the ground with one punch, didn't you?
 5   A.  No.
 6   Q.  And that person you were fighting also kicked you while you
 7   were on the ground, right?
 8   A.  No.
 9   Q.  And that's how you really injured your leg you were shown
10   Plaintiff's Exhibit 1Q?
11   A.  Yes.
12   Q.  That really is how you were kicked, while fighting?
13   A.  No, I was kicked by Mr. Jay.
14   Q.  And isn't it true that when the officers were arresting the
15   person you were fighting with, you came over and tried to pull
16   the officers away so you could hit that person you were
17   fighting with?
18   A.  That never happened, I'm -- 100 percent what I said is
19   true.
20   Q.  By the way, do you know that the person Henry was fighting
21   with is Alberto Molina?
22   A.  Never seen him before.
23   Q.  I want to ask you some questions about some other people.
24   Jose Sierra, is he a friend of yours?
25   A.  Yes, he's my friend.
```

459
```
     DCBTGUZ3                    Guzman - cross
 1   Q.  And he was there that night?
 2   A.  He was not there, I think he was some club in the area.
 3   Q.  Let me ask you about Jose Roman.
 4   A.  Roman, yes.
 5   Q.  He was there that night?
 6   A.  He was there that night.
 7   Q.  In fact, he was arrested that night?
 8   A.  Yes.
 9   Q.  He was also present for a meeting that you had with your
10   attorney, isn't that true?
11              MS. SMITH:  Objection.
12              THE COURT:  Let's have a side bar.
13              (In robing room)
14              THE COURT:  OK.
15              MR. MODAFFERI:  This person is on the plaintiff's
16   witness list.  He was there.  He was subpoenaed to come to
17   trial, and he testified at his deposition that he was present
18   for the meeting when he heard the plaintiff tell his attorney
19   what happened that night.  So I'm just asking the question to
20   get out of the fact that he has heard from the plaintiff what
21   his story was, that's all.
22              MR. NORINSBERG:  That question is --
23              THE COURT:  Hold on, that who has?  That Jose Roman --
24              MR. KUNZ:  Jose Roman was present at a meeting with
25   plaintiff and attorneys, and the meeting started with plaintiff
```

460

DCBTGUZ3                    Guzman - cross

1   telling Jose Roman what happened that day.  That's a pertinent
2   fact.
3               THE COURT:  Why is that pertinent?
4               MR. KUNZ:  We're anticipating that Jose Roman will
5   testify today.
6               MR. NORINSBERG:  He's not coming in.
7               THE COURT:  So you want to bring out the fact that he
8   was there?
9               MR. KUNZ:  We want to bring out that plaintiff asked
10  Jose Roman to testify, that he met with plaintiff's attorneys,
11  that then he went to a deposition.
12              MR. MODAFFERI:  The day before the deposition he spoke
13  to the plaintiff and the plaintiff told him again what
14  happened, and then he was deposed.
15              MR. KUNZ:  Then deposed in this case and then
16  subpoenaed to testify in this trial.  We want all those facts
17  in.
18              THE COURT:  OK.
19              MR. NORINSBERG:  Those questions would be perfectly
20  appropriate for Mr. Roman, not for my client.  It has nothing
21  to do with my client.
22              THE COURT:  What you said Mr. Roman won't be here --
23              MR. NORINSBERG:  We can't force him to be here.
24              MR. KUNZ:  That's what the subpoena was for.
25              MR. NORINSBERG:  The bottom line is he's not the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

461

DCBTGUZ3                    Guzman - cross

1   proper witness to do this through.  Most of those questions
2   relate to what statements were made by Mr. Roman at his
3   deposition, not statements my client made.  My client cannot be
4   impeached by something another witness said.
5           THE COURT:  My sense is they're not trying to bring
6   out the actual statements of the deposition.  Correct?
7           MR. KUNZ:  No, we're going not going to impeach the
8   plaintiff with Roman's statements.
9           THE COURT:  What's the relevance?
10          MR. KUNZ:  He asked his good friend who was there that
11  day to testify in the case, and he's apparently not coming.
12          THE COURT:  What's the relevance of the deposition?
13          MR. KUNZ:  It establishes that he asked Roman to work
14  in this case and Roman was cooperating with that and came to a
15  deposition and gave testimony, and now all the sudden --
16          MR. MODAFFERI:  Plaintiff told him what to say in the
17  deposition because they met the day before.
18          THE COURT:  How are you going to get into that?
19          MR. MODAFFERI:  That's the leap we're going to make,
20  but right now he was deposed and spoke to the plaintiff
21  beforehand.  I'm not going to ask it now with plaintiff on the
22  stand.
23          THE COURT:  I guess what I'm a little concerned about
24  is concerned about something else, but I guess that's not
25  really an issue.  I was concerned about this meeting being with

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCBTGUZ3                       Guzman - cross
1    the lawyers, and I didn't know why that was particularly
2    relevant, but that's fine.  So let's -- fine, you can go
3    through that.
4              Well, let me hear from plaintiff's counsel.
5              MR. NORINSBERG:  All of these questions are based on
6    what a non-party witness said at his deposition, so to ask my
7    client about it, if my client disagrees, there's nothing --
8              THE COURT:  That's fine.
9              MR. NORINSBERG:  Because they're going to try to
10   impeach him through someone else's testimony.
11             THE COURT:  They're stuck with his answers.  His
12   answers are what his answers are.
13             (In open court)
14             THE COURT:  OK, go ahead, counsel.
15             MR. MODAFFERI:  Thank you, your Honor.
16   BY MR. MODAFFERI:
17   Q.  Getting back to Jose Roman --
18   A.  Roman.
19   Q.  Roman.  He was there that night, correct?
20   A.  Yes.
21   Q.  He was also present for a meeting that you had with your
22   attorney?
23   A.  Say that again?
24   Q.  He was present for a meeting you had with your attorney?
25   A.  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

463

DCBTGUZ3                    Guzman - cross

1  Q.  And he was present when you told the attorney what happened
2  that night?
3  A.  No, he was not present.
4  Q.  So at that meeting you never told your attorney what
5  happened that night?
6  A.  When I went to my attorney it was by myself.
7  Q.  Didn't you just say that Jose Roman was present for a
8  meeting that you had with your attorney?
9  A.  Yes, he was present.
10  Q.  So my question to you is when he was present for that
11  meeting, did you tell the attorney what happened that night?
12  A.  I don't remember.
13  Q.  Well, Jose Roman was deposed in this case.
14           MS. SMITH:  Objection.
15           THE COURT:  I'll allow that.  Do you know that?
16  A.  Say again?
17  Q.  Do you know that Jose Roman was deposed in this case,
18  meaning his deposition occurred?
19  A.  No.
20  Q.  Do you remember the day before his deposition when --
21           THE COURT:  Sustained.
22  Q.  Did you subpoena him to come to trial to testify?
23  A.  Can you explain yourself like in simple words?  Because I
24  can't understand.
25  Q.  I'll try.  Did you send a subpoena to Mr. Roman to come and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCBTGUZ3                    Guzman - cross

1  testify at this trial?
2  A.  What do you mean?  If I told him to come?
3  Q.  Yeah.  Did you tell him to come?
4  A.  He told me that he wanted to come because he saw what he
5  saw.
6          MR. MODAFFERI:  Objection, and ask that be stricken as
7  non-responsive.
8          THE COURT:  OK, I'll sustain that.  Let's strike that.
9  Please rephrase the question.
10  Q.  You asked Mr. Roman to come and testify at trial, right?
11          MS. SMITH:  Objection.
12          THE COURT:  I'll allow it.
13  A.  I told him you can be my witness.
14  Q.  Let's move on to another person, Henry Luzuriaga.  He's
15  also a friend of yours, right?
16  A.  He's friends with me, but we don't get in touch with each
17  other.
18  Q.  He was there that night?
19  A.  Yes.
20  Q.  And you admit that he was fighting?
21  A.  Yes.
22  Q.  Now Dr. Ehrlich, you went to Dr. Ehrlich at some point, is
23  that right?
24  A.  Ehrlich in the fight?
25  Q.  No, no, no, have you ever been to a doctor named

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

465

DCBTGUZ3                    Guzman - cross

1    Dr. Ehrlich?
2    A.  I don't remember.  I went to a lot of doctors, I don't
3    remember who is the doctor names or who is not, I don't
4    remember.
5    Q.  Well, do you know that Dr. Ehrlich was hired to be your
6    expert in this case?
7    A.  Who is Dr. Ehrlich?
8              MS. SMITH:  Objection.
9    A.  Who is Dr. Ehrlich?  I don't know, I don't remember him.
10             THE COURT:  Overruled.
11   Q.  You don't know who Dr. Ehrlich is?
12   A.  I don't remember by names.  Like I told you, I went to a
13   lot of doctors.
14   Q.  We'll move on, Mr. Guzman.
15             You were at the precinct that night for about two and
16   a half hours.
17   A.  If I was in prison for two and a half hours?
18   Q.  Correct.
19   A.  No, more than that.
20   Q.  More than that?  I'm going to refer the Court to page 49 of
21   plaintiff's deposition, lines 15 to 16.
22             Mr. Guzman, do you recall being asked this question
23   and giving this answer:
24   "Q.  How long were you in the police station?
25   "A.  Maybe two and a half hours, I don't know."

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCBTGUZ3                         Guzman - cross

1            Do you recall being asked that question and giving
2    that answer?
3    A.  Yes, like I said, maybe two and a half hour.  I don't know
4    if it's more or two and a half hour.  What I know is that I
5    went to the prison after Mr. Jay arrest me and I got out of
6    prison approximately like 8 o'clock.
7    Q.  Mr. Guzman, let's just agree on one thing, at the
8    deposition you said two and a half hours, is that right?
9    A.  That's right.
10   Q.  And while you were at the precinct you were in the cells,
11   correct?
12   A.  Correct.
13   Q.  While you are in the cells you said that you were going to
14   sue?
15   A.  That's not true.
16   Q.  Sorry?
17   A.  That's not true.
18   Q.  So you never said that?
19   A.  I never said that.
20   Q.  But while you were at the precinct that night you spoke to
21   EMTs?
22   A.  I spoke with EMT.  Before I didn't remember, but refreshing
23   my mind, I remember that I spoke with EMT.
24   Q.  So I think what you're trying to say is at your deposition
25   you didn't remember but now you remember?

467

DCBTGUZ3                        Guzman - cross

1   A.  No, not now.  Before that, I remember.  I remember, like
2   I'm trying to tell you, I remember speaking to the EMT.
3   Q.  You remember?
4   A.  You mean like the paramedics, right?
5   Q.  Yes.
6   A.  Yes.
7   Q.  I'm talking about the first EMTs that arrived, do you
8   remember speaking to them?
9   A.  I remember speaking to them.
10  Q.  Do you remember telling the EMT that you were involved in a
11  fight and someone kicked you in the leg?
12  A.  I told EMT I was watching the fight and someone kicked me,
13  because Mr. Jay was next to the paramedic.
14  Q.  Mr. Guzman, I'm going to show you what is in evidence as
15  Defendant's Exhibit D.
16          Mr. Guzman, can you read that?  Are you able to read
17  that?
18  A.  No.  Can you read it for me?
19  Q.  Sure.  I want to refer you to this line right here starting
20  with this PT.  Can you see that?
21  A.  PT, yes.
22  Q.  You'll agree with me that it says PT stated that he was
23  involved in a fight and someone kicked him in his leg.  Do you
24  agree with that document that says that?
25  A.  No, I told him --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

468

DCBTGUZ3                    Guzman - cross

1   Q.  I'm not asking about what you told him, I'm asking about
2   the document.  The document says that?
3   A.  The document says that.
4   Q.  And I also want to show you a little lower on the document,
5   is that your signature?
6   A.  Yes.
7   Q.  And is that your signature?
8   A.  Yes.
9   Q.  So you signed that document twice?
10  A.  Correct.
11  Q.  So you signed that document even though the document said
12  something that you never told the EMT?
13  A.  I told the EMT, like I told you, I was watching the fight
14  and he kicked me.  The reason that I signed it was because
15  Mr. Jay was next to the paramedic and I was scared of him.
16  That's the only reason that I signed that.
17  Q.  So the only reason why you signed that document is because
18  Mr. Jay scared you?
19  A.  Ask him, ask Mr. Jay if he was not next to the paramedic
20  looking at me trying to scare me.  Ask him.
21  Q.  But let's just agree on one thing.  That statement was
22  written on that document when you signed it?
23  A.  That's correct, I signed it.
24  Q.  Now I want to refer your attention back to the top portion
25  of this exhibit.  Mr. Guzman, you see where it says chief

469

DCBTGUZ3                    Guzman - cross

1    complaint down here?
2    A.  Yes.
3    Q.  And you see it says:  I'm OK.
4    A.  Yes.
5    Q.  You told the EMT that you were OK, right?
6    A.  Yes, I told him that I was OK.  And the reason that I said
7    I was OK is the same reason that I just told you right now.
8            THE COURT:  Hold on.  Simply answer the question that
9    he asked you.
10   Q.  You agree it says I'm OK?
11   A.  Yes.
12   Q.  And Mr. Guzman, you also spoke to Officer Jay at the
13   precinct, is that right?
14   A.  Yes, I spoke to him.
15   Q.  And in fact, you testified that you -- when your attorney
16   asked you that, you told him that you wanted to go home, right?
17   A.  I told him that.
18   Q.  And did you also tell him that you told him to take you
19   home?  Is that true?
20   A.  That's true.
21   Q.  So you wanted the same person who just attacked you out on
22   the street to drive you home?
23   A.  That was the first thing that come up in my mind.
24   Q.  Yes or no?
25   A.  Yes.

470

DCBTGUZ3                          Guzman - cross

```
 1   Q.  You asked the same person who you say attacked you to drive
 2   you home?
 3   A.  I told him yes.
 4   Q.  Yes or no?
 5   A.  Yes.
 6   Q.  OK.  Yes.  You also told Officer Jay that you had a right
 7   leg injury, is that true?
 8   A.  What do you mean?
 9   Q.  Did you ever tell Officer Jay that you were injured?
10   A.  After the fight, yeah, after the fight that he was breaking
11   up, after that, yeah.
12   Q.  I want to show you -- I believe this is in evidence as
13   Defendant's Exhibit A.  Mr. Guzman, you recall being shown this
14   document when your attorney was asking you questions, correct?
15   A.  I remember the document, yes.
16   Q.  And this document has your signature on it, correct?
17   A.  That's correct.
18   Q.  And the document says that the prisoner had injury prior to
19   arrest.  You will agree with me on that?
20   A.  That's correct.
21   Q.  And you agree that that statement that prisoner had injury
22   prior to arrest, that's very damaging to your case, is it not?
23              MS. SMITH:  Objection.
24   A.  I didn't --
25              THE COURT:  That objection is sustained.  Please
```

471
DCBTGUZ3                    Guzman - cross
 1  rephrase the question.
 2  Q.  You also see on this document it says injury and says that
 3  "old" is checked off.  Do you see that?
 4  A.  Yes, I see that.
 5  Q.  But your story is that that entire document was blank when
 6  you signed it?
 7  A.  I signed it up to my signature.  Up and down it was blank.
 8  I'm a hundred percent, Mr. Jay told me, he said if I go to the
 9  hospital, the process, it will be more normal.
10  Q.  So your testimony is that everything above this line right
11  here was on the page?
12  A.  Up to there.
13  Q.  And everything below it was not on the page?
14  A.  It was not on the page.  That space was blank.
15  Q.  So the rest of it was blank?
16  A.  It was blank.
17  Q.  So you'll agree that where it says, "Prisoner refused
18  medical aid, yes," that was on there when you signed it?
19          MS. SMITH:  Objection.
20          THE COURT:  Overruled.
21  A.  I don't remember.
22  Q.  Now you will agree with me that this is a form document,
23  meaning there is some things that don't need to be filled in,
24  they're already on there, like medical treatment of prisoner,
25  where it says prisoner signature, that was on there when you
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

472

DCBTGUZ3                    Guzman - cross

1   signed it, correct?
2            MS. SMITH:  Objection.
3            THE COURT:  Overruled.
4   Q.  Sorry?
5   A.  It was there.
6   Q.  In fact, you knew that that was there because that's where
7   you knew where to sign, correct?
8   A.  Mr. Jay told me to sign it.  I was in pain and I just
9   wanted to leave.
10  Q.  So you were in pain and just wanted to leave, but isn't it
11  true that we just saw in the other document that you told the
12  EMTs that you were OK?
13  A.  I told the EMT, like I told you, that I'm OK because
14  Mr. Jay was there and I was scared.
15  Q.  But you will agree with me that you told the EMTs that you
16  were OK?
17  A.  Correct.
18  Q.  All right.  Mr. Guzman, showing you what is in evidence as
19  Defendant's Exhibit G, have you seen this document before?
20  A.  Yes.
21  Q.  Yes?
22  A.  Yes.
23  Q.  Is that your signature right there?
24  A.  That's my signature.
25  Q.  Was this form blank also when you signed it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

473

DCBTGUZ3                    Guzman - cross

1   A.  I'm not sure.
2   Q.  You don't remember?
3   A.  No.
4   Q.  Well, Mr. Guzman, when you left the precinct, you called an
5   ambulance, is that right?
6   A.  That's right.
7   Q.  And that ambulance came, picked you up, and took you to the
8   hospital?
9   A.  That ambulance came and picked me up and took me to the
10  hospital.
11  Q.  And at the hospital an X-ray was taken?
12  A.  An X-ray was taken.
13  Q.  And then after the X-ray was taken, you were given Tylenol
14  and sent home, is that right?
15  A.  Yes.
16  Q.  Mr. Guzman, isn't it true about four months after this
17  incident you fell, is that true?
18  A.  That's true, I fell in my house, but it was -- nothing
19  happened to me.
20  Q.  You fell when you were home, is that right?
21  A.  You said four months?
22  Q.  Fell, like you fell.
23  A.  My question is you said four months after?
24  Q.  Four months, yes.
25  A.  After the --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

474

DCBTGUZ3                    Guzman - cross

1   Q.  Incident.
2   A.  After the incident, right.
3   Q.  Correct?
4   A.  Yes.
5   Q.  So four months after the incident you were at your home and
6   you fell?
7   A.  I fell.
8   Q.  And the fall occurred before you had your surgery, isn't
9   that right?
10  A.  Before the surgery?
11  Q.  Correct.
12  A.  I think so, yes.
13  Q.  Well, the surgery occurred in October of 2010, didn't it?
14  A.  October 2010.
15  Q.  So that's -- the fall happened well before in 2009.
16  A.  Yes.
17  Q.  Now I had discussed before about a lawyer that had referred
18  you to Dr. Dassa, do you remember that?
19  A.  Yes, I remember.
20  Q.  That lawyer is not Mr. Norinsberg, is it?
21  A.  It's not.
22  Q.  In fact, that first lawyer referred you to Mr. Norinsberg,
23  correct?
24  A.  Yes.
25  Q.  I want to go back to Dr. Dassa for a brief second.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

475

DCBTGUZ3                    Guzman - cross

1   Dr. Dassa is a hand specialist, isn't he?
2   A.  What do you mean "hand specialist?"
3           MS. SMITH:  Objection.
4           THE COURT:  I'll allow it.  Go ahead.  Can you answer
5   that question?
6   A.  What do you mean "hand specialist?"
7   Q.  He specializes in hand injuries, do you know that?
8   A.  Specialize in hand --
9           THE COURT:  Do you know what Dr. Dassa's specialty is
10  in?
11          THE WITNESS:  Yeah, he's a bones, bones broken and
12  stuff like that, that's --
13  Q.  Are you aware he specializes in hands?
14  A.  Maybe, he's a doctor.
15  Q.  And Dr. Dassa is the one who told you you needed surgery,
16  correct?
17  A.  Yes.
18  Q.  But he didn't perform the surgery, true?
19  A.  He made the surgery?
20  Q.  Did he actually do the surgery?
21  A.  No.
22  Q.  So the surgery occurred in October of 2010?
23  A.  October 2010.
24  Q.  '10.
25  A.  Yes.

476

DCBTGUZ3                         Guzman - cross

1   Q.  So that's over a year and a half after the incident on
2   February 14, 2009, right?
3   A.  That's correct.
4           MR. MODAFFERI:  Your Honor, one moment, please.
5           (Pause)
6   Q.  Mr. Guzman, you saw Dr. Dassa a couple of months ago,
7   correct?
8   A.  Couple months ago, yeah.
9   Q.  That's what you testified when your attorney was
10  questioning you.
11  A.  Yes.
12  Q.  But that meeting occurred after you hired him for this
13  lawsuit, isn't it?
14          MS. SMITH:  Objection.
15          THE COURT:  I'll allow it.
16  A.  Can you repeat the question?
17  Q.  Sure.  When you last saw Dr. Dassa, you saw him at that
18  time, that was after you had already hired him for your case,
19  correct?
20          MS. SMITH:  Your Honor, request a side bar.
21          THE COURT:  OK, let's have a side bar.
22          (In robing room)
23          THE COURT:  OK, what's the objection?
24          MR. NORINSBERG:  Judge, I have the objection this is
25  entirely misleading.  He wasn't hired by anybody.  He's a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

477

DCBTGUZ3                    Guzman - cross

1  treating physician for a year and a half.  He had nothing to do
2  with anything until the contact of the trial coming up in terms
3  of if he's willing to testify as a treating physician.  He
4  wasn't hired.  It's misleading to this jury.  And furthermore,
5  this witness would have no knowledge, as this counsel well
6  knows.
7          MR. KUNZ:  Dr. Dassa will testify that he saw
8  plaintiff on November 24, 2013, and the last time he saw him
9  before that was three years before that.  Plaintiff took the
10 stand today and said that he is under Dr. Dassa's care and has
11 been since the incident, and that is not accurate.  Secondly,
12 Dr. Dassa is being paid for his testimony.
13         THE COURT:  What does that have to do with him?
14         MR. KUNZ:  We're laying the groundwork.  It's his
15 case.
16         THE COURT:  The question in terms of asking the
17 plaintiff about the expenses being paid for Dassa?
18         MR. KUNZ:  If he doesn't know, he doesn't know, fine.
19         THE COURT:  I will sustain the objection.  I think
20 it's cumulative.  Aren't you going to ask Dassa the same
21 questions?
22         MR. KUNZ:  Dassa will be asked those questions.
23         MR. MODAFFERI:  My only point there is really is that
24 he saw this doctor a couple months ago, and that was after he
25 was already hired -- he was doing work on this lawsuit, and in

478

DCBTGUZ3                        Guzman - cross
1   fact before that time the last time he saw him was three years
2   before.
3           THE COURT:  I guess one thing that might speed a lot
4   of this up is there are a lot of questions that are being asked
5   that I don't think are necessary to be asked.  Once you lay
6   certain frameworks like in terms of this is a year and a half
7   after this or this is after this, if you want to ask him -- I
8   think it's out there that he saw this doctor a couple of months
9   ago.  If you want to ask him the last time he saw Dr. Dassa
10  before that was whatever that was, doesn't that establish that?
11  We have to get in all -- you're going to ask Dassa about his
12  payment arrangements later, right?
13          MR. KUNZ:  But the problem is it's a little more than
14  that, which is that Mr. Norinsberg met with Dr. Dassa in late
15  October and asked Dr. Dassa if he would testify in this case.
16  Dr. Dassa said:  Yes, I will testify in this case, but can I
17  see the plaintiff again before I testify?  And then he saw the
18  plaintiff again, and now they're trying to present him as a
19  treating physician when in fact he was asked to testify, he
20  said yes, and he examined the plaintiff and now he's
21  testifying.
22          THE COURT:  That doesn't seem to me to be a problem if
23  you want to ask him about this after Dr. Dassa agreed to
24  testify.
25          MR. NORINSBERG:  He's not going to know this.  He's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

479

DCBTGUZ3                         Guzman - cross
 1   not the right witness.  It's not appropriate.
 2             THE COURT:  If he doesn't know he doesn't know, but in
 3   terms of trying to find out whether he's paid an expert with
 4   this witness I think is inappropriate.  If you want to ask him
 5   this is after Dr. Dassa agreed to testify, you're stuck with
 6   his answers.
 7             (In open court)
 8             THE COURT:  That objection is sustained.  I will
 9   strike that last question from the record.
10             Rephrase the question.
11             MR. MODAFFERI:  Yes, Judge.
12   BY MR. MODAFFERI:
13   Q.  So you saw Dr. Dassa a few months ago, correct?
14   A.  Correct.
15   Q.  And you saw Dr. Dassa after he agreed to testify in this
16   case, is that right?
17   A.  I saw him.
18   Q.  And prior to that last visit when you saw Dr. Dassa, you
19   hadn't seen him for three years, is that true?
20   A.  That's true.
21             MR. MODAFFERI:  Your Honor, one moment.
22             (Pause)
23             MR. MODAFFERI:  I have no further questions.
24             THE COURT:  Let me see counsel at side bar to discuss
25   scheduling.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

480
DCBTGUZ3
```
 1              (In robing room)
 2              THE COURT:  Do you anticipate redirect?
 3              MS. SMITH:  Yeah.
 4              THE COURT:  How short?
 5              MS. SMITH:  Pretty brief.
 6              THE COURT:  How brief?
 7              MS. SMITH:  Maybe 15 minutes.
 8              THE COURT:  Let's do that, and then let's see where we
 9      are then, and I'll let the jury go to lunch soon.  If we go
10      after 1:00, that's fine.
11              (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

481

DCBTGUZ3

```
 1              THE COURT:  Any redirect?
 2   REDIRECT EXAMINATION
 3   BY MS. SMITH:
 4   Q.  Noel, did you give a deposition or sworn testimony in
 5   November 23, 2009?
 6   A.  Yes.
 7   Q.  Did you in fact tell the questioner how you were referred
 8   to Dr. Dassa?
 9              MR. MODAFFERI:  Objection.
10              THE COURT:  Sustained.  Please rephrase the question.
11              MS. SMITH:  Sure.  Hold on just a second.
12   Q.  When you were asked about how you were referred to
13   Dr. Dassa, what was your answer?
14   A.  My answer was my friend's mom friends or whatever, he
15   already -- we speak, and he told me that there was a doctor in
16   the Bronx that called Dassa that -- he's a good doctor.  I
17   didn't pay attention to him.  Then, later on, I went to one
18   lawyer, and he told me about Dr. Dassa.  Then I find out that
19   Dr. Dassa, he was a good doctor for my injury.  And my knee.
20   Q.  If I understand correctly, you were first informed by your
21   friend, and then your lawyer later recommended you to the same
22   doctor?
23   A.  Correct.
24   Q.  Noel, were you involved in the fight at all on February 14,
25   2009?
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

482

DCB3GUZ2                      Guzman - redirect
1  A.  I was not involved in the fight, I swear.  I swear, I swear
2  to my mother, I swear for my life I was not involved in that
3  fight.
4  Q.  You positively identified the person who kicked you?
5  A.  Yes.
6              MR. MODAFFERI:  Objection.
7              THE COURT:  I'll allow it.
8  A.  Yes, Mr. Jay was the one who kicked me.
9  Q.  How are you sure that it was Jay and not somebody else
10  involved in the fight that kicked you?
11  A.  Well, when he kicked me first, first I saw his boot.  At
12  the precinct, I saw his boot too.  Then when he got up, when he
13  pulled me up, I saw him.  I saw him in the face.
14  Q.  So from the moment that he took you down to the ground and
15  then pulled you back up, did he ever let go of you so he lost
16  contact with you?
17  A.  Did he lost contact with me?
18  Q.  Yeah.
19  A.  No.
20  Q.  So the minute he pulled you up, were you able to see his
21  face?
22  A.  Correct.
23  Q.  You are sure that's the officer sitting here today?
24  A.  That's the officer 100 percent.
25              MS. SMITH:  Thank you.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

483
DCB3GUZ2                    Guzman - redirect

1            THE COURT:  Anything from defense?
2            MR. MODAFFERI:  No, Judge.
3            THE COURT:  All right.  Thank you.  You are excused.
4    We are going to take our lunch break now.  Let's come back at
5    2:15.  And again, don't discuss the case with anyone and have a
6    good lunch.
7            (Jury excused)
8            MR. NORINSBERG:  Just remember I had that application,
9    your Honor.
10           THE COURT:  Sure.
11           MR. NORINSBERG:  Just briefly, Mr. Molina is going to
12   be here in the afternoon.  He had remarkably poor memory.  He
13   had a very poor memory at the time of his deposition of many,
14   many facts involved in this incident.  I don't want the jury to
15   hear about this subsequent accident he had in May, because I
16   think it is going to allow for the excuse you had this accident
17   later on, and that's why he can't remember things.  I feel it
18   is totally irrelevant.  He is medically capable of coming in
19   here.  He has no problems.  We never heard from any doctor he
20   can't testify.  So I just don't think that fact should be
21   presented to the jury.
22           THE COURT:  You are saying that you believe that
23   Molina is going to come in -- is Mr. Molina here?  Is he in the
24   audience?
25           MR. KUNZ:  He should be soon.

484

DCB3GUZ2

 1              THE COURT:  Is he here?  I want to make sure he is
 2   excused.
 3              MR. KUNZ:  He is not in the courtroom, no.
 4              THE COURT:  So your concern is Mr. Molina had an
 5   accident after he was deposed?
 6              MR. NORINSBERG:  Yes, he had an accident in May.  The
 7   defense counsel originally said that they were trying to just
 8   read in his testimony because he's medically unavailable.
 9              THE COURT:  I understand.  I remember that.  The
10   accident happened after the deposition.
11              MR. NORINSBERG:  Well after the deposition, yes.
12              THE COURT:  Your concern is that Molina is going to
13   say he can't remember things because of the accident.
14              MR. NORINSBERG:  Exactly.  Exactly.  And he just
15   couldn't remember anything really of substance at the
16   deposition.  So many things he couldn't remember.  And I don't
17   think the jury should hear about this accident or that he was
18   in the hospital for several months and all this.  It has
19   nothing to do with his credibility as established by way of
20   what he testified to at his deposition.  Which is what I am
21   going to be cross-examining him about.  That's all we have to
22   go off of, is what he actually testified at the deposition.
23              THE COURT:  I understand.  The primary matter is his
24   testimony here in court.
25              MR. NORINSBERG:  I understand.  If there was any

485

DCB3GUZ2
1  medical issue that would have compromised his memory in any way
2  I'm sure defense counsel would have had some type of doctor's
3  note and that would have been made him unavailable and we would
4  have had to read his testimony.
5           THE COURT:  Let me hear from defense counsel.
6           MR. KUNZ:  I don't understand the application.  He's
7  got the deposition.  I think it was quite detailed.  If he
8  wants to try to suggest otherwise, he can use the deposition.
9  But the fact of the matter is the witness had an accident, and
10 was injured, and if that affects his ability now to remember
11 things, that's a totally fair topic.
12          THE COURT:  When was the accident?
13          MR. KUNZ:  May of this year.
14          THE COURT:  What kind of accident was it?
15          MR. KUNZ:  Car accident.
16          THE COURT:  What was the nature of the car accident?
17          MR. KUNZ:  Well, I believe it was very bad, your
18 Honor.  He was struck by a vehicle and he was in the hospital
19 until October of this year.
20          THE COURT:  Was he a pedestrian?
21          MR. KUNZ:  Yes.  What it comes down to, your Honor,
22 he's subpoenaed.  He's not under my control.  He's coming in
23 today and I am going to ask him questions, and I don't intend
24 to go into the car accident.  But if he starts to say, oh, I
25 don't really remember and that I need to refresh his
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

486

DCB3GUZ2

1  recollection with his deposition, it is totally fair to explain
2  to the jury why his memory has gotten worse since his
3  deposition until today.
4              THE COURT:  How long was he in the hospital for?
5              MR. KUNZ:  May to October.  Four or five months.
6              THE COURT:  It certainly may be relevant if he's had
7  some sort of head trauma that is causing him some memory loss,
8  that certainly seems appropriate for him to say that, if that
9  is in fact what he is going to say.  Counsel can certainly
10  cross-examine him about that and bring out the fact he doesn't
11  have any doctors' notes or medical evidence of that.  It may
12  open the door to him saying other things.
13             It is not particularly relevant about how severe this
14  injury or how long he was in the hospital and how much pain he
15  was in, because that seems like that may just engender some
16  sympathy for this witness.  That's a little inappropriate.
17             The fact is if he believes that because he hurt his
18  head or whatever and he has some memory problems, that's fine.
19  I am not exactly sure also from plaintiff's counsel's
20  perspective, how you're prejudiced by this if your claim is
21  going to be for this witness if this witness gets on stand and
22  says I'm sorry I hit my head, I don't remember anything.  And
23  you bring out the fact he didn't remember anything in his
24  deposition either.  I don't know what the heck the prejudice is
25  there.

487

DCB3GUZ2

1           MR. NORINSBERG:  With the proviso you just added where
2   we are not getting into details about the accident, how long he
3   was in the hospital, what his injuries were.  Just the fact he
4   had some accident.  That was much different.  I was concerned
5   about putting all of this evidence before the jury about the
6   other accident.
7           THE COURT:  I understand that.  It seems to me it
8   might be appropriate if he is going to claim that he had an
9   accident, certainly appropriate for the jury to know if he is
10  going to say this is the reason he can't remember something,
11  when the accident was and that his head was injured, but not
12  get into anything else.
13          I know this witness is under subpoena.  It may be
14  appropriate for counsel to just let this witness know about the
15  Court's ruling so this witness doesn't start on his own
16  blurting out all these sorts of things about how he was in the
17  hospital forever and had all these horrible injuries.
18          MR. KUNZ:  Well, I mean, I don't have control over
19  this witness.  I haven't prepped him for this trial.  We
20  subpoenaed him.  So if I ask a question and he blurts out that
21  answer, if you are asking me to give him an instruction.  I
22  have no intention of affirmatively asking about the accident.
23  If, however, I'm getting a lot of answers "I don't remember
24  that" and I'm needing to refresh him with his deposition to get
25  him back to that testimony, I feel it is totally fair to

488

DCB3GUZ2

1    explain to the jury that he had this traumatic event after his
2    deposition and that's why his memory isn't as good now as it
3    was at the deposition.
4              THE COURT:  For who to explain it?
5              MR. KUNZ:  For me to ask questions to get that
6    information in front of the jury.  If I'm asking him questions
7    that he definitively answered at his deposition and I need to
8    go and refresh his recollection with his deposition testimony
9    and then he says, oh, yes, now I remember this and this
10   happened.  Mr. Norinsberg is going to argue on closing that's
11   just making this all up and that's why he didn't remember, when
12   there is another explanation.  And we have a right to put that
13   explanation before the jury.  He had a traumatic event and that
14   would explain why his memory is no longer as strong.
15             So I frankly don't understand the application at all,
16   and I feel like it could be dealt with on a
17   question-by-question basis.  This may never come up.  If it
18   does, we could do a side bar and or Mr. Norinsberg could object
19   to any particular question.
20             THE COURT:  Again, I think it is fair for the jury to
21   find out that this witness, if it is relevant to this witness's
22   testimony, that the witness had some sort of head trauma, and
23   because of that the witness has difficulty remembering things.
24   That's fine.
25             My big concern is I don't want this witness to start

DCB3GUZ2

```
 1    blurting out that he was in traction for four months and that
 2    he's had all these other horrible injuries and he saw his life
 3    flash before his eyes.  That's what I'd like to prevent.  I am
 4    asking counsel for suggestions.  I suppose I can try to do that
 5    from the bench, and I'm certainly willing to do that.  I was
 6    just trying to find out from counsel.
 7            MR. KUNZ:  That seems to be a different application
 8    than what Mr. Norinsberg was making.  I will absolutely do the
 9    best I can to control the witness but again --
10            THE COURT:  What I was saying before in terms of what
11    was going through my mind is the first part of what
12    Mr. Norinsberg was asking for I am going to deny in terms of
13    not having any mention of any kind of medical condition in
14    general.  Medical trauma or this head injury that might cause a
15    lack of memory.  I think that's appropriate.  I don't want to
16    get into what kind of injury it was and how traumatic the
17    injury was and how long he was in the hospital.  I think that's
18    unnecessary.
19            MR. KUNZ:  I understand.  Quite frankly, I don't think
20    this is going to come out during my examination.  I think it
21    may come out during Mr. Norinsberg's, depending on the
22    questions Mr. Norinsberg asks.  If the witness wants to answer,
23    ends up answering the question, we have no control over his
24    testimony.  So, I want to --
25            THE COURT:  Sounds like I'll try my best to control
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

490

DCB3GUZ2

```
 1   this from the bench.
 2           MR. NORINSBERG:  I would ask perhaps before the jury
 3   is brought back, the witness is put before your Honor and your
 4   Honor gives him that instruction upfront.
 5           THE COURT:  What is defense counsel's position on
 6   that?
 7           MR. KUNZ:  What would the instruction be?
 8           THE COURT:  I'd give the instruction that -- I guess
 9   here's where the problem comes in.  I suppose the instruction
10   that plaintiff's counsel asking for is an instruction that if
11   it is necessary for you to talk about the accident, I don't
12   want you to talk about the details of that accident.  What
13   caused the accident, and how long you were in the hospital, but
14   you can certainly talk about memory loss.
15           The thing that seems odd to me is then we're now in a
16   position of I'm suggesting an explanation for this witness that
17   this witness may not need.
18           MR. NORINSBERG:  All I would ask your Honor is just
19   preemptively to say we understand you were in a very serious
20   accident, we don't want to get any details about this accident
21   in this case.  So please do your best not to refer in any way
22   to the accident or treatment.  And if it comes up because he
23   talks about memory loss on his own from the accident, then
24   that's fine.
25           THE COURT:  I think that instruction is too general.
```

491

DCB3GUZ2

1   That instruction is too big.  This witness is going to feel
2   that the witness can't say that I have memory loss because of
3   this accident, which I think would also be unfair.
4           MR. KUNZ:  I think that's right, your Honor.  But also
5   the scope of his treatment for this injury is relevant to this
6   hypothetical scenario where -- Mr. Molina, could you wait out
7   in the hallway?  Sorry, sir.  Thank you.  That was Mr. Molina.
8           So the scope and nature of the treatment that he
9   received is relevant to this hypothetical scenario where he no
10  longer remembers as well now as he did at his deposition
11  because of the fact that he was in a coma for a period of time.
12  The fact he was in the hospital for four to five months all is
13  relevant to a jury's assessment of whether or not it is
14  credible for him to his explanation of why he doesn't remember
15  as well now.  The jury needs to assess if that's a credible
16  statement.  If he just says, oh, I had this accident and I hurt
17  my head and that's why, that's not providing the jury with the
18  details they need to assess the credibility of that claim.
19          But, again, it is totally hypothetical.  If it comes
20  up, I really feel we can deal with this on a
21  question-by-question basis.
22          THE COURT:  What's plaintiff's counsel's response to
23  that?
24          MR. NORINSBERG:  I don't have any problem with dealing
25  with it on a case-by-case basis.  But I wanted to flag the
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

492

DCB3GUZ2

1    issue in advance because I didn't know what counsel's
2    intentions were, what the Court's view was on this issue.  But
3    we can address it if it comes up.  Maybe it is all
4    hypothetical.
5              THE COURT:  Okay.  Who knows what will happen, but my
6    sense is this may very well may be hypothetical.  If there is
7    this real medical issue, he may not remember a lot of things.
8    There have been several witnesses in this case who don't
9    remember a lot of things and their recollection is refreshed,
10   so I guess we'll just play it by ear.
11             I think defense counsel does make a good point.  There
12   may be other things in terms of the course of treatment that
13   may be relevant to memory loss but we'll wait and see.  I can
14   certainly, if necessary, give -- I am not even sure a curative
15   instruction is necessary in this case.  I was worried about
16   some sort of sense of sympathy or things of that nature.  I am
17   not sure how that will play out.  Let's play it by ear and see
18   what happens.  Okay.
19             See you everyone at 2:15.  After Mr. Molina, we don't
20   have any other witnesses today?
21             MR. KUNZ:  No, your Honor.
22             THE COURT:  Okay.  See everyone at 2:15.
23             (Continued on next page)
24
25

493

DCB3GUZ2

```
 1                        AFTERNOON SESSION
 2                          2:15 p.m.
 3             MR. KUNZ:  Just one issue related to what we were
 4    talking about just before the lunch break.  When I saw
 5    Mr. Molina in the hallway, I realize he walks with a cane and I
 6    don't want the jury to think that there is no way he was
 7    fighting that night because he's now walking with a cane.  So I
 8    just want to establish briefly I saw you walked in with a cane,
 9    did you walk with a cane at the time.  Just to make sure his
10    physical condition now is not the same as it was that night.
11             MR. NORINSBERG:  I don't know why that needs to be
12    brought out at all.  Why not put him on the witness stand and
13    bring the jury in.  Why do we have to get into his medical
14    condition that he is using a cane.  Why is that relevant to
15    this jury.
16             THE COURT:  He is going to walk in here with a cane.
17    I think that's appropriate to bring out the fact he is in a
18    different state than he is now.  There seems to have been
19    several questions of every witness, no matter what their age,
20    what their height is now, what was their height then.  Most
21    people don't tend to grow a lot.  It seems appropriate to ask
22    about somebody's physical condition now as opposed to how it
23    was back then.
24             MR. KUNZ:  Just the other issue is that this is our
25    witness for our case.  So I don't know if I feel like we should
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

494

DCB3GUZ2
1  give the jury --
2              THE COURT:  I can tell the jury that sometimes we take
3  witnesses out of order, you shouldn't draw any inferences from
4  that because of scheduling issues.
5              MR. KUNZ:  Thank you, your Honor.
6              THE COURT:  Let's bring them in.
7              (Jury present)
8              THE COURT:  I hope you had a pleasant lunch.  We're
9  going to have another witness.  Now, sometimes witnesses are
10  called out of order due to scheduling issues.  So sometimes
11  that happens.  You shouldn't draw anything from that.
12             Does the defendant have a witness then?
13             MR. KUNZ:  Yes, your Honor.  The defendants call
14  Alberto Molina.
15             THE COURT:  For the jurors, if you're more comfortable
16  moving around, there's nothing we can do about the glare.
17             THE DEPUTY CLERK:  Please remain standing while I
18  swear you in.
19   ALBERTO MOLINA,
20       called as a witness by the Defendant,
21       having been duly sworn, testified as follows:
22  DIRECT EXAMINATION
23  BY MR. KUNZ:
24  Q.  Thank you for coming this afternoon, Mr. Molina.  Now, were
25  you subpoenaed to testify today?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

495
DCB3GUZ4                    Molina - direct
1    A.  Yes, sir.
2    Q.  You also gave a deposition in this case, is that correct?
3    A.  Yes, sir.
4    Q.  Were you subpoenaed to testify at that deposition?
5    A.  Yes.
6    Q.  Was I the one who issued both the subpoenas for the
7    deposition and the trial?
8    A.  Yes, sir.
9    Q.  Has anyone told you what to say at this trial?
10   A.  No, sir.
11   Q.  I noticed you walked in with a cane.  Did you use that cane
12   in February of 2009?
13   A.  No, sir.
14   Q.  So, is it fair to say that your physical condition has
15   changed since then?
16   A.  Yes, sir.
17   Q.  On the night of February 14, 2009, did you have any
18   physical conditions that made it difficult for you to walk or
19   anything like that?
20   A.  No, sir.
21   Q.  On the night of February 14, 2009, did you go to a club
22   called the Red Lounge?
23   A.  Yes, sir.
24   Q.  Who did you go with?
25   A.  With Jorge Henriquez.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

496

DCB3GUZ4                    Molina - direct

1  Q.  Have you spoken to Mr. Henriquez since this incident
2  happened?
3  A.  I have spoke to him after the accident.  But, I haven't
4  seen him in the past six, eight months.
5  Q.  Do you know someone named Jocelin Ramon?
6  A.  No, sir.
7  Q.  Do you know someone named Jose Sierra who goes by the
8  nickname Biggy?
9  A.  No, sir.
10  Q.  Do you know the plaintiff in this case, Noel Jackson
11  Guzman?
12  A.  No, sir.
13  Q.  What time did you -- I'm sorry.  Withdrawn.
14          Why did you end up at the Red Lounge on the night of
15  February 14, 2009?
16  A.  Me and Jorge are friends.  And we decided to go to Red
17  Lounge because we knew the promoter there and we went to the
18  club and we had a few drinks and that's it.
19  Q.  What time did you arrive at the club that night?
20  A.  I don't recall but somewhere after 11.
21  Q.  After 11 at night?
22  A.  Yes, sir.
23  Q.  Before you went to the club that night, did you have
24  anything to drink?
25  A.  No, sir.

497

DCB3GUZ4                    Molina - direct

1   Q.  Before you went to the club that night, did you get
2   together with a group of friends at all?
3   A.  I was with some friends, but I did not go with them to the
4   club, I just went with Jorge.
5   Q.  The friends you were with before you went to the club, did
6   you have anything to drink with them?
7   A.  No, sir.  I don't recall.  But I might have because I was
8   going out.  But I don't recall having anything to drink.
9           THE COURT:  Hold on a minute.  Can all the members of
10  the jury hear the witness okay?  All right.  Go ahead.
11  Continue.
12  Q.  Then, when you arrived at the club, did you have anything
13  to drink?
14  A.  In the club I did have something to drink.
15  Q.  Can you just describe to the jury what you did in the club.
16  A.  I ordered a bottle, me and Jorge.  We was drinking a
17  bottle.  We was listening to some music.  We was drinking the
18  bottle, and we said hello to the promoter.  We happened to know
19  some of the bouncers, because it was not the first time that I
20  went to that club.  And I did know some of the bouncers.  And
21  that's about it.
22  Q.  Could you describe what it was like inside the club that
23  night.
24  A.  It was pretty much packed.  It was a lot of people I would
25  say.  But it was still some room to walk around and move

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

498

DCB3GUZ4                    Molina - direct

1   around.
2   Q.  Did anything happen inside the club while you were having
3   drinks?
4   A.  With me?  I didn't have no incident with nobody.  Jorge, I
5   don't think so neither because he would have told me.  And if
6   he did have something, and he kept it to himself, I can't
7   testify for that.  But I don't recall him having any problem in
8   the club.
9   Q.  So, nothing happened with you or with Jorge.  But did you
10  see anything in the club happen?
11  A.  No.  It was a pretty calm night.
12  Q.  Did you see any dancers or anything like that in the club?
13  A.  No.  No dancers.  It was people dancing, but no, there was
14  no special guest dancing, no, like that.
15  Q.  Did you see any arguments or disputes in the club at all?
16  A.  No.  No, sir.
17  Q.  Did there come a time when you left the club that night?
18  A.  Yes, I did leave with Jorge.  I had received a phone call
19  by a friend and we were going to meet up with her.
20  Q.  About what time did you leave?
21  A.  Closing time.  I'm not sure what time it was closing.  I
22  think it was like 2 a.m.
23  Q.  If I told you that clubs close at 4 a.m., would that make
24  sense?
25          MR. NORINSBERG:  Objection.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

499

DCB3GUZ4                      Molina - direct

1              THE COURT:  Sustained.
2     A.  That would make sense.
3              THE COURT:  Don't answer that question.
4     Q.  Setting aside the exact time, what happened when you went
5     outside the club?
6     A.  I happened to see both of the guys and me and my friend
7     Henriquez was talking, and those guys was talking about they
8     had an argument with somebody inside the club.  And I happened
9     to glance at them.  And they looked at us and we were like, it
10    wasn't with us, right?  And they said no.  And then they
11    happened -- we saw them get in the taxi on Sherman Avenue and
12    207.  When they crossed the street towards the Bronx, towards
13    Post Avenue, they jumped out of the cab and they came straight
14    at us and that's when the fight started.
15    Q.  So, I want to talk about that a little more slowly.  You
16    get out of the club and you said that you're standing there
17    with Jorge.  And two guys come up to you.  Is that right?
18    A.  No.  They was just talking.  They was having a conversation
19    about an incident that they had inside with some guys.  And I
20    happened to glance at them, and they looked at me, and I said
21    it wasn't with me.  So I just kept walking and they happened to
22    go across the street, got in the taxi, like I said.
23    Q.  Those two guys that you had this initial conversation with
24    outside the club, do you know the names of those men?
25    A.  No, I don't even remember seeing them in the club.  And

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

500

DCB3GUZ4                      Molina - direct

1   they said they was in the club.  I was pretty much by the VIP
2   section, and I didn't walk around too much.
3   Q.  You don't know the names of the men that you had this
4   conversation with outside the club?
5   A.  No.
6   Q.  Do you see one of those men in the courtroom today?
7   A.  No, sir.
8   Q.  You said you gave a deposition in this case?
9   A.  Yes, sir.
10  Q.  Do you recall at that deposition looking at a photograph?
11  A.  Yes, sir.
12  Q.  What did you say about the photograph at your deposition?
13  A.  That I recall one of those guys.
14  Q.  I am going to show you a picture that's in evidence as
15  Defendant's Exhibit 1J and tell me if you recognize this
16  photograph.  Do you recognize the photograph?
17  A.  I guess because it is daytime.  It looks lighter.  But I
18  thought he was a little darker.  He did have braids, so it
19  looks like he got long hair.
20  Q.  This was Exhibit A from the Molina deposition on 4/24/12.
21  What did you tell me about the man in this photograph at your
22  deposition?
23  A.  I said he did look familiar.  But I mean, it's been such a
24  long time I'm not too sure.  But he does look familiar.  I
25  don't know exactly if that's the same guy.  But he does look
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

501

DCB3GUZ4                          Molina - direct

```
 1  like the guy.
 2  Q.  So, the deposition that you gave in this case was on
 3  April 24, 2012.  Is that correct?
 4  A.  I think, yes, sir.
 5  Q.  I want to refer everyone to page 56 of the deposition,
 6  lines 15 to 17.  Before I do that, at that deposition, before
 7  you testified, you took an oath to tell the truth just like the
 8  oath you took here today?
 9  A.  Yes.
10  Q.  The testimony you gave at the deposition, that was accurate
11  testimony?
12  A.  Yes, sir.
13  Q.  So, page 56, lines 15 through 17.
14             MR. NORINSBERG:  Objection, your Honor.
15             MR. KUNZ:  Actually, could we do a side bar?
16             THE COURT:  Yes.
17             (At the side bar)
18             MR. KUNZ:  So, I think Mr. Norinsberg's objection is
19  going to be this question does indeed contain a hearsay
20  statement in it.  So the question is:
21  "Q.  How sure are you that the light-skinned guy who you
22  claim -- well, who Jorge told you he knocked out during the
23  altercation was the same person in this picture?
24  "A.  How sure am I that this is the guy that Jorge knocked out?
25  "Q.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

502

DCB3GUZ4                      Molina - direct
1    "A.  100 percent sure that's him."
2           So, I have no intention of getting the hearsay out.
3    So I'm willing to omit the hearsay statements from the question
4    and answer.  So we could read it:
5    "Q.  How sure are you that the guy in this photo was the same
6    person you saw in the altercation?
7    "A.  How sure am I that this is the guy?
8    "Q.  Yes.
9    "A.  100 percent sure that's him."
10          MR. NORINSBERG:  I just don't think he can do that.
11   He can't materially alter questions and answers to suit
12   counsel's needs here.
13          THE COURT:  Read the portion in total again.
14          MR. KUNZ:  We could do the question right before then.
15   He asked me to repeat the question right before.
16   "Q.  And now looking at Molina Exhibit A, how sure are you that
17   the light-skinned guy who was in the altercation with your
18   friend Jorge is the same person in this picture."  Then he says
19   repeat the question and then I repeat the question where I put
20   in that Jorge told you he was knocked down during the
21   altercation and then he says yes, 100 percent sure.
22          MR. NORINSBERG:  The guy that Jorge knocked out.
23          THE COURT:  Read that portion again, the hearsay.  The
24   whole portion.
25          MR. KUNZ:  The hearsay portion is "How sure are you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

503

1  that the light-skinned guy who you claim, well, who Jorge told
2  you he knocked out during the altercation was the same person
3  in this picture?
4  "A.  How sure am that I this is the guy that Jorge knocked out?
5  "Q.  Yes.
6  "A.  100 percent sure that's him."
7          THE COURT:  You're trying to establish that this is
8  the person who he identified as the guy who was involved in the
9  fight with his friend Jorge?
10         MR. KUNZ:  Right.
11         THE COURT:  So, why don't you start perhaps by asking
12  him that question directly, because I am not sure you've
13  actually directly asked him that question about the person in
14  the fight with Jorge.  There has been some testimony about a
15  conversation between Mr. Molina, Jorge, and two other
16  individuals.  I'm talking about at trial, I am not talking
17  about what's in the deposition.  I am talking about his trial
18  testimony.
19         MR. KUNZ:  So I could do a different section here.  I
20  could do page 28, line 23:  Now, do you recognize the person
21  shown there in the photograph?
22  "A.  Yeah, he was the light-skinned guy.
23  "Q.  So that was the guy that you fought with?
24  "A.  No.
25  "Q.  That was the guy Henriquez fought with?

504

DCB3GUZ4                          Molina - direct

1    "A.  Yes."
2              THE COURT:  Okay.  What's your objection to that?
3              MR. NORINSBERG:  Just give me the lines again.
4              MR. KUNZ:  28, line 23 -- page 28, line 23.  At 20,
5    sorry.  Page 28, line 20, to page 29, line four.
6              MR. NORINSBERG:  I don't have an objection to that.
7    That section is okay.
8              THE COURT:  Okay.  All right.
9              MR. NORINSBERG:  Is there going to be a predicate
10   question?
11             MR. KUNZ:  Yes.  We can do a predicate question.  And
12   also at this point, I think I do need to go into explaining why
13   his memory is not as good now as it was then.
14             MR. NORINSBERG:  The witness hasn't said that.
15             THE COURT:  Well, when you say explain, what do you
16   mean?  This is your witness, right?  I am giving you a little
17   latitude with leading him.  You can ask him an open-ended
18   question about his memory.  But for you to start leading him
19   and saying to him about his medical condition and whatever the
20   case may be and that's why you don't remember, he is your
21   witness.
22             MR. KUNZ:  I understand, your Honor.  So I guess we
23   can start with the open-ended questions and see where it leads
24   us.  But I do feel like at this point it is fair to ask him if
25   he has injured his head since the incident.  And if he feels

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

505

DCB3GUZ4                    Molina - direct

1   has that affected his ability to testify at all.
2           THE COURT:  I think you probably need to go back a
3   little further than that.  You can ask him how is your memory
4   today about this incident.  See what he says.  And then take it
5   from there.  If he says my memory is great or he says, well, it
6   is about the same as it was at the deposition, move on.  First
7   let's deal with this.  Make sure you ask that first question
8   and then you can go to that part of the transcript.
9           MR. KUNZ:  The first question being what?
10          THE COURT:  I don't believe this witness has testified
11  at this point about the actual fight that he and Jorge got
12  into.  He testified that some people came running out from a
13  cab, they said something, and he said that's when the fight
14  happened.  He didn't say he was in a fight.  He didn't say
15  Jorge was in a fight.  That's when the fight happened is my
16  recollection of the testimony.
17          MR. NORINSBERG:  Your Honor, just ask also the
18  photograph, unless it is being used in questioning by counsel,
19  should be taken down.
20          THE COURT:  Okay.  Why?
21          MR. NORINSBERG:  It gives an unfair opportunity for
22  the witness to look at the photograph, look at my client, and
23  basically he was asked to make an identification in court which
24  he failed to do.  And I think if he has questions, of course he
25  can ask him about the photograph.  But just to leave it up

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

506

DCB3GUZ4                        Molina - direct

```
 1    indefinitely for the witness I feel is prejudicial to me.
 2              THE COURT:  How?  The witness cannot make an in-court
 3    ID.
 4              MR. NORINSBERG:  Why should it be up there?  What is
 5    the purpose of why would you leave any piece of evidence just
 6    on the Elmo.
 7              MR. KUNZ:  I want to ask him questions about it.
 8              MR. NORINSBERG:  I just said if you want to ask him
 9    questions about it.
10              THE COURT:  I am still trying to figure out what are
11    you concerned about.  He is going to say what?
12              MR. NORINSBERG:  He is going to start looking at this,
13    and it is unduly influencing him.  Like a show up basically
14    just seeing one picture.
15              THE COURT:  You can cross him about that.
16              (In open court)
17              THE COURT:  Please rephrase the question.
18    BY MR. KUNZ:
19    Q.  I would like to take a step back and come back at this.  So
20    before when I was asking you questions, you mentioned that a
21    fight broke out, so I just want to focus on that for a moment.
22    So, when you got outside the club, can you describe what the
23    scene was like?  What did it look like outside?
24    A.  Okay.  The bouncers, when people was getting out, they was
25    making sure everybody just went home, got up in front of the
```

507

DCB3GUZ4                      Molina - direct

1    club.  They was trying to maintain the peace.  Trying to get
2    everybody out the club.
3              And we, like I said, I received a phone call.  We was
4    going to meet with up with a girl that I had knew.  And we was
5    calling her.  Before that, I called.  That's when I had the
6    incident with the argument back and forth with the guy, and
7    then I said, you know, it's not us.  You know, that happened
8    inside the club.  I don't even remember seeing them in the
9    club.  You guys deal with whoever you got a problem with.
10             We went to the corner, we started making our phone
11   call.  We was talking -- I was talking to the girl.  And they
12   crossed the street, they got in the taxi.  They cross, towards
13   the Bronx, and they got off the taxi, and they came towards us.
14   Q.  Let me stop you there for a second.  So, what you are
15   saying is the two men who originally had this conversation was
16   outside the club?
17   A.  Yes.
18   Q.  They got into a taxi, drove a short distance, and then got
19   out of the taxi?
20   A.  Yes.
21   Q.  When they got out of the taxi, what did they do?
22   A.  They started approaching us, me and my friend Jorge.  My
23   friend Jorge stepped to the left.  To the left.  And I stood to
24   the right.  I was by the walkway and one guy approached me, and
25   the other guy approached the other guy, then after that, I

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

508

DCB3GUZ4                        Molina - direct
 1   engaged into a fight with the guy in front of me.  I couldn't
 2   see what the guy was doing with my other friend.  But, they was
 3   fighting obviously.  Then, I saw a police officer come --
 4   Q.  I want to ask you about the police officers, but let me
 5   just stop you there for a second.  When you were standing there
 6   on the corner making your phone call, and you were watching the
 7   taxi go a short distance and then stop.  You said these two men
 8   got out of the taxi and came towards you?
 9   A.  Yes, sir.
10   Q.  Were you looking at them?  Were you watching them when they
11   got out of the taxi and came towards you?
12   A.  I don't recall exactly how it happened.  But, I did -- I
13   think Jorge noticed them get out of the taxi, and he told me
14   that they're coming towards us.  And I look, and then we focus
15   into the two guys.  And like I said, he stepped to the left, I
16   stepped to the right, we was at a short distance, and they came
17   towards us.  And I defend myself as best as I could and so did
18   my friend Jorge.  And then the fight got stopped by the police
19   officers.
20   Q.  So can you describe how the police officers stopped the
21   fight?
22   A.  To be honest, I think they said "stop."  And I noticed it
23   was a police officer, so I stopped.  They told me to get on the
24   ground, don't move, or you know, normally they'll have to use
25   some force if you keep fighting.  So, I knew that.  It wasn't
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCB3GUZ4                          Molina - direct

1    my first time fighting in the street.  It was not my first time
2    getting arrested for a fight.  So I know that I had to maintain
3    my order and do what they said.  So I got handcuffed, me and my
4    friend Jorge got handcuffed.  Before that, they had sprayed us
5    with some -- some -- spray in the eyes, and it was burning my
6    eyes and I was basically blind.
7    Q.  So, the fight that you were in ended when you said you got
8    sprayed in the face with pepper spray?
9    A.  Pepper spray, yes.
10   Q.  Then you got arrested?
11   A.  Yes, sir.
12   Q.  How long did your fight last?  The fight that you were
13   involved in?
14   A.  I would say about a minute.  Minute and a half.  That's me
15   just taking a guess because I pretty much threw about two,
16   three punches towards him and so did he.  So, the fight was
17   over pretty quick, and the police officers was -- they came
18   really quick.  I don't know where they was at.  I didn't notice
19   it.  And that's it.
20   Q.  So, the two men that you saw getting out of the taxi and
21   then coming towards you and your friend.  Had you ever seen
22   them before that night?
23   A.  No, sir.
24   Q.  Did you know them or know who they were or anything like
25   that?

510

DCB3GUZ4                    Molina - direct

1   A.  No, sir.
2   Q.  I want to put back up Defendant's Exhibit 1J which is this
3   photograph here.  Can you just tell me again do you recognize
4   the person in this photograph?  Would you recognize the person
5   in this photograph?
6              MR. NORINSBERG:  Objection.
7              THE COURT:  Overruled.
8   A.  Being that it was such a long time ago, I'm not going to
9   just say yes it was him.  But I cannot say it was not him.  But
10  he does look really familiar.
11  Q.  If I showed a section of your deposition, would that
12  refresh your recollection?
13             MR. NORINSBERG:  Objection.
14             THE COURT:  Overruled.
15  A.  Maybe it will, yes.
16  Q.  I'm going to have the witness read, and I'm going to have
17  you read it to yourself, not out loud.  I guess, we'll start
18  with page 56 -- sorry.  56, lines 15 through 17.  Again, just
19  read these to yourself, not out loud.  So page 56, lines 15
20  through 17.  Why don't you start up here at line six.  And read
21  down to --
22  A.  Okay.
23             (Pause)
24  Q.  I also want you to take a look at page 28 of your
25  deposition, lines 20.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

511

DCB3GUZ4                          Molina - direct
1                   (Pause)
2      Q.  When you get to the bottom of the page, just turn it and
3      read the first four lines there.
4                   (Pause)
5      A.  The first four lines.
6      Q.  Thank you.  After reviewing those two sections of your
7      deposition, does that refresh your recollection about who the
8      gentleman in this photograph is?
9      A.  Yes.
10     Q.  Who is the gentleman in the photograph?
11     A.  He was the guy engaged in the fight with Henriquez.
12     Q.  So when you say he was guy that was -- before we do that.
13     You said before that your deposition was April 24, 2012?
14     A.  Yeah.
15     Q.  So that's over a year ago year and a half ago?
16                 MR. NORINSBERG:  Objection.
17                 THE COURT:  Overruled.
18     A.  Yes.
19     Q.  The incident happened in February of 2009, is that correct?
20                 MR. NORINSBERG:  Object to counsel leading.
21                 THE COURT:  Overruled.
22     A.  Yes, sir.
23     Q.  So, how strong, sitting here today, how strong is your
24     memory of what happened during the incident?
25     A.  Percentage-wise, I would say 50 percent.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

512

DCB3GUZ4                    Molina - direct

1  Q.  At your deposition, was your memory stronger or weaker
2  or --
3  A.  It was, I would say, definitely stronger.
4  Q.  Why is it that your memory has gotten worse over time?
5           MR. NORINSBERG:  Objection.
6           THE COURT:  Overruled.
7  A.  The reason is, I don't know if anybody knows, but on May of
8  this year, I got hit by a car and I spent six months in the
9  hospital.  And I had a head injury and I had a leg injury.  And
10 at this point, I'm going to therapy to try to walk.  And the
11 doctors said that for me to do what I just did here, walk in
12 here, would be like a miracle.
13          MR. NORINSBERG:  Strike as non-responsive.  I also ask
14 for a curative instruction from the Court.
15          THE COURT:  I will strike as non-responsive.  We'll
16 strike that as non-responsive.
17          The question is about your memory.  And the question
18 is you said that your memory is worse today than it was then.
19 Is that correct?
20          THE WITNESS:  No, it is incorrect.  I wouldn't say
21 worse, because that's like saying that that's bad.  And it is
22 not bad.  It is just, it is not fresh because of the car
23 accident that I just received.
24          THE COURT:  Okay.
25          THE WITNESS:  So a lot of things are not too clear.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

513

DCB3GUZ4                      Molina - direct

1    You want to say worse, you can say worse.  But I wouldn't say
2    worse.  Because I do remember just having a fight with these
3    guys.  And if I make eye contact with you, and get into an
4    argument with you, and the argument lasts 30 seconds, I
5    wouldn't remember your face.
6               THE COURT:  Listen to my question.  I am not asking if
7    your memory is the worst of anybody's memory.  I am asking you,
8    you indicated that your memory today of what happened back then
9    is about 50 percent, right?
10              THE WITNESS:  Yes.
11              THE COURT:  You said your memory at the time of the
12   deposition would have been stronger, right?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  Why is your memory at about 50 percent?
15   Focus on your memory.  Not any other physical problems that you
16   have that might not be related to your memory.  If there is any
17   reason that your memory would be 50 percent today, which is
18   less than it was then, please tell us that.
19              THE WITNESS:  The reason is it's been a long time.
20   Number two is I wanted to erase that from my memory, because I
21   was the one that was attacked, and I was incarcerated, and I
22   last three days in jail because somebody attacked me and now
23   I'm supposed to help the city or the guy?  I was the one that
24   was injusticed here and you guys both need my help?
25              THE COURT:  Okay.  Thank you.  Go ahead, counselor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

514

DCB3GUZ4                        Molina - direct
 1  BY MR. KUNZ:
 2  Q.  You mentioned that during the accident that you had, you
 3  hit your head.  Is that accurate?
 4            MR. NORINSBERG:  Objection.
 5  A.  Yes, sir.
 6            THE COURT:  Objection sustained.
 7  A.  Yes, sir.
 8            THE COURT:  Objection sustained.  Please strike the
 9  answer.
10  A.  I was in the hospital --
11            THE COURT:  Hold on.  You don't have to answer that.
12  Go ahead, counsel.
13  Q.  So, in any event, a few questions ago, I showed you some
14  sections of your deposition and asked if it refreshed your
15  memory and you indicated that it did.  Is that correct?
16  A.  Yes, sir.
17  Q.  Now, just looking at this photograph again, do you recall
18  that this is the photograph that I showed you in your
19  deposition?
20  A.  Yes, sir.
21  Q.  What did you tell me at the deposition about this man?
22            MR. NORINSBERG:  Objection.
23            THE COURT:  Objection sustained.
24  A.  He was the guy --
25            THE COURT:  Objection sustained.  Don't answer that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

515

DCB3GUZ4                        Molina - direct

1   question.
2   Q.  Sitting here today, after reviewing your transcript, what
3   do you remember about this guy?
4   A.  He was the guy engaged with the fight with Jorge.
5   Q.  So, was he one of the men who when you got outside the club
6   that night, you had an argument with him?
7           MR. NORINSBERG:  Objection to counsel leading again.
8           THE COURT:  Overruled.
9   A.  Yes, sir.
10  Q.  Was he one of the men that you saw get into a taxi, drive a
11  short distance, and then get out of the taxi?
12  A.  Yes, sir.
13  Q.  How sure are you that this is one of the guys that was
14  fighting that night?
15  A.  Pretty sure.
16  Q.  After the fight got broken up by the police, what happened
17  next?
18  A.  We was brought in the 34th Precinct, we was put in
19  different cells.  And me and Henriquez was in the cell
20  discussing what happened, and we, like, we just defended
21  ourselves.  And then we overheard the other two guys arguing
22  with the police officers about how they mistreated them or
23  whatever.  And in my knowledge --
24          MR. NORINSBERG:  Objection.
25  A.  -- if you fight the police officers --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

516

DCB3GUZ4                     Molina - direct
 1            THE COURT:  That's sustained.  You can talk about what
 2   you saw, what you witnessed.  You can't give us your opinions
 3   on things.
 4            THE WITNESS:  Okay, no problem.  I didn't see any
 5   fight with the guys and the police officers.
 6            THE COURT:  You can talk about what you saw, heard,
 7   observed with your senses.  But you can't give us your opinion.
 8            THE WITNESS:  Okay, no problem.
 9   Q.  The fight that you were involved in, where did it take
10   place?
11   A.  In a corner of 207 and Post Avenue -- no, sorry.  In the
12   corner of Sherman and 207.
13   Q.  At any point that night, did you see a police officer kick
14   anyone in the knee?
15   A.  No, sir.
16   Q.  At any point that night, did you see police slam somebody's
17   head into the ground?
18   A.  No, sir.
19   Q.  Did you ever hear a police officer say "NYPD motherfucker"?
20   A.  No, sir.
21   Q.  So, I just have one more question and I want to be make
22   sure that we're clear about this because I think it maybe got a
23   little confusing.  The man in this photograph that you are
24   looking at --
25            THE COURT:  Sustained as to the first part of that.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

517

DCB3GUZ4                          Molina - direct
1    Please just ask the question.
2    Q.  The man in this photograph, did you see him fighting that
3    night?
4                MR. NORINSBERG:  Objection.
5                THE COURT:  Overruled.
6    A.  No.  I was engaged with the other guy.
7    Q.  Did you see him leaving the taxi and coming towards you and
8    your friend?
9    A.  Yes, I observed him, I watched him and the other guy come
10   towards us and we fought.  That's it.
11   Q.  You fought with the man that was with him, correct?
12   A.  Yes, sir.
13   Q.  And your friend fought with him?
14   A.  Yes.
15               MR. KUNZ:  No further questions.
16               THE COURT:  Plaintiff's counsel.
17   CROSS-EXAMINATION
18   BY MR. NORINSBERG:
19   Q.  Good afternoon, Mr. Molina.
20   A.  Good afternoon, sir.
21   Q.  You and I have never spoke before, have we?
22   A.  No, sir.
23   Q.  Never met before, right?
24   A.  I don't recall that.
25   Q.  You testified that this is not the first street fight that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

518

DCB3GUZ4                    Molina - cross
1   you've been in, is that correct?
2           MR. KUNZ:  Objection, your Honor.
3   A.  Yes, sir.
4           THE COURT:  Overruled.
5   Q.  You testified it is not the first time you were arrested
6   for fighting, correct?
7   A.  No, sir.  It's on the record.
8   Q.  Okay.  How many times have you been involved in street
9   fights?
10  A.  I don't recall that.
11          MR. KUNZ:  Objection.
12          THE COURT:  Overruled.
13  A.  I don't recall how many.
14  Q.  Would it be more than 10?
15  A.  No, sir.
16  Q.  Between five and 10 times?
17  A.  I don't recall.
18  Q.  You also indicated that you've been arrested a number of
19  times for getting in fights, correct, sir?
20  A.  I don't recall how many, but I did, yes, sir.
21  Q.  In this incident you were arrested by the police also,
22  correct?
23  A.  Yes, sir.
24  Q.  You were arrested and you were charged with assault,
25  correct?

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

519
DCB3GUZ4                      Molina - cross
1    A.  I don't recall the exact charge, but I -- I -- I think it
2    was the making -- I don't recall the exact charge, but I do
3    have it on paper.
4    Q.  You remember that you and your friend were charged with
5    assault, don't you, sir?
6    A.  The exact charge, I don't remember what it was, but I did
7    complete the sentence by the judge.
8    Q.  You were arrested because you were actually beating up a
9    man on the street, isn't that true?
10   A.  I say you're wrong about that.
11   Q.  You and your friend were kicking and beating a third man on
12   the ground when the police got there, isn't that true, sir?
13   A.  No, sir.
14   Q.  That never happened, right, sir?
15   A.  No.
16   Q.  So this whole time you were just acting in self-defense,
17   right, Mr. Molina?
18   A.  That's correct.
19   Q.  You were just defending yourself.  You weren't kicking or
20   punching a man on the ground, is that correct?
21   A.  No, sir.
22   Q.  As far as you're concerned, the police got it all wrong,
23   correct?
24   A.  All wrong about what?
25   Q.  In arresting you.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

520

DCB3GUZ4                        Molina - cross
1    A.  That's right.
2    Q.  You were the victim here, right, sir?
3    A.  That's right.
4    Q.  You were actually drinking that night, is that correct?
5    A.  Yes, sir.
6    Q.  You were actually drinking for approximately seven hours
7    before this incident, true?
8    A.  I think you are doing your math wrong.
9    Q.  Okay.  You started drinking at 9 p.m.  And you stopped
10   drinking at 4 in the morning.  Isn't that true?
11   A.  No, sir.  I said I arrived to the club at 11 a.m. and I
12   left around 2.  That's not seven hours.
13            THE COURT:  Hold on.  There is not a question.
14   Q.  Let's go back to before you went to the club.  Can we
15   agree, Mr. Molina, that you actually started drinking before
16   you went to the Red Lounge?
17   A.  No, we're not going to agree on that.
18   Q.  Referring to your deposition page 17, line one:
19   "Q.  Now, before you went to the club, did you have anything to
20   drink?
21   "A.  Yeah, we drank."
22            Do you recall that testimony, sir?
23   A.  Line by line, no, sir.
24   Q.  But you told us your memory was better at the deposition,
25   right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

521

DCB3GUZ4                    Molina - cross

```
 1   A.  Yes, sir.
 2   Q.  So you acknowledged drinking before you left to the club,
 3   correct?
 4   A.  No.  I don't acknowledge that.
 5   Q.  You actually split an entire bottle of tequila with your
 6   friends before you went to the club, isn't that right?
 7   A.  Yes, I would say that.  Yeah, I would say that.
 8   Q.  You split a $55 bottle of Patron?
 9   A.  Yes, sir.
10   Q.  This is before you got to the club, right?
11   A.  Yes.
12   Q.  You and your friends drank the entire bottle, correct?
13   A.  When you say "you and your friends," how many people you
14   talking about?
15   Q.  Well, you were there before you went to the club.  How many
16   people were with you sharing the drink?
17   A.  About eight people.  10 people.
18   Q.  In fact, you previously said it was you and four friends,
19   isn't that true?
20   A.  That's right.  But it doesn't mean that my other friends
21   didn't stop by.
22   Q.  You started drinking at approximately 9 p.m. that night.
23   Is that true?
24   A.  I don't recall that.
25   Q.  Referring to your deposition page 17, line 13:
```

522

DCB3GUZ4                         Molina - cross

1   "Q.  When you say early, what time do you think?
2   "A.  Around 9 maybe."
3           Does that refresh your memory it was 9 o'clock you
4   started drinking, sir?
5   A.  So in the deposition I said around 9 maybe?  "Maybe" is not
6   being sure.
7   Q.  Referring to page 17, line 10:
8   "Q.  So you think the five of you guys drank that before going
9   over to the Red Lounge?
10  "A.  Oh definitely.  We started early."
11          Do you recall that testimony, sir?
12  A.  I don't exactly know every line by line, but if I said
13  that, it was true.
14  Q.  Then once you were inside the club, you split another
15  bottle of alcohol, is that correct?
16  A.  We bought a bottle of alcohol, yes, sir.
17  Q.  You and two other people finished off an entire bottle of
18  alcohol, correct?
19  A.  We didn't finish it just me and the other person.
20  Q.  Excuse me?
21  A.  We didn't finish, me and just the other person, because I
22  did know other people at the club.
23  Q.  Referring to your deposition page 68, line 18:
24  "Q.  And then you and two other people finished a bottle of
25  Hennessy at the club?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

523

DCB3GUZ4                    Molina - cross

1   "A.  Yes."
2            That was your testimony, correct, sir?
3   A.  I don't remember that.
4   Q.  Just from what we've gone through here, you acknowledged
5   sharing a bottle of tequila before you left, and then at the
6   club sharing another bottle of Hennessy cognac.  Is that
7   correct?
8   A.  I don't recall what I was drinking at the club.
9   Q.  Do you recall saying at your deposition that you were,
10  quote, under the influence, end quote, on this night?
11            MR. KUNZ:  Objection, your Honor.
12            THE COURT:  Sustained as to form.  Please rephrase the
13  question.
14  Q.  Were you under the influence of alcohol this night, sir?
15  A.  At the club, yes.  Yes, sir.
16  Q.  It is your claim this was actually a fight involving four
17  people, is that right?  Is that your claim?
18  A.  Yes, sir.
19  Q.  You were fighting one guy, and Jorge was fighting another
20  guy.  That's your testimony, correct?
21  A.  Yes, sir.
22            (Continued on next page)
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

524

DCBTGUZ5                          Molina - cross
 1   BY MR. NORINSBERG:
 2   Q.  These two men who you were fighting with, at your
 3   deposition you could only describe them as a light-skinned guy
 4   and dark-skinned guy, right?
 5             THE COURT:  Objection sustained to form.
 6   Q.  One of the men was a light-skinned guy, is that correct?
 7             One of the men was a light-skinned guy, correct?
 8   A.  Lighter than the other one, yes, sir.
 9   Q.  What's that?
10   A.  One of the guys was lighter than the other one, the other
11   one was darker.
12   Q.  Then you described the other guy as a dark-skinned guy,
13   correct?
14   A.  Yes.
15   Q.  Who were you fighting, sir?  Were you fighting the
16   light-skinned guy or dark-skinned guy?
17   A.  The dark-skinned guy.
18   Q.  Do you recall at your deposition you originally claimed
19   that you were who was fighting the light-skinned guy.  Do you
20   recall that, sir?
21             MR. MODAFFERI:  Objection.
22             THE COURT:  Sustained as to form.
23   Q.  Do you recall being asked the following question, page 25,
24   line 17:
25   "Q.  So one looked dark skinned and one light skinned?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

525

DCBTGUZ5                    Molina - cross
1   "A.  Light-skinned, skinny guy, that's the one I fought, and
2   the other one, that's the one my that friend Enriquez fought."
3            Do you recall that testimony, sir?
4   A.  No, sir.
5   Q.  And at your deposition, you said you couldn't remember any
6   details about this light-skinned guy that you were supposedly
7   fighting with, isn't that true?
8   A.  I don't understand the question.
9            MR. KUNZ:  I object to that, your Honor.
10           THE COURT:  Objection sustained.
11  Q.  Do you remember any details about the light-skinned guy,
12  sir?
13  A.  Maybe not right now, but at the time, yes, sir, because we
14  was in the --
15           THE COURT:  The question is right now do you remember
16  any details about the light-skinned guy.
17           THE WITNESS:  No, sir.
18  Q.  Referring to your deposition, page 28, line 1:
19  "Q.  OK.  Now do you remember anything at all about the light-
20  skinned guy that you were fighting with?
21  "A.  No."
22           MR. KUNZ:  Objection.
23           THE COURT:  Sustained.  Please strike that.
24  Q.  At your deposition did you have any memory at all about
25  what the light-skinned guy looked like?
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

526

DCBTGUZ5                        Molina - cross
 1                THE COURT:  Sustained.
 2      Q.  Would you agree, sir, that a little later in your
 3      deposition you changed your story and you claimed that --
 4                MR. KUNZ:  Objection.
 5                THE COURT:  Sustained, let's have a side bar.
 6                (In robing room)
 7                THE COURT:  Where you going?
 8                MR. NORINSBERG:  He claimed and put before this jury
 9      the dramatic head injury is what changed his memory or
10      50 percent worse, I'm establishing that at his deposition,
11      first of all he couldn't remember any details at all.
12                THE COURT:  Hold on.  Where do you get that from?
13      That's not in front of the jury.  I sustained that objection.
14      I struck that.
15                MR. NORINSBERG:  No, no, he had a whole answer that
16      was not struck.
17                THE COURT:  It was struck.
18                MR. NORINSBERG:  No, there was a whole answer.
19                THE COURT:  Let's go back to the section that was
20      struck and I asked him the open-ended question, and his answer
21      to that question was it's been a long time, and then he said
22      and I want to forget all of this because I got incarcerated and
23      I spent three days there and I feel like I'm the victim, and he
24      went on and on and on about he hates the city and hates the
25      plaintiff and hates everyone else and doesn't want to be here.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

527
DCBTGUZ5                    Molina - cross
1   That was struck.  That's why defense counsel attempted to ask
2   that question again about the head injury and I sustained an
3   objection that wasn't made yet.
4           MR. NORINSBERG:  But this is why, Judge, I made the
5   application in the first place.  His memory was terrible and he
6   changed his story in the deposition.
7           THE COURT:  What is the prejudice of that?
8           MR. NORINSBERG:  Because it's credibility.
9           THE COURT:  You asked him a question, you asked him do
10  you remember any details about the light-skipped guy?  He said
11  no.  So where you going in the deposition to ask him a prior
12  consistent statement that he didn't remember anything?
13          MR. NORINSBERG:  Because in this particular case even
14  though you struck the testimony, the jury heard it and they see
15  him walking with a cane.  I would ask the Court to give me a
16  little latitude to establish it has nothing to do with this.
17          THE COURT:  But there's nothing in front of this jury
18  saying he remembered any details about this.  One of the
19  problems sometimes in civil litigation you got these
20  depositions you're in love with.  The jury hasn't heard all
21  this.  There's nothing in front of this jury that says to them
22  he remembers any details about the light-skinned guy.
23          MR. NORINSBERG:  But I'm trying to set up that he
24  changed the story in the middle of the deposition.
25          THE COURT:  For what?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

528

DCBTGUZ5                          Molina - cross

```
 1            MR. NORINSBERG:  Credibility.  Originally he had said
 2    he's fighting the light-skinned guy and then he changed his
 3    story after he saw my guy's picture and said it was the other
 4    guy fighting him.  I want to be able to establish that.
 5            THE COURT:  Establish what?
 6            MR. NORINSBERG:  He originally claimed -- he said that
 7    he, Molina, was the one fighting the light-skinned guy.
 8            THE COURT:  And you brought that out.
 9            MR. NORINSBERG:  Then he was shown a picture of my
10    client, and then he said actually come to think of it I wasn't
11    the one fighting the light-skinned guy, it was the dark-skinned
12    guy.
13            THE COURT:  But you brought out that prior
14    impeachment.
15            MR. NORINSBERG:  I don't think so.
16            THE COURT:  You asked him the question which guy were
17    you fighting, he said the light-skinned guy.  You went to a
18    deposition, the section of the deposition and you said which of
19    these guys were you fighting, and then in very dramatic voice
20    you indicated the dark-skinned guy, that was the guy I was
21    fighting.  You have done that.
22            MR. NORINSBERG:  But Judge, the what prevents me from
23    being able to establish that before he saw my client's picture
24    he completely had the wrong identity?  He identified the light-
25    skinned guy and then he changed it to conform with the picture.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

529

DCBTGUZ5                    Molina - cross

1   There's still testimony the jury heard today that he looked at
2   the picture and said that's the guy.  There is testimony in the
3   record, however weak it is, that he identified this picture as
4   being the guy fighting with Jorge.
5           THE COURT:  I'm trying to figure out what is it that
6   you ultimately want to say about that I guess is what I'm
7   trying to figure out.
8           MR. NORINSBERG:  He has zero credibility because he
9   wasn't sure in his deposition and he's making up this --
10          MR. KUNZ:  This is --
11          THE COURT:  Hold up.  You put out an inconsistency
12  from the deposition in terms of who he was fighting with and in
13  terms of what he said here in court.  What is it -- I don't
14  understand what is it that you are doing now.  You already
15  established that.  So what is it that -- you keep wanting to go
16  back.  The reason I keep sustaining the objection, you keep
17  going back to the deposition and there's no predicate question
18  if he says something inconsistent, but you can't go on and say
19  this is what you said in the deposition and this changed within
20  the context of the deposition.  What is important is
21  inconsistencies here.
22          MR. NORINSBERG:  I understand what the Court is
23  saying, but the fact of the matter is once he was shown a
24  picture of my client he changed his story at the deposition.
25  Why is that not relevant?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

530

DCBTGUZ5                    Molina - cross
1           THE COURT:  Because the jury is not concerned with the
2      deposition.  The deposition is only coming in to impeach
3      credibility.  That's the only relevance of the deposition
4      testimony.  There are many other ways you can have these other
5      facts that are here.  I'm not going to tell you how to try the
6      case, but there's lots of other stuff he can say.  He already
7      said on the witness stand he didn't recognize anybody, then he
8      sees the picture and then sees these other things, he's
9      refreshed.  I don't understand where this is going.  How much
10     more do you have with this witness?  I'm going to sustain to
11     the objections.  You can't keep referring to the deposition
12     transcript as the predicate question.
13          MR. NORINSBERG:  But at your deposition you were shown
14     a picture, shown one picture, and that's -- after you were
15     shown the picture that's the first time you said that the
16     light-skinned guy was fighting with your friend.  Can I say
17     that?
18          THE COURT:  I'm not sure why you need to say that for
19     the deposition?  Just slow down for me, you want to say what
20     again?
21          MR. NORINSBERG:  He was shown one picture, not a
22     picture of any other person, so is this the guy that you fought
23     with?
24          MR. KUNZ:  That not the question.
25          THE COURT:  One at a time.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

531

DCBTGUZ5                    Molina - cross
 1              MR. NORINSBERG:  He was shown one picture, the only
 2      picture shown was my client.
 3              THE COURT:  You can ask that question, this is the
 4      picture -- this is the only picture that you were shown at the
 5      deposition, this is the only picture you have been shown today.
 6              MR. NORINSBERG:  OK.  I would like to just follow that
 7      question up:  And after you were shown the picture at the
 8      deposition of my client, that's the first time that you said
 9      you were actually -- you weren't fighting the light-skinned
10      guy, you were fighting the dark-skinned guy.
11              MR. KUNZ:  Look, there's a number of problems here,
12      and first of all, he gives a rather detailed physical
13      description of the light-skinned guy.  So the plaintiff's
14      suggestion to the contrary is in direct violation of the
15      deposition itself, and I think that he should not be allowed to
16      do improper impeachment by suggesting -- he's suggesting that
17      the witness never gave a description of what the light-skinned
18      guy looked like.  He said he's skinny, he gives his height, he
19      talks about his body build.
20              THE COURT:  Wait, this is something different you're
21      talking about now, isn't it?
22              MR. KUNZ:  Your Honor, when Mr. Norinsberg puts
23      inflection in his voice when reading the deposition, he's
24      twisting the meaning of the words.
25              THE COURT:  What's your objection to what he's talking
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

532

DCBTGUZ5                      Molina - cross

1   about now?
2              MR. KUNZ:  Well, my problem is that when he was shown
3   the photograph at the deposition he was not asked:  Isn't this
4   the plaintiff?  He was asked:  Do you recognize who this person
5   is?
6              THE COURT:  I'm trying to figure out why isn't it
7   sufficient for plaintiff's counsel to indicate this is the only
8   picture you have been shown, this is the picture you were shown
9   in the deposition, this is the picture you have been shown
10  today, this is the only picture you have been shown relative to
11  the fight that happened on February 14, 2009.
12             MR. NORINSBERG:  I agree those are all appropriate
13  questions that I will ask, but the last question that I haven't
14  asked is:  After you saw this one picture, that's when you
15  changed your testimony.
16             THE COURT:  But I guess here's the other thing, and
17  this will help any move things along, I think counsel on both
18  sides get a little excited with the cross-examination of
19  witnesses, and it seems that by simply asking that you have
20  more than enough to argue that in front of the jury.  You can
21  argue that based on that.  Asking the questions, as counsel
22  have done on both sides, counsel asked these kind of questions
23  that are sort of argumentative, then end up getting answers
24  that they don't particularly like when they have been asked
25  several times, but again, there are different examples of that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

533

DCBTGUZ5                    Molina - cross

1          So again, just to point to one side again, when the
2    defendant asked the plaintiff about -- on the stand about he's
3    supposedly afraid of Officer Jay yet he was willing to ride in
4    his car with him, that's fine, but you could have argued that
5    without asking the question.  I don't think it's necessary for
6    you to ask the questions to make the arguments, and I think
7    you're getting into a lot of other improper material and
8    getting the jury far to engaged in the depositions, which is
9    not what they're here for.
10          So I'm going to sustain that objection, but you can
11   certainly ask him about the fact that this is the one picture
12   he's been shown in the deposition, this is the picture he's
13   been shown today, and he hasn't been shown a picture of anyone
14   else, and you can argue from that what you will.
15          (In open court)
16   BY MR. NORINSBERG:
17   Q.  Mr. Molina, at your deposition you were shown a picture of
18   my client, is that correct?
19   A.  Yes, sir.
20   Q.  And that was the only picture you were ever shown by
21   defense counsel, correct?
22   A.  I don't remember.
23   Q.  The picture we just saw here today was the one and only
24   picture you were ever shown at the deposition, isn't that true?
25          MR. KUNZ:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

534

DCBTGUZ5                    Molina - cross
```
 1            THE COURT:  I'll allow it.
 2   A.  I do remember that picture you showed me but I don't
 3   remember any other picture was shown.  Like I said, there were
 4   a number.
 5   Q.  Now before you testified at the deposition, the night
 6   before, did you consume any type of illegal drugs?
 7            MR. KUNZ:  Objection.
 8            THE COURT:  Let's have a side bar.
 9            (In robing room)
10            THE COURT:  What was the question?
11            MR. NORINSBERG:  Whether he consumed any illegal
12   drugs, which he acknowledged that he did, and that he consumed
13   alcohol the night before -- the night -- this all before
14   leading up to when he's identifying my client at a deposition,
15   that's where I'm going with that.
16            MR. KUNZ:  The night before, and he said it would not
17   impair his ability to testify fully and truthfully.  So it's a
18   backhanded attempt to impugn the credibility of the witness.
19   He's already asked what I think are improper questions about
20   the witness's criminal history.
21            THE COURT:  What drugs?
22            MR. NORINSBERG:  Marijuana, then he refused to
23   actually say how much he had, and vodka.
24            THE COURT:  OK.  What's your objection again?
25            MR. KUNZ:  My objection is he's trying to impugn the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

535

DCBTGUZ5                        Molina - cross

1  credibility with improper 403 and 609 evidence.  He's trying to
2  suggest this witness is a bad person because he does drugs and
3  drinks and has been arrested before, and he's backhanded in.
4  Had he smoked marijuana on his way to the deposition?  Fine,
5  that impacts his ability to testify.
6            THE COURT:  Those are things that you can deal with on
7  redirect if you like.  If your previous argument about his
8  brain trauma could affect his memory, I think marijuana could
9  affect his memory.  Did mean it did?  Could have?  Alcohol
10  could affect it.  You could certainly redirect on that.
11            And just so I have the sense, where is this ultimately
12  going after that?
13            MR. NORINSBERG:  Just establishing those basic facts
14  that he was getting high the night before his deposition, the
15  night before the next day he's coming in and identifying my
16  client.  That's just part --
17            THE COURT:  What's the next question after that I
18  guess is what I'm trying to anticipate.
19            MR. NORINSBERG:  Well, how much did you smoke the
20  night before?  How many blunts?  And basically that's it.
21            THE COURT:  OK.
22            MR. NORINSBERG:  I don't want to run afoul of the
23  Court's rulings.  He testified to a lot of stuff at his
24  deposition which I think are fair game for impeachment.  They
25  never made a motion in limine on it, they never put it before

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

536

DCBTGUZ5                    Molina - cross

1   the Court.  And I think the witness just talked about his prior
2   arrests, and he talked about it, it's fair game.  He's had
3   multiple convictions.  I believe that's fair game.  I don't
4   want to --
5           THE COURT:  I will let you ask those questions.
6           MR. KUNZ:  What do those convictions go towards?
7           THE COURT:  I will let you ask those questions, but
8   what are you talking about?  You asked about the convictions.
9           MR. NORINSBERG:  He had 20 convictions, according to
10  his deposition testimony.
11          THE COURT:  For what?
12          MR. NORINSBERG:  Selling -- drug sale offenses.
13          THE COURT:  What's that got to do with anything?
14          MR. NORINSBERG:  The point is, Judge, that this is who
15  they're bringing in as their star witness.  This goes to
16  credibility.
17          THE COURT:  I let you go into some of this because he
18  opened the door when asked a general question and said this
19  isn't my first rodeo, this isn't my first time I have been in a
20  fight, and this isn't the first time I have ever been arrested
21  for a fight.  So you are perfectly free to ask him about fights
22  and arrests for fights.  Arrests for other things seem
23  irrelevant, unless you have some perjury conviction or
24  something like that.  Drug sales and things seem totally
25  irrelevant to me, but he opened the door to his arrests for

               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

DCBTGUZ5                          Molina - cross
1    fighting and his convictions for fighting.  He's clearly opened
2    that, so you can go into that.
3              MR. NORINSBERG:  OK.
4              THE COURT:  And I guess I'm wondering again -- that's
5    fine.
6              (In open court)
7              MR. NORINSBERG:  Could we have the last question read
8    back?
9              (Record read)
10             THE COURT:  You can answer that question.
11   A.  I don't remember, but if I did, I said that I did, then I
12   did, but I don't remember exactly what I did the night before.
13   Sorry, if I go further, I work at Yankee Stadium and now they
14   do drug testing there.
15             THE COURT:  Hold on, that's not the question before
16   you.  Go ahead, counsel.
17   BY MR. NORINSBERG:
18   Q.  Referring to your deposition, page 7, line 22:
19   "Q.  And have you taken any illegal drugs in the last 24 hours?
20   "A.  I will testify yes.
21   "Q.  OK, which drug?
22   "A.  Marijuana."
23             MR. NORINSBERG:  Page 76 --
24             MR. KUNZ:  Could we get the next two question and
25   answers from page 8 read before he moves on?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

538

DCBTGUZ5                        Molina - cross
1              THE COURT:  Any objection?
2              MR. KUNZ:  Page 8, lines 2 through 5.
3              THE COURT:  Any objection to that?
4              MR. NORINSBERG:  I don't object to that.
5              THE COURT:  Go ahead.
6    Q.  OK.  Starting with 7, 25:
7    "Q.  OK, which drug?
8    "A.  Marijuana.
9    "Q.  Anything else?
10   "A.  No.
11   "Q.  Will that affect your ability to testify?
12   "A.  No."
13             Do you recall that testimony, sir?
14   A.  Yes, sir.
15   Q.  Now how many -- strike that.  How much marijuana did you
16   smoke the night before your deposition?
17   A.  I don't remember the exact amount, but probably about a
18   gram.  I don't know.  I don't know.  Different people affect
19   differently.  About a gram, I say, I would say, just roughly
20   guessing.
21   Q.  A gram of marijuana?
22   A.  Yes, sir.
23   Q.  And you were also drinking vodka the night before, is that
24   correct?
25   A.  I don't remember, but I don't think so.  I'm not a hundred
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

539

DCBTGUZ5                         Molina - cross

```
 1  percent.
 2  Q.  You drank a half a bottle of Gray Goose vodka the night
 3  before your deposition.  True or not true?
 4  A.  I don't recall that.
 5  Q.  Now you told us that when you were involved in this fight
 6  you were engaged with a guy you were fighting with, right?
 7  A.  Yes.
 8  Q.  And you didn't see anything else going on with the other
 9  guy, correct?
10  A.  No, sir.
11  Q.  You told us you couldn't see the other guy, what the other
12  guy was doing, correct?
13  A.  That's right.
14  Q.  And today you told us that you thought the person that was
15  involved with the fight with Jorge looked darker, is that
16  correct?
17  A.  That's right.
18  Q.  And you said you don't know exactly if the person in this
19  picture was the same guy, is that correct?
20  A.  I don't recall his face, but I -- he looked familiar, I
21  can't say exactly that he was or he was not.
22  Q.  You did say, though, that you don't see that person in this
23  courtroom today, correct, sir?
24  A.  No.
25          MR. NORINSBERG:  Thank you, Mr. Molina, I have nothing
```

540

DCBTGUZ5
1    further.
2              MR. KUNZ:  Could we have a moment?
3              THE COURT:  OK.
4              (Pause)
5              MR. KUNZ:  Nothing further, your Honor.
6              THE COURT:  OK.  Thank you, you're excused.
7              Let me see counsel at the side bar real quick to
8    discuss scheduling issues.
9              (In robing room)
10             THE COURT:  OK.  So I think we're finished with the
11   witnesses for today, is that correct?
12             MR. NORINSBERG:  Yes.
13             THE COURT:  And tomorrow we have got two doctors, the
14   EMT, and is that it?
15             MR. MODAFFERI:  Yes, on our end.
16             MR. NORINSBERG:  And just hate to even bring it up,
17   but I got notice this morning of a possible scheduling conflict
18   with my doctor.  Judge, I have been pleading and begging.  If
19   you saw my text, he's going to tell me -- I don't know, maybe
20   he texted in the interim.  I am doing everything I can.  I
21   can't believe I even have this situation, but that's the
22   situation I have now.  I thought this was squared away as early
23   as last week.  I just -- maybe he texted, if I could check.
24             THE COURT:  Check it.  But I guess while you're doing
25   that I guess what I want to find out now is it OK if I let this

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

541

DCBTGUZ5
1    jury go home now?
2           MR. MODAFFERI:  For today.
3           THE COURT:  And tell them to come back at 9:30 and
4    discuss scheduling, we should be able to finish up all the
5    testimony by tomorrow, my intention would be -- let me get a
6    sense again, how short is your expert going to be?
7           MR. KUNZ:  Hour and a half.
8           THE COURT:  And your cross of the expert?
9           MR. NORINSBERG:  Probably 45 minutes.
10          THE COURT:  OK.  And your expert?
11          MR. NORINSBERG:  Probably an hour and a half also.
12          THE COURT:  And your cross?
13          MR. KUNZ:  45 minutes.
14          THE COURT:  So and the EMT should be fairly quick.
15          MR. MODAFFERI:  Ten minutes on our end.
16          THE COURT:  Cross?
17          MR. NORINSBERG:  Probably 20 minutes, maybe less.
18          THE COURT:  Give me an offer of proof on the EMT
19   again.
20          MR. KUNZ:  Took the statement from him and said the
21   plaintiff told him he was kicked in the leg during a fight.
22          THE COURT:  Why would that take 20 minutes?
23          MR. MODAFFERI:  More like ten minutes, but we want him
24   to introduce himself and, you know, I'm an EMT, I fill out this
25   report, and what is in the report and that's it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

542

DCBTGUZ5

```
 1              THE COURT:  And without getting into your strategy for
 2    cross-examination, again, I have been pretty lenient, I don't
 3    want to have 18 minutes of:  You didn't see anything, right?  I
 4    mean I don't think there's any dispute the EMT didn't see what
 5    happened.
 6              MR. NORINSBERG:  Yeah, that's not part of the cross.
 7              THE COURT:  So I guess of my question, in a sense, why
 8    do you think the cross would be 20 minutes?
 9              MR. NORINSBERG:  We took his deposition and there's
10    some information we learned, and also just walking through the
11    ambulance call report.  There's a bunch of things that I think
12    are helpful that need to be explored.
13              THE COURT:  OK.  So I will let this jury go.  What I
14    will like to do is perhaps have my clerk send counsel our draft
15    jury instructions tonight.  You can start looking at those, and
16    then we can have the charge conference tomorrow.  We should be
17    finished, if not by lunch, hopefully shortly after that we
18    could have the charge conference and then we can have counsel
19    sum up and give the jury the charge Friday.
20              I'll let this jury go home.
21              MR. MEEHAN:  Your Honor, are we going to be summing up
22    right after on Thursday afternoon?
23              THE COURT:  Friday morning, probably.  Depends on how
24    soon these witnesses go.  I prefer to have these summations on
25    Thursday, but my experience thus far with the legal arguments
```

543

DCBTGUZ5

1       that I anticipate it will not happen.
2               MR. NORINSBERG:  Could we rest assured it's on Friday
3       morning?  It's a lot to cover, Judge.
4               THE COURT:  Defense counsel have position on that?
5               MR. KUNZ:  We could be ready tomorrow if push comes to
6       shove, but yeah, you know.
7               THE COURT:  I will give counsel Friday, but make sure
8       you can get your doctor here.
9               (In open court)
10              THE COURT:  Members of the jury, we are finished
11      today.  I will let you go home early today.  Pleasant surprise.
12      Tomorrow come here at 9:30 and we'll have more testimony.
13              Again, don't discuss the case with anyone, don't do
14      any independent research of your own.  If your family, friends,
15      significant others, insignificant others, ask you about the
16      case, just throw me under the bus and say that mean old judge
17      wouldn't let us talk about the case.
18              Have a good night.
19              (Jury not present)
20              THE COURT:  Anything else from either counsel today?
21              MR. NORINSBERG:  No, your Honor.
22              MR. KUNZ:  Not from us.
23              THE COURT:  OK.  I don't anticipate anything really
24      coming up, but let's have counsel again try to get here by
25      9 o'clock in case there's an issue.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

544

DCBTGUZ5

```
 1              Did plaintiff's counsel check to find out, is there
 2    any update in terms of your doctor's status?
 3              MR. NORINSBERG:  No update.
 4              THE COURT:  So let have plaintiff's and defense
 5    counsel get here at 9:00 just in case, because I definitely
 6    don't want to have the jury waiting, and let's make sure all
 7    the witnesses are here in the morning.  There's a chance we may
 8    be able to finish up all the testimony tomorrow morning, and I
 9    will come down at 9:15 or so.
10              MR. KUNZ:  On that point, our expert is seeing
11    patients first thing in the morning, and we were told he
12    wouldn't go until after lunch, so we were anticipating him
13    taking the stand at 1:00 or something tomorrow or after lunch.
14              So I can call, and I think I can get him here as early
15    as 12:00 or 12:30, but before then I don't think it will be
16    possible.
17              THE COURT:  OK.  I guess counsel had discussed this
18    amongst themselves before.
19              MR. KUNZ:  Yes.
20              THE COURT:  And plaintiff's expert is supposed to be
21    here what time tomorrow?
22              MR. NORINSBERG:  By 9:00.
23              THE COURT:  OK.  And what about the EMT?
24              MR. KUNZ:  He will be here at 9:00.
25              THE COURT:  OK.  Thank you very much.
```

545

DCBTGUZ5

1           MR. NORINSBERG:  Question, Judge, in terms of the
2     order of summation, I have actually seen it done both ways in
3     the Southern District where it's plaintiff, defendant and then
4     plaintiff, but I have also seen it more typically plaintiff
5     going last.  Does the Court have a practice as to which way it
6     should be done?
7           THE COURT:  Yes, we'll go one submission each, defense
8     first, then plaintiff.
9           And I guess can I get a sense now, I know the case
10    isn't over, but these last witnesses don't seem they're going
11    to be -- they're not going to really make a huge difference in
12    this case.  One never knows, but does counsel have an estimate
13    to how short -- emphasis on "short" -- the summations will be?
14          MR. NORINSBERG:  I would say an hour.
15          THE COURT:  Defense counsel?
16          MR. KUNZ:  That would be the very long end of our
17    closing.
18          THE COURT:  OK.  Thanks.
19          (Adjourned to December 12, 2013 at 9:00 a.m.)
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

546

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                         Page
 3   JOSE CARBAJAL
 4   Direct By Mr. Norinsberg . . . . . . . . . . 357
 5   Cross By Mr. Kunz  . . . . . . . . . . . . . 368
 6   Redirect By Mr. Norinsberg . . . . . . . . . 375
 7   Recross By Mr. Kunz  . . . . . . . . . . . . 378
 8   NOEL JACKSON GUZMAN
 9   Direct By Ms. Smith  . . . . . . . . . . . . 380
10   Cross By Mr. Modafferi . . . . . . . . . . . 429
11   Redirect By Ms. Smith  . . . . . . . . . . . 481
12   ALBERTO MOLINA
13   Direct By Mr. Kunz . . . . . . . . . . . . . 494
14   Cross By Mr. Norinsberg  . . . . . . . . . . 517
15                   PLAINTIFF EXHIBITS
16   Exhibit No.                           Received
17    12 and 13   . . . . . . . . . . . . . . . 359
18    1A through 1D  . . . . . . . . . . . . . . 392
19    1E   . . . . . . . . . . . . . . . . . . . 396
20    1F   . . . . . . . . . . . . . . . . . . . 399
21    1J   . . . . . . . . . . . . . . . . . . . 415
22
23
24
25
```

547
DCC3GUZ1

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   NOEL JACKSON-GUZMAN,
3
4                   Plaintiff,
4
5           v.                        10 CV 6353 (ALC)
5
6   P.O. BRIAN JAY,
6   Shield No. 29733, Individually
7   and in his Official Capacity,
7
8                   Defendant.
8
9   ------------------------------x
9                                   New York, N.Y.
10                                  December 12, 2013
10                                  9:00 a.m.
11
11  Before:
12
12              HON. ANDREW L. CARTER, JR.,
13
13                                  District Judge
14
14                      APPEARANCES
15
15  JON NORINSBERG
16  JOHN MEEHAN
16  KATHERINE SMITH
17      Attorneys for Plaintiff
17
18  NEW YORK CITY LAW DEPARTMENT
18  OFFICE OF CORPORATION COUNSEL
19      Attorneys for Defendant
19  BY:  MORGAN KUNZ
20       MATTHEW MODAFFERI
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

548

DCC3GUZ1
```
 1              THE COURT:  I just wanted to check in the parties
 2   before we brought the jury in.  Plaintiff's doctor is here
 3   today?
 4              MS. SMITH:  I believe Mr. Norinsberg just stepped out.
 5              MR. KUNZ:  He's here, I saw him.
 6              THE COURT:  Are you referring to Mr. Norinsberg or the
 7   expert?
 8              MR. KUNZ:  Dr. Dassa their expert is here.  We do have
 9   some initial matters to address this morning.
10              THE COURT:  What do you need to address?
11              MR. KUNZ:  So, three related matters that all have to
12   do with the testimony that's going to come out today.  The
13   first issue is we just want to be clear that there won't be any
14   mention in either experts' testimony about the details of the
15   Social Security disability proceeding and the documents from
16   that.  We just want to make sure that's clear.
17              MR. NORINSBERG:  There won't be any reference to any
18   Social Security or any documents.
19              MR. KUNZ:  The second issue, second and third issue
20   are closely related and they have to do with impeachment that
21   we anticipate Mr. Norinsberg using against our expert.  We
22   anticipate him going into some prior cases where the expert has
23   been retained and testified.  And we just want two things.  We
24   want to make sure that it is not implied he is a hired gun for
25   the City of New York, and so we doesn't want Mr. Norinsberg to
```

549

DCC3GUZ1

```
 1   repeatedly mention, oh, you were employed by the City of New
 2   York in this case, and you were employed by the City of New
 3   York in that case.  We just want him to stick to the facts of
 4   the case.  You did work for a defendant, you did work for a
 5   plaintiff, and not identify him as a city of New York person.
 6            MR. NORINSBERG:  I thought the Court ruled on this
 7   issue already.  That was one of our very first conferences when
 8   this issue came up, and I thought the Court clearly stated I
 9   would be able to elicit from this doctor that he worked for the
10   City of New York on this case, this case, and this case.  That
11   goes to his bias.  I can't conceive of a basis for keeping that
12   out.  They keep using the same expert on cases involving the
13   City of New York and city employees.  That's the nexus and
14   that's clear bias and the Court ruled on the issue.
15            THE COURT:  Defense counsel?
16            MR. KUNZ:  I don't think your Honor -- I don't recall
17   your Honor ruling on the issue.  In fact, we specifically
18   brought up the issue of identifying us as city attorneys, and
19   your Honor precluded that and gave a fair limiting instruction
20   on who we were at the beginning of the trial.
21            THE COURT:  That seems separate in terms of the
22   attorneys being referred to as representing the City of New
23   York.  Give me a sense as to what it is you intend to do in
24   terms of this.
25            MR. NORINSBERG:  Basically the fact that it is not the
```

550

DCC3GUZ1
```
 1   first time he's testified in court.  He's testified many times,
 2   and in those many times he's continuously testified for the
 3   City of New York and City of New York employees.  And there are
 4   a number of cases which he's admitted that.  In fact, he
 5   testified at his deposition that half of his testimony in court
 6   over the last four years has been for the City of New York in
 7   cases involving the city.
 8             And when we addressed this issue before, remember when
 9   this first came up in the first conference, I said to the
10   Court, I said, Judge, I understand not calling them city
11   lawyers, but when I am cross examining their doctor, I
12   absolutely will need to get into that area.  And you said that
13   area is perfectly appropriate.  You didn't see a problem with
14   that.  You didn't want me to get into factual details of those
15   cases.  The fact that he was hired and giving testimony on
16   behalf of the City of New York was fair game.
17             THE COURT:  This prior testimony that you're talking
18   about, who were the defendants?  Were these all police officer
19   cases?
20             MR. NORINSBERG:  They're all City of New York cases.
21   Most of them are police officers.  Three of them involve my own
22   law firm, so I have direct knowledge.  Those three were all
23   police officer cases.  The others are -- just from the little
24   that I know, I believe several of them were police cases.  But
25   some of them were just City of New York cases.
```

551

DCC3GUZ1

```
 1              THE COURT:  What is the relevance of the other City of
 2    New York cases that don't involve police officers?
 3              MR. NORINSBERG:  Because the City of New York was a
 4    party to this case when he was hired.  He's being paid by the
 5    City of New York, and there is a bias that goes with a party
 6    continually retaining the same expert over and over and over
 7    again.  That's what you ruled previously, Judge.  I wouldn't
 8    have it in my cross-examination but for the fact that you said
 9    that that line of inquiry was permissible.  What you did
10    caution me was not to go into specific facts of each case,
11    which I'm not going to do.
12              THE COURT:  What do you plan on asking him in terms of
13    his retainer agreement in this case?
14              MR. NORINSBERG:  It is not his retainer.  The fact he
15    is getting compensated for his time.  That is, whatever he is
16    being paid for, he is being paid by the City of New York.  He's
17    testified before for the City of New York.  And that's just
18    classic bias impeachment by bias.
19              THE COURT:  What is defendant's concern here?  That
20    the City of New York is not a defendant, I understand that.
21              MR. KUNZ:  Right.  But the clear implication of the
22    plaintiff's argument is going to be that there is deep pockets
23    behind this case, and the jury should award money with that in
24    mind.
25              I think the larger issue here, your Honor, is the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

552

DCC3GUZ1

 1   prejudice point.  When you look at the 403 issue, the probative
 2   value of this is minor because Dr. Gidumal has testified for
 3   defendants.  In fact, in the last four years, you testified for
 4   defendants and you have only done plaintiffs X number of times.
 5   He has that impeachment.  He doesn't need the City of New York
 6   in this case and in that impeachment.  So we really feel the
 7   403 issue here carries the day because there is very limited
 8   additional probative value to saying City of New York.
 9            THE COURT:  Tell me more about the prejudice that you
10   feel that you suffer if plaintiff's counsel is entitled to go
11   into this line of questioning.  What is the prejudice?
12            MR. KUNZ:  It is the same reason that we were
13   concerned about referring to myself and Mr. Moddaferi as city
14   attorneys.  We're concerned that the jury is going to hear City
15   of New York, think there is deep pockets behind this case, and
16   then award money and then keep that in mind when they're making
17   their deliberations.
18            So, Officer Jay is the defendant here.  And he's
19   entitled to have the jury consider him as the defendant and the
20   plaintiff as the plaintiff.  And when you bring in another
21   party that's not involved in this litigation, it prejudices
22   him.
23            THE COURT:  This is regarding which doctor again?
24            MR. KUNZ:  Dr. Gidumal, our expert.
25            THE COURT:  He's testifying this afternoon?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

553

DCC3GUZ1

```
 1              MR. KUNZ:  Correct.
 2              THE COURT:  Let me think about that.  Are there any
 3    other issues?
 4              MR. KUNZ:  The last remaining issue I think
 5    Mr. Norinsberg solved it.  I wanted to make sure that he would
 6    not be going into the facts of the other lawsuits that
 7    Dr. Gidumal has testified.
 8              THE COURT:  That's Gidumal.  Is there anything with
 9    Dr. Dassa?
10              MR. KUNZ:  We are going to abide by that same ruling.
11    If he's precluded into going into facts, then I will not go
12    into facts with Dr. Dassa.  I don't want to not go into facts
13    with Dr. Dassa, and have him come around this afternoon and go
14    into facts with Dr. Gidumal.  As long as we are all in
15    agreement there will be no discussion of the facts of other
16    lawsuits with the experts.
17              THE COURT:  Why would the other lawsuits be relevant?
18              MR. KUNZ:  I totally agree.  But in past litigation,
19    Mr. Norinsberg has gone into the facts.
20              THE COURT:  He said he is not going to do that, and I
21    don't think there is any reason to do that.
22              MR. KUNZ:  There you go.
23              THE COURT:  Let's get ready.
24              MR. NORINSBERG:  We are having a technical issue, your
25    Honor.  The issue is we have films here on CD that we want to
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

554

DCC3GUZ1

1   show to the jury, both sides want to do this in court.
2   Apparently, at least one of the MRIs, the computer that counsel
3   had doesn't read it and there is no way to hook it up to the
4   Elmo.  I'm trying to solve that technical problem right now and
5   come up with another solution.  I just ask the Court's
6   indulgence, if we could just have a little time to try to get
7   another laptop in here, that might be able to do it.  Or some
8   tech assistance.  I think both sides want this.  It is
9   important for the jury to actually see the films, and I am
10  trying to come up with solutions right now.
11            THE COURT:  Okay.  You are saying for another laptop,
12  you mean from the court?  Do you have another laptop or what's
13  going on?
14            MR. NORINSBERG:  There is a company that we work with
15  that has laptops that can be rented for this very purpose, to
16  put films on before a jury.  We've used them before.  We just
17  called them.  We are trying to see if we can get one brought
18  here right now.
19            THE COURT:  Let's do this. I assume that the MRIs that
20  you plan on showing this expert, that's not your first couple
21  of chapters of examination of this expert.
22            MR. NORINSBERG:  It is not, Judge.  I know what you
23  are saying, that we are not going to get to it right away.  I
24  would like to have a little more time to try to resolve this
25  because it is going to involve just setting it up and testing

555

DCC3GUZ1
```
 1   it.  With the Court's indulgence, maybe another 20 minutes to
 2   see if we can do this.
 3           THE COURT:  What is defense counsel's position on
 4   this?
 5           MR. KUNZ:  I'm sympathetic to the issue because I had
 6   also wanted to show the jury this particular MRI.  I did raise
 7   the issue that the CD was not working days ago.  But there has
 8   been a lot of indulgence with time.  If it is 20 minutes and we
 9   start at 9:40, I don't think that's a huge issue.  If I have
10   the time right.
11           THE COURT:  Okay.  My concern is I don't want to keep
12   the jury waiting.  I don't want the jury waiting kind of just
13   thinking we're not take their time seriously.
14           What's counsel's position if I bring the jury in here
15   and tell them we are going to start a little bit later today.
16   We appreciate their patience.  There is some technical issues
17   we need to resolve.  At least they know what's going on so they
18   don't think we are taking them for granted, because they work
19   hard to get here on time.
20           What's counsel's position on that?
21           MR. NORINSBERG:  Make sense to us, Judge.
22           MR. KUNZ:  That make sense.
23           THE COURT:  Tara, let's go ahead and bring the jury
24   in.
25           THE DEPUTY CLERK:  We are still waiting for one juror.
```

556

DCC3GUZ1

```
 1              THE COURT:  Can we contact our technical folks, see if
 2      they can come up and help?
 3              That other issue that was raised about Dr. Gidumal, I
 4      had a question.  The prior testimony from Dr. Gidumal and in
 5      these city cases, am I correct in assuming that the city was
 6      represented in all those cases by corporation counsel?
 7              MR. NORINSBERG:  Yes, definitely.
 8              THE COURT:  Okay.  So would there be an issue with
 9      allowing plaintiff's counsel to cross-examine on the fact that
10      this expert has been retained by corporation counsel every
11      time?  What is the problem with that?
12              MR. MODAFFERI:  Our first suggestion would be to say
13      he's been retained to be an expert in other cases where police
14      officers are defendants, without just saying the City of New
15      York or corporation counsel, thereby inferring the municipal
16      entity.
17              THE COURT:  I guess what I do worry about a little
18      bit, it does seem it is a fair argument that perhaps this
19      expert has a way to testify that's favorable to an agency that
20      employs him all of the time, or employs him frequently, or a
21      group of lawyers that employ him frequently.  It is different
22      to be retained by the defense and being paid by different law
23      firms over and over and over again just representing the
24      defense versus one law firm.  So if it were not corporation
25      counsel, if it were Shearman & Sterling, and this expert was
```

557

DCC3GUZ1
```
 1   retained by Shearman & Sterling 15 times, and that's who is
 2   representing the defendant in this case, it seems to me it
 3   would be appropriate for plaintiff's counsel to go into the
 4   fact that you're constantly retained by Shearman & Sterling.
 5   What is defense counsel's position on that?
 6              MR. KUNZ:  I guess I would say that Dr. Gidumal has
 7   done work for various divisions of the city, so it is not like
 8   I've retained Dr. Gidumal five times before.  This is the first
 9   time I've worked with him.  So I am not sure if that's the
10   exact impeachment that Mr. Norinsberg is going for.
11              But, I think Mr. Modafferi's solution here is probably
12   the best one, which is Dr. Gidumal has testified in cases for
13   the defense where the defendant was a police officer.  And I
14   think that gets him the impeachment he wants without having to
15   suggest that there is some higher power or deeper pockets
16   behind this litigation.
17              THE COURT:  What is plaintiff's counsel position?
18              MR. NORINSBERG:  That distorts the whole point.  The
19   point is he has an inherent bias because he keeps getting
20   retained by the same entity over and over again to come to
21   court to testify in behalf of city employees in lawsuits.  The
22   Court just pointed out an example of Shearman & Sterling.  It
23   would be the same with me.  If I brought an expert three or
24   four times, corporation counsel would be asking you worked with
25   Mr. Norinsberg on this case and this case and this case.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

558

DCC3GUZ1

1    That's the risk a party takes by continuously going to the same
2    expert over and over again.  And to start putting restrictions
3    on this, this is just classic bias.
4            THE COURT:  Let me think about that.  Let me bring the
5    jurors in and let them know we are having some technical
6    difficulties and to be patient and we'll get some testimony as
7    soon as we can.
8            (Jury present)
9            THE COURT:  The members of the jury are all here.  You
10   don't need to be seated.  I wanted to let you know something.
11   First of all, good morning.  I hope you had a pleasant evening.
12   I wanted to let you know we are having some technical
13   difficulties we need to get sorted out.  That's going to take a
14   while to get that sorted out.  We wanted to let you know we
15   appreciate your time.  And I wanted to let you know we are not
16   sitting here twiddling our thumbs, but there is some technical
17   issues we need to work out.  You can go back to the jury room,
18   and as soon as we got those sorted out, we'll bring you back in
19   here and get you some testimony.  Okay?  Thank you very much.
20           (Jury excused)
21           (Pause)
22           (Continued on next page)
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

559

DCCTGUZ2

```
 1                THE COURT:  OK.  So it's been about an hour, where are
 2      we with the technical issues at this point?
 3                MR. NORINSBERG:  We're getting there.  We have laptop
 4      that has the programs we believe uploaded onto it and we
 5      believe that we'll be able to put these CDs, but we're not
 6      sure.  But we have also originals coming from my office, so we
 7      think that may be OK.  We could proceed and then at an
 8      appropriate time we could come back during a break and see if
 9      we could get this set up.
10                THE COURT:  You said you have the other laptop?
11                MR. NORINSBERG:  We have it.  They texted my colleague
12      and he's going downstairs to get it now.  That's probably
13      another five to ten minutes, then we could see.
14                THE COURT:  What is the plan with this?  If this
15      laptop works, what do you plan to do with this laptop?
16                MR. NORINSBERG:  We could hook it up to the ELMO and
17      show the films to the jury.
18                THE COURT:  So can't the other attorney -- I guess the
19      other attorney could get that and make sure that's working and
20      give you a sign or something while you're up there.
21                MR. NORINSBERG:  I guess so, I'm not sure.
22                THE COURT:  You said originals are coming?
23                MR. NORINSBERG:  We're trying that also, yes.
24                THE COURT:  How long would it take for them to get
25      here?
```

560

DCCTGUZ2

```
 1              MR. NORINSBERG:  Someone is coming from my office.
 2              THE COURT:  How far away is your office?
 3              MR. NORINSBERG:  About ten minutes.
 4              THE COURT:  The defendants, your CDs, are those
 5    just --
 6              MR. KUNZ:  We have copies of the CDs.
 7              THE COURT:  So let's bring the jury back in.  Are
 8    counsel ready to bring the jury back?
 9              MR. NORINSBERG:  Yes.
10              MR. KUNZ:  Yeah.
11              MR. NORINSBERG:  I should bring the doctor in?
12              THE COURT:  Yes.
13              Does counsel want me to say anything about the jury?
14    I was thinking of tell the jury I think we worked out the
15    technicality issues, we will go ahead and see where we are, or
16    do you want me to not say something?
17              MR. NORINSBERG:  I think you should say we're not
18    quite there but we are ready to roll and we're going to give it
19    a shot during the break.
20              THE COURT:  Defense counsel?
21              MR. KUNZ:  That's fine.
22              THE COURT:  All right.  I'll tell them something that
23    we think we solved the technical issues but we're ready to
24    proceed anyway.  How does that sound?
25              MR. NORINSBERG:  Sounds good.
```

DCCTGUZ2                        Dassa - direct
1               THE COURT:  Let's bring in the jury.
2               (Jury present)
3               THE COURT:  So members the jury, we have made some
4       progress with the technical issues.  We think we have them
5       sorted out.  We'll go ahead and proceed and see how things go.
6               Plaintiff call your next witness.
7               MR. NORINSBERG:  At this time the plaintiff calls
8       Dr. Gabriel Dassa to the stand.
9        GABRIEL DASSA,
10            called as a witness by the Plaintiff,
11            having been duly sworn, testified as follows:
12      DIRECT EXAMINATION
13      BY MR. NORINSBERG:
14      Q.  Good morning, Dr. Dassa.
15      A.  Good morning.
16      Q.  Doctor, can you briefly tell us about your educational
17      background?
18      A.  Yes, I completed a four-year undergraduate and premedical
19      in biology and bachelor of science in biology at Fordham
20      University.  Upon completing that, I was accepted to medical
21      school at New York College of Osteopathic Medicine.  Upon
22      graduating, I was accepted to an orthopedic surgery residency
23      program at the Albert Einstein College of Medicine, and as a
24      prerequisite to that I had to do internship training.  And I
25      did a year of internship training in Coney Island Hospital in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

562

DCCTGUZ2                    Dassa - direct
1   Brooklyn, New York.  Upon completing that, a year of general
2   surgery training at St. Barnabas Hospital in the Bronx, New
3   York, then commenced my orthopedic surgery training in 1993 at
4   Albert Einstein College of Medicine at Bronx Lebanon Hospital,
5   and then I concluded my medical training with a year of hand
6   surgery fellowship training at the New York University Hospital
7   for Joint Diseases program.
8           THE COURT:  Hold on a second, let me check, I want to
9   make sure, can the jurors all hear the witness?
10          Go ahead.
11  Q.  Do you have any special certifications, Doctor?
12  A.  Well, I am board certified as an orthopedic surgeon.  I did
13  complete my initial certification in 1991, and then recertified
14  in 2010.
15  Q.  What does it mean to be board certified?
16  A.  Well, in the course of medical training, doctors have to do
17  medical training for a certain specialty.  In the realm of
18  specialty training programs, there are accredited and
19  non-accredited programs.  I did complete an accredited
20  residency program which made me what was deemed to be board
21  eligible.  That meant I was qualified to sit for an exam in my
22  field.  So I did complete a written part of an exam and then an
23  oral examination, and upon completing all sections you are
24  deemed to be functioning with the clinical competence in
25  keeping with the higher level of standard that is set forth by

563

DCCTGUZ2                    Dassa - direct

1   the peers in the field.
2   Q.  Doctor, are you currently affiliated with any hospitals?
3   A.  Yes, I am.
4   Q.  Which hospitals are you affiliated with?
5   A.  I have affiliation at Montefiore Medical Center in the
6   Bronx, New York, Bronx Lebanon Hospital Center in the Bronx,
7   New York, and Mount Vernon in Westchester County.
8   Q.  Do you hold any teaching positions?
9   A.  Yes.
10  Q.  Can you tell us about that, please?
11  A.  I have an associate clinical professorship at New York
12  Medical College in Valhalla in orthopedic surgery.
13  Q.  Doctor, have you authored any publications?
14  A.  Yes.
15  Q.  Tell us a little bit about that.
16  A.  In the course of performing medical training, you're
17  enlisted to do research.  In that process, you author several
18  papers.  I submitted papers for publication, had three
19  accepted.  One was accepted in the Sports Clinics of North
20  America, which had to do with sporting injuries in the upper
21  extremities.  I also had a paper authored that dealt with
22  bedsores and patients with hip fractures, as well as a paper
23  that was published pertaining to an operation that we had
24  devised when I was at NYU as part of my fellowship.
25  Q.  Are you a member of any medical organizations or societies?

564

DCCTGUZ2                    Dassa - direct
1   A.  Yes.
2   Q.  Tell us some of those.
3   A.  I'm a fellow of the American Academy of Orthopedic
4   Surgeons.  I am also a member of the AMA, the AOA, and also the
5   New York State Medical Society.
6   Q.  Doctor, do you currently have a private practice?
7   A.  I do.
8   Q.  Could you tell the members of the jury, what does your
9   private practice consist of?
10  A.  My practice is in the practice of orthopedic surgery.  I'm
11  a general orthopedist.  I do have a subspecialty in hand
12  surgery.  So I do predominately general orthopedics, what they
13  call the bread and butter orthopedic procedures, plus I'm also
14  a hand specialist.  So I do see more difficult cases that the
15  other community of orthopedics are not comfortable seeing as it
16  pertains to the hand.
17  Q.  Do you do knee surgeries?
18  A.  Yes, I do.
19  Q.  Approximately how many knee surgeries have you done in your
20  career?
21  A.  Can you repeat that?
22  Q.  How many knee surgeries have you done, approximately, in
23  your career?
24  A.  Thousands.
25  Q.  When was the last knee surgery you did?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

565

DCCTGUZ2                        Dassa - direct
1   A.  Yesterday.
2   Q.  Doctor, directing your attention to May of 2009, did Noel
3   Jackson-Guzman become a patient of yours?
4           MR. KUNZ:  Let the record reflect the witness is
5   paging through documents.
6           THE COURT:  OK.
7   A.  I do have a copy of a medical report prepared by myself on
8   May 4th of 2009 when I was employed for a company called All
9   Med Medical & Rehabilitation.
10  Q.  And while we're on that, why don't we very briefly cover
11  your employment history until you opened up your practice.
12  A.  Well, I had graduated from my fellowship and I was accepted
13  as the director of hand surgery and the curriculum director for
14  the residency program at Bronx Lebanon Hospital.  I commenced
15  that in 1998.  I did that until about 2000.  Then I became the
16  hand surgery director for Lincoln Hospital in the Bronx, New
17  York, and I did that until 2001.  And then I became the medical
18  director for a multispecialty health care organization called
19  All Med from 2001 through 2010, and I went into private
20  practice in November of 2010.
21  Q.  Doctor, did Mr. Guzman present to you with any type of knee
22  injuries?
23  A.  Yes, he did.
24  Q.  Before we get into the specifics of his knee injuries, I'm
25  wondering if you could step down.  And we have a diagram,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

566

```
DCCTGUZ2                      Dassa - direct
 1   anatomical diagram, if could you explain to us the basic
 2   anatomy of the knee.
 3            MR. NORINSBERG:  We have it over here, Doctor.
 4            THE COURT:  Can all the jurors -- you can move if you
 5   need to see that.  And defense counsel, if you wish, you can
 6   move up closer.
 7   A.  This is a graphic representation of the knee joint, anatomy
 8   of the knee.  The knee is a hinged joint, and when you are
 9   looking at the knee, a joint is composed of bones that are
10   connected with ligaments.  So on top you see here the thigh
11   bone or the bottom of the thigh bone, which is the femur.  In
12   front the femur you have patella or commonly called the
13   kneecap, then you have the bottom bone of your shin bone, which
14   is your tibia.  And the shadow that you see on the side here is
15   the outline of a fibula, which is the skinny chicken-like bone
16   that you see on the proper picture.
17            So this is an accurate representation of a knee, and
18   the specifics, it would be right knee, because fibula would be
19   on the outside of the right knee facing you.  So looking at the
20   knee joint, you have bony structures has described, and they
21   are connected by ligaments, and the ligaments are what give
22   stability to your knee.  You have external ligaments, which are
23   the collateral ligaments.  So we have the ligament that is
24   external on the outside of the knee, that's called the lateral
25   collateral ligament.  The knee ligament that is external on the
```

567

DCCTGUZ2                        Dassa - direct

1    inside part of the knee is called medial collateral ligament.
2    And also, in addition you any have internal ligaments that are
3    there.
4            So I'm sure you've heard of athletes who have been
5    injured, they have had an ACL injury, so that would be the
6    interior cruciate ligament.  They don't have it labeled, but
7    posterior to the ACL you can see them at an oblique angle to
8    the ligament called the PCL, posterior cruciate ligament.
9    There are two very taut, thick internal ligaments which provide
10   the major stability to the knee and are supplemented by two
11   external ligaments, the medial collateral ligament and the
12   lateral collateral ligament.
13           And the structures that I'm pointing to here are
14   structures made of fibrocartilage, and these cartilages are
15   called meniscus.  So as we have the collateral ligaments, you
16   have the collateral meniscus, and for the medial ligaments you
17   have the medial meniscus.  And these structures serve as shock
18   absorbers between the femoral bone and the tibia bone.
19           And on the surface of the bone, as represented here,
20   you have the articular cartilage.  So if you open up the ends
21   of a chicken bone and you see a white glistening substance,
22   that would be the articular cartilage or the hyaline cartilage.
23   And that is also present on the meniscus or the tibia as well
24   under the kneecap.
25   Q.  We also have an anatomical model.  Would that assist in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

568

DCCTGUZ2                        Dassa - direct
1    further explaining the knee?
2    A.  Yes.  So again, just to reiterate, if you're looking at the
3    right knee, the fibula is on the outside, this is the tibia,
4    the top is the femur, and again, the knee is connected by
5    ligaments, so you have the lateral collateral ligament.
6              THE COURT:  Hold on a second.  Can everyone see that?
7              (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

569

DCC3GUZ3                    Dassa - direct

1    A.  You have the medial collateral ligament.  And consistent
2    with what's on the graphic representation, now, if I was to
3    dislocate the kneecap, you can see the under surface of the
4    kneecap.  Okay, and the kneecap, which is not present on this
5    view, is held -- it connect yours thigh muscles to the kneecap
6    by the quadriceps tendon, and it attaches to the tibia.
7            If you rotate the kneecap out and bend the knee, you
8    can see this is the articular cartilage, this is the meniscus
9    between the joint, and in between in the center are the
10   cruciate ligaments as distracted, if you can see.  Everybody
11   can see that?
12   Q.  Which particular ligaments were involved with the treatment
13   of Mr. Guzman?
14   A.  Well, again, if you go through the medical record, there
15   was a surgical treatment performed to repair the ACL, PCL, and
16   the lateral collateral ligament.
17   Q.  We'll get into that shortly.  Also I want to ask you about
18   the nerve structure in the knee and particularly the peroneal
19   nerve.  If you can use this diagram and explain that, we would
20   appreciate it.
21   A.  So, this is another graphic representation of a leg.  This
22   would be the right leg.  And again, you can see just to
23   reiterate the bony anatomy, femur, patella, and tibia, and this
24   bony structure which is under the muscle down here is the
25   fibula.  That would be representative of this skinny bone.

DCC3GUZ3                        Dassa - direct
1          Now, as the nerves exit from your spine, out of your
2     pelvis into your legs, they form and traverse as several
3     branches.  One of the major branches that passes into the lower
4     leg is the peroneal nerve.  This is a nerve that courses from
5     the thigh down the outside part of the leg and actually it
6     rides right behind the fibula head.
7          So if I have to show you where that nerve would be
8     living in the leg, it would be behind the fibula head, in this
9     area.
10          And in essence, you can see graphically the fibula
11     head would be up right about here, and this is where the nerve
12     courses right behind that head.  And as it passes into the
13     muscle, it breaks up into several branches and they course all
14     the way down to the foot.
15          And this one is the most annoying.  If you've ever
16     crossed your leg and you kept it that way for a little while,
17     your foot falls asleep that's because you're compressing one of
18     the branches the of the peroneal nerve.
19     Q.  What is the main function of the peroneal nerve?
20     A.  Generally it is to control muscle function.  You can see
21     the branches do attach to several muscles.  But one of the
22     major functions is to maintain dorsiflexion.  If I have to look
23     at a foot, or my foot from the side.
24     Q.  We have a foot model.  Maybe that would help.
25     A.  It does provide sensation, but also it provides the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

571

DCC3GUZ3                        Dassa - direct
1    ability -- now if this is neutral, that is plantar flexion or
2    pointing your toes to the floor, it allows you to bring the
3    foot up to the ceiling from a neutral position.
4    Q.  Does it have any impact on the toes as well?
5    A.  Well, again, as part of the dorsiflexion process, any
6    muscles that will extend the ankle are affected by that
7    process.  Also to affect sensation to the dorsum of the foot.
8    Q.  You can go back to the stand now.
9              Doctor, before we actually get to your treatment I'd
10   like to ask you about some of the medical treatment that
11   Mr. Guzman received before he came under your care.  Do you
12   know which hospital Mr. Guzman was brought to?
13             MR. KUNZ:  Let the record reflect that the witness is
14   paging through documents.
15             THE COURT:  Okay.
16   A.  Again, I have records from several hospitals, but I do have
17   a record from Harlem Hospital.
18   Q.  So that's the one I wanted to start with.  We did have some
19   preliminary discussion yesterday from the emergency room
20   physician.  I want to follow up with a few questions with you
21   here.
22             MR. KUNZ:  This is Plaintiff's 12?
23             MR. NORINSBERG:  This is plaintiff's 12.
24             MR. MEEHAN:  Page four of Plaintiff's 12.
25   Q.  Doctor, just starting with the entry where it says most of

DCC3GUZ3                          Dassa - direct

1    pain is localized collateral aspect of knee.  Distal thigh and
2    proximal fibula.  Can you just tell us medically what that
3    means.
4    A.  Well, basically that would represent that his symptoms were
5    maximized and local to the upper outer aspect of his knee.  So
6    if you recall to what we described on the diagram, if you --
7    actually, may I have the knee model?
8    Q.  Sure.
9    A.  Basically what that is describing --
10            THE COURT:  Can everyone see?  I see someone shaking
11   their head.  Feel free to move carefully someplace where you
12   can actually see.
13            What is the witness holding?
14            THE WITNESS:  Again, Dassa, this is a model of the knee as
15   described.  This would be the bottom of the thigh.  Lateral
16   aspect over the fibula head.
17            THE COURT:  Hold on just a second.  You need to move?
18   Are you good?
19   A.  So it would be directly over this area.
20   Q.  I'd like to put up a photograph we have in evidence
21   Plaintiff's 1C.  Does that correspond with the lateral aspect
22   of the knee and the distal thigh and proximal fibula?
23   A.  Yes, it does.
24   Q.  The area that's described in Harlem Hospital is the same we
25   are looking at here in the photograph?

573

DCC3GUZ3                        Dassa - direct

1   A.  Yes.
2   Q.  I'd like to discuss some of the medical records from New
3   York Presbyterian Hospital which is the next hospital
4   Mr. Guzman visited.
5           MR. NORINSBERG:  I'd like to just first offer into
6   evidence the records from New York Presbyterian Hospital, your
7   Honor.
8           THE COURT:  As what?
9           MR. NORINSBERG:  Plaintiff's 14.
10          THE COURT:  Any objection?
11          MR. KUNZ:  No, your Honor.
12          THE COURT:  They're in.
13          (Plaintiff's Exhibit 14 received in evidence)
14  Q.  Let's try to read this together and then I am going to ask
15  you about these records which are from February 17, 2009, three
16  days after the incident.
17          Doctor, do you see where it says CC HPI?
18  A.  Yes.
19  Q.  What does that mean?
20  A.  That means chief complaint history of present illness.
21  Q.  Then it says persistent right knee leg ankle swelling.
22  Pain weakness.  States he was struck slash kicked.  Do you see
23  that, Doctor?
24  A.  Yes.
25  Q.  What is the significance of the fact that it is persistent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

574

DCC3GUZ3                       Dassa - direct

1   right knee leg and ankle swelling?
2   A.  Well, it represents that whatever incident occurred as
3   described, it was having lasting effects with swelling and
4   persistent symptoms of pain and weakness.
5   Q.  Going to the bottom where it says right knee leg ankle with
6   edema.  What does that mean?
7   A.  Edema is a term for swelling that is due to increased fluid
8   content in the soft tissues.
9   Q.  Where it continues it says bruises, decreased strength and
10  ROM.  What is that?
11  A.  That is range of motion.
12  Q.  What is the significance of this finding three days after
13  the incident that there is decreased strength and decreased
14  range of motion?
15  A.  Again, as I stated earlier, it is representative that
16  whatever process that was occurring earlier is continuing with
17  edema and swelling.  Edema and swelling represent worsening of
18  an injury.  Bruising is just describing what you showed me on
19  the pictures.  And decreased strength and range of motion is
20  the physical effects as it is manifesting in his function in
21  that he has decreased strength and loss of range of motion to
22  the ankle.  Or to the knee, I'm sorry.
23  Q.  Doctor, are you familiar with what is known as a Doppler
24  study?
25  A.  Yes.

575

DCC3GUZ3                    Dassa - direct
1    Q.  What is a Doppler study?
2    A.  Well, a Doppler is a study that is done utilizing
3    ultrasound.  And generally, it is employed to assess
4    circulation.  Typically it is utilized to assess a person's
5    blood flow, so there are dynamic Dopplers that will assess how
6    the blood is flowing to an organ.  And also a Doppler is
7    utilized to assess for blood clots.
8    Q.  Can you tell just from looking at this what we're looking
9    at, Doctor?
10   A.  Yes.
11   Q.  What is that?
12   A.  That is a report from -- of a lower extremity venous
13   Doppler of the right leg.
14   Q.  Why would the hospital be ordering a Doppler study for
15   Mr. Guzman three days after this incident?
16           MR. KUNZ:  Objection, your Honor.
17           THE COURT:  Overruled.
18   A.  Well, again, Doppler studies are typically ordered when
19   there is a high suspicion for a blood clot.  Generally when
20   patients come into an office or hospital setting with profound
21   swelling of one leg, generally that, in competent institutions,
22   would trigger the request for a Doppler because it raises a
23   high suspicion for a blood clot.
24   Q.  What were the results of this Doppler?
25   A.  There was no evidence of a deep venous thrombosis, which in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

576

DCC3GUZ3                    Dassa - direct
1    layman's terms it was negative.
2    Q.  Doctor, there is an indication in the hospital records to
3    instruct Mr. Guzman to remain non-weight bearing and elevate
4    his leg.  What is the reason for that?
5              MR. KUNZ:  Objection.  What medical record is this?
6              MR. NORINSBERG:  The New York Presbyterian Hospital
7    records.
8              THE COURT:  Rephrase the question, please.
9    Q.  What would be the reason why a medical facility would
10   instruct a patient to elevate their leg or keep their leg
11   elevated?
12   A.  In general, in any instance of swelling, the treatment to
13   alleviate the swelling would be to provide elevation, and that
14   would be a general instruction to any body part that is
15   swollen, to elevate to try to alleviate swelling.
16   Q.  I'd like to discuss with you a record from May 23, 2009,
17   five weeks after this incident from the Columbia Presbyterian
18   Medical Clinic.
19             MR. NORINSBERG:  It is Plaintiff's Exhibit 15.  I'd
20   like to offer that into evidence.
21             THE COURT:  Any objection?
22             MR. KUNZ:  No objection.
23             THE COURT:  It's in.
24             (Plaintiff's Exhibit 15 received in evidence)
25   Q.  Doctor, I'd like to start with the chief complaint here.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

577

DCC3GUZ3                          Dassa - direct

1   It says patient is 23 years old, 23-year-old male with chief
2   complaint of pain, swelling, and decreased sensation to RLE
3   below the knee.  What does RLE stand for?
4   A.  That would be right lower extremity.
5   Q.  Reading now from the history section.  Patient reports that
6   he has RLE pain below the knee associated with weakness and
7   decreased sensation.  He states that these symptoms have been
8   present for one and a half months.  Patient reports history of
9   being kicked in the leg before the onset of his symptoms.
10          What is the significance of the medical complaints
11  that are documented here five weeks after this incident?
12  A.  Well, I mean basically, going on the timeline, it does
13  represent continuation of dysfunction to the leg or the right
14  leg.  He's now showing symptoms of decreased sensation,
15  associated with weakness.  And in essence, it would represent
16  some type of objective injury to some type of nervous
17  structure.
18  Q.  Reading from page two of this same record from Plaintiff's
19  15, Columbia Presbyterian Medical Clinic, a physical exam was
20  conducted at that time.  And I'd like to ask you about some of
21  the findings.  First, if you see where it says musculoskeletal
22  extremities?
23  A.  Yes.
24  Q.  What does that mean, Doctor?
25  A.  Well, that is just a subsection of the physical exam which

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCC3GUZ3                        Dassa - direct

1  would be the musculoskeletal exam which was targeting the
2  muscles, joints, bones, and on that particular case it was
3  focusing on the lower extremities.
4  Q.  It says strength five out of five throughout, except zero
5  out of five right ankle.  What does that mean, Doctor?
6  A.  Well, if you look at what is qualifying for normal strength
7  on a physical exam, muscle strength is measured out of five.
8  So, a person who has normal muscle strength it would be
9  considered to have five over five for the muscles tested.  So
10 that represents that all muscles that were tested were strong
11 and normal, except for those around the right ankle which had
12 zero over five, or no muscle power.
13 Q.  What is the significance of that finding from a medical
14 standpoint?
15 A.  Well, it represents dysfunction of those muscles that would
16 move the ankle.  It shows that it is affecting all ranges of
17 motion, dorsiflexion, inversion and eversion.  So, in essence
18 it is affecting all the ankle movements.  So it represents that
19 there is some dysfunction to the ankle.
20 Q.  You had indicated earlier what dorsiflexion and plantar
21 flexion is.  Can you explain what movement is covered by
22 inversion and eversion?
23 A.  If you look at the ankle, there are four coupled movements.
24 So you have plantar flexion which is pointing the toes down.
25 You have dorsiflexion.  And then if you look at the ankle from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

579

DCC3GUZ3                    Dassa - direct

1  this plane, you have inversion which is turning the ankle in,
2  and you have eversion which is turning the ankle out.  So there
3  are four coupled movements when it comes to a normal ankle
4  joint.
5  Q.  These movements are all compromised or at least three of
6  them are, is that correct?
7  A.  Well, as described, they describe basically no muscle power
8  in inversion, eversion, and dorsiflexion.
9  Q.  The next line says sensation intact to light touch except
10  decreased lateral aspect RLE below the knee.  Dorsum of right
11  foot and in first web space.  It is describing decreased
12  lateral aspect of right lower extremity.  What does that mean?
13  A.  It is basically documenting an impairment to his ability to
14  feel in the lower part of the leg, on the outside portion of
15  his right lower extremity.
16  Q.  What is the significance from a medical standpoint of that
17  finding?
18  A.  Again, the weakness and sensory impairment all point to a
19  nerve injury or some type of compromise to a nerve.
20  Q.  Going to page three of this exhibit, it says assessment.
21  23-year-old male with RLE pain, weakness, decreased sensation
22  after being kicked in the just below the knee in the lateral
23  aspect of his RLE.  Patient's symptoms may be due to -- is that
24  how to read that?
25  A.  Yes.

580

DCC3GUZ3                          Dassa - direct
1   Q.  Patient's symptoms may be due to peroneal neuropathy.
2   First of all, Doctor, what is peroneal neuropathy?
3   A.  A neuropathy is a dysfunction of a nerve.  And
4   specifically, it would be referencing the peroneal nerve which
5   is the nerve we described earlier.  So, they were trying to
6   rule out neuropathy or dysfunction of the peroneal nerve.
7   Q.  Then it says patient referred for NCS EMG to evaluate RLE
8   peroneal neuropathy.  What is that?
9   A.  The NCS EMG is an electrophysiological study.  In all cases
10  where nerve dysfunction is suspected, you do an NCS EMG, which
11  will assess nerve function at the spinal cord where nerves come
12  out of the spinal cord as well as the peripheral nerves.  So
13  the EMG would test the nerves of the spinal cord where they
14  exit from the spine or the central nervous system.  And then
15  NCS would assess the function of the peripheral nerve system.
16          In doing that, you would do this test to assess if
17  this peroneal dysfunction coming from up above, or in the
18  spinal cord.  Or is it coming from a local injury in the leg.
19  And that's basically the test and the purpose of that test.
20  Q.  Doctor, you eventually ordered an NCV EMG test for
21  Mr. Guzman, is that correct?
22  A.  Yes.
23          MR. NORINSBERG:  I'd like to offer in Plaintiff's
24  Exhibit 16, the results of the NCV EMG test.
25          MR. KUNZ:  No objection.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

581

DCC3GUZ3                    Dassa - direct
1              THE COURT:  It's in.
2              (Plaintiff's Exhibit 17 received in evidence)
3     Q.  Looking at the summary of findings together, Doctor.  It
4     notes an absence of responses of the right peroneal nerve.
5     What does that mean?
6     A.  It in essence when these tests are done, they check for the
7     conductibility of a nerve.  So they will stimulate a nerve on
8     one end, and transmit an impulse through the nerve to a point
9     in distal to that and vice versa.  And as the impulse is
10    conducted or not conducted, it is measured on a transducer.
11    And basically what that is saying is that there is no
12    conduction capacity of the peroneal nerve.  Basically it is not
13    responding.  There is no function of the peroneal nerve.
14    Q.  Is this an objective test or subjective test?
15    A.  It is an objective test.
16    Q.  What do you mean by objective?  Does the patient have any
17    input in this?
18    A.  No.
19    Q.  When it notes at the bottom impression.  The study results
20    are suggestive for right peroneal neuropathy.  Is that
21    consistent with the finding that was made at the clinic five
22    weeks after this incident?
23    A.  Yes.
24    Q.  Doctor, this is referring to page three of the same record.
25    Do you see where it actually talks about this particular nerve,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

582

DCC3GUZ3                     Dassa - direct

1    the motor nerve?
2    A.  Yes.
3    Q.  It depicts almost a flat line?
4    A.  Yes.
5    Q.  Is that a visual indication that there is no response going
6    on when this nerve is stimulated?
7    A.  Well, if you look at these different graphs, and the best
8    characterization is to look at adjacent studies for other
9    nerves.  And generally conduction strength is measured in
10   amplitude.  And the amplitude is how high the graph peaks.  If
11   you look on the right peroneal motor, there is absolutely no
12   shift in that graph at all which means there is no electrical
13   activity in the nerve, and that represents the nerve is
14   completely dysfunctional.
15   Q.  Doctor, just going back to Plaintiff's 1C that we showed
16   before.  Where would the peroneal nerve be if you can see
17   through this photograph.  Where is it located?
18   A.  May I have your pointer, please.
19   Q.  Sure.
20   A.  So as stated on the model, this would be your thigh bone or
21   your femur.  This is your fibula.  So the peroneal nerve is
22   coursing down here and it runs right behind the head of the
23   fibula.  Which would be right here.  So it would be in this
24   area.
25   Q.  So it would be in the same area where the bruises are

DCC3GUZ3                    Dassa - direct

1   depicted?
2   A.  Yes.
3   Q.  Are these photos consistent with blunt force trauma to the
4   right knee?
5   A.  Yes.
6   Q.  Could blunt force trauma to the knee cause damage to the
7   peroneal nerve?
8   A.  Yes.
9   Q.  So blunt force trauma could cause peroneal neuropathy that
10  was diagnosed, is that correct?
11  A.  Yes, it can.
12  Q.  Doctor, you're familiar with what's referred to as a
13  history?
14  A.  Yes, sir.
15  Q.  When you first evaluated Mr. Guzman in May of 2009, three
16  months after the incident, did you obtain a history from him?
17  A.  Yes.
18  Q.  What was the history?
19  A.  Basically he had reported that he was assaulted on
20  February 14 of 2009.  He stated that he was exiting a nightclub
21  and was assaulted by a police officer who he stated had
22  suddenly kicked him in his right knee after which time he was
23  knocked to the ground, causing injury to his back as well as
24  his knee and neck.
25  Q.  Did you actually examine Mr. Guzman's knee during that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

584

```
     DCC3GUZ3                    Dassa - direct
 1   first evaluation?
 2   A.  Yes.
 3   Q.  What did your exam consist of?
 4   A.  It consisted of a visual inspection, which noted that he
 5   did have some moderate swelling to the right knee as compared
 6   to the left.  A range of motion assessment was performed.  And
 7   we measure two ranges of motion for the knee.  One would be
 8   flexion, which is the ability to bend the knee.  And extension
 9   which would be the ability to completely straighten up the
10   knee.  So his flexion was measured and documented to be
11   110 degrees on the right, and 140 degrees on the left.  And his
12   extension was measured to be 0 degrees right and left which was
13   normal.  Right and left.
14              THE COURT:  Just so the record is clear.  Doctor,
15   you've been looking at some documents as you're answering these
16   questions.
17              THE WITNESS:  Yes.
18              THE COURT:  Without referring to any specific
19   document, that entire group of documents that you are looking
20   at, what is that group of documents?
21              THE WITNESS:  This is my medical record.  It is my
22   treatment record of Mr. Guzman.  Plus additional medical
23   records pertaining to his treatment prior and subsequent to my
24   office visits.
25              THE COURT:  As you're looking at those documents
```

DCC3GUZ3                    Dassa - direct
1    before you answer those questions, are you looking at those
2    documents to refresh your recollection?
3              THE WITNESS:  Yes, sir.
4              THE COURT:  Thank you.
5              MR. NORINSBERG:  Your Honor, at this time, maybe we
6    can just offer the doctor's chart into evidence and then if
7    there is any issue we can just read a record.
8              MR. KUNZ:  No.  We have an objection to that.
9              THE COURT:  Why don't we do this.  Why don't we take
10   our morning break now and let's have the jury come back at
11   11:40.  Okay?
12             (Jury excused)
13             THE COURT:  Do we need to excuse the doctor for the
14   moment?
15             MR. KUNZ:  I don't think so.
16             THE COURT:  What is it, counsel, you're planning to
17   introduce?
18             MR. NORINSBERG:  Let's just put his chart into
19   evidence.
20             THE COURT:  Which chart?
21             MR. NORINSBERG:  The doctor brought all of his
22   records.
23             THE COURT:  All of his medical records?
24             MR. NORINSBERG:  Subject to any appropriate redactions
25   that either side would have.

586

DCC3GUZ3                         Dassa - direct

1              THE COURT:  Was that the entire file that's not listed
2      on the joint pretrial order?
3              MR. NORINSBERG:  Well, what we do have here, and I'm
4      certainly willing to use this instead.  It might be easier.  We
5      have as Exhibit 18 all of the narrative reports.  There are
6      many additional records he has that are part of his chart,
7      which have been part of the medical care and treatment that he
8      has given Mr. Guzman.  So I think they're all relevant.  If the
9      Court wanted to simply streamline it, I can use what we already
10     have as Exhibit 18, which is just the narratives.
11             THE COURT:  All these other documents that you are
12     talking about, are these things the defense has seen?
13             MR. NORINSBERG:  Yes.  We gave a copy.  They asked for
14     all the copies he had reviewed before his deposition that day.
15     It is the same chart, so we gave them a copy.
16             THE COURT:  They are not in the joint pretrial order.
17             MR. NORINSBERG:  They are not designated as such, no.
18     The only thing why were just the narrative records.
19             THE COURT:  Then that objection is sustained.
20             MR. NORINSBERG:  Okay.  I would like to, when we get
21     back, to offer his narrative reports in at least.
22             THE COURT:  Any objection to that?
23             MR. KUNZ:  When you say narratives, I believe he means
24     Exhibit 18.  So typically, expert reports don't come into
25     evidence.  And I understand there is some dispute among the
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

587

DCC3GUZ3                        Dassa - direct
1   parties about whether or not these are treating records or
2   expert reports.  So, if I could just maybe address that just
3   when we come back from the break.  I was not anticipating the
4   plan of offering these because typically expert reports don't
5   come in.
6            MR. NORINSBERG:  And I agree with that proposition.
7   We just disagree about these as being expert reports.  Almost
8   every one of them, except the very last one, was done by the
9   doctor himself having nothing to do with being asked to
10  formulate any opinions.  Which MRI is this?
11           MR. MEEHAN:  May 2009.
12           THE COURT:  Go ahead and take your break, if you need
13  to use the restroom or anything like that.
14           (Recess)
15           MR. NORINSBERG:  What we've agreed to do is put in
16  Plaintiff's 18 except for the last evaluation which was done in
17  November.  I've agreed to remove that so we are going to keep
18  all the treating records.  The most recent evaluation we've
19  taken out.
20           MR. KUNZ:  Pages one through 19 we have no objection
21  to.
22           THE COURT:  So I'll bring the jury in.
23           MR. NORINSBERG:  Yes.
24           THE COURT:  I suppose let me hear from the parties on
25  this.  I will consider this redacted version of Plaintiff's 18
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

588

DCC3GUZ3                          Dassa - direct
 1  as Plaintiff's 18.  I don't want to state to the jury -- no one
 2  needs to state anything as redacted or anything of that nature.
 3  So we'll call it 18 and have it in.
 4             (Jury present)
 5             THE COURT:  You can sit where you were sitting before
 6  if it helps you see.  You don't have to remain in those seats
 7  right now.  I think before the break plaintiff's counsel was
 8  seeking to admit an exhibit.  What exhibit is that?
 9             MR. NORINSBERG:  Plaintiff's Exhibit 18.  Dr. Dassa's
10  reports.
11             MR. KUNZ:  No objection.
12             THE COURT:  That's in.
13             (Plaintiff's Exhibit 18 received in evidence)
14  Q.  Doctor, I believe where we left off you had described the
15  results of your knee examination for Mr. Guzman.  You indicated
16  that there was a loss of motion on the right knee, is that
17  correct?
18  A.  Yes.
19  Q.  You said it was 110 degrees?
20  A.  Yes.
21  Q.  The normal is 140 degrees?
22  A.  Yes, sir.
23  Q.  You also indicated that there was swelling present at that
24  time, three months after this incident.  What is the
25  significance of swelling at that point?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

589

DCC3GUZ3                          Dassa - direct
1   A.  Well, in general, the significance of swelling is
2   representative of soft tissue dysfunction.  Swelling that's
3   persisting three months after an incident represents that it is
4   still a process that is causing soft tissue dysfunction.  And
5   more than likely was a severe insult.
6   Q.  Doctor, did you order any diagnostic tests after you
7   evaluated Mr. Guzman in May of 2009?
8   A.  Yes.
9   Q.  What specific test did you order?
10  A.  An MRI of his right knee, his right shoulder, his neck and
11  lower back.
12  Q.  Let's focus on the knee right now.
13           MR. NORINSBERG:  We actually have the MRI here.  We'd
14  like to offer it into evidence.
15           THE COURT:  What exhibit is that?
16           MR. NORINSBERG:  It is going to be Plaintiff's 23.
17           THE COURT:  Any objection?
18           MR. KUNZ:  No objection.
19           MR. NORINSBERG:  And the corresponding MRI report is
20  Plaintiff's 22.
21           THE COURT:  Any objection?
22           MR. KUNZ:  I have no objection to the corresponding
23  MRI.  I just think it might actually be 24, not 22.  I mean the
24  corresponding report.  I think turn the page you'll see what I
25  mean.  Into.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

590

DCC3GUZ3                      Dassa - direct
1              MR. NORINSBERG:  There are two reports in there.
2     Counsel is correct.  So it is 23 and 24.
3              THE COURT:  Any objection to those?
4              MR. KUNZ:  No objection.
5              THE COURT:  23 and 24 are in evidence.
6              (Plaintiff's Exhibit 23, 24 received in evidence)
7     Q.  Doctor, if you could take a look at Plaintiff's 23 and
8     explain to us what this MRI shows.
9     A.  Well, just for background information, an MRI basically is
10    an internal photograph that is created.  And how that is done,
11    generally, is an extremity or a body part is exposed to a
12    magnetic field, and the magnetic field is exposed to the body
13    part.  And it gives back energy that is absorbed by a
14    transducer, and it creates an image as a result of a computer
15    processing what the body is giving back to the transducer.  And
16    in interpreting MRI results, tissues that are normal give out
17    certain signals and they'll show up as certain colors when
18    they're normal.
19              So, in this particular sequence, muscle is normally
20    gray, bone marrow in this sequence is black.  And in other
21    sequences the bone marrow will be white and the muscles will be
22    dark and the fluid will be white.
23              So, you're basically looking at multiple sequences or
24    photographs that are taken as slices through the anatomy.  And
25    in this particular case we're dealing with Mr. Guzman's right
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

591
DCC3GUZ3                    Dassa - direct
1   knee.
2          Now, if I would ask you to double click on this image.
3   If you can just arrow down on your computer keyboard, just hit
4   the down arrow.  Keep going.  Now stop.  So now, how do we know
5   where we are at in the anatomy.  Can you just back up one.
6          So if we're looking at the knee, again on the outside
7   of the knee is the skinny bone which is the fibula.  So, we
8   know that we're slicing through the outside part of the knee
9   going from outside to in, because you can see the head of the
10  fibula bone which is present here, and media or inner to that
11  is the tibia.  If you progress the slices.  Stop.  Now go back
12  one more.
13         You can see the fibula is still present on this view
14  so you're getting progressively more inside the knee.  Now if
15  you go advance it again.  Now you see the fibula is gone.
16  Because now, you are slicing through the knee at around this
17  area.  So, that is what this is representing.
18         So, just for again informational reasons so you can
19  understand what we're talking about, this is the femur, a slice
20  through the femur bone or the thigh bone.  This is the tibia
21  bone.  This is the articular surface or joint surface.  These
22  triangular structures are the meniscus cartilages.  If you
23  recall on the model in between the joint is the meniscus tissue
24  which is represented by these triangular structures.
25         So, in interpreting this at least on this view, you
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

592

DCC3GUZ3                    Dassa - direct
1   can see that the bony articular looks normal.  There is no
2   bright signals in the dark signal to indicate any bony trauma.
3   The meniscus tissue looks healthy and not torn.  If you
4   progress to go forward next.  Keep going.  Keep going.  Stop.
5   Go back one more.
6           Now, the first thing that you do as you -- the first
7   thing that you see as you progress to the inner structure of
8   the knee, would be the ACL.  Now the ACL has a signal intensity
9   similar to the patella tendon which is a ligament.  So the ACL
10  if it was intact would look like a grayish structure that would
11  go from the anterior part of the tibia, which would be the
12  front of the tibia, to the back of the femur.  If you look
13  here, this structure is -- you don't see a structure.  There is
14  just a mass of white which means the ACL is absent.  There is a
15  complete tear of the ACL on this view.  If you can go progress,
16  keep going.  Go back.  One more.  Go ahead.  Stop.
17          And, this structure here is the PCL.  Again, for
18  similar reasons, you would expect a normal PCL to have this
19  signal intensity.  Here you can see some fibers of it, and
20  actually, the PCL is actually torn and scarred, so there is
21  some deforming of the upper part of the PCL but there is
22  actually no continuity, no connection of the PCL to the tibia.
23  So this is representing a torn posterior cruciate ligament.  If
24  you take the prior sequence correlating this, you have a torn
25  ACL and PCL on this MRI.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

593

DCC3GUZ3                    Dassa - direct

1    Q.  Is there a lateral collateral ligament that can be viewed
2    on this film?
3    A.  If you can go back to the initial images that you showed
4    me.  If you double click on this one.  Can you cycle through
5    that, please.  Go back.  Can you switch over to back to the
6    other image that you had.  Go back to this one.
7                MR. MEEHAN:  This one?
8                THE WITNESS:  Yes.  Click back to the very first one
9    where we saw the fibula head.  Keep going.  Keep going.
10               MR. MEEHAN:  This is the first.
11               THE WITNESS:
12   A.  See, the problem here is that here is the fibula.  When
13   they did this first cut, it wasn't superficial enough for you
14   to see the LCL.  So the part or the slice that you would
15   normally see it on is not present on this film.  So you don't
16   actually see the LCL on this image.
17   Q.  So, you see the ACL tear, you see the PCL tear clearly.
18   You can see both on this image, right?
19   A.  Yes.
20   Q.  But the LCL, the lateral collateral ligament, is obscured?
21   A.  Well, it is not there.  They just didn't slice through it
22   because they started their first image deep, deeper to the
23   ligament so you actually can't see it on the slice.  There
24   should have been one or two slices more superficial to the
25   actual bone in order to see the ligament.  Because if you look

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

594

DCC3GUZ3                    Dassa - direct

1   on this model you can see how superficial the ligament is to
2   the bone itself.  So, they actually sliced through this area
3   after the ligament.  So it is just not on the view.
4   Q.  Doctor, did you come to learn that during the operation
5   they did in fact find an LCL tear as well?
6   A.  Yes.
7   Q.  Does it surprise you that there would be an LCL tear
8   recognized during the operation that's not showing up on film?
9   A.  Again, MRIs are not 100 percent.  Frequently, I find things
10  in a knee joint that are not documented on an MRI.  So, if you
11  ask me if I'm surprised that they found something that's not
12  documented on the MRI, no.  I would not be surprised.
13  Q.  Doctor, typically, a report is generated by the radiologist
14  in connection with these MRIs that are taken, is that correct?
15  A.  Yes, sir.
16  Q.  Have you seen the MRI report from Bainbridge Avenue MRI?
17  A.  Yes.
18  Q.  I'd like to put this on, Plaintiff's 24.  You see up top it
19  says clinical information and then it says trauma to the knee.
20  Knee pain possible tear.  Doctor, you were the one that
21  referred Mr. Guzman for this evaluation?
22  A.  Yes.
23  Q.  Then at the bottom, it says impression.  Chronic tear of
24  the ACL with scarring resulting deformity of the PCL.  What
25  does that mean?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

595

DCC3GUZ3                    Dassa - direct

1   A.  I mean, basically it is just the same description of what I
2   described on the MRI film.  He doesn't actually say the PCL was
3   torn.  He states that it is deformed.  But the PCL was torn on
4   that film as well.  And in essence it is an ACL injury or tear.
5   And what he described is resulting deformity of the PCL.
6   Q.  The date of this exam is May 29, 2009.  So that's
7   approximately three and a half months after the incident, is
8   that correct?
9   A.  Yes.
10  Q.  According to MRI report it says ACL tear is chronic.  Can
11  you please tell us what does the term "chronic" mean in this
12  context?
13  A.  Well, again, you're dealing with a radiologist who is
14  examining diagnostic studies absent clinical information.  So
15  they don't really specify when this knee trauma occurred.  It
16  doesn't say one month, five months, six months.  In general
17  when you're looking at MRI findings, you have findings that
18  occur most close to the time the injury happened or in the
19  acute phase.
20         And in that when I say those findings, you have edema,
21  swelling, you have hemarthrosis or bleeding inside the joint
22  when you have ligament tears.  You take an MRI three months
23  after an incident, those acute findings are gone.  So, in the
24  absence of excessive soft tissue swelling, edema, blood inside
25  the joint, that's where the term "chronic" comes from.  Because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

596

DCC3GUZ3                      Dassa - direct

1   those acute findings that you would see in the acute phase of
2   an injury are absent.
3   Q.  How long does the acute phase of an injury typically last?
4   A.  Everybody is variable.  Generally it is between two to
5   three months.  Some patients will have lingering signs after
6   the acute phase of injury longer than others.  But I would say
7   average, two and a half to three months.
8   Q.  Under the findings it indicates, among other things, that
9   there is an absence of bone bruise.  What is a bone bruise?
10  A.  Well, again, what they're basically looking for on an MRI
11  when speaking of bone bruise, is there any bleeding internal to
12  the internal structure of the bone.  And in general, you can
13  take an X-ray which would be completely normal, and if you did
14  an MRI and there was a signal abnormality indicating a bone
15  bruise, that would indicate a subchondral fracture or bleeding
16  internal to the bone.  So the absence of a bone bruise would
17  represent that there was no disruption to the bony structure.
18  So if you go back to those films where I showed you that the
19  bone quality was normal, it just represents there was no
20  fracture or internal insult to the bones.
21  Q.  Does it tell you anything about the age of the ligament
22  tear?
23  A.  No.
24  Q.  Doctor, there was a second MRI taken in April 2010.  I'd
25  like to ask you about those findings.  Have you had a chance to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCC3GUZ3                        Dassa - direct
1    look at the April 2010 MRI?
2    A.  Yes, sir.
3    Q.  Do you know why a second MRI was ordered for the knee at
4    some point?
5    A.  Well, I do know that there was an intention to do surgery.
6    And generally, surgeons would like to have updated studies
7    prior to performing any operation, especially when it pertains
8    to a reconstruction.  Also, in viewing certain diagnostic
9    studies, maybe the technical quality may not be up to par to
10   what the surgeon is used to.  But, if I had to, you know, use
11   my opinion in this particular case, it would be because --
12            MR. KUNZ:  I'll object to this.  I think this is
13   speculation.
14            THE COURT:  Overruled.
15   A.  Is that it was part of preoperative planning since a
16   surgery was being planned, and his MRI would have been old by
17   that point.
18   Q.  We're just trying to load it up.  We should have it up in a
19   minute.
20            THE COURT:  Just for the record, this is Plaintiff's
21   23?
22            MR. NORINSBERG:  I think we've moved up to 25.
23            THE COURT:  Are you moving that into evidence?
24            MR. NORINSBERG:  Yes, we offer that into evidence.
25            THE COURT:  Any objection?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCC3GUZ3                         Dassa - direct
 1              MR. KUNZ:  No objection.
 2              THE COURT:  Okay.
 3              (Plaintiff's Exhibit 25 received in evidence)
 4      Q.  Can you tell us, Doctor, first of all, what are we looking
 5      at here, Plaintiff's 25.
 6      A.  Okay, this is a similar view to what we described earlier.
 7      It is another MRI of Mr. Guzman.  And this is from April 19 of
 8      2010 done at North Central Bronx Hospital.  And again, you have
 9      the thigh bone, the tibia, you have the patella which is the
10      kneecap, you have the patella tendon or patella ligament, and
11      the quadriceps ligament.  This is just another view of the
12      slice through the knee as described earlier.  And in this
13      particular case, this is a slice that would show the anterior
14      cruciate ligament or ACL.  You can see here is the remnant of
15      the bundle that's attached to the tibia.  And it is very close
16      in appearance to what a normal ligament would look like, but in
17      the center part you can see it is white and it is basically
18      absent.  As you go to the part that attaches to the femur, you
19      can see there is a remnant of some normal ligament, but in
20      between those two stumps there is absolutely no tissue that's
21      connecting.  And if you look at the part of the PCL, that's the
22      stump here that would normally attach up into here, you can see
23      that it is folded over and scarred down on to the ACL.
24              Can you cycle through some of the images?  Keep going.
25      Keep going.  Keep going.

DCC3GUZ3                         Dassa - direct
1              MR. MEEHAN:  That's the last one.
2    A.  Can we go back to the earlier ones we had shown?  Okay.  So
3    now, when you're looking at a knee joint that has several
4    ligaments that are damaged, and as described earlier, there are
5    four ligaments, there are two internal and two external.
6    Having two internal ligaments completely ruptured or torn
7    represents and creates instability in the knee.  Meaning that
8    when you're walking, there is no constraint to your knee to
9    come out of place.  Basically this is what your knee will want
10   to do and will do without an ACL and PCL.  As a result of that
11   chronic instability, that by this point in 2010, it is truly
12   chronic instability, I want to give you a view of what the
13   normal bone would look like.
14             This is basically normal bone.  As you cycle through
15   if you can come to the next image to go back.  One more.  One
16   more.  One more.  Come back.  Go back to the images you just
17   had on there.  Not so fast.  Right there.  Stop.
18             Now if you look at the prior image, it was all
19   uniformly dark.  What you're starting to see here is you're
20   getting stress edema where this whiteness in the bone is
21   representative of subchondral edema.  The radiologist
22   interpreted this as a subchondral fracture.  But again, he
23   didn't have the benefit of the prior MRI which showed no
24   fracture.  So, there is no reason for a fracture to be present
25   before and now it's present.  So what you're looking at is

DCC3GUZ3                        Dassa - direct

1   stress edema where there is extra stress that's being put on
2   this condyle because of the instability now.  What you're
3   starting to see is because you have abnormal movements of the
4   knee joint, there is extra stress on this lateral condyle, and
5   it also lends to the part of the LCL being absent.  Because it
6   is significant instability to produce this kind of stress edema
7   in the lateral condyle.
8   Q.  So in terms of comparing the first MRI to the second MRI,
9   what would be the significant changes that you're seeing?
10  A.  Basically, you're looking at a MRI done three months after
11  an injury.  And everything else is normal except for the torn
12  ligaments.  Now, you're starting to see the change that's
13  setting into a knee that's been unstable for over a year, and
14  you're starting to see the things that would now occur on an
15  MRI advancement of the chronic changes that you would see.
16  Q.  Was there also a report generated in connection with this
17  MRI?
18  A.  Yes.
19          MR. NORINSBERG:  I'd like to offer Plaintiff's 22 into
20  evidence.
21          MR. KUNZ:  No objection.
22          THE COURT:  Okay, it's in.
23          (Plaintiff's Exhibit 22 received in evidence)
24  Q.  Doctor, besides the problems that Mr. Guzman was having
25  with the instability in his knee, were there any other problems

601

DCC3GUZ3                      Dassa - direct
1    that you became aware of related to his knee?
2    A.  I'm not understanding the question.
3    Q.  Did there come a time where you made a diagnosis that the
4    patient had clinical evidence of right foot drop?
5    A.  Yes.
6    Q.  What is right foot drop?
7    A.  Well --
8    Q.  Let's go back a second.  What is foot drop to begin with?
9    A.  Okay.  Again, you have to reacquaint yourself with the
10   normal movements of the ankle.  You have plantar flexion and
11   dorsiflexion.  In order to walk when you're going into your
12   heel strike, the heel goes down, the foot goes down on the
13   floor, and you have to push off.  In order to have proper push
14   off, you have to be able to dorsiflex or bring your foot up
15   towards the ceiling.  Foot drop is a complete loss of the
16   ability of your foot to dorsiflex.  There is no ability to
17   raise the foot up.  It is basically a loss of the ability to
18   move the ankle in this direction.
19   Q.  Doctor, we actually have a diagram illustrating the way
20   somebody with a foot drop would walk.  I'm wondering if you can
21   take a look at that and explain to the members of the jury what
22   is depicted.
23            THE COURT:  Can everybody see that?
24   A.  As I stated in earlier descriptions when you're ambulating,
25   you have a heel strike and you have to toe off.  You cannot
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

602

DCC3GUZ3                        Dassa - direct

1    bring your foot up to strike your heel down to the ground.  So
2    what winds up happening is' your toe hits the floor.  In order
3    to walk, you have to raise your knee up very high to clear the
4    floor, which is called a steppage gait.  That's in essence the
5    consequence of having a foot drop.
6    Q.  What treatments are available to help somebody with a foot
7    drop?
8    A.  In general, depending on the cause of the foot drop, you
9    would first of all want to monitor it to see if it would
10   recover if it is due to a nerve injury.  You would try physical
11   therapy.  You would try bracing.  In the realm of that
12   treatment, you don't want the foot to stay chronically down.
13   Because if it becomes contracted in that position, then you
14   basically have no function.  So, what you do is you brace the
15   foot into neutral, which will allow you to clear the floor.
16   And it's done with an apparatus that is called an AFO which is
17   an ankle foot orthosis.
18   Q.  The AFO does what, Doctor?
19   A.  It maintains the ankle in neutral, so you have the ability
20   to walk and your toes can clear the floor.  It prevents the
21   foot drop from occurring.
22   Q.  Did you prescribe the AFO for Mr. Guzman?
23   A.  Yes.
24   Q.  When Mr. Guzman first presented to you in May of 2009, did
25   he have a full blown foot drop at that point?

603

DCC3GUZ3                         Dassa - direct

1   A.  No.
2   Q.  On the second visit were you able to see it?
3   A.  Yes.
4   Q.  How can you explain that medically, Doctor?
5   A.  Well, when you're dealing with a nerve injury, there is a
6   whole spectrum that occurs in the course of the nerves being
7   injured.  And you have to look at the physiology of a nerve
8   injury.  Again, I use the analogy of a person crossing their
9   leg.  You will have dysfunction of the peroneal nerve because
10  you're cutting off the circulation.  If you've ever tried to
11  walk after your leg falls asleep, you actually can't walk.  You
12  have no control over your leg.
13          In essence, when a nerve is injured and the injury is
14  severe enough to cause permanent damage, because when you
15  uncross your leg the circulation comes back and the nerve
16  recovers.  But in the realm where the injury is severe and
17  becoming to some degree permanent, you have different phases of
18  nerve injury that's really due to the effects of swelling,
19  edema, and the chemical reactions that occur as a result of
20  that swelling.
21          So if a person's hypothetically had a spinal cord
22  injury, the treatment is to control the inflammation.  You
23  bring them into the hospital, you give them steroids to control
24  the inflammation which in turn controls the damage.
25          So, when you're looking at nerve injury, it will
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCC3GUZ3                        Dassa - direct
1    progress to a certain degree and it will then recover.  It can
2    progress to a certain degree where it can be complete damage of
3    the nerve.
4              So, my explanation of why he had the foot drop, and
5    again, if you look through the notes, as early as two weeks
6    after the initial injury that was described, a doctor described
7    muscle wasting in one of the treatment notes.
8    Q.  What is the significance of that muscle wasting two weeks
9    after the incident?
10   A.  That there was already a start of nerve dysfunction and
11   that was the first manifestation of it.  As it progressed from
12   weakness to sensation loss, then it progressed to a full blown
13   foot drop.  So I just happened to have caught him as he was
14   progressing into the most severe stage of his loss of nerve
15   function.
16   Q.  Were there indications early on of loss of nerve function?
17   A.  Again, on my exam --
18   Q.  I'm referring back to the one five weeks afterwards.
19   A.  Yes.
20   Q.  What is your opinion as to the cause of the foot drop that
21   Mr. Guzman suffered?
22   A.  My opinion is --
23            MR. KUNZ:  I am going to object to this, your Honor.
24            THE COURT:  Overruled.
25   Q.  Just to be clear, all opinions which I will ask you to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

605

DCC3GUZ3                          Dassa - direct

1  express today, I would ask you to express to a reasonable
2  degree of medical certainty.  I am not going to repeat that
3  every time, but please understand that's what I'm asking.
4  A.  Yes, sir.
5  Q.  Okay.  So what is your opinion, Doctor, as to what the
6  cause of the foot drop injury in Mr. Guzman was?
7  A.  Again, if you review all the objective testing and physical
8  findings and follow the course of this injury, it was from
9  peroneal nerve injury that resulted in peroneal nerve damage.
10  Q.  Peroneal injury was documented as early as five weeks
11  after, is that correct?
12  A.  Yes.
13  Q.  Doctor, did you at some point recommend surgery for
14  Mr. Guzman?
15  A.  Yes.
16  Q.  Why did you recommend surgery?
17  A.  Well, again, he had an unstable knee.  It was a globally
18  unstable knee.  ACL and PCL injuries are significant.  And
19  given the fact that he's a young man, you would want to fix
20  these in order to slow down the progression of post-traumatic
21  arthritis.
22              (Continued on next page)
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

606

DCCTGUZ4                        Dassa - direct

1    BY MR. NORINSBERG:
2    Q.  Did Mr. Guzman eventually have that surgery?
3    A.  Yes.
4    Q.  Were you the one that performed the surgery?
5    A.  No, I did not.
6    Q.  And did you refer Mr. Guzman to someone else to do the
7    surgery?
8    A.  Yes, I did.
9    Q.  Why did you make that request?
10   A.  Well, in the realm of general orthopedics, there are
11   conditions that general orthopedics should be treating and
12   there are conditions that should be referred to a super
13   specialist.  Again, as I stated earlier, I'm a hand specialist.
14   Most general orthopedics will not deal with tendon or nerve
15   injuries, they sent them to me if they occur in the hand or
16   anywhere else in the body.  I do feel comfortable fixing a
17   one-ligament tear, an ACL or PCL, but this is a complicated
18   case, number one, because you have two ligaments torn, also the
19   peroneal nerve injury.  So that would entail additional
20   surgery, which, again, should be handled be someone who is more
21   familiar with it than I am.
22   Q.  Doctor, can you tell us what was the actual surgery that
23   was performed on Mr. Guzman, to your knowledge?
24   A.  The surgical procedure that was documented was a right knee
25   reconstruction.  They did a reconstruction of his ACL, his PCL,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCCTGUZ4                    Dassa - direct

1   and his lateral collateral ligament, as well as an exploration
2   of the peroneal nerve, lysis, or a taking down of scar tissue
3   and release of peroneal nerve.
4   Q.  What does it mean "lysis?"  What are they doing?
5   A.  Well, if you look at the description of the operative
6   surgeons, they describe that the nerve was encased in scar
7   tissue, which meant there was a jacket of tight tissue around
8   the nerve.  So what they actually do is they take the scar
9   tissue off the of the nerve layer by layer in order to
10  alleviate the pressure off of the nerve.
11          MR. NORINSBERG:  I would like to offer Plaintiff's
12  Exhibit 17 into evidence, which is the actual operative report.
13          THE COURT:  Any objection?
14          MR. KUNZ:  No objection.
15          THE COURT:  It's in.
16          (Plaintiff's Exhibit 17 received in evidence)
17  Q.  Reading from that report, it says peroneal nerve neurolysis
18  was performed.  However, the nerve did not look healthy, and
19  there was no distal motor -- I can't pronounce the word, maybe
20  you can.  Let's start with the first part, the nerve did not
21  look healthy.  What does that mean?
22  A.  When you're operating on or around nerves, nerves have a
23  certain normal appearance, a normal color and consistency, they
24  have a normal size.  When you do see a nerve that's
25  dysfunctional, there will be an alteration in that normal
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

608

DCCTGUZ4                          Dassa - direct

1   appearance than you expect.  The nerves will have a dusky
2   appearance, they can be constricted or deformed from being
3   encased in scar tissue.  So it's an alteration of what is an
4   expected normal anatomy.
5   Q.  When says the nerve was localized and noted significantly
6   scarred into and wrapped in scar tissue, what would be the
7   cause of that?
8   A.  Again, the only cause to cause that much scar tissue would
9   be local tearing of the tissues around the nerve.
10  Q.  And is it possible when you are doing a surgery to repair a
11  ligament to simply tie the ligament back, or does it involve
12  more?
13  A.  Well, ligament reconstruction is not just a matter of
14  sewing ligaments back together.  The substance of the ligaments
15  are such that the circulation generally is good at the ends of
16  the bone, so where the ligament attaches to the bone there's
17  good circulation that comes off of the bone.  As you get to the
18  central part of the ligament, that circulation is not very
19  good, and there's not sufficient profusion to facilitate those
20  tissues to repair, so what they actually do is a reconstruction
21  of ligaments.  So it's much more involved than just repairing
22  tissues.
23  Q.  It also notes in the report that given the significant
24  laxity of the knee, we did not need to use accessory portals.
25  What does that mean?

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

609

DCCTGUZ4                        Dassa - direct
1   A.  In general the knee, if ligaments are intact, doesn't move
2   to allow to you have access to certain parts of the knee.  But
3   if the ligaments are torn, the knee can actually distract so
4   you don't have to make extra holes in the knee to get to
5   certain parts of the knee.  So the knee was so unstable and not
6   connected that they were able to do everything through the
7   regular standard portals.
8           THE COURT:  Let me see counsel at the side bar.
9           (In robing room)
10          THE COURT:  I was trying to get a sense -- we have a
11  very good jury and trying hard, this is getting a little --
12  they're starting -- are we almost done with this?
13          MR. NORINSBERG:  We're almost done.  This is the
14  part -- I respect the Court's ruling, I'm not arguing, but this
15  is the part where it's hard to follow it without some visual
16  assistance.  I'm trying to do my best to pick out a few spots.
17          THE COURT:  I'm not talking about in particular, but
18  the length, how much more do you have?
19          MR. NORINSBERG:  We originally predicted 90 minutes,
20  both sides, and I think if you take away our breaks we're
21  probably still on target.  I guess the next 20 minutes, half
22  hour.  I don't want to bore the jury, but there's a lot to do.
23  We're almost -- we covered a lot.  We covered a lot.
24          THE COURT:  Give me a general sense of what else you
25  want to cover.  I'm getting worried about our jurors here.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

610

DCCTGUZ4                    Dassa - direct
1              MR. NORINSBERG:  I have two --
2              THE COURT:  Speed this up.
3              MR. NORINSBERG:  I have two more sets of films with
4    the X-rays, his most recent exam, and his opinions, basically.
5    I guess that would be it.
6              THE COURT:  All right.  Defense counsel, anything?
7              MR. KUNZ:  Well, part of our reason for not having
8    this surgical story brought in here is we don't think it's
9    relevant.  This isn't a medical malpractice case.  We think
10   this is wasting the jury's time.
11             THE COURT:  Let's try to move it.  Let's keep it
12   moving.
13             (In open court)
14             THE COURT:  Go ahead, counsel.
15   BY MR. NORINSBERG:
16   Q.  Doctor, the report also makes reference to bony tunnels and
17   screws being affixed.  Can you explain briefly what the reason
18   was for that?
19   A.  Well, in the realm of ligament repairs, there's two ways to
20   approach ligament repairs.  And as stated, they cannot be fixed
21   in sewing back the end of ligaments.  So how is that
22   facilitated?  Firstly, you can use your own ligaments or
23   tendons.  In the case of an ACL alone, you can actually take
24   the center part of this ligament with the piece of bone from
25   your kneecap and come here onto its attachment on the tibia.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

611

DCCTGUZ4                         Dassa - direct

1    And basically what is done is that to fix the ligaments to the
2    bone you have to actually drill tunnels through the bone and
3    then you interface those pieces of bone into the tunnel, and
4    then they're affixed with screws or stapled.  And then the bone
5    will heal into the tunnel and become part of the major bone,
6    and that's how the ligament is reconstructed.
7             But in this particular case, because there were so
8    many ligaments that had to be reconstructed, they had to use
9    cadaver ligaments.  So they had to take ligaments from deceased
10   people.  They use the Achilles tendons and create the tunnels
11   through the tibia and femur and connected the tunnels with the
12   ligament tissue and created fixation to reconstruct the
13   ligaments.
14   Q.  After the surgery, did you have any follow up of
15   evaluations of Mr. Guzman?
16            MR. KUNZ:  For the record, I believe the witness is
17   refreshing his recollection.
18            THE COURT:  That's fine.
19   A.  Yes, I did.
20   Q.  Just -- you don't need to go into great detail, but just
21   generally speaking, did you continue to see Mr. Guzman
22   following the surgery?
23   A.  I did follow him.  I saw him one time after his surgery,
24   and then I saw him the last time, which is after his surgery,
25   and the only time, on November 5, 2010.

612

DCCTGUZ4                          Dassa - direct
1   Q.  Then did that conclude your treatment phase with
2   Mr. Guzman?
3   A.  Yes.
4   Q.  So you saw him May 2009 to November 2010?
5   A.  Yes, sir.
6   Q.  Now most recently, did you have a chance to re-examine
7   Mr. Guzman this past fall?
8   A.  Yes, I did.
9   Q.  And when did you most recently see Mr. Guzman?
10  A.  November 4th of 2013.
11  Q.  And did you conduct an exam at that time, Mr. Guzman?
12  A.  Yes.
13  Q.  Can you tell the members of the jury what your exam
14  consisted of and what significant findings there were?
15  A.  Again we did the similar physical exam, which was an
16  inspection evaluation.  There was persistent swelling to the
17  right knee with healed surgical incisions.  We did a range of
18  motion assessment.  His flexion or ability to bend the knee was
19  105 degrees on the right and 140 degrees on the left.  His
20  ability to straighten or extend was zero degrees right and
21  left, which was normal.  He had tenderness to palpation.  When
22  touching the knee, he did elicit some discomfort.  He was noted
23  to have a persistent steppage gait.
24  Q.  What is a steppage gait?
25  A.  That was a walking pattern I described earlier to overcome
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

613

DCCTGUZ4                    Dassa - direct

1    a foot drop.  He did have an AFO that was not working when he
2    presented, it was worn out, so it wasn't holding his foot in
3    the proper position.  And when the AFO was removed he had a
4    persistent foot drop.  We also ordered some X-rays which were
5    reviewed.
6    Q.  I would like to put on the X-ray that you took and get into
7    the end of the examination, but I would like to get that on, if
8    we could.  We're going to load it up, so if you could verbally
9    tell us what you found on the most recent X-ray examination and
10   then we'll try to actually have it displayed to the jury.
11   A.  Basically the knee had post-operative changes.  There were
12   visual changes to the knee consistent with the operative
13   tunnels that were drilled for reconstruction, all the
14   reconstructive procedures.  He was also noted to have the
15   development of the post-traumatic arthritis in the knee.
16   Q.  What exactly is post-traumatic arthritis?
17   A.  Just as the name implies, arthritis that occurs after
18   trauma.  There was some traumatic event that upset the
19   mechanics of the knee.  You can see traumatic arthritis from
20   several causes:  Fractures, ligament injuries.  You can see
21   arthritis in general for several reasons, but specifically
22   post-traumatic arthritis is the arthritis that ensues after
23   having some type of trauma.  And basically it represents
24   narrowing of the joint space, abnormal growth of bone, which is
25   called osteophytes, sclerosis of the undersurface of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

614

DCCTGUZ4                          Dassa - direct

1   cartilage where it attaches to the bone.
2   Q.  We'll put up the film now and take a look at it.
3          MR. NORINSBERG:  We'll offer that in first before we
4   do that.  It's plaintiff's Exhibit 29.
5          MR. KUNZ:  No objection.
6          THE COURT:  OK, it's in.
7          (Plaintiff's Exhibit 29 received in evidence)
8   Q.  Can you tell us, Doctor, what significant findings are
9   showing up on this X-ray?
10  A.  Can you show me this one first?
11         First thing that we're looking at is, again, for
12  clarification purposes, is the femur.  So we're on the same
13  page, here's your patella or kneecap, this is your tibia, this
14  is your fibula.
15         So now when I say there is post-operative changes, if
16  you look here, you can see that it almost looks like a cavity
17  that is going through the tibia, and that cavity is the tunnel
18  that was created between the tibia starting from here going
19  internal to the knee and coming out this side of the femur.
20         And you can see here his knee affixing, they call it
21  an endobutton, that's the type of fixation particularly used
22  for this type of fixation, and then you see another tunnel
23  coming up through to affix the PCL superimposed behind this so
24  you can't see it too clearly.  And you can see some bony
25  changes to the lateral femoral condyle, which is the outside

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

615

DCCTGUZ4                    Dassa - direct

1  part of the femur to the fibula, which is where the
2  reconstruction of the ligament occurred.
3          And what is most notable here to me in a person of his
4  age is that there is significant changes to the joint surfaces.
5  Now if you look at a joint that is normal and consistent with
6  the younger person, these condyles are round.  You're starting
7  to see it form this pointy justing out of the condyle, which is
8  an osteophyte, on the femoral condyle.  You can see changes to
9  the lateral spine of the tibia, also here the lateral tibia
10 plateau.  So you are starting to see narrowing of the joint and
11 resultant development of arthritis of this joint as a result of
12 the micro instability, which is still present.
13          Even if you fixed these ligaments perfectly, you can
14 never recreate what you were born with, so you have some degree
15 of micro instability.  And the younger you are when you have
16 these operations, the greater the potential to develop
17 post-traumatic arthritis.
18          If you go to the lateral view, you can see here is the
19 side view of the femur, here is part of the tunnel fixation,
20 you can see there's a fixation device here as well, and as you
21 look here, you come down to the tibia, you can see an
22 osteophyte developing here.
23 Q.  What is an osteophyte?
24 A.  Again, as we described earlier on the femur, that point,
25 that is just excessive bone growth consistent with arthritis.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCCTGUZ4                    Dassa - direct

1   And you can see narrowing of the joint between the kneecap and
2   the femur.  And also, too, you can start to see this white line
3   that is developing under the cartilage which is sclerosis of
4   the subchondral bone, and that sclerosis is another hallmark
5   finding of arthritis.
6   Q.  So there are multiple findings of arthritis on this film?
7   A.  Yes.
8   Q.  And Doctor, can you tell the difference between
9   post-operative changes on the one hand and post-traumatic
10  arthritis on the other when looking at the film?
11  A.  Yes.
12  Q.  How can you tell the difference between the two?
13  A.  Well, because there was no joint work done.  Go back to
14  this view, there was no fractures of these joint lines, there
15  is no surgery done through the cartilage that's affected by
16  arthritis.  All the tunnels are done in between the areas where
17  you have the arthritis.  So post-traumatic changes are the
18  narrowing of these joint spaces, the osteophytes, the narrowing
19  of the patella firma joint, and you have the post-surgery
20  changes, which are the tunnels that are created for the
21  ligamentary construction.  So there's distinctly different
22  appearing changes on the X-ray.  If you had an X-ray that was
23  taken around the time of the injury, it will be very apparent.
24  Q.  So I will like to put that X-ray on.  That would be the
25  one -- the X-ray from Harlem Hospital from the first day.  As

617
DCCTGUZ4                    Dassa - direct
1    we load that, Doctor, are you saying you could only look at it
2    as a before and after day one?
3              THE COURT:  Which exhibit?
4              MR. NORINSBERG:  13 or 14 -- 14.  13.
5    Q.  Doctor, while we're loading it, what effect does
6    post-traumatic arthritis have on a patient who has such a
7    condition?
8    A.  Generally it's a competent cause of pain.  It can cause
9    joint dysfunction, swelling, it could cause mobility issues
10   when it becomes active.
11   Q.  And in terms of the person who has this at a relatively
12   young age, 27, what's the likely outcome in terms of somebody
13   who has a condition like this over time?
14   A.  Well, in any age arthritis is a progressive condition.  It
15   doesn't get better, it gets worse over time.  It's better to
16   develop arthritis at an older age because you're less active
17   than when you're younger.  The more active you are, the more
18   loads you place across that joint, so you have an accelerated
19   process of arthritis as opposed to if you are older.
20   Q.  Look at the film from day one, February 14, 2009, of
21   Mr. Guzman's right knee.
22             MR. KUNZ:  We have no objection to admitting
23   Exhibit 13.
24             MR. NORINSBERG:  We already admitted it, Judge.
25             THE COURT:  It's already in.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

618

DCCTGUZ4                        Dassa - direct

1   A.  OK.  So now by comparison you can see this is the femur,
2   patella, the tibia, the fibula.  What's most notably absent,
3   you don't have that tunnel in the tibia, you don't have the
4   tunnels going through the femur, but what's clear and apparent
5   is you have more joint space here than you have on the prior
6   X-ray, and you don't have that big point that developed on the
7   medial terminal condyle present on the other X-ray.  And if you
8   look on the lateral view, you don't see any hardware, you don't
9   see tunnels, you don't see that osteophyte anterior to the
10  tibia.  And you can see there's a nice space between the femur
11  and the patella or the kneecap.
12          So this represents a healthy knee, free of arthritis.
13  And the other X-ray that we described earlier, which had
14  narrowing of this joint and an osteophyte formation here and
15  this bony spike on the medial part of the condyle represented
16  arthritic changes which were not present on these X-rays.
17  Q.  Doctor, based on your treatment of Mr. Guzman, your review
18  of films and records and the surgery that was performed, have
19  you reached a final diagnosis for Mr. Guzman?
20  A.  Yes.
21  Q.  And can you tell the members of jury what is that
22  diagnosis?
23  A.  The overall diagnosis was a global injury to the right knee
24  which tore three ligaments.  Status post-reconstruction, there
25  was second assessment of post-traumatic arthritis of the right

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCCTGUZ4                     Dassa - direct
1   knee.  And the third assessment was persistent peroneal palsy
2   with foot drop.
3   Q.  Doctor, do you have an opinion within a reasonable degree
4   of medical certainty to whether or not the injuries you just
5   described are causally related to the incident of February 14,
6   2009?
7   A.  I do.
8   Q.  What is your opinion?
9   A.  My opinion is that the injuries as described are causally
10  related.
11  Q.  What's the basis of your opinion?
12  A.  Again, the history as described, the direct blow to the
13  leg, findings of multiple ligament tears, persist foot drop,
14  the need for surgery, and the absence of other pertinent
15  history to indicate another knee injury to cause these problems
16  is the basis of that opinion.
17  Q.  Did you see anything on the films or in the records that
18  you reviewed that would in any way suggest that he had a
19  pre-existing knee injury?
20  A.  No.
21  Q.  And the film that we looked at at Harlem Hospital, is there
22  any indication whatsoever that there was some type of prior
23  trauma to this knee?
24  A.  No.
25  Q.  Now I would like you to assume that we have had some

620

DCCTGUZ4                    Dassa - direct

1   testimony that Mr. Guzman was observed running at full speed
2   immediately prior to this incident.  If he had any of the
3   ligament tears that you have described, would he be able to do
4   that?
5            MR. KUNZ:  I object to this question, your Honor.
6            THE COURT:  Please rephrase the question.
7   Q.  Would a patient who had an ACL tear and PCL tear and LCL
8   tear be able to run?
9   A.  A person has the capability to run, but they would not be
10  able to maintain cadence.  The knee would become unstable and
11  they would fall.  So running is not possible on a sustained
12  basis, no.
13  Q.  And would it be possible that a person could be walking
14  around with these ligament tears for a while and just have no
15  idea that they had this injury?
16  A.  Again, you would have instability.  If you have those three
17  ligaments torn, you know your knee is unstable, there's no way
18  around it.  Also, too, if they were present prior, you would
19  see some findings of that on the X-ray in Harlem Hospital.
20  There was absolutely no abnormal changes on those X-rays to
21  indicate any ligament disruption prior.
22  Q.  Do you have an opinion, Doctor, as to the mechanism which
23  caused the ligament tears that you described and which you
24  described earlier?
25  A.  I do.

621

DCCTGUZ4                          Dassa - direct

1  Q.  What is your opinion, Doctor?
2  A.  My opinion is that there was a blow sustained to the
3  peroneal nerve, he lost function of his leg and twisted his
4  knee causing the ligament tears that occurred.
5  Q.  Do you have an opinion, Doctor, as to whether any of these
6  things could have happened if somebody was tackled and brought
7  down to the ground?
8  A.  Again, that would not be consistent with a mechanism to
9  cause that kind of injury.
10 Q.  Why is that?
11 A.  Firstly, the knee doesn't bend sideways, it bends forward
12 to back, so the bruising would not be on the side of the knee.
13 If there was a blow from him being tackled to the side of the
14 knee to deform the knee to the side, it would tear the MCL.
15 There was no MCL tear.  So there was a direct blow to the nerve
16 and a twisting injury to the knee.  That would be consistent
17 with producing this injury.
18 Q.  Now Doctor, do you have an opinion within reasonable degree
19 of medical certainty as to whether or not the injuries that you
20 described are permanent?
21 A.  I do.
22 Q.  What is your opinion, Doctor?
23 A.  I believe that his injuries are permanent.
24 Q.  And what is the basis of your opinion?
25 A.  The basis is anatomically his body has borne out that his
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCCTGUZ4                    Dassa - direct

1   peroneal nerve is dead.  It's not going to recover.  Too much
2   time has gone by to expect that to occur.  Secondly, he's had a
3   permanently altering injury to the knee, and he has cadaver
4   ligaments inside his knee to reconstruct it.  His knee could
5   never be what it was before, and that has resulted in a
6   progressive condition that will worsen over time.
7   Q.  Do you have an opinion, Doctor, based on your treatment of
8   Mr. Guzman and your review of his most recent X-ray films, do
9   you have an opinion within a reasonable degree of medical
10  certainty as to whether or not Mr. Guzman will need any
11  surgeries in the future?
12  A.  I do.
13  Q.  And what is your opinion, Doctor?
14  A.  I believe that he's a likely candidate for total knee
15  replacement.
16  Q.  What exactly is a total knee replacement?
17  A.  Well, in the application of knee replacements you put an
18  artificial surface to the knee joint.  So what you're basically
19  doing is cutting out the surfaces of the joint that have
20  cartilage and replacing it with metal and plastic spacers.  So
21  in essence you're putting in a prostheses, an artificial knee.
22  Q.  Why do you believe Mr. Guzman will eventually need this
23  type of procedure?
24  A.  If you look at the change in his joint from the Harlem
25  Hospital X-rays to the ones that we took in 2013, so going from

623

DCCTGUZ4                    Dassa - direct

1   2009 to 2013, that's a rapid progression of arthritis, and that
2   will get worse and worse each year.  And as that does progress,
3   it will become more symptomatic and will require resurfacing
4   his joint in order to walk.
5   Q.  What would be the present cost in 2013 cost of such a
6   procedure?
7   A.  If you take in account the hospital stay, anesthesia,
8   physical therapy, the prosthesis, the surgeon's fee --
9             MR. KUNZ:  I object to the question, your Honor.
10            THE COURT:  Rephrase the question.
11  Q.  Do you have an opinion as to what the cost of would be to
12  do a total knee replacement surgery for this particular
13  patient, Mr. Guzman?
14            MR. KUNZ:  Your Honor, I still have an objection to
15  this.
16            THE COURT:  Let's have a side bar.
17            (In robing room)
18            MR. KUNZ:  It's total speculation, your Honor, the
19  cost today, is it the cost in 20 years?  And in addition to
20  that, the patient is covered by insurance, so he's suggesting
21  this is going to be out-of-pocket expenses for the patient is
22  not correct.  So I just don't think -- I think there needs to
23  be what is cost today?  Is that the cost in 20 years?  Will it
24  actually be needed?  It's just too speculative of a question.
25            THE COURT:  That objection is overruled.  You can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

624

DCCTGUZ4                     Dassa - direct
1   cross on that.
2              (In open court)
3              THE COURT:  That objection is overruled.
4   BY MR. NORINSBERG:
5   Q.  You can answer the question.
6   A.  If you take reasonable customary fees for that treatment,
7   it would be about $65,000.
8   Q.  Doctor, Mr. Guzman's 27 right now.  Do you have an opinion
9   within a reasonable degree of medical certainty as to when he
10  would require this type of procedure?
11  A.  I do.
12  Q.  What is your opinion, sir?
13  A.  If you go on track with the changes to his knee X-rays, I
14  would say fourth decade of his life, 45, 44, 45.
15  Q.  Doctor, in order to be here today, did you have to cancel
16  any office hours?
17  A.  Yes.
18  Q.  And are you being compensated for your time away from the
19  office?
20  A.  Yes, I am.
21  Q.  What is your rate of compensation?
22  A.  It's $750 an hour.
23  Q.  Doctor, apart from your work as a treating physician, do
24  you work from time to time as a medical consultant?
25  A.  Yes, I do.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

625

DCCTGUZ4                         Dassa - direct
1   Q.  What percentage of your practice involves doing medical
2   consultation?
3   A.  Again, it varies.  I'm predominately a treating doctor.  I
4   spend 95 to 98 percent of my time treating.  From year to year
5   it could vary between three to five percent, two to five
6   percent.
7   Q.  And of the three to five percent of your practice which
8   consists of medical evaluations, how many are for plaintiff?
9   What percentage would be for plaintiff and what for defendant?
10  A.  Generally I do both plaintiff and defense exams, and the
11  predominance of the exams are done for defense purposes -- are
12  done for defense purposes.  I do do plaintiff examinations, but
13  I couldn't give you an exact percentage, but I know I do more
14  exams just for examination for medical expert testimony on
15  defendants.
16  Q.  Approximately, on average, how many times do you appear in
17  court?
18  A.  Again, I don't quantify it.  It averages out, like I would
19  say, ten times over the last ten years, five times over the
20  last ten years, five to ten times over the last ten years.
21  Q.  Meaning on average?
22  A.  Yes.
23  Q.  Doctor, you and I met in the fall, is that correct?
24  A.  Yes, sir.
25  Q.  Before we met in the fall, this fall, 2013, had we ever had

```
       DCCTGUZ4                      Dassa - direct
 1    any contact with each other?
 2    A.  No.
 3    Q.  Had you ever done any type of consulting work for me or my
 4    law firm?
 5    A.  No.
 6              MR. NORINSBERG:  Thank you, Doctor, I have no further
 7    questions.
 8              THE COURT:  OK.  Let's see if this would be a good
 9    time for our lunch break.  Let's come back at 2 o'clock.  Don't
10    discuss the case with anyone, and have a pleasant lunch.
11              (Jury not present)
12              THE COURT:  OK.  I guess for the record we started the
13    examination of this witness at 10:30, approximately, it is now
14    about eight minute to 1:00.  We did give the jury a 15-minute
15    break and we had two brief sidebars.  Examination was longer
16    than an hour and a half.  I wanted to get that on the record.
17    I gave the plaintiff much more leeway with his examination.
18              Anything else we could put on the record at this time?
19              MR. KUNZ:  We have a scheduling concern, your Honor,
20    which is that EMT Smith has been here since 9:00 this morning
21    ready to testify and he cannot come back tomorrow.  So just
22    when it gets time to cross-examine our doctor, we just need to
23    make sure that enough time is left at the end of the day to do
24    the EMT.
25              THE COURT:  OK.  Understood.  Is it possible to have
```

627

DCCTGUZ4
1    the EMT before your doctor?
2             MR. KUNZ:  Dr. Gidumal can't come back tomorrow
3    either.
4             THE COURT:  Make sure counsel keeps things moving.
5         And again, Doctor, let me ask you to step outside for
6    just a second.
7             (Witness exited courtroom)
8             THE COURT:  Defense counsel, how short do you
9    anticipate your examination of this witness will be?
10             MR. KUNZ:  This witness?
11             THE COURT:  Yes.
12             MR. KUNZ:  Half hour, 45 minutes, your Honor.
13             THE COURT:  OK.  Thank you.
14             (Luncheon recess taken)
15             (Continued on next page)
16
17
18
19
20
21
22
23
24
25

628

DCC3GUZ1

```
 1                         AFTERNOON SESSION
 2                              2:00 p.m.
 3             THE COURT:  Plaintiff's counsel, do you know where
 4    your witness is?
 5             MR. NORINSBERG:  No, your Honor.  I'll check.
 6             MR. MEEHAN:  He told me he would be back at 2, your
 7    Honor.  I imagine he left the building to go get lunch, but he
 8    should be back.
 9             THE DEPUTY CLERK:  We're ready.
10             THE COURT:  Is the EMT here?
11             MR. KUNZ:  He is.
12             THE COURT:  I know the EMT needs to leave today and
13    the witness needs to leave today.  I don't want to put counsel
14    in a difficult position.
15             MR. KUNZ:  Well, your Honor, we kind of wanted
16    Mr. Norinsberg to present his case in the way that they
17    selected.  We wanted to present our case in the way we selected
18    that had the EMT ending the testimony.
19             THE COURT:  That's fine.  I'm trying to accommodate
20    your witness's schedule.
21             MR. KUNZ:  I appreciate that.
22             THE COURT:  That's fine.
23             MR. KUNZ:  We really can't have him come back
24    tomorrow.
25             THE COURT:  I'm saying while we're waiting for the
```

629

DCC3GUZ1
1    doctor, I don't anticipate the EMT's testimony will take long.
2    Sometimes we do things out of order.  You shouldn't infer
3    anything from that.  Get the EMT.
4              MR. KUNZ:  Can we think about it for a moment?
5              THE COURT:  Think about it quickly because we've got a
6    jury who is ready to go.
7              MR. KUNZ:  Yes.  Your Honor, this is not the first
8    delay in this case from the plaintiffs.  There has been lots of
9    delay.  There was an hour delay this morning.  And I think if
10   he's not here to testify, quite frankly, he should be stricken
11   from the record.  There has been delay after delay in this
12   case.  There was a delay Wednesday, there was a delay this
13   morning.  It has gotten to be too much.  If the witness isn't
14   here to testify, he should be stricken from the record and we
15   should proceed.
16             MR. NORINSBERG:  He's on the security line downstairs.
17             THE COURT:  Okay.  He's on line downstairs.  I'm not
18   going to strike the witness for being seven minutes late.
19   Regarding that, I guess this won't be an issue anymore in this
20   case, but I guess it would have been preferrable had the
21   parties let me know that the EMT was here this morning when we
22   had that hour delay, we could have had the EMT on the stand
23   then while we were waiting for these technical issues.
24             MR. KUNZ:  I thought I indicated he was here, your
25   Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

630

DCC3GUZ1

```
 1                 THE COURT:  All right.  The doctor will be up here
 2   soon and we'll get the jury on.  Let's try to move things along
 3   expeditiously with the EMT.  Let's try to move things along
 4   quickly.  So, Dr. Dassa is going to be cross-examined and then
 5   the defense plans to call?
 6                 MR. KUNZ:  Dr. Gidumal.
 7                 THE COURT:  Is Dr. Gidumal here?
 8                 MR. KUNZ:  He's here.
 9                 THE COURT:  Is he in the courtroom?
10                 MR. KUNZ:  No, he's not.
11                 THE COURT:  Again, you still anticipate how long or
12   how short do you anticipate your direct?
13                 MR. KUNZ:  I am going to go as fast as I can, but
14   there is a lot of ground so at least an hour.  They went two
15   and a half hours with their expert, and I need my expert to be
16   able to explain his opinions.  So, I am certainly not going to
17   have him describe the internal workings of the knee.  So that
18   will cut some time off.
19                 THE COURT:  How short does the plaintiff anticipate
20   the cross of Dr. Gidumal going to be?
21                 MR. NORINSBERG:  Probably a half hour.
22                 We still haven't resolved the issue of how we refer --
23                 THE COURT:  I'll give you a ruling on that.  Regarding
24   Dr. Gidumal and the cross-examination about his alleged bias,
25   plaintiff's counsel can cross-examine him about being retained
```

631

DCC3GUZ1
1   by corporation counsel and testifying in cases on behalf of
2   city employees.  But plaintiff's counsel should not refer to
3   Dr. Gidumal as being retained by the city or testifying for the
4   city.  The city is not a defendant.  He's not testifying for
5   the city technically here.  So you can talk about city
6   employees and corporation counsel.
7            MR. NORINSBERG:  Okay.  That sounds fair, Judge.  Part
8   of the cross I had right now is you testified in Smith v. City
9   of New York.  I'm not sure because counsel, counsel is defense
10  counsel is planning on cross-examining my --
11           THE COURT:  We'll talk about it later.  Let's get this
12  jury in here now.  We'll revisit the specifics later.
13           (Jury present)
14           THE COURT:  Doctor, you are still under oath.  Go
15  ahead, counsel.
16  CROSS-EXAMINATION
17  BY MR. KUNZ:
18  Q.  Good afternoon, Doctor.
19  A.  Good afternoon.
20  Q.  You said on your direct examination that you are a hand
21  specialist, is that correct?
22  A.  Yes.
23  Q.  You also mentioned on direct examination that you've
24  published an article in the Journal of Sports Medicine?
25  A.  Yes.

632

DCC3GUZ5                         Dassa - cross
1    Q.  That article had to do with hand injury, correct?
2    A.  Yes, sir.
3    Q.  In fact, you've never done any writing, research, or given
4    a presentation on knee injuries, have you?
5    A.  That's not accurate, no.
6    Q.  Did you give a deposition in this matter?
7    A.  Yes, I did.
8    Q.  Did you swear to tell the truth at that deposition?
9    A.  Yes, I did.
10   Q.  Referring the Court to page 16, lines seven through 12 from
11   the deposition.  You gave the following answer to the following
12   question:
13   "Q.  The three papers that you have written, did they deal with
14   your hand specialty?
15   "A.  One dealt with bed sores and bedridden patients with hip
16   fractures, another dealt with wrist injuries, hand injuries and
17   wrist injuries, another paper was an operation we devised
18   during my hand surgery fellowship."
19            So, did you give you answered that question that way?
20            MR. NORINSBERG:  Objection.  That's not inconsistent.
21            THE COURT:  Overruled.
22   A.  Yes, you asked me about presentations just now.  You didn't
23   ask me about papers and presentations then.  You only asked me
24   about papers that were published during the deposition, and I
25   had never published a paper about anything else related to
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

633

DCC3GUZ5                          Dassa - cross

1    sports.  But I have given several presentations about knee
2    injuries, yes, I have.  So to answer your question I was
3    telling the truth during the deposition, and I'm telling the
4    truth now.
5    Q.  Your publications have never dealt with knee injuries, is
6    that correct?
7    A.  That's correct.
8    Q.  You are not an orthopedic sports specialist, are you?
9    A.  No.
10   Q.  An injury to the knee, that would fall under the purview of
11   an orthopedic sports specialist, correct?
12   A.  No.
13   Q.  Well, in fact, you ended up referring the plaintiff to an
14   orthopedic sports specialist, correct?
15   A.  Yes, I did.
16   Q.  That's Dr. Ehrlich?
17   A.  Yes, sir.
18   Q.  Isn't it true that before you were the plaintiff's expert
19   in this case, Dr. Ehrlich was the plaintiff's expert?
20   A.  I don't know if Dr. Ehrlich was the plaintiff's expert.  I
21   have no knowledge of that.
22   Q.  In fact, you never reviewed the report that Dr. Ehrlich
23   prepared in this case, did you?
24   A.  You had showed me two out of four -- two out of four page
25   report during my deposition, which I had never seen prior to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

634

DCC3GUZ5                         Dassa - cross
1    that, and it was incomplete content.
2    Q.  So, just simple yes or no.  You have not reviewed the
3    report that Dr. Ehrlich prepared?
4    A.  Again, what time frame?
5    Q.  Just yes or no, Doctor.
6    A.  I can't answer it yes or no.  If you are asking me have I
7    ever reviewed the report.  Pertinent to this -- preparing my
8    reports, the answer is no.  But I did review the report during
9    our deposition.
10   Q.  So, you reviewed the report during the deposition, but not
11   in preparation for your testimony today?
12   A.  That's correct.
13   Q.  You referred the plaintiff to Dr. Ehrlich because he was a
14   specialist in knee and shoulder injuries, correct?
15   A.  Yes.
16   Q.  So, just like he would sometimes refer a person with a hand
17   injury to you, you referred the plaintiff to him, correct?
18   A.  Well, again --
19   Q.  Just yes or no, Doctor.
20   A.  No.
21   Q.  So, again, referring to your deposition page 46, line 23.
22   You gave the following answer to the following question:
23   "Q.  You decided referring him to Dr. Ehrlich was better
24   because he is a specialist in sports and knee injuries?
25   "A.  Well, I felt more comfortable with someone who has done

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCC3GUZ5                    Dassa - cross

1 this operation more than three or four times like myself.  You
2 know, the same way he would refer me a similar case on the
3 hand."
4          You gave that answer to that question, did you not?
5 A.  Yes, the answer to that question was not the same question
6 you asked me.  There is different --
7 Q.  Doctor, if you could just answer the questions I would ask,
8 this would go a lot more quickly.
9          MR. NORINSBERG:  Objection.
10          THE COURT:  Overruled.  Everyone just calm down.  Make
11 sure you don't speak over each other.  Go ahead, counsel.
12          MR. KUNZ:  Thank you.
13 Q.  So, you felt that the complexity of the injury, the fact
14 that there were three ligament tears, it was too complex for
15 your expertise, correct?
16 A.  Yes.
17 Q.  In fact, it was too complex that you felt that it would be
18 better handled by someone who was a fellowship trained sports
19 doctor, correct?
20 A.  Yes, sir.
21 Q.  You are aware that Dr. Gidumal is a fellowship trained
22 sports specialist, are you not?
23 A.  I have no knowledge of Dr. Gidumal's credentials.
24 Q.  You are not a fellow a sports fellowship trained
25 orthopedist.

636

DCC3GUZ5                          Dassa - cross

1    A.  That's correct.
2    Q.  You state that the reason the injury was too complex was
3    because it involved three ligament tears?
4    A.  Well, it was a multi-ligament injury to the knee.  What
5    made it more complex was the fact that there was a peroneal
6    nerve injury involved to it.  So, it was territory that as an
7    orthopedic surgeon who does treat knees I had never been faced
8    with, so I felt it better to send him to someone with more
9    experience.
10   Q.  So, focusing just on the three ligament tear issue.  So
11   that was part of your consideration when you referred the
12   plaintiff to Dr. Ehrlich, is that correct?
13   A.  It was the entirety of the injury, not just the ligaments.
14   Q.  It was the three ligament tears and the peroneal nerve
15   combination is the reason you referred it to Dr. Ehrlich?
16   A.  Yes, sir.
17   Q.  You made that referral in August of 2009, correct?
18   A.  Yes.
19   Q.  But in fact, the plaintiff did not have three torn
20   ligaments in August 2009, did he?
21   A.  Again --
22   Q.  Just yes or no, Doctor.
23   A.  I don't know.  I don't know how to answer the question yes
24   or no.
25   Q.  Well, okay.  Let's talk about the ligaments.  Let's start
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCC3GUZ5                         Dassa - cross
1    with the PCL and the LCL.  An injury to those ligaments would
2    show up on an MRI, correct?
3    A.  Yes.
4    Q.  They can also be diagnosed using a physical exam?
5    A.  Yes.
6    Q.  The posterior drawer test, that's the test that is used to
7    determine if the PCL is injured?
8    A.  Yes.
9    Q.  I am going to refer to that as the PCL test.  And will you
10   understand that I'm referring to the posterior drawer test?
11   A.  Yes.
12   Q.  Similarly, the varus valgus test, that's designed to
13   determine if there is a problem with the LCL, correct?
14   A.  Yes.
15   Q.  I am going to refer to this as the LCL test, okay?
16   A.  Yes.
17   Q.  Now, both of these tests, the PCL test and the LCL test,
18   they involve having the patient manipulate his knee while you
19   the doctor feel the actual knee, and if you feel a snap that
20   means that the ligament is intact.  And if you don't feel the
21   snap, it means there is a problem with the ligament, correct?
22   A.  No, that's not an accurate description.
23   Q.  They're more complicated procedures, right?
24   A.  You're not describing the tests accurately.  It is not
25   complicated or not complicated.  They are just not being
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

638

DCC3GUZ5                          Dassa - cross

1   described accurately.
2   Q.  Okay, Doctor.  When you were conducting these tests, your
3   hands are physically on the patient?
4   A.  Yes.
5   Q.  You are having the patient assume a particular physical
6   position?
7   A.  They are generally laying on their back.
8   Q.  You may have them relax their hamstring?
9   A.  To the extent that they can, again, most patients when you
10  are doing these tests don't relax.  To do them properly you
11  would have to have somebody relax.  It is an instruction that
12  is given to do it properly.
13  Q.  Then, you have your hands actually around the knee, and you
14  put your thumb in a particular position so you can feel what is
15  happening inside the knee, correct?
16  A.  Which test are you referring to?
17  Q.  Let's do the PCL test.
18  A.  The PCL test is a test where you are holding the thigh in
19  one hand, and the tibia in the other hand, and you're applying
20  a posterior force to the knee and you are not feeling for a
21  click or a pop.  You are feeling to whether the knee translates
22  posteriorly out the back of the knee.
23  Q.  Doing that maneuver you just described, you can actually
24  feel if the PCL is intact or not, correct?
25  A.  You can feel --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

639

DCC3GUZ5                    Dassa - cross

1   Q.  Just yes or no.
2   A.  I'm describing the test.  I can't answer it yes or no.
3   Q.  Go ahead.  What are you feeling for?
4   A.  You're feeling for the tibia pushing out the back of the
5   knee abnormally on a level where you don't normally feel it.
6   If the ligament is intact, there is an end point.  There is no
7   end point if the PCL test is positive.
8   Q.  If the PCL was intact, if the PCL was not intact, if it was
9   broken, you would be able to feel that in that test?
10  A.  Again --
11  Q.  Just yes or no, Doctor.  You would be able to feel it in
12  that test?
13  A.  Again, it is not a yes or no question.  If you can do the
14  test properly, where the person relaxes enough for you to do it
15  properly, you can feel it.  And in the instance where the
16  person doesn't relax enough for you to do the test properly,
17  you may not feel it.  Which that's the correct answer.
18  Q.  The LCL test is another test.  I understand it has got
19  different hand positions than the PCL test you just described,
20  but it is another test where you physically put your hands on
21  the person's leg and knee, and you manipulate it in a way where
22  you can feel if the LCL is intact, correct?
23  A.  Again, it is another maneuver, and rather than pushing the
24  force out the back of the knee, you're pushing the force inside
25  towards the inside of the knee.  And if the person is relaxing

640

DCC3GUZ5                         Dassa - cross

1   sufficiently you will feel the joint open up.
2   Q.  You did both of these tests on the plaintiff, correct?
3   A.  Yes.
4   Q.  Multiple times in fact, right?
5   A.  Yes, I did.
6   Q.  The first visit with the plaintiff, I am going to show you
7   what's now in evidence as Plaintiff's 18.  This is the May 4,
8   2009, exam of the plaintiff.
9            On May 4 of 2009, you gave the PCL test to the
10  plaintiff, correct?
11  A.  Yes.
12  Q.  It came back negative, right?
13  A.  That's correct.
14  Q.  You also gave the LCL test to the plaintiff, right?
15  A.  Yes.
16  Q.  It came back negative, correct?
17  A.  That's correct.
18  Q.  Because those tests came back negative, that's why your
19  diagnosis of the plaintiff was a -- I think I have to move this
20  up a little.  That's why your diagnosis of the plaintiff was a
21  right knee sprain or strain, correct?
22  A.  Yes.
23  Q.  You wanted to rule out a meniscal tear?
24  A.  Yes, sir.
25  Q.  Plaintiff never had a meniscal tear, did he?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

641

DCC3GUZ5                        Dassa - cross
 1   A.  No, he did not.
 2   Q.  So, following this exam in May of 2009, you directed that
 3   the plaintiff should get an MRI of his knee, right?
 4   A.  Yes, sir.
 5   Q.  That MRI happened on May 29, 2009?
 6   A.  Yes.
 7   Q.  We looked at the MRI film and the MRI report when you were
 8   testifying before.  I just want to show you the report.  I'll
 9   put it up on the screen.  This MRI was taken by a radiologist?
10   A.  It was done by a technician, interpreted by a radiologist.
11   Q.  So the technician and the radiologist, these are people who
12   are specially trained to both take and interpret MRI studies?
13   A.  Yes, sir.
14   Q.  By the way, this is Plaintiff's 22 I believe.  That's
15   standard practice, right, to have MRI film taken by a
16   technician and interpreted by the radiologist?
17   A.  Yes.
18   Q.  You've seen this before, and this report you considered in
19   forming your opinions in this case, correct?
20   A.  I considered this report, yes.
21   Q.  You agree with the radiologist's conclusions?
22   A.  Again, to the degree as to what he reported, but in
23   addition to reviewing these films, the report, I also reviewed
24   films, in anticipating testimony.  You couldn't see the lateral
25   collateral ligament on that MRI either.  So I don't agree to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

642

DCC3GUZ5                    Dassa - cross

1  say that the collateral ligaments were intact.  The median
2  collateral ligament was clearly seen.  The LCL was not seen.
3  So the only thing I disagree with with that report is there was
4  ACL -- that I do agree with was the ACL and PCL were torn.  And
5  again, as I stated earlier, they described the PCL as deformed.
6  And it was not deformed, it was torn and scarred over on top of
7  the ACL.
8  Q.  So you do not agree with the conclusions of the
9  radiologist?  Just yes or no.
10  A.  I agree in part.  Part of the conclusions I do, and part I
11  don't.
12  Q.  Okay.  Part of the conclusions that you don't agree with is
13  that the radiologist said that the LCL was intact?
14  A.  That is correct.
15  Q.  You think it was not intact?
16  A.  Again --
17  Q.  Just yes or no.
18  A.  I couldn't make the call.  I didn't say it wasn't intact.
19  You couldn't make that call or that interpretation based upon
20  the film review.
21  Q.  I believe you just said that the radiologist believed that
22  the PCL was torn, but that's not what the radiologist says
23  here, is it.  The radiologist does not conclude that the PCL
24  was torn.
25  A.  Again, I corrected myself when I testified reading the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

643
DCC3GUZ5                    Dassa - cross
1   films earlier.  I did note that the radiologist stated that the
2   PCL was deformed.  But in my interpretation of it, it was torn.
3   So that's where I didn't agree with him.
4   Q.  So you disagree with the radiologist on the LCL and you
5   disagree with the radiologist on the PCL?
6   A.  Yes, sir.
7   Q.  You saw the plaintiff again on August 13, 2009, and then
8   December 4, 2009, correct?
9   A.  Yes.
10  Q.  In both of those visits, you did the PCL test, correct?
11  A.  Yes.
12  Q.  You did the LCL test in both of those visits?
13  A.  Yes, sir.
14  Q.  They all came back negative, right?
15  A.  Yes, sir.
16  Q.  That means the physical exam that you contacted of him
17  revealed no objective evidence of a torn PCL or torn LCL, did
18  it?
19  A.  Again, my physical exam only demonstrated those objective
20  tests were not positive.  That's all that represented to me.
21  Q.  Okay.  Then, in March of 2010, and May of 2010, and in June
22  of 2010, you saw the plaintiff.  That's three more times,
23  correct?
24  A.  Yes.
25  Q.  In those visits, you didn't even test the LCL, did you?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

644

```
        DCC3GUZ5                      Dassa - cross
 1   A.  No.
 2   Q.  So, I want to switch gears a little bit now and talk about
 3   the ACL.  Now, during your first examination of the plaintiff,
 4   you conducted the ACL test, right?  This is the Lachman test?
 5   A.  Yes, sir.
 6   Q.  So I am going to refer to the Lachman test as the ACL test
 7   and you'll know what I am talking about, right?
 8   A.  Yes.
 9   Q.  Again, I'm not a medical expert, so I will probably
10   describe the procedure incorrectly.  But the ACL test involves
11   putting your hands on the knee, and manipulating it in a way so
12   you can actually feel if the ACL is intact, right?
13   A.  Yes.
14   Q.  When you did that test on the plaintiff, in May 4 of 2009,
15   it was a negative ACL test, right?
16   A.  Yes, sir.
17   Q.  That means your examination of him showed that the ACL was
18   intact?
19   A.  Again, the exam findings did not suggest that it was torn
20   on clinical exam.
21   Q.  We believe now that the ACL actually was torn then, right,
22   because a subsequent MRI from May 29 showed that the ACL was
23   torn.
24   A.  Yes.
25   Q.  The radiologist who interpreted the ACL test, Plaintiff's
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

645

DCC3GUZ5                        Dassa - cross

1   22 here, wrote down that it was a chronic tear of the ACL,
2   right?
3   A.  Yes.
4   Q.  In fact, the radiologist noted that the ACL had rehealed
5   itself to the PCL, correct?  It had attached itself to the PCL?
6   A.  That was scarring.  It doesn't heal to the PCL.
7   Q.  Just referring to this section here.  Anterior cruciate
8   ligament with kinking of the PCL.  Do you see that?
9   A.  Yes.
10  Q.  That's the radiologist indicating that the ACL had been
11  torn, but was now twisting around and had attached itself to
12  the PCL, right?
13  A.  No.
14  Q.  Well, you do acknowledge that ACL injuries can in fact --
15  when an ACL gets torn, it can in fact reheal itself to the PCL?
16  A.  Again, you're describing it inaccurately.  "Healing"
17  implies that you're healing the torn tissue.  Scarring is an
18  abnormal condition which is what is on this MRI.  Healing is a
19  normal condition.  The ACL only can heal to the ACL.  The PCL
20  only can heal to the PCL.  If there is any communication
21  between the ACL and PCL, it is abnormal.  It's scarring.
22  They're not supposed to communicate with each other.
23  Q.  So, if the ACL is torn, and it is not repaired in a
24  surgery, it can in fact attach itself to the PCL, correct?
25  A.  Again, it doesn't attach itself.  It would be scar tissue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCC3GUZ5                    Dassa - cross

1   Q.  Through the scar tissue it becomes attached to the PCL?
2   A.  They become stuck together.
3   Q.  That's what the radiologist was noting in this report,
4   right?
5   A.  Yes, he's noting scarring of the ACL to the PCL.
6   Q.  That process takes time to happen, right?
7   A.  It could take about six weeks to two months, yes.
8   Q.  In your first five exams of the plaintiff, May, August,
9   September, December 2009, and March 2010, in all five of those
10  exams you gave plaintiff the ACL test, correct?
11  A.  Yes, sir.
12  Q.  In all five of those exams, the ACL test came back
13  negative, no indication of a torn ACL, right?
14  A.  That's correct.
15  Q.  The reason it was coming back negative is because when you
16  were doing this test, you were feeling a snap and you were
17  noting you believed that the ACL was attached, right?
18  A.  That is not the reason why it came back negative.  The
19  results indicated to me that the ACL wasn't torn.  But, the MRI
20  bore out the more accurate information.  It represented to me
21  that it could not be done properly because of the inability of
22  the patient to relax.
23  Q.  Doctor, you acknowledge, don't you, that a person can live
24  for many years with a torn ACL and live a relatively normal
25  life, right?

```
       DCC3GUZ5                    Dassa - cross
 1     A.  Yes.
 2     Q.  A person with a torn ACL could even run, couldn't they?
 3     A.  Again, they could run with caution.  They would have to
 4     wear a brace, but they can run, yes.
 5     Q.  You said during your testimony with Mr. Norinsberg that it
 6     was your opinion that the ACL, the PCL, and the LCL tear that
 7     were revealed when the plaintiff had surgery, it is your
 8     opinion that those were caused by whatever happened on
 9     February 14, 2009, right?  That was your opinion?
10     A.  Yes, sir.
11     Q.  If that were the case, though, you would have had to have
12     noticed the fact that all three of those ligaments were torn on
13     your very first exam, wouldn't you have?
14     A.  Again I answered that not necessarily.  It is based upon --
15     Q.  If a person has three --
16              MR. NORINSBERG:  Objection, Judge.
17              THE COURT:  Hold on.  Let the witness continue
18     answering the question.  Go ahead.
19     A.  Not necessarily.  Clinical exams have their limitations.
20     That's why we have MRI.  If the person does not allow you to
21     perform those tests properly because they can't relax, and
22     relaxation is the key word here, the test can be falsely
23     negative.  And in that instance, correlating them with an MRI
24     that showed a PCL and an ACL that's torn, what is the relevance
25     of those tests being negative when you have an MRI that's the
```

648

DCC3GUZ5                          Dassa - cross
1    most specific thing that told you that they are torn.
2                MR. KUNZ:  I am going to move to strike as
3    non-responsive, your Honor.  That wasn't the question I was
4    asking.
5                THE COURT:  That's overruled.  Go ahead.
6    Q.  You did say on direct though, didn't you, that a person
7    with three torn ligaments, they would know they had that
8    because there would be lots of looseness in the knee?
9    A.  There would be instability with function, yes.
10   Q.  That's not just a little instability.  You said there would
11   be a lot of instability, right?
12   A.  Yes.
13   Q.  You as a doctor examining such a person, if in fact there
14   was that much instability, you would have noticed it.  Yes or
15   no?
16   A.  Not necessarily.
17   Q.  All right.  I want to ask you a few brief questions about
18   your opinion with regard to the possible knee replacement.  You
19   said it's your opinion -- let me ask you this.
20               The plaintiff does not need a knee replacement right
21   now, does he?
22   A.  No.
23   Q.  It is your opinion that 20 years from now, he might need a
24   knee replacement, correct?
25   A.  Yes.

649

DCC3GUZ5                        Dassa - cross
1   Q.  You said you estimated that the cost of a total knee
2   replacement would be about $65,000?
3   A.  That's correct.
4   Q.  Is that the cost today?
5   A.  That would be the current reasonable and customary cost
6   associated with the surgery, the rehab, the hospital stay, yes.
7   Q.  All of that, the surgery, the hospital stay, the rehab,
8   that would be covered by an insurance plan, would it not?
9          MR. NORINSBERG:  Objection.  Move to strike and side
10  bar.  Request respectfully.
11         THE COURT:  Let's have a side bar.
12         (At the side bar)
13         THE COURT:  What is your objection?
14         MR. NORINSBERG:  Judge, any reference to insurance in
15  front of this jury is totally grossly improper.  They raised
16  this issue in their motion in limine, and I addressed it that
17  any issue as to what could be recovered through insurance is
18  handled in a collateral source verdict.  Under New York federal
19  law and New York State law, the jury makes the allocation of
20  award, there is a post-trial hearing outside the presence of
21  the jury.  It would be reduced for any evidence that costs
22  would be covered by the plaintiff's insurance.  It is not to be
23  done in front of the jury.  That was grossly improper.  I am
24  asking for an instruction right now to disregard that
25  completely.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

650

DCC3GUZ5                         Dassa - cross
1              THE COURT:  What are you going to do with this
2     evidence that you've brought out through this doctor about the
3     cost of this?
4              MR. NORINSBERG:  Because it is future medical
5     expenses.  There is a category on the verdict sheet, there is
6     past pain and suffering, and future pain and suffering, and
7     future medical expenses.  All three categories have to be on
8     the verdict sheet.  And this category, if I don't establish an
9     evidentiary basis for this in the record, we can't ask the jury
10    for future medical expenses.  So this was totally improper.  It
11    is false, it is misleading to suggest that he has some
12    knowledge of what's going to happen about insurance coverage at
13    the time this takes place is just totally misleading and
14    improper.
15             THE COURT:  Who has?
16             MR. NORINSBERG:  Mr. Kunz's suggesting that he has
17    some type of an insurance that is going to magically pay for
18    everything.  A collateral source hearing is when he would raise
19    that issue, and he knows this because I briefed the issue.  We
20    went through this issue before trial.
21             THE COURT:  Counsel.
22             MR. KUNZ:  Well, when I moved to preclude the doctor
23    from saying his opinion in the side bar in this very room I
24    informed everyone I intended to go into this area, and your
25    Honor said that's fair game for cross-examination.  So I don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

651

DCC3GUZ5                        Dassa - cross

1    understand how it is not fair game.
2           MR. NORINSBERG:  The Court's ruling was you can
3    explore the fact that right now it costs X.  You don't know
4    what it's going to cost then.  You didn't address and the issue
5    was never raised about insurance coverage.
6           MR. KUNZ:  I specifically said insurance.
7           MR. NORINSBERG:  It is totally improper, Judge.  This
8    the first time I've absolutely in my entire career as a trial
9    lawyer I've never heard a lawyer put in front of a jury.  It's
10   never, never done.  It's just never done.
11          THE COURT:  You want to put this in front of the jury
12   for what purpose?
13          MR. KUNZ:  The plaintiff suggested to the jury that
14   the plaintiff is going to bear a $65,000 cost, and he's got
15   insurance.  And that's going to cover the total cost of the
16   knee replacement.
17          THE COURT:  Why did you need to ask this witness that?
18          MR. KUNZ:  Who else am I going to get it in through?
19   No one else who knows about this has testified.
20          THE COURT:  Who knows about what?
21          MR. KUNZ:  I can ask Dr. Gidumal if knee replacement
22   is covered by insurance plans.
23          MR. NORINSBERG:  There can't be any reference to
24   insurance in front of the jury.  That is just per se prohibited
25   under federal and state law.  This is a for collateral source

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

652

DCC3GUZ5                    Dassa - cross

 1   hearing.  The jury never hears the word insurance.
 2            THE COURT:  They have heard the word insurance.
 3            MR. NORINSBERG:  They heard it through counsel.  They
 4   didn't hear it through me.
 5            THE COURT:  You asked your witness about the
 6   insurance.  Your witness.
 7            MR. NORINSBERG:  I didn't ask him any questions about
 8   insurance.
 9            THE COURT:  I'm talking about the plaintiff.  The
10   plaintiff talked about having to go get insurance.  He went and
11   got insurance.
12            MR. NORINSBERG:  Judge, that has nothing to do with
13   the issue of future medical coverage.  This is not to be before
14   the jury.
15            THE COURT:  I'll sustain the objection for now and
16   deal with it at some other point.  Let me just make sure I'm
17   understanding, you want to bring out that knee replacements --
18   I don't know what it is you want to bring out.
19            MR. KUNZ:  Knee replacements are covered by insurance
20   and the plaintiff is insured.
21            THE COURT:  Then you want to do what with that in
22   front of the jury?
23            MR. KUNZ:  I want to say that he's not going to suffer
24   the $65,000 damages that the plaintiff claims he is suffering.
25            MR. NORINSBERG:  That's not -- you can't make that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

653

DCC3GUZ5                         Dassa - cross
1    argument in front of the jury.  We briefed this.  I'll resubmit
2    it tonight.
3              MR. KUNZ:  We did brief this.
4              MR. NORINSBERG:  You dropped a footnote.  We briefed
5    the issue.
6              THE COURT:  I'll sustain the objection.
7              MR. NORINSBERG:  I'd like a curative instruction for
8    them to disregard any reference to insurance.
9              THE COURT:  I'll ask them to strike that testimony.
10   Let's move on.  I'll sustain that for now and think about it.
11             (In open court)
12             THE COURT:  That objection is sustained.  And we
13   should strike that question from the record and the jury should
14   disregard that question.  Go ahead.
15   BY MR. KUNZ:
16   Q.  I want to switch gears and talk about the foot drop.  In
17   your first exam of the plaintiff, May 4, 2009, you did not note
18   the foot drop, right?
19   A.  That's correct.
20   Q.  That's because he did not have a foot drop during that
21   exam, did he?
22   A.  Again, he didn't present with that as a complaint.  He was
23   walking without the gait that would be typical of a foot drop,
24   so I would only have to conclude that he didn't have it.
25   Q.  In fact, the plaintiff told you when the foot drop started,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

654

DCC3GUZ5                    Dassa - cross
1   didn't he?
2   A.  Yes.
3   Q.  He told you that it started after your first exam with him
4   in May, but before your second exam of him in August, right?
5   A.  Yes.
6   Q.  The information that you know about the plaintiff's medical
7   history, that came from the plaintiff himself, correct?
8   A.  Yes, sir.
9   Q.  So, the plaintiff told you about the incident of
10  February 14, 2009, right?
11  A.  Well, initially, he had told me about it, and then I had
12  information from medical records subsequent to that as well.
13  Q.  I'm just talking about what happened that night.  The story
14  of what happened that night.  You only know plaintiff's story,
15  right?
16  A.  Again --
17  Q.  Just yes or no, Doctor.
18  A.  I can't answer the question yes or no.
19  Q.  You didn't speak to any of the police officers involved in
20  the incident, did you?
21  A.  No.
22  Q.  You didn't speak to any witnesses who may have seen what
23  happened that night, did you?
24  A.  No.
25  Q.  The only person that you have spoken to who was there that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

655

DCC3GUZ5                         Dassa - cross
1   night is the plaintiff?
2   A.  Yes, sir.
3   Q.  It was the plaintiff who told you that he did not have any
4   preexisting injury, right?
5   A.  Yes.
6   Q.  It was the plaintiff that told you he never hurt his leg
7   after this night, right?
8   A.  Yes.
9   Q.  So then your opinion on causation that the ligament tears
10  and the foot drop are related to the night of February 14,
11  2009, that is totally based on the accuracy of plaintiff's
12  statements regarding his medical history, correct?
13  A.  No.
14  Q.  So, well, for example, if you learned that plaintiff did in
15  fact have a preexisting injury, that would change your opinion
16  on causation, right?
17  A.  Yes.
18  Q.  If you learned that plaintiff had an injury after the
19  incident, that would change your opinion on causation, right?
20  A.  To the knee?
21  Q.  Yeah.
22  A.  Yes.
23  Q.  Did the plaintiff ever tell you that he admits that he fell
24  after the incident?
25  A.  I mean, he did not tell me under the time when I did treat
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCC3GUZ5                          Dassa - cross
1   him.  But, it did come to my attention that he did fall, yes.
2   Q.  It came to your attention as you were preparing for
3   testimony in this case, right?
4   A.  Yes, sir.
5   Q.  So, when you were treating the plaintiff, he never told you
6   about this fall.
7   A.  No.
8   Q.  The exams that you conducted of the plaintiff, there was
9   four of them in 2009, and four of them in 2010, does that sound
10  right?
11  A.  Yes, sir.
12  Q.  In each those exams, you told the plaintiff to follow up in
13  four weeks, right?
14  A.  Yes.
15  Q.  But the plaintiff didn't follow that direction, did he?
16  A.  No.
17  Q.  He often came back months later, not four weeks later.
18  A.  Yes.
19  Q.  In each of those exams, you also told him to get physical
20  therapy, correct?
21  A.  Yes.
22  Q.  But you don't know whether or not he went to physical
23  therapy, do you?
24  A.  No.
25  Q.  This came out pretty clearly, but just so everyone is clear

657

DCC3GUZ5                    Dassa - cross
1   on this, you did not perform the surgery on the plaintiff?
2   A.  No, sir.
3   Q.  You were not present when the surgery was performed?
4   A.  No.
5   Q.  Well, I want to talk a little bit about the work you did do
6   on the case.  So, you saw the plaintiff in 2009 and 2010,
7   right?
8   A.  Yes.
9   Q.  Then there was a three-year gap before you saw the
10  plaintiff on November 4 of 2013, right?
11  A.  Yes.
12  Q.  But before you met with the plaintiff in November of 2013,
13  you met with Mr. Norinsberg, correct?
14  A.  Yes, sir.
15  Q.  At that meeting with Mr. Norinsberg, that occurred in late
16  October 2013?
17  A.  Yes, sir.
18  Q.  At that meeting with Mr. Norinsberg, you spoke about your
19  opinions, is that correct?
20  A.  Yes.
21  Q.  You told Mr. Norinsberg that your opinion was that the
22  plaintiff had sustained a blow to the right knee, and that you
23  believed the injuries that he had were related to the incident
24  of February 14, 2009.
25  A.  Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCC3GUZ5                          Dassa - cross

1    Q.  So you had formed those opinions before you ever saw the
2    plaintiff again on November 4, 2013, right?
3    A.  Again, yes.
4    Q.  Then you wanted to see him again on November 4 of 2013, so
5    you could make the paperwork in regard to that visit, right?
6    A.  No.  I asked to see him because there were issues of
7    permanency that I was asked to address, and I hadn't seen him
8    for three years.  I didn't know if his knee had recovered
9    100 percent, which could have happened.  I didn't know if his
10   foot drop had resolved or persisted or if there was any other
11   functional issues that remained.  For me to comment on
12   permanency, it would have been the only prudent thing to do, to
13   reexamine him to have an updated picture of where he was
14   physically and functionally.
15   Q.  Your opinion on the possible need for a total knee
16   replacement, you only developed that opinion after meeting with
17   the plaintiff's counsel, correct?
18   A.  No, I developed the opinion after seeing the arthritis that
19   was on the X-ray that I did on his knee.
20   Q.  But that was after you were asked to consider permanency,
21   right?
22   A.  I was -- it was after I met with Mr. Norinsberg, yes.
23   Q.  At that meeting with Mr. Norinsberg, it was also agreed
24   that you would provide expert testimony in this case, right?
25   A.  Yes, sir.

DCC3GUZ5                         Dassa - cross

1   Q.  You were deposed on November 22, 2013, correct?
2   A.  Yes, sir.
3   Q.  Before that deposition, you met with Mr. Norinsberg again,
4   right?
5   A.  Yes.
6   Q.  In fact, it was the same day of the deposition.  In the two
7   hours before the deposition, you were meeting with
8   Mr. Norinsberg, right?
9   A.  Yes.
10  Q.  In that meeting, you went over all the records, you
11  discussed the plaintiff's medical history, you discussed the
12  nature of the injuries, and you reviewed your opinion, correct?
13  A.  Yes.
14  Q.  Directly after that meeting, then you came in and were
15  deposed?
16  A.  Yes, sir.
17  Q.  You were paid for that work, weren't you?
18  A.  Yes, sir.
19  Q.  You were paid $750 an hour?
20  A.  Yes, sir.
21  Q.  You're also being paid to be here at trial, right?
22  A.  Yes, sir.
23  Q.  Your trial testimony rate is $6,500?
24  A.  Yes, sir.
25  Q.  This isn't the first time you have testified in a lawsuit,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

660

DCC3GUZ5                          Dassa - cross

1   is it?
2   A.  No.
3   Q.  In fact, you've testified in seven to 10 lawsuits every
4   year, correct?
5   A.  Approximately, yes.
6   Q.  In the vast majority of those cases you're testifying for
7   plaintiff, correct?
8   A.  As it would bear out, that would probably be accurate, yes.
9   Q.  You state that you're unable to provide a list of cases
10  that you've testified in in the last four years, correct?
11  A.  That's correct.
12  Q.  In addition to your testimony in lawsuits, you also testify
13  in worker's compensation hearings, correct?
14  A.  Yes, sir.
15  Q.  Do you that on a weekly basis?
16  A.  Yes.
17  Q.  In every single one of those cases, you're testifying for
18  the person making the claim, correct?
19  A.  Actually I'm not testifying for a person making a claim.
20  I'm testifying to get treatment authorized for my patients.
21  There is no such claims made in worker's compensation.  This is
22  basically to get treatment authorizations for my patients.
23  Q.  So you're testifying for the employee who is making the
24  worker's compensation claim, right?
25  A.  I'm testifying for my patient who happens to be an employee
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

661
DCC3GUZ5                        Dassa - cross
1   who requires medical treatment, and there is a contestation of
2   that treatment, and I testify as to the medical necessity for
3   that treatment.
4   Q.  So you're testifying for the person making the claim.
5   A.  Again, I testify for my patient.
6   Q.  That's what you are doing here, right?  You're testifying
7   for the person making claim?
8   A.  Again, you're comparing apples and oranges.
9   Q.  Just yes or no.
10  A.  Today I'm testifying for somebody making a claim.  When I
11  testify for worker's compensation hearings, there's no claims
12  made.
13          MR. KUNZ:  No further questions.
14          THE COURT:  Any brief redirect?
15          MR. NORINSBERG:  Yes, your Honor.
16  REDIRECT EXAMINATION
17  BY MR. NORINSBERG:
18  Q.  Doctor, is there a difference between having a foot drop
19  and having damage to the peroneal nerve?
20  A.  Yes.
21  Q.  What's the difference?
22  A.  Well, damage to the peroneal nerve can be -- is an injury.
23  It can be of varying degrees, it can be of varying severities,
24  and have varying consequences.  So, you can have a minor injury
25  to the peroneal nerve, which results in minimal consequences
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

662

DCC3GUZ5                        Dassa - redirect

1   that will recover shortly with time.  Or, you can have the end
2   of the spectrum of a peroneal nerve injury which is a foot
3   drop, which is a permanent injury that doesn't resolve.
4   Q.  The fact that Mr. Guzman did not present with a foot drop
5   on the first visit but did in fact have one on the second visit
6   at the end of that summer, is that surprising to you, Doctor?
7   A.  Again, it was only surprising to the fact that it was a
8   significant change in his condition.  But, you know, it is not
9   something that you would expect to see.
10  Q.  And the nerve damage that you found on that visit was
11  consistent with the nerve damage that was diagnosed just five
12  weeks after the incident, isn't that correct?
13  A.  Yes, sir.
14  Q.  Doctor, you were asked some questions about your opinion
15  being based on what Mr. Guzman told you.  Is your opinion in
16  this case based on what Mr. Guzman told you, or is it based on
17  your review of all the medical records and your treatment of
18  this patient?
19  A.  My opinion is based upon the entirety of the information in
20  this case.
21  Q.  So, let's talk specifically.  Besides Mr. Guzman's telling
22  you something, what else are you relying upon in forming your
23  opinions in this case?
24  A.  Well, in seeing a patient, you're getting historical
25  details.  When you review records, it is important to assess

663

DCC3GUZ5                    Dassa - redirect

1    whether the history they're giving is you corroborated by the
2    history given by the doctors who treated them at the time of
3    the incident.  Do their symptoms correlate with the complaints
4    and findings on objective testing.  There is lots of things
5    that go into formulating that opinion.  It is not just about
6    taking it for face value what somebody tells you.  There has to
7    be a corroboration of information to draw a conclusion.
8    Q.  Doctor, you were asked questions about your clinical
9    findings versus what shows up on an MRI.  You said clinical
10   exams have limitations.  What do you mean by that?
11   A.  Well, again, we were speaking specifically about the
12   provocative orthopedic tests that are performed.  You give
13   these exams to come to a presumptive diagnosis.  At times a
14   patient cannot cooperate with you to do the exams properly.  So
15   you'll get false negatives.  You can also get false positives.
16   That's why an MRI is requested in those instances to be more
17   specific.
18            But, the orthopedic tests, I've had them go both ways.
19   I've had them positive and come back with normal MRIs.  I've
20   had them come back negative and have MRIs be positive.  It is
21   just representative of how correct you could have performed
22   that test when you were examining the patient.
23   Q.  Once there is a definitive diagnosis with the MRI, what
24   would you consider more important as a medical provider, that
25   exam results or a clinical finding?

664

DCC3GUZ5                      Dassa - redirect

1    A.  Again, MRI is always more specific than on a physical exam,
2    and surgery is always more specific than an MRI.  So each level
3    you go that gives you more information, will give you the most
4    accurate information.
5    Q.  Doctor, you were asked some questions about a notation on
6    the MRI report referring to a deformity of the PCL versus it
7    being torn.  Do you recall those questions?
8    A.  Yes.
9    Q.  What is the difference between the PCL being torn and the
10   PCL appearing deformed on a film?
11   A.  Well, again the PCL being torn in half in two pieces is
12   different than it being intact and scarred down.  The only way
13   the PCL can get into the proximity of the ACL that is torn is
14   for it to be torn as well.  So, it is two distinctly different
15   things.  If the PCL is deformed, it is not the same thing as
16   being torn.  That's not what my interpretation was on that MRI.
17   Q.  There is a reference to some scarring on that MRI report.
18   Is that correct?
19   A.  Yes.
20   Q.  You told us that scarring takes place within two weeks to
21   two months?
22   A.  Well, actually it is six weeks to two months.
23   Q.  So within six weeks to two month?
24   A.  Yes.
25   Q.  Okay.  That exam was already three months, three and a half

665

DCC3GUZ5                        Dassa - redirect

1   months after the incident, correct?
2   A.  Yes.
3   Q.  So would it surprise you to have scarring at that point?
4   A.  No.
5   Q.  Did you see any evidence at all, in all of the medical
6   records that you've looked at, anything remotely suggesting
7   that there was any type of preexisting or prior injury?
8   A.  No.
9   Q.  Doctor, in your most recent exam, you took an X-ray, is
10  that correct?
11  A.  Yes.
12  Q.  What was the reason why you wanted to take an X-ray before
13  you actually came into court and testified in this matter?
14  A.  Well, it is important to base your opinions on accurate
15  information.  If I'm going to make statements regarding a
16  person's permanency or consequences of an injury, it is
17  important to have proper information.  So, that was just part
18  of the normal exam process.  Physical exam correlated with
19  X-ray, that was the information that I needed to give a proper
20  opinion regarding permanency.
21  Q.  You actually believe it is highly likely he is going to
22  have to have this procedure in the future, isn't that correct,
23  Doctor?
24  A.  Yes.
25          MR. NORINSBERG:  Thank you.  I have nothing further.
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

666

DCC3GUZ5                        Dassa - redirect

1              MR. KUNZ:  Nothing further.
2              THE COURT:  Thank you.  You are excused.
3              (Witness excused)
4              THE COURT:  Plaintiff have another witness?
5              MR. NORINSBERG:  No, your Honor.  We just do have a
6    series of medical records.  We don't have to offer them in at
7    this very moment, but before we formally rest on the record
8    we'd like an opportunity to do that.
9              THE COURT:  That's fine.  Defendant have a witness?
10             MR. KUNZ:  Yes, your Honor.  The defendants call
11   Ramesh Gidumal.
12    RAMESH GIDUMAL,
13        called as a witness by the Defendant,
14        having been duly sworn, testified as follows:
15   DIRECT EXAMINATION
16   BY MR. KUNZ:
17   Q.  Thank you for coming in, Doctor.  Could you just tell the
18   jury what you do for a living.
19   A.  I am an orthopedic surgeon.
20   Q.  Do you have a specialty?
21   A.  I do sports medicine.
22   Q.  As a specialist in sports medicine, can you just explain to
23   the jury what sort of injuries you focus on.
24   A.  I basically take care of injuries that would occur during
25   sporting events.  For example, knees, shoulders, elbows would
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCC3GUZ5                    Gidumal - direct

1   be the majority of what we do.
2   Q.  Where do you work?
3   A.  At NYU Medical Center.
4   Q.  How long have you worked at NYU?
5   A.  I joined the staff in April of '86.
6   Q.  What do you currently do at NYU?
7   A.  I currently see patients and operate on patients.
8   Q.  In addition to seeing patients, do you also do any
9   teaching?
10  A.  Yes, I teach the residents as well as the medical students.
11  Q.  Do you do any volunteer work?
12  A.  Yes.  I donate a day a month at Bellevue.
13          MR. NORINSBERG:  Objection.
14  Q.  Could you just tell the jury a little bit about your
15  education and training.
16  A.  Sure.  I went to high school at the Bronx High School of
17  Science.  I then went to the University of Pennsylvania.  I
18  graduated summa cum laude in three years.  I then went to
19  medical school at Mount Sinai.  I graduated in 1980. I did a
20  general surgery residency for a year.  Then I went to do
21  orthopedics at NYU Joint Disease, and I finished as chief
22  resident in 1985.  I then did a fellowship in sports medicine
23  with Jim Andrews for six months.  And then I did a second
24  fellowship at Columbia Presbyterian with a guy by the name of
25  Charlie Neer, that took me to April of '86 when I started in

668

DCC3GUZ5                          Gidumal - direct

1   practice.
2   Q.  Are you licensed to practice medicine in the State of New
3   York?
4   A.  Yes, I am.
5   Q.  Since when?
6   A.  I think it was April '81.
7   Q.  Do you have any board certifications?
8   A.  I'm board certified in orthopedic surgery.
9   Q.  Can you tell the jury about the nature of your practice.
10  A.  Yeah, basically I see private patients at NYU, Joint
11  Disease, I operate on the patients who require operations.  I
12  teach medical students and the house staff.  I work at Bellevue
13  once or twice a month.  I take emergency room calls for
14  Bellevue and NYU.
15              (Continued on next page)
16
17
18
19
20
21
22
23
24
25

669
DCCTGUZ6                        Gidumal - direct
1  BY MR. KUNZ:
2  Q.  And do you ever do work on patients that have problems with
3  their knee?
4  A.  Yes, I would say that's a large component of what we do.
5  Q.  And have you ever performed surgery on someone that has a
6  torn ACL?
7  A.  Yes.
8  Q.  How often?
9  A.  I would say probably do one or two a month.
10 Q.  And how about a torn PCL, ever done surgery on someone with
11 a torn PCL?
12 A.  I have.  I don't do it very often.
13 Q.  Finally LCL?
14 A.  I might have done one or two.
15 Q.  Now have you ever done surgery on a patient with multiple
16 ligament injuries?
17 A.  Yes.
18 Q.  What percentage of your time do you think is spent treating
19 patients?
20 A.  95 percent of the time.
21 Q.  And in addition to your work treating patients and your
22 work teaching, do you ever do work as an expert in court
23 proceedings?
24 A.  Yes.
25 Q.  And have you ever been qualified as an expert in court
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

670

DCCTGUZ6                         Gidumal - direct

1  proceedings before?
2  A.  Yes.
3  Q.  In what areas?
4  A.  In orthopedic surgery.
5  Q.  And how many times per year in the last four years do you
6  think you've testified in court?
7  A.  Probably two or three times a year.
8  Q.  And could you give the jury the percentage rate of
9  plaintiff versus defendants where you testified?
10  A.  Probably 80 percent defendants, 20 percent plaintiffs.
11  Q.  Are you being paid for your expert work in this case?
12  A.  Yes.
13  Q.  How much are you being paid?
14  A.  For the review of records I get paid $300 an hour, and for
15  testimony I get paid 5,000 a half day.
16  Q.  If you were not here today testifying, what would you be
17  doing right now?
18  A.  Right now I would be operating on a patient's ACL if I
19  wasn't doing this right now.
20  Q.  You had to cancel that appointment to be here?
21  A.  Right.
22          MR. KUNZ:  I move to qualify the doctor as an expert
23  in the field of orthopedic surgery with a specialty in sports
24  medicine.
25          THE COURT:  OK.  Go ahead.

                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

671

DCCTGUZ6                    Gidumal - direct
 1   Q.  Have you had a chance to review any records in connection
 2   with this case?
 3   A.  Yes, I have.
 4   Q.  I want you to give the jury a brief list of the records
 5   that you have reviewed in connection with this case.  And feel
 6   free to refresh your recollection with your report if you need
 7   to.
 8   A.  Sure.  The records I reviewed were medical records from
 9   Dr. Randall Ehrlich, the complaint, the 50-h hearing, the
10   medical treatment of prisoner forms, medical records from
11   Harlem Hospital, Gabriel Dassa, Jacobi Medical Center, New York
12   Presbyterian, Stand Up MRI in the Bronx, and the Social
13   Security records and the ambulance call report.  And I think
14   that's it.
15   Q.  Now I want to ask you briefly about that.  In your review
16   of those records, did you learn what the plaintiff is claiming
17   happened in this case?
18   A.  Yes.
19   Q.  And the Jacobi Medical Center records that you referred to,
20   is that where the operation, the surgery was conducted?
21   A.  That's correct.
22   Q.  And you reviewed the records of the surgery?
23   A.  Yes.
24   Q.  Now I want to talk about radiology reports that you
25   reviewed.

672
DCCTGUZ6                        Gidumal - direct
1    A.  Yes.
2    Q.  Have you reviewed the X-rays both from the night of
3    February 14, 2009 and from November 4th of 2013?
4    A.  Yes.
5    Q.  Have you reviewed the actual film of those X-rays?
6    A.  Yes.
7    Q.  And how about the MRI, did you review the MRI from May of
8    2009?
9    A.  Yes.
10   Q.  And how about the MRI of April 2010?
11   A.  Yes.
12   Q.  When you were describing the list of documents you
13   reviewed, you mentioned Dr. Ehrlich?
14   A.  Yes.
15   Q.  Tell me who Dr. Ehrlich is.
16   A.  Dr. Ehrlich was the expert that Mr. Guzman went to see, and
17   I have a narrative report sent to the Law Office of Jon
18   Norinsberg from Dr. Ehrlich.
19   Q.  So in addition to all those records that you reviewed, did
20   you also conduct a physical examination of the plaintiff?
21   A.  Yes, I did.
22   Q.  And can you just explain to the jury what you discovered in
23   your physical examination?
24   A.  What I found on my physical examination was that I examined
25   Mr. Guzman on November 24th, 2011, and at that time I found
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DCCTGUZ6                          Gidumal - direct

1   that he had a scar on his knee, that he had evidence of a
2   peroneal nerve palsy, that he had some instability in the
3   anterior and posterior direction of his knee, that he had no
4   instability with his lateral.  In terms of his valgus variance
5   testing, he was slightly unstable, but it was pretty good.  He
6   had full range of motion and he had good strength.
7   Q.  Did you also reach any conclusion on whether or not the
8   plaintiff had arthritis at that point?
9   A.  Based on my examination, and subsequently based on the
10  X-rays, it was my opinion that he either had no or minimal
11  arthritis in his knees.
12  Q.  And after you did the exam of the plaintiff, I believe you
13  said in November of 2011, but just to correct the record, is it
14  October of 2011?
15  A.  October 24th, yes.
16  Q.  And after you did that exam of the plaintiff, did you get a
17  chance to review any additional records?
18  A.  Yes.
19  Q.  And what additional records did you review after that first
20  examination?
21              MR. NORINSBERG:  Objection.  May we approach?
22              THE COURT:  Sure, let's have a side bar.
23              (In robing room)
24              MR. NORINSBERG:  My objection is one of the records
25  that he reviewed, the Harlem Hospital records of the 2013

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

674

DCCTGUZ6                    Gidumal - direct
1   accident, which is listed in the second report.  And by this
2   question he was just asked by counsel, he's going to absolutely
3   mention the car accident.
4            MR. KUNZ:  I specifically told him not to, and I can
5   lead him through what I need to to absolutely avoid that, but I
6   specifically told him to absolutely not mention that.
7            MR. NORINSBERG:  Because I have no way of knowing that
8   and it's in his record.
9            THE COURT:  OK.
10           (In open court)
11  BY MR. KUNZ:
12  Q.  So after you conducted the exam of the plaintiff, did you
13  review updated medical records from Dr. Dassa?
14  A.  Yes.
15  Q.  Did you review a 2013 X-ray as well?
16  A.  Yes.
17  Q.  Now based on your review of the records and your
18  examination of the plaintiff, have you reached any conclusions?
19  A.  Yes.
20  Q.  And let's talk about the foot drop issue first.  Have you
21  reached any conclusions or do you have an opinion in regard to
22  whether the plaintiff has a foot drop?
23  A.  Yes.
24  Q.  What your opinion?
25  A.  He has a foot drop.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

675

DCCTGUZ6                          Gidumal - direct

1   Q.  And based on your review of the records and your work in
2   this case, have you reached an expert opinion on when that foot
3   drop happened, when it occurred?
4   A.  Based on the medical records it's very hard to determine
5   when that foot drop took place.  If you take a look at the
6   records on February 14, 2009, he is seen at Harlem Hospital,
7   which is the date of the event, and in the Harlem Hospital
8   records they say that there is no focal numbness or weakness
9   and they don't perceive a foot drop.
10   Q.  Let me stop you there.  So that exam of the plaintiff was
11   on February 14, 2009?
12   A.  Yes.
13   Q.  And the incident happened early that morning, 4:00 a.m.
14   that morning?
15   A.  Right.
16   Q.  Now would you expect to see evidence of injury to the nerve
17   that quickly after the incident?
18   A.  When you have an injury to the nerve, you see it almost
19   immediately, and if anything, with time the nerve gets better,
20   not gets worse.  There are three stages to a nerve injury, and
21   the first is something called a neurapraxia where the nerve is
22   bruised.  For example, when you hit your funny bone and you get
23   numbness and tingling in your fingers, sometimes you can't move
24   your hand and a few minutes later the nerve recovers.  That's
25   referred to as neurapraxia.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

676

DCCTGUZ6                        Gidumal - direct

1              Then you get a second stage, which is called an
2      axonotmesis.  That's when the sheath to the nerve is injured,
3      because the nerve is more severely damaged.  At that point, the
4      nerve doesn't function right away, and over the course of
5      months the nerve recovers.
6              And then the third case is where the nerve is severed
7      and the nerve doesn't work right away, and over the course of
8      months it never recovers.  So the nerve stops working within
9      minutes of when the nerve is injured, and if anything, it
10     recovers or remains the same.  Over the course of time it
11     doesn't get worse.
12             The only time it gets worse is something called a
13     neuropathy.  A neuropathy is the nerve -- pathology is disease,
14     when the nerve is diseased, for example, someone with diabetes,
15     there the nerve gets damaged over the course of time, someone
16     with multiple sclerosis, someone with a slipped disk in their
17     back or neck, there what's happening is the damage is ongoing.
18     You haven't removed the inciting event.  So in the case of
19     diabetes, as long as the person is still diabetic, their nerve
20     is going to be further damaged as the nerve disease
21     progressions.  In those cases it's not a traumatic injury with
22     neuropathy.
23     Q.  So you said that in his first exam on February 14, 2009,
24     there was no sign of a foot drop, and that was because the
25     doctor noted there was no focal numbness or weakness, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

677

DCCTGUZ6                    Gidumal - direct

1   A.  Right.
2   Q.  So move forward in time in your review of medical records.
3   What is the next event relevant to your conclusion in regard to
4   foot drop?
5   A.  He is then seen in New York Presbyterian Hospital on
6   February 17, and there are no complaints of a foot drop or
7   weakness.  There is no note of peroneal nerve palsy in that
8   emergency room visit either.
9   Q.  And again, if the peroneal nerve had been injured on the
10  night of February 14, 2009, would you have expected to see
11  signs of it on February 17, 2009?
12  A.  That's correct.
13  Q.  Moving forward in time, what's the next medical reference?
14  A.  The next time he's seen is on May 23rd, 2009, again at
15  Presbyterian.
16  Q.  Just to correct, is it March 23?
17  A.  March 23rd, 2009, and there they notice the peroneal nerve
18  palsy.
19  Q.  So then based on that, what is your opinion in regard to
20  when the foot drop happened, when the traumatic event causing
21  the foot drop happened?
22  A.  There was no foot drop on February 17, and there was a foot
23  drop on March 23rd, so the foot drop happened someplace between
24  February 17 and March 23rd.
25  Q.  So let's now switch gears away from the peroneal nerve

678

DCCTGUZ6                          Gidumal - direct

1   injury and talk about the knee injury.  Did you get a chance to
2   conduct -- when you did your examination of the plaintiff, did
3   you get a chance to conduct a physical exam of his knee?
4   A.  Yes.
5   Q.  And you also said that you reviewed the operative report
6   from the surgery?
7   A.  Yes.
8   Q.  And how many ligaments were repaired in the surgery?
9   A.  Three.
10  Q.  Now you were aware -- are you aware of how the plaintiff
11  claims those three ligaments were torn?
12  A.  The way I understand it is that he said he was kicked on
13  the outside of his knee.
14  Q.  Now right next to you there's an anatomical model of a
15  knee.  Based on the plaintiff's report of how the injury
16  happened, could you explain to the jury what ligaments you
17  expect to be torn?
18           THE COURT:  Hold on, can everyone in the jury see?
19           Go ahead.  Can everyone hear the witness?
20           JUROR:  Yes.
21  A.  This is a knee model, this is the front, this is the back.
22  This is the fibula which makes it the outside of the knee.
23  This is the tibia, which is on the inside of the knee.  So if
24  you get kicked on the outside of your knee, you're kicked here,
25  the knee buckles in this direction.  And if you play football

679

DCCTGUZ6                        Gidumal - direct

1  or you play soccer, that's a clip, when you hit somebody on the
2  outside of the knee and you get hit like this.  And the classic
3  clipping injury is referred to as O'Donoghue's triad, which is
4  a tear of the ACL, but a tear of the medial collateral
5  ligament.
6           So this injury here, as you can see, if I did this,
7  would not do anything to the lateral collateral ligament.  The
8  lateral collateral ligament would just buckle, the medial
9  collateral ligament would tear.  So you would -- on a blow to
10 the outside of the knee, you would expect to see a tearing of
11 the medial collateral ligament.
12 Q.  Did the plaintiff have any tearing of his medial collateral
13 ligament?
14 A.  The patient had multiple physical exams by Dr. Dassa.  The
15 plaintiff had multiple physical exams with Jacobi.  The patient
16 had an intraoperative evaluation, the patient had an MRI done
17 in 2009, the patient had an MRI done in 2010, and Dr. Dassa,
18 the MRI, Jacobi, nobody found any evidence of a medial
19 collateral ligament injury.
20 Q.  So the ACL was torn.  Do you agree with me when it was
21 repaired, the surgery?
22 A.  Yes.
23 Q.  Now had you reached an opinion on when the plaintiff
24 suffered the ACL tear?
25 A.  Yes.

680

DCCTGUZ6                        Gidumal - direct
1  Q.  And what is that opinion?
2  A.  If you take a look at the MRI report of, the MRI was done
3  in May of 2009.  When you tear an anterior cruciate ligament,
4  there are multiple things that are expected to be seen.  You
5  expect to see bleeding in the knee, and there was no bleeding
6  on the MRI.  The X-rays done at Harlem show no effusion, which
7  means swelling or bleeding in the knee.  You expect to see a
8  bone bruise.  You don't see a bone bruise in May.  You would
9  expect to see some evidence of an anterior drawer, you don't
10  see that on Dassa's report.  You expect to see a positive
11  Lachman, you don't see that on Dr. Dassa's report.  You expect
12  to see evidence of an acute tear.  You see on the MRI evidence
13  of a chronic tear already healing to the PCL.  So based on the
14  MRI report and based on the physical exam, Dr. Dassa, based on
15  the X-rays, you expect that this ACL -- it's my opinion that
16  this ACL was torn, as the MRI report radiologist sees it, as a
17  chronic tear, meaning it was months and months old.
18  Q.  So what I'm showing you is in evidence, I believe it's
19  Plaintiff's 22, this is March -- sorry, the May 2009 MRI, and
20  you just said that the radiologist who read this said it's a
21  chronic tear of the ACL?
22  A.  That's correct.
23  Q.  Did you get a chance to review the corresponding MRI
24  itself?
25  A.  Yes.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

681

DCCTGUZ6                        Gidumal - direct

1  Q.  And did you agree with how the radiologist read the MRI?
2  A.  Yes.
3  Q.  Now did the radiologist or did you -- sorry, withdrawn.
4           When the radiologist notes a chronic tear of the ACL,
5  can you explain to the jury what a chronic tear means in this
6  context?
7  A.  Sure.  We tend to use three terms, one is acute, one is
8  subacute, on is chronic.  Acute means something less than six
9  weeks old.  Subacute means six weeks to six months old.
10 Chronic is something older than six months old.  When he chose
11 to use the term "chronic," he is saying this injury is over six
12 months old.
13 Q.  When you looked at the actual film, did you agree with that
14 conclusion?
15 A.  Yes.
16 Q.  You also said -- sorry, withdrawn.
17          Can you explain to the jury if a person has a torn ACL
18 and the torn ACL was torn for over six months, would that
19 person be able to function, to walk, to run?
20 A.  There are two groups of people who have torn ACLs.  They're
21 referred to a copers and non-copers; copers meaning you can
22 cope with the injury.  The best example of a coper would be
23 Tiger Woods.  Tiger Woods tore his ACL during military training
24 and he won several majors after tearing his ACL.  Then he gets
25 his ACL fixed and never won another major.  There are a number

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCCTGUZ6                         Gidumal - direct

1    of studies done in European countries where what you do is if
2    someone tears their ACL, you treat them conservatively.  And
3    about 50 percent of them never need their ACL fixed because
4    they're able to function perfectly, adequately for their knees.
5    And so those group of people are referred to as copers.  And
6    then you have a group of people who don't cope, their knee
7    gives out on them.  They can function for normal daily
8    activities, they can work, make a living, et cetera, but they
9    can't do sports.
10   Q.  Now could a person with a torn ACL, would they be able to
11   run?
12   A.  Yes.
13   Q.  Would they be able to run at full speed?
14   A.  Well, I mean you have to sort of time them to see how fast
15   they're running before the ACL and after the ACL.  That's a
16   hard question to answer.
17   Q.  Now you also mentioned bone bruising as one reason that you
18   believe that the ACL was torn on the night of February --
19   already torn on the night of February 14, 2009.  Can you just
20   explain why you believe that?
21   A.  Sure.  When you tear the ACL and the knee gives out, in
22   order to tear the ACL, the bones bang up against each other,
23   and what you get is you get something called a bone bruise.
24   It's a posterior lateral area of the femur which is irritated
25   and swells, and you get this bone bruising.  And that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

683

DCCTGUZ6                        Gidumal - direct
1   something that occurs in about 80 percent of cases and lasts
2   four to six months.  This scan was done less than four months,
3   certainly less than six months after the alleged event, and you
4   don't see any bone bruising.
5           The other thing you would expect to see on that MRI is
6   bleeding.  When the ACL tears you get bleeding in the knee, and
7   you don't see any bleeding.  Matter of fact, that's the reason,
8   if you take a look at that, the radiologist made sure to
9   mention the amount of fluid in the joint space is physiologic.
10  He wanted to made sure you understood there was no swelling, no
11  bleeding, et cetera.
12  Q.  And again, you looked at the film and you agreed with the
13  radiologist's conclusions?
14  A.  Yes.
15  Q.  So I want to switch gears now and talk about the PCL and
16  the LCL injuries.  So to do that I want to put up the MRI film
17  from this first exam.
18          THE COURT:  Why don't we take our afternoon break now.
19  Let take a ten-minute break and come back at 3:35.
20          (Recess taken)
21          MR. KUNZ:  We got the computer running.
22  BY MR. KUNZ:
23  Q.  What I wanted to do before we switched gears to the PCL and
24  LCL is I want to have you point out to the jury if you see the
25  torn ACL in the film.  So I will open up -- and let me give you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

684

```
       DCCTGUZ6                     Gidumal - direct
  1    a laser pointer.
  2    A.  You need to scroll through the picture.
  3             THE COURT:  Can the jurors all see?
  4    Q.  Tell me when, Doctor.
  5    A.  So right here you're seeing the PCL, it's inserting onto
  6    the femur.  Now go back one.
  7             THE COURT:  Can the jurors all hear?
  8             JUROR:  No.
  9             THE COURT:  It may be easier, since you have the
 10    pointer, to sit here so you could be by the microphone.
 11             THE WITNESS:  Got it.
 12    Q.  What you were just pointing to, you said, was the PCL?
 13    A.  Right.
 14    Q.  Could you show the jury where that is again?
 15    A.  Right here.
 16    Q.  And so this is -- just so we're all clear, this is the
 17    May 29, 2009 MRI?
 18    A.  That's correct.
 19    Q.  And when you're pointing to the PCL, is there a tear to
 20    that PCL?
 21    A.  No.
 22    Q.  Can you use the laser pointer again to show the jury the
 23    PCL?
 24    A.  Right there.
 25    Q.  Now could you also show the jury the ACL?
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

685

DCCTGUZ6                         Gidumal - direct

1    A.  No, because it's torn.
2    Q.  Could you show where the ACL would be?
3    A.  It would be running in through here.
4    Q.  So the fact it's not running through there means that it
5    was torn?
6    A.  Yes.
7    Q.  Is there any indication of the chronic nature of the ACL
8    tear?
9    A.  You can see it a little bit right here a little of the ACL.
10   It's getting right attached to the PCL.
11   Q.  Now when Dr. Dassa was testifying earlier today, he
12   indicated that in his reading of this film the PCL was torn.
13   Do you agree with that opinion?
14   A.  I disagree with that opinion.
15   Q.  Now the doctor pointed to several slides where the PCL
16   appeared where you could see the beginnings of the PCL and then
17   there was a white area that would sort of block it, and he
18   indicated the white area visible meant that this was a tear of
19   the PCL.  Can you explain to the jury your opinion of that, the
20   statement by Dr. Dassa?
21   A.  That white area is some of the fat and stuff around the
22   PCL.  That doesn't mean that the PCL is torn.  The other thing
23   that happens unfortunately with these scans, and this is why
24   you need a radiologist, is that if you take a look at the ACL
25   and the PCL on the model, it doesn't go straight up and down.

686

DCCTGUZ6                          Gidumal - direct

 1  So when you're in a view like this, it doesn't just go in that
 2  one plane.  Like a piece -- if you take white bread that's
 3  sliced, it's going in this direction, so it's going across
 4  slices of the bread, it's not going in line with the slices,
 5  it's going across it.  And so therefore, when you take a look
 6  at the pictures, you might see it on slice seven, then coming
 7  down a little bit, slice eight, then slice nine, slice ten, and
 8  therefore you have to -- unfortunately, it's not quite like an
 9  X-ray where it's very easy for regular people to read, these
10  actually are quite difficult to read, and that's the reason for
11  the radiologists.
12  Q.  So when you read this film, did you see the PCL intact?
13  A.  Yes.
14  Q.  And did the radiologist who also read this film find the
15  PCL intact?
16  A.  Yes.
17  Q.  Now in regard to the LCL injury, is it possible to diagnose
18  an LCL injury on an MRI?
19  A.  Yes.
20  Q.  Is that difficult to do?
21  A.  You sort of have to get the views right, and you also have
22  to have a clinical suspicion of it, but yes, you should be able
23  to see on an MRI.
24  Q.  Other than on an MRI, is there any other way to diagnose an
25  LCL injury?

687

DCCTGUZ6                        Gidumal - direct
1   A.  Yes, a physical exam.
2   Q.  What test do you run during a physical exam to diagnose an
3   LCL injury?
4   A.  You test what you refer to as valgus and varus stability.
5   Q.  Were -- was that LCL test ever conducted on the plaintiff?
6   A.  Yes.
7   Q.  Who conducted that?
8   A.  Dr. Dassa.
9   Q.  And what was the results of Dr. Dassa's LCL test?
10  A.  Dr. Dassa did the LCL test on the patient when he saw him
11  in May, and when he did the test in May he found that the --
12  there was no evidence of an LCL tear.  He found the knee to be
13  stable.  He then did the test again in August 13 of 2009,
14  negative varus and valgus stress test.  So he tested it and
15  found -- put stress on it and found the lateral collateral
16  ligament was intact.  He then, I think, reexamined him again.
17  Q.  I don't need you to go through all the records, but I
18  appreciate that.
19          Now so in your review of the medical records and your
20  examination of the plaintiff, have you reached an opinion on
21  when the LCL injury occurred?
22  A.  The LCL injury was not present on Dassa's exam in May, the
23  ACL injury was not present on Dassa's exam in August, the LCL
24  injury was not present on the MRI.  So therefore, the LCL and
25  PCL injuries had to have taken place subsequent to those exams.

688

DCCTGUZ6                    Gidumal - direct

1  Q.  Now I want to focus a little on knee stability.  And can
2  you tell the jury very quickly what is knee stability in terms
3  of ligament injuries?
4  A.  Sure.  What the ligaments do is hold the bones together,
5  and knee stability is the ability of the joints to be held
6  together, and instability is when the joints move out of place.
7  Q.  Now in your review of the medical records in this document,
8  did you see any indication of knee instability in the
9  plaintiff?
10  A.  Yes.
11  Q.  And when did that knee instability start?
12  A.  That instability is first noted I think in the Jacobi
13  records back in 2010.
14  Q.  Now in the May 2009 records from Dr. Dassa, did he test the
15  plaintiff's knee stability?
16  A.  Yes, he did.
17  Q.  What was the results of Dr. Dassa's tests on the
18  plaintiff's knee stability?
19  A.  Dr. Dassa did what is called a Lachman test, which is the
20  test for an anterior cruciate ligament tear, and he found that
21  it was normal or negative.  He did a test of posterior drawer,
22  which a test of the PCL, and found that it was negative, which
23  means normal.  And he did a valgus and varus instability, which
24  tests the medial collateral and lateral collateral, and he
25  found they were negative, meaning normal.

689

DCCTGUZ6                          Gidumal - direct

1   Q.  Now what, if anything, does that information tell you about
2   when the plaintiff's knee stability issues start?
3   A.  Well, there are two instability issues here; one is the ACL
4   and one is the PCL.  The ACL is the one with the chronic tear
5   in the 2009 X-rays.  And the fact that Dassa found no evidence
6   of knee instability when he was specifically testing for it in
7   May suggests that the ACL injury was old, had healed to the
8   PCL, which produced the degree of stability, which is what the
9   copers -- the Tiger Woods situation where the knee is stable.
10  Then he goes on to have another injury where he tears his PCL
11  and his lateral collateral and is unstable, and that's the exam
12  at Jacobi.  So the PCL injury, the lateral collateral ligament
13  injury took place sometime after August of '09, and the ACL
14  injury took place months before the May MRI.
15  Q.  Now if a person had three torn ligaments when they were
16  examined by an orthopedist, would you expect that the
17  orthopedist would be able to diagnose those torn ligaments?
18  A.  Yes, his knee would be flopping all over the place.
19  Q.  Can you explain what that means?
20  A.  Sure.  He would have nothing to make him stable, nothing
21  holding his knee in place.  So if you tested it, it's not like,
22  for example, if he just had an ACL tear that could heal to the
23  PCL and you need not be able to pick up the instability.  If
24  the ACL is torn and PCL and the lateral collateral ligament is
25  torn, there's absolutely nothing holding this knee in place.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

690

DCCTGUZ6                         Gidumal - direct

1   So it's like this model, if I were to take a scissor and was to
2   cut the ACL, this thing would still hold up, but if I cut all
3   three ligaments you would see this thing flopping all over the
4   place, and that's what his knee exam would be like.  So someone
5   like Dassa, he would definitely be able to pick it up.
6   Q.  Now have you reviewed the operative report from the
7   surgery?
8   A.  Yes.
9   Q.  And you did your physical examination of the plaintiff
10  after the surgery?
11  A.  Correct.
12  Q.  And have you reached any opinions in regard to whether or
13  not the surgery was successful?
14  A.  It's hard to tell because I didn't examine him before and
15  after, but the patient's knee is relatively stable based on my
16  exam when I examined him.
17  Q.  So you noted in your exam there was some instability in his
18  knee, correct?
19  A.  Right.
20  Q.  Now Dr. Dassa also reached some opinions in regard to the
21  presence of arthritis in the plaintiff's knee?
22  A.  Yes.
23  Q.  Have you reached any opinions in regard to the presence of
24  arthritis?
25  A.  Yes.

691

DCCTGUZ6                         Gidumal - direct

1   Q.  And what opinions have you reached?
2   A.  He either has no or he has minimal arthritis in his knee.
3   Q.  And I just want to briefly take a look at the X-rays.  So
4   first I want to show you the X-ray from the night of the
5   incident.  We'll start with this view.  Can you explain to the
6   jury what they're seeing in this view of the knee?
7   A.  What you are seeing in this view as referred to AP, front
8   to back of the knee, and what you have here is you have the
9   femur, here you have the tibia, here you have the fibula, and
10  here you have the joint spaces.  And this is a normal amount of
11  joint space consistent with a normal knee, meaning no
12  arthritis.
13  Q.  Now I want to compare that with a subsequent X-ray taken in
14  November of 2013.  I have a print out, we'll do this the old
15  fashioned way and put it up on the paper so it's a little
16  easier to look at.
17          So this is the X-ray from November of 2013, and --
18          THE COURT:  For the record, that's what exhibit?
19          MR. KUNZ:  This is Plaintiff's 29.
20  Q.  Can you explain to the jury what you're seeing in this
21  X-ray here?
22  A.  What you're seeing here is the same thing, you see good
23  joint spaces, meaning no or minimal arthritis, you see evidence
24  of the bone tunnels for the PCL and the ACL reconstruction, you
25  see the button that's holding the ACL in place, and you see

DCCTGUZ6                        Gidumal - direct

1   some of the channels that occur because you drilled holes
2   through the bone to put those ligaments in place.
3   Q.   Now Dr. Dassa testified that he saw evidence of arthritis
4   in this X-ray.  Do you see any evidence of arthritis?
5   A.   You don't really see any evidence of arthritis, what you
6   see is good joint spaces here and here.  And what this here
7   represents is if you take a look at that second MRI, you see
8   the osteochondral fragment where he has had an additional --
9   and suggestive of a second injury where he has a new injury to
10  the knee and damaged the bone, and that's the irregularity
11  you're seeing there.
12  Q.   Dr. Dassa referred to that irregularity as an osteophyte.
13  A.   I think if you look at the MRI report they have an
14  osteochondral fragment, which is a piece of bone that broke
15  off, and I think that's what that is.
16  Q.   And I want to show you another view of the knee.  And
17  Dr. Dassa -- you see where the kneecap is shown in this picture
18  here?
19  A.   Yes.
20  Q.   Do you see the space between the kneecap and the femur
21  appears to be smaller than the November 2013 X-ray as compared
22  to the February 2009 X-ray?
23          I want to put up -- here's the one from the night of
24  the incident, you see the space, then here's the one from
25  November?

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

693

DCCTGUZ6                         Gidumal - direct

1   A.  Right.
2   Q.  Can you explain to the jury why you see more space in the
3   November 2013 X-ray?
4   A.  That is a poor quality X-ray.  Whoever took this doesn't do
5   very many X-rays.  It's probably not a -- you see this and
6   this, these two bones should be on top of each other when you
7   take a good quality X-ray.  They shouldn't be overlapping.
8   This is an oblique view.  So if you've got something like this
9   and you have got this, you have got a space.  If you take the
10  view like this and you have two dimensional, this overlaps with
11  this back here because it's angle.d, so if you take a look at
12  this, look here, which is a poor quality lateral, not the
13  other, not like the other one -- now put up the other one, you
14  see this, this is obviously done more by a radiologist.  Here
15  there's virtually no overlap.  So this is a pure lateral.  You
16  don't have that overlap that you see giving you the difference
17  in space.
18  Q.  So am I right in thinking that the two X-rays are taken
19  from slightly different angles of perspectives?
20  A.  Right.
21  Q.  Now in addition to these two X-rays, did you see any
22  notations in the medical records about another X-ray that was
23  taken?
24  A.  There were several other X-rays taken.
25  Q.  Specifically thinking of an X-ray taken just after the

694

DCCTGUZ6                        Gidumal - direct

1   surgery?
2   A.  Yes.
3   Q.  Can you tell the jury about that X-ray?
4   A.  Sure.  That X-ray was taken post operatively, and what they
5   do is they report the post-operative changes without those bony
6   tunnels that we were talking about.
7   Q.  Was there anything in that X-ray relevant to your opinions
8   about the ligaments or the arthritis?
9   A.  They had the bony tunnels, which is what you need for the
10  ligament reconstruction, and it didn't show the arthritis.
11  Q.  And would you have expected there to be signs of arthritis
12  at that point right after the surgery?
13  A.  No.
14  Q.  Now you were aware that the plaintiff is claiming that the
15  only time he injured his leg was on February 14, 2009.
16  A.  Yes.
17  Q.  Based on your review of the medical records, are the
18  medical records consistent with that claim?
19  A.  No.
20  Q.  And why not?
21  A.  Well, if you go through it, he claims he injured his knee
22  on February 14.  If he injured his knee at that time, when the
23  X-rays were taken in the emergency room at Harlem Hospital you
24  would expect to see bleeding in the knee, which is an effusion,
25  you don't see it.  He then has a repeat X-ray done at Columbia,

DCCTGUZ6                      Gidumal - direct
1   and again they don't see a knee effusion.  He is then examined
2   by Dr. Dassa who doesn't see a knee effusion.  He's examined by
3   Dr. Dassa who doesn't find an anterior cruciate ligament tear.
4   He then has an MRI done which doesn't show any knee effusion.
5   He then had an MRI done which doesn't show bone bruise.  He has
6   an MRI done that shows a chronic tear of his ACL.  So the exams
7   at Harlem, at New York Presbyterian, by Dr. Dassa, and the MRI
8   are all consistent with this being an old injury and not a new
9   injury.
10  Q.  In terms of the ACL?
11  A.  In terms of the ACL.
12  Q.  How about in terms of the PCL and LCL?
13  A.  Again, if you take a look at his medical records, the MRI
14  from May doesn't show a PCL.  The examination by Dr. Dassa in
15  May and August doesn't show a PCL.  Dr. Dassa said he reviewed
16  the MRI and found the PCL.  Well, he examined the patient again
17  in August after he is supposedly saw the PCL, and he still
18  doesn't diagnose a PCL injury.  He reexamines him and doesn't
19  say anything about a PCL, only says ACL.  If he saw a PCL
20  injury in May, how come he doesn't put on his diagnosis PCL
21  injury?
22  Q.  I guess my last question, Doctor, is the opinions that you
23  have expressed in this case, are you giving those within a
24  reasonable degree of medical certainty?
25  A.  Yes.

```
       DCCTGUZ6                    Gidumal - cross
 1                MR. KUNZ:  I have no further questions.
 2                THE COURT:  OK.  Any cross-examination?
 3                MR. NORINSBERG:  Yes, your Honor.
 4     CROSS-EXAMINATION
 5     BY MR. NORINSBERG:
 6     Q.  Good afternoon, Doctor.
 7     A.  Hi.
 8     Q.  Doctor, first time you saw this plaintiff was almost three
 9     years after the incident, is that correct?
10     A.  Correct.
11     Q.  And you haven't seen him since that time, correct?
12     A.  Correct.
13     Q.  So you have seen him one time in the last five years,
14     right?
15     A.  Correct.
16     Q.  Now when you conducted your exam, you wanted to find out
17     whether some of the complaints that the plaintiff was making
18     were true, correct?
19     A.  When I examined the patient --
20     Q.  That's yes or no.
21                THE COURT:  Can you answer that yes or no?
22                THE WITNESS:  No, no.
23                THE COURT:  Do you want to rephrase the question?
24     Q.  You wanted to find out what medical problems the plaintiff
25     had, if any, at that time.  True or not true?
```

697

DCCTGUZ6                      Gidumal - cross

1   A.  True.
2   Q.  And then you wrote a narrative report setting forth your
3   findings in that exam, correct?
4   A.  Correct.
5   Q.  And you put forth findings relating to the examination of
6   his right leg in particular, correct?
7   A.  Correct.
8   Q.  OK.  Let's talk about some of those findings.  Can we agree
9   that the patient Mr. Guzman at that time had foot drop with no
10  ankle dorsiflexion on the right side?
11  A.  Correct.
12  Q.  There was zero degrees of dorsiflexion?
13  A.  Correct.
14  Q.  So Mr. Guzman wasn't able to bring up his ankle even a
15  little bit, correct?
16  A.  Correct.
17  Q.  You confirmed that finding with your exam, correct?
18  A.  Correct.
19  Q.  You also noted there was no dorsiflexion for his toes on
20  his right foot, correct?
21  A.  Correct.
22  Q.  That means that he also couldn't bring up his toes,
23  correct?
24  A.  Correct.
25  Q.  You also found decreased sensation on the top of the right

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

698

DCCTGUZ6                         Gidumal - cross
 1   foot, correct?
 2   A.  Correct.
 3   Q.  So if I understand your testimony correctly, you found no
 4   dorsiflexion in the ankle, no dorsiflexion in the toes, and
 5   decreased sensation to the top of the right foot, correct?
 6   A.  Correct.
 7   Q.  Symptoms which you believe document that he has a foot drop
 8   injury, correct?
 9   A.  Correct.
10   Q.  And that foot drop injury that you documented and confirmed
11   is permanent, correct?
12   A.  Correct.
13            (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
        DCC3GUZ7                    Gidumal - cross
 1   Q.  It's never going to improve, correct?
 2   A.  Unless something else is done, correct.
 3   Q.  Referring to your deposition.  Page 88, line 17.
 4           MR. KUNZ:  Which deposition?
 5           MR. NORINSBERG:  First one.
 6   "Q.  What is your opinion as to whether --"
 7           MR. KUNZ:  Which page?
 8           MR. NORINSBERG:  Page 88.
 9           MR. KUNZ:  One second.
10           MR. MODAFFERI:  Judge, we'd like to object.
11           THE COURT:  Let's have a brief side bar.
12           (At the side bar)
13           THE COURT:  My recollection is you asked something to
14   the effect of this foot drop is permanent.  That means it's
15   never going to improve.  The witness says unless something else
16   is done, that's correct.
17           MR. NORINSBERG:  He just said at the deposition he
18   said no, it is not going to -- he didn't say no, it's not going
19   to unless something else happens.
20           MR. KUNZ:  It is disingenuous impeachment.  Later on
21   in the deposition he's asked about other options and he talks
22   about other options for the treatment of the plaintiff.
23           MR. NORINSBERG:  We'll certainly get to that.  My
24   point is it is a permanent condition, without the -- it is not
25   going to improve without any qualification.  It may improve --
```

DCC3GUZ7                         Gidumal - cross

 1              THE COURT:  Ask the predicate question.  Ask him that.
 2     It is not going to improve period.  See what his answer is.
 3              MR. NORINSBERG:  Okay.
 4              THE COURT:  Where is this that you're referring to?
 5              MR. KUNZ:  This particular section here.
 6              THE COURT:  Which page?
 7              MR. KUNZ:  88, line 17 through 21, is what
 8     Mr. Norinsberg going to use to impeach him:
 9     "Q.  What is your opinion as to whether or not this foot drop
10     condition will ever improve?
11     "A.  My opinion is that it is not going to."  Then I can find
12     it, I'm sure, but --
13              THE COURT:  Find it.
14              MR. KUNZ:  I'm sure John is going to go into this.
15              MR. NORINSBERG:  At a later point in the exam he said,
16     look, if you did any type of procedure, you are going to weaken
17     another part of his body so you can't do it.  It is not
18     medically recommended.  You can't transfer a tendon from
19     another place to help the foot because it will then create a
20     new deficit.  That's in my exam.  That's a later point.
21              THE COURT:  Why not get to it in the exam now?
22              MR. NORINSBERG:  Judge, this is something, my point is
23     that the question that you formulated as we were leaving is a
24     question I'd like to ask.  That the condition is permanent.
25     Period.

DCC3GUZ7                    Gidumal - cross
 1              THE COURT:  Okay.  I am trying to figure out -- okay.
 2     You are saying you're going to go into this next section?
 3              MR. NORINSBERG:  No, Judge, the point --
 4              THE COURT:  That's the point --
 5              MR. NORINSBERG:  I will talk at some point during the
 6     exam about the fact that there are no surgical procedures that
 7     could be done for this.  But that's a different point
 8     basically.
 9              THE COURT:  Let's just move this.
10              (In open court)
11              THE COURT:  The objection is overruled.  Go ahead.
12     BY MR. NORINSBERG:
13     Q.  This foot drop condition is never going to improve, is that
14     correct?
15     A.  Correct.
16     Q.  It will be with him for the rest of his life, correct?
17     A.  Correct.
18     Q.  Doctor, you testified that there is just not enough
19     evidence to identify when exactly the foot drop occurred, is
20     that correct?
21     A.  Correct.
22     Q.  But you pinpointed it to a one-month period February 17 to
23     March 23 of 2009, correct?
24     A.  Correct.
25     Q.  You said it could be any time after that, right?  Any time
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

702

DCC3GUZ7                        Gidumal - cross

1   in that time period?
2   A.  Yes.
3   Q.  So, it could be February -- excuse me.  It could be
4   February 18, February 19, few days after the incident the foot
5   drop could have arisen, is that correct?
6   A.  No.  Because a few days after the incident would be the
7   16th.  He was examined on the 17th and they didn't find a foot
8   drop.  So, it had to be after the 17th.
9   Q.  Excuse me, Doctor.  My question is it could have been on
10  the 18th, 19th, or 20th, any time within a matter of days after
11  that, is that correct?
12  A.  Yes.
13  Q.  Based on what you just told us, correct?
14  A.  Yes.
15  Q.  You told us, Doctor, that you expect a nerve injury to show
16  up immediately, right?
17  A.  Yes.
18  Q.  That's only if it is a complete peroneal nerve injury,
19  isn't that true?
20  A.  No.
21  Q.  Isn't it true, Doctor, if it's a partial injury, you
22  wouldn't expect that?
23  A.  No.
24  Q.  Even though you said that at your deposition two weeks ago?
25  A.  No.  You would expect --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

703
DCC3GUZ7                              Gidumal - cross

 1              THE COURT:  Hold on.  There is not a question before
 2    you.
 3    Q.  Let me ask you this, Doctor.  Have you seen and reviewed
 4    carefully the medical record from March 23, 2009?
 5    A.  I have seen the medical records from March 23, 2009, yes.
 6    Q.  You reviewed them carefully, right, Doctor?
 7    A.  I reviewed them, yes.
 8    Q.  Tell the jury what point do those records say the foot drop
 9    symptoms first started showing up.
10    A.  Patient reports that his right lower extremity pain below
11    the knee associated with weakness and decreased sensation.  He
12    states that these symptoms have been present for one and a half
13    months.
14    Q.  One and a half months would put it just about exactly on
15    the day of this incident, wouldn't it?
16    A.  Again, that's what he states.
17    Q.  I understand, but you have no reason to sit here now and
18    say that what he was stating on March 23 was inaccurate, do
19    you, sir?
20    A.  Other than the fact that the records from Harlem, and the
21    records from New York Hospital, New York Presbyterian, don't
22    validate what you're saying.
23    Q.  Let's talk about those for a minute, Doctor.  Before we do
24    that, let me quickly show you a picture.  Doctor, you've seen
25    this picture before, correct?

DCC3GUZ7                    Gidumal - cross
```
 1   A.  Yes.
 2   Q.  That bruise in that photograph, is that correct?
 3   A.  Yes.
 4   Q.  The bruise appears on the outside part of the lower right
 5   knee, correct?
 6   A.  Correct.
 7   Q.  The peroneal nerve is on the outside part of the lower
 8   right knee, correct?
 9   A.  Correct.
10   Q.  The bruise in the picture is in the same region as the
11   peroneal nerve, is that correct?
12   A.  Correct.
13   Q.  The picture is consistent with blunt force trauma to
14   Mr. Guzman's knee, correct?
15   A.  Yes.
16   Q.  Blunt force trauma to the outside part of somebody's knee
17   could cause injury to the peroneal nerve.  True or not true?
18   A.  Yes.
19   Q.  So this photo is consistent with Mr. Guzman being kicked in
20   the leg, and having a peroneal nerve injury.  Isn't that true?
21   A.  Yes.
22   Q.  Doctor, I was the one that actually first showed you these
23   photos two weeks ago at your deposition, isn't that true?
24   A.  Yes.
25   Q.  So you formed opinions in this case without ever even
```

DCC3GUZ7                        Gidumal - cross

1  looking at those pictures, isn't that true?
2  A.  I don't know -- I take that back.  I'm not sure if that's
3  true or not.  I am not sure if I saw those pictures as part of
4  the medical records I was given at the time of the original
5  visit.
6  Q.  You were asked by counsel in part of the examination about
7  reviewing records.  You were asked about what things you
8  reviewed, correct?
9  A.  Right.
10  Q.  You didn't mention anything about photographs in your
11  report, did you, sir?
12  A.  That's why I wasn't sure.  That's correct.
13  Q.  You didn't mention in your first report, you didn't mention
14  in the second report, correct?
15  A.  Correct.
16  Q.  Because in fact, if you had reviewed photographs, you would
17  have put it in those reports, isn't that true?
18  A.  Yes.
19  Q.  So the fact of the matter is you formed a medical opinion
20  without ever seeing a picture of this injury, isn't that true?
21  A.  No, I've seen that picture you said at least two weeks ago.
22  Q.  Yes, but you were hired back in October 2011, right?
23  A.  Yes.
24  Q.  So during the two years and two months since that point,
25  you never once had seen that, is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCC3GUZ7                    Gidumal - cross
1   A.  Yes.
2   Q.  You talked about findings in the second hospital, New York
3   Presbyterian, that took place three days after the incident,
4   right?
5   A.  Right.
6   Q.  There was evidence of decreased strength and decreased
7   range of motion in the right knee, leg and ankle at that time,
8   correct?
9   A.  Correct.
10  Q.  That's a significant finding, right, Doctor?
11  A.  Yes.
12  Q.  That tells you he had some type of an injury to his right
13  leg, correct?
14  A.  Correct.
15  Q.  Those findings are consistent with somebody having some
16  type of peroneal nerve injury, true or not true?
17  A.  Consistent with many different things, the peroneal nerve
18  palsy being one of the things that it could be consistent with.
19  Q.  Referring to your deposition.  Page 32, line 20, this is
20  deposition number two:
21  "Q.  My question is you told us earlier --"
22          MR. KUNZ:  Objection, this is improper impeachment.
23          THE COURT:  Let's have a side bar.
24          (At the side bar)
25          MR. NORINSBERG:  Judge --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCC3GUZ7                        Gidumal - cross
1                THE COURT:  Hold on.  Go ahead.
2                MR. KUNZ:  He said yes to the question.  He said yes,
3        the injury is consistent with peroneal nerve injury.  That's
4        exactly what he said.
5                MR. NORINSBERG:  No, Judge.  What he is doing now is
6        he's adding different things to minimize the impact of the
7        answer.  At the deposition he cleanly said yes, it is
8        consistent.  Now he is saying it is consistent but it is
9        consistent with all these other things.
10               THE COURT:  Here's the thing.  I've given both counsel
11       lots and lots of scope.  We've got to move this along.  I guess
12       one of the things that's been concerning me from both sides is
13       I know counsel want to bring out inconsistencies.  I don't know
14       why it is necessary to bring out every single inconsistency
15       that there is.  The witness gave you pretty much what you want.
16       If you want to ask him again, ask him again.  Let's just move
17       things along here.  But again, as I've said, I think both sides
18       have been asking sometimes the same question over and over and
19       getting different answers.  Let's just move things along here.
20               (In open court)
21               THE COURT:  Go ahead, counsel.
22       BY MR. NORINSBERG:
23       Q.  Referring to your deposition.  The second deposition page
24       32, line 20:
25       "Q.  My question is, you told us earlier that some of the
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

708

DCC3GUZ7                    Gidumal - cross

1  findings in the second visit were in fact consistent with a
2  peroneal nerve injury.  True or not true?
3  "A.  Yes."
4          Page 30, line eight, same deposition:
5  "Q.  My question is, Doctor, is are the findings just
6  identified on the record, are those findings consistent with
7  somebody who has some type of peroneal nerve injury?
8  "A.  Yes.
9  "Q.  It is consistent or no, it's not consistent?
10  "A.  Yes."
11          Do you recall giving that testimony, sir?
12  A.  Yes.
13  Q.  That was just two weeks ago, correct?
14  A.  Yes.
15  Q.  According to your deposition testimony, the findings in the
16  second visit were consistent with peroneal nerve injury.  True
17  or not true?
18  A.  As I said --
19  Q.  True or not true?
20  A.  It is consistent with peroneal nerve palsy along with many
21  other things, yes.
22  Q.  When you told the jury earlier that there was no evidence
23  of peroneal nerve injury, you didn't mention the fact that some
24  of the finings in fact were consistent with that injury, did
25  you?  Yes or no?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

709

DCC3GUZ7                    Gidumal - cross

1   A.  The --
2   Q.  Yes or no, sir?
3   A.  The impression of the doctor --
4           MR. NORINSBERG:  I'd ask the witness to answer yes or
5   no.
6           THE COURT:  Can you answer that yes or no?
7           THE WITNESS:  It is an incomplete answer.
8           THE COURT:  Okay.  Can you rephrase the question?
9   Q.  When you told the jury before that there wasn't any
10  evidence in the second hospital visit, you didn't mention the
11  fact that some of the findings they documented were in fact
12  consistent with peroneal nerve injury, did you?  Yes or no?
13  A.  The findings that --
14  Q.  That's a yes or no.  You've testified many times.
15          THE COURT:  Hold on.  Please restate the question.
16  Q.  Would you agree, Doctor, as you sit here right now, that
17  some of the findings in the second visit were indeed consistent
18  with the peroneal nerve injury that was documented five weeks
19  later in the Columbia Presbyterian Medical Clinic?  Would you
20  agree with that, sir?
21          THE COURT:  Can you answer that question?
22  A.  I mean, one little finding someplace is consistent with
23  peroneal nerve palsy.  The totality of the visit is such that
24  that's not the diagnosis that they made.  That's not the
25  findings that they have.  Yes, pain along the outside of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

710

DCC3GUZ7                         Gidumal - cross

1   knee is consistent with a peroneal nerve palsy.  But it could
2   be consistent with 10 different things.  The totality of the
3   visit was such that they did not feel he had a peroneal nerve
4   palsy.
5   Q.  If I understand your testimony correctly, we have
6   photographs showing bruising in the region of the peroneal
7   nerve.  We have a hospital record from just three days later
8   showing findings that are consistent with peroneal nerve
9   damage.  We have a note five weeks later that documents that
10  the injuries are might be secondary to peroneal nerve injury.
11  But your testimony is you can't offer an opinion as to when
12  this arose.
13          Is that your testimony, sir?
14  A.  My testimony is that they do not have enough evidence to
15  make the diagnosis of a peroneal nerve palsy until five weeks
16  later.  They examined him at two different hospitals and a
17  third physician specifically examined him knowing he had an
18  injury on the outside of the knee.  Knowing where the peroneal
19  nerve was.  And they could not find evidence of a peroneal
20  nerve palsy.  Dassa specifically knew, he is an orthopedic
21  surgeon.  Dassa could not find evidence of a peroneal nerve
22  palsy.
23  Q.  Didn't you just tell us before that in your opinion the
24  injury actually arose between February 17 and March 23, didn't
25  you say that, sir?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

711

DCC3GUZ7                          Gidumal - cross
1    A.  My --
2    Q.  Yes or no, Doctor?
3    A.  My best guess --
4            MR. NORINSBERG:  I am going to ask respectfully that
5    the doctor answer a question yes or no, just in the same manner
6    my witness was forced to.
7            THE COURT:  Can you answer that yes or no?
8    A.  My best guess is that's when it took place.
9    Q.  If it took place sometime back in between February and
10   March, why are we talking about what Dr. Dassa did or didn't
11   diagnose months later?  That has nothing to do when it first
12   arose, does it, sir?
13   A.  Okay.
14   Q.  Does it?  Yes or no?
15           THE COURT:  This is responsive to that question that
16   you just asked.  Go ahead.
17   A.  Okay.  Then instead of three different physicians not
18   finding a peroneal nerve palsy, two different physicians at two
19   different hospitals at two different dates failed to document
20   the presence of the peroneal nerve palsy on the 14th and the
21   17th.
22   Q.  Really, are you --
23           THE COURT:  Hold on.  Let the witness finish answering
24   the question.
25   A.  If you take a look at it, just some pain on the outside of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCC3GUZ7                      Gidumal - cross

1    the knee is not a diagnosis of peroneal nerve palsy.
2    Q.  Are you aware of the fact one of those physicians actually
3    testified here yesterday, the emergency room physician.  Are
4    you aware of that, Doctor?
5    A.  No.
6    Q.  Do you have any idea what he testified to?
7    A.  No.
8    Q.  I'd like you to assume that he himself said he is not an
9    orthopedic doctor, he only had two weeks of training in
10   orthopedics, and he did not make any findings ruling out nerve
11   damage or ruling out ligament tears.
12              MR. KUNZ:  Objection.
13   Q.  I'd like you to assume that, Doctor.
14              MR. KUNZ:  Objection.
15              THE COURT:  Basis?
16              MR. KUNZ:  It is asking for speculation.
17              THE COURT:  Overruled.
18   Q.  I'd like you to assume that we heard from one of those
19   doctors.
20              THE COURT:  Is there a question?
21              MR. NORINSBERG:  Okay.
22   Q.  He indicated he only had two weeks of training during his
23   residency.  He said that he did not make any findings regarding
24   nerve damage, one way or the other.  And that's why he referred
25   the plaintiff to another orthopedic doctor.  I'd like you to

DCC3GUZ7                    Gidumal - cross

1   assume that.
2   A.  Okay.
3   Q.  Would you agree, Doctor, if he gave that testimony, you'd
4   have to modify your opinion, would you?  Yes or no.  Yes or no,
5   sir?
6   A.  Yes.
7   Q.  I'd like you to focus on the foot drop so far.  I'd like to
8   ask you about some of the findings you made with regard to the
9   right knee.
10  A.  Okay.
11  Q.  Would you agree that there were a number of findings
12  relating to instability with the PCL and ACL as well?
13  A.  Correct.
14  Q.  So you tested the varus and valgus instability, correct?
15  A.  Yes.
16  Q.  You found that even after the surgery had been performed,
17  Mr. Guzman still has his knee opening up and moving to the
18  side, yes?
19  A.  Yes, I found he had some degree of varus instability.
20  Q.  You found varus opening on the right side but not on the
21  left side?
22  A.  Correct.
23  Q.  He also a posterior drawer on the right side, correct?
24  A.  Yes.
25  Q.  Posterior drawer is a test for the PCL, correct?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

714

DCC3GUZ7                      Gidumal - cross

1   A.  Correct.
2   Q.  That indicated that ligament was loose also, correct?
3   A.  Correct.
4   Q.  You also did a Lachman test on him, correct?
5   A.  Correct.
6   Q.  The Lachman test was positive on the right side, correct?
7   A.  Correct.
8   Q.  The Lachman test tested the PCL, correct?
9   A.  Correct.
10  Q.  As far as you were concerned, based on the results of that
11  test, the PCL is definitely loose and the ACL could well be
12  loose, correct?
13  A.  Yes.
14  Q.  So, if I understand your testimony, you had a positive
15  drawer test, positive Lachman test, positive varus opening
16  test, correct?
17  A.  Correct.
18  Q.  You had three separate abnormal findings on the right knee,
19  isn't that true?
20  A.  Yes.
21  Q.  And that's separate, that's completely separate from the
22  foot drop; that's a separate finding, right?
23  A.  Correct.
24  Q.  So these findings that you did in your exam are consistent
25  with a patient who is continuing to have ongoing problems with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

715

DCC3GUZ7                        Gidumal - cross
1    his knee, correct?
2    A.  Correct.
3    Q.  It is your testimony, if I understand you correctly, that
4    none of these knee findings have anything to do with the
5    incident on February 14, 2009, correct?
6    A.  That's what the medical records suggest, correct.
7    Q.  Referring to your deposition.  Page 134, line seven:
8    "Q.  My question to you, Doctor, is could the findings that you
9    documented in your report, could they have come from the
10   incident which took place on February 14, 2009?  Yes or no?
11   "A.  Yes."
12           Do you recall giving that testimony?  Yes or no?  Do
13   you recall that, sir?
14   A.  Do I recall it?  No.
15   Q.  According to your deposition testimony, all of the findings
16   we just went through could have been from February 14, 2009.
17   True or not true?
18   A.  I mean, if you ask anything is possible, so the answer is
19   yes.  It could have.  But, that's not what the medical records
20   document.  And so if you ask it yes or no, the answer would be
21   yes.  It is possible.  But it is not medically, it is not any
22   degree of medical certainty, and it is not documented with the
23   medical records.
24   Q.  You changed your opinion after the first deposition, didn't
25   you, Doctor?

716
DCC3GUZ7                        Gidumal - cross
1    A.  No.  You asked me could it, yes or no, could it.  The
2    answer is yes.  But is it what is the most likely outcome,
3    the answer is the most likely outcome based on the Harlem, New York
4    Hospital, the MRIs, Dassa's exam, etc., most likely outcome is
5    that this did not take place on April 14.  But is it possible?
6    The answer is yes.
7    Q.  Let's actually look at the ACL injury first.  We know an
8    MRI was taken in May of 2009, correct?
9    A.  Correct.
10   Q.  The reason why it was ordered was because he was still
11   having persistent problems with his knee, correct?
12   A.  He was having --
13   Q.  Excuse me.  Is that correct, Doctor, or not?
14   A.  Is it one of these yes or no, anything is possible?
15             THE COURT:  Could you answer that yes or no?
16             THE WITNESS:  No.
17             THE COURT:  Could you rephrase the question.
18   Q.  The MRI that was taken in May of 2009, confirms that there
19   was an ACL tear, yes or no?
20   A.  Yes.
21   Q.  You would agree, Doctor, that if Mr. Guzman had been kicked
22   in the leg, that kick could have caused his knee to buckle and
23   that could have resulted in an ACL tear.  True or not true?
24   A.  Not an ACL tear, not a chronic ACL tear.  It would have
25   resulted in an acute ACL tear.  It would have resulted in a
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

DCC3GUZ7                    Gidumal - cross

1    knee effusion on his X-rays in Harlem Hospital.  It would have
2    resulted in a knee effusion on his X-rays at New York Hospital.
3    It wouldn't have resulted in a chronic healed ACL on his May
4    MRI.
5    Q.  Referring to your deposition testimony, second deposition.
6    Page 42, line one:
7    "Q.  So he could have been kicked in the leg, that kick could
8    have caused his knee to buckle, and that could have resulted in
9    a ACL tear, correct?
10   "A.  Yes."
11          Page 41, line 19:
12   "Q.  If his knee buckled, would it cause his knee to twist?
13   "A.  If his knee buckled, his knee would give out and, yes,
14   it's possible it could cause it to twist."
15          Page 41, line 23 --
16          MR. KUNZ:  Objection.
17          THE COURT:  Hold on.  Let's have a side bar.
18          (At the side bar)
19          THE COURT:  Twisting wasn't part of your question.
20   You already have impeachment.
21          MR. NORINSBERG:  I should have set up another
22   question.  But it all relates to the same topic.
23          THE COURT:  What topic?  What is it that you are doing
24   now?  It seems you're splitting hairs.  He said it could cause
25   an ACL tear.  He says it would be an acute ACL tear and not a

718

DCC3GUZ7                          Gidumal - cross

1   chronic.  What is it you expect to get with this witness?
2   Where is it you are expecting to get?  You have already brought
3   out before he said it could cause an ACL tear.  You've got that
4   to the extent that's inconsistent.  Where else are you going
5   with this now?
6            MR. NORINSBERG:  Simply that mechanism of injury which
7   he described on direct, that if the mechanism of injury
8   happened the way the plaintiff said it, he would have expected
9   an ACL tear and that's basically not what he said at his
10  deposition.  Basically if you have a knee buckling and twisting
11  that could have caused an ACL tear.  So I agree.
12           THE COURT:  He said that on the stand.  He said that.
13  He said it would cause an ACL tear.  He added it would be an
14  acute ACL tear.  How much more do you have with this witness?
15  Let's move on here.  Because I think again the jury is starting
16  to get a little antsy here.  How much more do you have?
17           MR. NORINSBERG:  Okay.
18           MR. KUNZ:  I think that's right, I also note it is
19  4:30 and we have to do the EMT today.
20           THE COURT:  I know.  What else do you have?
21           MR. NORINSBERG:  Okay.  I'll take certain sections
22  out.  But the first question and answer was a proper
23  impeachment.  That should be part of the record.
24           THE COURT:  That's fine.  But next thing doesn't have
25  to.  What else do you have with him?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCC3GUZ7                    Gidumal - cross

```
 1                MR. NORINSBERG:  Okay.  I mean, I have a few more
 2      sections.  I'll move through it quickly.
 3                THE COURT:  And what is the EMT's schedule for
 4      tomorrow because I don't think we'll get to him today?
 5                MR. KUNZ:  He's been sitting here all day, your Honor.
 6                THE COURT:  I understand, but I don't think we are
 7      going to get to him today.  He can come tomorrow?
 8                MR. KUNZ:  Like I said, he works two jobs.  He had to
 9      reschedule, he had to switch schedules with both of them.
10                THE COURT:  I can't do anything about that.
11                MR. KUNZ:  Can't we just say Mr. Norinsberg will be
12      done in the next 10 minutes?
13                MR. NORINSBERG:  That's not fair.
14                MR. KUNZ:  He chose to use two and a half hours with
15      his expert.  That was his choice.
16                THE COURT:  Your EMT person can come.  I know it will
17      be difficult.  I don't see why it would take long for him.
18      Right?
19                MR. MODAFFERI:  Can we ask the jury if they would mind
20      staying an extra 15 minutes in light of the fact he is only
21      going to be on the stand 15 minutes?
22                THE COURT:  We've got one juror who is the person who
23      performs in a show who has to leave.  I think 5:15 will be too
24      late for him.  How much more do you have?
25                MR. NORINSBERG:  Probably 10 minutes.  15 minutes I
```

720

DCC3GUZ7                        Gidumal - cross

1   just would ask.
2           THE COURT:  Again, let's try to cut down.  I'm giving
3   a lot of leeway.  Let's cut down on the minor inconsistencies.
4   I don't want to tell you how to try this case.  I don't think
5   it is scoring all that many points with the jury.
6           (In open court)
7           THE COURT:  That objection is sustained.  The last
8   question is struck from the record.  Go ahead, counsel.
9   BY MR. NORINSBERG:
10  Q.  Doctor, can we agree that you have not seen any records at
11  all showing that Mr. Guzman had any type of medical treatment
12  for his right knee before February 2009?  Can we agree with
13  that?
14  A.  I have not seen any medical records to that effect.
15  Correct.
16  Q.  You have not seen any complaints of right knee pain prior
17  to February 2009, have you?
18  A.  Correct.
19  Q.  You have not seen any treatment records prior to 2009,
20  February, correct?
21  A.  Correct.
22  Q.  You've never seen any type of films, any type of physical
23  therapy, any evidence that would suggest that Mr. Guzman
24  actually was getting treated medically for anything prior to
25  2009, is that correct?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

721

DCC3GUZ7                          Gidumal - cross
1   A.  That's not the correct.
2   Q.  Well, could we agree that you have not seen any
3   documentation anywhere that Mr. Guzman complained of knee pain
4   prior to February 14, 2009?
5   A.  Yes.
6   Q.  Doctor, when you were first retained, you reviewed records,
7   correct?
8   A.  Correct.
9   Q.  You reviewed up to 500 to 600 pages of medical records for
10  Mr. Guzman, right?
11  A.  Correct.
12  Q.  So, you had a large volume of records to see if there was
13  any mention of an old knee injury, right?
14  A.  I had the records that were given to me.  Correct.  I was
15  not necessarily given a complete set of all the medical records
16  that he had.
17  Q.  Whatever you were given, you were given by defense counsel,
18  right?
19  A.  Correct.
20  Q.  You had 5 or 600 pages of records, Doctor, right?
21  A.  Correct.
22  Q.  Can you tell the members of the jury in that 5 to 600 pages
23  of records, was there one single reference anywhere about a
24  preexisting knee injury?
25  A.  No.

DCC3GUZ7                    Gidumal - cross

1   Q.  Doctor, based on your own findings and your examination,
2   you agree that given Mr. Guzman's present condition, he would
3   at most be able to stand two to three hours at a time during
4   the day, would you agree?
5   A.  Yes.
6   Q.  You told us with respect to your view of arthritis, you
7   said looking at these films he might have minor arthritis.  I
8   believe that was your word.
9   A.  Correct.
10  Q.  Would you agree, Doctor, that one of the causes of joint
11  line pain is arthritis?  Would you agree with that?
12  A.  You mean his preexisting joint line pain he had when he
13  initially saw Dassa?  Is that what you are talking about or
14  just in general?
15  Q.  You really don't understand the question I asked?
16  A.  I am asking are you talking about in general or in this
17  specific case?
18  Q.  I'm talking about this specific case, with the finding that
19  you actually documented in your exam which I am about to get
20  into.
21  A.  Okay.  He had medial joint line tenderness when he
22  initially saw Dassa with normal X-rays.  So in his particular
23  case, medial joint line tenderness doesn't mean he has
24  arthritis.  That medial joint line tenderness was the reason
25  Dassa ordered the MRI.  Dassa never found the ACL tear.  He had

723

DCC3GUZ7                          Gidumal - cross

1   the medial joint line tenderness as of the original visit.  And
2   the original X-rays and the original MRIs do not show
3   arthritis.  So in his particular case, that medial joint line
4   tenderness is not consistent with arthritis, but his
5   preexisting problems.
6   Q.  Let's see if we can just clear this up.  You did your exam
7   in October 2011, correct?
8   A.  Correct.
9   Q.  You tried to be objective, Doctor, no matter who is hiring
10  you?  You try to be objective, right, Doctor?
11  A.  Right.
12  Q.  You call it like you see it when you make a finding, right?
13  A.  Right.
14  Q.  You documented that he had medial joint line pain on his
15  right side, correct?
16  A.  Correct.
17  Q.  That indicates there is an irritation around the joint line
18  at the time you examined him, correct?
19  A.  Correct.
20  Q.  We are not talking about Dr. Dassa now.  I am talking about
21  your exam.  You also found medial joint line pain on the
22  lateral side, correct?
23  A.  You mean, I found lateral joint line pain on the lateral
24  side, yes.
25  Q.  Thank you.  You found joint line pain on the outside of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

724

DCC3GUZ7                        Gidumal - cross
1    knee as well, correct?
2    A.  Correct.
3    Q.  That again would indicate something's irritating the knee
4    on the outside of the knee, correct?
5    A.  Correct.
6    Q.  So, we can conclude from that something is irritating his
7    knee on both the inside of the knee and the outside of the
8    knee, correct?
9    A.  Correct.
10   Q.  And the irritation is right near the joint line, correct?
11   A.  That's why it is called joint line tenderness.
12   Q.  You yourself would agree that this patient has at least a
13   20 percent chance of needing a total knee replacement in the
14   future, yes or no?
15   A.  Correct.
16   Q.  You agree that he would need this procedure, if it came
17   that he needed it, he would need it in his mid 40s, right?
18   A.  In 20 or 30 years, that's correct.
19   Q.  20 years would put him at a 47-year-old man, correct?
20   A.  Correct.
21   Q.  You are open to the possibility that another orthopedic
22   surgeon can look at the same film that you looked at and reach
23   a different conclusion, correct?
24   A.  Correct.
25   Q.  You would respect the fact that Dr. Dassa as the treating
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCC3GUZ7                    Gidumal - cross

1   physician for a year and a half could form his own opinion
2   looking at those films, and could conclude that in fact there
3   was arthritis, right?  You would respect that conclusion?
4   A.  Correct.
5   Q.  Doctor, would it be fair to say that you never actually
6   looked at any of the films in this case until the last week?
7   Would that be fair to say, Doctor?
8   A.  I --
9           MR. KUNZ:  Your Honor, I have to object and request a
10  side bar.
11          THE COURT:  Let's have a side bar.
12          (At the side bar)
13          THE COURT:  Your objection is because of the framing
14  of the timing, it was only last week or what is your objection?
15          MR. KUNZ:  My objection is that Mr. Norinsberg had the
16  records and didn't give them to us, and that's why the witness
17  wasn't able to review them.  So I think it is unfair.
18          THE COURT:  That's fine.  Rephrase the question.  What
19  is your point?
20          MR. NORINSBERG:  The point is he never looked at any
21  films, and he actually was aware of these films during his
22  first deposition because he testified about them.  He never
23  looked at them.  And he formed all of his opinions without
24  looking at any films.
25          THE COURT:  You can ask that.  Why do you bring in the

DCC3GUZ7                    Gidumal - cross

 1   last week.  Just ask him about when you formed these opinions
 2   as of this date you hadn't seen these films whatever date.  Not
 3   last week.  But the date that he formed the opinion.  Can't you
 4   just do that?
 5            MR. NORINSBERG:  Okay.
 6            THE COURT:  Does that solve your problem?
 7            MR. KUNZ:  That's fine.
 8            THE COURT:  Actually, while we're here.  Do you still
 9   intend on trying to ask him about the specific cases he
10   testified to before?
11            MR. NORINSBERG:  Yes.  I'll just say versus city
12   employee whatever, like you said.
13            THE COURT:  You are going to say what in terms of the
14   cases?
15            MR. NORINSBERG:  It was the Jones case versus a city
16   employee.
17            THE COURT:  Okay.  Any objection to that?
18            MR. KUNZ:  I believe that's what your Honor ordered.
19            THE COURT:  That's fine.  As long as it is employee.
20   Just don't say Jones v. City of New York.
21            (In open court)
22            THE COURT:  Please rephrase the question.
23   BY MR. NORINSBERG:
24   Q.  Doctor, would you agree that you wrote two different
25   reports in this case?  Would you agree with that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

727

DCC3GUZ7                         Gidumal - cross
1   A.  I wrote one report and one addendum, yes.
2   Q.  You wrote one report and one addendum.  Would you agree
3   that in those reports, you expressed your medical opinions on
4   this?
5   A.  Yes.
6   Q.  Before you actually expressed those medical opinions, you
7   had never actually looked at any of the films in this case,
8   isn't that true?
9   A.  No.
10  Q.  You never looked at the Harlem Hospital X-ray, did you,
11  sir?
12  A.  I have looked at the Harlem Hospital -- I looked at the
13  Harlem Hospital X-rays two -- about a month ago.
14  Q.  At the time of your deposition, you hadn't looked at any of
15  the films, had you, sir?
16  A.  No, that's not true.  I had looked at -- I also reviewed
17  X-rays referenced by Dr. Dassa on November 4, 2013.
18  Q.  Let's be clear and I'll move through it quickly.  The
19  Harlem Hospital X-ray from day one.  When was the first time
20  you looked at it; some time in this year?
21  A.  Yes.
22  Q.  The first time you looked at the MRI film from 2009, some
23  time this year?
24  A.  Yes.
25  Q.  The first time that you looked at the second MRI film from
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

728

DCC3GUZ7                         Gidumal - cross
1   2010, some time this year?
2   A.  Yes.
3   Q.  Would you agree that you formed the opinions in your case
4   in your first medical report before you looked at any of those
5   films?  Would you agree with that?
6   A.  I agree with that.
7   Q.  Doctor, you indicated earlier that you agree that the foot
8   drop is permanent, right?
9   A.  Yes.
10  Q.  But made a conscious decision to leave that permanency
11  finding out of your first report, isn't that true?
12  A.  It is my opinion with a reasonable degree of medical
13  certainty that Mr. Guzman has a foot drop.
14             THE COURT:  Could you please -- did you put that in
15  your first report?
16             THE WITNESS:  Yes.
17             THE COURT:  Okay.
18  Q.  Referring to your deposition, page 91, line 16:
19  "Q.  You made a conscious decision to leave that out of your
20  report.
21  "A.  Yes."
22  A.  If I take a look at the notice --
23  Q.  Did you give that testimony, sir?
24  A.  I defer to you.
25  Q.  The reason why you left out the permanency finding from
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

729

DCC3GUZ7                        Gidumal - cross
1   your report was because you believed it wasn't going to be
2   helpful to the defendant, true or not true?
3               THE COURT:  Sustained as to form.  Please rephrase the
4   question.
5   Q.  The reason why you left out the permanency part of the
6   report is because you thought it wasn't going to be helpful?
7               THE COURT:  Sustained.
8   Q.  You left out the permanency finding for a reason, right,
9   Doctor?
10              THE COURT:  Sustained.
11  A.  Yes.
12              THE COURT:  Okay, I'm sorry.  Let me have a side bar.
13  Actually, we don't need it.  Go ahead.
14  Q.  You left out the permanency part of your opinion for a
15  reason, correct, Doctor?
16              MR. KUNZ:  We object.
17              THE COURT:  Overruled.
18  A.  Yes, because I didn't think it had anything to do with the
19  February 14 injury.  As you can see the reports from Harlem,
20  the reports from New York Hospital, do not relate to peroneal
21  nerve palsy to the injury.  And therefore, it has nothing to do
22  with the injury of the 14th.  And that's why it was left off,
23  because it wasn't related.
24  Q.  I see.  That's the reason, okay.  Reading from your
25  deposition, page 91, line 19:

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

730

```
        DCC3GUZ7                    Gidumal - cross
 1      "Q.  And the reason why you left out the permanency part --"
 2              MR. KUNZ:  Objection, your Honor.
 3              THE COURT:  Okay, let's have a side bar.
 4              (At the side bar)
 5              MR. KUNZ:  I objected in the deposition when is he
 6      asked this question and I'm objecting now because he was trying
 7      to inquire into my communications with the expert and the work
 8      that I asked the expert to do in this case and that's improper.
 9              THE COURT:  What is that you wish to relate?
10              MR. NORINSBERG:  "And the reason why you left out the
11      permanency part of your report was because it wasn't going to
12      be helpful for the defendants, true?
13      "A.  That's correct."
14              THE COURT:  What is your objection to this?
15              MR. KUNZ:  My objection is that it is an improper
16      question to ask.  The follow-up to this question was that what
17      Mr. Kunz asked you to do in this case.  Why did Mr. Kunz ask
18      you to review this.  Why did he ask you to review that.  And I
19      objected to that whole line of questioning and then he asked
20      this question which I objected.  I didn't direct the witness
21      not to answer because objections at depositions --
22              THE COURT:  What is the basis of your objection?
23              MR. KUNZ:  My objection is it is getting into what I
24      asked Dr. Gidumal to opine in this case.
25              THE COURT:  I don't understand why that's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

731

```
      DCC3GUZ7                    Gidumal - cross
 1   objectionable.  That's overruled.  It is going right to his
 2   bias.  Which section do you plan on reading?
 3            MR. NORINSBERG:  The question that I just read.
 4            THE COURT:  What?
 5            MR. NORINSBERG:  "And the reason why you left out the
 6   permanency part of your report was because it wasn't going to
 7   be helpful to the defendants, true?"  Answer:  "That's
 8   correct."
 9            THE COURT:  That's fine.
10            (In open court)
11            THE COURT:  Go ahead, counsel.
12   BY MR. NORINSBERG:
13   Q.  Reading from page 91, line 19:
14   "Q.  And the reason why you left out the permanency part of
15   your report was because it wasn't going to be helpful for the
16   defendants, true?
17   "A.  That's correct."
18            Do you recall giving that testimony, sir?
19   A.  Yes.
20   Q.  So according to your deposition testimony, the reason why
21   you left out the permanency opinion is because it wasn't going
22   to be helpful to the defendant?
23            THE COURT:  Sustained.  Asked and answered.  Let's
24   move on, counsel.
25   Q.  Would you agree even though you are retained by the
```

732

DCC3GUZ7                        Gidumal - cross
1  defendant, you still have an obligation to remain objective,
2  right, Doctor?
3  A.  Yes.
4  Q.  You have testified on a number of other cases involving
5  city employees, correct?
6  A.  Yes.
7  Q.  You testified in a case called Reap against a city
8  employee, correct?
9  A.  I don't remember.  Was Reap the one who couldn't get a
10  lawyer and had to defend himself because no lawyer would take
11  the case?
12  Q.  Do you recall saying in your deposition you did testify in
13  that case, sir?
14  A.  Yeah, if that's the right one.  The one who couldn't get a
15  lawyer.
16  Q.  Do you remember the case Stevens versus city employee?
17  A.  Yes.  Was that the guy who was in a line of car accidents?
18          THE COURT:  The question before you is do you remember
19  testifying in that case.
20          THE WITNESS:  I would just need something to remind
21  me, but I think that was the guy who was involved in nine car
22  accidents and --
23          THE COURT:  Hold on.  Could you rephrase the question,
24  counsel.
25  Q.  Doctor, you and I have met before this case, correct?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

733

DCC3GUZ7                    Gidumal - cross
1   A.  Yes.
2   Q.  You testified in a case involving a woman named Anne
3   Stansick against a city employee?
4   A.  I don't think I testified in that case.
5   Q.  Well, you charged the city $10,000 for your testimony or
6   reviewing the records, isn't that correct?
7           THE COURT:  Objection sustained.
8   Q.  You testified in another case --
9           THE COURT:  That question and answer will be stricken
10  from the record.
11  Q.  You testified in another case involving Perry versus a city
12  employee, correct?
13  A.  Yeah.  That was the one that the jury found against you,
14  wasn't that it?
15          THE COURT:  No.  Hold on.  Can you rephrase the
16  question, counsel.  Let's have a side bar.
17          (At the side bar)
18          THE COURT:  Why is it necessary to go through each of
19  these cases by name?  How many cases are we talking about here?
20          MR. NORINSBERG:  Six, seven.
21          THE COURT:  Can't you just ask him that question?
22          MR. NORINSBERG:  Okay.
23          THE COURT:  Let's move on.
24          (In open court)
25          THE COURT:  Rephrase the question.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCC3GUZ7                          Gidumal - cross

1   BY MR. NORINSBERG:
2   Q.  Doctor, would you agree that in half of the cases in which
3   you've testified in over the last four years, half of those
4   cases were on behalf of a city employee?
5   A.  Correct.
6   Q.  You don't actually have your own private office anymore, is
7   that true?
8   A.  I am an assistant professor at NYU and I have a office at
9   NYU paid for by the medical center, correct.
10  Q.  So when you testified at your deposition that you don't
11  have a private office anymore, you didn't mean that, right?
12  A.  That's correct.  The office is NYU's and they give it to
13  me, correct.
14  Q.  When you testified that you stopped having a private office
15  in April of 2012, did you mean that, sir?
16  A.  Yes.
17  Q.  Can you tell us, Dr. Gidumal, how much money have you made
18  off your consultancy work for city employees in the year of
19  2013.
20  A.  Maybe, I don't know, $40,000.
21  Q.  How much from the year 2012, the year before.  How much
22  money did you get paid for your work on behalf of city
23  employees?
24  A.  Close to the same.
25  Q.  So just in the last two years, you've been paid

735

DCC3GUZ7                    Gidumal - cross
1   approximately $80,000 for your work in connection with cases
2   involving city employees, is that correct?
3              THE COURT:  Objection sustained.  Asked and answered.
4              MR. NORINSBERG:  Nothing further.
5              THE COURT:  Any redirect?
6   REDIRECT EXAMINATION
7   BY MR. KUNZ:
8   Q.  Real quick clarification.  You were just asked some
9   questions about not being able to see some MRI film until this
10  year.
11  A.  Right.
12  Q.  Did you review reports from radiologists about that film?
13  A.  Yes.
14  Q.  After you have reviewed the film, do you agree with the
15  conclusions that the radiologists made?
16  A.  Yes.
17  Q.  Did you consider the conclusions of the radiologists before
18  you formed your opinions in this case?
19  A.  Yes.
20             MR. KUNZ:  No further questions.
21             THE COURT:  Okay.  Anything else?
22             MR. NORINSBERG:  Nothing.
23             THE COURT:  Thank you.  You are excused.
24             THE WITNESS:  Thank you.
25             (Witness excused)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

736

DCC3GUZ7                          Gidumal - redirect
 1              THE COURT:  Let's call the next witness.
 2              MR. MODAFFERI:  At this time we call Arnold Smith.
 3              THE COURT:  Let me just inquire of the jury.  I want
 4    to get the jury out of here at 5 o'clock.  This next witness
 5    should be fairly short.  Is it possible that we can go until
 6    about 5:10?  I know that may be a problem.  Is that okay with
 7    everyone?
 8              A JUROR:  Yes.
 9              THE COURT:  Okay.
10     ARNOLD SMITH,
11        called as a witness by the Defendant,
12        having been duly sworn, testified as follows:
13    DIRECT EXAMINATION
14    BY MR. MODAFFERI:
15    Q.  Good afternoon, Mr. Smith.
16    A.  Good afternoon.
17    Q.  What do you do for a living?
18    A.  I work for the New York City Fire Department.
19    Q.  What do you do working for the New York City Fire
20    Department?
21    A.  I am an EMT.
22              THE COURT:  Can all the jurors hear?
23    Q.  Directing your attention to the early morning of
24    February 14, 2009.  Were you working that evening?
25    A.  Yes, I was.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

737

DCC3GUZ7                          Smith - direct

1   Q.  Did there come a point in time when you responded to a call
2   that required you to respond to the 34th Precinct?
3   A.  Yes, I did.
4   Q.  Just as an EMT, do you prepare any documents when you
5   provide medical care to an individual?
6   A.  Yes, we do.
7   Q.  What is the name of that document?
8   A.  It is called either an ACR, an ambulance call report, or
9   now it is called an EPCR, an electronic patient care report.
10  Q.  Okay.  I am going to show you what's already in evidence as
11  Defendant's Exhibit B.  Start with the top half of the
12  document.  What is that document?
13  A.  It is a patient care report or EPCR or ACR.  You can use
14  synonymously the names.
15  Q.  Did you prepare this document?
16  A.  Yes, I did.
17  Q.  How do you know that you prepared it?
18  A.  Okay.  Part of it is in my partner's handwriting.  And the
19  narrative is in my handwriting.
20  Q.  Did you sign this document at all?
21  A.  Yes, I did.
22  Q.  Where did you sign the document?
23  A.  On the second page, the bottom-right-hand corner.
24  Q.  Where it says technician's signature?
25  A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCC3GUZ7                    Smith - direct
1   Q.  So that's your signature?
2   A.  That's correct.
3   Q.  Is it your regular practice as an EMT to prepare an ACR?
4   A.  Yes, it is.
5   Q.  Was this ACR prepared at or around the time on February 14,
6   2009?
7   A.  Yes.
8   Q.  What time was it prepared?
9   A.  We received the call at 4:22.  And we completed the call at
10  5:26.  So somewhere within that timeframe.
11  Q.  Where are you getting that from on the document?
12  A.  On the page one, top part of it.
13  Q.  Looking at the screen behind you.  Would it be accurate to
14  say you're looking over here?
15  A.  Yes.
16  Q.  So what time were you assigned?
17  A.  At 4:22.
18  Q.  What time are you en route?
19  A.  4:23.
20  Q.  What time are you on scene?
21  A.  Let me take that back.  It says assigned at 4:22, en route
22  at 4:22, on the scene at 4:23.
23  Q.  Can you tell the jury the patient you were treating.
24  A.  The last name is Guzman and the first name is Noel.
25  Q.  When you arrived to the location, did you personally speak
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCC3GUZ7                    Smith - direct

1  to Mr. Noel Guzman?
2  A.  Yes, I did.
3  Q.  How do you know that?
4  A.  On page two in my narrative.
5  Q.  What does it say?
6  A.  You want me to read the whole complete narrative?
7  Q.  On what page tells you you spoke to Mr. Guzman?
8  A.  Patient at this time complains of pain with minor swelling
9  to right lower leg.  Right lower leg in parenthesis calf.  The
10 patient is ambulatory and looks like states, states -- if I put
11 down "patient states," it is what somebody's telling me.
12 Q.  Let's start at the top where the narrative begins.  Can you
13 read the first sentence.
14 A.  Patient 23-year-old male.  Found conscious.  AO times three
15 in NYPD custody at location upon our arrival.
16 Q.  And what is the A and O?
17 A.  Alert oriented times three.  Person, place and time.
18 Q.  The patient knew who he was, where he was, and the time?
19 A.  That's correct.
20 Q.  Can you read the next sentence after where you stopped at
21 arrival.
22 A.  Patient states that he was involved in a fight.  And
23 someone kicked him in his leg.  Patient at this time complains
24 of pain --
25 Q.  Let's stop there.  Where did you get that information from?

740

DCC3GUZ7                    Smith - direct
1   A.  Patient stated it.
2   Q.  So who stated if?
3   A.  The patient.
4   Q.  How do you know that?
5   A.  Because that's what he told me.  That's what I wrote.
6   Q.  Okay.  If you had received information from someone else,
7   let's say a police officer, is it your general practice to
8   report or make a notation that that source of the information
9   was a police officer?
10              MR. NORINSBERG:  Objection.
11              THE COURT:  Overruled.
12   Q.  You are allowed to answer, but I'll rephrase the question.
13   If you received information from a police officer, in your
14   general practice, would you write that a police officer was the
15   source of that information?
16   A.  In my practice, no.  Because my position or my job at the
17   particular scene where I was at is what the patient states.  I
18   treat the patient.  Not anybody else but the patient.
19   Q.  So you're only speaking to the patient?
20   A.  That's correct.
21   Q.  All your information that you gather is from only the
22   patient?
23   A.  That's correct.
24   Q.  Okay.  Did you have any difficulty understanding the
25   patient that night?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

741

DCC3GUZ7                     Smith - direct

1   A.  According to this, no.  Because this is, like I said, I
2   write down what the patient tells me.
3   Q.  If you had difficulty understanding him, would you have put
4   that in your report?
5   A.  I would have put in, my practices, if somebody speaks
6   another language, I would put it down.  And if I had had a
7   translator, I would put that in my narrative.
8   Q.  Did you put that in this report?
9   A.  No, I didn't.
10  Q.  I just want to move down to the last line.  The last
11  sentence actually.  The last two lines.  Can you state what
12  that says.
13  A.  Where it says after calf?
14  Q.  Correct.
15  A.  Patient is ambulatory, and states he does not want to be
16  taken to the hospital.
17  Q.  What does ambulatory mean?
18  A.  He's able to walk.
19  Q.  Looking at that report, did you take down the patient's
20  chief complaint?
21  A.  Yes.
22              (Continued on next page)
23
24
25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

742

DCCTGUZ8                    Smith - direct
1   BY MR. MODAFFERI:
2   Q.  What was it?
3   A.  "I'm OK," in parentheses.
4   Q.  And now looking at the screen, is it in this area?
5   A.  Yes.
6   Q.  And are there quotation marks around "I'm OK?"
7   A.  Yes.
8   Q.  What does that mean?
9   A.  Quotation marks mean it's what somebody is telling you, you
10  can quote that.
11  Q.  Who told you that?
12  A.  The patient.
13  Q.  I just want to move down the second page of your report.
14  Now looking at the section entitled refusal of release or
15  refusal of medical assistance, do you see that?
16  A.  Yes.
17  Q.  Are there signatures in that area?
18  A.  Yes.
19  Q.  And is there any indication as to whether the patient
20  refused medical treatment?
21  A.  Yes.
22  Q.  Yes, he did, or yes, there's an indication?
23  A.  It's an indication.  It says in my statement in the
24  narrative.
25  Q.  And what does it say?

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

DCCTGUZ8                    Smith - direct

1   A.  Patient is ambulatory and states he does not want to be
2   taken to the hospital.
3   Q.  Looking down at that section, did the patient sign the
4   document?
5   A.  There's a signature there, yes.
6   Q.  In fact, is the patient required to sign the document?
7   A.  Yes.
8   Q.  Why?
9   A.  It's part of the treatment.  If I come to you and I'm
10  treating you and you don't want to be taken to a hospital or
11  want any treatment, by my guidelines or by the guidelines given
12  to me, you have to sign the document stating you don't want to
13  be transported or treated.
14  Q.  And was this document filled out when the patient signed
15  it?
16  A.  I couldn't tell you exactly what time it was filled out.
17  The only thing I could tell you is if you look at page 1, the
18  first set of vitals was taken 15 minutes after being at the
19  call and the second was taken 24 minutes after that.
20  Q.  Actually I want to refer your attention to that now before
21  we finish.  When you say vitals, where are you looking at?
22  A.  To the left there where it says 15.  15 means 15 minutes
23  after I made patient contact.
24  Q.  Elapsed time, 15?
25  A.  That's correct.

```
         DCCTGUZ8                      Smith - direct
 1   Q.  And looking at the vitals here, can you just explain to the
 2   jury what the patient's vitals were?
 3   A.  At 15 it says blood pressure, systolic was 140 over 78, he
 4   had a heart rate, which is a pulse of 92, respiratory rate was
 5   18, and he gave a pain scale of two.
 6   Q.  Two out of what?
 7   A.  Ten.
 8   Q.  And where did you get that from?
 9   A.  It's a pain scale.  You ask the patient if you have any
10   pain, you ask him on a pain scale zero meaning no pain, ten
11   being the worst pain, what number will you give your pain.
12   Q.  Who gave you that number?
13   A.  The patient did.
14            MR. MODAFFERI:  No further questions.
15            THE COURT:  Any cross?
16   CROSS-EXAMINATION
17   BY MR. NORINSBERG:
18   Q.  Good afternoon, Mr. Smith.
19   A.  Good afternoon.
20   Q.  You testified a moment ago that Mr. Guzman's signature was
21   on this document, correct?
22   A.  Yes.
23   Q.  We also have a police officer's signature right next to it,
24   correct?
25   A.  It says PO, and I can't make the signature out.
```

745

DCCTGUZ8                         Smith - cross

1   Q.  Is that PO Jay?
2   A.  If that's what it says.  I can't read that signature.  It
3   says PO.
4   Q.  A police officer signed this document as well, correct?
5   A.  As a witness.
6   Q.  And Mr. Guzman never actually told you that he had a prior
7   knee injury, did he?
8   A.  No, he didn't.
9   Q.  If he said that he had a prior knee injury you would have
10  put that down, correct?
11  A.  Yes, I would have.
12  Q.  Now you're familiar with the abbreviation AOB, correct?
13  A.  AOB?
14  Q.  Yes.
15  A.  I have heard it in my career.
16  Q.  Stands for alcohol on breath?
17  A.  Yes.
18  Q.  And there's no notation of that in your report, is there,
19  sir?
20  A.  No.
21  Q.  And from time to time if the person appears to be under the
22  influence of alcohol, you would note it for purposes of medical
23  treatment, correct?
24  A.  I never use the term AOB.
25  Q.  How you would indicate it if you wanted to show somebody

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746

DCCTGUZ8                          Smith - cross
1   was intoxicated?
2   A.  If I asked you the question have you been drinking alcohol,
3   and you answer yes to that question, I will then term in my
4   narrative put down:  Patient states he had been drinking
5   alcohol.
6   Q.  So something that you would clearly note --
7   A.  Definitely would.
8   Q.  -- in the report?
9   A.  Definitely.
10  Q.  Right?
11  A.  Definitely.
12  Q.  Now on the report there's a quotation from Mr. Guzman says
13  "I'm OK," correct?
14  A.  Correct.
15  Q.  That's direct quote from Mr. Guzman, correct?
16  A.  Correct.
17  Q.  Now the other part where it says that he was involved in a
18  fight, you don't have quotation marks around that part, do you,
19  sir?
20  A.  No, because it says "patient states."
21  Q.  I understand, but in one section of this you put quotes, in
22  another section you put "stated?"
23  A.  That's the way I prepared my narrative.
24  Q.  Now I know you do a lot of ambulance calls during the year,
25  right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

747

DCCTGUZ8                     Smith - cross
1    A.  Correct.
2    Q.  Probably over a thousand year a year, correct?
3    A.  I would say so.
4    Q.  So be fair to say there's nothing in this particular one
5    that particularly stands out in your memory, correct?
6    A.  No.
7    Q.  You don't have any real independent memory of what this
8    person said to you, correct?
9    A.  Just what it states in the document.
10   Q.  And you can't remember if any police officers actually told
11   you that Mr. Guzman was involved in a fight, correct?
12   A.  No, not according to this document.
13   Q.  What's that?
14   A.  Not according to this document, it's not there.
15   Q.  And I understand not according to the document, but do you
16   recall testifying at your deposition as follows, page 49, line
17   12:
18   "Q.  Did an officer ever tell you that Mr. Guzman was involved
19   in a fight that night?
20   "A.  I can't recall."
21        Do you recall giving that testimony?
22   A.  If it's in that deposition, I must have said it.
23   Q.  So at that time you couldn't remember if in fact a police
24   officer told you that Mr. Guzman was involved in a fight?
25        MR. MODAFFERI:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

748

DCCTGUZ8                    Smith - cross
1              THE COURT:  Objection sustained.
2    Q.  And you also can't remember if there were officers present
3    at the time when this statement was made, right?
4    A.  I was in the precinct, so I'm quite sure there was
5    officers.
6    Q.  Going back to your deposition testimony, you were in the
7    precinct and you believe there might have been some officers
8    who were present when the statement was made?
9    A.  That's correct.
10             MR. NORINSBERG:  Thank you, Mr. Smith, I appreciate
11   you coming in.  No further questions.
12             THE COURT:  Any redirect?
13             MR. MODAFFERI:  No, Judge.
14             THE COURT:  Thank you, you're excused.
15             Let me see counsel at side bar just to discuss
16   scheduling.
17             (In robing room)
18             THE COURT:  OK.  Any more witnesses?
19             MR. NORINSBERG:  No, your Honor.
20             THE COURT:  Any more witnesses?
21             MR. KUNZ:  No.
22             THE COURT:  So I am going to let this jury get out of
23   here.  We'll have the charge conference first thing in the
24   morning.  You have our draft of the charge.  I will tell this
25   jury to get here, I would say, 10:30.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

749

DCCTGUZ8

 1          MR. KUNZ:  Sounds good.  There are -- we have a number
 2   of issues to talk about in the charge.  I think an hour is
 3   probably realistic, but it might be a little longer.
 4          THE COURT:  Let's tell the jury to be here at 10:30
 5   and we'll have counsel here at -- get here at 9 o'clock in case
 6   there's things we need to discuss.  I'll come down at 9:15.
 7          MR. KUNZ:  Will the plaintiff formally call the case
 8   tomorrow morning?
 9          THE COURT:  Yes, both sides have to rest.  There's
10   some documents you need to introduce, some other things.  Make
11   sure counsel confer and make sure all the documents are in
12   evidence.  If there are any stipulations, we'll get that
13   squared away.
14          MR. KUNZ:  Thank you.
15          (In open court)
16          THE COURT:  Thank you again for your patience.  I
17   would like you to come back tomorrow.  I anticipate that at
18   some point tomorrow you will hear closing arguments from
19   counsel and you'll get my instructions on the law and you will
20   get the case and begin to start deliberating at some point
21   tomorrow.  I would like you to come tomorrow at 10:30, so 10:30
22   tomorrow, and I will see you then bright and early.  Have a
23   good night and don't discuss the case and thank you for staying
24   a little late today.
25          (Jury not present)

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

750

DCCTGUZ8

```
 1              THE COURT:  Anything we need to discuss briefly again?
 2     You received copies of our draft charge, correct?
 3              MR. NORINSBERG:  I tried to print it out this morning.
 4     My printer ran out of paper I don't know how long it is.
 5              MR. KUNZ:  It was 39 pages.
 6              MR. NORINSBERG:  Is it possible to get another copy
 7     while we're here.
 8              THE COURT:  Like a hard copy?
 9              MR. NORINSBERG:  Yeah.
10              THE COURT:  Yeah, we can get you a hard copy.  Talk to
11     my deputy.
12              MR. NORINSBERG:  And your Honor, also we have not been
13     provided with a verdict sheet or any special interrogatories,
14     and I wanted to at least get those prior to the charge
15     conference tomorrow morning.
16              THE COURT:  OK.  We'll send those as well.  I think I
17     know the defendants submitted some special interrogatories but
18     we'll send you the verdict sheet as well.
19              I guess speak to my law clerk about getting hard
20     copies of that.
21              Anything else we need to discuss today?
22              OK, see everybody here at 9:15.
23              (Adjourned to December 13, 2013 at 9:15 a.m.)
24
25
```

751

```
 1                        INDEX OF EXAMINATION
 2     Examination of:                              Page
 3     GABRIEL DASSA
 4     Direct By Mr. Norinsberg . . . . . . . . . . 561
 5     Cross By Mr. Kunz  . . . . . . . . . . . . . 631
 6     Redirect By Mr. Norinsberg . . . . . . . . . 661
 7     RAMESH GIDUMAL
 8     Direct By Mr. Kunz . . . . . . . . . . . . . 666
 9     Cross By Mr. Norinsberg  . . . . . . . . . . 696
10     Redirect By Mr. Kunz . . . . . . . . . . . . 735
11     ARNOLD SMITH
12     Direct By Mr. Modafferi  . . . . . . . . . . 736
13     Cross By Mr. Norinsberg  . . . . . . . . . . 744
14                        PLAINTIFF EXHIBITS
15     Exhibit No.                              Received
16        14   . . . . . . . . . . . . . . . . . . 573
17        15   . . . . . . . . . . . . . . . . . . 576
18        17   . . . . . . . . . . . . . . . . . . 581
19        18   . . . . . . . . . . . . . . . . . . 588
20        23, 24   . . . . . . . . . . . . . . . . 590
21        25   . . . . . . . . . . . . . . . . . . 598
22        22   . . . . . . . . . . . . . . . . . . 600
23        17   . . . . . . . . . . . . . . . . . . 607
24        29   . . . . . . . . . . . . . . . . . . 614
25
```