752

DCDTGUZ1
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   NOEL JACKSON-GUZMAN,
3
4                    Plaintiff,
4
5            v.                            10 CV 6353 (ALC)
5
6   P.O. BRIAN JAY,
6   Shield No. 29733, Individually
7   and in his Official Capacity,
7
8                    Defendant.
8
9   ------------------------------x
9                                         New York, N.Y.
10                                        December 13, 2013
10                                        9:00 a.m.
11
11  Before:
12
12                   HON. ANDREW L. CARTER, JR.,
13
13                                        District Judge
14
14                            APPEARANCES
15
15  JON NORINSBERG
16  JOHN MEEHAN
16  KATHERINE SMITH
17       Attorneys for Plaintiff
17
18  NEW YORK CITY LAW DEPARTMENT
18  OFFICE OF CORPORATION COUNSEL
19       Attorneys for Defendant
19  BY:  MORGAN KUNZ
20       MATTHEW MODAFFERI
20       MICHAEL CHESTNOV
21
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

753

DCDTGUZ1

```
 1                  (In open court, jury not present)
 2              THE COURT:  OK.  Good morning.  I know counsel have
 3      seen our draft jury instructions.  We didn't receive any
 4      objections to the jury instructions in writing.  Do counsel
 5      have any objections to the jury instructions?  We previously
 6      received defendant's request for special interrogatories and
 7      last night we received the plaintiff's request for special
 8      interrogatories.
 9              Let's do the jury instructions.  Any objections to the
10      jury instructions by plaintiff's counsel?
11              MR. MEEHAN:  We have a couple objections.  I believe
12      if we start on page 17 we'll go through this in order.
13              The bottom of page 17 it says that in this case the
14      burden is on plaintiff to prove every element of his claim.  We
15      know that -- just by looking at the verdict sheet we know the
16      false arrest claim is on the defendant, so we would like that
17      to be reflected on the charge.
18              THE COURT:  You would like what?
19              MR. MEEHAN:  To have something that the false arrest
20      element -- the false arrest claim in this, the burden is on the
21      defendant.
22              THE COURT:  Isn't that covered in the actual charge on
23      the substantive charge?
24              MR. MEEHAN:  It most certainly is, it's just we would
25      like that to be reflected in this paragraph, or we could take
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

754

DCDTGUZ1

 1    the paragraph out, however the Court wants to do it.
 2              THE COURT:  I could strike the paragraph.  What's the
 3    defense position on that?
 4              MR. MODAFFERI:  Judge, it's correct as written.  Any
 5    claim under Section 1983 brought by a plaintiff it is the
 6    plaintiff's burden to prove.  However, the only element that
 7    the burden falls on the defendant is with respect to probable
 8    cause.  So as written, the charge is correct with respect to
 9    the burden.  It's not even an element, it's the defense of
10    probable cause.
11              MR. MEEHAN:  It is the only element in the false
12    arrest claim, so I feel it would be a little confusing for the
13    jury to hear on one end that the plaintiff has to prove every
14    element and then see on the verdict sheet it's the defendant's
15    burden.
16              Next we have --
17              THE COURT:  Hold on.  I think I will just -- on page
18    17, I think in light of the fact that there's one section of
19    instructions in the section on false arrest and the section on
20    excessive force, this is the only real element at issue in the
21    false arrest, whether or not there is probable cause.  I think
22    in this case I can just remove that last paragraph as well as
23    the paragraph before it talking about the difference between
24    proof beyond a reasonable doubt and preponderance of the
25    evidence, I will take both of those out.

DCDTGUZ1

1          MR. MODAFFERI:  Judge, our position with respect to
2     the burden is our position -- if your Honor wishes to take that
3     paragraph out and leave it as is, that's fine, but I think that
4     there should be some clarification on the burden and how it's
5     different from a criminal case.
6          THE COURT:  OK.  Plaintiff have a position on that?
7          MR. MEEHAN:  I agree with Mr. Modafferi on that.  If
8     you want to remove the last paragraph that's fine.
9          THE COURT:  We'll remove the last paragraph.
10          MR. MODAFFERI:  It's our position it's their burden to
11     prove the claim, it's our burden with respect to the defense of
12     probable cause.  Again we feel that it was correct in the first
13     place, but we want to go on record that's our position.
14          THE COURT:  OK, next objection?
15          MR. MEEHAN:  On page 23, the third full paragraph,
16     collective knowledge doctrine, we don't think it really has any
17     bearing on this case.  There was no investigation going on, so
18     we would like that removed.
19          MR. MODAFFERI:  Judge, we agree.  There's no objection
20     to that.
21          THE COURT:  All right.  We'll take that paragraph out.
22          MR. MEEHAN:  On page 24, the disorderly conduct
23     paragraph on the bottom, the third full paragraph we don't
24     really think that's necessary in this case.  There was an OGA
25     charge, not a dis con, and we feel it would be prejudicial to

756

DCDTGUZ1
```
 1   inform the jury of the disorderly conduct.
 2              THE COURT:  What's defendant's position?
 3              MR. MODAFFERI:  Judge, it doesn't matter.  As your
 4   Honor is well aware under both Devenpeck and JP in the circuit
 5   it doesn't matter what the plaintiff was charged with, provided
 6   with there was probable cause for any crime.  So I think the
 7   disorderly conduct instruction is appropriate here, and that's
 8   our position with respect to that paragraph.
 9              THE COURT:  Anything else from plaintiff on that?
10              MR. MEEHAN:  Yes, your Honor, there has been no
11   evidentiary basis in this trial whatsoever that Police Officer
12   Jay had any probable cause to arrest the plaintiff for
13   disorderly conduct.  He never mentioned the word disorderly
14   conduct or any contemplated arrest for disorderly conduct.  To
15   bring it up to the jury without any evidentiary basis
16   whatsoever would be prejudicial.
17              THE COURT:  OK, that's overruled.
18              Next objection by plaintiff?
19              MR. MEEHAN:  Yes, on page 26, just the factual
20   allegations in first paragraph where plaintiff alleges that
21   immediately prior to his false arrest defendant forcibly
22   grabbed and kicked him, struck him with a hard object on the
23   right knee, maced him with pepper spray, take out struck him
24   with a hard object and just say kicked him on the right knee.
25              THE COURT:  OK.
```

757

DCDTGUZ1

 1              MR. MODAFFERI:  Judge, this is something that we
 2      flagged as well.  The first statement in that paragraph is just
 3      generally setting forth that plaintiff has an excessive force
 4      claim, and then the last sentence the defendant denies that
 5      excessive force claim generally.  I think if we could take out
 6      the factual piece, the second sentence, then we both just
 7      generally have this is plaintiff's claim, this is defendant's
 8      defense, without actually getting into specific facts.
 9              THE COURT:  Strike that whole second sentence?
10              MR. MEEHAN:  I think there's two pretty simple
11      answers.  I wouldn't have a problem with that and wouldn't have
12      a problem with condensing what we already have written just a
13      little bit and take out in between the comma and the colon --
14      the semicolon, rather, so whatever the Court would prefer.
15              THE COURT:  OK.  We'll strike that whole second
16      sentence.  Is there anything that needs to be struck from the
17      third sentence?
18              MR. MODAFFERI:  It's fine for the defendant.
19              THE COURT:  Plaintiff?
20              MR. MEEHAN:  No objection, your Honor.
21              THE COURT:  OK.  Plaintiff's next objection, is there
22      another objection?
23              MR. MEEHAN:  Yes, page 29, the section entitled
24      qualified immunity, just don't feel that you really need to
25      tell the jury about qualified immunity and let them know why

758

DCDTGUZ1

 1  they're asking for a special interrogatories.  Kind of lets
 2  them know if they rule in favor of plaintiff they will to stay
 3  a little longer and get to the special interrogatories, so we
 4  just would prefer it out.
 5          THE COURT:  That's something actually was thinking
 6  about as well.  Let me hear from defendant on this.
 7          MR. MODAFFERI:  We agree to an extent.  We think you
 8  should not instruct them on that first.  To the extent we get
 9  there later on, I think we can do that at a later date.
10          THE COURT:  That's my thinking.  My thinking is take
11  that out for now.  Let's find out what the verdict is.
12  Depending on what the verdict is, if the verdict is in favor of
13  the plaintiff, I will bring the jury back in and give them the
14  instruction on qualified immunity and give them the special
15  interrogatories.  What's the parties' position on that?
16          MR. MODAFFERI:  We're fine with that.
17          MR. MEEHAN:  Plaintiff is fine with that as well.
18          THE COURT:  That's what we'll do, we'll take that out
19  of the charge as it is, we'll deal with that later.
20          Next objection, if any, from the plaintiff?
21          MR. MEEHAN:  Yes, in between compensatory and punitive
22  damages we just request a past and future damages charge.  I
23  think the record shows that some future medical costs can be --
24  plaintiff might have some future medical costs, and we would
25  like a charge so the jury can understand that and contemplate

DCDTGUZ1
1   that while deliberating, as well as future pain and suffering,
2   your Honor.
3           THE COURT:  And you want this as a charge contained
4   within compensatory damages?
5           MR. MEEHAN:  Yes, within compensatory, your Honor.
6           THE COURT:  OK, defendant's position?
7           MR. MODAFFERI:  Judge, it's our position that that's
8   already in the compensatory damages section.  In the second
9   full paragraph you must consider physical injuries, pain,
10  anguish, the seriousness and duration and impact on plaintiff,
11  as well as the degree of pain that plaintiff suffered, any
12  inconvenience, loss of enjoyment of life, that includes the
13  diminished ability to perform daily tasks, to participate in
14  activities, this is all part of the compensatory damages
15  section.
16          THE COURT:  Plaintiff, what's your response to that?
17          MR. MEEHAN:  You know, there's a lot of factors to
18  consider within that one paragraph.  We would like it parsed
19  out I think a little more.  I believe that in our jury charge
20  we submitted something regarding life expectancy because
21  plaintiff is a very young man.  I think we should have that
22  reflected within the future pain and suffering and future
23  medical costs.
24          THE COURT:  Life expectancy?
25          MR. MEEHAN:  Correct, your Honor.

760

DCDTGUZ1

```
 1              THE COURT:  What testimony has there been about
 2  plaintiff's life expectancy?
 3              MR. MEEHAN:  No testimony, but both doctors testified
 4  probably within 20, 25 years he would require a knee
 5  replacement, so we would like the jury to understand that this
 6  is a permanent injury.  And he's a young man, he's going to be
 7  expected to live for a long time.  Besides his knee, he's
 8  relatively healthy.
 9              THE COURT:  That's different than live expectancy.
10  Life expectancy mean his life would be cut short and he would
11  die prematurely.
12              MR. NORINSBERG:  Judge, to clarify, we're referring to
13  the life expectancy tables which are typically charged when it
14  involves an injury.  You look at the plaintiff's date of birth
15  and project, according to actuarial tables accepted by the
16  government, department of labor, how long he's expected to
17  live.  And the jury is instructed on that and instructed they
18  don't have to accept that he's going to live that long, they
19  could reject it, but that's according to government tables he
20  has a life expectancy of 40 years or whatever it would be.
21  Typically we get these from pattern jury instructions, and also
22  a federal companion charge.  So I think we have it submitted in
23  our charge, but basically that gives the jury a basis for
24  understanding the time period over which they're making an
25  award for the future.
```

DCDTGUZ1

```
 1                THE COURT:  There's been no testimony about it.
 2                MR. NORINSBERG:  There never would be, it's always
 3       judicial notice of the chart.  There never would be testimony
 4       on it.
 5                THE COURT:  Let me hear from defendant.
 6                MR. MODAFFERI:  You're absolutely right, there has
 7       about no evidence regarding the plaintiff's life expectancy to
 8       the extent that maybe he has something -- some other condition
 9       that we don't know about that's not relevant to the knee.  He
10       could have a heart condition.  His car accident would have been
11       fair game at the trial.  There are so many other factors at
12       play here.  There's absolutely no evidence regarding life
13       expectancy.  Again, getting back to the charge as is, I think
14       that is sufficient and I think the jury will understand what to
15       do with that charge.
16                THE COURT:  Let me ask plaintiff's counsel, why do you
17       need that in the charge?  I understand you may want to make
18       whatever argument you need to the jury, why do you need that in
19       the charge in terms of --
20                MR. NORINSBERG:  Once there's an award for future
21       damages -- we don't know what will happen, but assuming there
22       were an award then the next question would be over what period
23       of years is this intended to compensate the plaintiff.  Then
24       that sets up a factual finding for the post-trial litigation
25       whether it's fair and reasonable.  Without that, you have
```

762

DCDTGUZ1

```
 1    nothing to go by, so --
 2             THE COURT:  What's that got to do with the jury?  I
 3    understand that argument, but in terms of this jury, why -- I'm
 4    trying to understand the relevance of this in terms of the jury
 5    instruction, in terms of the instructions on the law.  You can
 6    certainly feel free to argue to the jury that he's going to be
 7    suffering from this pain, whatever it is you want to say, for a
 8    very long time, because he's a young man, why does that need to
 9    be in the instructions?  Why do you want to -- why would it be
10    appropriate to put an instruction that I instruct you that he
11    has a life expectancy of 60.2 years?  Why does that need to be
12    in the charge?
13             MR. NORINSBERG:  Just because we want the jury to have
14    some basis for that, and if they make an award for future
15    damages there should be a corresponding category on the verdict
16    form which says future damages and over what period of years is
17    this intended to compensate the plaintiff.  And then you have
18    some factual findings to whether or not the award is
19    reasonable.  I can only say, Judge, in my experience that's
20    always done.  I don't know, I can't articulate for you the
21    reason why it is, but I have never seen it not done.  It's
22    always done that way.
23             THE COURT:  You're talking about in federal court?
24             MR. NORINSBERG:  Yeah, we had a charge from a case we
25    could pull up quickly which I had last winter with Judge
```

763

DCDTGUZ1

 1    Matsumoto, Perry v. City of New York, and the judge's charges
 2    are on ECF, and it includes the life expectancy table that she
 3    charged that she relied upon, and the actual wording of the
 4    charge is in there as well.
 5              THE COURT:  What's the defendant's position?
 6              MR. MODAFFERI:  Judge, we can't go off what happened
 7    in another case because in this case there was no testimony.
 8              MR. NORINSBERG:  There was no testimony in that case
 9    either, it is just routinely done.
10              THE COURT:  I am still trying to figure out exactly
11    what it is that you -- if I were to include this in this
12    charge, I guess why is it not covered in what is here in terms
13    of the future damages?  Why isn't that encompassed in what's
14    here?  I can understand if your position is you want get to
15    that later if you want something parsed out separately on the
16    verdict sheet, that's one thing, but in terms of the jury
17    instructions, it seems to me this is covered in jury
18    instructions.  Why isn't that covered in what's here?
19              MR. NORINSBERG:  I don't know that the jury
20    instruction really talks about the future for the rest of his
21    life in a way that makes that clear.  A lot of the way it's
22    worded really sounds like up until the day right now anything
23    that he suffered, any loss of enjoyment, really that's what my
24    colleague was referring to that perhaps it should be separated
25    out.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ1

```
 1              THE COURT:  In the second paragraph here on page 31,
 2   the second -- I guess the third sentence, you must also
 3   consider the seriousness of the injuries and their duration and
 4   impact on the plaintiff as well as the degree of pain and
 5   mental anguish suffered.
 6              MR. NORINSBERG:  When I'm hearing that sentence I'm
 7   hearing it from the date of the incident and the duration five
 8   years until now.  If you added in one sentence and said your
 9   award should be for any damages that have been suffered up to
10   the date now and any damages that you believe should be awarded
11   for the plaintiff in the future for the remainder of his life
12   then that would cover the issue.  I don't have any problem.
13              THE COURT:  Defense?
14              MR. MODAFFERI:  Judge, I think as your Honor stated,
15   duration is pretty clear.  We have a jury that has been paying
16   attention the whole time.  I think they understand what the
17   testimony is, they will understand what duration means, and
18   they'll get it based on this paragraph.  I don't think that we
19   need to highlight the fact that the plaintiff wants future
20   damages, especially in light of the fact that there is duration
21   in this, loss of enjoyment of life is explained.  I don't think
22   that we need to highlight this any further.
23              THE COURT:  Let me ask plaintiff's counsel, how about
24   that third sentence, you must also consider the seriousness of
25   the injuries and their duration and impact on the plaintiff as
```

DCDTGUZ1

```
 1   well as the degree of pain and mental anguish, period.  If I
 2   take out that last "suffered," does that take out that
 3   connotation this is dealing with only things that happened up
 4   to this point?
 5            MR. NORINSBERG:  I would say has suffered and will
 6   continue to suffer in the future.
 7            THE COURT:  If I take "suffered" out, period, it has
 8   duration.
 9            MR. NORINSBERG:  Honestly, if I had to make a choice,
10   the way it is would be better.  I think there should be
11   something -- it's not a long charge, but something that
12   reflects the fact that it's past and future, and that is what
13   we correlated with what we believe should be on the verdict
14   sheet also with past and future.
15            THE COURT:  You're saying you would prefer my
16   suggestion taking out "suffered" -- you prefer to leave
17   "suffered" in there as opposed to taking "suffered" out alone?
18            MR. NORINSBERG:  Yes, if I had a choice.
19            THE COURT:  We'll leave that as it is then.
20            What is plaintiff's next objection?
21            MR. MEEHAN:  Yes, on the next page, page 33, nominal
22   damages charge, we do have some Second Circuit case law that
23   states that nominal damages charge is -- where there is no
24   nominal damages charge where there's been deprivation of
25   liberty called Kerman v. City of New York, 374 F.3d 93.  So we
```

766

DCDTGUZ1

```
 1   would like that taken out and we also would like that taken out
 2   of the verdict sheet.
 3              THE COURT:  What's defendant's position on that?
 4              MR. MODAFFERI:  Judge, I think the charge and verdict
 5   sheet are absolutely correct as written because in the verdict
 6   sheet there is no nominal damage question regarding false
 7   arrest, it's only force.  If you look at the page 33, the
 8   nominal damages is only with respect to, as your Honor stated
 9   in the first sentence, excessive force.  So I think as written
10   it's correct and shouldn't be changed at all.
11              THE COURT:  Plaintiff's response is that the damages
12   charge does not address the false arrest?
13              MR. NORINSBERG:  Judge, our position is that it's the
14   plaintiff's option to have this, and we have a case, Vilkhu v.
15   City of New York by the late Judge Sifton, that explains the
16   reason why it's the plaintiff's choice is because essentially
17   in a case like this where you have conflicting versions, it
18   would allow the jury to impermissibly compromise and
19   essentially say all right, we're finding for plaintiff but not
20   going to give him anything.  And Judge Sifton made it clear
21   that because of that risk, it's the plaintiff's option.  If the
22   plaintiff wants it, the plaintiff can have it.  If the
23   plaintiff doesn't want it, the plaintiff doesn't have to have
24   it.
25              THE COURT:  Do you have another authority than the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

767

DCDTGUZ1

1   case from Judge Sifton on that?
2           MR. NORINSBERG:  Obviously the Kerman case as well.
3   In our view, there is -- without question he had some type of
4   injury suffered as a matter of law.  There's no possible
5   rendering -- if the jury found that there was excessive force
6   here, I don't see how they could actually award nominal
7   damages.  It just wouldn't comport.
8           THE COURT:  Defense counsel?
9           MR. MODAFFERI:  Judge, I mean I think with respect to
10  Kerman, we can see that with respect to the false arrest.  But
11  for the excessive force, it's plaintiff's burden not only to
12  prove constitutional violation in that excessive force was
13  used, but also had to then approve by a preponderance of the
14  evidence that he's entitled to compensatory damages.  That's
15  why, if he fails to prove that, he's entitled -- he could only
16  be awarded nominal damages.  It's not plaintiff's choice.
17          MR. NORINSBERG:  Judge, we actually have the Vilkhu
18  case here which we would like to hand up.  But the bottom line
19  is the issue of causation is covered in the Court's charges.
20  So you made it very clear in the charge we have to show it's
21  proximately caused by the conduct.  So nominal damages is not
22  necessary to cover that legal issue, it's already covered.
23          MR. CHESTNOV:  Except, your Honor, there would be no
24  way for the jury on the verdict sheet, if there was no nominal
25  damages, if they found there was proximate cause as to

768

DCDTGUZ1

1   causation but not proximate cause to damages, if this is taken
2   out, what are they supposed to do?
3           THE COURT:  OK, that's fine.  And I'm aware of counsel
4   had some other matters.  I don't know if you have appeared in
5   this matter.  You might want to state your appearance.
6           MR. CHESTNOV:  Michael Chestnov.  I filed a notice of
7   appearance and gave the reporter my card.
8           THE COURT:  How many copies of this case does counsel
9   have?
10          MR. MEEHAN:  We have three of Kerman and three of
11  Vilkhu.
12          THE COURT:  Share a copy with defense counsel and hand
13  up a copy for me as well.  I'm very familiar with Kerman.
14          (Pause)
15          THE COURT:  OK, has defense counsel had an opportunity
16  to read?
17          I will give defense counsel a little more time.
18          MR. MODAFFERI:  Judge, before getting into that,
19  plaintiff's counsel and I had an excessive force trial back in
20  July before Judge Weinstein in the Eastern District, and I
21  don't have that charge and verdict sheet in front of me,
22  however, the same argument was raised there and nominal damages
23  were included in the charge and the verdict sheet by Judge
24  Weinstein.
25          THE COURT:  Does defense counsel need more time to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

769

DCDTGUZ1
 1   review the cases?
 2          MR. CHESTNOV:  Just another moment, your Honor.
 3          THE COURT:  Hold off on the argument until defense
 4   counsel has a chance to read that.
 5          MR. MODAFFERI:  Judge, I have taken a brief look at
 6   the case and I think the rule of law here which this case cites
 7   to is from the Supreme Court that basically says what I had
 8   stated earlier that in a 1983 if plaintiff can establish a
 9   violation of constitutional rights but cannot establish a
10   actual injury proximately caused by the injury he's entitled to
11   recover nominal damages.  And I think, based on my quick
12   reading, the judge in this case confines the fact that the
13   plaintiff's injury was slim, that he refused to charge on
14   nominal damages because the key issue came down to whether or
15   not it was proximately caused, not the extent of how much the
16   plaintiff actually proved his compensatory damages.
17          MR. NORINSBERG:  Just realistically, the issue in the
18   case is whether or not Officer Jay kicked plaintiff.  If the
19   jury were to find in our favor, as a matter of law the
20   plaintiff suffered injuries that are documented from day one.
21   What the verdict -- the value of the injuries are a separate
22   question, but there's no way -- if the jury found he used
23   excessive force, there's no way that they could award nominal
24   damages.  It would be completely inconsistent with the medical
25   picture that's been developed.

770

DCDTGUZ1

 1                  THE COURT:  That request, that -- plaintiff's
 2      objection is overruled, we'll leave the nominal damages charge
 3      in.
 4                  Any other objections from plaintiff?
 5                  MR. MEEHAN:  I do not believe so, your Honor.
 6                  THE COURT:  OK.  Defense counsel, objections from
 7      defense counsel?
 8                  MR. MODAFFERI:  Judge, our first objection is just
 9      with respect to the caption, and that goes for both the verdict
10      sheet and the jury instructions.  The piece about in his
11      official capacity is actually not correct, because to sue an
12      employee or an official in their official capacity is actually
13      a suit against the entity, so that is tantamount to suing the
14      city.  And we have case law on that, it's Lore v. City of
15      Syracuse, that's 670 F.3d 127, (2d Cir. 2012) and also citing
16      to Monell in the Supreme Court basically saying that a suit
17      against an official in his official capacity is not the suit
18      against the person because the real party in interest is the
19      entity.  So that's not correct.
20                  And also I think the caption should just read
21      plaintiff's name v. Police Officer Brian Jay.  And plaintiffs
22      have done that in their special interrogatories, so I think
23      that would be not a big deal.
24                  THE COURT:  Any objection to that?
25                  MR. MEEHAN:  No objection.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCDTGUZ1

 1              THE COURT:  We'll change the caption, Jackson-Guzman
 2     versus Police Officer Brian Jay.
 3              MR. MODAFFERI:  Judge, next we ask the Court for a
 4     missing witness charge with respect to two of the witnesses
 5     that did not testify in this case, Dr. Ehrlich and Jose Roman.
 6              And as your Honor may recall, plaintiff's counsel had
 7     included in their proposed jury charge a missing witness -- a
 8     proposed missing witness charge with respect to Dr. Gidumal.
 9     For those same reasons we request that the missing witness
10     charge be included in the charge with respect to those missing
11     witnesses, Jose Roman and Dr. Ehrlich.
12              MR. NORINSBERG:  First of all, Judge, with respect to
13     Dr. Ehrlich, at our initial pretrial conference, defense
14     counsel made an objection to us calling more than one
15     orthopedic doctor saying it would be cumulative and there's no
16     reason to call two doctors, at which point I indicated I would
17     try to get Dr. Dassa, the treating physician, to come in,
18     understanding that in fact it would be duplicative and
19     cumulative.  And in fact, the doctor's report, the expert
20     report, if you look at it, all of his opinions are essentially
21     the same as the opinions that were expressed by Dr. Dassa.  So
22     for that reason alone, that would be a completely inappropriate
23     charge.
24              I will also say that the reason why we included our
25     missing witness charge at the time we did was to give

DCDTGUZ1

1  defendants fair notice that in fact they need to bring this
2  doctor in, and if they don't bring this doctor in, we're
3  seeking that charge.  They didn't include such a charge with
4  Dr. Ehrlich.  They never supplemented their charges, so that
5  would be to the totally inappropriate and highly prejudicial at
6  this point.
7          With respect to Mr. Roman, he's equally available to
8  to both parties.  He's not a party that is under our control
9  any more than he's under the control of the defendant.  If they
10 wanted him here, they could have done the same thing and could
11 have tried to bring him in any way they wanted to.  He's not
12 somebody that we have control over.  In fact, I believe they
13 did bring him in by subpoena the first time to his deposition.
14 So there's no evidentiary basis to give a missing witness
15 charge against one party, in this case the plaintiff, when that
16 individual is equally accessible to both parties.
17          THE COURT:  Defense counsel?
18          MR. KUNZ:  Well, I think Mr. Norinsberg is incorrect
19 about what happened pretrial in regard to the doctors.  We
20 actually moved -- we did not move against Dr. Ehrlich because
21 that was plaintiff's expert and we anticipated fully
22 Dr. Ehrlich testifying in this case.
23          We moved to exclude Dassa and a number of other
24 so-called treating doctors because we believed that if all of
25 them were called it would be cumulative and confusing.  So when

773

DCDTGUZ1

1    plaintiff's counsel made the choice to drop Dr. Ehrlich, he did
2    it for a reason, and the missing witness charge that he
3    proposed explains to the jury how they're supposed to assess
4    that decision.  So I think it's absolutely fair to have a
5    missing witness charge in regards to Dr. Ehrlich for the exact
6    same reasons that the plaintiff wanted the missing witness
7    charge in if we didn't call Dr. Gidumal.
8              Second, with regard to Mr. Roman, this is the
9    plaintiff's best friend since high school, and they absolutely
10   subpoenaed him and put him on the JPTO, and we fully
11   anticipated him to come and testify at the trial, and we were
12   frankly very surprised that they made absolutely no efforts to
13   enforce the subpoena.  And again, the jury needs to have some
14   instructions to understand what weight or significance to put
15   on that.  And without the instructions of a missing witness
16   charge, they're not going to know what to do with that
17   information.  So I think the missing witness charge has to be
18   in to explain to the jury what is going on.
19             MR. NORINSBERG:  Judge, we'll go back to the
20   transcript at some point, because I specifically remember,
21   among many other arguments, they were arguing Dr. Ehrlich would
22   be cumulative.  The fact of the matter is he has highly
23   favorable report, there is absolutely no difference in terms of
24   opinions to what he would have expressed versus Dassa.  The
25   only difference is the treatment rendered by Dassa made him a

774

DCDTGUZ1

1   better witness because he could give a global overview as to
2   what treatment was given.  He was the one referring to him to
3   other doctors, ordering diagnostic tests.  So it's much ado
4   about nothing.  I feel it would be absolutely extremely
5   prejudicial to give missing witness charge on that and totally
6   inappropriate.
7          The difference with their doctor is he has confirmed
8   findings that were helpful to plaintiff, so I did not want to
9   be in a position where we couldn't have him here at trial and
10  we wouldn't be able to inform the jury of the fact that he
11  confirmed many of the issues that we were claiming, and that's
12  why we subpoenaed him as well.  That's how we covered ourselves
13  on that.  We subpoenaed him and we actually put the charge in.
14         The defendants never subpoenaed Mr. Roman, for
15  whatever reason.  And they were well aware, at least as early
16  as my opening on Monday, that we had somebody that may or may
17  not be coming in.  They were clearly on notice as of my
18  opening.  If they wanted him in, they could do whatever they
19  wanted to, and they made no effort whatsoever.  So to put that
20  on one party opposed to another I think would be wrong as a
21  matter of law, your Honor.
22         MR. KUNZ:  Your Honor, just briefly, Mr. Roman was
23  under subpoena from the plaintiffs, and so we fully expected
24  him to comply with that subpoena, and we brought it out
25  repeatedly in sidebars that we fully expected him to come and

775

DCDTGUZ1
 1    that we wanted the subpoena enforced.  Plaintiff made the
 2    decision not to do that.  So the jury needs to be explained
 3    what to do with that choice.
 4              THE COURT:  OK.  And what is it that you're
 5    requesting?  You're requesting an adverse inference as a result
 6    of this person --
 7              MR. KUNZ:  Not quite, your Honor, I believe the charge
 8    that the plaintiff proposed just explains in evaluating
 9    plaintiff's claims you may consider the fact that plaintiff did
10    not call two witnesses.  When a party has it within his power
11    to produce a witness whose testimony would be relevant to an
12    issue in dispute and fails to produce such a witness, you, as
13    jurors, may infer that the testimony, if produced, would be
14    unfavorable to the party.  In deciding whether to draw that an
15    adverse inference, you should consider whether the witness was
16    not produced -- whether the witness who was not produced would
17    merely have duplicated other evidence already produced.  You
18    may also consider whether the party offered a reason for not
19    producing the witness and whether the reason was explained to
20    your satisfaction.
21              So it's not required that they make an adverse
22    inference, it's just explaining that they can.
23              THE COURT:  It's very rare that a jury is told they
24    have to make an adverse inference, but let me hear from
25    plaintiff's counsel to the wording of that charge.  Why is that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCDTGUZ1
```
 1   so prejudicial?  Obviously it explains to the jury and it does
 2   seem that -- let's focus on Mr. Roman.  Let me hear more from
 3   plaintiff as to why it is that you can't just argue to the
 4   jury.  There certainly was some testimony from the plaintiff --
 5   there was some testimony about I think he said Henry was mad at
 6   him because -- Henry was mad because the plaintiff didn't
 7   intervene in the fight.
 8            MR. KUNZ:  I think that might have been stricken, your
 9   Honor.
10            THE COURT:  Let me hear from plaintiff's counsel a
11   little more.
12            MR. NORINSBERG:  What's really disturbing is being
13   ambushed when we're about to close to first have this issue
14   raised.  I know there's a lot of case law that I would have
15   submitted to the Court which says it's entirely inappropriate
16   under these circumstances when the witness is equally available
17   to both sides to pin it on one side.  They know what he had to
18   say in his deposition.  They could have subpoenaed him.  They
19   can't, on the day I'm about to close, say we want a missing
20   witness charge.  It's totally unfair and prejudicial.  And I
21   ask on that ground alone this application should be denied.
22            Judge, I mean in my experience a missing witness
23   charge is devastating to a party because then it gives the
24   impact of the Court.  They can get up and say you're going to
25   hear from the Court is going to tell you this.  And it's
```

777

DCDTGUZ1

1  extremely, extremely prejudicial.  They didn't set it up in any
2  manner which would survive review in the Second Circuit.  They
3  didn't do it the right way and it's too late to do it now.
4         THE COURT:  Let me hear from the defendants why
5  Dr. Ehrlich's testimony would be cumulative of what Dr. Dassa
6  testified.
7         MR. KUNZ:  Dr. Ehrlich was a retained treating expert
8  in this case, your Honor, and he was the knee specialist who
9  examined the plaintiff, who interpreted the MRIs, who did
10 everything in regard to the plaintiff's knee, and he had
11 conversations with Dr. Dassa.
12        So I absolutely don't believe the testimony has been
13 completely overlapping.  Dr. Ehrlich was the one who was
14 supposed to counter Dr. Gidumal.  They're the ones on equal
15 footing, they're the knee specialists.  And Dr. Dassa, as the
16 plaintiff explained, was I guess just a person who sort of saw
17 the plaintiff a few times and referred him out to other people.
18 So the plaintiff made a conscious decision not to call
19 Dr. Ehrlich, and the plaintiff is the one who proposed the
20 missing witness charge, so for him to come in here today and
21 claim surprise that the missing witness charge might be given
22 is totally disingenuous.  He proposed it.
23        (Continued on next page)
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

778

DCD3GUZ2

1                THE COURT:  Let me think about that.  What is
2      defendant's next objection?
3                MR. MODAFFERI:  On page 18, Judge.  I don't know if it
4      is a typo or not, but under part three, the law section B, the
5      first sentence, the law applied to Mr. Jackson's federal
6      claims.  Everywhere else in the charge he's referred to as
7      Mr. Guzman.
8                THE COURT:  Okay.
9                MR. MODAFFERI:  Moving along to page 23.  It would be
10     the sentence, the last sentence on the bottom of page 22 going
11     into 23.  Regarding the disposition of the criminal charges and
12     not relevant.  While the false arrest claim requires you to
13     decide if Officer Jay had probable cause based on the objective
14     circumstances to arrest Guzman for any offense regardless of
15     whether or not he was actually charged with that offense.  It
16     will explain why there is an OGA charge and a discon charge
17     when he was only actually charged with OGA.  I think it will be
18     a little confusing for the jury without that instruction that
19     it doesn't matter whether or not he was actually charged with
20     the offense.
21               THE COURT:  What specifically are you asking me to add
22     there?
23               MR. MODAFFERI:  At the end of the first -- the second
24     line on page 23, after Mr. Guzman, just to say for any offense
25     regardless of whether or not he was actually charged with that

779

DCD3GUZ2
```
 1   offense.
 2              THE COURT:  What is plaintiff's position on that?
 3              MR. MEEHAN:  You go into the discon on page 24.  For
 4   it to be listed on page 23 I think is a little duplicative.
 5   Again, there is no evidentiary record at all that Officer Jay
 6   was contemplating a disorderly conduct charge.  He never
 7   testified that he could have arrested him for disorderly
 8   conduct.  So I feel again to keep bringing out the fact that
 9   there could have been a discon is just prejudicial to the
10   client, to the plaintiff, in proving his claim.
11              THE COURT:  I'll partially grant the defendant's
12   objection on that.  We'll add to the end of this sentence based
13   on the objective circumstances to arrest Mr. Guzman for any
14   offense.  Period.
15              Next objection by the defense.
16              MR. MODAFFERI:  On the next page -- oh yes.  I'm
17   sorry.  The very next sentence starts with because of the
18   absence of a warrant.  I think it is undisputed that there
19   wasn't a warrant in this case, so I think that sentence could
20   just start with the defendant has the burden of proving by a
21   preponderance of the evidence.
22              THE COURT:  Plaintiff have any objection to that?
23              MR. MEEHAN:  No, your Honor.
24              THE COURT:  I'll do that.  Next objection.
25              MR. MODAFFERI:  Yes, Judge.  I guess we can move on to
```

780

DCD3GUZ2

1    page 24, the first full paragraph regarding official function.
2    The second sentence, therefore, if the official function at
3    issue is plaintiff's arrest, and there is an explanation, I
4    think before the next sentence that starts with physical force,
5    I think we need some sort of transition to -- I'm proposing on
6    the other hand, if the official function is arresting someone
7    for fighting, physical force, or interference in the arrest of
8    a third party, may constitute obstruction of governmental
9    administration.
10             THE COURT:  You're suggesting that I put in what now?
11   On the other hand.
12             MR. MODAFFERI:  If the official function is arresting
13   someone for fighting, and then the rest of that sentence.
14             THE COURT:  By that I take you to mean if the official
15   function is arresting somebody else?
16             MR. MODAFFERI:  Yes.
17             THE COURT:  Okay.
18             MR. MODAFFERI:  That's what the testimony was.
19             THE COURT:  Let me find out from plaintiff what is
20   your position is on that.
21             MR. MEEHAN:  I don't think it needs to be there, your
22   Honor.  I think we don't need a transitional sentence at all.
23   I think it is fine as written.
24             MR. MODAFFERI:  It goes back.
25             THE COURT:  Let me find out from defendants why do you

781

DCD3GUZ2

1   need to say fighting, arrest someone for fighting?  Why can't
2   it just be arrest someone else?
3           MR. MODAFFERI:  In the previous sentence there is a
4   factual predicate.  If the official function is plaintiff's
5   arrest.  So we need to have a factual predicate for the ruling
6   of law in the next sentence.  If the official function is what
7   is the factual predicate then here is the rule of law.
8           THE COURT:  I was going to say if, on the other hand,
9   if the official function is arresting someone else.  I am just
10  saying I don't know why it is necessary to put in arrest
11  someone else for fighting.
12          MR. MODAFFERI:  That's fine.  I misunderstood you.
13  Sorry, your Honor.
14          THE COURT:  Okay.  Next objection.
15          MR. MODAFFERI:  In the last paragraph on page 24 with
16  respect to the discon paragraph, the second sentence reads
17  defendant had probable cause.  In all other aspects of the
18  charge the defendant is referred to as Officer Jay, so we would
19  request uniformity there and have it state Officer Jay had
20  probable cause.
21          THE COURT:  Any objection?
22          MR. MEEHAN:  No, your Honor.  I just would like to
23  point out that throughout the whole charge sometimes plaintiff
24  is referred to as Mr. Guzman and sometimes he's referred to as
25  plaintiff so I see no distinction.  I certainly wouldn't raise

DCD3GUZ2
1   the issue between Mr. Guzman and plaintiff.  So if you would
2   like to keep it, I do not object.
3           MR. MODAFFERI:  Also, you are referring to Mr. Guzman
4   by name.
5           THE COURT:  That's fine.  I'll change that for that
6   sentence that's fine.  Officer Jay.
7           MR. MODAFFERI:  In that very same paragraph, the B or
8   C can come out because I don't think there has been any
9   testimony regarding the unreasonable noise or abusive language.
10  So it could just read, one, Mr. Guzman was engaging in fighting
11  or violent tumultuous threatening behavior; two, it was public.
12          THE COURT:  I take it there is no objection to that
13  from plaintiff.
14          MR. MEEHAN:  Not at all, your Honor.
15          THE COURT:  Okay.
16          MR. MODAFFERI:  On page 25 there is a typo on point
17  four of that first paragraph.  It should be whether plaintiff's
18  conduct occurred in a public location or Mr. Guzman for
19  uniformity.
20          THE COURT:  Okay.  Mr. Guzman.
21          MR. MODAFFERI:  At the end of the point on false
22  arrest, we would just request that there be some charge or
23  instruction regarding that the jury need not be unanimous as to
24  which offense that you find probable cause.  Meaning if two
25  jurors think that there was probable cause for disorderly

783

DCD3GUZ2

1   conduct and the other six think there was probable cause for
2   OGA, that is still fine.
3           THE COURT:  Which page are you at specifically?
4           MR. MODAFFERI:  In addition to just adding to the rest
5   of page 25, something that says, you know, you need not be
6   unanimous on which offenses you find probable cause, whether
7   charged or not, only that you are unanimous that probable cause
8   existed for any offense or for an offense.
9           THE COURT:  What is plaintiff's position on that?
10          MR. MEEHAN:  Your Honor, I don't think we need to go
11  into how the jury is going to deliberate and how they are going
12  to figure out whether or not there was probable cause.  I think
13  the charge is fine as is.  I think the charge listing two
14  distinct possible charges is fine.  I don't really think the
15  Court needs to go into, well, one of you can find a discon and
16  seven of you can find OGA and you can still find probable
17  cause.  I think they're a smart jury, they have been trying
18  very hard, they're been taking an incredible amount of notes.
19  I think they can figure it out.
20          THE COURT:  Anything else from defense on that?
21          MR. MODAFFERI:  No, Judge.  I have another charge
22  where that was specifically added stating please also note you
23  don't have to be unanimous in which offense, just that you have
24  to be unanimous that there was probable cause for an offense.
25          MR. MEEHAN:  I would like to raise it is a little
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

784

DCD3GUZ2

1   confusing and I think possibly the jury could draw an inference
2   that the Court is prodding them to find probable cause.
3           THE COURT:  I'll deny the defense objection to that
4   one.  If the jury is confused about that, I'm sure they'll let
5   us know and we'll answer the question appropriately.
6           MR. MODAFFERI:  On page 26 in the excessive force
7   charge, this is our main, I guess, objection is there is only a
8   part of the standard from Graham v. Connor in the charge.  We
9   would request that the remaining sentences from Graham v.
10  Connor be included, which are not every push or shove violates
11  a person's constitutional rights.
12          MR. NORINSBERG:  It is inapplicable on these facts,
13  Judge.  There is a sharp factual dispute --
14          THE COURT:  Hold on.  Let defense counsel finish.
15          MR. MODAFFERI:  That's one sentence.  Officers are
16  forced to make split second judgments.  They are in rapidly
17  tense evolving situations.  And that's directly from Graham v.
18  Connor, and I can give you the cite.  It is 490 U.S. 386,
19  396-97.  That's in the Supreme Court 1989.
20          MR. KUNZ:  On the factual predicate, your Honor.  The
21  jury could very well believe that Officer Jay's use of the
22  pepper spray when the plaintiff came and tried to grab him off,
23  they could think that was excessive.  So we need to be able to
24  have this Supreme Court precedent in there to explain to them
25  how they're supposed to assess Officer Jay's actions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ2

```
 1              THE COURT:  Let me hear from plaintiff's counsel.
 2              MR. MEEHAN:  Again, your Honor, it is kind of going
 3    into a prodding the jury to find there was no excessive force
 4    by telling how hard the police officer's jobs are in a rapidly
 5    evolving environment.  I think it already states to the jury
 6    about how difficult the police officer's job is, and what they
 7    can, and all the factors they can in fact look to when they are
 8    deliberating whether or not excessive force had been used.
 9              THE COURT:  Hold on a second.  Anything from defense
10    counsel?
11              MR. MODAFFERI:  Yes, Judge.  On that specific point?
12              THE COURT:  Yes.
13              MR. MODAFFERI:  Again, I don't think this is prodding.
14    This is the law from the United States Supreme Court.  It is
15    our position that the law on excessive force from the Supreme
16    Court should be given to the jury.  Giving them just a piece of
17    that I think is not proper.
18              THE COURT:  What language specifically are you looking
19    for?
20              MR. MODAFFERI:  It is in our proposed charge.  I
21    think, again, just my recollection of the case, I think it is
22    the same sentence where your Honor got the sentence where your
23    Honor took your 20/20 vision of hindsight, the rest of that
24    paragraph also includes not every push or shove by a police
25    officer violates someone's constitutional rights, even if it
```

786

DCD3GUZ2

1   may seem unnecessary in the peace and quiet of the judge's
2   chambers.  And then the next piece is you must allow for the
3   fact that police officers are forced to work in circumstances
4   that are tense, uncertain, and rapidly evolving.  That's all
5   from 396 in Graham v. Connor.
6           THE COURT:  I'll reserve on that.  What's your next
7   objection?
8           MR. MODAFFERI:  And also with respect to Graham v.
9   Connor, we would request something in there about that the jury
10  is not to decide if the least amount of force was used, just
11  that the force was reasonable.  I think that's relevant to this
12  case because Officer Jay testified that he did use pepper
13  spray.  So some jurors may think, well, that's not the least
14  amount of force that he could have used.  But then again,
15  that's not what they are to decide.  Only if it was reasonable.
16  And also, Officer Jay testified that he did take the plaintiff
17  down to the ground.  Some jurors may feel that's not the least
18  amount of force possible.  But again, without that instruction,
19  that's not the law.  It is just what is reasonable.  Again that
20  rule of law comes from Graham v. Connor, also at 396, and it
21  was in many other charges that we have.
22          THE COURT:  Okay.  Plaintiff's response to that?
23          MR. MEEHAN:  I think it is already clear from what is
24  written in the charge that the standard is reasonableness.  I
25  think that were the jury to believe Officer Jay's testimony

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ2

```
 1    that plaintiff came and violently grabbed him from behind, I
 2    don't think anyone would say being pepper sprayed would be
 3    unreasonable.  And just getting back to the other Graham
 4    factors, they are totally inapplicable here, and I don't see
 5    how we need to keep going into the police officer's role and
 6    their job when you already have the standard here written.
 7              THE COURT:  Okay.  I'll reserve.  I'll think about
 8    that.
 9              MR. MODAFFERI:   I wanted to go on the record and say
10    that these actual lines from Graham v, Connor were just charged
11    by Judge Furman in this courtroom on November 21 of 2013.  My
12    last point with respect to the excessive force is just that
13    there is nothing in here regarding negligence, mistake or
14    accident.  And how that doesn't violate the Fourth Amendment.
15              MR. NORINSBERG:  There is something in the charge on
16    that.  I think in the general instruction on intent.
17              THE COURT:  Defense counsel, did you find what
18    plaintiffs were talking about?
19              MR. MODAFFERI:  Judge, it is there with respect to
20    intent, but it is not there with respect to excessive force.  I
21    think it does need to be there with respect to excessive force
22    because of again what Officer Jay had testified to.  How he
23    took plaintiff to the ground.  Some jurors may see that as
24    negligent.  So I think it does again need to be included in the
25    excessive force portion of the instruction.
```

788

DCD3GUZ2

1          THE COURT:  That objection is overruled.  What is your
2     next objection?
3          MR. MODAFFERI:  On page 27, just the last sentence if
4     you find that the amount of force used by Officer Jay was
5     greater than that of a reasonable officer, the plaintiff will
6     have established a claim for excessive force.  I think the
7     converse also needs to be included there.  However, if you find
8     force was reasonable, then you must find in favor of Officer
9     Jay.
10          THE COURT:  Plaintiff have any objection to that?
11          MR. MEEHAN:  No, your Honor, we do not.
12          THE COURT:  What is the exact wording you want,
13     counsel?
14          MR. MODAFFERI:  However, if you find that the force
15     was reasonable, that the amount of force was reasonable, then
16     you must find in favor of Officer Jay.
17          THE COURT:  Okay.
18          MR. MEEHAN:  Your Honor, I would just ask that if we
19     use the "must find" in that sentence, and we switch the last
20     part of the original sentence that is in there, then you must
21     find for the plaintiff on his excessive force claim.
22          MR. MODAFFERI:  We can change the sentence that I had
23     read to mirror the previous sentence, that's fine.
24          THE COURT:  Okay.
25          MR. MODAFFERI:  Without the "must."
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCD3GUZ2

1                THE COURT:  If you find that the amount of force was
2     reasonable, then plaintiff will not have established a claim
3     for excessive force.
4                MR. MODAFFERI:  That's fine.
5                THE COURT:  Next objection.
6                MR. MODAFFERI:  Page 31.  I think the most salient
7     point is the last sentence of paragraph two regarding extensive
8     legal services and the expense that plaintiff had.  There is no
9     malicious prosecution claim here so we ask that be taken out.
10               THE COURT:  What plaintiff's position on that?
11               MR. MEEHAN:  No problem, your Honor.
12               THE COURT:  Take that out.  Next objection?
13               MR. MODAFFERI:  With respect to the compensatory
14    damages, that same paragraph, I think it is a little confusing
15    because plaintiff has a claim for emotional damages with
16    respect to his excessive force claim.  But as your Honor
17    remembers from the motion in limine conferences, they do not
18    have a claim for emotional damages in the false arrest claim,
19    so I think we need something in there to explain that.
20               THE COURT:  Okay.  What do you suggest?  What is
21    plaintiff's position on that?
22               MR. MEEHAN:  Let's hear what defense suggests before
23    we give a position.
24               MR. MODAFFERI:  Maybe something at the beginning of
25    that paragraph, where it say these damages include pain and

790

DCD3GUZ2

1   suffering as well as mental discomfort.  Maybe something before
2   that just saying that plaintiff's claim, or after that,
3   plaintiff's claim for pain and suffering as well as mental
4   discomfort should only be considered with respect to the
5   excessive force and not the false arrest claim or something to
6   that effect.
7           THE COURT:  All right.  What is plaintiff's position
8   on that?
9           MR. MEEHAN:  That's fine, your Honor.
10          THE COURT:  Counsel, do you want to propose some
11  particular language and where do you want to put it?
12          MR. MODAFFERI:  Sure.  After the first sentence, the
13  damages include pain and suffering as well as mental
14  discomfort.  Maybe just the sentence after that, that says
15  however.
16          MR. MEEHAN:  If I could make a suggestion.  These
17  damages include pain and suffering as well as mental discomfort
18  for the excessive force claim.
19          MR. MODAFFERI:  I was thinking maybe at the end of the
20  paragraph, now, however, these damages as I have just read to
21  you are only to be considered on plaintiff's excessive force
22  claim and not for his false arrest claim.
23          THE COURT:  Plaintiff's position on that?
24          MR. MEEHAN:  That's fine.
25          THE COURT:  You want that where, counsel?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

791

DCD3GUZ2

1          MR. MODAFFERI:  At the end of the second paragraph.
2     These damages as I've just read to you are only to be
3     considered on plaintiff's excessive force claim, not his false
4     arrest claim.
5          MR. MEEHAN:  Do we really need the not his false
6     arrest claim?  Sorry to nitpick, your Honor.
7          THE COURT:  I think that's fine.
8          MR. MODAFFERI:  Page 34.  The third paragraph we would
9     ask that the burden be placed in that sentence, so it should
10    read something along the lines of you may award the plaintiff
11    punitive damages if you find plaintiff has proven by a
12    preponderance of the evidence that the acts or omissions of the
13    defendant were done maliciously or wantonly.
14         THE COURT:  Any objection?
15         MR. MEEHAN:  Yes.  I don't think it is needed there.
16    It has already been explained.  I don't see why it needs to be
17    there.  It will be on the verdict sheet.
18         MR. MODAFFERI:  Judge, we'll withdraw that.  I believe
19    plaintiff's counsel had said that we'll put it on the verdict
20    sheet, and that was one of our other objections with the
21    verdict sheet, so we'll just bring that up later.
22         On page 35, the third line after discretionary, just
23    the line that says explaining that it is discretionary.
24    Something along the lines of that even if you find that the
25    standard for punitives has been met, you may but are not

DCD3GUZ2

1    required to award them.
2              THE COURT:  Let me hear from plaintiff on that.
3              MR. MEEHAN:  It says discretionary right there.  We
4    don't need a literal definition of every word in the charge --
5    it is already there.  I think it is pretty clear and obvious
6    and it is discretionary, so I don't see why we need to
7    reiterate what discretionary means.
8              THE COURT:  That objection is overruled.
9              MR. MODAFFERI:  Just on that same page at the end of
10   the last whole paragraph, or I guess we can make them their own
11   sections as we did in our proposed charge, and I'm looking at
12   page 26 of our proposed charge, there are two separate sections
13   we would like to be included in the jury charge.  One of them
14   is mitigation of damages.  I think we've heard a lot of
15   testimony about a subsequent injury, preexisting injury.  And I
16   think that we should have a charge regarding mitigation.
17             THE COURT:  Where do you want that?
18             MR. MODAFFERI:  I'm sorry?
19             THE COURT:  Where would you want that charge?
20             MR. MODAFFERI:  After compensatory.
21             THE COURT:  Okay.  Plaintiff's position on that?
22             MR. NORINSBERG:  There is no evidence whatsoever on
23   plaintiff's failure to mitigate.  There is nothing in the
24   record that would support that conclusion.  If they felt that
25   that was an appropriate charge, it should have been part of the

793

DCD3GUZ2

1  original request to charge.  We're basically getting ambushed
2  with that now.  There is nothing in the record that would
3  support that charge for the jury.
4           MR. MODAFFERI:  Judge, I'm looking at page 26 of our
5  proposed charge.  It was in there and we feel there was ample
6  testimony regarding mitigation.
7           MR. KUNZ:  There was in limine rulings on this,
8  Mr. Norinsberg --
9           THE COURT:  I'll include something on mitigation of
10  damages.
11           MR. NORINSBERG:  I just want to point out, yes, the
12  Court ruled on it and said it was permissible.  When their
13  doctor actually testified I didn't hear him say anything about
14  plaintiff failing to mitigate or about delaying surgery or
15  failing to get physical therapy.  You permitted that line of
16  inquiry.  It was never elicited.  What is the factual predicate
17  for giving this charge to the jury?
18           THE COURT:  Let me hear from defendant.
19           MR. MODAFFERI:  The factual predicate is plaintiff
20  testified that he waited for three months before he sought
21  treatment because of insurance, and we were unable to
22  cross-examine on that.  He testified about a fall.  The doctor
23  testified about a subsequent injury.
24           MR. KUNZ:  And through Dr. Dassa I elicited testimony
25  about how he didn't go back for his follow-up appointments when

DCD3GUZ2

1   he was ordered to.  Dr. Dassa didn't know if he did the
2   physical therapy.  The surgery was 19 months after the
3   accident.  There is lots of testimony about the failure to
4   mitigate.
5            MR. NORINSBERG:  There has to be a causal connection.
6   Failure to mitigate has to be causally connected.  They did not
7   elicit that testimony from their expert or my expert.  Saying
8   he waited three months to get an MRI whatever, unless you show
9   that delay was a causal factor in the development of somebody's
10  medical conditions, it would be completely really prejudicial
11  and misleading to the jury to give a charge on failure to
12  mitigate.  There is no factual predicate connecting the delay
13  with any of the medical conditions that developed.
14           THE COURT:  I'll grant the defendant's objection on
15  that.  I'll include something on mitigation of damages.
16           MR. MODAFFERI:  Our last objection is we would also
17  request a section in the damages or after the damages regarding
18  attorneys' fees.  Just something telling the jury that it is a
19  matter to be determined by the Court.  It is not for them to
20  consider in awarding any damage to plaintiff.
21           MR. NORINSBERG:  Judge, that's completely irrelevant
22  and unnecessary.  Why should the jury have to even consider
23  attorneys' fees?  It is not something either side is going to
24  argue about.  There's no facts in evidence about it.  It is
25  totally completely irrelevant.  If there were attorneys' fees,

795

DCD3GUZ2

1    it would be a matter of law for the Court and in a post-trial
2    motion.  It has nothing to do with this jury.  Why should they
3    be given that instruction?
4             THE COURT:  What is defendant's position on that?
5             MR. MODAFFERI:  Judge, without the instruction, jurors
6    are left to speculate on whether or not they have to include
7    that in their award.  Therefore, with a clear instruction
8    regarding the fact that they do not and should not include that
9    in the award, will leave them with the clear instruction that
10   that's not what they should do.  And other judges in this
11   circuit have done the same.  I have in my hand an instruction
12   from Judge Cogan in the Eastern District where he states that
13   federal law provides an award of attorneys' fees to a plaintiff
14   when he or she prevails in a civil rights action.  The award of
15   fees is determined by the judge.  Accordingly, if you award any
16   damages, including nominal damages, you should not take and
17   consider the fact the plaintiff may have to pay his attorneys.
18            Without any instruction, jurors speculate on whether
19   or not they have to include that in their award.  Without any
20   instruction on that, they're left to speculate and include that
21   in any damage award.
22            THE COURT:  There is nothing in the section on damages
23   in the instruction that is talking about attorneys' fees or
24   fees to lawyers, correct?
25            MR. MODAFFERI:  That's correct.  That's why the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

796

DCD3GUZ2
1    argument is they're left to speculate without a clear
2    instruction on that.
3            THE COURT:  That objection is overruled.  Any other
4    objections?
5            MR. MODAFFERI:  On the charge, no, Judge.
6            THE COURT:  Regarding the objections previously that I
7    reserved on.  Let me still think about the missing witness
8    charge at this time.  I'm inclined not to give it, but I am
9    going to think about it a little bit more.
10           Regarding the other language from the Graham case, I'm
11   inclined to grant that objection and include some of that
12   language from Graham.
13           I don't believe I reserved on anything else.  Let's
14   move on to the verdict form.  The verdict sheet.  Counsel have
15   any objection to our proposed verdict sheet?  Plaintiff's
16   counsel.
17           MR. MEEHAN:  Let's do this in order.  In the excessive
18   force compensatory damages, we just like it parsed out between
19   past and future.  Past pain and suffering, future pain and
20   suffering.
21           THE COURT:  Tell me clearly how you want this to read.
22           MR. MEEHAN:  Maybe divide compensatory damages,
23   subsection one, past pain and suffering dollar amount,
24   subsection two, future pain and suffering, three future medical
25   expenses.

797

DCD3GUZ2

 1              THE COURT:  Okay.  What is defense position on that?
 2              MR. MODAFFERI:  We would object to that.  The jury is
 3    here to just decide the compensatory damages without having to
 4    break it down.  I think the jury verdict form should mirror the
 5    charge in that respect.  It is clear in the charge what they're
 6    supposed to award for, and I think that they need to do that.
 7    Or are able to do that with the verdict sheet as written.
 8              Additionally, to the extent there is any collateral
 9    source rule argument, the only testimony that we've had here
10    regarding future medical expenses has been that $65,000.  So, I
11    don't think that it needs to be specifically parsed out into
12    separate questions.  Because to the extent there is any offset,
13    the only evidence we have is 65,000.  So, I think it is fine as
14    is.  We don't need to give the jury more questions than
15    necessary.
16              MR. NORINSBERG:  If you don't have separate
17    interrogatories, your Honor, you're not going to know whether
18    they made a separate allocation for future cost or whether they
19    just did pain and suffering, so it absolutely needs to be there
20    as a separate itemized category.  Then we'll know what we need
21    to do in post-trial motion if we have one.
22              THE COURT:  Let me seek clarity as to what plaintiff
23    is specifically requesting.  You are requesting that under
24    number two, is plaintiff entitled to compensatory damages as a
25    result of being falsely arrested, yes, no, and then it should

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

798

DCD3GUZ2
 1   be if your answer is yes --
 2            MR. MEEHAN:  Only for excessive force, your Honor.
 3   I'm sorry.  I don't have a physical copy of it.  I'm looking at
 4   it on a phone.  So, it would only be for number four.
 5            THE COURT:  The suggestion is that for number four,
 6   yes or no.  And then if yes, for 4A would be past pain and
 7   suffering, B would be future pain and suffering, and C would be
 8   what?
 9            MR. NORINSBERG:  Future medical expenses.  And then it
10   would have to be the last question would be over what period of
11   years, if you awarded it for future damages, over what period
12   of years is this intended to cover.
13            THE COURT:  Defendant's objection is?
14            MR. MODAFFERI:  Our objection is, in the first place,
15   as written it is fine.  You are giving them the charge on what
16   they have to do.  There is no reason to give them more
17   questions than necessary.
18            Additionally, to the extent your Honor is willing to
19   add more questions, I think that the first question on number
20   four is fine, but it just needs to be a total amount.  There
21   needs to be a total amount and then a breakdown.  Because I
22   think without using the word "total," there will be confusion
23   as to what the total award is.
24            THE COURT:  What is plaintiff's position on that?
25            MR. NORINSBERG:  There is no confusion.  You do past
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

799

DCD3GUZ2
1   and you do future.  And that's the total.  What is confusing
2   about that?
3                THE COURT:  Defendant's response to that?
4                MR. MODAFFERI:  Without having the total, you are just
5   encouraging the jury to award more.  It is clear that way.
6   What is the total and break it down.
7                THE COURT:  Let me think about that.  Any other
8   objection to the verdict form from the plaintiffs?
9                MR. MEEHAN:  Well, only the nominal damages, but I
10  think we've already gone over that.  Then the punitive is fine.
11  So, and that's fine.
12               THE COURT:  Okay.  Defendants have any objections to
13  the verdict form?
14               MR. MODAFFERI:  Just again we want the caption to
15  reflect just Police Officer Brian Jay.  And going back to what
16  plaintiff's counsel said regarding the charge, when we were
17  arguing that in punitive damages there should be the burden
18  included.  We want the burden included on all of the damages
19  questions as well.  Question one has the burden on us for
20  probable cause, so therefore question two should say has
21  plaintiff proven by a preponderance of the evidence that he's
22  entitled to compensatory damages false arrest.
23               MR. MEEHAN:  I just don't see that being necessary.
24  We don't need to include the burdens in the questions.  We've
25  already consented to the punitive damages needing a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

800

DCD3GUZ2

1    preponderance of evidence, so I don't really see why we need it
2    in every single damages award.
3              MR. MODAFFERI:  We would ask it in questions four and
4    five, for excessive force, compensatory and punitive, that has
5    plaintiff proven by a preponderance of the evidence.
6              MR. MEEHAN:  We think it is totally unnecessary for
7    number four, and we have no problem with it in number five.  It
8    is already in number three so we need to prove excessive force
9    to get to the damages.
10             MR. MODAFFERI:  The reason for that objection --
11             THE COURT:  Hold on.  Plaintiffs have no objection to
12   it being in five, but object to it being in four?
13             MR. NORINSBERG:  That's correct, Judge.
14             THE COURT:  Defendants want it just in four and five?
15             MR. MODAFFERI:  Correct.
16             THE COURT:  This is covered in the charge.  What I'll
17   do is I'll add it to four and five.  We don't need to keep
18   reiterating by a preponderance of the evidence.  Has plaintiff
19   proven that he is entitled, blah, blah, blah, for both of
20   those.  Any other objections by the defendants?
21             MR. MODAFFERI:  No, Judge.
22             THE COURT:  Let's turn to the special interrogatories.
23   The interrogatories proposed by each side.  They seem somewhat
24   similar.  Both sides have did Police Officer Jay kick
25   plaintiff.  Plaintiffs have regarding the pepper spray did

801
DCD3GUZ2
1   Police Officer Jay pepper spray plaintiff.  And defendants have
2   did Officer Jay pepper spray plaintiff while on top of him.
3           It seems to be there is no dispute that Officer Jay
4   pepper sprayed the plaintiff, correct?  So I'm not sure what
5   the special interrogatory just with nothing else gives us
6   there.  It seems to me that the Officer Jay pepper spraying
7   plaintiff while on top of plaintiff is a little bit more
8   probative of qualified immunity.
9           MR. MEEHAN:  Something like did Officer Jay pepper
10  spray plaintiff while on the ground?
11          THE COURT:  Okay.  What is defendant's position on
12  that?
13          MR. MODAFFERI:  Judge, I don't think there has been
14  any -- I think our question states it most accurately.  It is
15  plaintiff's version he was pepper sprayed while Officer Jay was
16  on top of him.
17          MR. KUNZ:  Officer Jay says he used the pepper spray
18  when he was on his knees on the ground.  So I think as just
19  propose by plaintiffs --
20          THE COURT:  You are talking about qualified immunity.
21  What is the harm if we ask both of those?
22          MR. KUNZ:  The harm would be if we got different
23  answers, your Honor, we wouldn't know what to make of that.
24          THE COURT:  Okay.  We'll go with did Officer Jay
25  pepper spray plaintiff while on top of plaintiff.  I guess go

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

802

DCD3GUZ2

```
 1   party by party.  Let's go with plaintiff.  Did plaintiff run up
 2   to Officer Jay from behind.  Any objection to asking that?  Did
 3   plaintiff grab Officer Jay.  Any objection to that?
 4              MR. MODAFFERI:  Judge, we really don't have any
 5   objection with their special interrogatories except for number
 6   six, because that was undisputed.
 7              THE COURT:  Okay.
 8              MR. MODAFFERI:  I think with respect to the grabbing,
 9   our special interrogatories are a little more precise.
10              THE COURT:  The concern I have with the special
11   interrogatory did the plaintiff grab Officer Jay while Officer
12   Jay was attempting to place another individual under arrest.
13   It seems if the jury found that, how could they find that there
14   wasn't probable cause.  If the jury found that, the jury is
15   basically saying that plaintiff is guilty of obstruction of
16   governmental administration.  Correct?
17              MR. MODAFFERI:  That's fine.  I think just the grab
18   would be enough for a qualified immunity.
19              THE COURT:  Okay.  Then let's find out what special
20   interrogatories of defendants do plaintiffs object to?
21              MR. MEEHAN:  Certainly number one.  But I think we've
22   already discussed that.  I think two gets back to what the
23   Court was just saying about number one.
24              MR. MODAFFERI:  No objection, Judge.
25              THE COURT:  Okay.
```

803

DCD3GUZ2

1           MR. MEEHAN:  I think we wouldn't be here if we
2  objected to number three.  For number four, we've only heard
3  testimony that Officer Jay pushed plaintiff's head into the
4  ground, so I'd like maybe to switch from slammed to push.
5           MR. MODAFFERI:  No objection to that.
6           MR. MEEHAN:  Number five is fine.  Number six we would
7  like to add scarf and jacket.
8           THE COURT:  Scarf and jacket.
9           MR. MEEHAN:  It was the plaintiff's testimony that
10  Officer Jay didn't just grab him by the scarf.  He grabbed him
11  by the scarf and coat.  So we'd like that to comport to what
12  plaintiff had stated.
13           MR. MODAFFERI:  Judge, we disagree.  I don't think
14  there was any testimony regarding that.  But in any event, we
15  think that the question just lifted plaintiff by his scarf is
16  more probative, because that's what he said caused the injury
17  to his neck.
18           MR. NORINSBERG:  He clearly said scarf and coat
19  together.  That was the testimony.  So to limit it to scarf
20  would be really not correct or consistent with what he
21  testified to.
22           MR. MEEHAN:  If I just might add, your Honor, our the
23  excessive force claim really isn't for the bruise to the neck.
24  So it really is kind of just irrelevant -- not irrelevant,
25  because it certainly does go with the story.  But why would

804

DCD3GUZ2

1    this one specific thing need to be in the special interrogatory
2    when it has nothing to do with the claim or with the damages
3    that are going to result should the jury find for the
4    plaintiff.
5             THE COURT:  How about did Officer Jay lift plaintiff
6    by his clothing around his neck area.  Does that cover that?
7             MR. MEEHAN:  That would be fine with plaintiff.
8             MR. MODAFFERI:  I guess if we could compromise, but I
9    think scarf is our first choice.  That was the testimony.
10            THE COURT:  Any other objection?
11            MR. MEEHAN:  I guess number seven, your Honor, also
12   going to it being irrelevant.  There has never been any
13   testimony from any of the officers saying he was in the fight.
14   In fact we've heard from several officers that he was not
15   involved in the fight.  So, we just object to number seven.
16            THE COURT:  What is defendant's position on that?
17            MR. MODAFFERI:  Again, we feel like it may go to the
18   discon, but to the extent there is a real objection, it is not
19   crucial to our qualified immunity defense.
20            THE COURT:  Let's strike that.  So what we have here,
21   just make sure we are on the same page here, is did plaintiff
22   run up to Police Officer Jay from behind.  Did plaintiff grab
23   Officer Jay.  Did plaintiff attempt to strike Police Officer
24   Jay.  Did plaintiff run away from Police Officer Jay.  Did
25   Police Officer Jay kick plaintiff.  Did Officer Jay push

805

DCD3GUZ2

1    plaintiff's head into the ground.  Did Officer Jay pepper spray
2    plaintiff while on top of plaintiff.  And did Officer Jay lift
3    plaintiff by his clothing around his neck area.  That's what
4    we've got for special interrogatories okay?
5              All right.  I think I reserved decision on the issue
6    of the missing witness charge and then we need to go back and
7    make these corrections and include some information from this
8    Graham case.  Then I think we're ready to go.  Is that correct?
9    Is there anything else we've omitted?
10             MR. NORINSBERG:  Will we have a copy of the verdict
11   sheet?
12             THE COURT:  You'll get a copy of the verdict sheet and
13   the instructions.  We'll let counsel review this to make sure
14   there are no typos or anything else anyone wants to object to,
15   and I am going to give the jury a copy of the instructions
16   themselves to go back in the jury room with them.
17             MR. CHESTNOV:  Defendants have several applications
18   they'd like to make at this time.  The first one is actually
19   the reason I filed a notice of appearance last night.  I
20   believe it to be a serious issue.  I'm Mr. Kunz and
21   Mr. Modafferi's supervisor in this trial.
22             Yesterday Mr. Norinsberg was allowed to cross-examine
23   Dr. Gidumal on the fact he did not review the MRI films at the
24   time of his deposition, at the time he issued his report, at
25   the time he issued his addendum to his report.  I think that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

806
DCD3GUZ2
1  was wholly improper and a curative instruction needs to be read
2  to the jury.
3          Mr. Norinsberg had an absolute discovery obligation to
4  provide those requests.  Defendant's discovery request number
5  three reads produce all medical records, including, but not
6  limited to, records of doctors, hospitals, psychiatric --
7  excuse me, psychiatrists, psychologists, and other counseling
8  services in plaintiff's possession, custody or control for
9  treatment received by plaintiff since the incident and for the
10  five years prior to the incident, including treatment for any
11  injury resulting from the incident.
12          These requests were served on December 14, 2010.
13  These requests were obligated to be responded to by February 9,
14  2011.  Mr. Norinsberg submitted a response, and his response to
15  that interrogatory in its entirety is plaintiff objects to this
16  request on the grounds that it is overbroad.  Notwithstanding,
17  and without waiving or in any way limiting this objection or
18  the general objections, defendants are referred to the
19  documents previously exchanged on December 9, 2010.
20          No MRI films were exchanged on December 9, 2010.  In
21  fact, we did not receive the MRI films until the Friday before
22  trial.  Mr. Norinsberg was under an absolute obligation under
23  discovery to produce these films.  He flouted his obligations
24  and was able to use that flouting of discovery obligations to
25  gain tactical advantage at this trial by cross examining our

807

DCD3GUZ2

```
 1   witness on records that he was obligated to produce to us and
 2   that he did not produce to us.
 3           Now, I understand Mr. Norinsberg has previously
 4   argued, well, I provided releases for these records.  That was
 5   an entirely separate request.  Document request number 11 I
 6   believe.  It is quite telling, that if that was really the
 7   reason that he did not reference document request number 11 in
 8   response to document request number three, he just said period,
 9   this is all we have.  Now, there was no objection on the fact
10   that, gee, defendants could have got it on his own.  That would
11   be an improper objection and that would be sustained, he's
12   waived it anyway because he didn't assert it in a timely
13   response.
14           These were plaintiff's own medical records.  There can
15   be no serious dispute they were not within his control.
16           THE COURT:  What is it you want me to do?
17           MR. CHESTNOV:  The proposed curative instruction we
18   would like to be read is yesterday Mr. Norinsberg questioned
19   Dr. Gidumal about the fact that he did not review plaintiff's
20   MRI films until after he issued his report on August 21, 2012,
21   his addendum to his report on November 22, 2013, and after his
22   deposition was conducted on November 26, 2013.  However, on
23   December 14, 2010, defendant Jay requested that plaintiff
24   produce these MRI films to him, and plaintiff was obligated to
25   provide them to defendant by February 9, 2011.  Plaintiff did
```

808

DCD3GUZ2

1  not actually provide them to defendant until December 6, 2013,
2  after Dr. Gidumal had issued his report, his addendum to his
3  report, and after his deposition had already been taken.
4        There is one more point I'd like to make on this.  It
5  is particularly egregious with respect to Dr. Gidumal's
6  deposition because the certifications we have on the record
7  indicated they were sent out to Mr. Norinsberg and on I believe
8  November 7 -- yes, November 7 of this year and November 14 of
9  this year.  There was an opportunity, even if the Court ignores
10 the fact that the records were under his control all the way
11 back in 2010, he actually had them in his actual possession
12 before the deposition and still withheld them.
13       If anyone from my office tried to pull a stunt like
14 that, we would be taken to the woodshed and possibly
15 sanctioned, and certainly we would not be allowed to
16 essentially benefit from flouting our discovery obligations.
17       THE COURT:  Okay.  What is plaintiff's response?
18       MR. NORINSBERG:  Judge, this is really the first time
19 this issue is coming up.  This is a discovery issue.  If there
20 was any deficiency at all in their ability to get films or our
21 ability to provide films, this should have been raised with
22 Magistrate Judge Francis while discovery was going on.
23       I'll also note their expert did the exam in October of
24 2011, but waited 10 months before rendering his final report.
25 And at any point during that 10-month period counsel could have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

809

DCD3GUZ2

1    simply contacted me, called me, e-mailed me, say listen, before
2    he gives his final report, can you please provide us with the
3    films.
4              I honestly can tell you, Judge, that if they had done
5    that, every effort would have been made at that time to do it.
6    The only reason we got physical possession of the films at this
7    point was with the trial coming up, putting together our final
8    exhibit binder, that's why these films were obtained.
9    Everybody was doing what they needed to do before on their own.
10   That is something that if it was brought to my attention, I
11   would have -- I worked well with Mr. Kunz -- I would have made
12   every effort.
13             There was 10 months to do it.  This was never raised
14   in a timely manner.  And the fact is I also questioned the
15   doctor at his first deposition about his failure to review
16   films, and even at that point defense counsel never wrote to
17   the Court, never asked for any type of remedy at that point.
18   So I feel this is really completely inappropriate right before
19   summation to raise a discovery issue that should have been
20   addressed a long time ago.
21             THE COURT:  What is it that you plan to argue to this
22   jury regarding Dr. Gidumal and his not looking at these MRIs
23   before issuing his opinion?
24             MR. NORINSBERG:  That he didn't look at -- he didn't
25   look at the original Harlem Hospital X-ray, he didn't look at

810

DCD3GUZ2
1    the MRI in 2009, he didn't look at the MRI in 2010.  He didn't
2    look at the photographs of plaintiff.  He came to a conclusion
3    without having an adequate basis for that conclusion.  And then
4    afterwards he is coming to court and then trying to adjust his
5    testimony to what is on the films.  And to me this is an
6    argument that either side can make.
7              But I don't know why he didn't look at the films.  I
8    was really surprised when they raised it for the first time.  I
9    thought they actually had them.  I would have assumed that with
10   the authorizations we gave, they would have done that as a
11   matter of reasonable practitioner.  Even if you don't have it,
12   at least the expert will have it.
13             (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

811

DCDTGUZ3

 1                THE COURT:  At the time that you cross-examined the
 2   doctor you knew that he hadn't looked at those things and knew
 3   that he didn't have possession of those.  At the time you
 4   crossed him yesterday you knew about this issue generally, and
 5   that's why we had this deposition of Dr. Gidumal that took
 6   place and all these other things.  You certainly knew at that
 7   point that the defendants had not made efforts to get these
 8   MRIs.  Dr. Gidumal hadn't seen them, correct?
 9                MR. NORINSBERG:  Absolutely at yesterday's
10   cross-examination, at that time I certainly knew that, Judge.
11   And that wasn't surprising to defendant.
12                THE COURT:  Let me hear again as to this.  Speak
13   slowly.
14                MR. CHESTNOV:  Your Honor, I have it printed.  Would
15   you like me to pass it up?
16                THE COURT:  That would be great, and give copies to
17   plaintiff's counsel.
18                MR. CHESTNOV:  I only have one copy of it.
19                THE COURT:  Let me see what you have.
20                (Pause)
21                THE COURT:  OK.
22                MR. NORINSBERG:  I feel it's totally improper, Judge,
23   to give a charge like this.  It's worded in a way which really
24   fails to take into account the fact that defense counsel had
25   every opportunity to obtain these on their own.  They were

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

812

DCDTGUZ3

1   provided authorizations.  They never raised the issue for ten
2   months during the interim period when the report was
3   forthcoming.  It's misleading as it's worded.  It suggests some
4   wrongdoing when in reality it's the inactivity in defense
5   counsel of raising this issue or spotting this issue.  So the
6   fact is if they thought it was important they should have
7   brought it to the Court's attention.
8          And the other point is they remedied this yesterday
9   through their own expert at the end because their expert
10  testified it wouldn't have mattered; he looked at the reports,
11  he looked at the films, they showed the same thing.  So that's
12  their argument, it's not to get an instruction relating to a
13  discovery issue that should have been raised two years ago.
14         THE COURT:  It seems that you've attempted to give an
15  impression to this jury that Dr. Gidumal was somehow lax and
16  Dr. Gidumal somehow didn't care to view these photos, didn't
17  care to view these MRIs, which is different than the argument
18  that they wouldn't have mattered to him and now that he has
19  seen them it doesn't matter.  That is different than this
20  impression.
21         So I'm going to grant -- to some extent I will grant
22  the defendant's request for a curative instruction.  I think
23  it's worded slightly harshly in terms of I don't think it's
24  necessary to get into Mr. Norinsberg questioned Dr. Gidumal.  I
25  could simply say there has been testimony about the fact that

813

DCDTGUZ3

1   Dr. Gidumal did not review plaintiff's MRI films until after he
2   issued his reports, period.  Has there been a been a report
3   issued by Dr. Gidumal following the review of the MRIs?
4            MR. CHESTNOV:  No, your Honor, we received the reports
5   at 4:45 p.m. on Friday before the trial.
6            THE COURT:  So I think it would be appropriate to say
7   there's been testimony that Dr. Gidumal did not review the
8   plaintiff's MRI films until after he issued his reports and
9   after his deposition was conducted.  Just to make sure, there
10  was no, obviously, reports after he had seen the MRIs on Friday
11  and there was no deposition after that, correct?
12           MR. CHESTNOV:  That's correct.
13           THE COURT:  We'll have on December 14, 2010, defendant
14  Jay -- defendant Jay or Officer Jay?
15           MR. CHESTNOV:  Officer Jay would be better.  Thank
16  you, your Honor.
17           THE COURT:  Officer Jay requested that plaintiff
18  produce these MRI films to him.
19           MR. NORINSBERG:  That's not in their request.  I would
20  like to see the request.
21           THE COURT:  This is what I'm reading from.
22           MR. CHESTNOV:  The discovery demand, produce all
23  medical records, including but not limited to doctors,
24  hospitals, psychiatrists, psychologists, and other counseling
25  services in plaintiff's possession, custody or control for
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

814

DCDTGUZ3

1   treatment received by plaintiff since the incident and for the
2   five years prior to the incident, including treatment for any
3   injury resulting from the incident.
4           MR. NORINSBERG:  So they did not request films.
5   Diagnostic films is a specific request.  We didn't have
6   possession of the films until we got them in November.  So this
7   is completely misleading based on that request.  And we gave
8   them the reports, we gave them authorizations, Judge.  To
9   suggest that they asked for films and tell the jury that is
10  actually factually inaccurate.  They didn't ask for films.  And
11  actually it would need to be clarified that in fact we gave
12  them authorizations to obtain those films and they failed to do
13  so.  That would be a balanced, fair charge, and then we could
14  have --
15          THE COURT:  What is the exact wording the request that
16  you have?  Slowly.
17          MR. CHESTNOV:  Produce all medical records, including
18  but not limited to records of doctors, hospitals,
19  psychiatrists, psychologists, and other counseling services in
20  plaintiff's possession, custody or control for treatment
21  received by plaintiff since the incident and for the five years
22  prior to the incident.
23          THE COURT:  Slow down.
24          MR. CHESTNOV:  That's not the end.
25          THE COURT:  All medical records in plaintiff's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

815

DCDTGUZ3
1   possession, custody or control for all treatment?
2            MR. CHESTNOV:  Well, for all treatment received by
3   plaintiff since the incident and for the five years prior to
4   the incident.
5            And there's more, your Honor.
6            THE COURT:  Sure, what's the rest?
7            MR. CHESTNOV:  Including treatment for any injury
8   resulting from the incident.  And there's another request that
9   could potentially fit into it, but I think this is more
10  directly on point.
11           MR. NORINSBERG:  We objected to the request as
12  overbroad.  If they had a problem with that they should have
13  made a motion to compel.  It doesn't reference MRIs, it doesn't
14  reference any type of diagnostic films.  We objected as overly
15  broad.  If they wanted relief from the Court, the time to do it
16  was sometime in the two years of discovery that we had before
17  the case went to trial.  To do this when we're about to sum up
18  is inappropriate, Judge.
19           THE COURT:  Here's what I'm going to do is parse out
20  some of the language from that, but I don't want to give a
21  impression that -- talking about psychiatric and psychological,
22  I don't want to start doing anything like that.  So on
23  December 14, 2010 Officer Jay requested that plaintiff produce
24  all medical records in plaintiff's possession, custody or
25  control for all treatment received by plaintiff since the

DCDTGUZ3
```
 1   incident and five years prior to the incident, including but
 2   not limited to -- what was that next part there?
 3              MR. CHESTNOV:  Any treatment -- excuse me, treatment
 4   for any injury resulting from the incident.
 5              THE COURT:  Plaintiff was obligated to provide this
 6   information to defendant by February 9, 2011.  Plaintiff did
 7   not provide -- plaintiff did not provide the MRIs to defendant
 8   until December 6, 2013.
 9              That is factually accurate.  If plaintiff -- that's
10   factually accurate without specifically stating anything else
11   about the MRIs.  What is the objection to that?
12              MR. NORINSBERG:  We would need to add language that
13   reflects the facts that we did provide authorizations for
14   Officer Jay to provide those MRI films on his own at that time
15   and he did not do so.  That would be a balanced charge, and
16   then the jury can infer whatever they want to do, but that's a
17   fair charge.
18              MR. CHESTNOV:  That would allow Mr. Norinsberg to be
19   rewarded for flouting discovery obligations.  It's quite
20   telling the arguments Mr. Norinsberg is making now.  Not once
21   did he argue these records were not responsive to the request
22   and that's not discoverable.  What he is arguing is well, there
23   is another one for releases, the defendant should have raised
24   this with the Court years ago.  So in other words, in
25   Mr. Norinsberg's mind his discovery -- he has an absolute
```

817

DCDTGUZ3

1  discovery obligation under Rule 34.  He said numerous times
2  before your Honor he's an officer of the court.  But his
3  position now is he does not need to require the discovery
4  responsibilities, it is defendant's job to make him do it.
5  That is outrageous, your Honor.
6          MR. NORINSBERG:  My position is if a party objects to
7  a discovery demand, the other party has an affirmative
8  obligation to raise the issue with the Court.  Their failure to
9  do so two and a half years ago should not be rewarded now at
10  this point.
11          The other point is we did in fact provide
12  authorizations, and that needs to be addressed in this
13  instruction.  But when we make an objection, what's the point
14  of making an objection?  It puts the burden on the other side
15  to come forward and say we want these records.  We're aware of
16  the fact he had an MRI, we want the records.  And we gave them
17  all the reports, Judge.  They had these MRI reports from the
18  very beginning.  They had all of Dr. Dassa's records in our
19  initial disclosures.  They were aware of this from the very
20  beginning of the lawsuit, they never once raised this issue
21  until now.  And why should we be punished for their --
22          THE COURT:  How about this, does plaintiff's counsel
23  agree that you had an obligation at some point to turn over
24  these documents as something you were relying on for trial?
25          MR. NORINSBERG:  The key element being once they're in

818

DCDTGUZ3

1   our possession, custody and control, yes, I have an obligation
2   at that point once I have seen them, which I did do.  I gave
3   them also the Dassa X-ray, and they didn't ask for it and I
4   affirmatively gave it to them.  Once I had it, I gave it to
5   them.
6           THE COURT:  So there's no dispute, plaintiff
7   acknowledges you had an obligation to turn over the MRIs,
8   correct?
9           MR. NORINSBERG:  When they're in my possession, yes,
10  Judge.
11          THE COURT:  You had an obligation to turn them over in
12  your possession.  You had an obligation to turn over the MRIs
13  and there's no dispute the MRIs were not turned over until
14  December 6, 2013, correct?
15          MR. NORINSBERG:  I believe that is correct.
16          THE COURT:  OK.  Doesn't that solve defendant's --
17          MR. CHESTNOV:  Your Honor, I want to address -- I'm
18  not sure how the Court is giving the instruction.  I wanted
19  clear up one thing.  Mr. Norinsberg -- is Mr. Norinsberg
20  suggesting that his own client's medical records are not within
21  his client's control?  It's not possession -- it's not custody,
22  possession and control, it's custody, possession or control.
23          THE COURT:  I understand.  But does that solve the
24  defendant's dilemma?  Maybe if the jury is instructed that
25  plaintiff had an obligation to turn these MRI records over to

819

DCDTGUZ3
1   the defense, to Officer Jay, these records were not turned over
2   until December 6, 2013, period.
3               MR. CHESTNOV:  I don't think the jury is going to
4   understand the date means anything specific, I think not until
5   after the report -- the addendum and the report and the
6   deposition were all conducted.  Even on the possession issue --
7               THE COURT:  They don't understand last week?
8               MR. CHESTNOV:  No, when we got them.
9               THE COURT:  That's what I'm going to say, they were
10  turned over -- what I'm suggesting is an instruction that
11  simply says the plaintiff had an obligation to turn over the
12  MRIs to the defense, to Officer Jay.  Plaintiff did not turn
13  these MRIs over to Officer Jay until December 6, 2013.
14              MR. NORINSBERG:  There needs to be an additional
15  sentence, Judge, there needs to be a sentence:  However,
16  plaintiff did provide authorizations two and a half years ago
17  to defendant Jay in order to obtain these films on his own, and
18  just leave it at that.
19              MR. CHESTNOV:  Plaintiff is attempting to rehabilitate
20  the fact that -- he is trying to use his failure to comply with
21  absolute discovery obligations to his tactical advantage.  He
22  did that at trial, he knew he did it at trial, it was part and
23  parcel of the tactics he used throughout the trial.
24              THE COURT:  I guess my question to plaintiff's
25  counsel, assuming that that's true, the defendant had the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCDTGUZ3

```
 1   opportunity to get these, but the defendant, unlike the
 2   plaintiff, didn't have an obligation to turn those documents
 3   over.  The defendant had no obligation to get those MRIs,
 4   correct?
 5           MR. NORINSBERG:  Judge, the fact is the charge that
 6   you have just drafted right now is very unbalanced.  It's
 7   against plaintiff in a way that doesn't account for the actual
 8   factual background, which is we objected, first of all, and we
 9   provided authorizations, second of all, and we provided MRI
10   reports three years ago.  That all has to be reflected in the
11   charge for it to be an appropriate charge, otherwise it's
12   misleading.  We gave them the reports, we gave them
13   authorizations.  That needs to be put before the jury.
14           THE COURT:  OK.  What is defendant's position on that?
15   I don't want to spend too much more time on this.  What is
16   defendant's position on that?  If we basically gave the jury
17   almost all of the factual background here, if we say that
18   plaintiff had an obligation to turn these MRIs over to the
19   defense, plaintiff did not fulfill his obligation -- plaintiff
20   did not fulfill his obligation until December 6, 2013.  And we
21   can start that -- we can precede that with plaintiff did give
22   authorizations to the defense that would allow the defense to
23   obtain these records but the defendant was not obligated to do
24   so.
25           MR. CHESTNOV:  That again puts it back on the
```

821

DCDTGUZ3
```
 1    defendant, and it completely ignores the fact Mr. Norinsberg
 2    ignored his discovery and flouted his discovery obligations
 3    like he flouted your Honor's in limine motions rulings earlier
 4    in the trial and yesterday.
 5              THE COURT:  I understand your feelings about that, but
 6    is there anything factually inaccurate about that?  And what's
 7    the prejudice?  You're still talking about curing the
 8    prejudice.  First of all, that statement would be correct, that
 9    would be factually accurate.
10              MR. CHESTNOV:  It is factually accurate, but it
11    doesn't cure the prejudice you because it makes it seem like
12    maybe the defendants should have done something we had no
13    obligation to do, but it allows the jury to infer that.
14    Mr. Norinsberg should be sanctioned for not complying with the
15    discovery not rewarded for not complying with the discovery
16    obligations.
17              THE COURT:  I understand, but if you say the defense
18    the not obligated to do something --
19              MR. CHESTNOV:  It was planting that in their mind.  If
20    we violated our discovery obligations and attempted to
21    cross-examine a witness on the fact that -- on something that
22    the reason or at least a partial reason for it is that because
23    we didn't produce a document we're obligated to produce, of
24    course the curative instruction should only have that part of
25    it.  We're not the ones questioning about it.  And plaintiff is
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

822

DCDTGUZ3

1    trying to plant the seed in the jury's head, and by adding this
2    part about defendants it takes the force out of the curative
3    instruction, it doesn't cure what happened.
4           MR. NORINSBERG:  Judge, we have a jury waiting.  Both
5    sides are eager to start summations.  This is really unfair.
6    It's a discovery issue that should have been raised much
7    earlier.  To put it in context, the Friday before trial we get
8    a new document from them, the memo book which we asked for for
9    Sergeant McHugh two and a half years ago, and they never
10   disclosed it.  We didn't have it when we deposed him.  And
11   Friday before trial we get it.  Do I get up and start asking
12   for sanctions?  No.
13          There should be some fairness and balance in this
14   analysis.  And what we talked about before is factually
15   accurate, we gave authorizations, we gave MRI reports, and we
16   were not under an obligation to do it on our own.  Those three
17   facts are accurate, and that would make the charge appropriate.
18          THE COURT:  Let me ask you, do you agree you had an
19   obligation to turn these documents over as soon as they were in
20   your custody or control?
21          MR. NORINSBERG:  I agree with that.
22          THE COURT:  And you did not do that, correct?
23          MR. NORINSBERG:  I don't know, Judge.  I mean we
24   did -- we just got them in November, meaning I did not do it.
25   I should have done it the day I got them, I agree with that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

823

DCDTGUZ3

 1            THE COURT:  But control, you had control over these
 2    documents before that, correct?
 3            MR. NORINSBERG:  Judge, they're not in my client's
 4    possession, they're in a third-party entity.  We did
 5    everything.  You should see the efforts we did internally to
 6    get films.
 7            THE COURT:  But the issue is not your efforts to get
 8    it, what I am concerned about is the impression that you're
 9    giving to this jury regarding Dr. Gidumal about MRI records
10    that he did not review, you're giving the impression that he
11    had access to these or he had them and decided not look at
12    them.
13            MR. NORINSBERG:  But New York City Health and
14    Hospitals, Harlem Hospital is a city hospital.  They had that
15    X-ray.  That's their own hospital.  They didn't give their own
16    doctor that.  How is that my fault?  That's the type of
17    argument being made here.  These films were in their possession
18    from Harlem Hospital, from Jacobi, from North Central Bronx.
19    Why didn't they get the MRI on their own?  It's the same party.
20            THE COURT:  That's different than the discovery
21    obligation, that's entirely different under the discovery
22    obligations and the obligations under the joint pretrial order
23    and the other general discovery obligations, that's an entirely
24    different thing.
25            MR. NORINSBERG:  But if you balance the charge out and

824

DCDTGUZ3

1    reflect the fact they were given authorizations, that they were
2    given MRI reports and did not have an obligation to use those
3    to get them on their own, that's a balanced charge.
4            THE COURT:  I guess the problem is I don't know if
5    it's appropriate to give a balanced charge when the whole
6    purpose of this curative instruction is because what happened
7    wasn't balanced and wasn't fair.  That's the whole purpose of
8    this jury instruction is because something that happened here
9    was not fair to the defendant in this case because you gave a
10   certain impression to the jury that is not fair.
11           So I will give the following instruction:  There's
12   been testimony that Dr. Gidumal did not review plaintiff's MRI
13   films until after he issued his reports and after his
14   deposition was conducted.  On December 14, 2010, Officer Jay
15   requested that plaintiff produce all medical records, all
16   medical records, including but not limited to records of
17   doctors, hospitals, in his possession, custody or control for
18   all treatment received by plaintiff since the incident and five
19   years prior to the incident.  Plaintiff did not actually
20   provide these MRIs to defendant until December 6, 2013.
21           Any other --
22           MR. NORINSBERG:  The MRI reports, shouldn't that be
23   referenced?  We did provide all the reports, the MRI reports
24   relating to these films.
25           THE COURT:  What do you -- I could say the plaintiff

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

825

DCDTGUZ3
1   did not provide the MRI films.
2           MR. NORINSBERG:  However, plaintiff did provide the
3   corresponding reports and authorizations for defendant to
4   obtain same.
5           THE COURT:  I won't do that.
6           MR. NORINSBERG:  Judge, the original X-ray and the
7   photographs were also things that I gave them that their doctor
8   didn't review.  I think that's a fair comment.
9           THE COURT:  Well, this curative instruction deals with
10  the MRI films, it doesn't deal with MRI reports or anything
11  else, just the films.
12          MR. NORINSBERG:  So I will be able to respond
13  accordingly.
14          THE COURT:  Perhaps, we'll see.
15          Anything else?
16          MR. CHESTNOV:  Based on Mr. Norinsberg's comment now,
17  I ask he be precluded in advance from mentioning anything about
18  authorizations were provided to defendants.  There was no
19  testimony about that whatsoever at trial and he should not be
20  allowed to testify on his closing examination.
21          MR. NORINSBERG:  I certainly can point out the fact
22  that doctor formed his opinion without looking at photographs
23  without look agent the original Harlem Hospital X-ray, and the
24  fact, Judge -- and these films.
25          THE COURT:  That's fine.  That is fine.  You can
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCDTGUZ3

```
1    certainly do that.  But you should be precluded from mentioning
2    anything about the fact of background of all the discovery and
3    the defendant getting authorizations for this and anything of
4    that nature.
5              MR. NORINSBERG:  Judge, shouldn't I be able to
6    respond -- if they're going to be able to make an argument on
7    this, then I should be able to respond to whatever argument
8    they make.  The punishment is already the charge.  If you're
9    putting the charge in, allowing them to comment without
10   allowing me to respond, that's not fair to plaintiff.
11             THE COURT:  Allow you to respond how?
12             MR. NORINSBERG:  If they felt it was important to get
13   the films, they could gotten the films and they didn't.  That's
14   the bottom line.  The doctor himself said it wasn't important,
15   he said that he didn't need to look at the films, basically he
16   could look at the report.  That was the explanation.
17             THE COURT:  The latter part is fine.  I think if they
18   wanted the reports so bad they should have gotten them I think
19   is unfair in this circumstance where you have taken advantage
20   of a failure to disclose this information.  So you can't say
21   that.  You can certainly say that the doctor's opinion wouldn't
22   have changed, his opinion didn't change, and he made his
23   opinion without that.  You can certainly do that.  But we don't
24   need to get into the background responding to anything else
25   here.  I wish we didn't have to do this in the first place, but
```

DCDTGUZ3
1    I think those questions that you asked clearly gave a
2    misimpression to the jury and you shouldn't be allowed to
3    benefit from that.
4              Anything else from the defendants?
5              MR. CHESTNOV:  Yes, your Honor, another issue I would
6    we would like to raise in advance of the summation, I
7    anticipate there being argument whether or not your Honor gives
8    the missing witness charge.  With respect to Mr. Roman as to
9    why he's not here or is here, I don't think Mr. Norinsberg
10   should be able to essentially testify in closing that he's
11   subpoenaed Mr. Roman, as he mentioned in his opening, or that
12   the comment your Honor referenced before that was stricken from
13   the record about hearing that Henry was mad at him.  There's
14   been no testimony of that fact in the trial, no testimony
15   Mr. Roman was subpoenaed at trial.  He should not be able to
16   testify on closing to that effect because there's no evidence
17   in the record about it.  I believe we asked Mr. Guzman if
18   Mr. Roman was subpoenaed, and he said he didn't know.
19             THE COURT:  OK, plaintiff's position, do you plan on
20   going into that.
21             MR. NORINSBERG:  Going to Mr. Henry?
22             THE COURT:  Mr. Roman being subpoenaed.
23             MR. NORINSBERG:  I would absolutely not going to talk
24   about subpoenas, but my position is that if is that important
25   that either side could have brought him in.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

828

DCDTGUZ3

```
 1              THE COURT:  I know that's your position in terms of a
 2    missing witness charge, but whether I give that charge or not
 3    I'm weighing that in my mind.  My assumption is defendant is
 4    going to make arguments about that, and my assumption is you
 5    want to respond to those arguments.
 6              MR. NORINSBERG:  Yes.
 7              THE COURT:  Let's see what happens.
 8              Anything else?
 9              MR. MODAFFERI:  Judge, we would like to make our
10    motions pursuant to Rule 50 at this time.  Our first motion is
11    we would like to renew our motion for a mistrial.
12              Actually, maybe I think plaintiff's counsel wanted to
13    put in more evidence before we actually closed the cases.
14              MR. MEEHAN:  Yes, your Honor, we wanted to include I
15    think before -- we need the jury in here so we can admit 19 and
16    20 into evidence, Jacobi medical records and the North Central
17    Bronx records, then we anticipate we would rest.
18              THE COURT:  OK.
19              MR. MODAFFERI:  Then I think it's fine, we could make
20    our Rule 50 now rather than bring the jury in and bring them
21    back out.
22              THE COURT:  OK.
23              MR. MODAFFERI:  Our first Rule 50 motion --
24              THE COURT:  There's no objection to 19 and 20?
25              MR. MODAFFERI:  No objection.
```

829

DCDTGUZ3

```
 1               Our first Rule 50 motion is we want to renew our
 2    motion for a mistrial.  Your Honor knows that our first witness
 3    was Officer Jay and he was questioned on his prior complaints
 4    in contravention of your Honor's in limine ruling.  The very
 5    next witness was the ER doctor, or the next day the first
 6    witness was the ER doctor, Dr. Carbajal, and he was questioned
 7    on the fact that he was a city employee and at his deposition
 8    Mr. Kunz represented him, thereby making the inference that
 9    we're city attorneys.  And then yesterday --
10               THE COURT:  What was the that first part on Gidumal,
11    the first part he was questioned on being city a employee?
12               MR. MODAFFERI:  Carbajal works for the New York City
13    Health and Hospitals, and at his deposition Mr. Kunz
14    represented him.  And the more egregious point was yesterday
15    when Dr. Gidumal was on the stand, counsel questioned him on
16    the fact that he had been paid by the city, and that was
17    something brought up at side bar.  And I know when we first
18    made the motion your Honor said that plaintiff's counsel was
19    very close to the line.  At this point we would like to renew
20    our motion for a mistrial based on all those things.
21               THE COURT:  OK.  Anything else?
22               MR. MODAFFERI:  One more thing, pursuant to Rule 50 we
23    would like to make our motion for a directed verdict in favor
24    of defendant Jay on the grounds that no reasonable or rational
25    juror could find in favor of plaintiff on his claims.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

830

DCDTGUZ3

```
 1                THE COURT:  OK.  Any response?
 2                MR. NORINSBERG:  Well, on the Rule 50 motion it's a
 3     sharp factual dispute, so it's not a situation that could be
 4     resolved as a matter of law, it's entirely within the province
 5     of the jury to decide whose version of the events to credit.
 6                In terms of other applications, we addressed it in the
 7     robing room, the Court actually overruled defense counsel's
 8     objection and allowed this questioning.  It clearly goes to
 9     bias.  They absolutely met two times, and it was a perfectly
10     appropriate inquiry for Dr. Carbajal because he had no
11     connection to my office, only to the defendant's office.
12                THE COURT:  That Rule 50 motion is denied.
13                Any motions by plaintiff?  Anything else?
14                MR. KUNZ:  We have one more --
15                THE COURT:  The motion for mistrial is also denied.
16                MR. KUNZ:  We had one more brief application to make.
17     In light of your Honor's ruling today that you were going to
18     instruct the jury that the burden is on the defendant for the
19     false arrest claim, we just believe that we should get a brief
20     opportunity after Mr. Norinsberg closes to argue our point on
21     just that false arrest claim.  Typically the party that has the
22     burden is allowed to go last, and we feel since the burden
23     placed on us we should have that opportunity.
24                MR. NORINSBERG:  We have the burden on excessive
25     force, should we have another word?  It doesn't make any sense.
```

DCDTGUZ3
```
 1   I have never heard of that being done.
 2              THE COURT:  That application is denied.
 3              Anything else?
 4              So what I think I will do is bring the jury in here
 5   because they have been waiting for about an hour, and we
 6   will -- I'll bring the jury in to tell them that we're still
 7   working on some issues and to be patient, and then we'll go
 8   work out some other things here.  Unless counsel wants me to
 9   bring the jury in and have plaintiff's counsel go ahead, we
10   have counsel rest on the record, do you want to do that now?
11              MR. MEEHAN:  Sure.
12              MR. KUNZ:  Could we have one moment?
13              THE COURT:  Sure.
14              MR. KUNZ:  Your Honor, I'm a little concerned about
15   the time frame here, and if I close before lunch and then we
16   take the lunch break and then Mr. Norinsberg closes, so perhaps
17   the better course would be to bring the jury in, put these new
18   documents on the record, and then send them to lunch.  And then
19   we can do our work and then they come back after lunch and hear
20   both closings back to back.
21              THE COURT:  Sounds fine.
22              MR. NORINSBERG:  That's fine.
23              THE COURT:  We'll bring them in, plaintiff will rest,
24   defendant will rest, I will tell them we're sending them to an
25   early lunch, maybe have them come back here by one, I think.
```

832

DCDTGUZ3

 1              Bring the jury in, and we'll do that, and I will send
 2    the jury in for lunch and order them lunches.  And we'll
 3    reconvene at one o'clock for -- we'll stay here, work out these
 4    other issues, and we'll have closing arguments at one o'clock,
 5    and I will give them the charge and they will do what they do.
 6              (Jury present)
 7              THE COURT:  Good morning.  Sorry about the delay.  I
 8    hope you had a pleasant evening.
 9              Plaintiff.
10              MR. MEEHAN:  Your Honor, at this time the plaintiff
11    would like to move into evidence what is previously been marked
12    as Plaintiff's 19, the Jacobi Medical Center hospital records.
13              THE COURT:  Any objection?
14              MR. KUNZ:  No objection.
15              THE COURT:  They're in.
16              (Plaintiff's Exhibit 19 received in evidence)
17              MR. MEEHAN:  We would also like to mark into evidence
18    what was marked Plaintiff's 20, the North Central Bronx
19    Hospital records.
20              MR. KUNZ:  No objection.
21              THE COURT:  They're in.
22              (Plaintiff's Exhibit 20 received in evidence)
23              MR. MEEHAN:  At this time the plaintiff rests its
24    case.
25              MR. KUNZ:  And the defendant also rests its case, your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

833

DCDTGUZ3

1    Honor.
2            THE COURT:  So members of the jury, both sides have
3    rested.  I need to discuss some things with the lawyers.  We're
4    going to send you to lunch early today.  And I already ordered
5    lunch, it will hopefully get there relatively soon, and we'll
6    reconvene here at one o'clock.  At one o'clock you will hear
7    closing arguments by counsel and I will give you my
8    instructions on the law.
9            (Jury not present)
10           THE COURT:  You can be seated.  We'll go down to
11   chambers and make some corrections.  It may take a little bit
12   of time.  I want to make sure counsel get an opportunity to
13   grab lunch.  There are different kinds of lawyers, some eat a
14   lot and gain 15 pounds, and some lose 15 pounds, I don't know
15   which ones you are, but if you want to grab lunch, I can let
16   you grab a quick lunch now and come back here at 12:15.  By
17   that time we'll have made those corrections and things to the
18   charge and look at the charge to make sure there are no
19   typographical errors or anything like that.  Be ready to sum
20   up.  To do that, I will have you come back at 12:30, or if you
21   want, you can wait here, come back here at 12, and you can grab
22   a quicker lunch later.  Tell me what you want to do.
23           MR. KUNZ:  Option one, your Honor, I think makes the
24   most sense.
25           MR. MEEHAN:  Plaintiff agrees.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

834

DCDTGUZ3

```
 1              THE COURT:  So I will give you your lunch and come
 2    back here at let's say 12:15.
 3              MR. KUNZ:  Yes, your Honor.
 4              THE COURT:  See you then.
 5              (Pause)
 6              THE COURT:  Counsel, I want make sure the court
 7    reporter gets a chance to grab lunch.  Do counsel have any
 8    objection -- I want counsel to come back at 12:15.  I can just
 9    have my wonderful and talented clerk come up and given you a
10    copy of the jury instructions, and you can take that time and
11    read that, and then we'll come back on the record at 12:30.
12              Anybody have a problem with that?
13              MR. MEEHAN:  No problem.
14              MR. MODAFFERI:  No problem.
15              THE COURT:  Sounds good.
16              (Luncheon recess taken)
17              (Continued on next page)
18
19
20
21
22
23
24
25
```

835

DCD3GUZ4

```
 1                         AFTERNOON SESSION
 2                            12:30 p.m.
 3             THE COURT:  Do we need to wait for Mr. Norinsberg?
 4             MR. MEEHAN:  No, it's fine.
 5             THE COURT:  My law clerk is copying the instructions
 6    now.  I wanted the parties to know I've decided not to include
 7    any further break down of the damages section under
 8    compensatory damages for the excessive force claim.  And I've
 9    decided not to give a missing witness charge.  Okay?
10             So my clerk will be up here with the instructions and
11    everything else soon.  Look at those, and we'll be ready at
12    1 o'clock.  All right?
13             MR. MEEHAN:  Thanks so much.
14             (Recess)
15             THE COURT:  Has each side had the opportunity to look
16    at our revised instructions?
17             MR. MEEHAN:  I just want to go back to the special
18    interrogatories specifically number seven.  It just sounds like
19    a weird question.  I think we can say did Police Officer Jay
20    pepper spray else plaintiff, maybe go back to the original, like
21    while on the ground.  What was the original form of the
22    question?
23             THE COURT:  That was the original.
24             MR. MEEHAN:  While on the ground or did Officer Jay
25    grab plaintiff by the hair and pepper spray him.  It doesn't
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

836

DCD3GUZ4
```
 1    sound right I think.
 2              THE COURT:  It doesn't sound right in terms of what,
 3    the wording?
 4              MR. MEEHAN:  While he was on top of him.  I might just
 5    be nitpicking.  But did Police Officer Jay place the can of
 6    pepper spray on plaintiff's face?
 7              THE COURT:  I think there is no dispute that Officer
 8    Jay pepper sprayed the plaintiff.
 9              MR. MEEHAN:  There is no dispute.
10              THE COURT:  What is relevant in terms of qualified
11    immunity?  Some of the things that would be relevant is when
12    this is taking place, was it necessary for him to pepper spray
13    him.  Where was the plaintiff and what position was he in.
14              MR. MEEHAN:  So maybe if that's what we are looking
15    for, then I think did Police Officer Jay pepper spray plaintiff
16    while on the ground I think would help the Court determine the
17    qualified immunity argument.
18              THE COURT:  While who is on the ground?
19              MR. MEEHAN:  Did Officer Jay pepper spray plaintiff
20    while plaintiff was on the ground.
21              THE COURT:  That won't really give me anything in
22    terms of qualified immunity.  The fact that plaintiff is on the
23    ground, depending on what the plaintiff is doing, it still
24    might be appropriate to pepper spray him.  If Officer Jay was
25    on top of the plaintiff, I think your position would be it
```

837

DCD3GUZ4
 1  would be totally unnecessary for him to pepper spray him.
 2          MR. MEEHAN:  I agree with the Court.  So okay we will
 3  leave it as is.  I was just worried about the way it sounded.
 4  Never mind.  I have no problem.
 5          MR. MODAFFERI:  We have no problem with the charge.
 6          THE COURT:  And the verdict sheet is fine and the
 7  special interrogatories are fine?
 8          MR. MODAFFERI:  Yes.
 9          THE COURT:  Here's what I plan to do.  We'll have the
10  defendant sum up first.  And how short do you think your
11  summation will be?
12          MR. KUNZ:  After I went through it, we are looking at
13  45 minutes to an hour.
14          THE COURT:  And plaintiff?
15          MR. NORINSBERG:  Probably the same range.
16          THE COURT:  I want to make sure the jury stays
17  engaged.  After defendant's summation we'll take an eight
18  minute break, and then have plaintiff's counsel's summation,
19  have another eight minute break, and then I'll give them the
20  charge.
21          MR. NORINSBERG:  Makes a lot of sense.
22          MR. KUNZ:  That's fine.
23          THE COURT:  Before we start these summations, are
24  there any demonstrative aids that are going to be used that
25  need to be shown to the other side?  Is there any issue with

838

DCD3GUZ4
1   anything?
2           MR. KUNZ:  I'm using exhibits.  I am trying to get
3   this working.  Do you know how to turn this on?
4           MR. MEEHAN:  Yes.
5           THE COURT:  From plaintiff's perspective?  Are there
6   any demonstrative aids?
7           MR. NORINSBERG:  No, just things in evidence.
8           THE COURT:  Okay.  So we're ready to bring in the
9   jury.  We have the Elmo working.
10          MR. MEEHAN:  Elmo is working, your Honor.
11          THE COURT:  I gather that defense counsel is going to
12  be using the Elmo in summation?
13          MR. KUNZ:  Yes.
14          THE COURT:  Would either side have any objection to me
15  informing the jury when they come in they can sit appropriately
16  to make sure they can see the screen before the summation
17  starts?
18          MR. KUNZ:  Not at all, your Honor.  I think that makes
19  sense.
20          MR. NORINSBERG:  That's fine.
21          THE COURT:  Let's bring in the jury.
22          (Jury present)
23          THE COURT:  Let me just say to the members of the
24  jury, I believe counsel may be using the Elmo, the projector,
25  so you may want to sit in a position to start off with to make

839

DCD3GUZ4

1   sure you can see it.  Okay?
2            Everyone is in a position where they can see.  We're
3   about to have closing arguments.  I'll instruct you again,
4   closing arguments are not evidence.  This is the lawyers'
5   argument, this is the lawyers' view on what the evidence in
6   this case has shown.  We will start off with closing argument
7   by defense counsel.
8            MR. KUNZ:  Thank you, your Honor.  Good afternoon,
9   ladies and gentlemen.
10           When we started this trial, my colleague Mr. Modafferi
11  said that the evidence would show that this case is about the
12  plaintiff lying to get money.  And that's exactly what the
13  evidence has shown.
14           Now, right off the bat, plaintiff's story does not
15  make sense.  He wants you to believe that he was hailing a cab,
16  not in a fight.  That his friends were fighting, he was just
17  watching.  When the police officers came up and didn't go stop
18  the fight, they went and attacked him.  It does not make sense.
19           Then, the story of how Officer Jay supposedly kicked
20  him doesn't make sense.  The plaintiff says that as he's
21  standing there hailing a cab, Officer Jay came up behind him
22  and kicked him in the leg.  Well, he admitted something during
23  his testimony.  He admitted when he felt the kick he thought it
24  was someone he fighting with.  He thought it was someone from
25  the fight.  The reason he thought it was someone from the fight

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

840

DCD3GUZ4                    Summation - Mr. Kunz
1   is because he was in the fight.  He was fighting.  If he was
2   just standing there hailing a cab, he would have never thought
3   a person from the fight kicked him in the leg.
4           Then, there is another reason why his story doesn't
5   make sense.  When I asked the plaintiff, when the plaintiff was
6   asked during his examination -- sorry, during his deposition if
7   he remembered speaking to the EMT at the precinct, he said no.
8   I have no memory of speaking to the EMT at the precinct.  Then
9   he gets to this trial, and he remembers it.  Well, the reason
10  he remembers it at this trial is because he needs to come up
11  with some explanation for what the EMT wrote about the fight.
12  The EMT wrote very clearly plaintiff stated he was involved in
13  a fight.  So now we get here at this trial and he has to
14  explain that away.  So what does he do to explain it away.  He
15  does two different things.  First he says, well, Officer Jay
16  was there with me.  And I was scared of Officer Jay, so I
17  didn't tell the truth.  And then he says, no, actually, it
18  might have been some confusion.  The EMT didn't understand what
19  I was saying and just wrote it down wrong.
20          That's not what happened.  His statement wasn't
21  ambiguous.  The EMT was clear with you.  He wrote down
22  plaintiff states he was involved in a fight.  That's not an
23  ambiguous statement.  It is not confusing.
24          In regard to this idea that he was scared of Officer
25  Jay, he told you that just an hour later he asked Officer Jay
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

841

DCD3GUZ4                    Summation - Mr. Kunz

1    for a ride home.  He wasn't scared of Officer Jay.  And if he
2    was scared, he certainly wouldn't have asked him for a ride
3    home.
4            Another aspect of the story that doesn't make sense.
5    Plaintiff says that when he's on the ground, Officer Jay is on
6    top of him.  He says Officer Jay grabbed him by his hair,
7    pulled it back, and sprayed him in the face with mace.  Officer
8    Jay would have sprayed himself in the face with mace if that
9    was truthful.
10           When plaintiff is called on that, he's got to explain
11   that away.  What does he say?  He says okay, they put the mace
12   right up against my face.  Right up against my face.  There is
13   no reference in any medical documents, not the EMT that saw him
14   20 minutes later, not in the emergency room, there is no
15   reference at all about an injury from having been hit with
16   pepper spray at point blank range.
17           We all know this is pepper spray.  Officer Jay
18   explained.  This pepper spray would shoot for 15 feet.  If this
19   was against his face when he was sprayed, there would have been
20   a mark and it would have been noted in the paperwork.  It
21   wasn't and the reason it wasn't is because plaintiff is not
22   telling the truth about how it happened.
23           Another aspect of the case that doesn't make sense is
24   this neck injury.  You all saw the photograph, right.  He's got
25   a red line along the side of his neck.  Again, at his

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCD3GUZ4                    Summation - Mr. Kunz

1    deposition I asked him where did this injury come from.  What
2    does he tell me?  I don't know.  I'm not sure.  I don't
3    remember how it happened.  But I know it happened that night.
4    Then he comes to this trial and all of a sudden he's got an
5    explanation for it.  Why?  Because if he doesn't have an
6    explanation for it, we've caught him in a lie.  So what does he
7    say?  He says it was my scarf.  Come on, ladies and gentlemen,
8    you saw that mark.  That mark isn't a scarf burn.  He got that
9    injury when he was fighting.  But he has to blame it on Officer
10   Jay or else you'll realize his story doesn't make sense.
11               I want to show you a photograph that came into
12   evidence here.  This is the plaintiff in the clothes he was
13   wearing that night leaving the hospital.  And there is no
14   scarf.  Where is the scarf that caused the injury if that's how
15   it happened?
16               Another aspect that doesn't make sense.  Plaintiff
17   states when he got to the precinct, he was right before the
18   desk, his pedigree information was taken, they asked him
19   questions about who he was and what his address was.  And he
20   didn't tell anyone that he was just brutally attacked,
21   supposedly brutally attacked by Officer Jay?  Officer Jay was
22   at the precinct, yes, granted.  But so were many, many other
23   police officers.  So was Officer Jay's supervisor.  So was the
24   head of precinct.
25               If this actually happened, if plaintiff was actually

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

843

DCD3GUZ4                    Summation - Mr. Kunz

1    kicked in the leg, he would have told someone that that's what
2    happened.  But he didn't.  And the reason he didn't is because
3    he didn't make up the story until later.
4           Another aspect that doesn't make sense.  Plaintiff
5    comes in here and tells you that when he was at the precinct,
6    his pain was -- was so bad, his pain at the precinct was so bad
7    that he was crying.  His leg really hurt.
8           But you saw the report from the EMT.  You heard the
9    EMT explain that when he asked the plaintiff what is your pain,
10   zero of 10, plaintiff says two.  It doesn't make sense if he
11   had been kicked in his leg so bad that it tore three ligaments
12   and caused nerve injury, his pain wouldn't have been two out of
13   10.  Plaintiff's story does not make sense.
14          Plaintiff says at his deposition that the person who
15   kicked him was not wearing glasses.  He was clear on that.  The
16   person who kicked him was not wearing glasses.  Officer Jay
17   wears glasses.  He always wears glasses.
18          The reason that plaintiff gets these little details
19   wrong is because he's making the story up, ladies and
20   gentlemen.  Officer Jay is not the person who kicked him.  But
21   you know who probably didn't wear glasses?  The person that
22   plaintiff was fighting with.  The person that actually injured
23   plaintiff that night.
24          Another aspect that doesn't make sense.  When
25   plaintiff leaves the precinct, he calls his own ambulance.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ4                    Summation - Mr. Kunz
1   Right.  He does this because after he's been sitting in the
2   precinct for a period of time, he comes up with this story.
3   And he realizes that if the story is going to be believable, he
4   needs to have some medical records.  But he had already told
5   the first EMT what actually happened.  He had already said to
6   the EMT I was involved in a fight.  So, now he goes outside the
7   precinct and he calls this new ambulance.
8            If the plaintiff wasn't concocting the story, if the
9   plaintiff actually needed the medical -- wanted to go to the
10  hospital, he would have gone with the first EMT.  He wouldn't
11  have waited until he left the precinct.  It doesn't make sense.
12           Then, the medical treatment medical form.  The
13  plaintiff wants you to believe the medical treatment of
14  prisoner form was blank when he signed it.  You don't sign a
15  blank form.  Officer Jay is going to strongarm the plaintiff
16  into signing this blank form.  It doesn't make any sense.
17           And the other aspect about it is that plaintiff says
18  he signed this blank form, but that blank form says the exact
19  same thing as the ambulance call report.  So, on the ambulance
20  call report that's filled out 20 minutes after the incident, I
21  was involved in a fight and that's when I was injured.  On the
22  medical treatment of prisoner form, the plaintiff was involved
23  in a fight and he was injured before he was arrested.  These
24  are the exact same statements.  So Officer Jay allegedly made
25  up a statement that plaintiff admits is on the ambulance call

DCD3GUZ4                  Summation - Mr. Kunz
1   report?  Plaintiff's story does not make sense.
2           Then, he says as he's leaving the precinct, he asks
3   Officer Jay for a ride home.  This is the officer who he claims
4   maliciously kicked him for no reason.  He's so terrified of
5   Officer Jay that he has to lie to the EMT who sees him at the
6   precinct.  And he is so scared of Officer Jay because Officer
7   Jay forced him to sign this blank document, and then he turns
8   around and he says I want to get into a car with this guy by
9   myself and have him drive me home?  Out of all the police
10  officers at the precinct, out of everyone he could have asked
11  for a ride home at the precinct, he says he asked Officer Jay.
12          The reason it doesn't make sense is that's not what
13  happened.  The plaintiff knew that he had been in a fight that
14  night and that's how he was injured.
15          But the biggest part of this case, the biggest part of
16  plaintiff's case that doesn't make any sense is his total lack
17  of witnesses.  Not a single person, none of his friends that he
18  was out with that night, none of the hundred people that were
19  in the crowd, no one came in here to support plaintiff's claim
20  that he was not fighting, and that he was kicked by Officer
21  Jay.  Come on.  If that happened in a crowd full of people,
22  someone would have come in here and told you it.  But nobody
23  did.  And the reason plaintiff did not bring anyone here to
24  tell you that is because that's not what happened.  He couldn't
25  bring anyone to come in because there is no one that would be

846
DCD3GUZ4                    Summation - Mr. Kunz
1    able to say that.
2              I could go on all day about how plaintiff's story
3    doesn't add up because there is so much of it that doesn't make
4    sense.  But I only have so much time.  So, I want to talk a
5    little bit about the plaintiff's credibility.
6              The first thing we have to keep in mind is that the
7    plaintiff has a major incentive to lie to you.  He wants to get
8    money.  If he doesn't lie to you and tell you that Officer Jay
9    did this, you're not going to give him money.  That's the first
10   thing.
11             The second thing is that we already know that
12   plaintiff has given inaccurate statements about his condition.
13   You heard him admit that in May of 2009, a few months after the
14   incident, he filed for disability.  He told disability I'm
15   100 percent disabled.  I cannot work.  Then, just a few months
16   later he tells unemployment I am not disabled and I can work.
17   Those two statements cannot both be true.  You cannot both be
18   disabled and not disabled.  You cannot both be ready and
19   willing and able to work, and not ready and willing and able to
20   work.  We already know plaintiff has made inaccurate and false
21   statements about his condition.
22             Another lie that we've caught the plaintiff in is this
23   idea that Officer Jay said NYPD motherfucker.  But we know
24   that's not what he said.  Officer Jay and Sergeant McHugh were
25   both crystal clear on this.  That's not how police officers
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

847

DCD3GUZ4                    Summation - Mr. Kunz
1   talk.  NYPD motherfucker barely identifies who you are, and
2   doesn't give the person you are talking to any direction about
3   what you want them to do.
4          What do officers say?  They say police, don't move.
5   That's what Officer Jay said he said.  That's what Sergeant
6   McHugh said they always say.  And you know who else said that?
7   Alberto Molina.  His memory wasn't great, but Alberto Molina
8   did specifically recall that what the police said was police,
9   don't move.  This idea NYPD motherf'er, that's what they say in
10  the movies, ladies and gentlemen.  That's not what happens in
11  real life.
12         The reason he makes something like that up is because
13  this is a fiction.  This doesn't happen.
14         Another lie.  Plaintiff says in his deposition, he's
15  asked at his deposition what were you drinking that night.  He
16  say two or three beers, you know, I wasn't that drunk.  The
17  reason he said that is because he wanted to make himself look
18  good.  Right.  He didn't want to be portrayed as drunk.  He
19  just had a few beers.  I was fine.  But then he realizes no one
20  is going to believe that he is at a club until 4 a.m.  They
21  close the place down.  It is a special event.  A friend is in
22  town.  All the old group is getting back together.  No one is
23  going to believe he only had beers when everyone else admits
24  they were drinking mixed drinks.  And he comes in here and says
25  I admit I was drinking mixed drinks.  But, we already caught

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ4                        Summation - Mr. Kunz

1   him in that lie.  He already gave the false testimony at his
2   deposition.
3            Then he made a similar lie about how many times he had
4   been to the Red Lounge.  He says at his deposition I've only
5   ever been to the Red Lounge -- this is the only time I've been
6   there.  This is my first time there.  But, again, he realizes
7   that no one is going to believe that.  So what does he say on
8   the stand?  He says no, I've been there a few times before.
9            He's changing his story, ladies and gentlemen, because
10  he wants to come across as more believable.  But we caught him
11  in those false statements, and they show that plaintiff's story
12  is a fiction.
13           So, what did really happen that night?  Well, let's
14  put the timeline together.  Here is what we do know.  The
15  plaintiff was out partying at a club.  He was out with school
16  friends.  It is a special occasion because a friend was in from
17  out of town and they all go out together.  Henry is there, Jose
18  Ramon is there, Jose Sierra is there, Jonathan is there.
19  Plaintiff's group of high school friends is all going out
20  together.  Remember none of these people, none of these old
21  friends showed up at this trial.  But, the plaintiff told us
22  that the whole group is out drinking and partying all night.
23  They closed down the bar.  They leave at 4 a.m.  The plaintiff
24  is drunk and so is everybody else.
25           And they're outside the Red Lounge and it is a

DCD3GUZ4                    Summation - Mr. Kunz

1    crowded, chaotic scene.  The bouncers are telling people to
2    leave and a fight breaks out.  Who started the fight?  You
3    know, plaintiff blames Alberto Molina and his friends.  Alberto
4    Molina blames the plaintiff and his friends.  But it doesn't
5    matter who started the fight.  What matters is there was a
6    fight and plaintiff was in it.
7              He wants you to believe that when they leave the bar,
8    he is standing there trying to hail a cab, and just feet away
9    from him are his friends from high school, his old buddies he's
10   been partying with all night.  And they're fighting but he's
11   just standing there hailing a cab.  Come on.  Doesn't make
12   sense.
13             Even before the fight broke out, it was a chaotic
14   scene.  Hundreds of people had left the club, like I said
15   before, the bouncers were pushing people and tell them to move
16   on.
17             Now that the fight breaks out, it gets even more
18   chaotic as the crowd starts to move around the fight.  So, what
19   happens.  The police show up.  And he sees this fight in full
20   swing.  Now, this wasn't a 911 call about a fight about to
21   break out.  This wasn't like the bouncers saw the fight was
22   about to happen and they called the police.  The police came
23   upon the fight and plaintiff has suggested that the officers
24   were there and they watched the fight start.  That doesn't make
25   any sense.  Because if the police were just driving by and

850
DCD3GUZ4                    Summation - Mr. Kunz
1   there was no fight, they wouldn't have stopped.  Why would they
2   have stopped if the fight hadn't broken out.
3           When they got there, the fight was in full swing, and
4   you heard them explain.  There was a large confrontation going
5   on.  There was multiple victims on the ground.  There were
6   people punching and kicking.  That's why the police stopped,
7   because they saw that happening.
8           So, what do the police officers do.  They go and stop
9   the fight.  This is an anticrime unit.  You heard the officers
10  explain their job is to focus on violent street-level crime.
11  That's what was happening.  There was a violent, street-level
12  fight happening.  So these officers did their job.  They went
13  to break it up.  Officer Diaz and Officer Jay, they went to
14  help one victim, stop one fight.  Sergeant McHugh, Officer
15  Walters, they went to help another victim to stop another
16  fight.
17          So, just think about that action.  Think about what
18  Officer Jay did.  He comes up to a fight that's in progress.
19  He sees a guy being beaten on the ground with punches and
20  kicks.  He runs to that fight.  Of course he runs to that
21  fight.  He is trying to help this man.  The idea that he would
22  not help this man and just attack a random person in the crowd,
23  who is trying to hail a cab.  That doesn't make sense.
24          And Officer Diaz came and explained that's exactly
25  what happened.  Officer Diaz said I was driving, so I was the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

851

DCD3GUZ4                        Summation - Mr. Kunz

1    last one out of the car.  And when I got out of the car, I saw
2    Officer Jay was already heading towards the fight and he is my
3    partner so I went with him.  What did they do?  They were
4    arresting someone.  They grabbed one of the assailants from the
5    fight.  They had him on the ground and they were handcuffing
6    him.  Officer Walters and Sergeant McHugh, that's the exact
7    same thing they did.  They went to the other fight.  They each
8    got a person themselves and they were handcuffing those people.
9            And then what does the plaintiff do?  The plaintiff
10   comes up behind Officer Jay and he tries to pull Officer Jay
11   off the person that he's handcuffing.  So, that right there,
12   ladies and gentlemen, that's a crime.  That's called
13   obstruction of governmental administration.  Officer Jay was
14   performing the lawful police duty of handcuffing someone who
15   was just assaulting another man, and the plaintiff interfered
16   in that activity.  It is also disorderly conduct because he was
17   engaging in a fight when the plaintiff went up to Officer Jay
18   and pulled him off or had his fist raised in the air, that was
19   disorderly conduct.
20           So right now the very first thing that the plaintiff
21   did to Officer Jay is two possible crimes.  So what does
22   Officer Jay do. Officer Jay uses reasonable force to apprehend
23   the plaintiff.  The first force that he uses, the first force
24   was the pepper spray.
25           So think about it.  He is on his knees, his partner is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ4                        Summation - Mr. Kunz

1     on his knees as well, and they're struggling with the guy who
2     has just been engaged in a fight to get him handcuffed.  It is
3     a chaotic scene.  There is a crowd around him.  They're
4     concerned for their safety.  Officer Jay is concerned for the
5     safety of his partner.  And all of a sudden, he feels and he
6     hears and he senses someone running up behind him, feels him
7     grab him and try to pull him off the man on the ground.  When
8     he looks up, it is not another police officer coming to his
9     assistance.  It is the plaintiff trying to interfere with
10    Officer Jay's police activities with his hand raised.  So
11    Officer Jay applies a spray of pepper spray.  That was a
12    reasonable decision to end the plaintiff's aggressive behavior.
13    Officer Jay didn't punch him.  He didn't kick him at that
14    point.  He didn't hit him with a hard object.  He used a short
15    blast of pepper spray.  That is a reasonable use of force.
16             So what does the plaintiff do?  The plaintiff tries to
17    flee.  He flees because now he realizes he just grabbed a cop.
18    And he knows that you can't grab a cop.  He knows it is against
19    the law to grab and pull a cop off someone who is conducting an
20    arrest.  So he tries to run.  He doesn't make it very far,
21    because he was injured in a fight.
22             Officer Jay explains how he apprehended the plaintiff.
23    He put him in a bear hug.  He used his body weight to pull him
24    to the ground.  This is not excessive force.  This is
25    reasonable force to apprehend a suspect who just tried to pull

853

DCD3GUZ4                         Summation - Mr. Kunz

1   a police officer off a suspect and take him to the ground.
2          That's it.  That's the extent of the force.  That's
3   the force that Officer Jay used to arrest the plaintiff.  The
4   brief spray of pepper spray, using the body weight to pull him
5   to the ground.  That is not excessive force.
6          So then, Officer Jay picks the plaintiff up, and they
7   walk over to a police car to bring the plaintiff to the
8   precinct.  But what happens before they go to the precinct?  He
9   goes up to his boss, his sergeant, Sergeant McHugh.  And
10  Sergeant McHugh didn't see what happened.  Sergeant McHugh and
11  Officer Walters were arresting two different people.  So,
12  Sergeant McHugh says to Officer Jay what happened.  Why did you
13  arrest this guy.  And Officer Jay explains.  He tried to pull
14  me off the other guy that Officer Diaz has, and I pepper
15  sprayed him and then I grabbed him and I arrested him.  And the
16  sergeant says, all right, bring him in.
17         This is seconds after it happened.  Seconds after it
18  happened.  And Officer Jay says the exact same thing to
19  Sergeant McHugh that he said today and that he put in his
20  paperwork and he has said throughout.  He tells the truth.
21         Now plaintiff is going to want you to believe that
22  Officer Jay made up this whole story in the few seconds it took
23  him to pick the plaintiff up and walk over to his boss?  It
24  doesn't make sense.  The statement that Sergeant McHugh told
25  you about was the truth.  The plaintiff tried to pull Officer

854

DCD3GUZ4                     Summation - Mr. Kunz

1    Jay off the man being arrested, and that's a crime.
2           Look at the timeline.  Look at the timing of this.
3    The arrest is at 4:09 in the morning.  They are at the police
4    station by 4:19.  At 4:20 they call emergency medical
5    technicians.  This isn't a cover up.  You don't cover up
6    something by calling an ambulance a minute after you get to the
7    precinct.  This is the plaintiff coming in front of the desk
8    and telling the desk sergeant my leg hurts.  Do you want
9    medical attention?  Yes, I do.  Okay.  Call an ambulance.
10          The EMTs get there they are at 4:23.  Just 20 minutes
11   after this incident happened, he is talking to the EMTs.  He
12   tells them the truth.  I was involved in a fight.  I got hurt.
13   He didn't say Officer Jay kicked me.
14          So then EMTs leave at 5:26 in the morning.  Take a
15   look at the ambulance call report.  5:56 in the morning EMTs
16   leave.  5:45 in the morning Officer Jay has the plaintiff sign
17   the medical treatment to prisoner form.  So at this point the
18   plaintiff has not had time to concoct his story.  Right.  He
19   gets arrested, he's brought to the precinct, he's seen EMTs,
20   then he's signing some paperwork for Officer Jay.  He hasn't
21   had time to make up this story, and that's why he's telling the
22   truth throughout this time.  That's why he's telling everyone
23   he was involved in a fight before he was arrested.
24          Now at 5:45 Officer Jay explains that everyone is in
25   the cells and Officer Jay sits down to do his paperwork.  It is

855

DCD3GUZ4                      Summation - Mr. Kunz

1   while Officer Jay is doing the paperwork, and before 8:05 in
2   the morning, when plaintiff gets released.  This is when he
3   starts to make up his story.  He starts to realize he can get
4   some money out of this if he blames everything on the police
5   officer.
6           That's exactly what he does.  He starts to assemble
7   the pieces he needs to make this work.  The first thing he
8   needs is medical documentation.  He's already told one EMT the
9   truth, that he was involved in a fight.  Now he needs to go to
10  the hospital and tell a different story.  He does that.  As
11  he's leaving the precinct, he calls the ambulance.
12          What is the next thing he needs.  He needs some
13  photographs.  So I'll show you this one again.  This is him
14  leaving the station.  You can see here there is the person who
15  is taking photograph and then there is this person taking a
16  photograph as well.  Plaintiff is already lining this case up
17  so he has proof.  He has something to show you to support his
18  claims.  He's already thinking about this lawsuit as he's
19  leaving the emergency room.
20          I want to go back for a second.  And Officer Jay
21  explain to you, right, that the plaintiff pulled Officer Jay
22  off the man he was arresting.  So you've got to be asking
23  yourself, why would a person like the plaintiff go up and grab
24  a police officer.  Well, the explanation is simple.  He didn't
25  know he was a police officer.  Right?  These are plainclothed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ4                    Summation - Mr. Kunz

1   officers.  Plaintiff is behind him so he doesn't see the shield
2   hanging off Officer Jay's neck.  All he sees is someone he
3   doesn't know.  Not one of his friends, and this person is on
4   top of another man on the ground.  So what does he think?  He
5   thinks this is someone that I'm fighting against.  This is
6   another combatant in the fight.  So that's why he goes up to
7   Officer Jay.
8          And as soon as he realizes that it is a police
9   officer, that it is not another person fighting, that's when he
10  starts to flee.
11         Plaintiff's now got his medical documents, he's got a
12  photograph of himself leaving the precinct.  And he is starting
13  to put the pieces together.  Now what does he need.  He needs a
14  lawyer and he needs a doctor.  So he goes and talks to a
15  lawyer, and the first lawyer he talks to refers him to
16  Mr. Norinsberg.  All right.  So now he's got his lawyer.
17         How does he end up with Dr. Dassa?  We've heard two
18  different stories about how he ends up with Dr. Dassa and
19  plaintiff says they're both true.  But plaintiff says he talks
20  to a friend and a friend's mother refers him to Dr. Dassa.  And
21  then he says at a different time, no, it was his first lawyer
22  that I spoke to, he sent me to Dr. Dassa.  That's a pretty big
23  coincidence, right?  That a friend's mother and this other
24  lawyer both send him to Dr. Dassa.  But fine, he ends up with
25  Dr. Dassa as his expert.

857

DCD3GUZ4                    Summation - Mr. Kunz

1          So now he's got all the pieces together, right.  He's
2    got medical documents, he's got a photograph, he's got his
3    hand-picked lawyer, he's got his hand-picked specialist, whose
4    specialty is hand surgery, by the way.  He's got all these
5    pieces together.
6          But what is the problem?  What is the problem of
7    plaintiff's case?  The problem is that the burden in this case
8    is the plaintiff's.  It is the plaintiff that needs to show
9    that his rights were violated.  But he can't do that and he
10   can't do that because he doesn't have any witnesses.  Again,
11   nobody, not a single person out of all of his friends that were
12   there, out of all the 100 people that were on the street that
13   night, nobody comes in here to tell you that he wasn't
14   fighting?  And that he didn't kick someone?
15         The one person who did come in, who was subpoenaed by
16   me to be here, Alberto Molina.  It was clear Alberto Molina did
17   not want to be here.  He's pissed at the cops; he's pissed at
18   the plaintiff.  He didn't want to be here.  But he came because
19   he was subpoenaed to be here.
20         What did he tell you?  He told you the truth.  When I
21   asked him if the person he was fighting with was in this
22   courtroom, he said I don't see him.  You know why he didn't see
23   him, ladies and gentlemen?  Because the plaintiff looks totally
24   different today than he does that night.  Totally different.
25   The plaintiff has cut his hair.  He's wearing the suit.  He
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

858

DCD3GUZ4                    Summation - Mr. Kunz
1   looks totally different.  Alberto Molina knows what the
2   plaintiff looks like when he's fighting.  In this photograph.
3   This is what the plaintiff looks like when he's fighting.
4   Alberto Molina does not know what the plaintiff looks like when
5   he comes into a trial to testify.
6            But what did Alberto Molina do?  Alberto Molina looked
7   at his photograph and said, yes, that's that guy who was
8   fighting that night.  That guy outside the club got into an
9   argument with my friends.  That guy, the plaintiff, after the
10  argument, got into a taxi, drove a short distance, jumped out
11  of the taxi, and came at me and my friends and a fight started.
12           Now, again, Alberto Molina's memory was not perfect,
13  but he explained to you why his memory was not perfect.  He
14  said his memory today is 50 percent.
15           MR. NORINSBERG:  Objection.
16           MR. KUNZ:  He said that my memory is about 50 percent
17  today.  Then I asked him how good was your memory before, and
18  he said my memory was a lot stronger before.  So that's why he
19  doesn't remember.  That's why he wasn't able to pick the
20  plaintiff out in the courtroom.  His memory isn't as good.  The
21  incident was five years ago.
22           But, the one thing that Molina was clear on, is that
23  the man in this photograph fought that night, and that fact
24  right there puts the lie to plaintiff's claims, because
25  plaintiff says he wasn't fighting.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

859

DCD3GUZ4                    Summation - Mr. Kunz

1           Now, another reason, and I've mentioned this before,
2    but the biggest reason that plaintiff cannot meet his burden is
3    that nobody, nobody came in here to support his story.  Not a
4    single person.  Not Henry, not Jonathan, not Jose Ramon, not
5    Jose Sierra.  None of his friends from high school came in
6    here.
7           So, plaintiff can't meet his burden, so what does he
8    do?  He makes his case through distraction and confusion.  So,
9    let's talk about some of the ways that he tried to distract you
10   from what actually happened that night.
11          The first is the order of witnesses.  Right.  The
12   plaintiff called the officers first.  If his case was so
13   strong, he takes the stand first.  He comes in here and he
14   tells you in clear and concise terms this is what happened to
15   me.  But he didn't do that.  He wanted to make this as
16   confusing as possible.  And the way he did that is by calling
17   the officers first, and then confusing their testimony and
18   calling this in the most confusing way possible.  So that's the
19   first distraction.  He's muddying waters to try to get it so
20   you guys can't see the truth.
21          What is the next way he distracts you?  It is the way
22   they asked questions.  You saw the way he questioned the
23   officers.  He took something that happened in seconds, right,
24   it takes just a few seconds for the plaintiff to come up to
25   Officer Jay, pull him off, Officer Jay chase him, bring him to

860

DCD3GUZ4                    Summation - Mr. Kunz

1    the ground.  That's a few seconds.  And they break that down
2    and they ask every single police officer, did you see this
3    happen to Officer Jay, did you see that happen to Officer Jay.
4    You see that happen to Officer Jay.  And every single officer
5    explained to you, no, I didn't see that.  I was arresting
6    somebody else.  But he still continues to harp on that point.
7    The reason he does it is because he wants to distract you from
8    the truth.  He wants to distract you from what actually
9    happened that night.
10         Next thing he does to distract you is they come up
11   with this idea that there is just one fight.  Right.  Well, we
12   know that's not true.  You saw the sprint report, the record of
13   the police officer radio traffic that night.  What does it say.
14   It first says six under from location.  But then there is a
15   correction.  Correction.  Four under from location.  Other two
16   victims.  Two victims, two fights.  It is exactly what the
17   police officers told you.  It is exactly what happened.
18   Sergeant McHugh and Officer Walters went to one fight.  Officer
19   Diaz and Officer Jay went to the other fight.  Four under; two
20   victims.
21         What else does he do to distract you?  Plaintiff's
22   counsel makes a big deal of the fact that Officer Jay says he
23   was aware of the plaintiff running up behind him.  And how
24   could you possibly be aware he was running up behind you?  He
25   was behind you, you couldn't see him.  Come on, ladies and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

861

DCD3GUZ4                    Summation - Mr. Kunz

1   gentlemen.  You know if someone's coming up behind you.  You
2   hear the footsteps.  You sense it in your peripheral vision.
3   Especially if you're on your knees surrounded by a crowd.  You
4   maintain awareness of what's going on around you.  This idea
5   that he couldn't possibly have done that, just another
6   distraction.
7        What else does he do to confuse you.  He confuses you
8   with the paperwork.  He tries to suggest, well, Officer Jay
9   didn't write the word grab on the arrest report.  Didn't write
10  it on the arrest report, therefore he never grabbed you.  I had
11  to get up and I had to show you the paperwork.  And I had to
12  show you that Officer Jay clearly wrote that the plaintiff was
13  under arrest for obstruction of governmental administration.
14  That's the grabbing, ladies and gentlemen.  That is when the
15  plaintiff grabbed Officer Jay.
16       What is the next distraction with the arrest
17  paperwork.  The arrest paperwork doesn't mention anything about
18  the fact that plaintiff was threatening Officer Jay with his
19  clenched fist.  Yes, it does.  I had to point it out.  Physical
20  force.  Threatened.  That's the plaintiff raising his fist in
21  the air as he's pulling Officer Jay off of the other man being
22  arrested.
23       What force did Officer Jay use?  "You didn't use the
24  chemical agent to prevent the escape."  Well, you heard Officer
25  Jay explain.  He used physical force, yes.  He used chemical

862

DCD3GUZ4                    Summation - Mr. Kunz
1   agent, yes.  And he prevented escape when he grabbed the
2   plaintiff in the bear hug and took him to the ground.  To
3   suggest otherwise is a distraction.
4          Then he shows you the criminal complaint.  He says oh,
5   Officer Jay, the criminal complaint says that you grabbed his
6   shirt, but he was wearing a jacket that night.  Ah-ha.  Come
7   on, ladies and gentlemen.  A shirt, a jacket?  It is exactly
8   what the plaintiff did.  The plaintiff went up to Officer Jay,
9   and grabbed him, and pulled him off.  Quibbling over whether it
10  was a shirt or a jacket is a distraction.
11         Another way he tries to distract you, right, he comes
12  up with this idea that Dr. Carbajal, the emergency room doctor
13  who is not an orthopedic expert, didn't diagnose the plaintiff
14  with the foot drop and that wasn't something he was looking at.
15  But, you know what Dr. Carbajal did do?  Dr. Carbajal asked the
16  plaintiff do you have numbness or weakness.  Do you feel
17  numbness or weakness, and the plaintiff said no.  So fine,
18  Dr. Carbajal isn't an expert in orthopedics, but Dr. Gidumal
19  is, and Dr. Gidumal knows that if you had been injured so bad
20  that it hurt your nerve, you are going to have weakness and you
21  are going to have numbness.
22         Another distraction.  You are going to hear a little
23  bit about this when the judge instructs you on the law, but one
24  of the biggest distractions in this case is this idea that
25  Dr. Gidumal didn't review the actual MRI film until after he
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

863

DCD3GUZ4                    Summation - Mr. Kunz

1   had issued his first and second report.  After he was deposed.
2   But you are going to hear the Court explain that it was the
3   plaintiff's obligation to provide these medical documents.  And
4   the plaintiff did not provide these medical documents until the
5   Friday before trial.  Last Friday.  A week ago is when these
6   documents were provided.  So for them for him to suggest that
7   Dr. Gidumal should have looked at them is a distraction.  And
8   moreover, Dr. Gidumal explains to you he saw the reports of the
9   MRI, the reports prepared by a specially trained radiologist.
10  And he had those when he wrote his reports and he had those
11  when he did his deposition.  And after he looked at the film,
12  you know what?  He agreed with the radiologist.  He says the
13  radiologist got it right.  Another distraction.
14          Another distraction about the medical documents is the
15  plaintiff's expert Dr. Dassa.  You heard questions about this,
16  but plaintiff's original expert in this case was Dr. Ehrlich,
17  right.  Dr. Ehrlich was the man who Dr. Dassa sent the
18  plaintiff to because it was a knee injury and Dr. Dassa is a
19  hand specialist.  So Dr. Dassa sent the plaintiff to a knee
20  specialist, Dr. Ehrlich.  Dr. Ehrlich was hired by the
21  plaintiffs to be his expert in this case.  Dr. Ehrlich prepared
22  a report about the injuries.  Where is Dr. Ehrlich?
23  Dr. Ehrlich didn't testify.  The man who was supposed to be the
24  counter to Dr. Gidumal, the other knee specialist, didn't come
25  in.  The hand specialist came in to testify.  Another

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

864

DCD3GUZ4                    Summation - Mr. Kunz

1    distraction.
2            Beyond distractions and beyond the plaintiff's
3    credibility, we also know that the plaintiff's medical
4    documents show that he's not being truthful to you about his
5    medical condition.  Plaintiff says all of my problems, all
6    three torn ligaments, the nerve, it all happened that night,
7    everything, it all happened that night.  Well, he admitted on
8    cross-examination that he had fallen before.  He admitted that.
9    And Dr. Dassa told you that plaintiff never even mentioned to
10   him that he had fallen.  So, you also heard Dr. Gidumal and
11   Dr. Dassa explain that if the plaintiff had had three ligament
12   tears in his knee that night, his knee would have been
13   incredibly unstable.  Any doctor, any doctor worth his salt,
14   worth his medical degree, would have been able to diagnose
15   three ligament tears.  But Dr. Dassa missed it in visit after
16   visit after visit.  Dr. Dassa put his hands on the plaintiff's
17   knee and did these tests, the ACL test, the PCL test, the LCL
18   test, and he missed the ligament tears time and time again?
19           The reason that Dr. Dassa missed the PCL tear and the
20   LCL tear is because they weren't there.  Those ligaments were
21   not torn on the night of February 14, 2009.  They were torn
22   months later, probably when the plaintiff fell.  And the ACL,
23   the ACL was a preexisting injury.  The radiologist wrote in the
24   report from just three and a half months after the incident it
25   was a chronic tear.  A chronic tear, medical definition is six

865

DCD3GUZ4                    Summation - Mr. Kunz

1   months or older.  So if the tear is chronic as of May 2009,
2   that means that the tear happened in December 2008 or earlier.
3   Dr. Gidumal said it could have been years earlier, because
4   people can live with a torn ACL.
5          The medical documents show that plaintiff is not being
6   truthful with you about when the ligaments were torn.  And they
7   also show he's not being truthful to you about the foot drop.
8   So, everyone admits that the foot drop was not present in the
9   first exam, it wasn't present in the second exam.  Dr. Gidumal
10  explains that five or six weeks after the fact, there is a
11  doctor who notes that the foot drop might be present.  Well,
12  they try to explain this away by saying, oh, the nerve injury
13  actually gets worse over time, not better.  That's not how it
14  works.  Dr. Gidumal explained to you.  When you get injured it
15  doesn't get worse over time, it heals.  So this idea that his
16  knee was hurt that night, and it didn't show up for weeks until
17  after the fact doesn't make sense.  Something else happened to
18  cause the foot drop.
19         Dr. Dassa says to you I tell the plaintiff in each of
20  my exams to come back every four weeks and to go do physical
21  therapy.  We know that plaintiff did not go back every four
22  weeks before Dr. Dassa admitted that.  It was often months
23  between the exams.  And the plaintiff says that he went to
24  physical therapy, but where are the records of the physical
25  therapy?  No physical therapy records at all were admitted in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ4                    Summation - Mr. Kunz

1    this case.  And Dr. Dassa admits that he has no idea if the
2    plaintiff actually went to physical therapy.
3            But, the biggest admission that the plaintiff made,
4    ladies and gentlemen, the biggest admission was that he fell.
5    He says he fell only once.  But even if it was only one fall,
6    that's what Dr. Gidumal was talking about.  That's what
7    Dr. Gidumal was seeing in the medical records.  When you look
8    at the medical records, it doesn't match up that all this
9    happened on February 14, 2009.  There had to have been
10   something else, and the plaintiff told you what it was.  He
11   fell.
12           Another aspect of the story that doesn't make sense,
13   as Dr. Gidumal explained to you, is how the actual injury
14   allegedly happened.  He says I'm kicked, I'm standing there
15   hailing a cab, and I'm kicked on the outside of my leg.
16   Dr. Gidumal explained to you that if you're kicked on the
17   outside of your leg, it doesn't cause a tear on the ligament
18   that got hit.  That just bends.  It causes the tear on the
19   opposite side of the knee, which stretches and snaps.
20   Plaintiff never had a tear on the inside of his knee.  He had
21   the tear on the outside of his knee.  That shows this did not
22   happen how plaintiff says.
23           So, the point is, ladies and gentlemen, is that the
24   plaintiff is not credible.  The medical documents show that
25   he's not being truthful to you about his medical condition.

867

DCD3GUZ4                     Summation - Mr. Kunz

1              So let's talk about the officers.  So the plaintiff
2     spent the first two days of this trial doing his best to muddy
3     the waters about the officers.  How did he do that.  Well, he
4     tried to make really big deal out of this idea that there were
5     minor inconsistencies in the statements of the officers.  In
6     the statements the officers made six months after the incident
7     with the statements they made at their deposition years later.
8     And that somehow these minor inconsistencies are a big deal.
9     But, the differences were slight, and it is not at all
10    surprising there was differences in stories.
11             The one thing that was consistent throughout all of
12    the testimony of the officers, throughout their testimony six
13    months after the incident, throughout their testimony at the
14    deposition, and their testimony here today, you know what was
15    consistent in all that?  The plaintiff pulled Officer Jay off
16    someone he was arresting.  The plaintiff started the incident
17    and Officer Jay arrested him.  There was never any confusion
18    about that.
19             He also tries to make a big deal out of small
20    differences in the officers' memory of what happened that
21    night.  He says Officer Jay testified that it might have been
22    Officer Walters who helped him handcuff the plaintiff.  But
23    Officer Walters says, no, no, it wasn't me, I was over at the
24    other fight arresting my guy.  Officer Jay tells you it might
25    have been when the plaintiff grabbed me, he might have also
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

868

DCD3GUZ4                          Summation - Mr. Kunz

1   grabbed Officer Diaz.  Officer Diaz says, no, I don't really
2   think that the plaintiff grabbed me.
3            Come on, ladies and gentlemen.  This was a chaotic
4   scene with 100 people standing around.  And I guarantee you ask
5   all 100 of those people what happened, and you are going to get
6   slightly different stories about what happened that night.  But
7   again, one thing that was consistent throughout was what the
8   plaintiff did.
9            In fact, I bet in six months from now or four years
10  from now, if someone were to ask each of you what happened in
11  this trial, you would all have different perspectives on what
12  happened.  But you know the one thing you all will remember?
13  The defense verdict for Officer Jay.
14           You are going to hear the judge explain when he
15  instructs you on the law that when you are assessing the
16  credibility of a witness, you can keep in mind that sometimes
17  people forget things.  And you need to consider, therefore,
18  whether the witness's testimony is an innocent lapse of memory
19  or an intentional falsehood.
20           Ladies and gentlemen, the minor inconsistencies about
21  the stories were not intentional falsehoods.  They were just
22  that minor inconsistencies.  The fact that officers remember
23  these small details differently does not change the fact about
24  what they all agree upon.  That the plaintiff committed the
25  crime of obstruction of governmental administration when he

869

DCD3GUZ4                    Summation - Mr. Kunz
1   tried to pull Officer Jay off a man he was arresting.
2           If you compare the incredibleness of plaintiff's
3   story, the absurdity of the idea that a police officer would
4   randomly attack someone who is trying to hail a cab, if you
5   compare that with the story of Officer Jay, what Officer Jay
6   told you about what happened.  Officer Jay has been on the
7   police force for 18 years.  He was a military medic.  He spent
8   seven years giving people medical attention.  He's in an
9   anticrime unit that focuses on violent street-level crimes.
10  When he comes upon this scene, he sees a man being beaten,
11  being assaulted.  So he goes to give assistance to that person.
12  He goes to stop the fight.  And the idea that he would randomly
13  attack someone in the crowd is just absurd.
14          So, in a little while, after the closing statements
15  are done, you are going to go into the jury room and you are
16  going to deliberate.  And you are going to be given the verdict
17  sheet.  The verdict sheet will have some questions on it, and
18  you are going to answer those questions and that's going to
19  guide you through your deliberations.
20          Now, the first question you are going to be asked is,
21  has defendant Police Officer Brian Jay proven by a
22  preponderance of the evidence that there was probable cause to
23  arrest Noel Jackson Guzman on February 14, 2009.  The answer to
24  that question is yes.  Yes, we have proven that there was
25  probable cause to arrest the plaintiff.  That probable cause is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

870

DCD3GUZ4                     Summation - Mr. Kunz

1   when the plaintiff tried to pull Officer Jay off of the man he
2   was arresting.  That's obstruction of governmental
3   administration.  It was also, as I mentioned before, it was
4   also disorderly conduct.  It was engaging in violent tumultuous
5   behavior.  So the answer to the first question is yes.
6           Then you are going to be asked in regard to the
7   excessive force, has the plaintiff proven by a preponderance of
8   the evidence that defendant Police Officer Jay used excessive
9   force against him.  The answer to that question is no.  The
10  plaintiff has not proven that Officer Jay used excessive force
11  against him.  We know the force that was used.  It was
12  reasonable force.  It was the brief pepper spray to get the
13  plaintiff off of him.  It was the grabbing him in the bear hug
14  and using his weight to pull him to the ground.  That is
15  reasonable force to place a suspect under arrest.  So the
16  answer to the question in regard to excessive force is no.
17  Plaintiff has not proven his case.
18          This is my last opportunity to talk to you, ladies and
19  gentlemen.  When I'm done, plaintiff's attorney is going to get
20  up and he's going to give his statement.  And then you are
21  going to be instructed on the law by the judge, and you'll go
22  and do your deliberations.  So as you listen, as you listen to
23  the plaintiff's closing statement, and as you deliberate,
24  remember the only person who testified in this trial for
25  plaintiff was the plaintiff.  None of his friends came in.  No

871
DCD3GUZ4                      Summation - Mr. Kunz
1    one who was in the crowd came in.  No one supports his story
2    other than himself.
3              Thank you for your time.
4              THE COURT:  Members of the jury, we are going to take
5    a brief break, and then we'll have the summation from
6    plaintiff's counsel.  Let's take an eight minute break.  So
7    let's be back here at 2:05.  Thanks.
8              (Jury excused)
9              (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

872

DCDTGUZ5                    Summation - Mr. Norinsberg
1                (Jury not present)
2                THE COURT:  One small thing on page 16, we had added
3        the preposition "to," five years prior to the incident.  We
4        didn't have the "to" there, so we made that correction.
5                (Jury present)
6                THE COURT:  Good afternoon, because of the glare you
7        may want to move over so you can avoid the glare, four to the
8        left, the first four, and four on the back, it should be fine.
9                Now we're going to have summations by counsel, by
10       defense counsel and then plaintiff's counsel.  Remember, as I
11       told you in beginning, summations are not evidence, it's just
12       argument.
13               Go ahead.
14               MR. NORINSBERG:  Good afternoon, folks.
15               Before we begin, I just wanted to thank you, not just
16       for your time that you gave us this week but for really taking
17       this job so seriously.  We see how you're paying attention and
18       taking notes.  I think when we see that, we understand that you
19       get it, you understand how important this case is to us, and
20       we're counting on you to review the evidence and get to the
21       right results.
22               They say a trial is like a jigsaw puzzle, and it's
23       certainly true.  I know in this trial there are a lot of pieces
24       out there.  Some of them might be crystal clear and others may
25       be spread out over the floor and may be unclear.  The way I see
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCDTGUZ5                    Summation - Mr. Norinsberg
1    my job is to walk through the evidence with you, organize it,
2    put it back in a logical structure, present it back to you, and
3    you decide as jurors.  So the way we're going to do it is work
4    through the evidence and then put it back and you'll decide.
5          Now before we actually start talking about evidence, I
6    think it's important to frame the issue.  What does this case
7    really come down to?  Really one central issue.  Did Mr. Guzman
8    get his injuries from a fight, as defendants say, or did he get
9    it from being kicked by Officer Jay?  That is what this entire
10   case really comes down to.
11         Now I understand when you talk you may speculate about
12   any other possibilities, but your job, your sworn duty as
13   jurors is to look at the evidence.  The evidence in this case
14   allows only those two possibilities, if you think about it, and
15   that's why, when I do my discussion with you now, that's going
16   to be the framework that I'm using as we're going through it,
17   to see what makes sense, what actually happened here.
18         Now I want to go back to the beginning of this trial
19   when we made opening statements.  And this is what the defense
20   attorney told you, he told you, "Plaintiff got hurt from
21   fighting with Alberto Molina and Jorge Henriavez."  They said
22   that not just that he was in a fight, this is how he hurt
23   himself, fighting these two people.  And just in case it wasn't
24   clear, they said it again, "Now you're going learn that
25   plaintiff was not only was in the fight, but started the fight.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

874

DCDTGUZ5                    Summation - Mr. Norinsberg

1  You're going to learn that from Alberto Molina because he was
2  there."  So that was a key part of what their defense was going
3  to be in this case, he was in a fight and Alberto Molina was
4  going to be witness to tie plaintiff to that fight.
5            Well, you heard from Alberto Molina.  This was going
6  to be the star witness who was going to come in and who was
7  going to help Officer Jay get off the hook.  Think about this
8  witness.  You saw him up there.  What did you think?  Did you
9  find him to be a credible witness?  Did you find him to be an
10  honest, trustworthy witness, a reliable witness?  This guy
11  comes into this courtroom and actually tells you that he's the
12  victim.  He's comes in, he's a guy who tells you that he lost
13  count of how many times he's been arrested for assault, he's
14  lost count how many times he's been in street fights, and he's
15  telling you he's the victim.
16            What does he come in here and tell you?  He comes in
17  here and tells you nothing.  You saw the man sitting there ten
18  feet way from my client.  I mean they literally couldn't be
19  facing each other more, ten feet way from each other, and this
20  is the evidence that the defense wants you to rely on.
21            And then we learn more.  What do we learn about
22  Mr. Molina?  We learn the night before his deposition he is
23  smoking a gram of marijuana, drinking a half bottle of vodka,
24  he comes in there, and then in his deposition his original
25  story is hey, I'm the one that fought with the light-skinned

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

875

DCDTGUZ5                    Summation - Mr. Norinsberg
1   guy.  Then he sees a picture of the plaintiff, and all the
2   sudden the story changes, come to think of it, I didn't fight
3   with the light-skinned guy, I fought with the dark-skinned guy.
4           Really?  Why is it that the story changes like that in
5   the middle of a deposition?  Because it's not true.  It's not
6   true.  More important thing, though, the logic.  And so much
7   when I'm talking now I'm asking you to use logic and common
8   sense.  Think about what the defendants are saying.  On the one
9   hand they want you to believe that Mr. Guzman was fighting with
10  Alberto Molina, he's having a fight.  On the other hand at the
11  same time somehow he's grabbing Officer Jay from behind.  You
12  can't be in two places at the same time.  How is it possible
13  that he could be in a fight with Mr. Molina and with Henriavez
14  and at the same time he's coming at Officer Jay?  It's
15  illogical, doesn't make sense.
16          But more importantly, Officer Jay himself got up there
17  and said there's a two-on-one fight.  Two on one.  That was one
18  of the very first points that we covered during
19  cross-examination.  Two on one.  And that's the defendant in
20  this case, he's saying it's two on one.  Why does the defense
21  team put a witness on to say no, it's actually two on two?
22  Basically, they're saying you should believe Officer Jay for
23  anything he talks about with Mr. Guzman except for the fight
24  part.  When you get to the fight part, don't believe our own
25  client, don't believe Officer Jay, believe Mr. Molina.  Doesn't

876

DCDTGUZ5                    Summation - Mr. Norinsberg

1   make sense.
2           But one thing else, ladies and gentlemen, and this is
3   the most important thing, they want to talk about here who is
4   and who is not here, where is Mr. Henriviaz?  Why do they bring
5   the person who wasn't involved in the fight?  Why wouldn't they
6   bring the person that they're claiming my client was fighting
7   with?  You want to show he's in a fight?  Bring this man to
8   court, have him come in here and actually prove it.  Instead
9   what they do is bring in the other person who is not involved
10  in the fight who is down on the ground.  The whole thing makes
11  no sense.
12          And if you step back for a moment -- and this is what
13  I would like you to do, is logically think about this.  Here's
14  a police officer who arrested this man for assaulting the man
15  on the ground, Mr. Guzman's friend, and charged him with
16  assault, and now they're bringing the same guy in who was
17  supposedly beating someone like a rag doll to come in and help
18  the police officer get off of this case.  Doesn't make sense.
19          Now I want to -- so we're in the category of --
20  remember I talked about at the beginning our framework, talking
21  about what evidence is there to support a fight?  Let's talk
22  about another thing, medical evidence.  What does the medical
23  evidence show?  Does the medical evidence support the claim
24  that Mr. Guzman was in a fight?  No, there's nothing in the
25  hospital records about it.  There's nothing indicating that at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

877

DCDTGUZ5                    Summation - Mr. Norinsberg

1    all.  You would expect somebody in a fight to have bruises,
2    cuts, you got lacerations, you have got a black eye, you have
3    something that would show any neutral observer, anybody looking
4    at it would say OK, here's the evidence he's in the fight.
5    Look at the hospital records.  You can see it.  There's not one
6    word in there.  It's not just that they don't talk about a
7    fight, it's that there's no evidence of a fight.  He doesn't
8    have injuries that are consistent with a fight.
9         In fact, even though the one picture that we have in
10   evidence, let's look at this.  And we put this picture in, we
11   put this picture in just to show the contact, to show where his
12   head was at the point when he's down on the ground.  If you
13   will, look at -- unintentionally this becomes very strong
14   evidence that he wasn't in a fight.  Look at his eyes.  Look at
15   that.  Is there any black and blue mark, any swelling, any
16   bruising, anything that looks like a young man who was just in
17   a fight?  Everyone has seen it from time to time what someone
18   looks like when they're in a bar fight.  It's not there.
19        So you look in the medical evidence, nothing in there,
20   look at the photograph, yes, you see two discrete things,
21   nothing that looks look somebody who just got out of a fight.
22   But most telling of all, you have four police officers that
23   took the stand, not one single officer said that Mr. Guzman was
24   in a fight.  Not one.  So you have on the one hand Mr. Molina
25   coming in here claiming he's in a fight, but the police

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

878

DCDTGUZ5                    Summation - Mr. Norinsberg

1    officers who were actually testifying under oath in this case,
2    every single one of them said he's not involved in a fight.
3          So you put it all together, ladies and gentlemen, you
4    have no medical evidence, no photographic evidence, no police
5    officer saying it, you have a star witness for the defense that
6    has zero credibility, zero.  You put that all together, what
7    evidence is there?  That's the only thing that we come back to
8    over and over again.  What evidence is there that he was in a
9    fight besides them coming in here and telling you?  What
10   evidence?  Where is Mr. Henriviaz, the man he's supposedly
11   fighting with?
12         Now let's transition a little.  What did the police
13   officers have to say?  We know that Officer Jay says he didn't
14   kick the plaintiff, which I told you in my opening statement.
15   No great surprise there.  We knew that.  But that's fine.  But
16   that's fine.
17         So let's talk about what some of the other officers
18   said and then work into Officer Jay.  Now if Officer Jay didn't
19   actually kick Mr. Guzman, then the question becomes how exactly
20   did he get down to the ground?  It's a simple question.  It's a
21   very simple question, but it's a question not a single police
22   officer can answer apart from the defendant in this case.  None
23   of the other three officers have the answer for the very simple
24   question:  How did this man get down to the ground?  Officer
25   Diaz, I asked him what happened.  I mean just remember, if you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

879

DCDTGUZ5                    Summation - Mr. Norinsberg

1   will, ladies and gentlemen, Officer Diaz says Mr. Guzman is
2   within a hand's distance of where I am.  He's that close to me.
3           OK.  So you see Officer Jay kind of get up, right?
4   What happens next?  I don't know.  How did he get down to the
5   ground?  I don't know.  How did he get tackled?  I don't know.
6   I was looking down the whole time.  Remember that little story?
7   My sleeve, I was trying to cuff him for so long the sleeve got
8   caught, I didn't see anything.  Does anyone here believe that?
9   Does anyone in this courtroom believe that?
10          You have a man supposedly running up to your partner,
11  grabbing him pulling him so violently, cocking his fist back
12  about to punch him, getting maced and running away and this man
13  doesn't see anything?  Are you kidding me?  Who here is buying
14  that?  I want to know the first juror going back to the room to
15  deliberate saying I'm buying that.  I'm buying what they're
16  selling.  I believe that.  I believe it.
17          What is worse is this phony amnesia six months after
18  the incident.  He's in an interview by investigators, they
19  asked him simple questions.  You say you saw Mr. Guzman
20  approach.  Did he approach from the front or the back?  I don't
21  remember.  How did Officer Jay get him down to the ground?  I
22  don't remember.  How did Officer Jay handcuff him?  I don't
23  remember.
24          Are you buying this?  Is it that easy to get off the
25  hook, you can fake amnesia?  Of course he saw it.  He's

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

880

DCDTGUZ5                    Summation - Mr. Norinsberg

1   standing right there.  Everybody knows he saw it.  He's
2   standing there and he knows exactly what happened.  He's not
3   saying.
4           Let's go to the other officers.  What does officer
5   Walters have to say?  Essentially something like this:  Hey,
6   don't ask me, I was nowhere near there.  I was 50 to 75 feet
7   away.  I was a half a block away, I didn't see anything.
8           Put aside for the moment that Officer Jay and Noel
9   Guzman was there, how did he get that far away?  He told us he
10  got out of the car and in five seconds they were on the corner
11  and in 15 to 30 seconds they have handcuffed two men on the
12  corner, the Molina defendants, as you will see when we talk
13  about it.
14          How did he get that far away?  He wasn't a half a
15  block away, he's right there.  Sergeant McHugh, what does he
16  have to say?  Don't ask me.  There were two fights going on,
17  there wasn't just one fight.  Really?  It's funny, that's not
18  what you said in your deposition, sergeant, you never said
19  that.  Actually, you were asked a very specific question, the
20  question actually was, if you remember, folks, the question
21  started like this:  To be accurate, let's be accurate here, was
22  there more than one fight?  No, he saw one fight and one fight
23  only.
24          And then when my colleague impeached him, he said OK,
25  it was one fight, but it was a real big fight.  That's not what

DCDTGUZ5                    Summation - Mr. Norinsberg

1    you said in your deposition, sir.  You said it was a two-on-one
2    on the corner, one fight and one fight alone.
3            So my question to you folks, can they simply do this,
4    make this stuff up, pretend they don't know what happened, and
5    walk away without any consequences?
6            Now you have three officers.  And then the story, just
7    by the way, the last one, Sergeant McHugh -- I left out the
8    most important point, Sergeant McHugh saying there's two
9    fights.  There's only one problem, Officer Jay himself said
10   there is one fight.  Officer Jay put four police officers on
11   the corner at the same time at the same place in the center of
12   the crowd, all four at one point.  That was one of the very
13   first things when I cross-examined him was establishing from
14   the get go there are not two fights, there's one fight,
15   everybody is in the same place at the same time.
16           So why do you start hearing these stories of that?
17   Because there has to be some explanation as to why these
18   officers didn't see, which logic and common sense dictates they
19   should have seen, what explanation would there be for three
20   officers being on the same corner at the same time and not
21   seeing all of these things that Mr. Guzman supposedly is doing.
22   There is no explanation.  So the best thing to do is just kind
23   of move as far away as you can from the scene or come up with
24   an excuse.  You're so busy cuffing somebody you don't see, or
25   lie, change your deposition testimony, say it's actually two

```
DCDTGUZ5                    Summation - Mr. Norinsberg
 1   fights, that's why.  That's what is going on here.
 2           Now let's talk about what Officer Jay had to say.
 3   Let's put it like this, this entire story, the entire story
 4   from start to finish makes no sense.  But what I'm going to do
 5   now is focus on three key parts of this story.  You can almost
 6   say the beginning, the middle and the end.  But this sequence,
 7   these three things are critical to understanding how this man
 8   has lied.
 9           The first thing he says, the very first thing he says,
10   I asked him about Mr. Guzman running up to him at full speed.
11   And he forgot about that, he kind of forgot about that.  Guess
12   what, folks, that's why we had audiotape.  Is that your voice,
13   sir?  That's what you told investigators six months after this?
14   You said you saw this man with your own eyes running up to him
15   full speed.  That's what you said under oath, right?  And then:
16   Oh, yeah, that's my voice.  Yeah, I did say that.
17           So I asked him:  OK, do you stand by that testimony
18   now?  Is that what you saw, sir?  Yeah, I stand by that, that's
19   what I saw.  I knew I had an obligation to be honest with the
20   investigators and that's what I saw.
21           Really?  Funny, that's not what you said in your
22   deposition.  At your deposition you said that you never saw
23   this guy.  At your deposition you said he came up completely
24   from behind you and grabbed you and that's the first time you
25   saw him.  So which story is true?  Which story is true?  What
```

DCDTGUZ5                        Summation - Mr. Norinsberg

1    you told investigators or what you said in your federal court
2    deposition in this trial?  Which story is true?  Because they
3    can't both be true.
4              And why does the story keep changing and changing on
5    points like that?  You either saw somebody or you didn't see
6    him.  You know why?  It's very simple.  We know this in life,
7    when you tell the truth it's easy to remember the truth because
8    it happened.  You don't have to think about it, it's there,
9    it's at your hands.  Any time somebody asks you something, you
10   remember.  When you're lying and you start changing your story
11   and it goes on over a period of time, you forget the lie you
12   told.  That's what happened.  He forgot the original story he
13   told.
14             Then what does he tell you?  He's got peripheral
15   vision.  He can see things peripherally.  Really?  Last time I
16   checked, you can't see behind your head, I don't care how good
17   your peripheral vision is.  He made up a story and lied in this
18   courtroom.
19             Now that was the start.  The second part.  This second
20   part is the part where Mr. Guzman is supposedly running away.
21   You know, I didn't spend a lot of time on that in this trial,
22   but when you think about it, it's the key part of Officer Jay's
23   story.  I will tell you why.  Because when Mr. Guzman is
24   running away, this is Officer Jay's account, his only account
25   of how Mr. Guzman got down to the ground, and it's the only

884

DCDTGUZ5                    Summation - Mr. Norinsberg

1   police officer on the scene that gives any explanation as to
2   how he got down to the ground if he wasn't kicked is from
3   Officer Jay's story this guy was running away from him and he
4   chased after him and brought him down.
5          Now again, I want to talk about logic and looking at
6   evidence.  I want to show you the picture.  You heard first of
7   all from Dr. Dassa who explained to you there were no injuries
8   to the front of Mr. Guzman's leg.
9          Now if this story that Officer Jay is telling is true,
10  if he's tackled from behind and brought down to the ground,
11  wouldn't you expect some type of cuts or bruises or something
12  documenting?  There's nothing there.
13         Let's go back.  I wanted show you, it's in evidence,
14  this is the front.  Now this picture again is a picture that
15  was taken for one purpose, but as we're here at trial it takes
16  on a whole new meaning.  This picture was taken to demonstrate
17  the swelling around the leg.  But there's no injury.  If he
18  fell, he's running, he's running away from Officer Jay, he
19  falls down on to his knee, there's nothing there.  There's
20  nothing in the medical records that supports that claim.  Why?
21  Because it never happened.
22         The other point, similar, ladies and gentlemen, think
23  about this, Officer Jay himself, he claims that he tackled not
24  just one person, but two persons.  He was involved somehow with
25  Mr. Henriviaz, then he got my client, tackled him, he has no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ5                    Summation - Mr. Norinsberg

1   bruises or cuts either.  He had supposedly landed on his arm on
2   a concrete sidewalk, not one shred of evidence to back that up.
3   So I think this part of Officer Jay's story, the only version
4   of how he got to the ground, this fantastic tale of him running
5   away doesn't add up, doesn't make sense.  Medically it didn't
6   make sense with the pictures and is not consistent with Officer
7   Jay's testimony.
8            Now the third part that I want to talk about Officer
9   Jay's story, Officer Walters.  Officer Jay said to the
10  investigators, he told these investigators not that Officer
11  Walters might be there, that he was there.  Not just that he
12  was there, that he helped me, he actually assisted me because
13  Mr. Guzman was giving us a hard time being cuffed, and I took
14  one arm, he took the other arm.  Really?  That's news to
15  Officer Walters.  Officer Walters is not there, according to
16  his testimony.
17           So you have one officer, the defendant here, saying
18  that he has another police officer right next to him at the
19  moment when Mr. Guzman was down, and that police officer is
20  saying actually no, I was not there at all.  Somebody is not
21  telling the truth.  Who might that somebody be?  Officer
22  Walters is not a defendant in this case, Officer Jay is.
23           And we had to play that tape for him again of his own
24  audio because he forgot the story that he originally told.  But
25  it's a story.  He wanted to make sure that Officer Walters was

886

DCDTGUZ5                    Summation - Mr. Norinsberg
1    there to back him up.  The only problem was Officer Walters
2    wasn't playing ball.  He didn't back him up the way that
3    Officer Jay thought he would.
4            So at the end of the day, counsel is talking -- where
5    are the witnesses for the plaintiff?  What about the police
6    officers who are supposedly there?  Nobody is backing up
7    Officer Jay.  Not one person.
8            We've talked about the other officers not seeing how
9    Mr. Guzman got to the ground.  We just went through three
10   points of Officer Jay's testimony.  Now I would like to ask you
11   to focus on the paperwork for a minute.  What's really stunning
12   in this case with all the things that Mr. Guzman supposedly is
13   doing to this officer, there's not one word of this in the
14   reports, not one word about him grabbing a police officer, not
15   one word about violently pulling him back, not one word about
16   cocking his fist, not one word about grabbing his partner.
17           Using logic or common sense, don't you think -- forget
18   about where we are now, if somebody asked you, common sense
19   point of view, if a person comes up to a police officer and
20   does all these things, wouldn't that be the first thing, the
21   first thing you would see in the report?  Perpetrator came up
22   and grabbed officer and tried to hit me.  Wouldn't that be the
23   first thing?  How could that not be in the report?  How could
24   it not be there?
25           And then when you look at what is in the report,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

887

DCDTGUZ5                    Summation - Mr. Norinsberg

1   nothing is what it seems.  When it says prevent escape, that
2   doesn't really mean prevent escape.  When it says that there
3   was another person aiding Mr. Guzman, that doesn't really mean
4   there was another person aiding Mr. Guzman.  When it talks
5   about all of the things about how this happened, nothing means
6   what it says.  You get excuses.  Instead, you get excuses.
7         The DA saw this -- like when we talked about that
8   complaint that was just up here, when it says grab shirt,
9   meaning clearly from the front, even Officer Jay said that
10  that's the way you interpret that, no, that actually means from
11  the back.  So nothing means what it says, and then you get
12  excuses.  Hey, I didn't write that, it's the DA's office.  But
13  you read it, you read it carefully and you signed it under
14  penalty of perjury.
15        Hey, I didn't choose this term "prevent escape," it's
16  just a drop down menu.  OK, but there was a drop down menu for
17  overcoming resistance, which is what you claim happened, and
18  you're the one that chose this.  No explanation for these
19  things.  When the mistake -- this is a mistake we're going to
20  come back to because it turns out to be a very important clue
21  in this case with the aid of someone else.  You're going to see
22  it's something that takes on much greater significance than
23  when we were questioning, but what was the excuse on that?
24  Well, the report already left the precinct, it was already
25  done, there was nothing we could do to fix it.

888

DCDTGUZ5                         Summation - Mr. Norinsberg

1              Words that are written don't mean what they say and
2     the excuses and explanations come up.  For what?  And then you
3     get to just plain old common sense, your God given common
4     sense, and I will ask you, when you go back to deliberate more
5     than anything, yes, please follow the law, absolutely, listen
6     to the judge carefully on this, but also your common sense.  If
7     you use your common sense and you think logically and carefully
8     to all parts of this case, that will help you work through the
9     evidence.  And common sense, he does all of these things that
10    they're claiming and the officer gives him a DAT, a ticket?  He
11    comes up to an officer, grabs him, threatens to punch him,
12    grabs his partner.  Are you kidding me?  Who is buying that?  I
13    want to know who here is buying that?
14             If you run up to any New York police officer anywhere
15    in this city and you did that, you are going to have a nice
16    little time cooling your heels in Rikers Island.  You're not
17    getting a ticket.  Would any one of you ever dare even touch a
18    police officer, much less do that?  You think that officer is
19    just going to say sure, nice meeting you, Mr. Guzman, no
20    problem, go on your merry way?  Does that make sense logically?
21    It's impossible.
22             And the final thing, talking common sense, let's talk
23    about it from Mr. Guzman's perspective.  Why on earth would you
24    be attacking people who are helping your friends, your friends
25    on the ground?  The cops are actually restraining the people

889

DCDTGUZ5                    Summation - Mr. Norinsberg

1   who were beating the daylights out of him, the cops are
2   breaking it up, counsel gets up here and says he didn't know
3   they were handcuffed.  You have them in handcuffs, putting a
4   person's hands behind their back, what possible reason would
5   Mr. Guzman have for charging and attacking officers who were
6   helping his friend?  Doesn't make sense.
7            And that's the problem with all this.  Listen to their
8   summation.  I'm listening and writing as fast as I can because
9   there are so many things that are illogical.  When you think
10  carefully about it, it couldn't possibly be true.
11           So what really happened here?  I'll tell you what
12  happened.  It happened just like this, Mr. Guzman actually is
13  there and then there's a clue about why this officer came up
14  and did what he did.  There's a clue that he referred to
15  before.  Do you remember when I was asking the officer about
16  this aiding other people?  Do you remember that in that police
17  report?  He told us -- and I got to tell you, I didn't even
18  realize it at the time how important this is, but it makes
19  everything fit because it gives a logical explanation to why he
20  did what he did.  He said that in that police report he
21  believed originally that Mr. Guzman was connected somehow to
22  the Molina defendants.  That's what he said, and he later
23  clarified it.
24           You read it.  I don't know whether you can see it
25  here, we'll read it together, time and place of occurrence,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

890

DCDTGUZ5                    Summation - Mr. Norinsberg

1   defendant, with aid of other in custody, Mr. Molina.  He's got
2   it all wrong.  He made an assumption coming out of that car.
3   My client is standing three to four feet away, but he's not in
4   the fight.  And we know he's not in the fight because none of
5   the officers put him in the fight.  But he's close enough when
6   Officer Jay comes out of that car and goes there, McHugh and
7   Walters go to first two guys, Molina defendants, and he sees my
8   guy and kicks him down to the ground, and that's what happened.
9   That's exactly what happened.  He believed for that moment --
10  and his mistake was revealed in his paperwork, because even
11  when he got back to the precinct that's what he wrote:  With
12  the aid of someone else in custody.  That's what he wrote.
13          When you think about it logically, even as close as we
14  are in the case, as much as we work on it hours and hours and
15  hours, sometimes you just learn something and in an unexpected
16  way it makes things click.  So it's not just that he's in his
17  way, it's that he's actually thinking somehow it's guilt by
18  association.  But he didn't do anything, he is just standing
19  there, and this cop comes out there and he's got his adrenaline
20  pumping at four in the morning and charging out there and
21  that's why he kicked him.
22          And that's why, in the Harlem Hospital record, just
23  hours after this incident, it's clearly documented what
24  happened.  23-year-old man with no significant prior medical
25  history brought in by EMS with complaints pain to right leg

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ5                    Summation - Mr. Norinsberg

1   after he says he was kicked in the leg by police.  This is day
2   one.  This is a year and a half before this federal action.
3   This has a time frame on it right after the incident.  So to
4   deny being scheming, denying Mr. Guzman, I'm sure he was just
5   thinking about his lawsuit, you know what it says in there.
6   You can read it yourself, it says patient states he cannot walk
7   due to pain.  It's right in the record.  They document it.
8   They give them crutches for God's sake.  He had a splint by
9   EMS.  Obviously it's in there from the beginning.  That's what
10  happened.
11          You know, you didn't hear too much from defense
12  counsel on that.  They don't really want to talk about that,
13  all they want to do -- all the problems in the case can be
14  magically solved, instead of using logic and common sense, if
15  you're in the defense counsel you can wave it all away, all the
16  problems in the case by saying it's greed, it's money.  He
17  concocted this.  Any issue about that comes up, it's about the
18  plaintiff.  But in the end of day we know we have a good jury
19  in the sense that you're paying attention and want to get the
20  right thing done here.
21          And at the end of the day, you know, when you do broad
22  strokes like that you miss a lot of stuff in between.  For
23  example, when you just heard from Mr. Kunz and he got up here
24  and he told you, after we had this trial, he told you that the
25  medical treatment of prisoner form says the same thing as on

892

DCDTGUZ5                    Summation - Mr. Norinsberg

 1   the ambulance call report, no, it doesn't.  No, it doesn't at
 2   all.  There's not one word on there about a fight.  Why would
 3   he tell that you?  We have been trying this case for the whole
 4   week.  Because all you have to do is put an argument out there,
 5   broad brush strokes, hopefully the jury will bite on one or two
 6   things and won't think as carefully as you want them to, and
 7   then basically they can make problems disappear.
 8              And so what is the response by defense counsel to all
 9   of this?  The response is essentially like this:  It doesn't
10   matter if Officer Jay lied about how this incident happened to
11   investigators.  It doesn't matter if the other officers on the
12   scene fake amnesia or move themselves away.  It doesn't matter
13   if Officer Jay's story keeps changing over time.  It doesn't
14   matter if there's not one single word in any police record
15   supporting the claims that he's making and that the first time
16   it comes out is a month later.  That doesn't matter.  None of
17   that matters.
18              What matters is the plaintiff's statement that he made
19   to Officer Jay, that matters.  That's the medical treatment of
20   prisoner form we were talking about.  Prisoner had injury prior
21   to arrest.  Where did you get that from, Officer Jay?  Oh, I
22   had a conversation with Mr. Guzman.  Really?  It's funny,
23   that's not what you said in your deposition.  At your
24   deposition you said you did not have a conversation and that
25   this came from the sergeant.  He came in to the desk sergeant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

893

DCDTGUZ5                        Summation - Mr. Norinsberg

1   and complained about pain.  In fact, Officer Jay said the first
2   three lines he didn't even fill out.
3            But more importantly, the logic here.  Look, by the
4   way, as we see, there's not one word about him being in a
5   fight.  There's nothing.  As we look at this, you think about
6   this logically again, he is saying, according to this,
7   Mr. Guzman told him prisoner had injury prior to arrest.  Can
8   you imagine that?  I could imagine that conversation.  The
9   officer comes in, you saw him, he had quite a little difficulty
10  getting out some basic words and things here, but imagine this
11  conversation in the precinct, the officer comes by and sees
12  Mr. Guzman, and Mr. Guzman says my leg is hurting.  All right.
13  But Officer, don't worry about it, Officer, it's not your
14  fault, I had this leg injury before you arrested me.  Don't
15  worry about it.  Are you folks buying this?  Who is buying
16  this?  This is ridiculous.  Of course those aren't his words.
17           Now think about it though, again, from common sense,
18  let's look at it from a common sense standpoint.  On the one
19  hand Officer Jay is telling you, and he told investigators, he
20  is running full speed.  On the other hand he's telling you he's
21  injured prior to the arrest.  Which is it?  They can't both be
22  true.  If he had a leg injury, you see the condition he was in
23  after the hospital, this is documented.  It isn't us saying it.
24  Patient says he can't walk due to pain.  But we're to believe
25  the same patient was able to run up to him, and not just run up

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ5                    Summation - Mr. Norinsberg

 1    to him, then craftily, with great ability, run away from the
 2    police officer, ten feet away with mace in his eyes?  It's
 3    ridiculous.
 4            The defense in this case doesn't care about lies.
 5    Essentially the way the case has been tried is throw out as
 6    many possible things as you can to the jury and somebody will
 7    bite on it.  Keep throwing it against the wall, maybe one or
 8    two or jurors will bite on one thing, another two or three
 9    jurors will bite at another thing, and then we can get Officer
10    Jay off the hook because no one knows what happened.  But you
11    can figure out what happened if you look at the evidence in a
12    rational way looking at all the evidence.
13            Now the other thing, their other answer, the ambulance
14    call report from EMS.  And you saw, I had my moments in court,
15    maybe a little too aggressive for some people's taste, but
16    whatever.  I didn't attack the EMT.  I don't think he's
17    dishonest at all.  And he came in here and told us the best he
18    can.
19            But you have to take it with a grain of salt because
20    of two documents, Defendant's A and Defendant's B.  The one
21    thing they have in common is Officer Jay.  He prepared one
22    document and he signed the other.  And he's there when the
23    statement is made.  So right there you have to take that with a
24    grain of salt.
25            Then you have to factor in, look at the issues in this

```
DCDTGUZ5                    Summation - Mr. Norinsberg
 1   courtroom, even when we were questioning, he's our client we
 2   had difficulties trying to get him to understand or testify.
 3   But you know, really what was most telling, something that
 4   happened when Mr. Modafferi got up and he was cross-examining
 5   him.  And the first question he said, Mr. Modafferi says first
 6   thing, sir, you just admitted you were in a fight.  We're all
 7   shaking our heads.  Really?  No one heard that.  I don't doubt
 8   that he honestly thinks he heard that, but it illustrates how
 9   easily there can be something that is a miscommunication.
10            Now compare it to the record at Harlem Hospital a few
11   hours later where it notes in the record communication in
12   patient's primary language, Spanish.  That's the primary
13   language.  It does not say Spanish, but in his primary
14   language.  We know that's his primary language.  And all the
15   sudden Jay is nowhere to be found in the hospital, there's no
16   police officers, and someone is speaking to him in his native
17   tongue, and wouldn't you know it, in plain language, kicked by
18   police.  So as for you as jurors, I'm not saying to throw out
19   one thing or the other, I would look at it carefully.  Look at
20   both documents.  You have two documents that are made,
21   statements that are made within hours of each other.  Which
22   document is more believable and reliable knowing the
23   circumstances?
24            So we're transitioning now to -- I will talk to you
25   about some of the claims that have made to the defenses in this
```

896

DCDTGUZ5                    Summation - Mr. Norinsberg

1   case related to damages.  And essentially it's just picking up
2   where I left off because it's just one phony, false, dishonest
3   event after another.  For example, give you an example, the
4   foot drop condition.  Defense counsel would have you believe
5   that it's just a coincidence, it's a coincidence that on the
6   day of this incident, that on the day of this incident
7   Mr. Guzman is kicked right in the knee, and it just so happened
8   that right below the area of that knee there's a peroneal
9   nerve, and it just so happens the peroneal nerve is now
10  damaged, and the peroneal nerve is documented to be damaged
11  within five weeks after this incident.  It happens this took
12  place, but it has nothing to do with this incident, it's just a
13  coincidence.  Somehow four week later he developed this.
14          Who here is buying that?  Which juror is going to say
15  I believe that, that sounds credible.  Then to come in, with
16  audacity, talking about this man making up a story, you heard
17  from Dr. Dassa, just five weeks after this incident, what did
18  he tell you?  No ankle aversion, zero out of five -- no ankle
19  inversion, zero out of five, no dorsiflexion, zero out of five,
20  documented in a medical record within weeks after this.  But
21  listening to defense counsel, it has nothing to do with this
22  incident, it's a coincidence.  The doctor can't seem to figure
23  out what happened.  I said OK, sir, you can't figure it out,
24  you said was some time between February 17 and March 23rd of
25  2009, so it's sometime after the first three days of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ5                    Summation - Mr. Norinsberg

1  incident within the next month.  Right?  And he said yes.  I
2  said OK, so according to your logic, it can be February 18,
3  February 19, February 20.  No, that couldn't be.  You just told
4  us that could be.  That's what you told us.  It's ridiculous.
5          Then we brought out the fact that in the second
6  hospital visit just three days later, three days later he has
7  symptoms with decreased range of motion, decreased strength
8  obviously consistent with the onset of nerve damage, completely
9  consistent.  And I got the doctor to say that.  He first
10  started to fight me, but then he acknowledged at his deposition
11  he said yes, they're consistent.
12          Why are they playing this charade with you?  Why are
13  they trying to constantly move things around like a shell game
14  so you can't see what really happened?  It's clear as day if
15  you walk through the timeline, you look at the photographs, you
16  match up it with the medical records, and the most damning
17  record of all in terms of refuting this claim is the one from
18  Columbia Presbyterian Medical.  This is the one where it's
19  clearly documented foot drop.
20          Look what it says.  Dr. Gidumal can't figure out when
21  this happened.  Look what it says.
22              (Continued on next page)
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

898

DCD3GUZ6                    Summation - Mr. Norinsberg

1              MR. NORINSBERG:  It says he states it starts with
2    patient reports that he has right lower extremity pain below
3    the knee, associated with weakness and decreased sensation.  He
4    states that those symptoms have been present for one and a half
5    months.  Patient reports history of being kicked in the leg
6    before the onset of the symptoms.
7              What part of that is not clear?  What part is not
8    clear to Dr. Gidumal?  It puts the timeframe exactly, the onset
9    of the symptoms exactly when it happened.
10             Then we go from this phony defense that they have on
11   foot drop to now the other defense on the knee injury.  Once
12   again, we're in the world of remarkable coincidences.  The fact
13   that he showed up to New York Hospital three days later, his
14   entire lower leg was swollen, his knee was swollen, his ankle
15   was swollen, and his leg was swollen.  Defense counsel kept
16   saying what about that two, only two on the pain scale.  Do you
17   know what he didn't show you?  He didn't show you the three
18   days after that incident they did a pain scale measure.  Guess
19   what the pain number was?  Nine on a scale of 10.  What they
20   noted was severe pain.  This is Mr. Guzman concocting his
21   story.  Right?  Why didn't he tell you, just be honest, come up
22   here and tell you there is another record just a few days later
23   that talks about severe pain.  It is right there.  It is in
24   black and white.
25             But now the knee injury, this has nothing to do with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCD3GUZ6                    Summation - Mr. Norinsberg
1   this incident either.  But here Dr. Gidumal's been good, he is
2   giving us a multiple choice of options.  Let's see.  Part of
3   the knee injury came before.  Part of the knee injury came
4   after.  But no part of it is actually due to this incident,
5   even though it's documented over and over again that even he
6   had pain and swelling even months after this incident in his
7   knee, and of the MRI done in May 2009 confirms 100 percent he
8   had the tear.
9           Are you kidding me?  They just want to keep throwing
10  things out here and just somebody's going to bite on it.  All
11  Dr. Gidumal wants to talk about are tests that were done by
12  Dr. Dassa.  How about the tests that were done right after?
13  How about the tests that were done five weeks after?  What
14  about those tests?  What about the MRI?  Nobody disputes that
15  that MRI shows clearly an ACL tear.  Dr. Dassa showed you where
16  the PCL tear is.  He shows it.  He was not just saying it.  He
17  is not just looking at reports.  He is looking at a film and
18  making a clear diagnosis for you.
19          Just on that subject, we are getting to the end, we're
20  moving, I know it's been long.  This whole idea, what a phony
21  argument bring Dr. Ehrlich in.  Are you kidding me?  If we
22  brought Dr. Ehrlich in, the same lawyer would be getting up
23  here and saying where is Dr. Dassa?  He treated him for a year
24  and a half.  They don't bring Dr. Dassa, they bring in this
25  expert who has only seen him one time.

900

DCD3GUZ6                    Summation - Mr. Norinsberg

1              You saw Dr. Gidumal.  He had Dr. Ehrlich's report.  It
2      is the exact same thing.  There is no change.  The difference
3      is Dr. Ehrlich has a global understanding because he was the
4      point man.  He is the one referring the test.  He is the one
5      ordering the test and referring him to other people.
6              Now, I am sure all of you would have been really happy
7      if we took another day of your time bringing in another doctor
8      to go through the same stuff.  I'm pretty sure you wouldn't.  I
9      know it was exhausting and very tiring for you yesterday.  We
10     had a long day, all medical stuff.  I know it's boring in a lot
11     of ways, but that basically was accomplished through one
12     doctor.  So to start putting out these phony arguments about
13     who else should have been in here.  Give me a break.
14             The same thing with Mr. Guzman's friend.  If we
15     brought Mr. Guzman's friend in, what is the first argument?  Of
16     course he is going to say that.  That's his best friend.  Then
17     you don't bring him in, where is he.  These are just phony
18     arguments to distract you from what this case is about.
19             Some things have been established beyond any question.
20     He has a permanent injury.  There is no question.  It is not
21     going to ever get better.  For the rest of his life he has
22     permanent foot drop.  Their own defense expert confirmed to
23     this day he has instability in several planes in his knee.
24     That's beyond dispute.  The only real dispute is where it's
25     going in the future.

DCD3GUZ6                        Summation - Mr. Norinsberg

1              To me, when you look at the doctor explain it, the
2    writing is on the wall.  Obviously, he's going to have some
3    problems down the road because they're already started.  And he
4    has way too much in terms of changes in the joint for a man who
5    is 27.
6              But what happens?  Dr. Gidumal comes in.  Dr. Gidumal
7    is going to dispute that.  Wouldn't it be, again, just talking
8    about logic and common sense.  Wouldn't the logical thing be to
9    look at the X-ray day one, then look at the X-ray year five,
10   and make a comparison and say, you know what, what is different
11   and what is the same.  Does he do that?  No.  He just looks at
12   year five without ever looking at the first X-ray and comparing
13   it.
14             You don't have to be a doctor to know that's not the
15   way to do it.  It is a before and after picture.  This is day
16   one, this is year five.  What changes have taken place.  He
17   doesn't bother doing that.  You know why?  He is not too
18   interested in finding out stuff that may be hurtful for the
19   defendant.  This is a guy, he admitted, ladies and gentlemen,
20   and brought this out during cross-examination yesterday.  He
21   admitted that he made a conscious decision to leave out the
22   fact that there a permanency with a foot drop from his report
23   because it would not be helpful for the defendant.  That's what
24   he said.  Then when you understand why, the man is getting
25   paid, made 80 grand over the last two years after he shut down

902

DCD3GUZ6                    Summation - Mr. Norinsberg

 1   his office in 2012, his private office anyway, and he is coming
 2   to court and he's trying to do it.  He admitted to you, half of
 3   the cases he's testified in the last four years involve city
 4   employees.  Half of them.  So is it a great surprise somehow he
 5   is going to try to find something in the case he can give to
 6   the defendant to be helpful?  There is so much of it he can't
 7   even argue about, with the foot drop and the ligament damage.
 8   Can't even argue it.  All he can do is come up with some
 9   theories before, after, and the big thing is, oh, I don't see
10   the arthritis, I just see a little minor arthritis, maybe.
11         Do you believe that knowing this guy's background?
12   Knowing what he gets paid?  Do you actually believe that?  I'm
13   sorry, but you know, ladies and gentlemen, at the end of the
14   day, we respect medical professionals, no question about it.
15   But still, when you come into court, you have to tell it like
16   it is.  And to come into court and try to keep things out of
17   your report and don't put them in because it's not helpful to
18   the party that hired you, that's not the right thing.  All of
19   you know that.
20         So, ladies and gentlemen, this case just comes down to
21   some questions that you are going to get, the judge will give
22   you instructions.  As you heard right from the beginning, the
23   case has two key issues.  One issue is false arrest.  The other
24   issue is excessive force.  The order is you actually do the
25   false arrest first.

DCD3GUZ6                    Summation - Mr. Norinsberg
 1            Now, the thing that might strike you as unusual is
 2     that it is actually Officer Jay's burden to prove he had
 3     probable cause to arrest.  He has the burden.  So the first
 4     question is has defendant Police Officer Brian Jay proven by a
 5     preponderance of the evidence that there was probable cause to
 6     arrest plaintiff on November 14, 2009.  What that question
 7     really means, do you buy this man's story.  Do you believe the
 8     story that he came up with, with Mr. Guzman coming up to him,
 9     grabbing him, trying to punch him and run away.  If you buy
10     that story, then he's proven his case.  If you don't buy it,
11     because it makes no sense whatsoever, because no one else saw
12     it, because it is not written anywhere in any police report, if
13     you don't buy it, then the answer to that question should be
14     no.  He didn't prove it.  He proved nothing.  The only thing he
15     proved was an amazing ability to keep changing his story as
16     time goes on.
17            The next question talks about excessive force against
18     plaintiff.  Ladies and gentlemen, when you go back into that
19     jury room, if you do honor the pledges you made, which is to go
20     carefully, look at all the evidence, do it carefully,
21     logically, just like we did now, piece it together, there is no
22     question this man did it.  He did it.  He can make his claims,
23     he can come up with whatever stories he wants.  We told you at
24     the beginning your job isn't easy, it's hard.  If it was easy,
25     you wouldn't have to be here.  We wouldn't need a jury, we

904

DCD3GUZ6                    Summation - Mr. Norinsberg
1    could just figure it out on your own.
2             For five years this man has denied, denied, denied.
3    For five years he's shifted blame and pointed fingers.  For
4    five years he has been changing his story, refusing to accept
5    responsibility.  But what happened out on that street that
6    night was wrong.  It was wrong.  And this case at the end of
7    the day is about an officer who used force first and asked
8    questions later.  And that's what happened.  He went out of
9    that car.  He kicked him all right.  He went and kick him and
10   put him down.  And he's responsible.
11            Up to this time he has not been willing to own it.
12   But at this point in time, ladies and gentlemen, it is up to
13   you to apply the standard of law that this judge gives you
14   under the Constitution, which is what we're suing under, and
15   you will understand there is no question he used excessive
16   force.  The answer to that question is absolutely yes.
17            That, ladies and gentlemen, brings us back to where we
18   started at the beginning.  We brought the case very simply for
19   this reason.  This should never have happened.  You want to
20   talk to this guy if you think he might be involved in some way,
21   then do it.  But don't run up and kick someone and then figure
22   out whether or not he's involved back at the precinct.  Oh, he
23   actually wasn't aiding someone else in custody.  Sorry.
24            This case is about accountability and responsibility.
25   So I ask you, ladies and gentlemen, to hold this man
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCD3GUZ6                    Summation - Mr. Norinsberg
 1    accountable.  What happened on that street shouldn't have
 2    happened.  If you let this man walk out of this courtroom, if
 3    you let that happen, that will be a travesty.  He needs to be
 4    held accountable.  This is the last time, the last day in
 5    court.  I am asking you, please do the right thing in this
 6    case.  Thank you very much.
 7              THE COURT:  Okay.  Let's take another, call it another
 8    eight minute break.  We'll come back and I'll give you my
 9    instructions on the law.  Okay.
10              (Jury excused)
11              MR. MODAFFERI:  Before we break, we have two
12    objections that we just have to place on the record in light of
13    plaintiff's counsel's summation.  I didn't want to break the
14    flow as a courtesy.  But there were two things that were said
15    that were pretty disturbing.
16              The first is an aggressive tone when he intimidated
17    the jury, I want to know the first juror who is going to go
18    back in and buy this.  That's intimidating.  He said it in an
19    angry voice.  At the end he coupled that with if you let him
20    walk out of this courtroom, again, in an angry voice.  He's
21    threatening, he's intimidating the jury.  So again that's just
22    our objection.  Again, it goes to our long-running objection
23    regarding counsel's actions and it is another grounds for a
24    mistrial.
25              THE COURT:  That's overruled.  See you after the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

906

DCD3GUZ6
1   break.
2           (Recess)
3           THE COURT:  Just for the record, regarding defense
4   counsel's last objection about plaintiff's counsel's alleged
5   intimidating tone to the jury.  Obviously I was here for
6   plaintiff's counsel's summation.  I do not find that the tone
7   plaintiff counsel used was a tone of intimidation.  It appears
8   to me more of a tone of very intense supplication than
9   intimidation.  Let's bring the jury in.
10          (Jury present)
11          THE COURT:  Now I am going to give you the
12  instructions on the law.  It is very important that I read this
13  accurately, so forgive me in advance for not making any eye
14  contact with you.  I am going to give you a copy, a copy of
15  these instructions on law are going to be sent to the jury room
16  with you, so I know you're taking notes.  It is not necessary
17  to take notes on this because I will send a copy in there with
18  you.  Okay?
19          Role of the court.  You have now heard all the
20  evidence in this case.  At this point, it is my duty to
21  instruct you on the law that will govern your deliberations.
22  As I told you at the start of this case, it is your duty to
23  accept my instructions of law and apply them to the facts as
24  you determine them.  You must follow the law as I give it to
25  you, regardless of any opinion you may have about what the law

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

907

DCD3GUZ6                        Jury Charge

1  may be or ought to be.
2          If any attorney states a legal principle different
3  from any that I state to you in my instructions, it is my
4  instructions that you must follow.  You should not single out
5  any instruction, or any word or phrase in an instruction, as
6  alone stating the law; you should consider the instructions as
7  a whole.
8          Role of the jury.  As I have said, your role is to
9  decide the fact issues in this case.  You, the members of the
10  jury, are the sole and exclusive judges of the facts.  You
11  determine the weight of the evidence.  You appraise the
12  credibility of the witnesses.  You resolve such conflicts as
13  there may be in the testimony.  You draw whatever reasonable
14  inferences you decide to draw from the evidence or lack of
15  evidence.
16          In determining facts, you should rely on your
17  recollection of the evidence.  What the lawyers have said the
18  evidence shows in their opening statements, objections or
19  questions, or may say in their closing arguments, is not
20  evidence.  Nor is anything I may have said during the trial or
21  may say during these instructions to be taken as evidence.  If
22  there is any difference or contradiction between what any
23  lawyer has said and what you decide the evidence has shown, or
24  between anything I may have said and what you decide the
25  evidence has shown, please be mindful that it is your view of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

908

DCD3GUZ6                          Jury Charge
1    the evidence only that controls.
2                 Duty of impartiality.  You are to perform your duty of
3    finding the facts in this case in an atmosphere of complete
4    fairness and impartiality, without bias, prejudice, or sympathy
5    toward any party.  All parties stand as equals before the bar
6    of justice.  You are to deliberate coolly and calmly,
7    considering and weighing the evidence without emotion or regard
8    to the reaction the parties or the public may have to your
9    verdict.
10                Conduct of counsel.  It is the duty of the attorney
11   for each side of a case to object when the other side offers
12   testimony or other evidence that the attorney believes is not
13   properly admissible.  An attorney has the right and duty to ask
14   the Court to make rulings of law and to request conferences at
15   the side bar, out of the hearing of the jury.  All such
16   questions of law must be decided by me.  You should not show
17   any prejudice against any attorney or party because an attorney
18   objected to the admissibility of evidence, asked for a
19   conference out of the hearing of the jury, or asked me for a
20   ruling on the law.
21                Whether offered evidence is admissible is purely a
22   question of law in the province of the Court, and outside the
23   province of the jury.  In admitting evidence to which objection
24   has been made, the Court does not determine what weight should
25   be given to such evidence, nor does it pass on the credibility

909

DCD3GUZ6                    Jury Charge

1  of the evidence.  Of course, you will dismiss from your mind
2  completely any evidence which has been ruled out of the case by
3  the Court, and you will refrain from speculation or conjecture
4  or any guesswork about the nature or effect of any colloquy
5  between the Court and counsel held out of your hearing or
6  sight.
7          I also ask you to draw no inference from my rulings or
8  from the fact that upon occasion I may have asked questions of
9  certain witnesses.  My rulings were no more than applications
10 of the law, and my questions, if any, were only intended for
11 clarification or to expedite matters.  I have no opinion
12 concerning the verdict you should render in this case.
13         Evidentiary matters.  What is or is not evidence.  The
14 evidence from which you are to decide the facts in this case
15 consists only of:
16         One, the sworn testimony of witnesses on both direct
17 and cross-examination, regardless of who called the witness;
18         Two, the exhibits that were received in evidence; and
19         Three, any facts to which all the lawyers have agreed
20 or stipulated.
21         Nothing else is evidence; not what the lawyers say,
22 not what I say, and not anything you may have heard outside the
23 courtroom.
24         Direct and circumstantial evidence.  There are two
25 types of evidence which you may use in reaching your verdict --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ6                    Jury Charge

1    direct evidence and circumstantial evidence.  Direct evidence
2    is when a witness testifies about something that the witness
3    knows by virtue of his own senses, something the witness has
4    seen, touched, heard or tasted.  Direct evidence may also be in
5    the form of an exhibit admitted into evidence where the fact to
6    be proven is its present existence or condition.
7             Circumstantial evidence is evidence which tends to
8    prove a disputed fact by proof of other facts.  For example,
9    assume that when you came into the courthouse this morning the
10   sun was shining.  Assume the courtroom blinds were drawn and
11   you could not look outside.  As you were sitting here, someone
12   walked in with an umbrella which was dripping wet.  Then a few
13   minutes later, another person entered with a wet umbrella.  On
14   these facts you cannot look outside of the courtroom to see
15   whether it is raining, so you have no direct evidence of that
16   fact.  But on the combination of facts that I have asked you to
17   assume, it would be reasonable and logical for you to conclude
18   that it has been raining.  That is all there is to
19   circumstantial evidence.  Using your reason, experience, and
20   common sense, you infer from established facts the existence or
21   non-existence of some other fact.
22            The law makes no distinction between direct and
23   circumstantial evidence.  Circumstantial evidence is of no less
24   value than direct evidence.  You can consider either or both
25   and give them as much or as little weight as you deem

911

DCD3GUZ6                    Jury Charge
1    warranted.
2           Inferences.  In their closing arguments, the attorneys
3    may ask you to infer from one or more facts the existence of
4    some other fact.  An inference is not a suspicion or a guess.
5    It is a logical conclusion that you, the jury, are permitted to
6    draw, but not required to draw, from the facts that have been
7    established by either direct or circumstantial evidence, using
8    your reason, experience, and common sense.
9           There are times when different inferences may be drawn
10   from facts, whether proved by direct or circumstantial
11   evidence.  The plaintiff may ask you to draw one set of
12   inferences, while the defendant may ask you to draw another.
13   It is for you, and you alone, to decide what inferences, if
14   any, you will draw.
15          Witnesses.  Witness testimony.  A question put to a
16   witness is not evidence.  Only a witness's answers are
17   evidence.  However, you may not consider any answer that I
18   directed you to disregard or struck from the record or to which
19   I sustained an objection.  At times, a statement may have been
20   incorporated into a question which assumed certain facts to be
21   true, and a witness may have been asked if the statement was
22   true.  If the witness denied the truth of the statement, and if
23   there is no evidence in the record proving that assumed fact to
24   be true, then you may not consider it to be true simply because
25   it was contained in the question posed to the witness.

DCD3GUZ6                    Jury Charge
1  Similarly, if a hypothetical question was asked based upon
2  certain assumed facts, it is for you to determine, based upon
3  the evidence in the case, whether those assumed facts are true.
4  You may not consider them to be true simply because they were
5  contained in a question posed to a witness.
6          Witness credibility.  You have had the opportunity to
7  observe or hear from the witnesses.  It is now your job to
8  decide how believable each witness was in his testimony.  You
9  are the sole judges of the credibility of each witness and the
10 importance of each witness's testimony.
11         How do you determine where the truth rests?  You
12 should use all the tests for truthfulness that you would use in
13 determining matters of importance to you in your every day
14 life.  You should consider any bias or hostility the witness
15 may have shown for or against any party, as well as any
16 interest the witness has in the outcome of the case.  It is
17 your duty to consider whether the witness has permitted any
18 such bias or hostility to color or affect his testimony.
19         You should consider:
20         One, the opportunity the witness had to see, hear and
21 know the things about which he testified;
22         Two, the accuracy of the witness's memory;
23         Three, the witness's candor or lack of candor;
24         Four, the witness's intelligence;
25         Five, the reasonableness and probability of the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCD3GUZ6                     Jury Charge
1   witness's testimony; and
2           Six, the consistency and corroboration of the
3   witness's testimony with other believable testimony.
4           You watched each witness testify.  Everything a
5   witness said or did on the witness stand counts in your
6   determination.  Often it is not what a witness says but how the
7   witness says it that counts.  How did the witness impress you?
8   Did the witness appear to be frank, forthright and candid or
9   evasive and edgy as if hiding something?  What was the
10  witness's demeanor?  What was the witness's behavior, bearing,
11  manner, and appearance while testifying?  These are examples of
12  the kinds of common sense questions you should ask yourselves
13  in deciding whether a witness is truthful.
14          In other words, what you must try to do in deciding
15  credibility is to size a witness up in light of the witness's
16  demeanor, the explanations given, and all the other evidence in
17  the case.  Always remember you should use your common sense,
18  your good judgment, and your own life experience in determining
19  witness credibility.
20          In deciding whether to believe a witness, keep in mind
21  that people sometimes forget things.  You need to consider,
22  therefore, whether the witness's testimony reflects an innocent
23  lapse of memory or an intentional falsehood, and that may
24  depend on whether it has to do with an important fact or with
25  only a small detail.

914
DCD3GUZ6                        Jury Charge
 1              Let me reread that.
 2              You need to consider, therefore, whether the witness's
 3      testimony reflects an innocent lapse of memory or an
 4      intentional falsehood, and that may depend on whether it has to
 5      do with an important factor or with only a small detail.
 6              If you find that any witness has testified falsely as
 7      to any material fact, that is, as to any important matter, the
 8      law permits you to disregard completely the entire testimony of
 9      that witness upon the principle that one who testifies falsely
10      about one material fact is likely to testify falsely about
11      everything.
12              You are not required, however, to consider such a
13      witness as totally unbelievable.  You may accept so much of his
14      testimony as you deem true, and disregard what you feel is
15      false.
16              As the sole judges of the facts, you must decide which
17      witnesses you will believe, what portion of their testimony you
18      accept, and what weight you will give to it.
19              Interest in outcome.  In evaluating the credibility of
20      a witness, you should take into account any evidence that the
21      witness may benefit in some way from the outcome of the case.
22      Such interest in the outcome creates a motive to testify
23      falsely, and may sway a witness to testify in a way that
24      advances the witness's own interest.  Therefore, if you find
25      that any witness whose testimony you are considering may have
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

915

DCD3GUZ6                      Jury Charge

1    an interest in the outcome of this trial, then you should bear
2    that factor in mind when evaluating the credibility of his
3    testimony.
4            Keep in mind, however, that it does not automatically
5    follow that testimony given by an interested witness is to be
6    disbelieved.  There are many people who, no matter their
7    interest in the outcome of a case, would not testify falsely.
8    It is for you to decide, based upon your own perceptions and
9    common sense, to what extent, if at all, a witness's interest
10   affected his or her testimony.  In this case, as in any
11   lawsuit, both the plaintiff and the defendant have an interest
12   in the outcome of the case.
13           Testimony from law enforcement officers.  You have
14   heard testimony from several law enforcement officers.  Law
15   enforcement officers do not stand in any higher station in the
16   community than other individuals.  An officer who takes the
17   witness stand subjects his testimony to the same examination
18   and tests as any other witness.
19           In the case of law enforcement officers, you should
20   not believe them merely because of the position they hold.  You
21   should recall their demeanor on the stand, their manner of
22   testifying, the substance of their testimony, and weigh and
23   balance it just as carefully as you would the testimony of any
24   other witness.
25           Number of witnesses.  The weight of the evidence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

916

DCD3GUZ6                    Jury Charge

1   presented by each side does not necessarily depend on the
2   number of witnesses testifying on one side or the other.  You
3   must consider all the evidence in the case, and you may decide
4   that the testimony of a smaller number of witnesses on one side
5   has a greater weight than that of a larger number on the other.
6           The testimony of a single witness which produces in
7   your minds belief in the likelihood of truth is sufficient for
8   the proof of any fact and the testimony of a single witness
9   which produces in your minds belief in the likelihood of truth
10  is sufficient for the proof of any fact, and would justify a
11  verdict in accordance with such testimony, even though a number
12  of witnesses may have testified to the contrary, if, after
13  consideration of all the evidence in the case, you hold greater
14  belief in the accuracy and reliability of the one witness.
15          The test is not which side brings the greater number
16  of witnesses or presents the greater quantity of evidence, but
17  which witness, and which evidence, appeals to your minds as
18  being the most accurate, and otherwise trustworthy.
19          Exhibits.  To constitute evidence, exhibits must be
20  received in evidence.  Exhibits marked for identification but
21  not admitted are not evidence.  Materials brought forth only to
22  refresh a witness's recollection are also not evidence.
23          Discrepancies in testimony.  Inconsistencies or
24  discrepancies in the testimony of a witness, or between the
25  testimony of different witnesses, may or may not cause you to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ6                    Jury Charge

1  discredit such testimony.  Two or more persons witnessing an
2  incident or a transaction may see or hear it differently.  An
3  innocent misrecollection like failure of recollection is not an
4  uncommon experience.  In weighing the effect of a discrepancy,
5  always consider whether it pertains to a matter of importance
6  or an unimportant detail, and whether the discrepancy results
7  from innocent error or intentional falsehood.
8          Expert witnesses.  An expert is allowed to express his
9  or her opinion on those matters about which he or she has
10  special knowledge, skill, experience, and training.  Expert
11  testimony is presented to you on the theory that someone who is
12  experienced in the field can assist you in understanding the
13  evidence or in reaching an independent decision on the facts.
14  In weighing each expert's testimony, you may consider the
15  expert's qualification, his or her opinions, his or her reasons
16  for testifying, as well as all of the other considerations that
17  you ordinarily apply when you are deciding whether or not to
18  believe a witness's testimony.
19          You may give the expert testimony whatever weight, if
20  any, you find it deserves in light of all the evidence in this
21  case.  You should not, however, accept a witness's testimony
22  merely because he or she is an expert, nor should you
23  substitute it for your own reason, judgment, and common sense.
24  The determination of the facts in this case rests solely with
25  you.

DCD3GUZ6                    Jury Charge
1               There has been testimony that Dr. Gidumal did not
2      review the plaintiff's MRI films until after he issued his
3      reports and after his deposition was conducted.   On
4      December 14, 2010, defendant requested that plaintiff produce
5      all medical records, including, but not limited to, records for
6      treatment for any injury resulting from the incident and for
7      five years prior to the incident in plaintiff's possession,
8      custody or control.   Plaintiff did not provide the MRI films to
9      Dr. Gidumal until December 6, 2013.
10              Burden of proof.   Members of the jury, now that I have
11     given you general instructions, I am going to instruct you on
12     the law to be applied to the specific issues in this case.   But
13     first I am going to explain the concept of burden of proof.
14     The burden of proof in this case is by a preponderance of the
15     evidence.
16              The party with the burden of proof on any given issue
17     has the burden of proving to you every disputed element of that
18     party's claim by a preponderance of the evidence.   If you
19     conclude that the party bearing the burden of proof has failed
20     to establish that party's claim by a preponderance of the
21     evidence, you must decide against that party on the issue you
22     are considering.
23              What does a preponderance of the evidence mean?   To
24     establish a fact by a preponderance of the evidence means to
25     prove that the fact is more likely true than not true.   A

919

DCD3GUZ6                    Jury Charge

1   preponderance of the evidence means the greater weight of the
2   evidence.  It refers to the quality and persuasiveness of the
3   evidence, not to the number of witnesses or documents.
4           In determining whether a claim has been proved by a
5   preponderance of the evidence, you may consider the relevant
6   testimony of all witnesses, regardless of who may have called
7   them, and all the relevant exhibits received in evidence,
8   regardless of who may have produced them.  This concept,
9   preponderance of the evidence, is often illustrated with the
10  idea of scales.  In considering whether the plaintiff has met
11  his burden of proof on his claim, you put on one side all the
12  credible evidence favoring the plaintiff, and on the other side
13  all the credible evidence favoring the defendant.  If the scale
14  tips toward the plaintiff because plaintiff's evidence is
15  weightier, then you must find in plaintiff's favor.  If the
16  scale tips toward the defendant because his evidence is
17  weightier, then you must find in the defendant's favor.  If you
18  find that the credible evidence on a given issue is evenly
19  divided between the parties, that it is equally probable that
20  one side is right as it is that the other side is right, then
21  you must decide that issue against the party having this burden
22  of proof.  That is because the party bearing this burden must
23  prove more than a simple equality of the evidence.  That party
24  must prove the element at issue by a preponderance of the
25  evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCD3GUZ6                    Jury Charge

1           On the other hand, the party with this burden of proof
2    need prove no more than a preponderance.  As long as you find
3    that the scale tips, however slightly, in favor of the party
4    with this burden of proof, that what the party claims is more
5    likely true than not true, then that element will have been
6    proved by a preponderance of the evidence.
7           I remind you, as I did at the beginning of the trial,
8    that proof beyond a reasonable doubt is the proper standard of
9    proof in a criminal trial.  That requirement does not apply to
10   a civil case such as this, and you should put it completely out
11   of your mind.
12          The law.  Nature of the case.  The plaintiff in this
13   case is Noel Guzman.  The federal claims asserted by Mr. Guzman
14   arise under a federal statute, 42, United States Code, Section
15   1983, which I will explain to you in greater detail shortly.
16          Section 1983 provides as a remedy, among other things,
17   for individuals who have been deprived of their federal
18   constitutional rights under color of state law.  Mr. Guzman
19   alleges that the defendant deprived him of his right to be free
20   from false arrest.  Officer Jay denies this charge.  He
21   contends that he had probable cause to arrest Mr. Guzman.
22   Mr. Guzman also alleges that the defendant deprived him of his
23   right to be free from excessive force during an arrest.
24   Officer Jay also denies this charge and claims that the force
25   used, if any, was reasonable under the circumstances.

DCD3GUZ6                       Jury Charge
1              Introduction to federal law claims 42, United States
2    Code, Section 1983.  The law to be applied to Mr. Guzman's
3    federal claims in this case is 42, United States Code, Section
4    1983, the federal civil rights law, which provides a remedy for
5    individuals who have been deprived of their federal
6    constitutional rights under color of state law.  This statute
7    reads in relevant part:
8              Every person who, under color of any statute,
9    ordinance, custom or usage of any state, subjects or causes to
10   be subjected any citizen of the United States or other person
11   within the jurisdiction of the United States to the deprivation
12   of any rights, privileges or immunities secured by the
13   Constitution, shall be liable to the party injured in an action
14   at law.
15             Section 1983 does not create any federally protected
16   right.  Instead, it creates a form of liability that allows
17   people to enforce the rights, privileges and immunities
18   guaranteed to them by, among other things, the United States
19   Constitution.  Later in these instructions I will explain the
20   specific constitutional rights at issue in this case, and what
21   the plaintiff must prove to demonstrate a violation of those
22   rights.
23             Overview of elements of Section 1983 claims.  To
24   establish a claim under Section 1983 against defendant,
25   Mr. Guzman must establish by a preponderance of the evidence
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

922

DCD3GUZ6                        Jury Charge

1    each of the following elements:
2             First, that the conduct complained of was committed by
3    the defendant acting under color of state law;
4             Second, that in so acting, defendant violated the
5    constitutional rights of Mr. Guzman; and
6             Third, that the defendant's acts were the proximate
7    cause of the injuries and consequent damages allege by
8    Mr. Guzman.
9             I instruct you that the parties stipulate and agree
10   that Officer Jay was acting under color of state law on the
11   date of the incident in question.  Therefore, you need not
12   consider the first element since it is already established.  I
13   will now explain the second and third elements in more detail.
14            Deprivation of a right.  The second element that
15   Mr. Guzman must prove by a preponderance of the evidence is
16   that defendant deprived him of rights protected by the United
17   States Constitution.  In order for Mr. Guzman to establish this
18   element, he must establish the following three things by a
19   preponderance of the evidence:
20            First, that the defendant committed the acts alleged
21   by plaintiff;
22            Second, that those acts caused him to suffer the loss
23   of a federal or constitutional right; and
24            Third, that in performing the acts alleged, the
25   defendant acted intentionally or recklessly.

923

DCD3GUZ6                          Jury Charge

1              I will now explain each of these requirements to you.
2      Commission of alleged acts.  The first requirement is fairly
3      simple and means exactly what it says.  Plaintiff must prove
4      that defendant actually committed the acts he alleges.
5              Loss of a constitutional right.  The second
6      requirement is that plaintiff must prove that the acts
7      committed by defendant deprived him of a federal right.
8      Mr. Guzman makes two claims.  That defendant falsely arrested
9      him and that defendant subjected him to excessive force.  I
10     will instruct you as to these two claims in more detail in a
11     moment.
12             Intent.  The third requirement is that, in performing
13     the acts alleged, defendant acted intentionally or recklessly.
14     An act is intentional if it is done voluntarily and
15     deliberately, and not because of mistake, accident, negligence,
16     or other innocent reason.  An act is reckless if done in
17     conscious disregard of its known probable consequences.
18             In determining whether defendant acted with the
19     requisite state of mind, you should remember that while
20     witnesses may see and hear and so be able to give direct
21     evidence of what a person does or fails to do, there is no way
22     of looking into a person's mind.  Therefore, you have to rely
23     on your understanding of what was done, what people involved
24     said in their minds, and your belief or disbelief with respect
25     to those facts and statements.

DCD3GUZ6                      Jury Charge

1           Proximate cause.  Proximate cause means that there
2    must be a sufficient causal connection between the act or
3    omission of a defendant and any injury or damage sustained by
4    the plaintiff.  An act or omission is a proximate cause if it
5    was a substantial factor in bringing about or actually causing
6    the alleged injury.  That is, if injury or damage was a
7    reasonably foreseeable consequence of the defendant's act or
8    omission.  If a injury was a direct result or a reasonably
9    probable consequence of a defendant's act or omission, it was
10   proximately caused by such an act or omission.
11          In other words, if a defendant's act or omission had
12   such an effect in producing an injury that reasonable persons
13   would regard it as being a cause of the injury, then the act or
14   omission is a proximate cause.
15          A proximate cause need not always be the nearest cause
16   either in time or space.  In addition, there may be more than
17   one proximate cause of an injury or damage.  Many factors or
18   the conduct of two or more people may operate at the same time,
19   either independently or together, to cause an injury.
20          In order to recover damages for any injury, the
21   plaintiff must show by a preponderance of the evidence that
22   such injury would not have occurred without the conduct of the
23   defendant.
24          A defendant is not liable if plaintiff's injury was
25   caused by a new or independent source of an injury that

DCD3GUZ6                    Jury Charge

1    intervenes between the defendant's act or omission and the
2    plaintiff's injury.
3             Let's go back and discuss in more detail the two
4    claims that plaintiff alleges deprived him of his
5    constitutional rights, false arrest and excessive force.
6             False arrest.  Plaintiff alleges that he was falsely
7    arrested by defendant, when, on February 14, 2009, he was
8    charged with obstruction of governmental administration in the
9    second degree.  Plaintiff claims that he had just exited Red
10   Lounge and was lawfully standing on the northeast corner of
11   Sherman Avenue and 207th Street in the county, city and state
12   of New York, at the time of his arrest.
13            The defendant contends that the arrest of plaintiff
14   was lawful because there was probable cause to make the arrest
15   under the laws of the State of New York.
16            A claim for false arrest is based on the Fourth
17   Amendment right of an individual to be free from unreasonable
18   seizures, which includes a right not to be taken into custody
19   by police officers without probable cause.  A police officer
20   makes a lawful arrest when he or she acts with probable cause
21   that a person is committing or has committed a crime.
22            By contrast, a police officer commits a false arrest
23   if he arrests a person without probable cause.
24            The only element of the false arrest claim at issue
25   here is whether the police had probable cause to arrest

926

DCD3GUZ6                    Jury Charge
1    Mr. Guzman.
2            Probable cause.  Probable cause, sometimes called
3    reasonable cause, exists when an officer has knowledge or
4    reasonably trustworthy information of facts and circumstances
5    that are sufficient so that an officer of ordinary
6    intelligence, judgment, and experience can reasonably believe
7    that the person to be arrested has committed or is committing a
8    crime.  Probable cause does not require proof beyond a
9    reasonable doubt or even proof by a preponderance of the
10   evidence.  Probable cause requires only a probability of
11   criminal activity.
12           Therefore, the disposition of the criminal charges
13   against the plaintiff, how the criminal case ended, is not
14   relevant to your determination of false arrest, because a
15   criminal case requires proof beyond a reasonable doubt, while a
16   false arrest claim requires you to decide if Officer Jay had
17   probable cause based on the objective circumstances to arrest
18   Mr. Guzman for any offense.
19           The defendant has the burden of proving by a
20   preponderance of the evidence the existence of probable cause
21   for his arrest of Mr. Guzman.  In order to have probable cause
22   for an arrest, an officer need not the make an actual showing
23   of criminal activity on the part of the arrestee.
24           (Continued on next page)
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

927
DCDTGUZ7                    Charge

1              THE COURT:  Furthermore, the existence of probable
2     cause is measured as of the moment of the arrest, and not on
3     later developments.
4              In this case, Mr. Guzman was arrested for obstruction
5     of governmental administration in the second degree.  Defendant
6     Officer Jay had probable cause to arrest Mr. Guzman for
7     obstructing governmental administration in the second degree if
8     he had reasonable cause to believe that Mr. Guzman
9     intentionally obstructed, impaired, prevented, or attempted to
10    prevent a public servant from performing an official function
11    by means of intimidation, force or interference.
12             A person acts intentionally with respect to a result
13    or to conduct described by a statute defining an offense when
14    his conscious objective is to cause such result or to engage in
15    such conduct.  A police officer cannot look into someone's mind
16    to determine whether that person has the intent commit a
17    criminal offense.  Therefore, in determining whether there is
18    probable cause, the officer can infer intent from a person's
19    conduct and the surrounding circumstances confronting the
20    officers seeking to effectuate the arrest in order to determine
21    whether they had probable cause.  An arrest made with
22    reasonable cause is lawful even though the plaintiff may have
23    not committed any of the offenses for which he was arrested or
24    detained.
25             For an arrest to be an "official function," it must be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ7                        Charge

1     lawful and supported by probable cause.  Therefore, if the
2     official function at issue is plaintiff's arrest, and if the
3     defendant did not have probable cause to detain plaintiff for
4     any other crime, they could not have had probable cause to
5     arrest plaintiff for obstructing their efforts to arrest
6     plaintiff.  On the other hand, if the official function is
7     arresting someone else, physical force or interference in the
8     arrest of a third party may constitute probable cause for an
9     arrest for obstruction of governmental administration in the
10    second degree.
11            Even though plaintiff was arrested for obstruction of
12    governmental administration in the second degree, if you find
13    that there was probable cause to arrest him for the offense I
14    am about to describe to you, then you must find for the
15    defendant on plaintiff's false arrest clam.  I will briefly
16    instruct you on the elements of this crime.
17            The other possible offense you may consider is
18    disorderly conduct.  Officer Jay had probable cause to arrest
19    Mr. Guzman for disorderly conduct if he had reasonable cause to
20    believe that Mr. Guzman was engaging in fighting or in violent,
21    tumultuous or threatening behavior; Mr. Guzman's conduct was
22    public in nature; and Mr. Guzman's conduct must have been done
23    with intent to cause public inconvenience, annoyance, or alarm
24    or with recklessness as to a risk thereof.  A person acts with
25    this "intent" when he acts with a conscious objective to cause

DCDTGUZ7                         Charge

1   a public inconvenience, annoyance or alarm or with a conscious
2   disregard of a substantial and unjustifiable risk his conduct
3   would cause such result.  In making this evaluation, you may
4   consider the extent to which Mr. Guzman's conduct annoyed
5   others; whether Mr. Guzman persisted in the conduct after
6   warnings by others or the police; whether Mr. Guzman's conduct
7   created at least the risk that disorder might result; and
8   whether Mr. Guzman's conduct occurred in a public location.
9           I have just provided the elements of these various
10  offenses to give you a complete picture of the applicable law.
11  If, after considering all of the evidence, you find that there
12  was probable cause to arrest plaintiff for any one, or even
13  more than one of the offenses that I just described to you,
14  then you must find in favor of the defendant with respect to
15  plaintiff's false arrest claims.
16          Excessive force.
17          Plaintiff alleges that the defendant violated his
18  Fourth Amendment rights by using excessive force.  The
19  defendant denied that any excessive force was used on
20  plaintiff, and asserts that his actions were justified,
21  reasonable under the circumstances, and in accordance with
22  existing law.
23          The Fourth Amendment to the United States Constitution
24  protects persons from being subjected to excessive or
25  unreasonable force during an arrest.  This means that law

930

DCDTGUZ7                         Charge

1    enforcement officers may only employ the amount of force
2    necessary under the circumstances to make an arrest.
3            Your role is to decide what action Officer Jay took on
4    February 14, 2009, and to determine whether his actions were
5    objectively reasonable in light of the facts and circumstances
6    confronting him, without regard to his underlying intent or
7    motivation.
8            Not every push or shove by a police officer violates a
9    person's constitutional rights, however, even if it may later
10   seem unnecessary -- let me read that again.
11           Not every push or shove by a police officer violates a
12   person's constitutional rights, however, even if it may later
13   seem unnecessary in the peace and quiet of this courtroom.
14           In order to determine whether the defendant's acts
15   caused the plaintiff to suffer the loss of a federal right, you
16   must determine whether the amount of force used to effect the
17   arrest was that which a reasonable officer would have employed
18   in effecting the arrest under similar circumstances.  You must
19   allow for the fact that police officers are forced to work in
20   circumstances that are tense, uncertain, and rapidly evolving.
21   Because police officers are often forced to make split second
22   judgments about the amount of force that is necessary in a
23   given situation, this "reasonableness" of a particular use of
24   force must be judged from the perspective of a reasonable
25   officer on the scene, rather than with 20/20 vision of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

931

DCDTGUZ7                    Charge

1  hindsight.  The question is only whether the officers' actions
2  were objectively reasonable in light of all the facts and
3  circumstances confronting him at the time he used the force.
4  In this regard, you are not do decide if the least amount of
5  force was used, but rather you are only to decide if the force
6  used was within the range of conduct identified as reasonable.
7            In making this determination, you must pay careful
8  attention to the facts and circumstances of this particular
9  case, including the severity of the alleged crimes at issue;
10  whether Mr. Guzman posed an immediate threat to the safety of
11  the police officers or others; and whether Mr. Guzman actively
12  resisted arrest or attempted to evade arrest by flight.
13            However, I remind you not to consider an officer's
14  intentions or motivations.  An officer's bad intention will not
15  make a constitutional violation out of an objectively
16  reasonable use of force; nor will an officer's good intention
17  make an objectively unreasonable use of force constitutional.
18            If you find the amount of force used by Officer Jay
19  was greater than that a reasonable officer would have employed,
20  Mr. Guzman will have established a claim for excessive force.
21  However, if you find that the amount of force was reasonable,
22  then Mr. Guzman will not have established a claim for excessive
23  force.
24            In summary, if you find that the plaintiff has shown,
25  by a preponderance effort evidence, that:  One, the defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

932

DCDTGUZ7                              Charge

1   acted or failed to act in a manner that deprived the plaintiff
2   of his constitutional right to be free from false arrest or the
3   use of excessive force; and two, that act of omission
4   proximately caused injury to the plaintiff, then the plaintiff
5   has proven his claim.
6              Damages.  Damages generally.
7              If you find that the plaintiff has proven his claim by
8   a preponderance of the evidence, you must then decide the
9   damages to which he is entitled.  Please note that just because
10  I am instructing you on how to award damages does not mean that
11  I have any opinion on whether any defendant should be held
12  liable.  That is for you to decide on the evidence presented
13  and the law I have given you.
14             You should not reach the issue of damages unless you
15  find that the plaintiff has established the liability of at
16  least -- the liability of the defendant.  If you decide that
17  the plaintiff has not proven that he is entitled to recover
18  from the defendant, you need go no further.  I am instructing
19  you on damages only so that you will have guidance should you
20  decide that the plaintiff is entitled to recover damages.
21             Compensatory damages.
22             If you return a verdict for the plaintiff, then you
23  must award him such sum of money as you believe will fairly and
24  justly compensate him for any injury you believe was
25  proximately caused by the liable defendant's conduct.  These

933

DCDTGUZ7                              Charge

1    damages are known as "compensatory damages."  Compensatory
2    damages seek to make the plaintiff whole, that is, to
3    compensate him for the damage that he has suffered.
4              These damages include pain and suffering, as well as
5    mental discomfort.  Thus, you must consider physical injuries,
6    physical pain, emotional scarring and mental anguish which the
7    plaintiff suffered and/or will continue to suffer.  You must
8    also consider the seriousness of the injuries and their
9    duration and impact on the plaintiff, as well as the degree of
10   pain and mental anguish suffered -- as well as the degree of
11   pain and mental anguish plaintiff suffered and/or will continue
12   to suffer.  You may also consider the inconvenience and loss of
13   enjoyment of life caused by the defendant's conduct.  Loss of
14   enjoyment of life involves the loss of or diminished ability to
15   perform daily tasks, to participate in the activities which
16   were a part of the person's life before the injury, and to
17   experience the pleasures of life.  However, these damages as I
18   have read to you are only to be considered for plaintiff's
19   excessive force claim and not plaintiff's false arrest claim.
20             You must award compensatory damages only for those
21   injuries which you find the plaintiff has proven by a
22   preponderance of the evidence.  Moreover, I remind you that you
23   may award compensatory damages only for injuries that the
24   plaintiff proves were proximately caused by the liable
25   defendant's wrongful conduct.  The damages that you award must

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ7                          Charge
1    be fair and reasonable, not inadequate or excessive.
2              Compensatory damages must not be based on speculation
3    or sympathy.  They must be based on the evidence presented at
4    trial and only that evidence.  In awarding compensatory
5    damages, if you decide to award them, you should be guided by
6    common sense.  Computing damages may be difficult, but you must
7    not engage in arbitrary guesswork.  On the other hand, the law
8    does not require the plaintiff to prove the amount of his
9    losses with mathematical precision, but only with as much
10   precision and accuracy as the circumstance permit.
11             It is the plaintiff's burden to prove the amount of
12   damages and to prove that the damages were caused by the
13   defendant's intentional or reckless use of excessive force.
14   The purpose of such an award of damages is not to punish the
15   defendant.
16             If you find that the plaintiff was falsely arrested,
17   then from this fact alone you are required to award the
18   plaintiff monetary damages for the loss of freedom of movement.
19   The plaintiff is not required to show any particular loss of
20   money resulting from confinement before you award damages for
21   false arrest.  In awarding damages for the fact of confinement,
22   you may consider the loss of time, the physical discomfort or
23   inconvenience, and the conditions of confinement.
24             Nominal damages.
25             If the plaintiff has established the elements of
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

935

DCDTGUZ7                          Charge

1    excessive force but has not shown any injury or actual damages,
2    then you may return an award of nominal damages not exceed the
3    sum of one dollar.  Nominal damage must be awarded when a
4    defendant deprived the plaintiff of a constitutional right but
5    the plaintiff has suffered no actual damages as a natural
6    consequence of that deprivation.  The mere fact that a
7    constitutional deprivation occurred is an injury to the person
8    entitled to enjoy that right, even when no actual damages flow
9    from that deprivation.  Therefore, if you find that Mr. Guzman
10   has suffered no injury as a result of the defendant's conduct
11   other than the fact of a constitutional violation, then you may
12   award nominal damages not to exceed one dollar.
13          Mitigation of damages.
14          In determining the amount of damages to which
15   Mr. Guzman is entitled to, if any, you may take into
16   consideration whether the plaintiff failed to mitigate his
17   damages after the incident on February 14, 2009.  A plaintiff
18   claiming damages due to the wrongful act of another is under an
19   obligatory duty to minimize the damages liable to result from
20   such injury.  If the plaintiff does not make a reasonable
21   effort to minimize his damages, he is barred from recovering
22   those additional damages that result from his own failure to
23   mitigate.  Therefore, if you find that plaintiff could have
24   reasonably avoided certain of his injuries, you may deny
25   plaintiff compensation for those damages stemming from the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

936

DCDTGUZ7                    Charge

1    avoidable injury.
2              Punitive damages.
3              Just because I am instructing you on how to award
4    punitive damage does not mean that I have any opinion on
5    whether the defendant should be held liable or that the
6    plaintiff is entitled to punitive damages.
7              Punitive damages are awarded in the discretion of the
8    jury to:  One, punish a defendant for extreme or outrageous
9    conduct; or two, deter or prevent a defendant, and others like
10   him, from committing such conduct in the future.  If you find
11   Officer Jay liable to the plaintiff, you may decide that
12   awarding punitive damages against Officer Jay is appropriate.
13   You may make an award of punitive damages even if you find that
14   the plaintiff has failed to establish actual damages.
15             You may award the plaintiff punitive damages if you
16   find that the acts or omissions of the defendant were done
17   maliciously or wantonly.  An act or failure to act is done
18   maliciously if it is prompted by ill will or spite towards the
19   injured person.  An act or failure to act is wanton if done in
20   a reckless or callous disregard of or indifference to the
21   rights of the injured person.  The plaintiff has the burden of
22   proving by a preponderance of the evidence that the defendant
23   acted maliciously or wantonly with regard to his rights.
24             An intent to injure exists when a defendant has a
25   conscious desire to violate federal rights of which he is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

937

DCDTGUZ7                         Charge

1   aware, or when the defendant has a conscious desire to injure
2   the plaintiff in a manner he knows to be unlawful.  A conscious
3   desire to perform the physical acts that caused the plaintiff's
4   injury, or to fail to undertake certain acts, does not by
5   itself establish that the defendant had a conscious desire to
6   violate rights or injury the plaintiff unlawfully.
7            If you find, by a preponderance of the evidence, that
8   the defendant acted with a malicious intent to violate the
9   plaintiff's federal rights or injury him unlawfully, or if you
10  find that a liable defendant acted with a callous or reckless
11  disregard of the plaintiff's rights, then you may decide that
12  punitive damages are appropriate.  Remember, however, that an
13  award of punitive damages is discretionary.
14           If fixing the amount of punitive damages, you should
15  consider the degree to which a certain sum would punish a
16  defendant or deter him, or persons like him, from committing
17  wrongful acts in the future.
18           Concluding instructions.
19           Rights to see exhibits and hear testimony.
20           As I said earlier, in determining the facts of this
21  case, you must rely on your recollection of the evidence.  In
22  aid of your recollection, all the exhibits admitted into
23  evidence will be given to you at the start of deliberations.
24  Let me read that again.  In aid of your recollection, all the
25  exhibits admitted into evidence will be given to you at the

938

DCDTGUZ7                          Charge

1   start of deliberations.   Additionally, if any of you wishes to
2   have witness testimony read to you, you may request that.   I am
3   not suggesting that you must or should do this, I am simply
4   saying that it is a service we can make available to you.
5              If any juror wishes to have testimony read, simply
6   send me a written note through your foreperson.   If you request
7   testimony, please try to be as specific as possible about which
8   portions of the testimony you would like read.   If you are not
9   specific, the lawyers must agree on what portions of testimony
10  you are requesting, and if they disagree, I must resolve that
11  disagreement.   In any event, it takes time for the court
12  reporter to find testimony in the record, so please be patient
13  if you send a note and there seems to be a delay in responding
14  to you.   If you want any further explanation of the law as I
15  have explained it to you, you may also request that.
16             Notes to the Court.
17             Any notes that you send to me should be:  One, signed
18  by your foreperson, indicating the date and time of the note;
19  two, sealed in an envelope; and three, given to the marshal who
20  will be seated outside the jury room throughout your
21  deliberations.
22             If you do send me any notes, please make sure you do
23  not give me any indication of your present state of thinking on
24  any disputed issue; particularly, you must not inform me of
25  your vote count on any issue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCDTGUZ7                     Charge

1              Note taking by jurors.
2              Any notes you may have taken during trial are simply
3    an aid to your memory.  Because the notes may be inaccurate or
4    incomplete, they may not be given any greater weight or
5    influence than the recollections of other jurors about the
6    facts or conclusions to be drawn from the facts in determining
7    the outcome of the case.  Any difference between a juror's
8    recollection and a juror's notes should always be settled by
9    asking to have the court reporter's transcript on that point
10   read back to you.  You must base your determination of the
11   facts, and ultimately your verdict, on the court record rather
12   than on any juror's notes.
13             Selection of foreperson.
14             The juror who sits in the number one chair will be the
15   foreperson of the jury unless, for any reason, that person
16   prefers not to act in that capacity, in which event your first
17   order of business will be to send me a note identifying the new
18   foreperson.
19             The foreperson preside over the deliberations and
20   speaks for the jury in open court.  Moreover, the foreperson
21   signs and sends all notes to me and notifies the marshal when
22   the jury has reached a verdict.
23             The foreperson has no greater voice or authority than
24   any other juror.
25             Duty to a deliberate to unanimous verdict.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

940

DCDTGUZ7                          Charge

1           It is your duty as jurors to consult with one another
2    with a view towards reaching a unanimous verdict.  Each of you
3    must decide the case for yourself after consideration of the
4    evidence with your fellow jurors.  You should not hesitate to
5    change an opinion if the discussion persuades you that you
6    should.  However, you are not to give up a point of view that
7    you conscientiously believe in simply because you are
8    outnumbered or outweighed.  You should vote with the others
9    only if you are convinced on the evidence, facts and law, that
10   is the correct way to decide the case.
11           I remind that you no juror should surrender his
12   conscientious beliefs about the effect or weight of the
13   evidence solely for the purpose of returning a unanimous
14   verdict.
15           Return of verdict.
16           In an effort to assist you, your verdict in this case
17   will be a verdict in the form of a series of questions to be
18   answered by you in the jury room after you have begun your
19   deliberations.
20           No inference is to be drawn from the way the questions
21   are worded about what the answers should be.  The questions are
22   not to be taken as any indication that I have any opinion about
23   how they should be answered.
24           Before the jury attempts to answer any question, you
25   should read all the questions and make sure that everyone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCDTGUZ7                        Charge

1   understands each question.  Before you answer the questions,
2   you should deliberate in the jury room and discuss the evidence
3   that relates to the questions you must answer.  When you have
4   thoroughly considered the questions and the evidence that
5   relates to those questions, record the answers to the questions
6   on the verdict form.  Remember, all answers must be unanimous.
7           After you have reached a verdict and your foreperson
8   has filled in the verdict form that has been given to you, each
9   of you should sign and date it.  The foreperson should then
10  send me a note indicating that you have reached a verdict.  Do
11  not specify what the verdict is in the note.  Instead, the
12  foreperson should retain the verdict sheet and hand it to the
13  deputy clerk in open court when you are called in.
14          I remind you that your verdict must be unanimous.
15  Once your verdict is announced by the foreperson in open court
16  and officially recorded, it cannot ordinarily be revoked.
17          Give me a moment.  I need to meet with the parties at
18  sidebar, and I will be right back out.
19          (In robing room)
20          THE COURT:  I caught a couple of typos which I
21  corrected on the record.  We'll have those corrected.
22          Any objection to my reading of the instructions?
23          MR. NORINSBERG:  No, but I take it whatever earlier
24  objections that we expressed with respect to future damages are
25  preserved.

942

DCDTGUZ7                    Charge

 1            THE COURT:  Yeah.
 2            MR. KUNZ:  No objection to how it was read.
 3            THE COURT:  We'll make the minor corrections on that
 4    and send it in to the jury and have the jury start
 5    deliberating.
 6            MR. NORINSBERG:  I'm very concerned about that,
 7    actually.  We're already at 4:15 Friday afternoon, and there's
 8    a great risk of a jury that's exhausted after this week of
 9    reaching a quick verdict.  I request, your Honor, that we just
10    start deliberations Monday when they're fresh.
11            MR. KUNZ:  Well, I mean I don't see -- you were very
12    clear in your instructions that they're supposed to take this
13    seriously and deliberate to unanimous verdict.  So I think they
14    should get started, and if they have to come back Monday they
15    will have to get back Monday.
16            THE COURT:  That objection is overruled.  They might
17    as well start today.  And my intention, as we get close to
18    5 o'clock, I'll let them go.  I'll call them in.  I'm not going
19    to say anything to them now, I'm not going to tell them that
20    I'm letting them go at any particular time, I will say go ahead
21    and start your deliberations.  If they ask me, we'll deal with
22    that with the parties.  But my intention is at 5 o'clock, I
23    will have them brought in and say it's 5 o'clock, it's the time
24    for us to let you go, period.  We'll see where we are at that
25    point.

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

943

DCDTGUZ7                          Charge

1            Any objection to me, while we make these, instead of
2    just having the jury wait, I can send them in to start
3    deliberating?
4            Before we go in there, could you grab the verdict form
5    from Tara and bring it in here so they can look at it?
6            We'll bring the official verdict form.  I want to make
7    sure there's no issues with that.
8            MR. MODAFFERI:  That's fine.
9            MR. MEEHAN:  That's fine.
10           THE COURT:  All right.  I was just going to tell the
11   jury that we need to clean up a few typos in the instructions
12   and get those in to them later.
13           Anybody have an objection to me telling them that?
14           MR. KUNZ:  No.
15           THE COURT:  All right.
16           (In open court)
17           THE COURT:  So you can start your deliberations.  I
18   will give you a copy of the verdict sheet.  We need to clean up
19   a few typos in the instructions, we'll clean those up and get
20   those to you later.
21           You can start your deliberations.
22           (Marshal sworn)
23           THE COURT:  Thank you.  You may start your
24   deliberations.
25           (Jury retired to deliberate, time noted: 4:17 p.m.)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCDTGUZ7
```
 1                 (Jury not present)
 2                 THE COURT:  Ordinarily my practice would be once the
 3     jury starts deliberations, counsel has permission to move
 4     around.  It's 4:15.  It makes sense for counsel to hang out
 5     here, but if counsel need to go somewhere, make sure you give
 6     my deputy a cell phone number, one you can be reached at.
 7                 Anything from counsel?
 8                 MR. MODAFFERI:  The only thing, I have to run, but
 9     Mr. Kunz will be here.
10                 MR. KUNZ:  We'll look over each other's exhibits and
11     get them back to the jury.
12                 MR. MEEHAN:  Plaintiffs are ready now, your Honor.
13                 MR. KUNZ:  I wanted to look through them real quick,
14     and I'm sure they want to look through mine.
15                 THE COURT:  Am I gathering then that the parties are
16     agreeing to send all the exhibits back, or do you want to wait
17     for them to ask for things?
18                 MR. KUNZ:  Whatever is your Honor's preference.
19                 MR. MEEHAN:  We have no preference, your Honor.
20                 THE COURT:  I suppose I prefer just to wait and see
21     what they ask for.  Let's see what they do.  Thanks.
22                 (Recess taken)
23                 THE COURT:  So we have received a note from the jury,
24     Court Exhibit 3, it states:  Juror number three needs to leave
25     at 5:00 p.m.  No later.  Is there a schedule we need to adhere
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

945

DCDTGUZ7

1   to, or can we set the schedule according to our needs?  Signed
2   by the foreperson, received at 4:25 p.m.
3               For the record, let me hear plaintiff's position on
4   how to respond to that note.
5               MR. MEEHAN:  Your Honor, given the light that it is
6   already close to 5 o'clock, I think that the best course of
7   action would be to simply call the jury back in, say in light
8   of the fact someone needs to be somewhere at five or needs to
9   leave here by five, we will just dismiss you now and please
10  return at 9:30 on Monday.
11              THE COURT:  Let me hear from defense counsel.
12              MR. KUNZ:  Well, your Honor, I think that we should
13  just answer the question and say yes, we will leave at five
14  today and your schedule next week will be 9:30 to five.  It was
15  clear -- it was crystal clear during your Honor's instructions
16  they're to take their duties seriously.  It's been clear to
17  everyone in this courtroom that the jurors take this case very,
18  very seriously, so I don't think there's any risk of a rushed
19  judgment.
20              THE COURT:  It seems to me in terms of specifically
21  answering that question to say that our schedule is 9:30 to no
22  later than five, and then I will listen to counsel as to when,
23  perhaps at ten minutes to five, I assume nothing will have
24  happened, I do bring them in and dismiss them for the day.  But
25  I think plaintiff's counsel suggestion is singling out a

DCDTGUZ7

1  particular juror a little too much.  I know the jury note says
2  juror three.  If I say one of you needs to leave early, we will
3  break at five --
4          MR. MEEHAN:  I have no problem with that.  How about
5  bringing them in and saying because we would be concluding at
6  five anyway, and you had a long day, we'll dismiss you right
7  now, and please come back at 9:30.  We just don't want them
8  during their deliberations to know they have a time limit
9  otherwise they have to come back on Monday.  They may want to
10  resolve this quickly and be done.
11         THE COURT:  What do you mean they don't want to know
12  there's -- you don't want me say we'll work until 8 o'clock
13  tonight.
14         How about this as a suggestion, what if I say to them,
15  in answering this question, our schedule will be 9:30 to no
16  later than 5:00 p.m.  It is approximately whatever time it is
17  when they come in, and if you like we can dismiss you now.  How
18  is that?
19         MR. KUNZ:  That's what I was going to suggest is give
20  them the option.
21         MR. NORINSBERG:  Absolutely.
22         THE COURT:  Then if they start nodding, fine, if they
23  say no, no, no, we're close, we'll send them back in.
24         How is that?
25         MR. NORINSBERG:  That's fine.

947

DCDTGUZ7

1             (Jury present)
2             THE COURT:  I have received a note, the note reads:
3    Juror number three needs to leave at 5:00 p.m.  No later.  Is
4    there a schedule we need to adhere to or can we set a schedule
5    according to our needs?  And signed by the foreperson of the
6    jury.
7             Our schedule continues to be 9:30 to no later than
8    5:00 p.m.  Seeing as it is about 4:45 now, if you would like, I
9    can dismiss you now.  If the jury would like to go talk amongst
10   yourselves and let me know what you want to do, but I could
11   certainly dismiss you now.
12            JUROR:  Yes.
13            JUROR:  Thank you.
14            THE COURT:  So I will dismiss you, we'll come back
15   Monday at 9:30.  Do not discuss the case with anyone else.  Do
16   not discuss the case with any other juror until all the jurors
17   are assembled in the jury deliberation room.  Again, if your
18   friends or family ask you about the case, throw me under the
19   bus and say that that judge said we can't talk about the case.
20            Have a good weekend.
21            Actually hold on just a second.  Before you go, let me
22   see counsel at the side bar.
23            (At side bar)
24            THE COURT:  Any objection to my answering that
25   question?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

948

DCDTGUZ7

 1              MR. KUNZ:  No.
 2              MR. MEEHAN:  None whatsoever.
 3              (In open court)
 4              THE COURT:  Thank you.  We're adjourned.  Have a good
 5    weekend.
 6              (Jury not present)
 7              THE COURT:  Counsel, we have the corrections to the
 8    instructions.  We have just made corrections on those three
 9    pages, I think it was 11, 30 and 31.  So to save a few more
10    trees, we made copies to change those pages, and you can insert
11    those in the instructions that you already have.
12              We're going to give you one copy to look at.  So we
13    have a little bit of time now.  Counsel, look at the copy that
14    will go into the jury room on Monday just to make sure there's
15    nothing wrong with that, and we'll put the exhibit sticker on
16    that and let's have counsel glance at that and look at it
17    carefully and make sure it's right because that's the one going
18    to the jury.
19              We're going to give you all the changes.  There was
20    another change also on page 25.  Originally had A, engaging in
21    something, B something else, B was taken out by agreement of
22    the parties, so we just eliminated the A in front of "engage."
23              So give them a copy of all the changes.
24              Another one, we have a copy of this as well, on page
25    34, at the top it said "entitled to," and there was another
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

949

DCDTGUZ7

```
 1  "to" after that.  We have removed that on page 34.
 2           I assume there's no objection to any of these minor
 3  changes.
 4           MR. MEEHAN:  No, your Honor.
 5           MR. KUNZ:  None, your Honor.
 6           The instruction will be filed as a court exhibit, I
 7  imagine.
 8           THE COURT:  Yes, Court Exhibit 2.  The verdict form is
 9  Court Exhibit 1, that's why that note is Court Exhibit 3.
10           Any objection?
11           MR. KUNZ:  No.
12           MR. MEEHAN:  No, your Honor.
13           THE COURT:  Sorry, the charge is Court Exhibit 1, the
14  verdict form is Court Exhibit 2.  You have seen that and
15  that's -- Court Exhibit 1 will go to the jury on Monday.  We'll
16  send it to them Monday morning.
17           I take it there's nothing else you need me for.  We're
18  done for the day?
19           MR. NORINSBERG:  Done for the day.
20           MR. KUNZ:  Thank you, your Honor, for everything this
21  week.
22           MR. NORINSBERG:  Thank you, your Honor.
23           THE COURT:  See you Monday.  I got make sure there's
24  no -- can't imagine there will be any issues.  We don't want
25  you running into the jurors, so get here by 9:15 Monday.
```

950

DCDTGUZ7
1               Have a good day.
2               (Adjourned to December 16, 2013)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

951

DCG3GUZF                    DELIBERATIONS

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    NOEL JACKSON-GUZMAN,
3
4                    Plaintiff,
4
5            v.                          10 CV 6353 (ALC)
5
6    P.O. BRIAN JAY,
6    Shield No. 29733, Individually
7    and in his Official Capacity,
7
8                    Defendant.
8
9    ------------------------------x
9                                       New York, N.Y.
10                                      December 16, 2013
10                                      9:30 a.m.
11
11   Before:
12
12                   HON. ANDREW L. CARTER, JR.,
13
13                                      District Judge
14
14                         APPEARANCES
15
15   JON NORINSBERG
16   JOHN MEEHAN
16   KATHERINE SMITH
17       Attorneys for Plaintiff
17
18   NEW YORK CITY LAW DEPARTMENT
18   OFFICE OF CORPORATION COUNSEL
19       Attorneys for Defendant
19   BY:  MORGAN KUNZ
20       MATTHEW MODAFFERI
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

952

DCG3GUZF                    DELIBERATIONS

1          THE COURT:  Just to confirm, we had an off-the-record
2   conversation regarding some technical issues.  The last time we
3   were here on Friday, we had the jury instructions edited.  We
4   didn't get a chance to send them into the jury, so we're going
5   to send in to the written jury instructions today.
6          Also, I reconsidered my decision about sending in the
7   exhibits.  I've conferred with counsel, and counsel for
8   plaintiff and defendant are still in agreement that all the
9   exhibits should go into the jury.  Let me confirm that on the
10  record.
11         Plaintiff's counsel, is that your position?
12         MS. SMITH:  It is, your Honor.
13         MR. KUNZ:  Yes, your Honor.
14         THE COURT:  I think it is appropriate to send all
15  exhibits in to the jury.
16         And the other issue that we talked about in terms of
17  scheduling is I plan to take a lunch break between 12:45 and
18  2 o'clock.  Therefore, if the jury has any notes during that
19  time, we will not be able to respond to them until we resume at
20  2 o'clock.  I don't think it would be appropriate for me to
21  tell the jury that.  I can tell them that, but we've had that
22  conversation.
23         Anything else we need to address before I bring the
24  jury in from plaintiff?
25         MS. SMITH:  No, your Honor.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

953

DCG3GUZF                    DELIBERATIONS

1              THE COURT:  From defendant?
2              MR. KUNZ:  None from us, your Honor.
3              THE COURT:  Bring the jury in.
4              (Jury present)
5              THE COURT:  I hope you all had a pleasant weekend.
6    You are going to resume your deliberations now.  And I want to
7    let you know we are going to send in all the exhibits, that you
8    can have those in the jury room, you can do with them whatever
9    you wish to do with them.  You can go ahead and resume your
10   deliberations.
11             (Jury resumes deliberations.  Time noted 9:45 a.m.)
12             THE COURT:  Do any counsel have any objections to my
13   instructions to the jury?
14             MS. SMITH:  No.
15             MR. KUNZ:  No, your Honor.
16             THE COURT:  Make sure my deputy can get in touch with
17   you.  Make sure you're no more than 15 minutes away.
18             (At 10:17 a note is received from the jury)
19             (In open court; jury not present)
20             THE COURT:  We received a note from the jury.  My
21   deputy has handed copies of the note to all counsel.  I'll wait
22   and give counsel a chance to read their copy.  Counsel had a
23   chance to look at the copies of the note?
24             MR. NORINSBERG:  Yes, your Honor.
25             THE COURT:  I'll read it into the record.  It is Court
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

954

```
         DCG3GUZF                    DELIBERATIONS
 1   Exhibit 4 dated December 16, 2013.  It reads as follows:
 2            The Guzman jury would like the following:  Four copies
 3   of jury instructions, four copies of verdict sheet, the
 4   following portions of the transcript:  Guzman's testimony in
 5   its entirety, Jay's testimony in its entirety.
 6            Is it possible for the Court to let us know who were
 7   the four people arrested and the two victims.  And then can we
 8   have one pad of small Post-it notes, please.  Thank you.
 9            Signed by Juror No. 1, the foreman.
10            Let me hear from the attorneys, you can all be seated,
11   regarding the positions.  Let's go one at a time.  Four copies
12   of the jury instructions.  What is plaintiff's position on
13   that?
14            MR. NORINSBERG:  No objection.
15            THE COURT:  Defense position on that?
16            MR. KUNZ:  No objection.
17            THE COURT:  That's fine.  That seems appropriate to
18   me.  I don't want to get hyper-technical here.  I guess I'll
19   read this literally, they want four additional copies as
20   opposed to four copies in total.  They'll have five copies of
21   the jury instructions, so we'll make four copies and send that
22   in.
23            Next, four copies of verdict sheet.  Plaintiff's
24   position on that?
25            MR. NORINSBERG:  No objection.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

955

DCG3GUZF                    DELIBERATIONS

1               THE COURT:  Defendant's position on that?
2               MR. KUNZ:  I guess my only concern would be that
3    confusion what is the original.  So I don't know if we can mark
4    the copies as like "copy" or something.
5               THE COURT:  I'm a little concerned about four copies
6    of the verdict sheet floating around in there.  It seems there
7    is a possibility of confusion as to what the verdict sheet is.
8    But again, I'll listen to counsel in terms of suggestions.  We
9    can certainly write "copy" on each page of the verdict sheet.
10   It is a two-page document.  Do counsel want to do that?  I'll
11   listen to counsel but I am very concerned about having multiple
12   versions of the verdict sheet floating around.
13              MR. NORINSBERG:  I think it would make perfectly good
14   sense just to write "copy" on the ones that are copies, and the
15   one that doesn't have it on there, that would be the original.
16              THE COURT:  Defendant's position?
17              MR. KUNZ:  That's fine.
18              THE COURT:  Okay.  So let me see what the parties'
19   position on this is.  It is best to make sure there is no
20   confusion with stickers.  I'll have my deputy who has very nice
21   handwriting just handwrite "copy" on each page of the eight
22   pages of the verdict sheet.  What is plaintiff's position on
23   that?
24              MR. NORINSBERG:  That sounds reasonable, Judge.
25              THE COURT:  And defendant's position?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

956

```
        DCG3GUZF                   DELIBERATIONS
 1               MR. KUNZ:  That sounds reasonable.
 2               THE COURT:  All right.
 3               THE DEPUTY CLERK:  I can stamp it in red in copy.
 4               THE COURT:  She can stamp in red ink.
 5               MR. NORINSBERG:  Even better.
 6               MR. KUNZ:  Perfect.
 7               THE COURT:  So she'll stamp each of those pages in red
 8       "copy."  And we'll send in four copies with the red stamps of
 9       the verdict sheet.
10               Next question, the following portions of the
11       transcript:  Guzman's testimony in its entirety, Jay's
12       testimony in its entirety.  It is clear as to what they want.
13       No one has ordered the transcripts, therefore, she will have to
14       read it.
15               MR. NORINSBERG:  Okay.
16               THE COURT:  That kind of solves that then.
17               MR. KUNZ:  I was going to say perhaps we should bring
18       the jury in and explain that it has to be a readback, and if we
19       read all of Mr. Guzman and all of Mr. Jay's testimony, that's
20       going to be several hours of reading.
21               THE COURT:  I think it might be inappropriate to say
22       that.  They've asked for it, so we'll give it to them.  We'll
23       do it in a readback form.  And they'll know from then on if
24       they ask for other testimony how it will be.  I think it will
25       be inappropriate to say are you sure you really want this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

957

DCG3GUZF                    DELIBERATIONS

1  because this is how it will have to be.  I think it is
2  appropriate to have it read back.  Again, the direct
3  examination, cross-examination, redirect, everything else.
4          MR. KUNZ:  I totally understand your Honor's point.
5  Perhaps the jury would narrow its request down, like, we want
6  all of plaintiff's on direct or all of Jay's on direct.  If
7  they knew that it would be two and a half, three hours of
8  reading.  Just a thought.
9          THE COURT:  Plaintiff's position?
10          MR. NORINSBERG:  I agree with the Court.  I feel you
11  can't really tell them that.  This is what they've asked for,
12  this is what they want.
13          THE COURT:  I think that's right.  This is what
14  they've asked for.  I don't think it will take three hours to
15  read this back.  It may have taken a long time for the
16  testimony to go out the first time around because there were
17  objections and side bars, time for the lawyers to formulate
18  their questions and time for the witnesses to formulate their
19  answers, so it will be long.  But that's what they've asked
20  for.
21          Next question, is it possible for the Court to let us
22  know who are the four people arrested and the two victims.
23  What is plaintiff's position on that?
24          MR. NORINSBERG:  The four people arrested, it is in
25  evidence already, it is in the memo book of Jay.  There are two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

958

DCG3GUZF                    DELIBERATIONS

1  arrested for assault and two for OGA.  So we know the two
2  arrested for assault were Molina and Henriavez.  We know
3  Mr. Guzman was arrested, and there was testimony that Mr. Roman
4  was arrested.  Those are the four people that were arrested.
5  The only testimony regarding any victim is Henry Luzuriaga.
6  That is the only victim of which there is testimony that we can
7  inform the jury.  So I think this is actually a mistake on the
8  record.  There is no evidence of two victims, a second victim.
9  Because the two other charges were OGA charges.  They are not
10 assault charges.
11             THE COURT:  What do you suggest I do?
12             MR. NORINSBERG:  I suggest that we identify the four
13 people arrested, for which there is evidence.  And the one
14 victim for which there is evidence is Henry -- whatever his
15 name is, I can't pronounce it.  Basically that's the answer to
16 that question.  There are four people arrested, we had know
17 their identities because there was testimony about it.  And we
18 know the identity of one victim because there was testimony
19 about it.  And that's all the information that they have
20 evidence of in the record.
21             THE COURT:  What is defense counsel's position?
22             MR. KUNZ:  Your Honor, this is obviously an issue in
23 dispute.  So I just feel like it might be inappropriate for us
24 to answer this question.  I think we could just say that it is
25 up to the jury to answer this question and that we are unable

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

959
DCG3GUZF                    DELIBERATIONS

1  to give a direct answer to it.
2          THE COURT:  Let me hear more from plaintiff's counsel.
3  I think I tend to agree perhaps with defense counsel, because
4  if there is some information in the exhibit or information from
5  which the jury -- and I believe there may have been testimony
6  that there were two victims.  Was there some testimony there
7  were two victims?
8          MR. KUNZ:  Yes, there was testimony from all of the
9  officers that there were two victims.  There is a notation in
10  the sprint report that there was two victims.  And so I think
11  there is plenty of testimony to support that.
12          I just think if we get into naming this person and
13  that person, it gets too close to issues that are hotly in
14  dispute by the parties.  It would be inappropriate for us to
15  affirmatively answer that question.
16          MR. NORINSBERG:  There was actually one witness who
17  testified about two victims, that was Sergeant McHugh.  He
18  based that testimony solely on reading the sprint report.  I
19  think there are two parts to this question.  One part of the
20  answer, clearly we know the Molina defendants, we know
21  Mr. Guzman, and we know Mr. Roman were arrested.  That part is
22  clear.
23          As to the number of victims, I don't have a problem
24  saying to the jury that that is a matter which has been
25  disputed by each party.  It is up to your best recollection to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

960

DCG3GUZF                    DELIBERATIONS

1    answer that question based on what you remember.
2              THE COURT:  What is defense counsel's position on
3    that?
4              MR. KUNZ:  I guess the problem is, it is one question.
5              THE COURT:  What?
6              MR. KUNZ:  It is one question.  I don't think we can
7    split it up and say here is an answer to the first part of the
8    question, the answer to the second part of the question is in
9    dispute.  I think it is all part and parcel of the same issue,
10   your Honor.  And we believe this is just too close to an issue
11   that's in dispute in this case.
12             THE COURT:  What do the parties think about this.
13   What if in answering the question I remind the jury that you
14   are the judges of the facts, you will determine the facts.  If
15   there is any particular testimony or anything else that you'd
16   like us to give you, let us know.
17             MR. NORINSBERG:  I would be very concerned with that
18   instruction because it is not answering the question.  The
19   question can be answered based on the evidence in the record.
20   Now, the parties might disagree about the number of victims, we
21   might disagree about that, but we don't disagree about the
22   people arrested.  There are only four people arrested.  Officer
23   Jay's memo book made a notation of the four and what the
24   charges were for.  So why, Judge, shouldn't we at least answer
25   that question as here are the four people who were arrested.

961

DCG3GUZF                    DELIBERATIONS

1   As to the number of victims, that's an issue in dispute.  You
2   can remember, you can use your memory on that.
3           THE COURT:  I guess my concern is the jury, obviously
4   they are the judges of the facts.  And even if the parties
5   agree to some certain factual elements, the jury doesn't have
6   to accept that.  The jury can make their own determinations.
7   They may take part of one party's position, part of another
8   party's position.  I think it may be inappropriate, it is
9   invading their province for us to say, okay, based on our
10  reasoning and based on our marshaling the evidence in this
11  case, here is the answer to that question.  I think it may be
12  fairer to both sides to simply say you are the judges of the
13  facts.  If there is any particular testimony or any
14  particular -- I think it would just be testimony because they
15  have all the exhibits.  If there is any particular testimony
16  that you'd like read back to you, let us know.
17          MR. NORINSBERG:  Your Honor, certainly on the number
18  of disputed issues, the jury is the fact finder and they can
19  draw some conclusions.  One thing they couldn't draw a
20  conclusion on is the number of people arrested.  The only
21  evidence in the trial is that there were four people arrested.
22  So if the jury were to come back and speculate there were six
23  or eight people arrested, that's not in evidence.  There is
24  nothing in evidence to suggest that.  Nobody testified to more
25  than four victims.

962
DCG3GUZF                    DELIBERATIONS
1          So, I feel like just pushing back on them and saying
2    refer to your memory is not answering the question.  We are not
3    addressing the issue.  We know the identities, it is in
4    evidence, and what possible prejudice is there to identify
5    what's already in evidence.  Just to tell them these are the
6    four.
7          THE COURT:  I think because it is in evidence, the
8    jury can ask for that testimony.  And their question seems to
9    not be -- they don't seem to be asking the question about the
10   number of people arrested or the number of victims.  The jury's
11   question seems to be stated in the affirmative in terms of this
12   question that they believe there were two victims.  That's why
13   I'm concerned they are asking about the identities, it seems to
14   me, of the four people arrested and the two victims.
15         MR. NORINSBERG:  Right.  So we know the identities of
16   the four people arrested.  So why not at least answer to that
17   part which we know.  And then as to the other two, the two
18   victims that's an issue in dispute, you'll use your best memory
19   to determine that.
20         It is like one question with a part A and part B.  We
21   know the answer to part A.  They've asked it, it is in
22   evidence, why not just tell them.  Otherwise we are not
23   responding at all.  We are not answering the question they've
24   raised.
25         THE COURT:  Hypothetically speaking, let's say they
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCG3GUZF                    DELIBERATIONS

1    asked the question where did Diaz say that the fight started.
2    Let's say they asked that question.  Would it be appropriate
3    for us to just affirmatively answer that question or would it
4    be more appropriate for us to turn to that relevant portion of
5    the transcript and have that read back for them?
6              MR. NORINSBERG:  Well, that question would be where
7    did he say that.  Where did it happen.  If there is testimony
8    that answers that, that's appropriate.
9              THE COURT:  What would be appropriate?
10             MR. NORINSBERG:  To read back the portion of testimony
11   that specifically answers that question.
12             THE COURT:  Right.  So what you're suggesting is that
13   we answer this question without referring them to any portion
14   of the transcript.  You are asking us to basically marshal the
15   evidence and say here is the answer to that question.  Which is
16   what's got me a little concerned here.
17             Obviously, if the jury comes back and they say all
18   right, we'd like testimony regarding that.  Then the parties
19   will have to go sift through that and figure out what's
20   responsive to that.
21             I'm hesitant at this point to try to deliberately
22   answer that question.  So I think it is appropriate to say to
23   them, and they even phrase it as is it possible for the Court
24   to let us know who the four people arrested and two victims.
25   We are sort of reading tea leaves here.  I don't want to read

964

DCG3GUZF                         DELIBERATIONS
1   too much in this.  It could be insinuating is it possible to
2   let us know something that's not in evidence.  I don't know.  I
3   don't know what the question is, and I don't want to take a
4   chance by affirmatively telling this jury something factually
5   if I'm not sure that's what they are asking for.
6            I think the safer thing is to say you are the judges
7   of the facts.  If there is any testimony that you'd like, be as
8   specific as you can and let us know.
9            MR. NORINSBERG:  Can we at least say as a preface with
10  respect to that question, there is sharply conflicted evidence
11  in the record.  Just because otherwise it suggests there is
12  just one answer to this.  And at least with respect to the
13  second part of that question, it is very much in dispute.
14           THE COURT:  How am I suggesting an answer if I say you
15  are the judges of the facts.  If there is any testimony you'd
16  like read back, let us know.  How am I suggesting anything?
17  That's why I'm suggesting that, because that's the safest and
18  fairest for everyone.  We are not pushing them one way or the
19  other.  I am not saying look for this testimony or look for
20  that testimony.  Or look at this exhibit or look at that.  They
21  can ask us for any testimony that they want, and we'll see what
22  they respond to.
23           MR. NORINSBERG:  Okay.  Thank you.
24           THE COURT:  Then this final question, can we have one
25  pad of small Post-it notes please.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

965

DCG3GUZF                    DELIBERATIONS
1               Plaintiff's position on that?
2               MR. NORINSBERG:  No objection.
3               MR. KUNZ:  No objection.
4               THE COURT:  I think we have Post-it notes, right,
5       Tara?
6               We have three sizes.  Do the lawyers have any
7       preference for which of the three or all three?  Do they care?
8               MR. NORINSBERG:  Give them all three.
9               THE COURT:  Defendant's position?
10              MR. KUNZ:  No position.
11              THE COURT:  We'll give them all three sizes.  We have
12      the small, medium, and large size of Post-it notes.  Let me
13      have the parties inspect them, make sure they are free from
14      writing anywhere on them before we send anything into the jury.
15              Counsel have both inspected the Post-it notes that are
16      going in.  Any objection by plaintiff?
17              MR. NORINSBERG:  No objection.
18              THE COURT:  Any objection by defendant?
19              MR. KUNZ:  No, your Honor.
20              THE COURT:  Regarding the readback of the testimony,
21      as indicated by the court reporter, she will need some time to
22      go back to her office and gather this.  I would intend to tell
23      the jury that it will take time for us to locate that testimony
24      and have it read back to you.  Anyone have an objection to
25      that, plaintiff's counsel?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

966

DCG3GUZF                    DELIBERATIONS

1              MR. NORINSBERG:  No objection.
2              THE COURT:  Defense counsel?
3              MR. KUNZ:  No objection.
4              THE COURT:  My intention again is to answer the first
5    question, four copies of the jury instructions, the answer will
6    be yes.  We'll send that into them.  Four copies of the verdict
7    sheet, I will answer that yes.  And I would recommend
8    suggesting to them that for their actual verdict, that they
9    only enter their verdict on the verdict sheet with the exhibit
10   number on it.  Plaintiff's counsel have a position on that?
11   Should I say if you reach a verdict, you should only enter your
12   verdict on the form that has the exhibit sticker on it?
13             MR. NORINSBERG:  That's fine.
14             MR. KUNZ:  That make sense.
15             THE COURT:  Parties agree I should have that sort of
16   conditional "if" in there or no?
17             MR. NORINSBERG:  That's fine.
18             MR. KUNZ:  If they reach a verdict, it should only be
19   on the final version with the sticker.
20             THE COURT:  Okay.  Then in terms of the portions of
21   the testimony, I will tell them it will take some time for us
22   to locate that for them and have that read back to them in open
23   court.  So be patient.  And then for that next question is it
24   possible for the Court to let us know who were the four people
25   arrested and the two victims.  I will instruct them that you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DCG3GUZF                    DELIBERATIONS

```
 1    are the judges of the facts.  If there is any particular
 2    testimony that you would like, let us know.  We'll try to
 3    locate that for you.  And then the other thing we'll tell them
 4    for the Post-it notes, we'll say we've got three sizes of
 5    Post-it notes that we are sending into you.
 6              I'll bring the jury in.
 7              (Jury present.  Time noted 10:39 a.m.)
 8              THE COURT:  We've received your note, Court Exhibit 4,
 9    dated today's date and signed by Juror No. 1, the foreman.
10              The Guzman jury would like the following:  Four copies
11    of jury instructions.  So the answer to that question, we will
12    make four additional copies of the jury instructions and we
13    will send those into you.
14              Four copies of verdict sheet.  To answer that
15    question, we will make four copies of the verdict sheet, and
16    send that into you.  If the jury reaches a verdict, however,
17    you should enter the verdict only on the verdict sheet that has
18    the court exhibit sticker on it.
19              The following portions of the transcript:  Guzman's
20    testimony in its entirety, Jay's testimony in its entirety.  We
21    will have that read back for you.  It will take some time for
22    us to locate that portion of the testimony.  We'll bring you
23    back in open court, and the court reporter will read that aloud
24    for you.  It will take some time to locate that.
25              Is it possible for the Court to let us know who were
```

968

DCG3GUZF                     DELIBERATIONS

1   the four people arrested and the two victims.  I remind you
2   that you are the judges of the facts.  If there is any
3   testimony that you'd like, be as specific as you possibly can
4   and ask us and we will try to locate that testimony.
5             Can we have one pad of small Post-it notes, please.
6   We have Post-it notes for you.  We will give those to you.  We
7   have three separate sizes.  We will give you all three sizes.
8   Small, medium and large.  You can do with them as you will.
9             Thank you very much.  If you have any other notes,
10  again follow that procedure.  I see a juror raising her hand.
11  If you have any other notes, just follow that procedure.
12            (Jury excused)
13            THE COURT:  Plaintiff's counsel, any objection to my
14  answering the jury's questions?
15            MR. NORINSBERG:  No, your Honor.
16            THE COURT:  Defense counsel?
17            MR. KUNZ:  No, your Honor.
18            THE COURT:  We probably should hang around because one
19  of the jurors had raised her hand.  We may be getting another
20  note soon.  Also, the court reporter had a question regarding
21  the reading back of the transcript.  Since the jury asked for
22  Guzman testimony in its entirety first and then Jay's testimony
23  in its entirety, even though Officer Jay testified first, I
24  believe it is more appropriate in answering the jury's question
25  to answer the question in the order in which the question was

969

DCG3GUZF                        DELIBERATIONS

1   presented.  So I think it would be appropriate to start off
2   with Guzman's testimony in its entirety, then Jay's testimony
3   in its entirety.  Any position from plaintiff?
4             MR. NORINSBERG:  Judge, I agree, based on the way the
5   question was worded, that's the order they asked for and we
6   should follow that.
7             THE COURT:  Defense counsel?
8             MR. KUNZ:  We agree, your Honor.
9             THE COURT:  Let's just hang out here for a second
10  because they may have another note.  In the meantime, we should
11  go ahead and send in the Post-it notes, and I guess we should
12  go make copies of the jury instructions as well as the verdict
13  sheet.
14            (Pause)
15            THE COURT:  I think it's been about six minutes since
16  they were last here.  We didn't get a an immediate note.
17  Counsel can move around and make sure we'll reach you.  We'll
18  give the court reporter an opportunity to locate that
19  testimony.  All right?  Thank you, and again my staff is in the
20  process of copying the jury instructions, verdict sheet, and
21  stamping the verdict sheet appropriately.  Thanks.
22            (Recess pending verdict)
23            (A note was received at 11 a.m.)
24            THE COURT:  We have another note, Court Exhibit 5.
25  Counsel have copies of the note?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

970

DCG3GUZF                    DELIBERATIONS
1                MR. KUNZ:  Yes, your Honor.
2                THE COURT:  The note is dated today.  It says:  Please
3       disregard our request to hear Police Officer Jay's and Noel
4       Guzman's testimony in their entirety.  We will put together
5       questions and request specific points at a later time.
6                I don't think we need to answer anything, but we no
7       longer need the court reporter to go and find that testimony.
8       Regarding the other request, the answers that we've already
9       given them, we have the four additional copies of the jury
10      instructions.  And we've got those collated.  We're going to
11      staple those and send those in.  We also have the four copies
12      of the verdict form and we are going to stamp those with the
13      red "copy" stamp.  I'm wondering just for consistency's sake,
14      what the parties' position is, the jury instructions have been
15      marked as a court exhibit.  I don't think there is really any
16      danger so much in the jury instructions getting confused as to
17      what is what.  But perhaps it makes sense to mark the first
18      page of the copies of the jury instructions with the red "copy"
19      stamp as well.  Getting into some minutia here but plaintiff's
20      counsel have a position on that?
21               MR. NORINSBERG:  We wouldn't object to it, but we feel
22      it is unnecessary.  The danger was only with the verdict form,
23      not with the charges.
24               THE COURT:  Defense counsel?
25               MR. KUNZ:  Fine with us, your Honor.  We have no
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

```
        DCG3GUZF              DELIBERATIONS
 1   position.
 2              THE COURT:  So I don't have to do it.  I was trying to
 3   be consistent.  What do counsel prefer?
 4              MR. NORINSBERG:  I would prefer not do it, just get it
 5   to them as quickly as possible.
 6              THE COURT:  Defense counsel?
 7              MR. KUNZ:  That's fine.
 8              THE COURT:  We won't stamp those with the red "copy"
 9   stamp.  We'll do that with the verdict form.  We'll show those
10   verdict forms to counsel before we send them in.
11              Let me hand the copies of the verdict sheet to counsel
12   so counsel can review them before they go in the.  The red
13   "copy" stamp is on the lower-right-hand side on the document.
14   On the front and back on the front and the second page.  And
15   counsel have reviewed those.  Are those okay to go into the
16   jury room?
17              MR. NORINSBERG:  Yes.
18              MR. KUNZ:  Yes, your Honor.
19              THE COURT:  We also have the four copies of the jury
20   instructions, we are just waiting to bring up our heavy duty
21   stapler.  We've got them now bound with an alligator clip.  And
22   Post-it notes have already gone into the jury as have the other
23   things they've requested.
24              We've stapled the jury instructions.  Let me give
25   counsel a chance to peruse those briefly before we send those
```

972

```
        DCG3GUZF                    DELIBERATIONS
 1   into the jury as well.  Have counsel reviewed that?
 2              MR. KUNZ:  Yes, your Honor.
 3              MR. NORINSBERG:  Yes, your Honor.
 4              THE COURT:  Are those good to go into the jury?
 5              MR. NORINSBERG:  Yes, your Honor.
 6              MR. KUNZ:  Yes, your Honor.
 7              THE COURT:  We'll send those in.  I think this takes
 8   care of everything.  Correct?
 9              MR. NORINSBERG:  Yes, your Honor.
10              (Recess pending verdict)
11              (A note was received at 11:26 a.m.)
12              THE COURT:  All right.  Counsel have a copy of the
13   most recent note, Court Exhibit 6.  I'll give counsel a chance
14   to look at that.  I'll read the note into the record.  It is
15   dated today's date.
16              Judge Carter, regarding the false arrest, does Police
17   Officer Jay have to prove by a preponderance of the evidence
18   that, one, there was probable cause to arrest Guzman for any --
19   which is underlined -- offense.  Or two, there was probable
20   cause to arrest Guzman for OGA specifically?
21              There is an asterisk, as per jury instructions page
22   24, first two lines.  Signed by the foreman of the jury, Juror
23   No. 1.
24              Then there is an also.  Postscript down at the bottom:
25   Is it possible for us to have a white board or a flip chart,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

973

DCG3GUZF                    DELIBERATIONS

1  please.  Thank you.
2            Regarding the first question, what is counsel's
3  position starting with counsel for the plaintiff?
4            MR. NORINSBERG:  I believe there were only two
5  offenses that you charged the jury on.  One was OGA and one was
6  disorderly conduct.  That is the universe for which they can
7  operate within in order to answer this question.  In other
8  words, they can say there was probable cause for OGA or for
9  disorderly conduct.  When they say any offense, there is no
10 other offense they've been instructed on or heard evidence for.
11 So I don't think that is an appropriate answer for the Court to
12 give to say it could be any other offense.
13           THE COURT:  What is it you suggest I say?
14           MR. NORINSBERG:  I suggest the Court say they have
15 been instructed on two possible offenses for which Mr. Guzman
16 could have been arrested, OGA or disorderly conduct, and
17 Officer Jay's burden is to prove that there was probable cause
18 for one or the other offense.
19           THE COURT:  Defense counsel, what is your position?
20           MR. MODAFFERI:  Our position is that the jurors'
21 first, I guess, question, if you will, is an accurate account
22 of the law as stated in the jury charge.  And again, this goes
23 back to our charging conference where the law is that Officer
24 Jay need only have probable cause for any offense.  And I know
25 counsel is saying in the charge the only crimes that were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCG3GUZF                    DELIBERATIONS

1   listed or charges were OGA and disorderly conduct.  But to the
2   extent that the jury believes that maybe Mr. Guzman threatened
3   Officer Jay, that would be harassment.  I mean, we can't just
4   say just because the charge has two offenses, that that's it,
5   the law as stated in the charge is it.  Probable cause for any
6   offense.  So I don't know how your Honor wishes to respond to
7   that, just say one or two.  But I think just saying you are
8   correct with number one would be an accurate recount of the
9   law.
10          THE COURT:  I don't think that this question is the
11   jury indicating they're speculating about other offenses that
12   are not indicated in the charge.  This question is posed as
13   either this or that.  It is either one, as they listed here,
14   there was probable cause to arrest Guzman for any offense, or,
15   this restriction there was probable cause to arrest Guzman for
16   OGA specifically.
17          In answering the jury's question I think it is
18   appropriate to say that the answer is one, there was probable
19   cause to arrest Guzman for any offense.  I think it would be
20   inappropriate for me to say anything else in terms of what else
21   is in the charge.  They are not asking about anything else
22   that's in the charge.  It would certainly be inappropriate for
23   me to start talking about other offenses that are not in the
24   charge or limiting it to the offenses in the charge.
25          I think in answering the question it would be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

975

DCG3GUZF                     DELIBERATIONS

1   appropriate for me to simply state it the way they've stated it
2   here.  It is either carrots or peas.  That's what they've posed
3   here and the answer is carrots, not peas.
4           So my intention would be to answer that question
5   reading this question to them and say the correct answer is
6   one, there was probable cause to arrest Guzman for any offense.
7   Anything else from plaintiff on that?
8           MR. NORINSBERG:  But, Judge, the problem is there is
9   no evidentiary basis for any other offense, and there is no
10  legal basis in the charge for any other offense.  To just say
11  any offense is in itself I think incorrectly instructing the
12  jury on the law.  While there are theoretical possibilities of
13  other offenses, those possibilities were eliminated by the fact
14  we didn't have testimony about them and they haven't been
15  charged on them.  For example, maybe he could have been charged
16  with assault in the third degree, or some other mythical
17  charge, but there is no evidence for it and there is no legal
18  instruction for it.  So I feel like to just reiterate this by
19  saying it could be any offense is incorrect as a matter of law.
20  There is no basis here for them to make that conclusion.
21          THE COURT:  Let me just look at our copy of the jury
22  instructions again.
23          MR. KUNZ:  We have a copy here, your Honor.
24          THE COURT:  Okay.
25          MR. KUNZ:  This was I don't think corrected as read,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

976

DCG3GUZF                    DELIBERATIONS
1   but this is the copy.
2            MR. MODAFFERI:  It may have my pen corrections but
3   other than that it is accurate.
4            THE COURT:  That's fine.  I'm looking at page 24, line
5   two, since the jury did reference that with the asterisk as per
6   jury instruction page 24, first two lines, proof beyond a
7   reasonable doubt.  Reading from page 24, the first two lines, I
8   guess I'll read the start of that sentence on page 23.
9   Therefore, disposition of the criminal charges against
10  plaintiff, how the criminal case ended, is not relevant to your
11  determination of false arrest because a criminal case requires
12  proof beyond a reasonable doubt, while a false arrest claim
13  requires you to decide if Officer Jay had probable cause based
14  on the objective circumstances to arrest Mr. Guzman for any
15  offense.
16           That's what they were specifically referring to.  So
17  looking at that, in conjunction with their specific question,
18  it appears that the jury is parsing out the word "any," meaning
19  was there probable cause to arrest Mr. Guzman for any offense,
20  meaning they were confused as to whether that means a specific
21  offense meaning OGA, or any offense.
22           So, I believe, again, as I stated before, the
23  appropriate answer there to answer their question directly is
24  that it means any offense, and by eliminating the second one,
25  they will know it is not talking about OGA specifically.

977

DCG3GUZF                    DELIBERATIONS
 1          All right.  Let me hear from plaintiff's counsel again
 2     on that.
 3          MR. NORINSBERG:  I feel if you gave them that
 4     instruction and then just added to it, it could be any offense
 5     but in this case you've only been instructed on two possible
 6     offenses for which Mr. Guzman could have been arrested, OGA and
 7     disorderly conduct, and those are the two offenses which you
 8     should be focusing on when answering this question.  So you're
 9     reaffirming yes, in theory it could be any offense, but in this
10     case we've only heard two and that's what you should focus your
11     analysis on.
12          MR. KUNZ:  We think your Honor is absolutely right,
13     and we should just answer the question.  And then I would also
14     note that I think there is evidence in the record to support
15     other offenses.  In fact, an issue we were going to raise at an
16     appropriate time is that plaintiff's theory in closing argument
17     changed the landscape a little bit.  So we do believe there
18     might be a different special interrogatory.  The only reason I
19     am saying this, in closing argument plaintiff argued that
20     Officer Jay may have mistakenly believed that the plaintiff was
21     in the fight.  So if the jury adopts that theory, they could
22     think there was probable cause to arrest him for assault or
23     some other offense.
24          THE COURT:  I think the problem here is that we are
25     talking about, obviously, counsel are very well versed in New
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

978

DCG3GUZF                    DELIBERATIONS

1   York's Penal Law and the statutes concerning New York's Penal
2   Law.  The jury has not been instructed on elements of any other
3   offense.  It would be inappropriate for the jury to start
4   speculating about any other offense.  And the jury would be
5   prohibited from doing such.  I don't think that's what the jury
6   is doing.  The jury is asking a specific question, basically
7   does "any offense" mean this specific one offense, or more than
8   just that specific one offense.  I don't believe that we can
9   infer from this that the jury is speculating what the elements
10  of the crime is for assault or harassment or anything else.
11  The jury can't speculate about that.
12           So I think that the jury is asking the specific
13  question, meaning the difference between "any," meaning this
14  specific OGA offense, or "any" meaning more than just that
15  bigger, greater than that.
16           MR. KUNZ:  We absolutely --
17           THE COURT:  Greater or equal to OGA is what their
18  question seems to me to be asking.  It would be inappropriate
19  to start suggesting anything else like that.  And I think by
20  stating to them what's clearly in the charge about disorderly
21  conduct might start inviting them to start thinking about other
22  things.  I don't think that their question is indicating that
23  they are back there looking at the New York Penal Law, trying
24  to figure out what possible offenses there might be in looking
25  at the elements of those offenses.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

979

DCG3GUZF                    DELIBERATIONS
 1          I know plaintiff is objecting to this.  Does plaintiff
 2  want me to add this other thing that I don't think is directly
 3  responsive to this question.  I want to make sure plaintiff has
 4  an opportunity to be heard on this.  Let me hear plaintiff some
 5  more on that.  I think if I say to them, however, in this case
 6  you're only -- I think that's going a little bit too far.  I
 7  think their specific question is, is it OGA or is it greater
 8  than or equal to OGA.  That's how I read that from a
 9  mathematical standpoint, greater than or equal to OGA, based on
10  what they have been charged with, would be disorderly conduct.
11  But it doesn't seem to me to be appropriate to tell them that
12  since they didn't ask that.
13          What is plaintiff's position on that?
14          MR. NORINSBERG:  I'm very concerned that maybe they
15  are having a discussion about other possible offenses for which
16  there has been no evidence and no legal instruction and they
17  can go off in there and we'll never know.  We have an
18  opportunity to simply state on the record you've been charged
19  in this case on two criminal offenses.  When answering that
20  first question, those are the relevant offenses you should
21  consider.
22          THE COURT:  Aren't we required to believe that the
23  jury is following the instructions, and if the jury is out
24  there being a rogue jury looking into their own definitions of
25  the law, then we are in a lot of trouble anyway.  If I'm
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

980

DCG3GUZF                    DELIBERATIONS

1   required and we are all required to believe that this jury is
2   taking the instructions seriously, and obviously by this
3   question they are taking the instruction seriously, why is it
4   we are to infer that they are doing something, that they are
5   totally off the reservation and doing their own legal research
6   and their own factual research into something else?
7           MR. NORINSBERG:  I agree, Judge.  We are not helping
8   them at all.  We are not answering the question.  We are
9   pushing it back on them and repeating the question they asked.
10          THE COURT:  I think especially with this jury, this
11  jury seems to be a particularly conscientious jury, and this
12  jury does not seem to be particularly shy if they feel the
13  question hasn't been answered.
14          I am going to overrule the plaintiff's objection on
15  that and I will answer the question.  I will read their
16  question and I will answer.  I'll listen to counsel in terms of
17  how to phrase this, but I was going to say in terms of that the
18  proper answer is there was probable cause to arrest Guzman for
19  any offense.
20          What is plaintiff's position on that?  What is defense
21  counsel's position on that?  I know what plaintiff's counsel's
22  position is on that.  In terms of the wording of that,
23  plaintiff's counsel have a position on that?
24          MR. NORINSBERG:  I have nothing to add other than what
25  I said before, Judge.  Same argument and just hearing you say

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

981

DCG3GUZF                    DELIBERATIONS

 1  it really makes me wince a little.  It just seems to be opening
 2  up the door to other offenses that you haven't charged on.
 3              THE COURT:  Okay.  Defense counsel?
 4              MR. KUNZ:  We agree to your Honor's language.
 5              THE COURT:  Regarding the next request, is it possible
 6  for us to have a white board or flip chart, please.
 7              We do have the white board we brought out before
 8  that's available.  We can make that available to them and my
 9  deputy has the appropriate pens and erasers for that.  My
10  intention would be to give them the white board with the
11  markers and the eraser.  Plaintiff have a position on that?
12              MR. NORINSBERG:  We have no objection.
13              MR. KUNZ:  No objection.
14              THE COURT:  Just do me a favor and let's look at the
15  white board before we send that in there, just make sure there
16  is nothing still left on there on the back of it or front of it
17  that could be problematic and we'll send that in.
18              Counsel don't have any objection to that white board
19  going in?
20              MR. NORINSBERG:  None from plaintiff.
21              THE COURT:  Put it up in the light, make sure there is
22  nothing there that was written and is showing through in any
23  way.
24              MR. KUNZ:  It is totally blank.
25              THE COURT:  I'll send that in.  Well, we're ready to

982

DCG3GUZF                    DELIBERATIONS

 1   bring the jury in.  Just before I let them in, now that the
 2   white board has been removed there is this diagram sitting
 3   here.
 4             MR. NORINSBERG:  I'll turn it around, your Honor.
 5             THE COURT:  Let's bring the jury in.
 6             (Jury present.  Time noted 11:42 a.m.)
 7             THE COURT:  We've received your note.  Judge Carter,
 8   regarding the false arrest, does Police Officer Jay have to
 9   prove by a preponderance of the evidence that, one, there was
10   probable cause to arrest Guzman for any offense, or two, there
11   was probable cause to arrest Guzman for OGA specifically?
12             Underneath that it says as per jury instructions page
13   24, first two lines.  Signed by Juror No. 1, the foreperson of
14   the jury.  Also, is it possible for us to have a white board or
15   flip chart, please.  Thank you.
16             Regarding your question regarding the false arrest,
17   does Police Officer Jay have to prove by a preponderance of the
18   evidence, the answer to that question is one, there was
19   probable cause to arrest Guzman for any offense.
20             Regarding the second request for a white board, or
21   flip chart, we have a white board available for you.  That will
22   be brought into the jury room.  We also have the appropriate
23   pens and eraser for that so we'll bring that into the jury room
24   for you.  Okay.  Thank you.
25             (Jury excused.  Time noted 11:44 a.m.)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

983

DCG3GUZF                    DELIBERATIONS

 1          THE COURT:  Regarding my answering of the jury's
 2  question, other than the objection previously noted by
 3  plaintiff's objection, is there an objection to my answer?
 4          MR. NORINSBERG:  No, your Honor.
 5          MR. KUNZ:  No, your Honor.
 6          THE COURT:  I noticed when there was this white board,
 7  I also looked over to my right, I noticed this exhibit, this
 8  demonstrative aid is over here by the witness stand as well.
 9  Perhaps whoever's exhibit that is, we should have that removed
10  and taken out of the jury's line of sight.
11          MR. MEEHAN:  We'll move it right now, your Honor.
12          THE COURT:  Okay.  Just so the record is clear, that
13  seems to be a foot and that's a model of a foot and a model of
14  what is that.
15          MR. MEEHAN:  A knee, your Honor.
16          THE COURT:  The small model of the knee.  Let's remove
17  that out of the jury's line of sight.  Anything else today?
18          MR. NORINSBERG:  No.
19          THE COURT:  Thank you.  So counsel, you're free to
20  move around.  But the way the jury has been very actively
21  sending us notes, you may want to hang around the next 10
22  minutes.  Thank you.
23          (Recess pending verdict)
24
25          THE COURT:  It is about 12:50 now.  I am going to let

984

DCG3GUZF                    DELIBERATIONS
1   the lawyers go to lunch.  We haven't received any notes.  Is
2   there anything anyone needs to bring to my attention?
3           MR. KUNZ:  Yes, your Honor.  I want to bring it up now
4   because I believe if we wait too long it will be waived.  But
5   we wanted to propose an additional special interrogatory which
6   is based on plaintiff's theory on closing, which was something
7   along the lines of Officer Jay, as he was going through the
8   crowd, mistakenly thought that plaintiff was involved in the
9   fight and that's why he used force on the plaintiff.
10           So in light of that argument that the plaintiff's
11   counsel made, we think there should be an additional special
12   interrogatory along the lines of do you find that P.O. Jay
13   reasonably, even if mistakenly, believed that plaintiff was
14   involved in a fight.
15           THE COURT:  Okay.  Let me hear from plaintiff's
16   counsel on that.
17           MR. NORINSBERG:  Yes, Judge.  As the Court pointed out
18   multiple times, an argument in opening or closing is not
19   evidence.  It is an argument by counsel.  The evidentiary
20   record already existed prior to closings.  Both parties
21   submitted interrogatories.  We based our respective summations
22   in part on what's in those interrogatories.  And to ask for it
23   now after summations have been concluded, to devise questions
24   based on what one party or another said in summations I think
25   is totally improper.  It is far too late to do that.  And in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCG3GUZF                    DELIBERATIONS
1    any event, the issue as it stands now before the Court I
2    believe is also completely premature.  The jury has not made a
3    verdict yet in our favor.  In the event that they do, we can
4    revisit this.  But in my view, this argument is inappropriate,
5    it is untimely, and it shouldn't be entertained at all.
6            THE COURT:  Let me hear from defense counsel, because
7    I think I tend to agree with plaintiff's counsel.  I don't
8    think there was evidence in the record to support that it was a
9    mistake.
10           MR. KUNZ:  We agree with you there.  We don't think
11   there is evidence in the record to support that.  That is what
12   was argued at closing.
13           In terms of the timeliness issue, our reading of the
14   Second Circuit case law in qualified immunity, as long as the
15   issue is raised before the verdict comes back, I think it would
16   be too late.
17           THE COURT:  Putting timeliness aside, do you agree
18   there is no evidence in the record for the jury to base that
19   determination on?
20           MR. KUNZ:  Plaintiff's counsel argued in closing that
21   the reference in the arrest report --
22           THE COURT:  We just saw the marshal.  We want to make
23   sure there is no note or anything from the jury.
24           THE DEPUTY CLERK:  No note.
25           THE COURT:  Go ahead, counsel.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

986

DCG3GUZF                    DELIBERATIONS

 1          MR. KUNZ:  What plaintiff's counsel argued in closing
 2   was that there is a reference on the arrest report for the
 3   plaintiff that says that he was doing this with the aid of
 4   another.  With the aid of another, plaintiff interfered in the
 5   arrest.  So, plaintiff's counsel used this notation in the
 6   arrest report to argue that what happened is that as Officer
 7   Jay was going through the crowd, McHugh and Walters arrested
 8   the people that were fighting, and Jay mistakenly thought that
 9   the plaintiff was involved in this fight because of his
10   proximity to the fight that was going on.  And that's when he
11   used the force.
12          So based on the argument that the plaintiff's counsel
13   made in closing, which is totally different than what they had
14   argued in opening and throughout the case, we feel like there
15   needs to be this additional interrogatory to get at that
16   argument.  Did the jury buy that?  Does the jury believe that
17   Officer Jay mistakenly thought the plaintiff was involved in
18   the fight?
19          THE COURT:  You've raised it, I'll reserve on that.  I
20   would be interested to find out if you have any cases on that,
21   because clearly, again, as both sides tend to agree and as I
22   agree, there was no evidence in the record for that statement.
23   Officer Jay certainly didn't testify that he believed that the
24   plaintiff was involved in the fight.
25          MR. KUNZ:  Right.

987

DCG3GUZF                    DELIBERATIONS

 1           THE COURT:  In fact, testified to the contrary, if my
 2    recollection controls, that he did not believe the plaintiff
 3    was involved in a fight.  So, counsel's argument is not
 4    evidence.  The jury has been told over and over that arguments
 5    by counsel are not evidence.  So, I'll reserve on that.  I'm
 6    inclined to deny that request.  I'll reserve on that.  If you
 7    can give me some cases that an argument by counsel somehow
 8    opens the door to some sort of special interrogatory for a jury
 9    to make some determination based on something that's not in
10    evidence.  I don't think you are going to find anything, but I
11    will reserve on that.
12           MR. KUNZ:  The only two evidentiary pieces that the
13    plaintiff's counsel cited in his closing was the arrest report,
14    which indicated that the plaintiff acted with the aid of
15    another.  And plaintiff's testimony that he was in close
16    proximity to the fight but not participating in the fight.  So
17    those were the two factual underpinnings that did come out into
18    evidence, and plaintiff's counsel used those factual
19    underpinnings to make this argument about what he believes
20    happened.  So, we just want to get a special interrogatory that
21    gets to that issue as identified by plaintiff's counsel in the
22    closing.
23           THE COURT:  Again, we've got time, depending on what
24    this verdict is.  You have raised it.  I'll reserve on that.
25    I'm inclined not to grant it.

988

DCG3GUZF                    DELIBERATIONS

1           Everyone can go grab lunch now and we'll be back here
2      at 2 o'clock.  Anything else anyone needs to raise with me?
3      Thank you very much.
4           (Recess)
5           THE COURT:  Back to the case on trial.  We have
6      another note from the jury.  Court Exhibit 7.  Counsel have a
7      copy of the note and it reads as follows:  May we have another
8      white board please.  Signed by Juror No. 1, the foreman of the
9      jury.  The postscript says with all due respect, if you don't
10     need to call us in for this, we're okay with that.
11          So, my intention is to give them a white board without
12     calling them in.  What is plaintiff's position on that?
13          MR. NORINSBERG:  Yes, your Honor.
14          MR. KUNZ:  We agree.
15          THE COURT:  I believe we have a white board in the
16     back.  I believe it is one with actual paper.  So we can send
17     that in, but before we send it in I want counsel to look at it,
18     examine it, make sure there is nothing written on it, on the
19     front or back of any of those pages, and we'll send that into
20     the jury.
21          MR. MEEHAN:  There is nothing else on it, your Honor.
22          THE COURT:  Counsel for both sides have examined that
23     and we'll send that into the jury.  We'll do that.  Thank you.
24          (Recess pending verdict)
25          THE COURT:  We have another note from the jury.  Court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

989

DCG3GUZF                    DELIBERATIONS
1   Exhibit 8.  The note reads:  Number one.  If we award damages,
2   are they subject to taxes.  Number two, are the plaintiff's
3   attorneys compensated out of the damages we award.  Signed by
4   Juror No. 1, the foreman of the jury.  And the postscript is we
5   will not be able to come to a conclusion this evening.  Can we
6   be dismissed after your reply.
7            How do the parties want me to answer these questions?
8   Let's start with number one.  If we award damages, are they
9   subject to taxes.  Plaintiff's counsel?
10            MR. NORINSBERG:  Your Honor, I believe the jury should
11   be instructed that they should not take into account one way or
12   the other the issue of taxes.  They should just evaluate the
13   amount of damages based on the instructions that you gave them.
14   And that this shouldn't be a factor one way or the other.
15            THE COURT:  Okay.  Defense counsel?
16            MR. KUNZ:  I think we agree in regard to taxes, your
17   Honor.  The second question, however, I think is a little
18   different.
19            THE COURT:  Let me just get the agreement then on the
20   first question is both parties want me to tell the jury.
21            MR. NORINSBERG:  They should base their decision on
22   damages according to the instructions you have given them, and
23   they should not add or subtract based on any considerations of
24   income taxes.
25            THE COURT:  Okay.  Defense counsel?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

990

DCG3GUZF                    DELIBERATIONS
1              MR. KUNZ:  I think that's right.
2              THE COURT:  So I say something to the effect of you
3      should award any damages based on the law as I've given it to
4      you, and you should not consider taxes in adding or subtracting
5      to any amount that you may award.  Sound good?
6              MR. NORINSBERG:  Yes.
7              THE COURT:  As to number two, plaintiff's counsel?
8              MR. NORINSBERG:  At this point now that the jury has
9      specifically raised this issue, I think we're inclined to
10     revisit defense counsel's request for the instruction they
11     asked for before, where they wanted you to instruct the jury
12     about attorneys' fees.  We feel now that they've raised it on
13     their own, it might be an appropriate time to give such an
14     instruction.
15             THE COURT:  What instruction?
16             MR. NORINSBERG:  This is one that defense counsel
17     submitted.  I would like to hear it again before we agree.  I
18     think substantially we would be in agreement on that charge.
19             MR. MODAFFERI:  Our exact proposal would be for you to
20     read the proposed attorneys' fees charge that we had in our
21     proposed charge.  It basically says something to the effect of
22     you are not to consider attorneys' fees in your award of
23     damages.  This is something for the Court to determine.
24             MR. KUNZ:  I have it here.  Federal law provides for
25     an award of attorneys' fees to a plaintiff when he or she
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

991

```
DCG3GUZF                    DELIBERATIONS
 1   prevails in a civil rights action.
 2              THE COURT:  Slow up a little bit.
 3              MR. KUNZ:  Federal law provides for an award -- I can
 4   probably copy this and e-mail this to an address if that's --
 5              THE COURT:  That's fine.  If you can e-mail it to the
 6   chambers address.
 7              MR. KUNZ:  I'll do that right now.
 8              MR. NORINSBERG:  Can we still have it read into the
 9   record.
10              THE COURT:  Yes.
11              MR. KUNZ:  That's ALCarter.
12              THE COURT:  I believe that's correct.
13              MR. KUNZ:  I just sent it.  Would your Honor like me
14   to continue reading or do you want to do it?
15              THE COURT:  I'll do it once I have received it.  For
16   the postscript there, anybody object to me sending them home
17   after we answer these questions?
18              MR. NORINSBERG:  No, your Honor.
19              THE COURT:  All right.  So it reads:  Federal law
20   provides for an award of attorneys' fees to a plaintiff when he
21   or she prevails in a civil rights action.  The award of
22   attorneys' fees is a matter to be determined by the Court.
23   Accordingly, if you award any damages to plaintiff, including
24   nominal damages, you should not take into consideration the
25   fees that plaintiff may have to pay his attorneys.
```

DCG3GUZF                    DELIBERATIONS

1              MR. NORINSBERG:  I think we're okay with it except for
2      that nominal damages part.  I don't think that's really
3      appropriate here.
4              THE COURT:  Okay.  What is defense counsel's position
5      on that?
6              MR. KUNZ:  I believe we did instruct the nominal
7      damages.  It is on the verdict sheet, so just to be completely
8      accurate, I think it should stay as it is.
9              THE COURT:  It seems to me if we have "accordingly, if
10     you award any damages to plaintiff," I think that encompasses
11     nominal damages.  I don't think it is necessary to specify
12     nominal damages there so I'll take that out.  Are we ready to
13     bring this jury back in?
14             MR. NORINSBERG:  Yes.
15             THE COURT:  Okay.
16             (Jury present.  Time noted 4:57 p.m.)
17             THE COURT:  We've received your note.  It is Court
18     Exhibit 8.  It reads:  If we award damages, are they subject to
19     taxes, number one.  Number two, are the plaintiff's attorneys
20     compensated out of the damages we award.  Signed by Juror No.
21     1.  The postscript reads we will not be able to come to a
22     conclusion this evening.  Can we be dismissed after your reply.
23             So we'll answer your questions in order.  Number one,
24     if we award damages are they subject to taxes.  You should
25     award any damages based on the law as I've given it to you, and

993

DCG3GUZF                    DELIBERATIONS

1   you should not add or subtract any amount from that based on
2   any possible tax consequences.
3           Regarding number two.  Are the plaintiff's attorneys
4   compensated out of the damages we award.  Federal law provides
5   for an award of attorneys' fees to a plaintiff when he or she
6   prevails in a civil rights action.  The award of attorneys'
7   fees is a matter to be determined by the Court.  Accordingly,
8   if you award any damages to plaintiff, you should not take into
9   consideration the fees that plaintiff may have to pay his
10  attorneys.
11          Regarding the postscript, we will not be able to come
12  to a conclusion, can we be dismissed after you reply, the
13  answer is yes.  I take it you are ready to be dismissed right
14  now.  So we will see you tomorrow at 9:30.  Again, don't
15  discuss the case with anyone else.  Don't discuss the case
16  amongst yourselves until you're all assembled in the jury room.
17  Have a good evening.
18          (Jury dismissed)
19          THE COURT:  I'll see everybody here at 9:30.  Try to
20  get here at 9:15.  Anything else from plaintiff today?
21          MR. NORINSBERG:  No, your Honor.
22          THE COURT:  Anything else from defendant this evening?
23          MR. KUNZ:  No, your Honor.
24          THE COURT:  Thanks very much have a good night.  I
25  guess actually while I have counsel here.  Any objection to my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

994

```
     DCG3GUZF                    DELIBERATIONS
1    answering of the jury's questions counsel for plaintiff?
2              MR. NORINSBERG:  No, your Honor.
3              THE COURT:  Counsel for defendant?
4              MR. KUNZ:  No, your Honor.
5              THE COURT:  Have a good night.
6              (Adjourned until December 17, 2013, at 9:30 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

995

```
DCH3GUZ1                    Deliberations
```

 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   NOEL JACKSON-GUZMAN,
 3
 4                   Plaintiff,
 4
 5           v.                          10 CV 6353 (ALC)
 5
 6   P.O. BRIAN JAY,
 6   Shield No. 29733, Individually
 7   and in his Official Capacity,
 7
 8                   Defendant.
 8
 9   ------------------------------x
 9                                   New York, N.Y.
10                                   December 17, 2013
10                                   9:30 a.m.
11
11   Before:
12
12                   HON. ANDREW L. CARTER, JR.,
13
13                                   District Judge
14
14                         APPEARANCES
15
15   JON NORINSBERG
16   JOHN MEEHAN
16   KATHERINE SMITH
17        Attorneys for Plaintiff
17
18   NEW YORK CITY LAW DEPARTMENT
18   OFFICE OF CORPORATION COUNSEL
19        Attorneys for Defendant
19   BY:  MORGAN KUNZ
20        MATTHEW MODAFFERI
20
21
22
23
24
25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

DCH3GUZ1                    Deliberations

1           THE COURT:  I wanted to check in with counsel.  It is
2      about 9:33.  Anything anyone wanted to raise with me?
3           MS. SMITH:  No, your Honor.
4           THE COURT:  Defendants?
5           MR. KUNZ:  No.
6           THE COURT:  We'll wait for the jury to get here.  When
7      they get here, we'll check in with them and send them back to
8      deliberate.  Thanks.
9           Something was brought up yesterday.  Does defense
10     counsel have any cases on that or any further argument in terms
11     of the special interrogatory you were requesting in terms of
12     whether Officer Jay reasonably but mistakenly believed that the
13     plaintiff was involved in a fight?  Are you still looking for
14     something like that?
15          MR. KUNZ:  We are, your Honor.  Again, I don't think
16     it is necessarily anything that -- we didn't find any cases.  I
17     don't have any cases to offer, other than the sort of general
18     qualified immunity case law.  But we do believe that the
19     factual predicate is there.  That's what the plaintiff argued
20     in the closing statement.  And we just feel the addition of
21     this question will provide us insight if there is a verdict
22     against the defendant.
23          THE COURT:  That particular question it seems to me
24     would only be potentially relevant for qualified immunity
25     regarding the false arrest claim, correct?

997

DCH3GUZ1                        Deliberations
1              MR. KUNZ:  It could arguably go to force, depending on
2       how the jury argues some of the other questions.
3              THE COURT:  Okay.
4              MR. KUNZ:  I agree with you, arguably it would on its
5       face be related to the arrest.
6              THE COURT:  I think we just saw the marshal peep his
7       head in here and let's check and see if we have the jury.
8              The jury is all here.  I'll bring them in and we'll
9       tell them to resume their deliberations.
10             (Jury present.  Time noted 9:39 a.m.)
11             THE COURT:  I hope you had a pleasant evening.  We're
12      now ready for you to resume your deliberations.  Thank you.
13             (Jury continues deliberations.  Time noted 9:41 a.m.)
14             THE COURT:  Let me hear more from defense counsel.  We
15      don't know what the jury is going to do.  It seems like we may
16      need to deal with these special interrogatories at some point.
17      Let me hear from defense counsel as to the specific special
18      interrogatory that you are requesting.  Because my recollection
19      is you were requesting an interrogatory dealing with whether
20      Officer Jay reasonably but mistakenly believed that the
21      plaintiff was -- what exactly are the words?
22             MR. KUNZ:  Was involved in the fight.
23             THE COURT:  By involved in a fight, you mean what?
24             MR. KUNZ:  The interrogatory would be aimed at
25      basically the argument that plaintiff's counsel made during
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

998

DCH3GUZ1                    Deliberations

1  closing that when the officers approached the fight, he argued
2  that Officer Walters and Sergeant McHugh went and actually
3  arrested the individuals, and that Jay arrived and saw the
4  plaintiff standing nearby and mistakenly thought that the
5  plaintiff was one of the assailants, one of the fighters, and
6  that's why he says Officer Jay then used force and arrested
7  plaintiff.
8            THE COURT:  By involved in a fight, you mean fighting?
9            MR. KUNZ:  Well, yeah, exactly, right.
10           THE COURT:  If this is related to the false arrest and
11  obviously the only point in time when this could be
12  particularly relevant is did Officer Jay reasonably but
13  mistakenly believe at that time plaintiff was involved in a
14  fight prior to his arrest.
15           MR. KUNZ:  Right.
16           THE COURT:  For the force you are saying this is
17  somehow related to excessive force potentially.  Tell me more
18  about that.
19           MR. KUNZ:  So for example, if in conjunction with that
20  question the jury says that Officer Jay did not kick plaintiff,
21  then you can say, well, they don't believe that he kicked him,
22  but they do believe he used some force on him, and it is
23  reasonable to use force to place someone under arrest, so you
24  could use that, that could be one additional fact that would
25  weigh in your Honor's consideration of qualified immunity in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

999
DCH3GUZ1                    Deliberations

1   regard to a force argument.  But I don't think that question on
2   its own would be dispositive of the force question.  I just
3   think depending how they answer that, it could be a fact that
4   would educate your Honor's decision in regard to force.
5            THE COURT:  I suppose then I guess if the critical
6   question there is their answer to did Officer Jay kick
7   plaintiff, it seems that other part may not really be all that
8   relevant.  If the answer to did Officer Jay kick plaintiff, if
9   the answer to that is no, then what is the relevance of whether
10  or not Officer Jay thought he was fighting?
11           MR. KUNZ:  Well, I guess the problem will come in,
12  your Honor, is we all know the jury can adopt certain parts of
13  each party's story and reject certain parts, right.  So they
14  could not believe that Jay kicked him, but they could believe
15  that the force that he did use, the pepper spray and the
16  tackling to the ground, was excessive.  So this question is
17  aimed at parsing out what exactly the jury found, if they found
18  liability.  It is just sort of trying to get at an issue that
19  the plaintiff's counsel raised in the closing arguments.
20           THE COURT:  I understand that.  It seems just if there
21  is a "no" answer to did Officer Jay kick plaintiff, it seems
22  all that has been established -- what is the plus of whether
23  Officer Jay thought he was fighting?
24           MR. KUNZ:  I guess it depends, like I said, it depends
25  on the verdict.  For example, let's say they found liability in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCH3GUZ1                    Deliberations

1   regard to the arrest, but not in the force.  And then we send
2   in some special interrogatories, I think this question would
3   help us understand what conclusion they came to.  Why they
4   reached that decision.
5           You could imagine a scenario the other way, too.  You
6   could say, let's say they returned a verdict and they say that
7   the arrest was good, but the force was bad.  Which again would
8   be a bit of a confusing verdict.  And then some of the special
9   interrogatories would help us understand why they got there.
10  We just think this one adds some more knowledge and
11  understanding of what the jury decided when they reached their
12  verdict.
13          THE COURT:  What is the relevance of the reasonably
14  but mistakenly?  My recollection of the testimony is Officer
15  Jay said that he didn't see the plaintiff fighting.
16          MR. KUNZ:  They could reject that.  The jury could
17  reject that and they could say we don't believe Jay there.  We
18  don't believe that part of Jay's story.
19          THE COURT:  I don't believe that Officer Jay was asked
20  nor did he answer any question or say that he believed
21  plaintiff was fighting.  I don't believe that was a question
22  that was posed to him, and I don't believe that's something he
23  testified to.  I think he testified, my recollection is, that
24  he had never saw the plaintiff engaged in any fight.
25          MR. KUNZ:  That's right.  But the jury doesn't have to

1001

DCH3GUZ1                    Deliberations

1   give credence to Jay's statement there.  The jury could reject
2   that statement, and they could think that no, Officer Jay did
3   in fact see the plaintiff before he used the force, and that he
4   reasonably but mistakenly believed that Jay was involved in the
5   fight.  That is a possible conclusion that the jury could reach
6   in rejecting Jay's story and adopting part of the plaintiff's.
7               THE COURT:  In terms of those adverbs, reasonably and
8   mistakenly, what is the relevance of putting that, if the
9   critical question is did Officer Jay believe the plaintiff was
10  involved in a fight?
11              MR. KUNZ:  That's the constitutional standard would be
12  if you reasonably but mistakenly believe that someone is
13  committing a crime, the arrest is still privileged by probable
14  cause.  Then in regard to the force, if the arrest is
15  privileged by probable cause, and the person struggles in some
16  way, some degree of force is reasonable under the
17  circumstances.
18              So that's the only reason we're putting it in there,
19  your Honor, is if the jury disbelieves Jay's story, if they
20  don't believe it, one possible scenario of what they found
21  happened could be that Jay mistakenly believed that the
22  plaintiff was involved in a fight, and that's why he took the
23  actions that he did.
24              THE COURT:  Okay.  My concern is what if the jury
25  believes that Jay reasonably believed that the plaintiff was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1002

DCH3GUZ1                    Deliberations

1    involved in a fight or fighting, and they think it wasn't a
2    mistake.  That they agree that Jay -- if this verdict comes
3    down that the jury says that the plaintiff does not prevail on
4    false arrest but prevails on excessive force, then that
5    question may get an answer that doesn't tell us anything.  If
6    they are saying, well, we believed that he reasonably believed
7    this but it wasn't a mistake.
8            MR. KUNZ:  So, well then perhaps it is two questions
9    then or perhaps removing one of the descriptive verbs there.
10           THE COURT:  Do we need "mistakenly"?
11           MR. KUNZ:  "Did he reasonably believe that the
12    plaintiff was involved in a fight" might be a simpler wording
13    of the question.  But we do think that that question needs to
14    get asked to help us understand what the verdict comes down to.
15           THE COURT:  Let me hear from plaintiff on that.
16           MR. NORINSBERG:  Judge, the problem is, as the Court
17    pointed out, there is no testimony whatsoever that he believed
18    plaintiff was in a fight.  This is an argument in summation
19    based on inferences and has nothing do with the officer's own
20    testimony.  His testimony was he was suddenly attacked from
21    behind, violently pulled backwards, and plaintiff ran away.
22    So, at this point to start adding an additional interrogatory
23    to address the officer's state of mind and what he believed at
24    that time, I think is totally inappropriate.  And more
25    importantly, it doesn't get us anywhere.  What he reasonably

1003

DCH3GUZ1                    Deliberations

```
 1  believed wouldn't get him off the hook if the jury found it is
 2  subjectively unreasonable to kick someone to the knee and bring
 3  them down to the ground.  His belief doesn't lead to the next
 4  step that, okay, he believed that and was reasonable, however,
 5  he kicked him in the leg so he gets off the hook for that.  It
 6  doesn't logically follow.
 7             THE COURT:  Obviously, this question is sort of
 8  contingent on the answer to the question did Officer Jay kick
 9  plaintiff.  If the answer to that question is yes, then it
10  seems to me that the defendant's argument for qualified
11  immunity is pretty weak, if answer to that question is yes.  If
12  the answer to that question is no, then perhaps this could be
13  relevant.
14             I thought about this more, and there are inferences,
15  as you said, that the jury could draw.  It is not simply
16  because you stated this in your summations.  It is because
17  there does seem to be some factual basis from which the jury
18  could draw those inferences and believe that.  And that
19  certainly might be relevant to qualified immunity.  It is not
20  dispositive.  I'm not sure what the harm would be in asking
21  that question.  This is assuming there is a plaintiff's verdict
22  on something.
23             If we ask this question, obviously the parties can
24  brief this after the fact.  If we don't ask the question, then
25  the question hasn't been asked and we don't have an answer to
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1004

DCH3GUZ1                    Deliberations

1  that, and I can't really use that.  If it is answered and I'm
2  persuaded it is irrelevant and I don't need to consider it,
3  then I don't need to consider it.
4         It seems since we've got a jury here, and if there is
5  in fact a plaintiff's verdict, the jury can be certainly
6  helpful in terms of determining certain facts that may be
7  relevant to qualified immunity.  So it may be appropriate to
8  give them the opportunity to develop these facts, and then the
9  lawyers can make whatever arguments they want to make after the
10  facts as to whether or not those facts are relevant or whether
11  or not I should consider it.  It seems like it may be best to
12  get answers to those questions.
13         MR. NORINSBERG:  I understand the Court's point.  In
14  our situation we have four police officers testify.  Not one of
15  them saw plaintiff involved in a fight.  So it is like you're
16  inviting them to start thinking that maybe he was in a fight
17  when they're answering these questions.
18         THE COURT:  This is all after the verdict on this.
19  This is not for any of those things, and I guess that's why as
20  I thought about this more last night, there is a difference
21  between seeing someone involved in a fight and believing that
22  person is involved in a fight.  And it seems to me the jury
23  could find that yes, even though Officer Jay didn't see the
24  plaintiff involved in a fight due to his proximity to the fight
25  that was happening and everything else, the jury might infer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1005

DCH3GUZ1                    Deliberations
 1    that Officer Jay reasonably believed the plaintiff was involved
 2    in a fight even though Officer Jay testified he didn't see it.
 3    That's what the distinction is.
 4             MR. NORINSBERG:  I understand.  Let's say he
 5    reasonably believed he is in a fight.  How does that resolve
 6    the qualified immunity question?  So he sees somebody and he
 7    reasonably believes they are in a fight.  Would that
 8    necessarily allow that officer at that point to simply kick him
 9    in the knee and bring him down to the ground?
10             THE COURT:  This is going under the assumption if the
11    jury says that Officer Jay did not kick the plaintiff in the
12    knee and the jury finds there was excessive force in the way
13    that Officer Jay brought the plaintiff to the ground.  That
14    certainly could be relevant in terms of the amount of force
15    that's being involved that's being utilized against someone who
16    the officer believes is fighting.  There is certainly a
17    different quantum of force that might be acceptable as opposed
18    to someone who is standing there on the street with their hands
19    up.  That could be relevant.
20             MR. NORINSBERG:  I am just putting this out there.
21    Assuming we get to this point, but if we use the
22    interrogatories we have and if in fact they answer the
23    interrogatories in a certain way, maybe we have one final set
24    of interrogatories to further clarify what their findings were.
25    This all might be unnecessary, depending on what they ask.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DCH3GUZ1                    Deliberations
1  Maybe we agree on certain extra questions that would have to be
2  asked, one or two, based on what counsel's just saying in the
3  event that they answer the interrogatories in a certain way.
4           THE COURT:  What is defendant's position on that?
5           MR. KUNZ:  I just think that would be a little
6  confusing.  If they return a plaintiff's verdict I think they
7  are going to be surprised they have to go back in and answer
8  these interrogatories, and I think we should just have them do
9  it once, get the information, and then like your Honor said, we
10 can argue this in post-trial briefing if we have to.
11          THE COURT:  Let me hear a little bit more from
12 defendants in terms of if I give this special interrogatory, in
13 terms of the wording again.  I told you before my concern about
14 "involved in a fight" seems a little vague.
15          MR. KUNZ:  So the wording that we have proposed was do
16 you find that P.O. Jay reasonably, even if mistakenly, believed
17 that plaintiff was involved in a fight.  So I think that "even
18 if mistakenly" would sort of alleviate the concern we were
19 talking about before.  And then in terms of the verb involved,
20 I think if there was a problem there we could just say "was in
21 a fight."  We just thought it just added what the argument was,
22 is did Officer Jay reasonably believe that the plaintiff was
23 involved in a fight.  "Prior to arrest" is fine with us, your
24 Honor.  That's not a problem.  Adding that clause at the end.
25          THE COURT:  What is plaintiff's position on that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCH3GUZ1                    Deliberations

```
 1   wording?  I know plaintiff objects to this special
 2   interrogatory at base, but what is plaintiff's position on the
 3   wording?
 4           MR. NORINSBERG:  There are additional facts and
 5   qualifications that I think have to be made.  One is the
 6   wording "prior to his arrest."  And two, it is the Molina
 7   defendants, if there is any argument he is involved with a
 8   fight, it has to be with reference to the Molina defendants,
 9   that in some way he was aiding or assisting the Molina
10   defendants.  That's the factual predicate for that argument.
11   It is not, your Honor, it is not just generically he was
12   involved in some fight.  The argument and the facts in the
13   record suggest that Officer Jay believed that Mr. Guzman was
14   connected with the Molina defendants.  That came out in his
15   paperwork.  And then that's why it says with the aid of another
16   in custody.  So, I think that just to put generically the word
17   "fight" is really not accurate.  It should be confined to the
18   specific facts of our case.
19           So I can live with this.  Let's put language I could
20   live with even though I object to the question.  Did Officer
21   Jay reasonably but mistakenly believe that plaintiff was
22   involved in aiding the Molina defendants prior to the arrest.
23           THE COURT:  Let me hear from defense counsel.
24           MR. KUNZ:  I guess, your Honor, that's why we want the
25   "even if mistakenly" in there, is that I don't think it really
```

1008

DCH3GUZ1                    Deliberations

1   matters who Officer Jay thought that the plaintiff was fighting
2   with.  That's not really the question there.  Then I think if
3   we added in that additional clause, we get into this whole
4   thing who was fighting who, and that's just not really relevant
5   to the question here.  The only question would be in the jury's
6   mind, what did Officer Jay reasonably believe when he got
7   there.  And I think that a simpler question would provide us
8   more information here.  We're okay with adding the clause
9   "prior to his arrest."  But we don't think we should add in the
10  Molina defendants because that opens up a whole other can of
11  worms that I don't think would be relevant here.
12          MR. NORINSBERG:  How does --
13          THE COURT:  I think I agree with defense counsel,
14  especially in light of the fact that one of the early notes
15  that this jury had before they started asking for extra Post-it
16  notes and white boards was for us to possibly clarify who were
17  the people fighting and who the victims were.  And there has
18  been different testimony, as opposed to whether the lawyers
19  have taken different positions, as to whether there is one
20  fight that's a specific small defined fight between two people
21  stomping on one person, or whether there is one fight which is
22  a big fight that has lots of little fights in it, or whether
23  there are two separate fights.
24          It seems if what's relevant in terms of qualified
25  immunity in terms of the excessive force as well as the false

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCH3GUZ1                    Deliberations

1    arrest would be if Officer Jay reasonably believed that the
2    plaintiff was fighting, obviously this is at the scene prior to
3    his arrest, whoever he may have been allegedly fighting with, I
4    think that's relevant.  I don't think it matters who the
5    plaintiff was fighting with.  And I think that plaintiff's
6    counsel is correct in that it seems that a lot of the testimony
7    focused on the Molina defendants.  But again, there is
8    confusion as to the Molina defendants and who is fighting.  It
9    seems to me that the jury can make that determination.
10             Again, there has been testimony that none of the
11   officers saw Mr. Guzman fighting.  But the question of whether
12   or not Officer Jay believed he was fighting I do think is
13   relevant potentially to the amount of force that's used, if the
14   jury finds that Officer Jay didn't kick the plaintiff.
15             I tend to agree with plaintiff's counsel at this point
16   that if Officer Jay believes the plaintiff is fighting, that
17   doesn't give him right to kick plaintiff in the knee so hard
18   that it damages ligaments in his knee.  But, if the jury finds
19   that Officer Jay grabbed plaintiff from behind and forced him
20   to the ground, they might feel that is excessive force and the
21   amount of force that's used there could vary based on what the
22   plaintiff was doing at that time.
23             MR. NORINSBERG:  My only concern is, Judge, is this
24   particular defendant Officer Jay was very clear that there was
25   one fight going on at the corner, there were all four officers

1010

DCH3GUZ1                    Deliberations

1  in the same area at the same time, it was a two-on-one fight.
2  So why introduce the possibility, for which there is no
3  evidence, that plaintiff was involved in some other fight.  To
4  the extent that he could have been involved in any fight at
5  all, the only fight he could have been involved with is,
6  according to Mr. Molina, that fight that was taking place.
7  He's either fighting with Mr. Henriavez, as Molina says there,
8  or he's not.  There is no other possibility that the evidence
9  would allow the jury to conclude.  That's my concern.
10              I think that based on his own testimony and based on
11  defendant's theory of the case, based on their witness, Molina,
12  everything points to one fight on that corner.  If Officer Jay
13  were entitled to qualified immunity, it would be based on his
14  perceptions of what's going on at that one fight on the corner,
15  not some other fight of which he has no knowledge and for which
16  there is no testimony about.
17              THE COURT:  I'm still trying to figure out what your
18  concern here is.  I don't think this jury is going rogue doing
19  all sorts of speculation about all sorts of other things.  If
20  you want me to specify on the corner of whatever, the northwest
21  corner of whatever, I can do that.  It seems that that's where
22  the fight, fights, or big fight took place.  It doesn't seem
23  that the jury is going to be thinking about some other fight.
24              MR. NORINSBERG:  We are getting closer to something
25  that I can live with.  Again, clarifying our objection to this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCH3GUZ1                    Deliberations

```
 1    I don't want to repeat that objection.  But assuming you give
 2    this interrogatory, the fight taking place on the northwest
 3    corner of 207th Street and Sherman Avenue at the time that the
 4    police arrived, I can live with that.  That's qualifying
 5    language that get us into the same universe that we've been
 6    talking about.
 7              THE COURT:  How about instead of the article the, how
 8    about "a"?  A fight on the southwest corner of 207th and
 9    Sherman Avenue.
10              MR. NORINSBERG:  Judge, what other fight was there on
11    that particular corner?  To the extent there is another fight,
12    which I'm not aware of, but if there was another fight, it
13    wouldn't be at that location.  That's the location that they
14    arrived at.
15              THE COURT:  If we have the qualifier "prior to
16    arrest," that kind of solves everything, doesn't it?  The jury
17    is not going to start speculating about did Officer Jay believe
18    that the plaintiff was in a fight the week before this.  They
19    are not going to do anything like that.
20              MR. NORINSBERG:  Let's just flip it backwards again.
21    What is wrong with just saying the fight on 207th Street and
22    Sherman Avenue as the police officers arrived.  The article
23    there "the" really refers to what all the officers testified
24    to.  There was some fight at that corner at that time.  So I
25    don't feel in any way that is prejudicial.  It just clarifies
```

1012
            DCH3GUZ1                    Deliberations
 1    that's what everybody was talking about.
 2            THE COURT:  This get backs to the "involved in," and
 3    maybe this is what is making things more complicated.  What if
 4    we just say did Officer Jay reasonably believe that the
 5    plaintiff was fighting on the southwest corner or northwest
 6    corner of 207th and Sherman Avenue prior to his arrest.
 7            MR. NORINSBERG:  I don't know where that gets us,
 8    Judge.  I really don't.
 9            THE COURT:  Because in terms of your concern about
10    trying to indicate that there was more than one fight.
11            MR. NORINSBERG:  I'm sorry.  I didn't mean to
12    interrupt you.  But there is only evidence of one fight.  At
13    least let's say in the temporal context, at the very moment the
14    police arrived, everybody says there is a fight.  There's
15    multiple men and there is somebody on the ground who is getting
16    kicked and beaten.  Everybody has some variation of that, all
17    the officers.  That's the fight that we are focused on.  And
18    that's why I just want to make clear.  I don't want to put out
19    the possibility there is some other fight before they got there
20    before the arrest took place.
21            THE COURT:  What I'm concerned about is in your
22    cross-examination of I believe Sergeant McHugh, there was some
23    hair splitting going on between whether or not this was two
24    fights or one fight.  Officer McHugh stated this was one fight
25    involving multiple individuals.  And my recollection is there
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCH3GUZ1                     Deliberations
1   was a lot of cross-examination from you about that there were
2   two fights.  It was one fight?
3            MR. NORINSBERG:  My colleague handled that, yes.  But
4   I thought he was impeached, and he said very clearly at his
5   deposition.  The question was, let's have an accurate record
6   here.  Is it accurate to say there is one fight?  And he said
7   yes.  He was impeached on that so he changed his testimony
8   here.  He is allowed to do that.  Whatever.
9            But the point is, the only evidence that the jury
10  heard of when the police first approached was that one fight.
11  And there is no description of any other fight going on when
12  they first arrive.
13           THE COURT:  I am not sure if Sergeant McHugh described
14  this scene as one fight when he was on the stand.  He said this
15  was one fight that just involved six people.  But he said it
16  was one fight and there were two mini fights within this fight,
17  but he described it as one fight.  You are saying there was one
18  fight, and there was only one mini fight.  There weren't two
19  mini fights, there was just the one mini fight.  In terms of
20  trying to get rid of any of that confusion, if the question
21  posed to the jury is did Officer Jay reasonably believe that
22  the plaintiff was fighting.
23           MR. NORINSBERG:  At the time when he arrived at the --
24  at the time the police arrived at the northwest corner of 207th
25  and Sherman.  I can live with that.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCH3GUZ1                    Deliberations

1          THE COURT:  I don't know.  I don't know if we need to
2     get quite that specific, but just prior to arrest.
3          MR. NORINSBERG:  No.  Maybe I'm mistaken for having
4     interjected that language.  Maybe that's not good language.
5     What I was trying to get at is at the moment where he's getting
6     at the scene and approaching.  As Officer Jay approached the
7     corner, that corner.  I am trying to get a temporal context
8     which limits it to his perceptions as he's leaving the police
9     vehicle and approaching the scene.  Whatever takes place in
10    that limited time period, that's the only time period we're
11    concerned with.
12         THE COURT:  Let me hear from defense counsel.
13         MR. KUNZ:  We agree that that's the time period we're
14    concerned with.  I don't like the spatial limitation specifying
15    the particular corner, because I believe that there was a
16    little different testimony from different people about which
17    exact corner it happened on.  And I don't think that adds
18    really anything to the analysis.
19         But absolutely, we agree with counsel what we want to
20    get at is what was in Officer Jay's mind as he got out of that
21    vehicle and went to the fight.  So, we can do that with prior
22    to arrest, we can do that with did Officer Jay reasonably, even
23    if mistakenly, believe that plaintiff was fighting at the
24    moment Officer Jay exited his police vehicle, or something like
25    that.

1015
DCH3GUZ1                    Deliberations
 1              THE COURT:  Okay.
 2              MR. NORINSBERG:  I'm okay with that.  I would just add
 3      the last part without saying northeast versus northwest, say at
 4      the corner of 207th Street and Sherman Avenue.  Then I can live
 5      with that.
 6              MR. KUNZ:  That's fine.
 7              THE COURT:  Okay.  We have agreement.
 8              MR. NORINSBERG:  I want to clarify we all are in
 9      agreement this question becomes relevant only if the jury were
10      to find there was no kick.  So, again we go back to this
11      notion, we did this in one trial I had over the summer where we
12      had a main set of interrogatories, and then depending on that,
13      there was one or two extra interrogatories that the judge asked
14      the jury to find.  That seems to me that that would be
15      appropriate here.  If they answered that there was a kick in
16      place, I don't think this question should be asked.  If they
17      answer there was no kick, then I think that's an appropriate
18      line of questioning for them.
19              THE COURT:  We're only really talking about, again, we
20      are only talking about one additional question that wasn't
21      included in the special interrogatories that I'd already ruled
22      on.  It seems it may not be efficient to bring them out, have
23      them answer all these questions, and then depending on the
24      answers, bring them out for one final question as opposed to
25      just adding this question.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DCH3GUZ1                    Deliberations

1          That question to me doesn't seem that it invites the
2   jury to lean one way or the other in terms of this case.  It
3   seems to me in terms of their deliberations, they're already
4   considering that.  They've already made a determination about
5   that.  So I don't think there is any danger here by including
6   that question that it is going to somehow persuade the jury to
7   go one way or the other in terms of the kick.
8          So it seems to me it is appropriate to put it in at
9   the end as the last special interrogatory.
10         So, what is plaintiff's counsel position on that?  It
11  is one question.  If there were five different questions that
12  were all contingent on these, I can understand plaintiff's
13  counsel's position.  We're talking about one question here that
14  does not appear to be, at least in terms of the special
15  interrogatories that we're already giving them, the most
16  important question.  It certainly is a somewhat dependent
17  question.  It is dependent on the answer to the other answers.
18              MR. NORINSBERG:  Okay.  The only other thought and I
19  haven't worked it out completely, I wanted to put it out there.
20  By putting these clauses all into one sentence, are we allowing
21  for a possibility that the jury would find it was reasonable
22  but not mistaken, or unreasonable but mistaken, and we are not
23  going to know clearly by the way the question is phrased?  Or
24  does it matter?  Just putting it out there.
25              THE COURT:  I don't think whether it is mistaken or
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DCH3GUZ1                    Deliberations

1   not matters.  I think what matters is, is it a reasonable
2   belief.  Did he reasonably believe it, whether it was actually
3   true or not doesn't matter.  So I do think that if we have
4   "even if mistaken" in there, I don't think that that does
5   anything.  I don't think that does anything.  I do think the
6   law is clear.  It doesn't matter if he's right or wrong.  It
7   matters if it is objectively reasonable.
8              MR. NORINSBERG:  Right.  Okay.
9              THE COURT:  So we'll add to the special interrogatory
10   and have it there if we need it.  Anything else from either
11   side today right now?  Plaintiff's counsel?
12              MR. NORINSBERG:  No, your Honor.
13              MR. KUNZ:  Just a procedural question that my
14   colleague brought up which is that if a verdict comes back for
15   the plaintiff, I believe procedurally we need to make some
16   motions before the special interrogatories get sent in, so we
17   can do that at a side bar.  But we wanted to alert your Honor
18   to that issue.
19              THE COURT:  Okay.  So counsel are free to leave if you
20   want, just make sure my deputy can find you.  I don't know if
21   we have a lot of other materials for the jury in case they want
22   another white board.  We're kind of running low on those.  I
23   don't know if counsel have a laser pointer that the jury can
24   use if they want that.  They may want some more supplies.  Take
25   care.

1018

DCH3GUZ1                    Deliberations
1              (Recess pending verdict)
2              (At 11:15 a.m., a note was received from the jury)
3              THE COURT:  We have a note from the jury, Court
4    Exhibit 9.  It says:  Judge Carter, we have reached a verdict.
5              So my intention is to bring the jury in and have them
6    publish their verdict.  In the event that the verdict is in
7    favor of the plaintiff on either the false arrest or excessive
8    force, we have our modified qualified immunity charge.  I've
9    handed a copy of that to counsel.  All that we did to change
10   that is we took out the sort of future conditional tense there.
11   We would only be giving them this charge if in fact they have
12   found in favor of the plaintiff.  So we've eliminated some
13   unnecessary sentences there.
14             Does plaintiff's counsel have any objection to the
15   qualified immunity charge?
16             MR. NORINSBERG:  No, your Honor.
17             THE COURT:  Defense counsel?
18             MR. MODAFFERI:  No, your Honor.
19             THE COURT:  I believe you've been provided with a copy
20   of the updated special interrogatories form.  Has plaintiff's
21   counsel seen that?
22             MR. NORINSBERG:  Yes.
23             THE COURT:  Other than your previous objection to that
24   question being asked, any objection to the wording on that
25   form?

1019

DCH3GUZ2                    Verdict

```
 1              MR. NORINSBERG:  No, your Honor.
 2              THE COURT:  Defense counsel?
 3              MR. KUNZ:  We don't particularly like the "exited his
 4    police vehicle" because there was a short delay as he walked
 5    through the crowd so they -- I don't want them to be hung up on
 6    "as he exited his police vehicle" which is why we would prefer
 7    the prior to arrest, rather than this language.
 8              THE COURT:  I only included that because at the last
 9    conversation we had the last time we talked about that, I think
10    you said you didn't object to that.  You didn't object to that
11    language.
12              MR. KUNZ:  We don't object to putting the temporal
13    timeline, the timeframe in there, which the operative time
14    period is after he exits his vehicle and he's walking over to
15    the fight.  But I don't want the jury to get hung up on, well,
16    right at that moment he exited his vehicle and a few seconds
17    later he may have believed it.
18              THE COURT:  How does it read in front of you?
19              MR. KUNZ:  Did Officer Jay reasonably, even if
20    mistakenly, believe that plaintiff was fighting at the moment
21    Jay exited his police vehicle at the corner of 207th Street and
22    Sherman Avenue.
23              THE COURT:  So your basic suggestion would be to
24    change that "at the moment" to "after"?
25              MR. KUNZ:  Right.  Maybe in the moments after, but
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1020

DCH3GUZ2                    Verdict
1   prior to the plaintiff's arrest or something.  I know it may
2   get more confusing which is why we think just "prior to arrest"
3   simplifies it.
4            MR. NORINSBERG:  We can compromise and say was
5   fighting as Officer Jay approached the corner of 207th Street
6   and Sherman Avenue.
7            THE COURT:  How is that, counsel?
8            MR. MODAFFERI:  It doesn't take into account that he
9   approached the corner while he was in the police vehicle.  I
10  think adding that makes it even more confusing.  Because now it
11  could mean that as he was approaching the corner, but before he
12  even got out of the vehicle.
13           THE COURT:  That's better for you.  Why would you
14  object to that?
15           MR. MODAFFERI:  It's broader.
16           MR. KUNZ:  I guess the problem would become then its
17  usefulness to the qualified immunity question could become
18  diminished.  It is confusing as to what timeframe we are
19  talking about.  If it is that broad, plaintiff's counsel could
20  argue --
21           THE COURT:  There won't be any more argument.
22           MR. KUNZ:  Post-trial, when we are arguing over to
23  what effect these special interrogatories should be used.
24           THE COURT:  What is wrong with my original suggestion
25  with "prior to arrest"?  We've got the other qualifier about
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1021

DCH3GUZ2                    Verdict

```
 1    the corner.  We can have that other qualifier about -- what do
 2    we have in there about the corner at this point?
 3              MR. KUNZ:  It just says at the corner of 207th Street
 4    and Sherman Avenue.
 5              THE COURT:  In terms of the location of the alleged
 6    fighting.  We can just say prior to arrest.  How does that work
 7    for everyone?  How is that for plaintiff?
 8              MR. NORINSBERG:  That to me just takes us into a
 9    greater area of confusion and gray area.  The whole reason I
10    wanted that language out was I wanted to confine it to as
11    Officer Jay exited and approached, and maybe we can just say at
12    the moment he exited his police vehicle or in the moments
13    thereafter.  Immediately thereafter.  Just to make it clear
14    that's what we're talking about.
15              THE COURT:  How does that sound, defense counsel, if
16    we say at the moment he exited the police vehicle or
17    immediately thereafter?
18              MR. KUNZ:  That works for us.
19              THE COURT:  So let's go change that.  We'll bring the
20    jury in, get their verdict, and we'll see what the verdict is.
21    If there is in fact a verdict in favor of the plaintiff, my
22    intention would be to tell the jury, okay, there is still a
23    little work for you to do, just hold on a moment.  I'll just
24    send them back to the jury room.  Bring them out while we make
25    these other technical changes to this, then give them the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCH3GUZ2                    Verdict

1    instruction on qualified immunity, and the special
2    interrogatories, and send them on their way.
3              Counsel have a position on that?  Plaintiff's counsel?
4              MR. NORINSBERG:  That sounds fine, Judge.
5              MR. KUNZ:  That's fine.
6              THE COURT:  Let's bring the jury in.
7              MR. NORINSBERG:  Are we going to be provided with
8    copies of the verdict sheet right now?  That's what I was
9    alluding to before.
10             THE COURT:  You want to look at it and go through it?
11             (Pause)
12             THE COURT:  Let's bring in the jury.
13             (Jury present.  Time noted: 11:28 a.m.)
14             THE COURT:  We have received a note from the jury,
15   Exhibit 9.  It says:  Judge Carter, we have reached a verdict.
16   Signed by the foreperson.
17             Let me ask the foreperson of the jury to please stand.
18   Has the jury unanimously agreed on its verdict?
19             THE FOREPERSON:  Yes, we have.
20             THE COURT:  Please hand it to my deputy.
21             Now, members of the jury, your verdict will be
22   published; that is, read aloud in open court.  So I'd ask the
23   foreperson to go ahead, read the questions and your answers to
24   the questions.
25             THE FOREPERSON:  Okay.  Question one:  Has defendant

DCH3GUZ2                    Verdict

1    Police Officer Brian Jay proven by a preponderance of the
2    evidence that there was probable cause to arrest plaintiff Noel
3    Jackson Guzman on February 14, 2009?  Answer:  No.
4              Question two:  Is plaintiff entitled to compensatory
5    damages as a result of being falsely arrested?  Answer:  Yes.
6              If your answer is yes, please write the -- I'm sorry.
7    Give what the amount is?
8              THE COURT:  Yes.
9              THE FOREPERSON:  If your answer is yes, please write
10   the amount in.  4,000.
11             Question three:  Has plaintiff Noel Jackson Guzman
12   proven by a preponderance of the evidence that defendant Police
13   Officer Brian Jay used excessive force against plaintiff on
14   February 14, 2009?  Answer:  Yes.
15             Question four:  Has plaintiff proven that he is
16   entitled to compensatory damages as a result of being subjected
17   to excessive force?  Answer:  Yes.
18             The amount:  2,270,000.
19             Question five:  Has plaintiff proven that he is
20   entitled to punitive damages from defendant?  Answer:  Yes.
21             The amount:  200,000.
22             THE COURT:  Okay.  Now I am going to poll the members
23   of the jury.
24             A JUROR:  I can't hear you.
25             (Jury polled; each juror answers in the affirmative)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1024

DCH3GUZ2                    Verdict

```
 1          THE COURT:  Now, there is still some work that we need
 2   you to do.  I am going to ask that you retire to the jury room.
 3   We'll bring you out and there's some more questions that we'll
 4   need you to answer.  Okay?
 5          (Jury excused.  Time noted 11:33 a.m.)
 6          THE COURT:  Any motions?
 7          MR. MODAFFERI:  Yes.  Our first motion is pursuant to
 8   Rules 50 and 59 of the Federal Rules of Civil Procedure and any
 9   other applicable rule.  And we request that the judgment be set
10   aside as against the weight of the evidence.  And that's our
11   first motion.
12          Our second motion is we again renew our motion for a
13   mistrial in light of all the previous arguments that were made
14   on the record, regarding our applications for a mistrial.
15          Third, we would ask for a delay in the entry of
16   judgment, to the extent that any motions are denied.  We just
17   ask that the parties are given some time to possibly work
18   something out before judgment is entered.
19          And last, I don't know how your Honor wants to proceed
20   with respect to the collateral source rule.  I believe a
21   hearing has to take place, but again, just leave it up to the
22   Court and we'll take your Honor's lead in that regard.
23          THE COURT:  Plaintiff's position on any of those?
24          MR. NORINSBERG:  Judge, this was fundamentally a case
25   that hinged on credibility.  It is a case about factual
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1025

DCH3GUZ2                    Verdict
1    disputes which had to be resolved by the jury.  The jury has
2    spoken now and there is no basis at all to set aside this
3    verdict.
4              With respect to delaying entry of judgment, I'm sure
5    we can work something out within a reasonable time period where
6    we can agree with defense counsel on that.  And I'm not sure
7    what else the Court would like me to address.
8              THE COURT:  Okay.
9              MS. SMITH:  Your Honor, I'd like to address the Rule
10   50 motion.  It is our position this is untimely.  They should
11   be barred from binging it.  Rule 50(a)(2) states that any Rule
12   50 motion must have been made before the jury was out, before
13   submission to the jury.
14             THE COURT:  I think there is another subsection there.
15             MR. KUNZ:  Subsection (b), your Honor.
16             THE COURT:  Subsection (b) as well.  So I took it that
17   the defense motion was pursuant to 50(b), not 50(a).  Is that
18   correct, counsel?
19             MR. MODAFFERI:  That's correct.  As well as Rule 59.
20             THE COURT:  I'll reserve on the Rule 50(b) and 59.  I
21   will reserve on the motion for mistrial.  I will grant the
22   requests.  I'll reserve judgment on the collateral source
23   doctrine in terms of what to do on that until after the parties
24   have had an opportunity to see if they can work something out.
25   Any other motions by the defense now?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DCH3GUZ2                    Verdict

```
 1                MR. MODAFFERI:  That's all.
 2                THE COURT:  Any motions by plaintiffs now?
 3                MR. NORINSBERG:  No, your Honor.
 4                THE COURT:  Again, as I indicated, I am going to bring
 5      the jury back in, give them the qualified immunity instruction,
 6      and give them the special interrogatories.
 7                We did not discuss whether or not it is appropriate
 8      for me to give a copy of the qualified immunity charge to the
 9      jury.  It is a brief charge.  My intention is not to give them
10      a copy of it, and I'm sure if the jury wants one they'll ask
11      for one.  Plaintiff have any position on that?
12                MR. NORINSBERG:  We missed the last question.
13                THE COURT:  Plaintiff have any position?  I am not
14      intending on giving the jury a copy of this qualified immunity
15      instruction unless they ask for one.
16                MR. NORINSBERG:  That's fine.
17                THE COURT:  Defendant?
18                MR. KUNZ:  No position.
19                THE COURT:  Let's bring the jury back in.  Let's not
20      bring the jury in.  Let me make sure you've seen the special
21      interrogatories form as it has been edited.  Have both sides
22      seen it and reviewed it?
23                Plaintiff have any objection to it?
24                MR. NORINSBERG:  No, your Honor.
25                THE COURT:  Defendants?
```

1027

DCH3GUZ2                    Verdict
1              MR. KUNZ:  No, your Honor.
2              THE COURT:  Let's get the clean copy and mark that as
3     a court exhibit.  Let's have the parties look at that copy
4     before we send that into the jury.  That would be Court Exhibit
5     10.  Let me ask counsel to look at Court Exhibit 10 before that
6     goes into the jury.  Make sure that conforms to the copies you
7     have.
8              MR. NORINSBERG:  Yes, your Honor.
9              THE COURT:  Make sure defense counsel has seen it as
10    well.
11             MR. KUNZ:  That's fine, your Honor.
12             THE COURT:  I'll bring the jury in.
13             (Jury present.  Time noted: 11:40 a.m.)
14             THE COURT:  I have another instruction for you.
15             Qualified immunity.  Even if you find that the
16    plaintiff has proven his claim for false arrest or excessive
17    force, the defendant still may not be liable to plaintiff if
18    they are entitled to what is called qualified immunity.  The
19    question of qualified immunity is one for the Court to
20    determine.  However, the jury has an important role to play in
21    this determination.
22             On the special interrogatories form, you will be asked
23    several questions regarding particular contentions by the
24    parties.  Your answers to these questions will be used by me in
25    making the ultimate determination of whether the defendant is

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DCH3GUZ2                    Verdict
1   entitled to qualified immunity, and we will hand you that
2   special interrogatories form as you retire to the jury room.
3   So please resume those deliberations, and answer the questions
4   on the special interrogatories form.
5            I see a juror has a hand raised.  If you have a note
6   or a question, follow the ordinary procedure.  But we are going
7   to give you the special interrogatories form and there are
8   questions for you to answer on that special interrogatories
9   form.
10            A JUROR:  As a group?
11            THE COURT:  Yes.  Again as a jury.  Yes.  Yes.  Not
12  individual questions, but questions for the jury to answer on
13  that special interrogatories form.  So you may resume your
14  deliberations.
15            (Jury excused.  Time noted:  11:42 a.m.)
16            THE COURT:  Any objection to my instruction or my
17  answering the questions by the jury by the plaintiff?
18            MR. NORINSBERG:  No, your Honor.
19            THE COURT:  By the defendant?
20            MR. KUNZ:  No, your Honor.
21            THE COURT:  So the record is complete, the last juror,
22  Juror No. 8, made some hand motions taking both hands, with her
23  fingers extended in a Freddy Krueger like manner, moving them
24  together and then asked the question asking together or
25  individually.  So that's why I answered that question that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
        DCH3GUZ2                    Verdict
 1      special interrogatories should be answered by the jury
 2      collectively and not individually.
 3              Counsel are free to move around if you like.  The jury
 4      very well may answer these questions pretty quickly.
 5              MR. KUNZ:  I'm sorry, your Honor.  One quick question.
 6      What is your Honor's practice in speaking to the jury?  Do you
 7      let them know it is okay to speak with attorneys and ask them
 8      to hang around if they're willing to?
 9              THE COURT:  It is my practice to, yes, it is my
10      practice to let the jury know that, if they wish, they can
11      speak to the lawyers but they are not obligated to do so.
12              MR. KUNZ:  Okay.
13              (Recess pending verdict)
14              (A note is received at 11:54 a.m.)
15              THE COURT:  I've shown it to counsel, we have Court
16      Exhibit 11.  It says:  Please define qualified immunity and its
17      impact.
18              My intention would be to reiterate what I read to them
19      before.  But let me hear from counsel.  In terms of its impact,
20      well, what is plaintiff's counsel's position?
21              MR. NORINSBERG:  I think, your Honor, you should
22      reread the charge that you just gave to the jury, and I think
23      that the charge itself explains what the impact is.  It is in
24      the charge.  So I don't know that anything further needs to be
25      said.
```

DCH3GUZ2                    Verdict

1           MR. MEEHAN:  I was going to say perhaps if we gave
2      them a copy of it and let them go back there with it and read
3      it out loud with each other, maybe that would allow them to
4      determine.
5           MR. NORINSBERG:  That's a good idea.
6           THE COURT:  Defense counsel?
7           MR. KUNZ:  Well, yes.  I would be fine with you just
8      reading the charge again and sending it back.  There might be a
9      simpler solution which you can bring them in and say qualified
10     immunity is a question for me to decide, and I just need for
11     you to answer these questions.  And that might focus them on
12     what their task is.
13          THE COURT:  It seems to make sense to read the charge
14     again to them and give them a copy of the charge.  Our jury has
15     certainly indicated that they are visual learners, so perhaps
16     by giving them a copy of the charge, that will help them.  So
17     I'll give them a copy of this.  Let's go ahead and have this
18     marked as Court Exhibit 12.  And let's have counsel again
19     review it before I send it into the jury.  And I'll read it to
20     them again.
21          MR. MODAFFERI:  We have one other issue and this is
22     something I raised to counsel in the brief period of time that
23     we had before coming back into the courtroom.  Was that
24     plaintiff's counsel had proposed a breakdown under the
25     compensatory damages on the verdict sheet regarding excessive

1031

DCH3GUZ2                    Verdict

1  force.  One question was how much for past pain and suffering
2  and how much for future damages.
3          And in light of the large or excessive award that was
4  given for the compensatories on the excessive force claim, and
5  because we still have the jury here, maybe it wouldn't be a bad
6  idea to just ask them how they broke it down.  Because to the
7  extent there is going to be a collateral source hearing or
8  there is going to be briefing on the issue, we're sort of just
9  guessing now as to how the jury awarded past pain and suffering
10 as opposed to any future damages.  They can parse that out.  I
11 think that would make both the attorneys' job a little easier
12 and the Court's job a lot easier in figuring out what offset
13 should be made due to the collateral source rule.
14         THE COURT:  What is plaintiff's position on that?
15         MR. NORINSBERG:  Judge, we strongly oppose the
16 application now.  We had requested it, defendants vehemently
17 opposed it.  In the end the Court didn't charge it.  It wasn't
18 on the verdict sheet.  We weren't allowed it to argue it in
19 summation.  It is a little late on that regard.
20         With respect to the collateral source hearing, it is
21 really limited simply the only evidence of future medical costs
22 was $65,000.  And that would be the full extent of the hearing.
23 It is not for pain and suffering.  It is only for costs that
24 are going to be reasonably paid for by a third party.  It is
25 really not a complicated issue at all.  It is very finite in

DCH3GUZ2                    Verdict

1    scope.  And additional questions here are not going to help us
2    resolve that issue.
3              MR. KUNZ:  I don't think that's quite right, your
4    Honor.  If the jury did indeed award a large sum of this for
5    anticipated future medical costs, that would certainly be
6    subject to a collateral source hearing.  And I think the
7    collateral source hearing will be much more detailed than the
8    estimated cost of a knee replacement in 20 years.
9              So, I feel like Mr. Modafferi's point is a good one.
10   Just like after the issue came up, we gave them the instruction
11   on attorneys' fees.  Now that the issue has come up, we feel it
12   is important to ask them how they broke down their damages in
13   regard to the excessive force claim.
14             Then, just to be clear, Mr. Modafferi mentioned it but
15   we do believe that the award is excessive.  And we want to
16   reserve all rights to argue that at a later time if needed.
17             THE COURT:  Okay.  Plaintiff's counsel's perspective.
18   What, if any, prejudice would plaintiff suffer if we get this
19   breakdown in terms of how the jury went about making this
20   determination?
21             MR. NORINSBERG:  It is a great deal of prejudice,
22   because if we were foreclosed from arguing it to the jury when
23   we were doing summations, there were no legal instructions as
24   to past versus future, there was no interrogatory in the
25   verdict form.  So all of these things which we wanted and

DCH3GUZ2                    Verdict

1  thought would be helpful were foreclosed.  To do it now, to
2  force them to re-deliberate and retroactively go back to some
3  earlier point in their deliberation and artificially create
4  past and future when defense counsel told the jury that was
5  completely unnecessary and that it was all one number.
6          You can't have it both ways.  They took a position.
7  Now based on the outcome, they are not happy with the results
8  and they want to force another set of deliberations.  It is
9  inappropriate at this point in time.
10          THE COURT:  Let's do this.  I don't want to keep this
11  jury waiting anymore.  Let me reserve on that.  Let's go ahead
12  and have them come in and I'll read them the charge on
13  qualified immunity.  Give it to them.  And if I decide to ask
14  for more interrogatories I will.  At this point I am leaning
15  against it.  Primarily because the defendants were the ones who
16  strongly opposed this.  The plaintiffs did ask for this, and
17  the defendants strongly opposed this and now are asking for
18  this.  So I'm leaning against it.  But let me think about it a
19  little more.
20          Let's bring the jury in.
21          (Jury present.  Time noted: 12:01 p.m.)
22          THE COURT:  We have another note from the jury.  Court
23  Exhibit 11.  It says:  Please define qualified immunity and its
24  impact.  Signed by the foreman.
25          Qualified immunity.  Even if you find that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1034

DCH3GUZ2                    Verdict

1   plaintiff has proven his claim for false arrest or excessive
2   force, the defendant still may not be liable to plaintiff if
3   they are entitled to what is called qualified immunity.  The
4   question of qualified immunity is one for the Court to
5   determine.  However, the jury has an important role to play in
6   this determination.  On the special interrogatories form, you
7   will be asked several questions regarding particular
8   contentions by the parties.  Your answers to those questions
9   will be used by me in making the ultimate determination of
10  whether the defendant is entitled to qualified immunity.
11          I will hand a copy of this instruction to the jury and
12  you can have this with you in the jury room as you continue to
13  deliberate.
14          (Jury excused.  Time noted: 12:04 p.m.)
15          THE COURT:  Plaintiff's counsel, any objection to my
16  answering of the jury's question?
17          MR. NORINSBERG:  No, your Honor.
18          THE COURT:  Defense counsel?
19          MR. KUNZ:  No, your Honor.
20          THE COURT:  Okay.  You can be seated.  While I've got
21  everyone here, let me ask counsel this.  What we did yesterday
22  is we broke for lunch at about 12:45.  Given the fact that the
23  jury has returned its verdict, and they are simply dealing with
24  these special interrogatories, my intention would be to perhaps
25  work through lunch but I'm open to suggestions from the

DCH3GUZ2                        Verdict

1   parties.  Perhaps we can take a brief 30-minute break.  I don't
2   want the lawyers to starve.  But let me just hear from counsel
3   as to what their suggestion is.  It is about three minutes
4   after 12 now.  Plaintiff's position?
5              MR. NORINSBERG:  We're happy to work through lunch,
6   Judge.
7              THE COURT:  Defense counsel?
8              MR. KUNZ:  That's fine.
9              THE COURT:  You're free to roam about if you'd like.
10  Just make sure we can reach you within 10 minutes.  My sense is
11  the jury may come back within the hour, but who knows.  Thanks.
12             (Recess pending verdict)
13             THE COURT:  We have a note from the jury.  It is about
14  1:15.  Court Exhibit 13.  We have answers to all the questions.
15  Signed by the foreman.  I'll bring the jury in.
16             MR. KUNZ:  Your Honor, before we do that, we wanted to
17  ask if your Honor had reached a conclusion on the break down of
18  the compensatory damages for the excessive force claim.
19             THE COURT:  Yes.  I have, and I am not going to have
20  any further breakdown of that.
21             MR. KUNZ:  I appreciate that.  Just for the record we
22  want to put down that part of the reason that we really feel
23  like it is needed in this particular case is that the award
24  itself, $2,270,000, suggests there was some calculation going
25  on.  It is not the type of award that you would expect.  It is

DCH3GUZ3                    Verdict

1    an uneven number.  So we really do believe that it is
2    appropriate to ask for a breakdown in this particular case.
3              THE COURT:  Okay.  Plaintiff have any position on
4    that?
5              MR. NORINSBERG:  Judge, I have nothing to add to what
6    I said before.
7              THE COURT:  Okay.  Thank you.  Again, that request is
8    denied.  I'll bring the jury in and have them publish their
9    answers to the questions unless someone has a different
10   suggestion.  Plaintiff?
11             MR. NORINSBERG:  No, your Honor.
12             THE COURT:  Defendant?
13             MR. KUNZ:  No, your Honor.
14             THE COURT:  Let's bring them in.
15             (Jury present.  Time noted:  1:19 p.m.)
16             THE COURT:  We've received your note, Court Exhibit
17   13.  We have answers to all the questions.  Signed by the
18   foreman.
19             Let me ask the foreman the foreperson to stand.  And
20   has the jury answered all the questions on the special
21   interrogatories?
22             THE FOREPERSON:  Yes, we have.
23             THE COURT:  I'd ask you to hand it to my deputy for
24   just a moment.
25             Let me ask it again.  Has the jury unanimously
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DCH3GUZ3                    Verdict
1    answered all the questions on the special interrogatories?
2              THE FOREPERSON:  Yes, we have.
3              THE COURT:  Okay.  Now we are going to publish your
4    answers on the special interrogatories.  So if you could please
5    read the questions and read your answers.
6              THE FOREPERSON:  Did plaintiff run up to Officer Jay
7    from behind?  No.
8              Did plaintiff grab Officer Jay?  No.
9              Did plaintiff attempt to strike Officer Jay?  No.
10             Did plaintiff run away from Officer Jay?  No.
11             Did Officer Jay kick plaintiff?  Yes.
12             Did Officer Jay push plaintiff's head into the ground?
13   Yes.
14             Did Officer Jay pepper spray plaintiff while on top of
15   plaintiff?  Yes.
16             Did Officer Jay lift plaintiff by plaintiff's clothing
17   around his neck area?  Yes.
18             Did Officer Jay reasonably, even if mistakenly,
19   believe that plaintiff was fighting at the moment Jay exited
20   his police vehicle or immediately thereafter at the corner of
21   207th Street and Sherman Avenue?  Yes.
22             THE COURT:  Now we are going to go ahead and poll the
23   jury.
24             (Jury polled; each juror answers in the affirmative)
25             THE COURT:  Let me just see counsel at side bar
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1038

DCH3GUZ3                    Verdict

1  briefly.
2          (In the robing room)
3          THE COURT:  I intend to tell the jury thank you and
4  let them go.  I will also tell them if they wish to, they can
5  speak to the lawyers, but they are not required to.  Any other
6  motions or anything else from anybody?  Plaintiff?
7          MR. NORINSBERG:  No, your Honor.
8          MR. KUNZ:  No, your Honor.
9          (In open court)
10         THE COURT:  Members of the jury, thank you very much
11 for your jury service.  We all appreciate your service.  We
12 know it has been inconvenient.  I hope you found it to be a
13 rewarding experience.  You are free to leave.  You may speak to
14 any of the attorneys if you wish, but you are not required to.
15 Thank you very much and happy holidays.
16         A JUROR:  Thank you.
17         (Jury dismissed)
18         THE COURT:  Let me just ask the question.  Does anyone
19 plan on making any post-trial motions?
20         MR. KUNZ:  We anticipate post-trial motions, your
21 Honor.
22         THE COURT:  The parties had indicated a desire to
23 delay entry of judgment to see if the parties could work
24 something out.  Let me just hear from the parties if you have
25 any position as to whether or not you wish to try to work

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1039

DCH3GUZ3                    Verdict

1    something out prior to briefing the post-trial motions or
2    whether you think it is appropriate to brief the post-trial
3    motions in the first instance.
4              I know by statute there are certain timeframes set out
5    for the briefing of a post-trial motion.  But my understanding
6    is that I can give the parties more time for any brief that
7    they wish to file.
8              Do the parties want to confer on that or have any
9    position on that?
10             MR. NORINSBERG:  We can confer momentarily, your
11   Honor.
12             THE COURT:  Go ahead.
13             (Pause)
14             THE COURT:  What is your pleasure, counsel?
15             MR. KUNZ:  We just chatted and I think both sides have
16   at least one motion they are going to make.  But in light of
17   the upcoming break with the new year, we thought maybe if the
18   parties could have until January 17 to talk to each other about
19   resolving this without any post-trial motions.  Then we could
20   write in on that date, January 17, with a schedule for the
21   motions.  And then obviously both sides want to reserve their
22   rights and make sure none of their motions are untimely as a
23   result of this agreed upon extension.
24             THE COURT:  Okay.  Is that a joint application?
25             MR. NORINSBERG:  Yes, your Honor.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1040

DCH3GUZ3                    Verdict

1            THE COURT:  Granted.  So let's have the parties file a
2    joint status report on January 17.  I'll delay entry of
3    judgment at least until then.  And then we'll hear from the
4    parties.
5            Anything else from anybody today?
6            MR. NORINSBERG:  No, your Honor.
7            THE COURT:  Everyone is all clear on all the answers
8    to everything?  Everyone has copies of everything?
9            MR. NORINSBERG:  Yes, your Honor.
10           THE COURT:  I guess the parties should be responsible
11   for retrieving your own exhibits.  I believe the exhibits may
12   still be in the jury room.  We'll let the parties retrieve
13   their exhibits.  Thank you very much.
14           MR. MEEHAN:  It's been a pleasure, your Honor.
15                            o0o
16
17
18
19
20
21
22
23
24
25