UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

NOEL JACKSON GUZMAN,                          :
                                              :
                                 Plaintiff,   :        1:10-cv-6353 (ALC) (JCF)
                                              :
            -against-                         :        **OPINION & ORDER**
                                              :
P.O. BRIAN JAY, Shield No. 29733,             :
Individually and in his Official Capacity,    :
                                              :
                                 Defendant.[1]:
-----------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

## I.  INTRODUCTION

On August 25, 2010, Plaintiff Noel Jackson Guzman ("Plaintiff") brought this action,

pursuant to 42 U.S.C. § 1983, against New York City Police Department Police Officer Brian

Jay ("Officer Jay" or "Defendant") and others alleging, among other things, false arrest and

excessive force.  This Court held a jury trial beginning on December 3, 2013 and concluding on

December 13, 2013.  On December 17, 2013, the jury rendered a verdict for Plaintiff, awarding

him $4,000 in compensatory damages on his false arrest claim, $2,270,000 in compensatory

damages on his excessive force claim and $200,000 in punitive damages.   Defendant moves for

a new trial and/or remittitur pursuant to Rule 59 of the Federal Rules of Civil Procedure (the

"Federal Rules") and for judgment as a matter of law pursuant to Rule 50 of the Federal Rules.

(ECF No. 98.)  For the reasons stated below, Defendant's motion for a new trial and remittitur

are denied, while the motion for judgment as a matter of law on the false arrest claim is granted.

---

[1]     The Clerk of the Court is respectfully directed to amend the case caption as indicated, pursuant to
the parties January 3, 2013 Stipulation.  (ECF No. 45.)

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Case

On February 14, 2009, Plaintiff, 23 years old at the time, went out with a group of friends to a nightclub located on 207th Street and Sherman Avenue in Manhattan, New York. (Tr. 383:17 – 384:14.) Plaintiff testified that, after the club closed at approximately 4:00 a.m., he and a friend walked up to the corner of Sherman Avenue and 207th Street to hail a cab. (Tr. 381:1-9.) At some point, Plaintiff heard a commotion and turned around to see one of his friends who had accompanied him to the nightclub, Henry Luzuriaga, engaged in a fight with two males, Alberto Molina and Jorge Henriquez. (*See* Tr. 388:1-22). Plaintiff testified that, while he was observing the altercation among a large crowd, Officer Jay, in plain clothes and wearing a pair of Timberland boots, walked up to him and without provocation kicked him on his right knee. (Tr. 390:3-12.) Plaintiff testified that he experienced a "strong pain [which he had] never felt before," (Tr. 390: 14-16), and that his knee buckled and he fell to the ground. (*See* Tr. 390:24-25.) Plaintiff testified that Officer Jay then got on top of Plaintiff, maced him and grabbed his ponytail and shoved his head into the ground twice, causing him to sustain facial abrasions. (Tr. 394:16 – 397:9.) Plaintiff testified that Officer Jay then began to place him under arrest, at one point saying "NYPD motherfucker." (Tr. 397:13-22.)

Plaintiff was arrested and subsequently charged with obstruction of governmental administration. He was transported to the precinct, where he almost immediately complained of pain in his right leg. (Tr. 405:13-15.) The paramedics were called and eventually evaluated Plaintiff, who declined to be transported to the hospital. Plaintiff testified he advised the Emergency Medical Technician ("EMT") who evaluated him that he had been kicked that

2

evening, but did not specify Officer Jay because Officer Jay was standing next to him at the time. (Tr. 406:7-13.) Plaintiff also testified that, at the time he signed it, a prisoner medical report form documenting his treatment did not include a statement indicating that he sustained the injury prior to the arrest. (Tr. 408:2-13.)

Plaintiff was released a few hours later, at approximately 8:00 a.m. He testified that, upon release, he requested that Officer Jay give him a ride home, given that he was unable to walk and did not have money for a cab. (Tr. 409:7-13.) After Officer Jay declined, Plaintiff attempted to walk home, but was unable to and called an ambulance, which picked him up outside the precinct and transported to Harlem Hospital where Plaintiff was treated and released. (Tr. 410:1 – 413:1.) Still in pain on February 17, 2009, Plaintiff went to New York Presbyterian Hospital where he was given pain medication and x-rays were performed, which were negative. (Tr. 416:1-15.) With the pain not having subsided and now suffering from lost sensation in his right knee, Plaintiff went to Columbia Presbyterian Hospital on March 29, 2009. (Tr. 416:16 – 417:15.) Plaintiff was eventually diagnosed with and had surgery to repair torn anterior cruciate, posterior cruciate, and lateral collateral ligaments ("ACL," "PCL" and "LCL," respectively), permanent peroneal nerve damage and a foot drop. Plaintiff will be required to wear a corrective ankle brace for the rest of his life, and testified that he still suffers from residual pain in his knee, particularly during the colder months, has difficulty navigating up and down stairs and is unable to stand for more than two to three hours a day. (Tr. 422:12-16, 423:19 – 424:25.)

Dr. Gabriel Dassa, an orthopedic surgeon and Plaintiff's physician from May 2009 to November 2010, also testified regarding Plaintiff's injuries. Dr. Dassa testified that the records indicated that the Plaintiff was suffering from pain, swelling and decreased sensation in his right knee in May 2009. (Tr. 577:6-10.) Dr. Dassa testified that the swelling three months after the

3

incident in particular was indicative of soft tissue dysfunction in the knee. (Tr. 589:1-5.) Dr. Dassa eventually ordered the nerve test which diagnosed Plaintiff with a completely dysfunctional peroneal nerve. (Tr. 580:20 – 582:14.) Dr. Dassa also ordered an MRI of the knee which diagnosed Plaintiff with complete tears of the ACL and PCL. (Tr. 592:14-25.) During surgery to repair those ligaments, Plaintiff was diagnosed with a tear to his LCL. (Tr. 594:4-12.) Dr. Dassa diagnosed Plaintiff with a foot drop, attributable to the peroneal nerve dysfunction, on a follow-up visit. (Tr. 602:24 – 603:20, 604:4-19.)

Dr. Dassa evaluated Plaintiff again in November 2013 and diagnosed him with post-traumatic arthritis which causes continued joint dysfunction and swelling and which limits Plaintiff's activity. (Tr. 613:14 – 614:1, 617:5-20.) Dr. Dassa testified that it was his opinion that the torn ligaments, post-traumatic arthritis and peroneal palsy with foot drop were permanent and caused by the blunt force trauma that Plaintiff reported he suffered on February 14, 2009, rather than a preexisting injury. (Tr. 618:23 – 619:20, 621:1-4, 18-25.) Dr. Dassa also testified that Plaintiff's knee condition would progressively worsen over time such that Plaintiff would likely need a total knee replacement within the next 20 years, a procedure which he testified had the current cost of $65,000. (Tr. 621:25 – 624:14.)

### B.    Defendant's Case

Officer Jay testified that he, along with three other officers from the Anti-Crime Squad of the 34th Precinct of the NYPD, arrived on the scene while a fight was breaking out, and that he immediately proceeded to try and break up a two-on-one fight going on with Messrs. Henriquez and Molina assaulting Mr. Luzuriaga. He testified that when Mr. Henriquez tried to flee, he chased after him and brought him to the ground and handcuffed him with the help of his partner, Officer Johnny Diaz. (Tr. 95:25 - 96:7.) He testified that, while he was trying to handcuff Mr.

4

Henriquez, Plaintiff charged at him, grabbed him and tried to pull him off Mr. Henriquez, and then attempted to strike him. (Tr. 96:16 – 99:16.) Officer Jay also testified that he believed the Plaintiff had grabbed Officer Diaz, (Tr. 96:17-18), and that he then pepper sprayed the Plaintiff in an effort to subdue him. (Tr. 112:19 – 113:8.) Officer Jay testified that Plaintiff attempted to flee at this point, but that he was able to corral him and place him under arrest. (Tr. 115:8 – 117:20.) Despite the foregoing, Officer Jay testified that he never saw the Plaintiff fighting that night. (Tr. 91:1-3, 218:8-12.)

Officer Jay transported Plaintiff back to the precinct. (Tr. 130:2-4.) After Plaintiff began to complain about pain to his right leg, Officer Jay requested medical assistance. (Tr. 130:24-25.) Officer Jay testified that, consistent with the EMT's paperwork, the Plaintiff had advised both him and the EMT that he sustained the injury to his leg prior to the arrest. (Tr. 134:6-13, 137:4-15.)

Officer Jay's fellow officers testified and had accounts that were different in material respects from Officer Jay's. Officer Diaz, for example, testified that he had no recollection of Plaintiff grabbing him or Officer Jay. (Tr. 236:1 – 237:3.) Officer Diaz claimed that Plaintiff had instead repeatedly approached Officer Jay, ignoring Officer Jay's instructions to step back, until Officer Jay pepper sprayed him. (Tr. 237:17-23.) Meanwhile, Sergeant Michael McHugh testified that he and Officer Walters, the other officers on the scene, had apprehended the two men assaulting the one individual with neither Officer Jay nor Diaz being in the immediate vicinity. (Tr. 281:14 – 282:4, 285:6-9, 285:23-25.) Officer Walters similarly testified that he and Sgt. McHugh had arrested Messrs. Molina and Henriquez and that, after apprehending them, he turned them over to Officer Jay. (Tr. 314:8 – 315:15.)

Finally, Mr. Molina testified that he and Mr. Henriquez were attacked by and fought with

two individuals that evening, and that the individual Mr. Henriquez had fought could have been the Plaintiff. (Tr. 507:14 – 511:11.)

## III. DISCUSSION

### A. Motion for New Trial

Rule 59(a)(1)(A) of the Federal Rules provides that a district court can grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." The Second Circuit has held that a grant of a new trial is appropriate under this rule only where "the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Piroscafor v. Metro-North Commuter R. Co.*, 552 F. App'x 6, 9 (2d Cir. 2013) (summary order) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)). In making this determination, the court is permitted to "weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). However, a district court judge "must exercise their ability to weigh credibility with caution and great restraint," and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)).

In fact, where, as here, "the resolution of the issues depended on assessments of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Id.* (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)). As illustrated by this Court's recount of some of the relevant testimony in Section II, *supra*, this case was at bottom one that turned on the jury's credibility assessments. The Court sees no basis

6

to disturb those assessments. Indeed Defendant's motion, rather than arguing the verdict is erroneous or lacking support in the evidence, insists instead that a new trial along with monetary sanctions are warranted because of Plaintiff's counsel misconduct at trial.

A court considering a motion for a new trial based on the misconduct of counsel "must consider such a claim in the context of the trial as a whole." *Morse v. Fusto*, No. 07-CV-4793 (CBA) (RML), 2013 WL 4647603, at *15 (E.D.N.Y. Aug. 29, 2013) (quoting *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.*, No. 09–CV–5251 JFB AKT, 2013 WL 3820671, at *20 (E.D.N.Y. July 24, 2013)). It must examine, "among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Levitant v. N.Y.C. Human Res. Admin.*, 914 F. Supp. 2d 281, 311 (E.D.N.Y. 2012) (quoting *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 477 (S.D.N.Y. 2010)).

Here, in support of his motion for a new trial, Defendant raises arguments related to Plaintiff's counsel violation of *in limine* rulings which this Court already considered during trial. "It is well-settled," however, "that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits or otherwise taking a 'second bite at the apple.'" *Sequa Corp v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998); *see also Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029(JSR), 2007 WL 683985, at *4 (S.D.N.Y. Mar. 2, 2007) (denying motion for new trial that "rel[ied] on a potpourri of arguments and objections that were previously rejected at trial and that have gained no greater persuasiveness since"); *Morse v. Fusto*, 2013 WL 4647603, at *14 (same). Nonetheless, Defendant seeks this Court's reconsideration of rulings because he believes the "excessiveness of the jury's verdict" demonstrates the prejudice to him that this Court found lacking when many of the objections

were tendered at trial. For the reasons described below, this argument is unpersuasive.

*1. Officer Jay's Prior Bad Acts*

Defendant's primary objection pertains to Plaintiff's counsel's violation of this Court's order excluding any evidence or reference to Officer Jay's "disciplinary history" at trial, which this Court found had a risk of unfair prejudice to the Defendant that substantially outweighed its probative value. The Court denied Plaintiff's original motion on this issue, (ECF No. 58.), on November 13, 2013, as well as Plaintiff's motion for reconsideration of that decision, (ECF No. 84), which sought introduce one particular incident involving Officer Jay allegedly kicking someone, on December 3, 2013. In so ruling, the Court observed that "obviously if somehow *Officer Jay* were to open the door up . . . [it] would be fair game." (*See* Ex. C to January 27, 2014 Declaration of Morgan D. Kunz ("Kunz Decl."), at 28 (emphasis added).)

Nonetheless, during Plaintiff's direct examination of Officer Jay, on the first day of trial, Plaintiff's counsel began to query him about the subject:

> MR. NORINSBERG: And you would never kick a suspect, right?
> DEFENDANT: No, sir I would not.
> MR. NORINSBERG: And in fact, you have never done that in your career, correct, sir?
> MR. KUNZ: Objection, your Honor.
> THE COURT: Objection sustained.
> MR. NORINSBERG: No one else has ever made a complaint against you
> MR. KUNZ: Objection, your Honor.
> THE COURT: Sustained.
> MR. NORINSBERG: May we approach?
> THE COURT: No, keep going.
> MR. NORINSBERG: Was this the first time in your career that anyone had ever made a complaint that you kicked them?
> MR. KUNZ: Objection, your Honor.
> THE COURT: Sustained. Let's approach.

(Tr. 148:11-25.)

At sidebar, Plaintiff's counsel argued that *he* was "trying to open the door" through this

8

line of questioning, consistent with this Court's observation at the motion *in limine* conference. (Tr. 149:15.) This Court summarily rejected this dubious explanation, sustained Defendant's objection, struck the questions from the record and instructed the jury to disregard them. (Tr. 150:11-13.) Defendant later moved for a mistrial based on counsel's conduct arguing, as they do now, that the jury was left with the impression that Officer Jay had a prior history of kicking individuals and would draw an impermissible propensity inference in this case on that basis. Defendant argued this was especially true given that one juror had expressed during *voir dire* that he was surprised to learn after prior service on a jury that the defendant had an extensive criminal history. This Court heard argument on the issue during trial, but denied Defendant's motion for a failure to demonstrate prejudice, considering the questions were unanswered and stricken from the record and that a curative instruction was given. (Tr. 150:11-13.)

Defendant now argues that the prejudice this Court found lacking in its initial ruling is now evidenced in the jury's rendering what he contends is an excessive compensatory damages award. Not only does the premise of this argument fail as a matter of law for the reasons described in Section III-C, *infra*, but the argument itself is also unpersuasive. It simply defies logic that the jury, after drawing the impermissible propensity inference that Officer Jay had a propensity for kicking suspects, would conclude on that basis alone that the Plaintiff must have endured more pain and suffering as a result of Officer Jay's actions in this case. Furthermore, the fact that the jury evidently gave Officer Jay the benefit of the doubt in finding that he acted reasonably in falsely arresting Plaintiff, *see* Section III-B *infra*, belies the argument that the jury drew such an inference. *See, e.g., United States v. Henderson*, 303 F. App'x 30, 36 (2d Cir. 2008) (summary order) (holding that partial acquittal belied argument that jury drew impermissible propensity inference).

## 2.    CCRB Investigation

Defendant next argues that Plaintiff's counsel committed misconduct by creating the impression that Defendant had been disciplined for this incident by the NYPD and/or Civilian Complaint Review Board ("CCRB"). During motions *in limine*, the Court ruled that Plaintiff's counsel could not refer to the CCRB's investigation of this matter, although it could refer to a generic "investigation," while Defendant's counsel would be precluded from mentioning that Officer Jay had been exonerated by the CCRB. (Tr. 12:8 – 14:5, 172:16-17.) Defendant asserts that Plaintiff's counsel committed misconduct by referring to "investigators" or "investigation" nearly 100 times and by at one point referring to the "CCR," before correcting himself and referring to a generic "investigative body." (Def.'s Mot. at 11-12.)  Defendant argues that these repeated references to the investigation created the false impression that Officer Jay had been disciplined and not exonerated by the CCRB.

The Court rejects this argument. As the Court previously permitted references to investigations and investigators in lieu of the CCRB, this simply cannot be grounds for a mistrial predicated on trial counsel's violations of *in limine* rulings. The Court had also previously determined that Plaintiff's counsel use of the term "CCR" was a good-faith mistake that was corrected, (Tr. 327:12-14), and that most of prejudice stemming from the use of the term CCRB at trial was a result of the testimony of Defendant's own witness. (Tr. 274:13 – 275:7.)  In any event, the Court is not convinced that the jury necessarily drew any inferences about the results of the CCRB investigation, and finds Defendant's contention to the contrary to be speculative.[2]

---

[2]    For similar reasons, the Court rejects Defendant's contention that Plaintiff's counsel violated *in limine* rulings through a couple of references to the City of New York during his cross-examination of Dr.

10

3. *Untimely Disclosure of Plaintiff's Medical Records*

Defendant also requests that this Court revisit its prior ruling with respect to Plaintiff's

counsel's failure to timely turn over MRI films that he used to impeach Defendant's expert

witness, Dr. Rajesh Gidumal. As conceded by Plaintiff's counsel, Plaintiff had an obligation,

pursuant to Defendant's discovery request, to turn over the MRI films in Plaintiff's medical

records as soon as they were in counsel's possession. (Tr. 818:9 – 819:14.) Plaintiff's counsel

indicated that he had received them in November 2013 while preparing for trial, but failed to turn

them over until December 16, 2013, the Friday before trial. (Tr. 822:22-25.) After Defendant

raised the untimely disclosure issue, and the Court heard argument from both sides, the Court

decided to charge the jury with the following curative instruction:

> There has been testimony that Dr. Gidumal did not review the
> plaintiff's MRI films until after he issued his reports and after his
> deposition was conducted. On December 14, 2010, defendant
> requested that plaintiff produce all medical records, including but
> not limited to, records for treatment for any injury resulting from
> the incident and for five years prior to the incident in plaintiff's
> possession, custody or control. Plaintiff did not provide the MRI
> films to Dr. Gidumal until December 6, 2013.

(Tr. 918:1-9.)

Defendant now asserts that this curative instruction was insufficient because it came

during the charge and not during Dr. Gidumal's testimony, reasoning that the jury had already

considered and accepted Plaintiff's claim that Dr. Gidumal's testimony was unreliable before the

charge. This argument is untenable and unduly presumptuous of the jury's thought processes.

---

Jose Carbajal. The Court only excluded any reference to Defendant's counsel as attorneys for the City of
New York, and had previously acknowledged that it was natural that the City of New York would be
mentioned during the course of trial. (*See* Ex. B to Kunz Decl., at 22 ("Again I don't want to preclude
you totally from mentioning the City of New York if it's appropriate, but we want to stay away from
going overboard . . . .")).

Among other things, there is no basis for this Court to assume that the jurors were both irrational and obstinate, refusing to assess (or reassess) a witness's testimony even after receiving relevant evidence on the subject, and ignoring this Court's multiple instructions not to evaluate the case until deliberations had begun. *See, e.g.*, *United States v. Romano*, 487 F. App'x 607, 610 (2d Cir. 2012) ("We must assume a jury will follow a curative instruction 'unless there is an overwhelming probability that the jury will be unable to follow the court's instructions . . . .'" (quoting *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008))); *United States v. Sabhnani*, 599 F.3d 215, 241-42 (2d Cir. 2010) ("[j]urors are entitled and routinely encouraged, to rely on their own experience and common sense" (quoting *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008))).

### 4. *Plaintiff's Counsel Summation*

Defendant's final grievance, offered only in his reply brief, pertains to the following statements by Plaintiff's counsel in summation: "[H]old this man accountable . . . . If you let this man walk out of this courtroom, if you let that happen, it will be a travesty. He needs to be held accountable. This is the last time, the last day in court . . . ." (Tr. 904:25 – 905:5.) This Court overruled Defendant's objection to this portion of the summation, which came after the summation had concluded, explaining that: "Obviously I was here for plaintiff's counsel's summation. I do not find that the tone the plaintiff's counsel used was a tone of intimidation. It appears to me more of a tone of very intense supplication than intimidation." (Tr. 906:3-9.) Defendant now argues, however, that a new trial is warranted because counsel's remarks bear similarities to those he gave in *O'Hara v. McAvoy*:

> *[I]f you let these defendants get out of here.* Walk off [sic] that door without ever being held accountable, that would be a tragedy of justice. That would be absolutely terribly wrong and a mistake.

12

> And ask you not to do that. For three years, they have been bobbing and w[e]aving. Shifting blame. Denying responsibility. Pointing their fingers at other people. *At long last, it's judgment day, at long last. Hold them accountable for what they did.* If you don't, no one will. They'll get away with this [scot] free forever.

No-11-3990, 2013 WL 4507067, at *5 (E.D.N.Y. Aug. 22, 2013) (alterations in original (emphasis added). The court in *O'Hara* sustained a contemporaneous objection to these remarks, but denied defendant's motion for a new trial after a verdict for plaintiff. *Id.*

As the court in *O'Hara* itself noted, a court must consider remarks in a summation in their entirety, not in isolation. *Id.* The Second Circuit has also noted that where, as here, the "jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005). Accordingly, the Court reaffirms its prior ruling, as the fact that Plaintiff's counsel made similar, although certainly not identical, statements does not have any bearing on prejudice to the Defendant in *this* trial.[3] Further, even if the remarks were improper, the Court finds that it had no more than a *de minimis* effect on the trial, and that Defendant's arguments to the contrary are seriously undercut, if not waived, by counsel's failures to lodge a contemporaneous objection and to raise this issue before his reply brief. *See Marcic*, 397 F.3d at 127-28 (affirming denial of motion for new trial and noting "to the extent that [trial counsel's] statements were improper, they were not objected to, and occurred in the context of a summation spanning thirty-seven pages of trial transcript, at the end of a week-long trial in which voluminous evidence was introduced that sufficed to support the jury's verdict"); *Malmstein v.*

---

[3] Among other things, counsel's reference to "judgment day" in *O'Hara*, possesses a far greater capacity to inflame and prejudice a jury, given its religious undercurrent, than the "this is the last day in court" remark in this case.

*Berdon, LLP*, 595 F. Supp. 2d 299, 310 (S.D.N.Y. 2009) ("defendants' claim to have been prejudiced by the summation is considerably undermined by their failure to object to the statements in question at trial.").[4]

### B.    Motion for Judgment as a Matter of Law

At the close of evidence at trial, Defendant moved for judgment "pursuant to Rule 50 [of the Federal Rules] . . . for [judgment as a matter of law] in favor of defendant Jay on the grounds that no reasonable or rational juror could find in favor of plaintiff on his claims." (Tr. 829:22-25.) This Court denied this motion, (Tr. 830:12), and Defendant now moves for judgment as a matter of law on the defense of qualified immunity with respect to Plaintiff's false arrest claim.

Under Rule 50(a) of the Federal Rules, a party can move, prior to the submission of a case to the jury, for judgment as a matter of law on any issue on the grounds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." The moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), if that motion is denied, the moving party can subsequently renew the motion if the jury returns a verdict for their opponent. On such a motion, the Court draws all reasonable inferences in favor of the nonmoving party, although it cannot find facts that are inconsistent with the jury's findings. *Zellner v. Summerlin*, 494 F.3d 344, 370-74 (2d Cir. 2007).

Under the doctrine of qualified immunity, meanwhile, public officials are entitled to immunity from lawsuits for acts undertaken in their official capacity so long as "(1) their conduct does not violate clearly established constitutional rights, and (2) it was objectively reasonably for

---

[4]    In the same vein, the Court declines Defendant's invitation to reconsider its prior rulings based on Plaintiff's counsel conduct in other cases, as such conduct obviously could not have prejudiced Defendant at his trial.

them to believe their acts did not violate those rights." *Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000) (quoting *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)). Qualified immunity is an affirmative defense, but a court can resolve the issue as a matter of law on a Rule 50(b) motion based on the jury's answers to special factual interrogatories. *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).

In this case, Defendant's Rule 50(b) motion on the qualified immunity issue is premised on the jury's answer of "yes" to the following special interrogatory: "Did Officer Jay reasonably, even if mistakenly, believe that plaintiff was fighting at the moment Jay exited his police vehicle or immediately thereafter at the corner of 207th Street and Sherman Avenue?" Plaintiff argues that Defendant is not entitled to judgment as a matter of law on the procedural ground that he waived the claim by failing to raise the issue with sufficient particularity in his Rule 50 motion, and on the substantive ground that it is not merited given the jury rejected all of P.O. Jay's claims relating to the arrest and there was no evidence presented at trial that Plaintiff was fighting at or near the time of arrest.[5] The Court agrees with Defendant and enters judgment as a matter of law in his favor on the false arrest claim.

Specifically, Plaintiff's procedural argument that Defendant waived this issue by not specifically referring to it in his oral Rule 50(a) motion is unavailing. The parties had previously agreed during the pre-charge conference, before Defendant's Rule 50(a) motion, that the Court would not charge the jury on qualified immunity before its initial deliberations, but would instead wait to see if the jury had rendered a verdict against the Defendant. If it did, the Court would at that point explain the doctrine of qualified immunity to the jury and provide them with

---

[5] Specifically, the jury answered "no" to the following queries: "Did plaintiff run up to Officer Jay from behind?"; "Did plaintiff grab Officer Jay?"; "Did plaintiff attempt to strike Officer Jay?"; "Did plaintiff run away from Officer Jay?" (Tr. 1037:6-10.)

special interrogatories relevant to the issue. (Tr. 757:23 – 758:17.) This very procedure was endorsed by the Second Circuit in *Stephenson* and does not constitute forfeiture of Defendant's Rule 50(b) motion on the qualified immunity issue. *See Stephenson*, 332 F.3d at 73-74, 80-81; *see also Zhiwen Chen v. Cnty. of Suffolk.*, 927 F. Supp. 2d 58, 65-66 (E.D.N.Y. 2013).

On the merits, Plaintiff's argument that judgment as a matter of law is not available because the jury found for Plaintiff with respect to all other special interrogatories and because there is no evidence that the Defendant was fighting "at or near the time of the arrest" is unpersuasive. The probable cause necessary for a lawful arrest exists when an officer "has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person in the belief that *an offense has been or is being committed*." *Betts v. Sherman*, 751 F.3d 78, 82 (2d Cir. 2014) (emphasis added). Thus, whether there was evidence presented at trial that Plaintiff was fighting "at or near the time of the arrest" is irrelevant, because all that is required for qualified immunity was that Officer Jay have the reasonable belief that the Plaintiff had committed *or* was committing an offense. The jury clearly found the former, according to its special interrogatory, and this was supported at least by the testimony of Mr. Molina. This is sufficient to sustain the defense of qualified immunity even though the jury may have believed Plaintiff and disbelieved the Defendant on all other issues, as a jury can accept all or part of any witness's testimony. *See, e.g., Zellner*, 494 F.3d at 371 (noting that, in ruling on a Rule 50 motion, courts "must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony").

### C.     Motion for Remittitur

Defendant moves finally to "substantially reduce the amount of the [compensatory damages] verdict against Officer Jay as against the weight of the evidence." (Def.'s Mot. at 26.)

Under Rule 59(e) of the Federal Rules, a court can grant a motion to alter or amend a judgment "to correct a clear error of law or prevent manifest injustice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (quoting *Collision v. Int'l Chem. Workers Union, Local 217*, 34 F.3d 233, 236 (4th Cir. 1994)). With respect to a compensatory damages award, "[i]f a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995)). While calculating damages is traditionally the province of the jury, the Second Circuit has held that an award can be amended or set aside as "excessive" in three different circumstances: (1) where the court identifies an error that resulted in the improper inclusion of a quantifiable amount, (2) where, although a particular error cannot be identified, the award is "intrinsically excessive," i.e., in excess of the amount any reasonable jury could have awarded, and (3) where the courts finds the amount of award "shock[s] the judicial conscience and constitute[s] a denial of justice." *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1988).

In this case the Court instructed the jury that "compensatory damages" included "physical injuries, physical pain, emotional scarring and mental anguish which the plaintiff suffered and/or will continue to suffer." (Tr. 932:21 – 934:22.) But, because the verdict form did not include a request for a breakdown of the jury's compensatory damages award, it is not clear how much of the jury's award of $2.27 million in compensatory damages on the excessive force claim accounted for certain quantifiable measures of damages, as opposed to past and future pain and suffering. As a result, the Court is unable to consider whether the jury's award was

17

"quantifiably" or "intrinsically" excessive.[6] The parties apparently agree, however, that the only quantifiable evidence in the record for the jury on the issue of damages was Dr. Dassa's testimony that the present cost of any knee replacement surgery that the Plaintiff will likely need in the future was $65,000. (*See* Def.'s Mot. at 27-28, 30; Pl.'s Opp'n at 34 n. 11.)[7] The Court thus posits that $2.205 million of the jury's award of compensatory damages represents an award for Plaintiff's past and future pain and suffering, and will consider whether this award "shocks the judicial conscience and constitutes a denial of justice."

"Because there is no precise way in which to calculate damages for pain and suffering, the jury's award should not be disturbed unless 'the quantum of damages found by a jury is clearly outside the maximum limit of a reasonable range.'" *Ahlf v. CSX Transp., Inc.*, 386 F. Supp. 2d 83, 87 (N.D.N.Y. 2005) (citing *Paper Corp. v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 350 (S.D.N.Y. 1992)); *see also Clarke v. One Source, Inc.*, No 99 Civ. 2323 (RPP), 2002 WL 31458238, at *5 (S.D.N.Y. Nov. 21, 2002) ("Although a jury has a great amount of discretion when awarding pain and suffering damages, a 'court may not sustain an award that it deems so excessive at to suggest that it was motivated by 'passion or prejudice' rather than a

---

[6]     During the pre-charge conference, Defendant's counsel objected to Plaintiff's request for the inclusion of separate categories on the verdict form which would denote how much of the compensatory damages award was for past versus future pain and suffering on the grounds that it was unnecessary. (Tr. 797:2-15.) The Court ruled in Defendant's favor on this issue, but Defendant's counsel changed course and requested such a breakdown after the jury announced its verdict. (Tr. 1030:21 – 1031:13.) The Court denied this belated request in light of Defendant's prior position. (Tr. 1033:10-19, 1035:19-20.) To the extent Defendant now seeks to impugn the compensatory damages award based on the lack of such a breakdown, this is of course precluded by the doctrine of judicial estoppel. *See, e.g., Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 485-86 (2d Cir. 2014) ("Judicial estoppel generally prevents a party from prevailing in one phase on an argument and then relying on a contradictory argument to prevail in another phase." (quoting *Pegram v. Herdich*, 530 U.S. 211, 227 n.8 (2000))).

[7]     The Court notes that the parties presently dispute whether this $65,000 is subject to the collateral source rule, but the parties have agreed to defer any consideration of this question until the resolution of the pending motion.

reasoned assessment of the evidence presented at trial.'" (quoting *Bachir v. Transoceanic Cable Ship Co.*, No. 98 Civ. 4625(JFK), 2002 WL 413918, at *10 (S.D.N.Y. Mar. 15, 2002))). A verdict shocks the judicial conscience "only if it surpasses an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." *Ahlf*, 386 F. Supp. 2d at 87 (quoting *Mazyck v. Long Island R.R. Co.*, 896 F. Supp. 1330, 1336 (E.D.N.Y. 1995)). In making this determination, courts canvass the amounts awarded in "comparable cases" and determine whether the award falls within the "reasonable range." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012).

With respect to Plaintiff's pain and suffering, the Court finds that the jury determined that Plaintiff: sustained irreparable damage to his peroneal nerve and a permanent foot drop injury that requires him to walk with an ankle device; suffered a global knee injury with tears to his ACL, PCL and LCL which required extensive surgical reconstruction; now suffers from post-traumatic arthritis in his right knee and will likely need a total knee replacement in the next 20 years as result; is unable to stand for more than two or three hours, has difficulty navigating up and down stairs, and suffers from knee discomfort during the colder seasons; was maced, had his head driven into the ground, and was pulled by his clothing around his neck area by Officer Jay. (*See generally* Tr. 410-424, 577-604 (testimony of Plaintiff and Dr. Dassa on the extent of Plaintiff's injuries).).

As the court observed in *Marcoux v. Farm Service and Supplies, Inc.*, 290 F. Supp. 2d 457, 477 (S.D.N.Y. 2003), and as confirmed by this Court's independent review, jury pain and suffering awards in comparable cases with similar leg, knee and foot injuries fall in a wide range. *See e.g., Starr v. Cambridge Green Homeowners Ass'n*, 300 A.D.2d 779, 781-82 (3d Dep't 2002) (affirming award of $528,000 for past pain suffering for approximately four years and

$750,000 for future pain and suffering for 29-year-old who fell from roof and had multiple fractures to femur, wrist and heel bone that required surgery and that he wear an oversized shoe and would ultimately require a hip replacement); *Boshankov v. Bd. of Educ.*, 277 A.D.2d 996, 996 (4th Dep't 2000) (affirming award of $2 million future pain and suffering award, for 27.2 years, for plaintiff that sustained serious injuries to his ankles and left knee after falling more than 20 feet from manlift in auditorium seats of an elementary school, in light of plaintiff's "remaining life span, the nature of plaintiff's unremitting pain and the need for further surgery"); *Meng v. Dember*, No. 103506/95 (N.Y. Sup. Ct. Jan. 4, 2000) (31-year-old Plaintiff awarded $1 million and $2 million for past and future pain and suffering, respectively, after sustaining a fractured femur, deforming leg injury and a peroneal nerve damage that caused foot drop after being hit by car); *see also Dwyer v. Deutsche Lufthansa, AG*, 686 F. Supp. 2d 216, 220-21 (E.D.N.Y 2010) (collecting cases). Moreover, as a general rule, juries tend to award greater compensation for lower extremity injuries than for arm and wrist injuries. *Marcoux*, 290 F. Supp. 2d at 477.

In light of the above-cited cases, this Court is unable to conclude, as it must for a remittitur, that the jury's award of compensatory damages in this case exceeds the upper limit of reasonable damages so as to shock the judicial conscience. Among other things, the Court has identified several cases from over a decade ago involving similar injuries to the lower extremities—including some that, as here, would require multiple surgeries, the use of walking assisted devices and/or nerve damage—which had future pain and suffering awards that are *by themselves* comparable to the $2.2 million *total* (i.e. past and future) award in this case.[8] And,

---

[8]     It also deserves note that many of these cases sustained jury verdicts under New York state law's less deferential "deviates materially" standard, which permits reduction of an award "if it deviates

while they likely were not sizable, it deserves mention that this Court's comparison discounts

any pain and suffering damages awarded by the jury in connection with Defendant's macing the

Plaintiff, driving his head into the ground, and pulling him around the neck area.

Defendant, in arguing to the contrary, points to *Pena v. Delchamps, Inc.*, 960 So.2d 988,

995 (La. Ct. App. 2007), where the court increased an award from $200,000 to $250,000 for a

plaintiff with similar injuries, and *Jarrell v. Kaul*, DOCKET NO. A-3492-11T1, 2013 N.J.

Super. Unpub. LEXIS 469 (N.J. Super. Ct. App. Div. Mar. 1, 2013), where the court sustained an

award of $500,000 for a plaintiff with similar injuries. These awards only illustrate the wide

range of compensatory damage verdicts for injuries to lower extremities referenced earlier,

however, and are not germane to the issue of whether the award in this case is so high as to

shock the judicial conscience. In *Pena*, for example, the court increased the damages to

$250,000 because it found that to be "*the lowest amount* within the jury's discretion for the

particular injuries proven by plaintiff." 960 So.2d at 995 (emphasis added). This Court's task on

a motion for remittitur, conversely, is to ascertain the *highest* amount within the jury's discretion.

*See Earl*, 917 F. 2d at 1330 (noting that "a district court should remit the jury's award only to the

*maximum amount* that would be held by the district court as not excessive"); *see also Marcoux*,

290 F. Supp. 2d at 477 ("[e]valuation of the reasonableness of [an] award . . . does not properly

turn on adherence to one-defendant favorable 'precedent'"). Applying that standard here, this

Court is compelled to conclude that, even if the jury's award extends toward the high end of the

spectrum, it should not be disturbed because it "fairly reflects the nature and extent of the

injuries sustained, the permanence and extent of the pain caused by those injuries, the loss of

---

materially from what would be reasonable compensation." *Fowler v. N.Y. Transit Auth.*, No. 96 Civ.
6796, 2001 WL 83228, at *10 (S.D.N.Y. Jan. 31, 2001).

enjoyment of life, and the need for further surgery." *Marcoux*, 290 F. Supp. 2d at 478 (internal quotation marks and citation omitted).

IV.    **CONCLUSION**

For the reasons described above:

(1) Defendant's motion for a new trial is **DENIED**;

(2) Defendant's motion for judgment as a matter of law on Plaintiff's claim of false arrest is **GRANTED**; and

(3) Defendant's motion for remittitur is **DENIED**.

The Clerk of the Court is respectfully directed to close Docket Number 98. The Court further directs the parties to submit a joint status report **on or before October 27, 2014**, advising the Court whether either party intends to file any further motions or submissions, or if there is otherwise any reason for this Court to defer consideration of Plaintiff's motion for attorney's fees and costs.

**SO ORDERED.**

**Dated:** September 24, 2014

New York, New York

ANDREW L. CARTER, JR.
**United States District Judge**